UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NO SUMMONS ISSUED

CV 15-0023

-------------------------------------------------------

DR. JOSEPH WILSON, Ph.D.                    :    INDEX NO.
                                            :
                                            :
                    **PLAINTIFF**           :
                                            :
                                            :
          vs.                               :
                                            :
THE STATE OF NEW YORK                       :
THE CITY OF NEW YORK                        :
CITY UNIVERSITY OF NEW YORK (CUNY)          :
Frederick P. Schaffer, Esq., personally and as    :
General Counsel and Senior Vice Chancellor        :
for Legal Affairs, CUNY,                          :
Marcia Isaacson, Esq., personally and as          :
Senior Associate General                          :
Counsel & Chief Compliance Officer, CUNY,         :    **COMPLAINT**
John Kotowski, personally:                         :
And as Director of City Relations, CUNY;          :
Brooklyn College,("BC"),                          :
Karen L. Gould, President, Brooklyn College, personally and    :
as President Brooklyn College,                    :
Provost William A. Tramontano, personally         :
and as Brooklyn College Provost,                  :    **SCANLON, M.J.**
Pamela Pollack, Esq., personally and as Director, Legal    :
Services, Brooklyn College, Associate Provost for Academic    :
Affairs, Terrence Cheng, personally and as Associate Provost,    :
Michael T. Hewitt, Esq., personally and as Director of Human    :
Resources,  Dr. Paisley Currah, Ph.D,  Dr. Corey Robin, Ph.D.    :
Dr. Mark Ungar, Ph.D., Dr. Jeanne Theoharis, Ph.D., Dr. Gaston    :
Alonso, Ph.D.,                                    :
Dr. Caroline Arnold, Ph.D.,                       :
Barbara Haugstatter, Secretary, (now former) Dean    :
Kimberly Phillips,                                :
personally and as employees of Brooklyn College,    :
                                            :
                                            :
                                            :
                    **DEFENDANTS**          :    **JURY TRIAL**
                                            :    **DEMANDED**
-------------------------------------------------------X

AMON, CH.J.

1

Plaintiff, by his attorney, Colin A. Moore, Esq., 26 Court Street, Suite 701, Brooklyn, NY 112432, alleges as follows for his complaint against defendants:

THE STATE OF NEW YORK
THE CITY OF NEW YORK
FREDERICK P. SCHAFFER. ESQ.
MARCIA ISAACSON, ESQ.
JOHN KOTOWSKI
BROOKLYN COLLEGE, THE CITY UNIVERSITY OF NEW YORK
KAREN I. GOULD
PROVOST WILLIAM A. TRAMONTANO
PAMELA POLLACK, ESQ.
MICHAEL T. HEWITT, ESQ.
DR. PAISLEY CURRAH, Ph.D
DR. COREY ROBIN, PhD.
DR. MARK UNGAR, PhD.
DR. JEANNE THEOHARIS, PhD
DR. GASTON ALONSO, PhD
DR. CAROLINE ARNOLD, PhD
BARBARA HAUGSTATTER, SECRETARY
DEAN KIMBERLY PHILLIPS

## PRELIMINARY STATEMENT

This is a Civil Rights action against The City of New York (CITY), The City University of New York (CUNY), Brooklyn College (BC), and their named employees, and the employees agents and managers of these institutions, in which the plaintiff seeks compensatory and punitive damages, a temporary restraining order, a preliminary and prominent injunction, a declaratory judgment, for the violation of his civil and constitutional rights secured by the Civil Rights Acts of 1866 and 1871, 42 USC §1981, 1983 and 1985, the rights secured by the First, Fourth, Thirteenth and Fourteenth Amendments to the United States Constitution, and of the Rights secured under the Constitution and Laws of the State of New York.

Plaintiff seeks damages, both compensatory and punitive, and award of cost and attorney's fees, and such other relief as the Court deems just and proper, for the loss of income and benefits, loss of job opportunities, the loss of reputation and professional

2

integrity, the humiliation, embarrassment, mental and emotional pain and suffering, loss of love, affection and consortium of spouse, offspring and family members.

The tragic events that formed the back drop of this litigation occurred in 2005 when defendant, Dr. Paisley Currah approached Professor Mort Berkowitz, Chairman of the Political Science Department of Brooklyn College, and Professor Berkowitz informed him that his significant other was not selected to be part of the faculty. The response of Paisley Currah to this news could only be described as melodramatic. He fell to the floor outside of the political science department office, writing in pain and screaming no! no! It became clear after this event that Paisley Currah blamed the plaintiff for the rejection of his friend, and secured the assistance of four other professors – Corey Robin, Mark Ungar, Jeanne Theoharis, and Gaston Alonso to form part of the self-proclaimed "gang of five" who waged a frenetic scorched campaign to assassinate the character and destroy the accomplishments of Plaintiff Joseph Wilson.

## NATURE OF THE CLAIMS

1. The Defendants violated Plaintiff's rights secured by 42 USC §1981 and the Thirteenth Amendment to the United States Constitution. The Defendants, acting under color of state law, subjected the Plaintiff, an African American Professor to unlawful acts and omission, including and not limited to interference of Plaintiff's contract rights in relation to his position as Director of the Brooklyn College Center for Worker Education (BCWE) and in relation to his position as a Tenured Professor at Brooklyn College. The Defendants intentionally, knowingly and with malice engaged in acts of defamation, harassment and intentional infliction of emotional distress with the express purpose of causing Plaintiff to lose his contract rights, to damage his professional reputation and to create conditions for tortuous interference with his contract. Defendants' conspiracies, unlawful acts and omissions, denied Plaintiff equal rights under the law, including but not limited to, the Plaintiff's rights to the full and equal benefits of all laws and benefits for the security of persons and property as is enjoyed by White citizen, and instead,

subjected to punishment, pains and penalties, unlike those imposed upon White citizens. Defendants acted intentionally and purposefully without lawful justification and with a reckless disregard for the natural probable consequences of the acts, causing specific and serious mental and emotional harm, economic injury, pain and suffering in violation with plaintiff's constitutional rights guaranteed under 42 U.S.C. §1981 and the Thirteenth and Fourteenth Amendment to the United States Constitution and damage to Plaintiff Professor Joseph Wilson.

2. The Defendants violated Plaintiff's rights secured by 42 U.S.C. §1983, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

The Defendants under color of State Law subjected Plaintiff to the following acts and omissions without due process of law, thereby depriving Plaintiff of rights, privileges and immunities secured by the Constitution and Laws, including, but not limited, those rights privileges and immunities secured by the Fourth, Fifth, Sixth, Ninth and Fourteenth Amendment to the United States Constitution, including, without limitation, deprivation of the following constitutional rights, privileges and immunities.

a. The Plaintiff was denied his Constitutional Rights not to be deprived of his liberty or property without due process of law.

b. The Plaintiff was denied his Constitutional Rights to a fair and impartial hearing.

c. The Plaintiff rights to equal protection of the laws.

d. The Plaintiff was denied his constitutional, substantive and procedural due process rights, because he was terminated as the Director of the GCWE even before charges was filed and before a Step Two hearing was held.

e. The individual Defendants acted intentionally, maliciously and with racially discriminatory motives and with a reckless disregard for the natural and probable consequences of their acts.

Defendants conspiracies, unlawful acts and omissions, conducted without lawful justification caused specific and serious mental and emotional harm, economic injury, pain and suffering in violation of the Plaintiff's Constitutional Rights as guaranteed 42 U.S.C. §1983 and the Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution.

3.     Defendants violated Plaintiff's rights secured by 42 U.S.C. §1983 and 1985(3) and the Fourteenth Amendment to the United States Constitution. The Defendants Paisley Currah, Corey Robin, Mark Ungar, Jeanne Theoharris, Gaston Alanso, Kimberly Phillips and Michael Hewitt engaged in a course of conduct, and otherwise conspired among and between themselves to deprive Plaintiff of his Constitutional Rights, including but not limited to, Plaintiff's rights to be free from malicious prosecution, abuse of process, witness tampering, mail tampering and deprivation of intellectual property and Plaintiff's rights of access to procedural due process as guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.

Because said actions were done with the knowledge and purpose of depriving Plaintiff who is African American of the equal protection of the laws and/or equal privileges and immunities under the law, and with racial animus towards the Plaintiff, they also deprive Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. §1983 and 1985(3).

In furtherance with these conspiracies, the Defendants and others named above committed the overt acts set forth in the facts of above, including, but not limited to malicious prosecution of Plaintiff; the publication of defamatory material against Plaintiff; the manufacture of knowingly false exculpatory evidence of Plaintiff; the suppression of exonerating exculpatory evidence in favor of Plaintiff; the intimidation of witnesses who were willing to testify in Plaintiff's favor; the publication of defamatory material in The

New York Times, the Kingsman, in Corey Robin's , in Henwood's Blog, Burich Newspaper.

In furtherance of these conspiracies, CUNY conducted a raid in the offices of the GCWE at 25 Broadway, there was a raid conducted by armed CUNY security on or about November 2011, in which they seized Plaintiff's computer and various files. On January 8, 2012, Plaintiff's was locked out of his office and all his possessions were seized. CUNY officials tried to get New York State Attorney General to indict Plaintiff on various criminal charges. Realizing, however, that the allegations lacked credibility, the Attorney General failed to prosecute Plaintiff. Finally, in January 2012, Plaintiff was fired as Director of the GCWE without a charges being filed and without a hearing.

The said conspiracies were continued in nature and caused Plaintiff constitutional violations and injuries, pain and suffering, humiliation and embarrassment, mental anguish, defamation of character and reputation, loss of freedom and companionship.

4.     **DEFAMATION**

Defendants Currah, Robin, Ungar, Theoharis and Alonso, the self-proclaimed gang of five, together with members of the faculty and administrative staff of Brooklyn College, including President Gould made defamatory statements intended to impeach the credibility, integrity and honesty of Plaintiff Wilson. Some of these defamatory comments were disseminated in various publications, including Robin's 2014 Facebook Blog, Henwood's Facebook Blog, The New York Times Publication of January 12, 2014, The Kingsman Publication of September 2014, The Barauch Publication of                  . These defamatory statements have been published and repeated on an ongoing basis up to the present time. The following constitutes a chronology of the defamatory statements by the defendants from 2011 to the present time:

- Between September and October 2011, Currah sent an email to Plaintiff and to the BC administrators stating that tuition money

(FTE's) was missing from the Graduate Center of Worker's Education and clearly implied that Plaintiff was responsible for this misappropriation of funds.

- Defendant Currah also stated that Plaintiff was improperly changing the grades of his students. These false allegations were communicated to Defendant Kimberly Phillips, former Dean at Brooklyn College who reported directly to President Gould. Other members of the Brooklyn College administration, including Vice President Stephen Joyner repeated these defamatory allegations.

- Defendants Pollock, Gould, Phillips, Schaeffer, Robin and Currah alleged that Plaintiff was entering into leases with outside groups, such as the Manhattan Institute of Management (MIM) without the consent or authorization of Brooklyn College.

- The Defendants also accused Plaintiff of colluding with students to engage in the plagiarism of intellectual property. Defendants Currah, Robin, Phillips and Gould repeated defamatory allegations that Plaintiff was a thief, was stealing tuition money, improperly changing student grades and engaging in the plagiarism of intellectual property.

- Defendant Kimberly Phillips told the head of ESRA that "Wilson was a thief." Defendant Kimberly Phillips reported these defamatory statements to Brooklyn College professors and Brooklyn College employees. Defendant Phillips, with the consent of President Gould, repeated these defamatory allegations to Brooklyn College and CUNY attorneys, officials and managers.

- Defendants Robin and Currah, with the consent of Phillips and Gould made defamatory statements that Plaintiff was teaching paralegal courses and the JD/MA degree program with Brooklyn Law School without the consent of or authorization of Brooklyn College. At the time they were making these allegations, they knew that Brooklyn College had the records documenting that the JD/MA program with

Brooklyn Law School was authorized by Brooklyn College and was contained in the Brooklyn College bulletin.

- During the period of five years and continuing to the present, these defamatory statements were repeated and republished in Currah's Facebook Blog, The New York Times of January 2014, Henwood's November 2014 Facebook posting.

- Plaintiff, together with several BC professors, including Professor Mannie Ness held meetings with Michael Hewitt, the Brooklyn College Director of Human Resources, complaining of the defamatory statements by the Gang of Five, and pleaded with Hewitt to put a stop to these defamatory statements.  Hewitt refused to put an end to these defamatory statements.

- In the Fall of 2011, Plaintiff and several BC professors sought a meeting with Defendant Kimberly Phillips to put an end to these defamatory statements. Defendant Phillips not only refused to take any action against the Gang of Five, actively participated in repeating these defamatory statements.

- The plagiarism allegations that Plaintiff participated with his students in plagiarizing intellectual property was made to Defendant Phillips who reported to President Gould. Neither Dean Phillips nor President Gould sought to discourage the Gang of Five from repeating this false and libelous allegations.

- On March 12, 2014, Associate Provost for Academic Affairs, Terrence Cheng, told BC faculty members and Professor Joycelyn Wills and Plaintiff Wilson that "Wilson was engaging in criminal activity." Defendant Cheng repeated these defamatory statements to the Labor Arts Society, a 501C3 not-for-profit organization.

- In the Fall of 2011, Defendant Currah sent out an email accusing Plaintiff of stealing tuition money.

- A 2014 Facebook blog by Mr. Henwood, husband of Professor Featherstone, a Brooklyn College Professor, stated that the Graduate

8

Center for Worker's Education (GCWE) "was run by a bunch of thieves."

- On March 25, 2013, a meeting was held in the offices of Assemblyman Joseph R. Lentol. Present at the meeting were Steve Liberstein, Professor Mannie Ness, Eric Radesky, chief of staff to Assemblyman Lentol, and a former GCWE student. President Karen Gould participated in the meeting by speaker phone, and stated to the participants that "the center is being closed because Wilson was corrupt and was stealing."

- In March 2014, John Kotowski, director of city relations at CUNY, told City Councilwoman Inez Baron, Chairwoman of the Higher Education committee of the City Council to disinvite Plaintiff from her instillation ceremony. When she asked why, he stated that "you are aware of Professor Wilson and what is going on at the Graduate Center for Worker Education."

- On August 20, 2013, Economics Professor Cherry told Professor Mannie Ness that due to Ness' support of Wilson, Ness was "an extremist and an enemy."

- On September 17, 2013, Alex Ellefson, a reporter for the BC campus newspaper, Kingsman, wrote an article, entitled "New York State Attorney General's Office Investigate Brooklyn College." The Kingsman is distributed online throughout the Brooklyn campus and the Brooklyn community. The Kingsman quoted from Robin's blog, which stated that "the Attorney General's investigation discovered evidence of financial wrong doings at the center."

- The article concluded by stating that "we don't want our students and our degree programs to be associated with that center because it was getting a bad reputation."

The defamatory statements made by the Defendants were intentionally made to assassinate the character of Joseph Wilson.  Defendant Robin had told Professor Mannie

Ness and other faculty members, "I declare war on Joe." In November 2011, Defendant Robin had stated that "Joe is going down" and told Professor Mannie Ness, "Joe should no longer be a Professor because he is no longer interested in teaching. I am going to launch an investigation into Wilson," and he had warned Professor Mannie Ness "to stay away from Joe-- Joe is going down and you will go down with him."

The defamatory statements were false, and the defendants knew them to be false. The Defendants failed to produce any evidence that Plaintiff was plagiarizing intellectual property or that he had colluded with any students to plagiarize. The Defendants had failed to produce any evidence that Plaintiff was stealing tuition money. In fact, Professor Hewitt, as Director of Human Resources and Vice President of Finance had full and complete access to all the fiscal and accounting records of Brooklyn College, and knew that the salary that Plaintiff received was well within the salary guidelines for the Director of the Graduate Center for Worker Education. Yet, when the Gang of Five made the false allegations that Plaintiff was misappropriating tuition money, Defendant Hewitt as the Vice President of Finance, remained silent.

Similarly, Defendant Pollack, as Director of Legal Services at Brooklyn College told Marcia Issacson, CUNY Chief Investigator, that she did not know about the GCWE lease with the Manhattan Institute of Management (MIM), and that neither she or VP of Finance, Little, authorized Plaintiff to enter into the lease.

However, on April 29, 2014, at Plaintiff's Step 2 Disciplinary hearing, when questioned by the union attorney, Zwiebach, Defendant Pam Pollack admitted under oath that she and VP of Finance, Steve Little, did know about the MIM lease, and had in fact authorized Plaintiff to enter into the lease. Similarly with regard to the Paralegal and JD joint program with Brooklyn Law School, the Defendants, in fact, admitted that they knew and had authorized those programs.

The defamatory statements were intended to cause harm to Plaintiff, and did in fact caused significant harm to the Plaintiff. As a result of the defamatory allegations, a raid was conducted by armed CUNY guards on the GCWE premises at 25 Broadway. As a result of this raid, Plaintiff suffered a loss of his computer with all of its electronic files,

his books, memoranda, memorabilia, research notes for future publications. These items were never returned to him. As a result of the defamatory statements, Brooklyn College and CUNY sought to persuade the New York State Attorney General to file criminal charges against Plaintiff. The Attorney General found that the allegations lacked legal merit and dropped the criminal charges. Dismayed by its failure to obtain criminal charges, the Brooklyn College administration filed disciplinary charges against Plaintiff. In January 2012, Plaintiff was fired as Director of GCWE, and Robin, who had vowed to eliminate the Urban Policy program and the GCWE was appointed Director of the GCWE. Currah was appointed Chairman of the Political Science department. Plaintiff is still facing disciplinary charges, and if found guilty, could be terminated as a tenured professor.

5. **EMPLOYMENT DISCRIMINATION**

Employment discrimination is a violation of 42 U.S.C §1981 and the Thirteenth Amendment of the US Constitution; Title VII of the Civil Rights Act of 1964 as amended in 1991; Executive Order 11246; The Age Discrimination Employment Act; The New York State Constitution; The New York State Human Rights Law; Executive Law, Article 15; New York City Human Rights Law; Administrative Code of the City of New York, Title VIII; The Anti-Discrimination Provision of the Collective Bargaining Agreement of the Professional Staff Congress/CUNY; CUNY Policies and Procedures on Non-Discrimination and  Sexual Harassment ; The Brooklyn College Non-Discrimination Policy and The Brooklyn College Non-Discrimination Policy.

Employment discrimination manifested in many forms:

i.  Harassment

ii. Hostile Work Environment

iii. Retaliation

iv. Disparate Treatment

v.  Disparate Impact

vi. Under Representation of Minorities

i.        **Harassment**

In the instant case, Plaintiff was subjected to a continuous campaign of harassment and vilification by the Gang of Five that was endorsed and ratified by senior administrative personnel at Brooklyn College, including Karen Gould, President of Brooklyn College, The Director of Legal Service Provost Pamela Pollack, Associate Provost for Academic Affairs, Terrence Cheng, Associate Provost Michael Hewitt, Dean Kimberly Phillips, Director of Human Resources and Vice President of Finance Michael Hewitt, and Director of Legal Services Pamela Pollack, and that was aided and abetted by Marcia Issacson, Senior Associate General Counsel and Chief Compliance Officer at CUNY and by John Katowski, Director of City Relations at CUNY.

The harassment consisted of allegations that Plaintiff was involved in plagiarism, misappropriation of student funds, entering into unauthorized leases and teaching unauthorized courses. None of these allegations were true, and they were proven to be false at the Step 2 Hearings, in which it was established that Pollack had authorized the lease with the Manhattan Institute of Management. It was also established that Michael Hewitt, Director of Human Resources and Vice President of Finance had accounting records which established that Plaintiff's salary as Director of GCWE was well within the statutory guidelines. Nevertheless, these false and defamatory statements were disseminated so often, that powerful media, such as Professor Robins Facebook blog, The Kingsman, the campus newspaper, The New York Times, Henwood's Facebook blog that they created the veneer of authenticity.

ii.    **Hostile Work Environment**

This harassment created a hostile work environment in which a raid was conducted at Plaintiff's office at 25 Broadway, and were it not for the fortunate happenstance that Plaintiff was absent, he would most likely have been arrested by the armed CUNY security forces and would have been

publicly paraded, in handcuffs, in front of students and staff. The administration was still relying on the State Attorney General to bring criminal charges against Plaintiff. As soon as the Attorney General decided to dismiss the charges, the administration frantically sought to file disciplinary charges. However, the impatient President of Brooklyn College did not even bother to wait for the Step 2 Hearing. She fired Plaintiff in January 2012, and when Plaintiff went to the City Council to testify about the lack of diversity on the Brooklyn Campus, he was promptly barred from returning to the Brooklyn Campus. He is presently on administrative leave, pending the outcome of the disciplinary charges.

### iii.    Retaliation

In November, 2013, Plaintiff testified before the joint Higher Education and Civil Rights Committee at City Hall. The title of his presentation was Institutional and Structural Racism at CUNY. He said that "the cancer of racism permeates the City University of New York, "it is hidden, obfuscated rationalized, minimized, and never confronted directly either in faculty hiring or segregated student services like the McCauloy Honors progam." He spoke specifically of the decline of African American faculty, the decline in African American male students. He stated that African American and Latino faculty are dramatically under-represented at the level of distinguished faculty, and are the last to hire and first fired at all faculty levels. Shockingly, CUNY does not contribute financially to the Black Male Initiative (DMI), yet ask the council for millions to fund the DMI program.

In 2012, out of approximately twelve hundred first year students, about 2% in a Borough with predominantly African American and Caribbean population, CUNY is guilty of excuses, cover-ups, neglect and overt hostility towards under-represented faculty. There is no affirmative action in CUNY. CUNY needs to be investigated, with Affirmative Action audits, new goals and timetables must be established…rigorous oversight must be instituted. When

this committee reconvenes in 5 years, I can confidently predict, based on the last twenty-five years of history, we will be discussing the same problems, and the same lack of diversity and affirmative action at CUNY.

Immediately after his presentation at the City Council, the Plaintiff was barred from entering the Brooklyn campus in blatant violation of his First Amendment Rights of free speech and free expression.

### iv.    Disparate Treatment

There is a significant difference in the treatment meted out Plaintiff and in the treatment meted out to the Gang of Five. Plaintiff, who was the victim of the most vicious campaign of defamation, vilification and abuse ever meted out to a Tenured Professor in a public institution, had his office raided, his computer and properties seized, was the subject of criminal proceedings, was fired from his position as Director of the GCWE is still facing disciplinary charges, was barred the Brooklyn campus, and was placed on academic leave. The Gang of Five who perpetrated this campaign of defamation, vilification and abuse, who instigated false charges against Plaintiff, who intimidated and coerced witnesses, conspired to conceal a vicious sexual attack on Professor Mannie Ness, a Senior Professor in the Political Science department, who tampered with the US mail and converted property belonging to Plaintiff were rewarded for their outstanding work. Professor Robin who vowed to eliminate the Urban Policy Program and shut down GCWE was appointed as Director of the GCWE, Professor Currah was appointed Chairman of the Political Science Department. Both appointments were made by President Gould. A clearer disparate treatment could not be found anywhere.

### v.    Disparate Impact

Disparate impact discrimination results when a neutral employment policy or practice has a disproportionate impact on a protected group. Some members of the Gang of Five were seeking to replace the older faculty members with

14

younger faculty. While this employment policy was facially neutral, it has a disproportionate impact on the African-American faculty, since many minority faculty had faced years of discrimination and did not receive appointment until they were advanced in age.

### vi.    Under-Representation of Minorities

The under-representation of minorities in the workplace creates a presumption of discrimination in the workplace. The demographics of New York City indicate that Whites constitute 44.7% of the population, African-Americans 26.6%, Asians 9.8% and Hispanics 27.0%. Thus, New York City is a majority/minority City, where Blacks, Hispanics and Asians constitute a majority of the population. However, there is a disparity between the Black population in the workforce and the Black representation at Brooklyn College.

There are 106 African Americans on the full-time instructional staff at Brooklyn College representing only 12.6% of the workforce, and there are 98 part-time instructional staff representing 11.5% of the workforce. There are no Blacks on the instructional staff, there is only one Black Deans, one Black Associate Dean and one Administrator, two Assistant Administrators making a total of five African Americans in the Administrative staff or 16.1% of the Administrative Staff at Brooklyn College. There are no distinguished professors, 11 tenured Professors, 7 Associate Professors, 14 Assistant Professors, 3 Lecturers, making a total of 35 full time faculty or 6.7% of the total. Most of the professors are clustered in three departments – Africana Studies, Education and Seek. Many departments have no African American Professors. Professor Wilson was the only African American tenured Professor in the Political Science department at Brooklyn College.

### 6.    TORTUOUS AND CRIMINAL ACTS PERPETRATED BY THE DEFENDANTS

The Gang of Five, Paisley Curray, Corey Robin, Mark Ungar, Jeanne Theoharris, Gaston Alonso perpetrated a series of activities between 2011 and the present time that can only be described as tortuous or criminal. These include:

a. Malicious Prosecution—the fabricating of false charges of plagiarism, changing of grades, misappropriation of funds and entering into unauthorized leases and teaching unauthorized courses, which resulted in a warrantless search of Plaintiff's office and a criminal investigation by the Attorney General's office, the filing of disciplinary charges against plaintiff, which resulted in the firing of GCWE, and the filing of fabricated disciplinary charges which has resulted in his forced academic relief at Brooklyn College.

b. Tortuous interference of Plaintiff contract as a Tenured Professor at Brooklyn College.

c. The abuse of process, the warrantless search of Plaintiff's office and the seizure of his computer and business documents.

d. The unjustified seizure of Plaintiff's business records and conversion of Plaintiff's personal property by Brooklyn College.

e. Tampering with Plaintiff's mail in violation of his Fourth Amendment Rights and 18 U.S.C §1708 and 1703.

f. Witness tampering—trying to discourage potential witnesses from testifying in Plaintiff's favor.

g. Fabrication of inculpatory evidence—false claims of plagiarism, changing of grades and misappropriation of tuition money.

h. Suppression of exculpatory evidence

i. Perjurous testimony by Kimberly Phillips to Marcia Issacson about the MIM's lease

j. Obstruction of justice—attempt by the Gang of Five to suppress the sexual assault by Gaston Alonso on Professor Mannie Ness and attempt to discourage him from reporting the incident, either to the campus police of the New York Police Department.

## THE PARTIES

7.     Plaintiff, Professor Joseph Wilson, is a tenured full professor of Political Science at Brooklyn College.  Plaintiff is a sixty-three (63) years of age male of African-American race. Plaintiff has been a Brooklyn College employee since 1986, at which time he was hired as an Assistant Professor of Political Science.  In 1988 Professor Wilson was appointed Graduate Deputy by the Political Science Department at Brooklyn College.  In 1992, Professor Wilson advanced to tenured Associate Professor of Political Science at Brooklyn College. In 1993 Professor Wilson became the founding Director of the Brooklyn College Center for Diversity and Multicultural Studies.  In approximately1995 Professor Wilson was promoted to tenured full professor.  In 1994 Plaintiff was appointed Director of the Graduate Center for Worker Education. In 1973Plaintiff was awarded his BA degree in Political Science from Columbia University.

In 1975 Plaintiff was awarded his MPhil. Degree, Columbia University.  In 1977 Plaintiff was awarded an MA degree in Political Science, Columbia University. In 1980, Plaintiff was awarded his Ph.D., Political Science, Columbia University. In 1997 Plaintiff was awarded an MDP Certificate (Management Development Program), Harvard University.

In 2011 the New York City Council issued a Proclamation to Professor Wilson in recognition of his life-long work promoting diversity at Brooklyn College.  Plaintiff has received numerous additional awards and has additional accomplishments including the publication of books on labor and economics.

8.     Defendant, State of New York, was at all times relevant herein, an entity created and authorized under the laws of the State of New York.

9.      Defendant, City of New York, was at all times relevant herein, a municipal entity, created and authorized under the laws State of New York.

10.     Defendant, The City University of New York, was at all times relevant herein, a public university organized pursuant to the laws of New York State.

11.     Defendant Frederick P. Schaffer, Esq., was at all times relevant herein, the General Counsel and Senior Vice-Chancellor for Legal Affairs.  This Defendant heads the CUNY Law Department. The CUNY investigation of Plaintiff was conducted by Schaffer's office, with the Office of Investigations under his direction.

12.     Defendant Michael T. Hewitt, Esq., was at all times relevant herein, Director of Brooklyn College Office of Human Resources.  Defendant Hewitt was formerly the Assistant Vice President for Finance and reported to the former VP of Finance Steve Little.

13.     Defendant Marcia Isaacson, Esq., was at all times relevant herein, Senior Associate General Counsel and Chief Compliance Officer, CUNY. This Defendant is a former prosecutor.  She headed the internal investigation by CUNY of Plaintiff.

14.     Defendant John Kotowski, was at all times relevant herein, Director of City Relations, CUNY.

15.     Defendant Karen L. Gould, was at all times relevant herein, the President of Brooklyn College.  She was appointed in 2009 by the CUNY Board of Trustees.  She is the highest-ranking officer at Brooklyn College.

16.     Defendant William A. Tramontano, was at all times relevant herein, the Provost at Brooklyn College and the Senior Vice-President for Academic Affairs.  He was named to those positions in 2008.

17.     Defendant Pamela Pollack, Esq., was at all times relevant herein,  the Director of Legal Services at Brooklyn College.

18.     Defendant Terrence Cheng, was at all times relevant herein, the Associate Provost of Academic Affairs at Brooklyn College.

19.     Defendant Dean Kimberly Phillips, was at all times relevant herein, the Dean at Brooklyn College.  She was employed by Brooklyn College from approximately 2011-2013 and she reported directly to President Gould.  She is now Provost and Dean at Mills College in Oakland, California.

20.     Defendant Barbara Haugstatter, was at all times relevant herein, employed by Brooklyn College as a secretary in the Political Science Department.  She works for Defendant Robin who is now the chairperson of the BC Political Science Department.

21.     Defendant Professor Paisley Currah, was at all times relevant herein, a tenured full Professor of Political Science at Brooklyn College.  Defendant was chair of the Brooklyn College Political Science Department from approximately May 2011 to May 2014.

22.     Defendant Corey Robin, was at all times relevant herein, a tenured full Professor of Political Science at Brooklyn College.  He was formerly Interim Director of the Graduate Center for Worker Education, from approximately February 2012 to approximately February 2014.  He is currently the chairperson of the Brooklyn College Political Science Department.

23.  Defendant Mark Ungar, was at all times relevant herein, a tenured full Professor of Political Science at Brooklyn College.  Defendant was on the Appointments Committee of the Brooklyn College Political Science Department.

24.  Defendant Jeanne Theoharis, was at all times relevant herein, a tenured full Professor of Political Science at Brooklyn College.  Defendant was on the Appointments Committee of the Brooklyn College Department of Political Science.  In approximately 2008 Defendant Theoharis told Prof. Ness that she was mad at Plaintiff for opposing her appointment as a professor in the Political Science Department.  Plaintiff's vote was required to be confidential based on Brooklyn College procedures.  Defendant Theoharis and the other members of the Gang of Five socially interacted including at their homes.  Prof. Ness saw the Gang of Five members at the houses of their members.  Defendant Theoharis stated animus towards Plaintiff and on information and belief did not inform the officials and managers of Defendant Brooklyn College of the ongoing defamation against Plaintiff by the Gang of Five and its members individually and collectively.  Due to animus of Defendant Theoharis, the close association of the Gang of Five Defendants and the explicit defamation of Plaintiff by the Gang of Five Defendants, on information and belief Defendant Theoharis participated in the defamation

25.  Defendant Gaston Alonso, was at all times relevant herein, a tenured Associate Professor at Brooklyn College.

26.  Defendant Caroline Arnold, was at all times relevant herein, a tenured Associate Professor at Brooklyn College.

27.    Defendants Corey Robin, Paisley Currah, Mark Ungar, Jeanne Theoharis
       and Gaston Alonso, are all members of the self proclaimed "Gang of Five"
       at Brooklyn College.

## JURISDICTION AND VENUE

28.    This action is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1988 and
       the Fourth, Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amendments to
       the United States Constitution and pursuant to Article 1, §§ 1, 6, 11 and 12
       of the Constitution of the State of New York.

29.    Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the
       previously mentioned statutory and constitutional provisions.

30.    Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant
       to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law that
       are so related to claims in this action within the original jurisdiction of this
       Court that they form part of the same case or controversy.

## VENUE

31.    Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391(b)
       and (c) in that Defendants maintain offices within this judicial district, and a
       substantial part of the events giving rise to this action have taken place
       within this judicial district.

## FACTUAL BACKGROUND

32.    There are five Defendants who are self-identified in the Political Science
       Department as the "Gang of Five". These Defendants are Professor Paisley
       Currah, Professor Corey Robin, Professor Jeanne Theoharis, Professor Mark
       Ungar, and Professor Gaston Alonso. Over a period of years and
       continuing, the Defendants who are members of the Gang of Five, who are
       the named Defendants who are professors, Dean Kimberly Phillips,
       President Karen L. Gould, and other named Defendants, engaged in various
       acts of wrongdoing, as individuals, and with BC and CUNY as schools and

corporate entities, and in circumstances where the Defendants functioned individually and as a group, and functioned with Brooklyn College and CUNY officials and managers, in the enumerated and stated acts of wrongdoing that have resulted in the injuries sustained by Plaintiff and the charges contained herein. The Defendants at various times individually and collectively and with various members of the "Gang of Five" engaged in various acts of wrongdoing. As a result of the ongoing defamation and harassment by the Gang of Five, against Plaintiff, and also against other minority and female professors and against professors who supported Plaintiff and the work performed by Plaintiff as Director, GCWE, and the work Plaintiff did in support of minority students, and the individual and collective and collusive wrongdoing of all named Defendants, Plaintiff suffered tortious interference, age, race, and sex discrimination, a hostile work environment, and a series of punitive acts that wrongfully interfered with Plaintiff's express and implied contract rights and his civil rights. The defamation of Plaintiff and the hostile work environment that Plaintiff was forced to work in were encouraged and participated in by various additional individual Defendants including Defendants Gould, Cheng, and Phillips, over time. There is an ongoing history of the wrongful acts against Plaintiff.

33.     Some context for the ongoing wrongful acts against Plaintiff is presented with an account of an early event involving Defendant Currah. In approximately 2005, Plaintiff was coming out of a Political Science Department meeting. The purpose of the meeting was to engage in the procedures to appoint new faculty to the department. Defendant Currah was outside of the door of the meeting that was occurring in the Chairman's office on the third floor of James Hall at Brooklyn College. The meeting was concluded and the faculty had been exiting the meeting room. Defendant Currah approached Chairperson Berkowitz who was standing outside the third floor hallway in front of the Political Science Department Office. Plaintiff was standing next to and talking with Chairperson Berkowitz.

Chairperson Berkowitz told Defendant Currah: "Your friend was not selected." Immediately, Defendant Currah literally fell to the floor of James Hall, other people were in the hallway and walking about. Defendant Currah was literally rolling around on the floor, writhing as if in pain, and screaming at the top of his lungs "NO!NO!NO!". Defendant Currah's screaming, shrieking, writhing, rolling, continued and people who were walking around in the hallway were looking at Currah. This scene continued for several minutes. The screaming fit was Currah's response to having been told that his friend was not selected to be part of the faculty.

34.   In approximately 2004, the BC Political Science Department was chaired by Prof. Mort Berkowitz. (He is now deceased.) The department had undertaken search for another professor. One of the applicants was known to the department to be the significant other of Defendant Paisley Currah, a white transgender female who became a man. The BC Political Science Department hired Defendant Currah in approximately the late 1990's as a conscious effort to promote all types of diversity within the department. In approximately 2003 the Political Science Department began the search. It was at that time that one of the candidates, the one not chosen, was known to be Defendant Currah's significant other. In approximately 2005, at the above stated Political Science Department meeting, the candidate who was actually chosen was Defendant Robin. Plaintiff advocated for Robin and supported Defendant Robin's appointment.

35.   The various acts of defamation, wrongdoing, accusations against Plaintiff, started between the time of 2005-06, and forward to current date, with Robin's blog just one evidence of the continuing opposition to and defamation of Plaintiff, as well as opposition to the GCWE and worker education, in the context where Plaintiff advocated worker education and had successful grant funded programs for minority males, and Plaintiff was the Director of the GCWE.

36.     In approximately 2006, at the request of Brooklyn College and CUNY,
        Plaintiff was asked by former BC President Kimmich and former VP
        Finance Steve Little to work with Dean Daniel Lemon to select a site for the
        new GCWE.  Plaintiff met regularly with a CUNY Vice-chancellor who was
        responsible for facilities.  The work effort was to select the site for the new
        GCWE, and to design and build the new GCWE.  From 2006-2008, Plaintiff
        and Dean Lemon worked together with the architect and construction
        management to fully design and build the new GCWE.  Plaintiff and Dean
        Lemon spent hundreds of hours over a two year period of time to bring the
        new GCWE to full completion. The old GCWE was located at 99 Hudson
        St, NYC.  During the time this construction design and build project was in
        progress Plaintiff continued with all of his administrative and other duties as
        GCWE Director.  Plaintiff and Dean Lemon were responsible for the gut
        renovation of the 50,000 square foot building that was to be the new GCWE
        at 25 Broadway.  Plaintiff and Dean Lemon worked together to tour and
        finally pick the 25 Broadway site as the place for the new GCWE.  Plaintiff
        and Dean Lemon with the CUNY team were responsible for the entire
        activity from development, design, reviewing architectural plans, including
        electrical, air conditioning, technology and aesthetics of the physical space.
        The gut renovation was brought in on time and on budget.  The new GCWE
        was toured by high-level officials including the CUNY Chancellor and Vice-
        Chancellor, Brooklyn College and City College presidents, provosts, and VP
        Finance Steve Little.  Plaintiff was congratulated for the beautiful new
        Center that was built on-time and on budget.

37.     In approximately 2008 Defendant Robin falsely alleged bias by Plaintiff
        against Defendant Robin in grant funding for Defendant Robin at the CUNY
        Research Foundation.  In 2008 Defendant Robin made a formal charge
        against Plaintiff that Plaintiff was interfering with Defendant Robin's
        application for a CUNY research grant of $3K-$5K.  Defendant Robin wrote

a letter of complaint against Plaintiff to the CUNY Research Foundation. Plaintiff was contacted by the CUNY Research Foundation and informed of Defendant Robin's complaint and allegation.

38.  CUNY Vice-Chancellor Gillian Small was notified by Defendant Robin's letter, of Defendant Robin's allegation.  In fact, Plaintiff had read and approved Defendant Robin's research grant application.  Vice-Chancellor Small and Paul Cole investigated Defendant Robin's allegations against Plaintiff and found out that Defendant Robin's allegations were false. Defendant Robin's allegations against Plaintiff were dismissed.

39.  After the CUNY Research Foundation dismissed Defendant Robin's complaint against Plaintiff, in 2008 Defendant Robin then filed charges against CUNY Vice-Chancellor Small.  Defendant Robin accused Vice-Chancellor Small of being biased and accused Vice-Chancellor Small of covering up the investigation of the charges Defendant Robin made against Plaintiff.  The Vice-Chancellor's office conducted an internal review and investigation of Defendant Robin's allegations against Vice-Chancellor Small and Defendant Robin's charges against Small were found to be groundless and were dismissed.

40.  Professor Ness and Bermonzohn and Plaintiff from 2008 and forward, had a number of meetings with Defendants Hewitt and then also Phillips, occurring also in 2011 after other allegations were made against Plaintiff. The purpose of those meetings was to inform the administration of the ongoing defamation and attacks against Plaintiff, the ongoing conflicts and disruptions to the Political Science Department caused by Defendants Robin, Currah, and the Gang of Five, and to ask for help so that the conflicts and problems could be addressed.  The BC and CUNY administrations never gave any help, guidance, or assistance with the problems.   In 2011 BC and CUNY began their investigations and then their punitive actions against

Plaintiff.

41.     Defendants Robin and Currah ongoing made numerous statements in
        Political Science Department meetings that they wanted young faculty
        members and not older faculty members.  Based on Defendants Robin's and
        Currah's participation in the Appointment Committee work, they
        systematically eliminated qualified faculty of color/minority faculty seeking
        positions, and systematically eliminated older professors who were also
        seeking faculty positions.  These older and minority prospective faculty
        members were eliminated from searches and from hiring.  The
        discriminatory statements and discriminatory actions by Defendants Robin
        and Currah, voiced in faculty and other meetings, began when Plaintiff was
        age fifty-three to fifty-four and he is an African-American male.  Defendants
        Robin and Currah are white males and are approximately 15 years younger
        than Plaintiff, as well as younger than other Political Science Department
        members.

42.     Neither Defendants Currah, Robin, or the other members of the Gang of
        Five had any official or unofficial participation in the administrative and
        educational programs, policies, and procedures at the GCWE.  However, in
        approximately February 2012, after Plaintiff was fired as BC Director
        GCWE, Defendant Robin, a younger white male, and a key person involved
        in the ongoing defamation of Plaintiff, who had vowed to take down
        Plaintiff, was appointed interim director of the GCWE by Defendant Gould.

43.     Defendant Currah was the chairperson of the BC Political Science
        Department from May 2011 to May 2014.

44.     Continuing with the race and age discrimination against Plaintiff, on July 1,
        2014 a non-minority male in his forties, Lucas Rubin, was appointed to the
        position of Assistant Dean at the GCWE.  His salary is $90-$100K, he

manages fewer staff, fewer students and faculty, fewer programs and events, and does not bring in revenues or grants.  Due to the fact that Defendant Gould in 2014 terminated the non-tax levy revenue generating Continuing Education program at the GCWE, which program was populated by about 95% by minority and minority female night students seeking degrees, the GCWE now has no revenue from Continuing Education and programs and services to students are almost nonexistent.  While Plaintiff was the GCWE Director, with many more duties, his annual salary was approximately $68K.

45.    It was determined by Plaintiff, and by Prof. Sally Bermonzohn, Department chair, and Prof. Ness, that it was necessary to explain to the BC administration the serious problems and disruptions caused by the Gang of Five. Plaintiff and Profs. Ness and Bermonzohn had meetings with the BC administration including Defendant Hewitt.

46.    The first meeting with the BC administration was in 2008.  The purpose of the meetings was to explain the problems and to ask for help.  Plaintiff and Ness and Bermonzohn had a meeting with Defendant Hewitt, and Jerry Mirotznik, Brooklyn College Assistant Provost, during which meeting Plaintiff and Profs. Ness and Bermonzohn discussed the ongoing defamation and bullying against Plaintiff, by the Gang of Five, the "Gang of Five" Email written by Defendant Robin, the sexual assault against Prof. Ness by Defendant Alonso, the problems the Gang of Five professors were causing in the Political Science Department. Plaintiff, Prof. Bermonzohn, and Prof. Ness asked for help in addressing the problems.  No help was ever provided. The email about the Gang of Five, written by Defendant Robin, was given to Hewitt and Mirotznik during that meeting.  That email remains in the possession of Defendants Brooklyn College and Defendant Hewitt, and Mirotznik.

47.     In 2008 Defendant Alonso sexually assaulted Prof. Ness in Ness' home. As a result of the attack against Ness, Plaintiff, Ness and Bermonzohn had a meeting with Assistant Provost Jerry Mirotznik, and Defendant Hewitt, Esq., Director Human Resources. In this meeting the Defendants were presented with the facts of the sexual assault by Defendant Alonso against Prof. Ness. In this meeting Plaintiff and the others also went into great detail about the ongoing individual and collective acts of defamation and harassment against Plaintiff and other Political Science Department faculty who supported Plaintiff, by the entire Gang of Five, because the members of the Gang of Five helped and supported each other. Defendant Hewitt and Mirotznik were given graphic details of the ongoing attacks, defamation, harassment. Defendant Alonso had exposed himself to Prof. Ness, in Prof. Ness' apartment as part of the sexual attack against Ness. Defendant Hewitt and Mirotznik gave absolutely no help and did nothing to report or stop the defamation and attacks against Plaintiff and other professors who supported Plaintiff, the GCWE, and who advocated for positive educational experiences for minorities and females and who had an interest in hiring more faculty of color.

48.     Approximately two days after the Alonso sexual attack against Ness, during which attack Ness had to force Alonso out of his apartment, Prof. Ness wanted to file charges against Defendant Alonso with Brooklyn College and the NYC police. Prof. Ness discussed the assault against him with Defendant Robin. Defendant Robin not only refused to help and support Prof. Ness, Defendant Robin actually engaged in verbal abuse and intimidation against Prof. Ness. Defendant Robin disdained what Prof. Ness told him about Defendant Alonso's attacks against him, and Defendant Robin actually coerced and intimidated Prof. Ness and told him not to file charges against Alonso. Defendant Robin insisted that Prof. Ness not file charges against Defendant Alonso with either BC or the police. Defendant Robin actually told Prof. Ness that no one would believe him about the

charges because Ness was a senior faculty member and Defendant Robin told Ness that it would really look like Ness was taking advantage of Alonso because Ness was a senior faculty member. Defendant Robin told Prof. Ness that he should just forget about the assault and not report it or cause trouble. Not only did Prof. Ness not only not get the help and support he was seeking from Defendant Robin, Defendant Robin intimidated him and told him not to make any reports of the attack, and twisted the whole incident so that it would make Prof. Ness look like the guilty party if Ness tried to make any reports.

49.    On or about the fall of 2008, Defendant Robin sent an email that was received by Jeanette Zelhoff, Esq. Ms. Zellhoff is not a BC employee. The email began with the "The Gang of Five" written in the subject line of the email. Ms. Zellhoff read the email. Ms. Zellhoff brought this email to the attention of her friend, BC Prof. Manny Ness. Ness read the email. The other Defendants designated as recipients of the email were: Profs. Alonso, Ungar, Currah. At the time Ness and Zellhoff read the email they noticed that the content related to problems and conflicts within the BC Political Science Department. Ness and Zellhoff believe that the email was mistakenly sent to Zellhoff because she is not a BC employee. Within two days of Zellhoff's receipt of this email Ness spoke to Defendant Robin about this email. Defendant Robin stated to Ness: "Jeanette got the email by mistake. It was intended for Jeanne Theoharis.".

50.    In 2008 Defendant Theoharis tells Prof. Ness she dislikes Wilson because he voted against her admission as faculty member in the Political Science Department.

51.    In 2009 Defendant Robin stated in Brooklyn College Political Science Department meeting, "I want to eliminate the Urban Policy Program and the Graduate Center for Worker Education."

52.     Plaintiff until his firing as caused by the tortious interference and harassment and other wrongful acts of the Defendants individually and collectively, was the Director of the Graduate Center for Worker Education at Brooklyn College . The GCWE was a nationally recognized Center with nationally and internationally recognized scholars in the Brooklyn College Political Science Department who taught at the Graduate Center for Worker Education, including a Rhodes Scholar, Lisette Nieves.

53.     The Urban Policy Program at the GCWE was a program endorsed by Plaintiff and was a long-standing Program at the GCWE until the content and the purpose of the academic program at the GCWE was attacked and terminated by Defendants Gould, Phillips, Currah, Robin, Ungar, Theoharis, Alonso. The courses and MA degree at the GCWE were moved to the Brooklyn College Campus in Brooklyn. The GCWE student enrollment was approximately 90% minority and female including a large population of Caribbean and Latino students. The students were working class students who worked during the day and attended the GCWE in the evening. Enrollment at the GCWE has dwindled due the reduction and elimination of student support services and due to the relocation of the GCWE to the Brooklyn campus of Brooklyn College and the difficulty for students, many of whom work full time, traveling after work to Brooklyn.

54.     The current status of the academic operations of the Graduate Center for Worker Education reflects the statement made by Defendant Robin that he wanted to eliminate the Urban Policy Program and the Graduate Center for Worker Education. The Political Science Urban Policy MA (Master of Arts) Degree has been eliminated from the academic program of the Graduate Center for Worker Education. During the time Plaintiff was the Director of the Graduate Center for Worker Education, the student enrollment was approximately 180 students, and the MA degree was awarded. The current

student enrollment at the Graduate Center for Worker Education is now approximately thirty-five (35) students.

55.   In November 2011, at a Political Science Department faculty meeting, Defendants Currah and Robin made vocal and strenuous plagiarism allegations against Plaintiff's students, and against Plaintiff in that Plaintiff was knowingly allowing and encouraging his students to plagiarize and was thereby participating with his students in plagiarism. It is to be noted that none of the professors present at this faculty meeting, including the members of the Gang of Five, would have had direct access to the papers written by Plaintiff's students. The only way these Defendants would have had access to the Plaintiff's students' papers would have been through Defendant Phillips providing the Defendants with papers written by Plaintiff's students. Defendant Phillips also made these defamatory plagiarism and grade changing allegations against Plaintiff. No proof of plagiarism or changing grades was ever provided. In 2011 Defendants Phillips, Robin and Currah confiscated various papers written by Plaintiff's students. No formal plagiarism charges were ever filed or proven. The plagiarism charges and the charges that Plaintiff was changing grades continued.

56.   These allegations by Defendants Currah and Robin were made at a Political Science Department faculty meeting where all of the Defendant members of the Gang of Five were present. No members of the Gang of Five opposed the false allegations and the allegations were made with the knowledge and support of the Defendants Phillips and the Defendants Gang of Five.

57.   Defendant Robin stated to Professor Manny Ness, and other professors: "Stay away from Joe. Joe is going down and you'll go down with him.". At various times from 2011-2014 Defendant Robin, with the knowledge and support of the Gang of Five, Dean Kimberly Phillips, President Gould, and other Defendants, engaged in various defamatory, and harassing actions

31

against Plaintiff. Defendant Robin stated to Professor Ness and other faculty members: "I declare war on Joe.". Defendant Robin made this statement about declaring war on Plaintiff to people over a period of years.

58.     On or about September-October 2011 Currah sent out emails to Plaintiff, and on information and belief to the BC administration, and the Defendants in the Gang of Five, that stated that tuition money (FTE's, Full Time Equivalent) was missing from the GCWE. These defamatory allegations against Plaintiff of theft continued even though Defendants had and could request access to audits and fiscal and accounting records thatwould have proven that their allegations of theft by Plaintiff were false.

59.     The Gang of Five Defendants also raised ongoing allegations against Plaintiff that he was changing grades, which is a felony in NY. At the time Defendants made these accusations, Defendant Currah was the chairperson of the Political Science Department, elected in May 2011. These and other false allegations against Plaintiff were the defamatory and tortious acts carried out by Defendants individually and in collusion to carry out their objective to attack and defame and "get" Plaintiff. Defendants were abusing and wrongfully using their administrative positions and violating their employment contracts, and violating Plaintiff's employment contract, to in violation of the law defame, attack, and cause the other punitive acts against Plaintiff.

60.     Defendant Currah made defamatory accusations against Plaintiff that Plaintiff was improperly changing students' grades. In New York improperly changing grades is a felony. These false allegations were communicated to Defendant Phillips and other members of the administration, including BC Vice President Stephen Joyner who made the same defamatory accusations.

61.     Defendant Robin stated:  "Joe is going down"; and in November 2011 stated
        to Professor Manny Ness:  "Joe should no longer be a professor because he
        is no longer interested in teaching.  He should be an entrepreneur.  I'm going
        to launch an investigation into Wilson.".  This statement by Defendant
        Robin is clear evidence that Defendant Robin and the other Defendants
        including Defendants Phillips, Gould, Currah,on an ongoing basis were
        actively involved in an exchange of negative and defamatory accusations
        and statements about Plaintiff.  The following shows the sequence of events
        as evidence that Defendants' acts were punitive and wrongful acts against
        Plaintiff.

The acts are evidence that shows a direct causal relationship between the
spread of the defamation and accusations against Plaintiff and the punitive
actions taken by Defendants Gould, Brooklyn College, and CUNY including
Brooklyn College conducting an internal investigation of Plaintiff.

a.    The Brooklyn College/CUNY investigation of Plaintiff was marked by a
      significant event, Defendant CUNY entering the GCWE unannounced in
      approximately November or December 2011 and conducting a type of
      raid where Plaintiff's computer and all of his files were confiscated by
      Defendant CUNY.

b.    Defendant Isaacson, Esq., who is the Chief Investigator for CUNY, was
      the leader of that raid at the GCWE.  After that Brooklyn College raid
      and confiscation, CUNY in 2012 then conducted an investigation of
      Plaintiff.

c.    It was during this 2012 CUNY investigation of Plaintiff, led by
      Defendant Isaacson who worked in Defendant Schaffer's Office, the
      CUNY Legal Department, that Defendant Isaacson questioned Defendant
      Pollack, Esq. about the MIM lease.

d.   It was during this questioning by Isaacson during the CUNY
investigation of Plaintiff that Defendant Pollack falsely answered that
neither she nor (former) VP Finance Steve Little either authorized or had
knowledge of the MIM lease, which therefore falsely meant that Plaintiff
was entering into leases without the knowledge, instruction,
authorization, and even copies of leases, from and with Defendant
Brooklyn College.

e.   In January 2012 as a result of the defamation, violations of law and
ongoing wrongdoing by the Defendants individually, collectively, and in
collusion that Plaintiff was fired as GCWE Director.

f.   When the efforts of Defendants BC, CUNY, and the other Defendants
failed to result in Plaintiff being criminally prosecuted by the NY AG,
Defendants BC in collusion with CUNY and as the result of the
individual and collective unlawful and wrongful acts, Defendant BC filed
disciplinary charges against Plaintiff on January 13, 2013.

g.   Plaintiff has completed his step two disciplinary hearings and the
remaining charges will be the subject of arbitration that will start in
January 2015.

h.   It was during Plaintiff's Step Two disciplinary hearings that Defendant
Pollack, Esq., under oath, stated and finally told the truth, that she and VP
Finance Little had authorized Wilson to enter into the MIM lease, they
both had full knowledge, and Pollack has copies of the lease.

i.   MIM and ESRA were the tenants at the BC GCWE that was located at 25
Broadway, NYC.  MIM had a longstanding lease at the GCWE located at
25 Broadway, their lease began when the GCWE was located at 99
Hudson St. in approximately the early 1990's.  During the CUNY
investigation of Plaintiff in 2012 conducted by Defendant Isaacson, when
Isaacson questioned Defendant Pollack about her knowledge and
approval of the MIM lease and VP Little's knowledge and approval,

Pollack falsely denied that either she or Little knew about, authorized, or approved the MIM lease.

j. Pollack made this false denial during the CUNY and Isaacson investigation in the presence of Plaintiff's union attorney Pete Zwiebach, Esq., and Plaintiff.

k. Various disciplinary charges against Plaintiff included charges about the MIM leases and Plaintiff entering into leases without Brooklyn College's knowledge or authorization or approval.

l. An ongoing point of defamation by Defendants Pollack, Gould, Phillips, Schaffer, Robin, Currah was that Plaintiff was entering into secret leases at the GCWE without Brooklyn College knowledge or authorization.

m. The ongoing defamation and wrongful acts by Defendants caused the various acts of wrongdoing against Plaintiff, including Brooklyn College in collusion with the Defendants filing false criminal allegations against Plaintiff with the NY Attorney General,

n. the filing, by Defendants Gould, Brooklyn College, CUNY, and all Defendants collusively, of disciplinary charges against Plaintiff on January 3, 2013, which charges were filed to cause Plaintiff to be fired from his position as tenured full professor of Political Science,

o. with allegations and punitive actions that knowingly, intentionally, were based on suppression of evidence and witness tampering during the BC and CUNY investigations of Plaintiff,

p. that the Defendants acted individually and collusively, wrongfully, such that Defendant Brooklyn College filed false criminal allegations against Plaintiff on or about April 2012, with the NY AG serving a subpoena on Defendant Brooklyn College on or about June 8, 2012, which subpoena was served as a result of the criminal allegations against Plaintiff,

q. with the result that the NY AG did not file charges against Plaintiff,

r. then causing Defendants Brooklyn College and CUNY, individually and collusively, with the aid and collusion of the other Defendants, filing knowingly and intentionally false disciplinary charges against Plaintiff in

January 2013 to continue the defamatory and harassing attacks on
Plaintiff because the conspiracy to have Plaintiff criminally indicted had
failed and the goal and last option was to cause Plaintiff to be fired as a
full tenured professor.

62.     Pete Zwiebach, Esq.,Plaintiff's Faculty Union, in January 2012 sent a letter
to Defendant Gould providing information about the ongoing defamation of
Plaintiff.

63.     In January 2012 Plaintiff was fired as the Director of the Brooklyn College
Graduate Center for Worker Education.  Plaintiff had served as Director for
almost 20 years, and in fact had worked with another CUNY employee to
design and build the new GCWE, that relocated from 99 Hudson St. to 25
Broadway in lower Manhattan.  Plaintiff was commended by BC and CUNY
officials for building a beautiful center and bringing in the project on time
and on budget.

64.     On or about April 2012 after that statement by Defendant Robin, that he was
going to launch an investigation into Plaintiff, Brooklyn College provided
information to the CUNY Chief Counsel the result of which was a CUNY
investigation of Plaintiff.

65.     On or about April 2012 Brooklyn College filed criminal allegations against
Plaintiff with the New York Attorney General (NY AG).  The filing of the
false criminal charges would have preceded the June 8, 2012 subpoena to
Defendant Brooklyn College, which subpoena was issued by the NY AG to
obtain information related to allegations about Plaintiff made by Defendant
BC, in collusion with Defendant CUNY and the other named Defendants, to
the AG.

66.     In January 2013 Brooklyn College brought disciplinary charges against
Plaintiff, which charges contain the same types of false and defamatory

36

accusations made by Defendants against Plaintiff over many years starting in approximately 2005.

67.  In December 2013 Plaintiff was barred from the BC campus and removed from teaching by Brooklyn College.  Plaintiff was barred after he gave public testimony at a NY City Council committee hearing on diversity and civil rights at CUNY.  Plaintiff's testimony cited problems with diversity for faculty and administrators at CUNY.  Plaintiff testified before this committee in November 2013.

68.  On June 8, 2012, the New York Attorney General served Brooklyn College with a subpoena.  Defendant Brooklyn College was served with the subpoena as a result of the allegations of criminal wrongdoing against Plaintiff filed with the NY AG by Brooklyn College with the assistance and collusion of CUNY, and all named Defendants.  The allegations of criminal wrongdoing filed with the NY AG would have preceded the June 2012 subpoena so would have been filed with the NY AG on or about April 2012. The filing of the criminal allegations with the NY AG followed the rigged investigation of Plaintiff by CUNY.

69.  The rigged investigation of Plaintiff done in collusion by Defendants BC, CUNY, Gould, Kotowski, Schaffer, Hewitt, Pollack, Isaacson, Robin, Currah, included the false statements by Defendant Pollack, to Defendant Isaacson, during questioning on or about April 2011, by Defendant Isaacson of Defendant Pollack regarding the MIM lease.  Defendant Pollack falsely denied that she and VP Finance Little had knowledge of, approved, or authorized Plaintiff to enter into the MIM lease and Pollack totally and falsely denied that either she or VP Finance Little had authorized Plaintiff to enter into the MIM lease.

70.  At the time Plaintiff was authorized to enter into the MIM lease, by Defendant Pollack and former VP Finance Steve Little, BC had leased space

to MIM for a number of years. MIM leases with BC GCWE had been effected by the prior GCWE Director in the 1990's and the MIM lease was authorized and in effect even prior to the time Plaintiff was appointed Director of the GCWE by former BC President Vernon Lattin. The MIM lease that Defendant Pollack and VP Little authorized Plaintiff to enter into was simply a continuation of the former tenant status of MIM at the GCWE. Former BC President Lattin was the superior of Defendant Pollack and VP Finance Little. MIM continued as a lease tenant at the GCWE for many years during and even after the time Plaintiff was the Director.

71.     Defendants BC and CUNY and their Budget Offices would have had extensive fiscal and accounting records of rents paid for long term leases such as MIM's lease, and daily and weekly space rentals at the GCWE for special events, conferences.

72.     The authorization of the MIM lease by Defendant Pollack, and by former BC President Vernon Lattin, and former VP Finance Steve Little, and the MIM lease authorization by Defendants Gould, Pollack, Kotowski, Schaffer, Hewitt, as MIM continued to be a rent paying tenant at the GCWE, and the fact that all Defendants had as relevant dominion, custody, control, access to, and constructive and actual knowledge of, leases, fiscal and accounting records, Budget Office staff, the job duties of Defendant Hewitt, annual fiscal reports, rent payments, BC and state audits, year end closings, is prima facie evidence. The prima facie evidence is that Defendants BC, CUNY, Gould, Hewitt, Isaacson, Schaffer, Pollack, and all of the Defendants individually and collectively knowingly, and in collusion, intentionally, maliciously, defamed Plaintiff with ongoing statements that Plaintiff was a thief, stealing tuition money, entering into secret leases.

73.     On April 29, 2014, at Plaintiff's Step Two disciplinary hearing, upon questioning Defendant Pollack, under oath, stated that she and VP Little did authorize the MIM lease that Plaintiff entered into, that Plaintiff was

authorized to enter into the MIM lease and that she and VP Little had full knowledge of Plaintiff's entering into that lease and had authorized Plaintiff to enter into the MIM lease.  Defendant BC even in the face of Defendant Pollack's admission and now truthful testimony has failed to withdraw the MIM lease disciplinary charges against Plaintiff, as well as have failed to withdraw all lease charges against Plaintiff.

74.     The rigged BC internal investigation of Plaintiff preceded the rigged CUNY investigation of Plaintiff.   The BC investigation was being conducted by Defendants Gould, Phillips, Hewitt, Pollack. Defendants Robin and Currah were active participants in the investigations of Plaintiff.  Defendant Currah's participation in the investigation was done under his presumed authority after he was elected Political Science Department chair person in May 2011.

75.     The investigation of Plaintiff by Defendants Gould, Phillips, Hewitt, Currah and Robin included Defendants Phillips, Currah and Robin making ongoing personal visits together and individually to the offices of faculty and staff who supported Plaintiff.  During these visits faculty and staff were subjected to repeated defamatory statements about Plaintiff including that he was a thief and engaged in illegal activity.

76.     The investigation of Plaintiff was not a fact-finding activity, it was an intimidation activity, a pretext to harass and bully faculty and staff who supported Plaintiff.  After Defendant Currah was elected Department Chair in May 2011 he had access to all Department based faculty personnel files, including Plaintiff's personnel file. Defendant Currah then began an improper and therefore unlawful examination and search of Plaintiff's personnel file.  This improper examination of Plaintiff's personnel file occurred in the context of the ongoing defamatory statements Defendants Currah, Robin, Phillips, Gould, were making about Plaintiff, over a long period of time, including accusations that Plaintiff was a thief, was stealing

tuition money, changing students' grades, acting with students to engage in plagiarism. During this period of time that Defendant Currah publicly made accusations that Plaintiff was stealing tuition money,

77. Plaintiff, with no request from the Attorney General, voluntarily provided a volume of his personal business emails to the Attorney General. The Attorney General never at any point called Plaintiff in for an interview, though Plaintiff was under investigation. As of this date the Attorney General has not filed charges against Plaintiff.

78. Defendant Currah, in 2013, as Brooklyn College Political Science Department Chair, assigned Plaintiff a contract violating five course teaching load. This teaching load violated and exceeded the contract teaching load that could be assigned to any professor.

79. Defendant Currah in 2011 refused to fulfill his contractual and administrative duty to sign Plaintiff's Multiple Position Authorization Form. This refusal by Defendant Currah was a violation of Plaintiff's employment contract with Brooklyn College due to the fact that Multiple Position forms must be signed consistent with CUNY/Brooklyn College policies and procedures and the fact that faculty have multiple teaching and professional obligations by contract.

80. The Defendants individually and collectively over a long period of time knowingly made various defamatory and harassing charges and accusations against Plaintiff. These accusations included theft of tuition money and other accusations of criminal conduct by Plaintiff. The individual and collective conduct and statements by Defendants caused tortious interference with Plaintiff's contract rights, harassed Plaintiff, inflicted intentional and negligent emotional distress. Plaintiff had been the Director of the GCWE for close to 15 years, since his appointment in 1998.

81. Defendants Currah and Robin failed to secure boxes of Plaintiff's academic

and administrative documents and papers and valuable personal items at the Graduate Center for Worker Education after Plaintiff was fired due to tortious interference by the Gang of Five and the other defendants. Defendants converted Plaintiffs property to their own use.

82.     Defendant Dean Kimberly Phillips instructed Defendants Robin, Currah, Haugstatter, to interfere with and prevent Plaintiff's receipt of his U.S. mail. Defendant Dean Phillips took these actions with the actual and constructive knowledge of BC President Gould, Defendant.

83.     Defendants Robin, Currah, Phillips, Haugstatter, and other Defendants caused Plaintiff's U.S. mail, personal and professional property to be confiscated, unsecured, interfered with, lost, tampered with, and destroyed, for a period of sixteen months at the GCWE and extending to current time at the Political Science Department, after Plaintiff was fired as the Director of the Graduate Center for Worker Education. Students and faculty saw Plaintiff's unsecured property, in open boxes, and his BC computer in common areas accessible and traversed by BC students, faculty, and visitors to the Political Science Department.  Plaintiff's BC documents such as copies of his Multiple Position forms and other professional and business documents, and his personal property, were lost, discarded, unsecured while in the custody and control of Defendants Brooklyn College and CUNY. Plaintiff's documents and property were in those unsecured boxes in the common areas in the GCWE and in the Political Science Department.

84.     Plaintiff's property including his emails, electronic communications, and U.S. mail and personal property and documents and records were tampered with, discarded, and otherwise lost and stolen while in Defendants' control.

85.     Defendants Brooklyn College and CUNY also violated the Electronic Communications Privacy Act of 1986 (ECPA), 18 U.S.C. 2510-22 by reading, destroying and otherwise interfering and preventing Plaintiff from

receiving his Brooklyn college emails and electronic communications.

86.   Defendant Robin continues to defame Plaintiff in his blog.  See, for
example,
Robin's blog where he tells people not to sign the petition to save the
Graduate Center For Worker Education.  Robin's blogs also make the same
kinds of charges against Plaintiff that were in his BC disciplinary charges,
such as having secret leases, financial wrong doing.

87.   The following are additional specific wrongful acts by Defendants against
Plaintiff.

88.   Defendant Dean Kim Phillips told the head of ESRA that Wilson was a thief
and stealing from him.  This false charge defamed Plaintiff.  Prior to and
during the BC and CUNY investigations, Defendant Phillips intentionally
and with the constructive and actual knowledge of Defendant Gould,
engaged in ongoing defamatory and negative statements about Plaintiff.  The
purpose of these statements was to influence and intimidate employees who
were also persons who could function as witnesses for Plaintiff in, for
example, his disciplinary hearings.  Defendant Phillips had meetings with
various professors and BC employees and specifically and overtly stated that
Plaintiff was a thief.  The effect of Defendant Phillips' words and meetings
with BC employees, who knew Plaintiff was under investigation, was to
make it clear that Wilson was not regarded in favor and that BC employees
should not support Wilson.

89.   As one of the BC investigators, Defendant Phillips did not truthfully and in
observance of procedures investigate, she planted ideas and pressured
employees by making it clear that Plaintiff was a bad person and should not
be supported, and that the administration said he was a thief and persona non
grata.

90.     Defendant Phillips, with the knowledge and consent of Defendant Gould and
        other BC and CUNY attorneys, officials and managers, and as further
        supported by the Gang of Five, overtly acted to corrupt the investigative
        processes conducted by BC and by CUNY. Defendant Phillips' overt and
        continuing pressuring and intimidation of potential witnesses, and her
        continuing defamation of Plaintiff, was never honestly reported to the NY
        AG.

91.     The witness tampering and intimidation by BC and CUNY, and their false,
        misleading, and evidence suppressing responses to the AG's June 8, 2012
        subpoena to BC that was served in response to the BC with the aid of CUNY
        criminal allegations filed against Plaintiff, was hidden from the NY AG, as
        was the corrupted investigative process of CUNY and BC.  Also hidden
        from the NY AG was exculpatory evidence about GCWE leases as finally
        revealed by the testimony under oath of Defendant Pollack, Esq., on April
        29, 2014, at Plaintiff's BC Step Two disciplinary hearing.

92.     Dean Phillips came to the GCWE on one occasion to discuss the Brooklyn
        Law School and GCWE joint degree that was the JD-MA program.  The
        joint degree program was presented as public information and information to
        students in the Brooklyn College Bulletin, and Brooklyn Law School
        handbook of courses and BC information.  One of the false disciplinary
        charges against Plaintiff was that Plaintiff was running unauthorized
        programs.  One of the ongoing defamatory statements by Defendants against
        Plaintiff was that Plaintiff was running unauthorized programs at the
        GCWE.  Defendants Robin, Currah, and members of the Gang of Five made
        and were complicit in these defamatory statements.

93.     Even though the JD-MA program at the GCWE was publicly advertised,
        was  approved by the BC Faculty Council as a joint degree program, and had
        been a joint degree program with Brooklyn Law School, for many years, the

BC false disciplinary charges against plaintiff included stating that BC did not know of or approve the joint degree program.

94.     Among the defamatory and false charges made by Defendants Robin and Currah, was that Plaintiff was running unauthorized programs at the GCWE, including the joint degree program, and a Paralegal Certificate Program.  All degree bearing courses at the GCWE were taught by BC professors. Certificate programs were approved by BC Continuing Education Department.

95.     Defendants Robin and Currah, with the knowledge and consent of Defendants Phillips and Gould, made numerous and ongoing false and defamatory statements that the Paralegal Certificate, JDMA joint degree, and other courses at the GCWE courses were not authorized, and that Plaintiff was running unauthorized programs.

96.     BC at all times had under its dominion, custody and control BC and GCWE records that proved the JDMA program with Brooklyn Law School was an authorized program. The JDMA program was advertised in the BC Bulletin of courses. Only approved courses can be accredited and listed in the BC Bulletin.  All of the Defendants' claims and charges about the GCWE courses and Plaintiff's wrongdoing were and continue to be false.

97.     Defendants Currah, Robin, and Defendant professors who were members of the self-proclaimed Gang of Five, and BC and CUNY, and the individual employee Defendants, over a period of five (5) years, and continuing to present day, per Currah's blog, and the Brooklyn College and CUNY "New York Times" January, 2014 defamatory and factually incorrect article about Plaintiff and his work at the GCWE, continued to defame and act in tortious interference against Plaintiff.  The defamation and tortuous interference included statements in the 2014 NY Times article, with false information and non-facts presented in that article with Defendants BC, CUNY, and

Isaacson the sources of the information in that NY Times article, that Plaintiff had "secret leases" at the GCWE, and engaged in various acts of financial wrongdoing, and a November 2014 Facebook posting by Mr. Henwood, a radio host. Brooklyn College, CUNY, President Gould, and the other individual Defendants continually made defamatory allegations and statements about Plaintiff. This defamation was communicated to the public on an ongoing basis and the defamation and the defamation and character assassination continues to harm Plaintiff.

98.   Specific to various Defendants, with the knowledge and consent of BC and CUNY, Defendants made the following various defamatory remarks, as stated herein.

99.   In the context of the ongoing defamation and attacks against Plaintiff and his work as Director of the GCWE, Plaintiff and other BC professors including Professor Manny Ness, had meetings with Brooklyn College Director of Human Resources, Michael Hewitt, Esq.,to report on the defamation, attacks, and disruptive actions of the Gang of Five. These meetings began on or about 2008 and a number of meeting requesting help were had with the BC administration, Defendant Hewitt, and Mirotznik.

100.   Plaintiff and other professors who are not Defendants also brought the attacks, defamation, and disruptive behavior of the Gang of Five to the attention of Defendant Phillips in the fall of 2011. However, Defendant Phillips specifically participated in the defamation and attacks. Defendant Phillips by and through her participation in the defamation and attacks failed to help or take any measures to stop the attacks and to stop the disruptive and tortuous acts of the Defendants who are members of the Gang of Five.

101.   Defendant Hewitt's only responses to Plaintiff and professors who met with him in 2008 for help to stop the attacks and defamation by the Gang was to ask "Can't we all get along?". In November 2011 Plaintiff met with Hewitt

and told him that Defendants Currah and Robin were improperly going through Plaintiff's personnel files. At this timeDefendant Hewitt's response to Plaintiff was that "he would look into it.".

102. BC and CUNY silence in the form of the continuing failure to act to stop the tortuous, harassing, and defamatory attacks against Plaintiff, (and other professors), and the actual active participation in the attacks, wrongful conduct, defamation, punitive acts, by Defendants, created the hostile and bullying work environment, created the conditions for the various race and age based attacks, and allowed the hostile environment to continue and flourish unabated, for many years and continuing to the present.

103. The attacks and defamation against Plaintiff were and are continuous and ongoing.

104. In November 2011, Defendant Robin stated to Professor Manny Ness: "Joe should no longer be a professor because he is no longer interested in teaching. He should be an entrepreneur. I'm going to launch an investigation into Wilson. Joe is going to jail."

105. At various times from 2011-2014 Defendant Robin stated and took active measures to do what he said he would do, which was to "Declare war on Joe."

106. In 2009 Defendant Robin stated in a Brooklyn College Political Science Department meeting, "I want to eliminate the Urban Policy Program and the Graduate Center for Worker Education.". The attack on the GCWE and Plaintiff in his capacity as Director included active participation by Defendants Robin, Currah, the Gang of Five, Dean Phillips, and the constructive and actual knowledge and participation by President Gould, and over a period of years the other Defendants. The attacks were ongoing, malicious, intentional, and not based on facts.

107. Defendant Robin warned Prof. Ness and other professor to "Stay away from Joe. Joe is going down and you'll go down with him.".  These ongoing attacks on Plaintiff and threats and bullying, and the discrimination against and defamation of Plaintiff was participated in and supported by the Defendants Gang of Five, and Defendants Gould, Cheng, Phillips, Kotowski, BC, CUNY, and the other Defendants.

108. The various defamatory allegations were made against Plaintiff in Political Science Department meetings, to CUNY and other personnel from other colleges, and in other venues, and various allegations have been publicized in Defendant Robin's blog.

109. The continuing attacks on Plaintiff, and the GCWE, by the Gang and Five with the knowledge, consent, and participation of the all of the Defendants, resulted in the January 2012 firing of Plaintiff as GCWE Director, the other punitive acts against Plaintiff, and in 2014 in the termination of the Urban Policy Program at the BC GCWE, as well as the almost complete closing of the physical premises for the graduate academic program operation of the GCWE at 25 Broadway.  Defendant President Gould and other officials and managers at BC and CUNY knew about the attacks and defamation and took no action to stop it, and actively participated. The defamatory plagiarism allegation was that Plaintiff participated with students in plagiarism.  The plagiarism allegations against Plaintiff were made to Defendant Phillips and by Defendant Phillips, who reported directly to Defendant President Gould.

110. Defendants Robin and Currah also made public allegations that Plaintiff was improperly changing students' grades with the help of BC administrator Jesus Perez, who was also accused but not charged.   Changing grades improperly is a felony in NY.

111. At the time Defendants Robin and Currah were making various defamatory and criminal accusations against Plaintiff, the accusations were not only made within the Political Science Department, the accusations were also

made in the Africana Studies Department, Sociology Department, other
Departments, to CUNY employees and students and the greater community.

112. All of the various defamatory and criminal allegations stated by the Gang of
Five on an ongoing basis were communicated to Defendants Phillips and
Gould. Defendant Hewitt, Esq., also knew the attacks that were being made.
No official action was taken to stop the attacks and defamation. On the
contrary the Defendants actively condoned and participated. The objective
evidence including the rigged BC and CUNY investigations, the filing of the
false disciplinary charges, the NY Times article, Plaintiff's firing as GCWE
Director, the suppression of exculpatory evidence, the filing of the false
criminal allegations against Plaintiff, Defendant Pollack's falsehoods about
the MIM lease during the CUNY investigation, Defendant Isaacson's false
and rigged investigation of Plaintiff, Defendant Schaffer's participation in
the rigged CUNY investigation of Plaintiff and his failure to require
exculpatory evidence to be presented, and allowing false criminal charges to
be filed against Plaintiff with incomplete, misleading and false responses to
the AG's June 2012 subpoena to Defendant BC, all show the conspiracy
against Plaintiff by BC and CUNY, and by the individual Defendants who
facilitated, cooperated, colluded, and proceeded in the face of a lack of facts,
maliciously, and in gross negligence that is malice to support their punitive
actions, tortious interference, defamation, and wrongful conduct in violation
of the law.

113. Defendant Robin also called Professor Ness a "useful idiot" in
approximately February 2012, due to the fact that Ness had been outspoken
in his support for Plaintiff. Defendant Robin actually announced and
conducted his own investigation of Plaintiff, with the full knowledge of BC
and CUNY and with Defendant Phillips' knowledge and participation.
Defendant Robin met with witnesses repeatedly, including Professors Ness
and Leberstein, and Defendant Ungar, defamed Plaintiff to them, and
actively participated in the attacks against Plaintiff. Such ongoing attacks by

employees, including officials and managers, make it clear to all employees that support for Plaintiff would not reflect the position of Defendant Gould and the entire administration.

114.   On or about March 14, 2014, between 5:00PM and 6:00PM, Professor Ness met with a Brooklyn College student, Kirsten Burke, Esq., who is also a lawyer who works in the CUNY Legal Department and is familiar with the disciplinary charges Brooklyn College filed against Plaintiff. Ms. Burke also has knowledge of the Brooklyn College internal investigation of Plaintiff, the CUNY investigation of Plaintiff that preceded the filing of the false criminal allegations against Plaintiff with the NY Attorney General.

115.   During Ms. Burke's March 14, 2014 meeting with Professor Ness, she told Ness that she had just had a meeting with Defendant Ungar, and Ungar had stated to her that he "Should have reported Joe earlier.".

116.   On Tuesday, May 6, 2014, at a Political Science Department meeting, the issue of the lack of African-American faculty was discussed. An African female faculty member, Prof. Okome, lamented and raised the issue of racism in the department and the absence of Black faculty members. After Professor Okome's comment, Defendant Caroline Arnold, a white female, stated that "Professor Wilson is a bully and a thug." Plaintiff is an African-American male and the word 'thug' is understood to have the implication and reference to Black males who act like thugs and gangsters.

117.   Defendant Robin, at a faculty gathering at Prof. Okome's house in approximately 2012, asked Professor Okome if her "house had been purchased with the proceeds from Nigerian drug money?". Similar racially discriminatory statements had been made over a period of time against minority professors at the GCWE.

49

118.    Defendant Currah accused distinguished visiting Prof. Lisette Nieves, of
        failing to teach her class at the GCWE.  Professor Nieves is a Latina female,
        Rhodes Scholar, and co-chairs the Presidential Commission on Latinos in
        Higher Education, and was recruited by Plaintiff to be a distinguished Belle
        Zeller Professor of Political Science at Brooklyn College.

119.    Professor Ness brought these and other charges of discrimination and
        racially biased statements and attacks to the attention of Defendant Phillips.
        Brooklyn College and CUNY, and Defendants Phillips and President Gould
        took no official action against these various race based attacks and
        defamatory charges against faculty including Plaintiff.

120.    On or about March 12, 2014, Defendant Assistant Provost Cheng told
        Brooklyn College faculty members, including Professor Jocelyn Wills, that
        "Professor Wilson was engaging in criminal activity."  Defendant Associate
        Provost Cheng who is employed by BC made this defamatory statement
        about Plaintiff at a BC faculty meeting.  Defendant Cheng made this and
        other defamatory and malicious comments to Labor Arts, a 501-C3 not for
        profit organization,  even two years after the NY AG did not indict Plaintiff.

121.    In the spring of 2012, Defendant Currah wrote an email accusing Plaintiff of
        not teaching.  This allegation means that Plaintiff was collecting his salary
        but not doing his job.  This email was sent to Defendant Dean Kim Phillips
        and other administrators and faculty members.

122.    In the fall of 2011, Defendant Currah wrote an email accusing Plaintiff of
        stealing FTEs (Full Time Enrollment Tuition), meaning stealing tuition
        money.

123.    This email was one in a series of ongoing defamatory accusations including
        criminal accusations against Plaintiff by Defendants Robin, Currah, and the
        Gang of Five, that Plaintiff was a thief, stealing tuition money, running

illegal programs at the GCWE, conspiring with students to plagiarize, Plaintiff changing grades, which is a felony, which defamatory and character assassinating charges were made to Defendant Phillips, to Defendant Gould, and to persons within and outside of Brooklyn College and CUNY, including through Defendant Robin's blog and the 2014 "New York Times" article that was written because BC and CUNY contacted the NY Times reporter and provided false and defamatory information about Plaintiff. The wide and public circulation of the accusations against and defamation of Plaintiff is evidenced by various publications about Plaintiff including the NY Times article, the information in the Kingsman, and the 2014 negative Facebook posting related to Plaintiff and the operation of the GCWE, that "it was run by a bunch of thieves", made by Mr. Henwood.

124.  Defendant Currah engaged in various harassing acts against Plaintiff, with the knowledge and consent of Brooklyn College officials and managers with no sanctions against Defendant Currah. CUNY also has authority and knowledge and took no action.These wrongful and harassing acts include Defendant Currah refusing to sign Plaintiff'sMultiple Position Forms, which is a violation of CUNY policy and Defendant Currah's contractual obligations. Defendant Currah also wrongfully assigned Plaintiff a twelve (12) hour work day and created a contract for Plaintiff that violated mandates and regulations that control the Plaintiff's employment contract and rules for teaching and prohibiting course overload, and forced Plaintiff to teach three section of the same undergraduate class, which is an unprecedented action to take against a tenured full professor. Defendant Currah also prevented Plaintiff from teaching summer school. These were intentional and malicious acts to degrade, harass, defame and humiliate Plaintiff, cause tortious interference, deny Plaintiff his property and contract rights, were also punitive acts against Plaintiff motivated by racism, and were acts for which Brooklyn College Defendants and officials and managers had actual and constructive knowledge and allowed by Defendants

Gould, BC and CUNY without interference and without sanctioning Currah, and without sanctioning the members of the Gang of Five and other Defendants who individually and collectively participated in the ongoing malicious, defamatory and harassing attacks against Plaintiff.

125. On March 25, 2013, a meeting was held in the office of New York State Assembly person Joseph R. Lentol. Present at that meeting and in the meeting room were former professor Steve Leberstein, GCWE, Professor Manny Ness, Eric Radezky, Chief of Staff and former GCWE student who also functions as a legislative aide to Assembly Member Lentol. Brooklyn College President, Defendant Gould, participated in that meeting via speakerphone. President Gould stated to the meeting participants: "The Center is being closed because Wilson was corrupt and stealing." Lentol was present at the meeting.

126. In March 2014 NYC Council person Inez Barron extended a written invitation to Plaintiff to attend her inaugural event for her installation as Chair of the NY City Council Higher Education Committee. CUNY Defendant John Kotowski telephoned Council Member Barron and spoke with her personally. Defendant Kotowski instructed Barron to "un-invite" Plaintiff. Barron refused to un-invite Plaintiff. Kotowski stated to Barron: "You are aware of Professor Wilson and what is going on with worker education."

127. On August 30, 2013, BC Economics Professor Robert Cherry told Professor Ness that President Gould had made statements against Professor Ness. Prof. Cherry told Prof. Ness that President Gould told him that due to "Ness' work in support of the GCWE and Professor Wilson", Gould told Cherry that "Ness was an extremist and an enemy."

128. On September 17, 2013, Alex Ellefson, a reporter for the Brooklyn College student newspaper "Kingsman", wrote an article entitled "NYS Attorney General's Office Investigates Brooklyn College." The "Kingsman" is distributed online and throughout the campus and the Brooklyn community.

129.   The "Kingsman" article contained information about Plaintiff, Defendant Robin's blog, the Brooklyn College investigation at the GCWE.  The "Kingsman" news article also stated : "Prof. Corey Robin , who served as interim Director of the Center, wrote on his blog that the Attorney General's investigation, as well as a CUNY investigation, began after the Political Science Department discovered evidence of financial wrong doing at the Center.".  The article also stated that Professor Wilson had a lawyer from the PSC representing Professor Wilson in his disciplinary charges brought by President Gould.  The article ends by stating: "We didn't want our students and degree program associated with that Center because it was getting a bad reputation", Currah said."

130.   Over a long period of time, Defendants Currah, Robin, Cheng, Gould and Phillips repeatedly made open defamatory statements about plaintiff, including that Plaintiff was changing grades, allowing and encouraging students to plagiarize, stealing tuition money, entering into leases at the GCWE in secret and without authorization, and engaged in other financial wrongdoing and administrative and professional wrongdoing.

131.   In January 2012 as a result of the intensive, public, pervasive and ongoing defamation of Plaintiff by defendants, plaintiff was fired as the Director of the GCWE. The specific defamatory statements have been enumerated for the Defendants, herein before, and are incorporated herein, and as to plaintiff's claims herein are specified.

132.   On or about February 2012, Defendant Robin was appointed interim Director of the GCWE.  Defendant Robin continued his defamation of Plaintiff, including recent blog Posts stating that Plaintiff was entering into secret leases at the GCWE and taking money.

133.   On or about Fall 2011, through approximately Spring 2013, CUNY in collusion with BC conducted an internal investigation of Plaintiff.

134.     Plaintiff has made numerous and repeated oral and written demands to Brooklyn College, and Defendant Robin who is now the chairperson of the Political Science Department, and Defendant Currah, to account for and return all of his personal files, objects of art, historical and labor related memorabilia, books, documents, research papers, records.

135.     To date Brooklyn College and the individual Defendants have failed to account to Plaintiff the belongings of his that were confiscated and they have failed to return Plaintiff's belongings.  Plaintiff charges Brooklyn College, Brooklyn College in collusion with CUNY, and named Defendants including (now former) Dean Kim Phillips, President Gould, Defendants Robin and Currah, Barbara Haugstatter, with conversion of property and larceny.

136.     On or about June 8, 2012 The NY AG served Brooklyn College with a subpoena.  BC and in collusion with CUNY did not respond honestly and completely to the AG's subpoena and this falsity included suppression of exculpatory evidence for Plaintiff.

137.     Brooklyn College and individual defendants including Robin, Currah, and Haugstatter have informed persons including former students who have requested contact information for Plaintiff that Plaintiff is no longer employed by Brooklyn College.  This is false.  Plaintiff is on forced administrative leave and is still employed by Brooklyn College as a tenured full professor.  Brooklyn College and individual defendants have refused to provide contact information for Plaintiff to persons contacting the college to obtain information on how to contact Plaintiff.

138.     145.  From January 2012 when Plaintiff was fired as the Director of the GCWE, Brooklyn College and individual defendants including Robin, Currah, Haugstatter, have, at the direction of former Dean Kim Phillips, confiscated Plaintiff's U.S. mail and his interoffice mail.  Plaintiff made

repeated and longstanding requests and demands for his U.S. and other mail. In approximately May 2013 Brooklyn College stopped confiscating Plaintiff's U.S. mail.  This confiscation of Plaintiff's mail is wrongful conduct by Brooklyn College and individual defendants and is mail fraud, mail tampering, and theft.  None of the confiscated U.S. mail has ever been returned to Plaintiff.

139.   In violation of CUNY policies and procedures, Brooklyn College has refused to allow Plaintiff to fulfill his contract obligation to complete his Multiple Position forms.  Brooklyn College is thereby forcing plaintiff to violate the terms and conditions of his employment contract, and is itself violating CUNY policies and procedures for an important requirement of completing the Multiple Position form.

140.   On January 13, 2013, Brooklyn College under signature of President Karen Gould served Wilson with extensive disciplinary charges.  The purpose of the disciplinary charges is to have Plaintiff fired as a tenured full professor of Political Science at Brooklyn College.

141.   Plaintiff has completed his Step Two disciplinary hearings.  On or about October 2014 CUNY issued its findings against Plaintiff Wilson in his disciplinary charges.  Most of the disciplinary charges were sustained, though several of the disciplinary charges and specifications within the charges were dismissed by CUNY.

142.   The disciplinary charges included requiring Plaintiff to take a forced administrative leave with pay as a tenured full professor of Political Science from Brooklyn College. Plaintiff continues to be employed by Brooklyn College as of the date of this filing.  It is therefore Brooklyn College's and stated individual defendants' responsibility to provide contact information for Plaintiff to persons requesting such contact information from Brooklyn

College and individual employees who are defendants, including Defendants Robin, Currah, Haugstatter, and President Gould.

143.   On or about May 2013 Brooklyn College allowed Plaintiff to receive his U.S. mail that was sent to Brooklyn College. The prior sixteen months of Plaintiff's U.S. mail sent to Brooklyn College have never been given to Plaintiff, despite his repeated demands.

144.   The AG conducted an investigation of Plaintiff. As of the date of this filing the AG has not indicted Plaintiff. The AG at no point in time ever called Plaintiff into the AG's office for any personal interviews or questioning.

145.   The lack of facts supporting the claims and charges against Plaintiff show gross negligence, malice, malicious and intentional infliction of emotional distress and harm, by Defendants against Plaintiff, by Defendants individually and collectively, and show other acts criminal in nature including suppression of evidence, filing various false charges, witness tampering and intimidation, and falsely responding to the AG's subpoena to Brooklyn College.

146.   CUNY and BC and the Defendants who were officials and managers, Defendants Phillips and President Gould, Pamela Pollack, Esq., Marcia Isaacson, Esq., Frederick Schaffer, Michael Hewitt, Esq., at all times had actual and constructive knowledge of the acts of Defendants Robin and Currah in conducting their own investigation of Plaintiff and in repeatedly making defamatory and criminal accusations against Plaintiff during their meetings on BC premises in the offices of various professors.

147.   Defendant Phillips participated in some of these meetings with professors. During the meetings negative statements and defamatory comments about Plaintiff were made by Defendants who participated in the meetings. The BC and CUNY investigations were not procedurally correct. The investigations were conducted more as witness tampering and intimidation

with clearly procedurally defective, evidence suppressing tactics.  The repeated defamation of Plaintiff made it clear to BC employees who are not Defendants that the administration was opposed to Plaintiff.

148.   Defendant Michael Hewitt, Esq., functioned for more than (3) years as the Assistant Vice-President for Finance at Brooklyn College.  Defendant Hewitt reported to the former BC Vice President of Finance, Steve Little.

149.   Defendant Hewitt processed and personally delivered Plaintiff's paychecks to Plaintiff while Plaintiff was the Director of the GCWE.  Therefore, any criminal allegations filed by BC with the collusion of CUNY as related to Plaintiff's salary as Director GCWE, were false.  Defendant Hewitt also reviewed, and approved other BC payments made to Plaintiff.  Defendant Hewitt as the VP Finance had full and ongoing access to all BC fiscal and accounting records, internal BC audits and state audits, which fiscal and accounting records present information on BC leases including the MIM lease, with MIM leasing space at the GCWE for many years and MIM remitting rent payments. Defendants Isaacson and Pollack also had full access to records and documents related to BC leases, rent remittances, including the MIM lease.  Failure to provide this and other exculpatory evidence for Plaintiff and to the AG in response to the AG's subpoena to BC, and failure to provide exculpatory evidence during the BC and CUNY investigations of Plaintiff, and Defendants Gould, Isaacson, Pollack, Schaffer, Hewitt allowing disciplinary charges to be filed against Plaintiff, and allowing criminal allegations to be filed against Plaintiff, are additional evidence that BC, CUNY, and the individual Defendants were individually and collectively and in collusion engaged in ongoing violations of the law, suppression of evidence, malicious and wrongful conduct, to support, facilitate and cause the punitive actions against Plaintiff, his wrongful termination as Director GCWE, intentional and malicious infliction of emotional harm, defamation, tortious interference, and violation of Plaintiff's civil and property rights.

150.   The results of the BC and CUNY investigations of Plaintiff were rigged, fraudulent, and based on suppression of evidence, and witness tampering, due to the fact that BC internal and external audits and year end closings, and fiscal and accounting records in the BC Budget Office, and full and honest testimony by Defendant Hewitt, would have substantiated the valid, authorized and true basis upon which Plaintiff received all BC salaries and monies paid to him.  Defendant Hewitt knows the truth about salaries and payments made to Plaintiff yet has remained silent and has failed to provide exculpatory evidence, and is therefore acting in collusion with BC and CUNY.

151.   As related to the false disciplinary charges BC with the collusion of CUNY filed against Plaintiff, and with the collusion, knowledge, consent of the other named Defendants, all monies paid to Plaintiff were paid with the full knowledge of Defendant Hewitt, the BC fiscal and accounting office, employees therein, and information related to audits and fiscal and accounting records was at all times under the custody and control of BC and CUNY.  Therefore, BC and CUNY, and relevant Defendants including Gould, Hewitt, Isaacson, Schaffer, and other officials and managers and employees named as Defendants, had continuous, ongoing constructive and actual knowledge of the falsity of the their defamatory allegations against Plaintiff, the falsity and fraud of the investigations, the falsity and fraud of the criminal allegations filed against Plaintiff, the falsity of the alleged wrongdoing that caused BC to fire Plaintiff as the Director of the GCWE, the falsity of the BC disciplinary charges against Plaintiff, the falsity of the blogs and Facebook postings, and the falsity of the 2014 NY Times article.

152.   The pending BC disciplinary charges against Plaintiff to cause him to be fired as a professor are false in their entirety, and false with regard to disciplinary charges alleging that Plaintiff received salary in excess of salary he was entitled to receive during the time Plaintiff was employed as GCWE Director and a professor.  BC and CUNY are Suppressing relevant exculpatory evidence.

153. Hewitt assisted in the punitive acts against Plaintiff by failing to explicitly present exculpatory information and evidence, especially as regarding the fact that Hewitt processed and approved the salary payments to Plaintiff particularly with regard to the salary paid to Plaintiff as GCWE Director, and Defendant Hewitt failed to come forward to provide exculpatory evidence, and failed to provide exculpatory evidence that would have helped Plaintiff during the time the investigations were conducted and BC with the collusion of CUNY filed false criminal allegations against Plaintiff.

154. Defendant Phillips, the former BC Dean, called Professor Steven Brier, who was the former Assistant Provost for the CUNY Graduate Center, and intimidated him.  Prof. Brier told Plaintiff that Defendant Phillips threatened him that he must not support the GCWE and Wilson (Plaintiff).  Brier told Defendant Phillips that he refused to cooperate and Brier told Plaintiff that Phillips attempted to intimidate him.

155. In 2013 BC Prof. Nancy Romer, a potential witness who worked with Plaintiff, was told by high ranking administrators that they had "evidence" against Plaintiff.  Romer repeated this "evidence" against Wilson statement to other people.

156. Prof. Alex Vitaly, a union official, was told by Defendant Gould that she had evidence against Plaintiff.  Vitaly repeated this claim to other and secretly worked with Currah on a memo and policy paper that attacked and defamed Plaintiff.

157. A high-ranking BC administrator who was prepared to testify on behalf of Plaintiff at his disciplinary hearings was told by Defendant Phillips that her testimony on behalf of Plaintiff "would not be good for her career.".  Subsequently she declined to testify in a related disciplinary proceeding against professor Prof. Steve Leberstein, who is also a witness and was intimidated by Defendant Phillips.

158. The Brooklyn College EEO Officer was aware of Defendant Robin's age biased on-going comments and his rejection of pedagogical employment candidates of color, with Defendant Robin's overt support and appointment

of less qualified candidates applying for positions as professors. Robin uniformly selected the less qualified white and younger candidates for Political Science professorships. Prof. Manny Ness conveyed the information on this ongoing discrimination by Robin to the BC EEO Officer, in meetings in 2011 and 2012. No actions were taken by BC or CUNY, even in the face of the internal policies against discrimination. This same EEO Officer saw on TV Plaintiff's testimony at the NY City Council 2013 public hearings on higher education, during which testimony Plaintiff did not provide positive testimony about the efforts of CUNY to recruit and hire qualified minority and minority female professors. After that testimony BC banned Plaintiff from all teaching and from the BC campus.

159.    The BC Director of Continuing Education, Lillian O'Reilly, Esq., told Plaintiff that he could not testify in support of Plaintiff regarding the Continuing Education Programs at the GCWE because she is an at-will employee and a single mother and she would be retaliated against. When O'Reilly was interviewed by BC and CUNY investigators, the investigators did not ask for any corroborating or exculpatory evidence that would show the complete validity and official approval and knowledge regarding Plaintiff's Paralegal Certificate Program and other co-sponsored revenue generating programs at the GCWE, including leasing space at the GCWE to unions for educational programs. It is to be noted that BC was intensively knowledgeable and supportive of the GCWE Continuing Education Programs and actively encouraged such programs because revenues from Continuing Education were used to pay the salary bonuses in the Executive Pay Plan. 184.   In 2013 BC Mailroom Director Madonna Charles told Plaintiff that Defendant Phillips ordered the confiscation of Plaintiff's U.S. mail. Charles complied and confiscated all of Plaintiff's U.S. mail. Defendant Phillips had no authority or factual basis to confiscate Plaintiff's U.S. mail. This act, with the knowledge and consent of BC and CUNY, constitutes mail fraud and mail tampering.

160.   Former GCWE staff administrator Joshua Board signed and submitted an affidavit confirming that Defendant Robin took Plaintiff's U.S. mail and discarded and destroyed Plaintiff's mail and documents and files at the GCWE. Several BC faculty and staff have signed similar affidavits regarding mail tampering and as related to Plaintiff.

161.   On or about November 2011 to January 2012 Defendant Phillips refused to process and sign Plaintiff's timesheets as Director of the GCWE. This resulted in Plaintiff losing approximately $12,000 in salary.

162.   Douglas Henwood is not a Defendant. Mr. Henwood is a journalist and a radio show host. He is the husband of Leza Featherstone who is a visiting professor in the BC Political Science department. The defamation of Plaintiff and the defamatory and negative statements directly related to Plaintiff and the GCWE have extended through publication to Mr. Henwood's 2014 Facebook threads and statements that directly make character assassinating and defamatory statements about Plaintiff, due to the fact that Plaintiff was the Director of the GCWE, including a Facebook statement by Mr. Henwood that the GCWE was "run by a bunch of thieves." This is a defamatory statement and public posting that directly relates to Plaintiff as the person responsible for the overall administration and functioning of the GCWE. Mr. Henwood's Facebook posting and the thread of comments indicates the widespread defamation and seriously negative comments that relate to Plaintiff and that impugn Plaintiff and the operations of the GCWE while Plaintiff was the Director. The Facebook postings indicate that Mr. Henwood had full knowledge of the ongoing, public, pervasive defamation of Plaintiff by the Gang of Five and all of the Defendants, and he believes the defamation.

## FIRST CAUSE OF ACTION
### (Violation of Rights Secured by 42 U.S.C. § and the
### Thirteenth Amendment to the United States Constitution)

163.   The Plaintiff incorporates by reference the allegations set forth in Paragraphs
1 through 162 as if fully set forth herein.

164.   Defendants, subjected the Plaintiff, who is African-American to the
foregoing conspiracies, unlawful acts and omissions, including but not
limited to malicious prosecution, tortious interference of Plaintiff's contract
as a tenured full Professor at Brooklyn College. The abuse of process, in
particular, the warrantless search of Plaintiff's office and the seizure of his
computer and business documents, the unjustified seizure of Plaintiff's
business records and conversion of his personal property by Brooklyn
College, tampering with Plaintiff's mail in violation with his Fourth
Amendments Rights and 18 U.S.C § 1703 and 1708, attempting to alter or
prevent testimony of a potential witness in a Civil or Criminal proceeding,
fabrication of inculpatory in particular to false claims of plagiarism,
changing student grades, and misappropriation of tuition money, the
produced testimony by Pam Pollack, Esq., legal counsel at Brooklyn
College, Marsha Issacson, senior associate general counsel and chief
compliance officer at CUNY about the MIM's lease, obstruction of justice,
attempts by the Gang of Five to suppress the sexual attack on Professor
Ness, and attempted sodomy in the First Degree, a Class C Felony offense,
carrying a prison sentence of 5 to 15 years, and an attempt by Corey Robin
to discourage Professor Ness from reporting the incidence to the New York
Police Department.

165.   During the ongoing campaign of harassment against Professor Wilson,
Defendant Robin displayed extreme racial animus towards Professor Wilson.
He told faculty members, "I declare war on Joe--that Joe is going down, Joe
should no longer be a Professor because he is no longer interested in
teaching, and he warned Professor Mannie Ness to stay away from Joe—Joe
is going down and you will go with him." Professor Robin also stated to

faculty members that he was going to eliminate the Urban Policy Program and the Graduate Center of Worker Education. The Gang of Five accused Professor Wilson of plagiarizing intellectual property, and with colluding with students to plagiarize. He also accused him of stealing tuition money, of entering into unauthorized leases, such as MIM, of authoring unauthorized courses, such as, the Paralegal and the joint JD program with Brooklyn Law School.

166.    As a result of the campaign of vilification launched by the Gang of Five, a raid was conducted by armed CUNY guards on the GCWE premise at 25 Broadway. As a result of this warrantless search on his office, Plaintiff suffered a loss of his computer and all of his electronic files. Also suffered a loss of his books, memoranda, memorabilia, research notes for future publications. These items were never returned to Plaintiff, in spite of his repeated request for its return.

167.    In addition, from January 2012 to May 2013, Plaintiff's U.S. both to his office at GCWA at 25 Broadway and the Political Science Department at Brooklyn College were seized and confiscated by authorities at Brooklyn College. Madonna Charles, mailroom director at Brooklyn College that she was instructed by Dean Phillips to seize his mail. This was a clear violation of 18 U.S.C § 1703 and 1708, which makes it a criminal offense to tamper U.S. mail.

168.    In January 2012, as result of the campaign of vilification and defamation perpetrated by the Gang of Five, Plaintiff was summarily terminated without due process as Director of the GCWE without any charges and specifications being filed against him, and without an opportunity for a hearing. The President of Brooklyn College did not even offer him a termination letter, explaining the reason for the termination. Professor Robin, the interim Director, carried out his mission to destroy the center. The students enrolment was predominantly African-American and Caribbean, plummeted from approximately 200 to approximately 30. The degree in Urban Policy was eliminated from GCWE and the Technology Grant from New York City

Council was gratuitously rejected by the administration at Brooklyn College, and almost all the minority staff at GCWE was dismissed.

169.   Defendant's conspiracies, unlawful acts and omissions denied Plaintiff equal rights under the law, including but not limited to Plaintiff's rights to the full and equal benefit of all laws of proceedings for the securities of persons and properties as is enjoyed by White citizens and was instead subjected to the punishment, pains and penalties, unlike those imposed on White citizens. Defendants acted intentionally and purposefully, without lawful justification and with a reckless disregard for the natural and probable consequences of their acts causing specific mental and emotional harm, economic injury, pain and suffering in violation of the Plaintiff's Constitutional Rights as guaranteed under 42 U.S.C. §1981 and the Thirteenth and Fourteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff demands the following relief, jointly and severally, against all of the defendants, except for the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City.

a.   Compensatory and punitive damage awards in the amount of twenty million dollars ($20,000,000.00) or such greater amount as may be set by a Jury;

b.   A Court order, pursuant to 42 U.S.C. § 1988 that the Plaintiff is entitled to the cost involved in maintaining this action and attorney's fees;

c.   Such other and further relief as the Court may deem just and proper;

## DEMAND FOR A JURY TRIAL

A Jury trial is hereby demanded on each and every one of the claims as plead herein.

Dated:  New York, New York
        January 5, 2015


BY: _____
        COLIN A. MOORE, ESQ.
        26 Court Street, Suite701
        Brooklyn, New York 11241
        Telephone: 718-643-1214
        Fax: 718-643-1246