# EXHIBIT 1

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 15-cv-0023(CBA)(VMS)

5    ----------------------------------------x

6    DR. JOSEPH WILSON, PhD,

7                        Plaintiff,

8             - against -

9    THE STATE OF NEW YORK, et al.,

10                       Defendants.

11   ----------------------------------------x

12                       January 29, 2019

                         9:30  a.m.

13

14            DEPOSITION of DR. JOSEPH WILSON,

15   taken by the Defendants, pursuant to

16   Notice, held at the Law Offices of John S.

17   Yong, P.C., 39 East Broadway, New York,

18   New York, before Debbie Zaromatidis, a

19   Shorthand Reporter and Notary Public of

20   the State of New York.

21

22

23

24

25

Page 2

1
2 A P P E A R A N C E S :
3
4      LAW OFFICE OF JOHN S. YONG, P.C.
5      Attorneys for Plaintiff
6         39 East Broadway
7         New York, New York
8      BY:  CHRIS YONG, ESQ.
9         - and -
10        JAMES B. KLEIN, ESQ.
11
12 STATE OF NEW YORK
13 OFFICE OF THE ATTORNEY GENERAL
14 Attorneys for Defendants
15     28 Liberty Street
16     New York, New York
17 BY: MARK E. KLEIN, ESQ.
18
19
20
21
22
23
24
25

Page 3

1
2         S T I P U L A T I O N S
3
4         IT IS HEREBY STIPULATED AND
5 AGREED by and between the Attorneys for
6 the respective parties hereto that filing
7 and sealing be and the same are hereby
8 waived.
9         IT IS FURTHER STIPULATED AND
10 AGREED that all objections except as to
11 the form of the question, shall be
12 reserved to the time of the trial.
13        IT IS FURTHER STIPULATED AND
14 AGREED that the within examination may be
15 signed and sworn to before any notary
16 public with the same force and effect as
17 though signed and sworn to before this
18 Court.
19
20
21
22
23
24
25

Page 4

1                    WILSON
2 DR. J O S E P H   W I L S O N,
3 having first been duly sworn by a Notary
4 Public of the State of New York, was
5 examined and testified as follows:
6 EXAMINATION BY MR. KLEIN:
7      Q.   Good morning, Dr. Wilson.
8      A.   Good morning.
9      Q.   Have you ever been deposed
10 before, sir?
11     A.   No.
12     Q.   You understand, sir, that I'll
13 be asking you a series of questions today,
14 and you are required to answer those
15 questions under oath.   Do you understand
16 that?
17     A.   Yes, I do.
18     Q.   And do you understand that the
19 oath you gave today is the same as if you
20 were testifying in court? Do you
21 understand that?
22     A.   I understand that.
23     Q.   If at any time you do not
24 understand the question that I ask you,
25 please tell me, and I'll do my best to

Page 5

1                    WILSON
2 rephrase it, so that you do.  Is that
3 agreed?
4      A.   That is agreed.
5      Q.   If you answer my question, I
6 will assume that you understood my
7 question.  Do you understand that?
8      A.   I understand that.
9      Q.   Is there any medication that
10 you're taking that would interfere with
11 your ability to give truthful and complete
12 answers to my questions here today?
13     A.   No.
14     Q.   Is there any other reason that
15 you would be unable to give complete and
16 truthful answers to my questions today?
17     A.   I am recovering from a very bad
18 cold, so I am not sure on that answer.
19     Q.   So you think the bad cold might
20 interfere with your ability to give
21 truthful and complete answers?
22     A.   No, I may have to blow my nose
23 and so forth.   So that is the point.
24     Q.   Aside from having to blow your
25 nose --

2 (Pages 2 - 5)

WILSON

1
2 A. Clear my throat.
3 Q. -- and possibly taking a break,
4 does the fact that you are recovering from
5 a cold interfere with your ability to give
6 truthful and complete answer?
7 A. No.
8 Q. It is important that you allow
9 me to finish my question before you start
10 answering. The court reporter can't take
11 down both of us at the same time. Okay.
12 MR. JAMES KLEIN: Can I just
13 interject something? Last night we
14 received the Supplemental Disclosure under
15 Federal Rule 26 A where you disclosed to
16 us for the first time Ms. Joan C. Waters
17 as a potential witness in this case.
18 MR. MARK KLEIN: Actually I
19 e-mailed it to you last week.
20 MR. JAMES KLEIN: I don't think
21 I received it subsequent to the
22 investigation of documents obtained by
23 CUNY's investigation. Since I had not
24 seen this until last night, you know, I am
25 going to have a standing objection with

WILSON

1
2 regards to anything that is the subject
3 matter of Ms. Waters' potential testimony
4 because I do not believe that we had any
5 opportunity to do any discovery, and we
6 just got this last night.
7 MR. JAMES KLEIN: Well, your
8 objection is completely off base, but I
9 hear what you say.
10 Q. All right. Dr. Wilson, what,
11 if anything, did you do in preparing for
12 your deposition here today?
13 MR. JAMES KLEIN: I would
14 object as to any privileged issues.
15 Q. Can you answer the question,
16 sir?
17 A. I reviewed my history of
18 employment at CUNY.
19 Q. And how did you go about
20 reviewing the history of your employment
21 at CUNY?
22 A. By carefully reviewing my
23 resume.
24 Q. And what resume are you
25 referring to?

WILSON

1
2 A. I don't understand the question.
3 Q. Well, do you have a resume in
4 your possession either at home or here?
5 A. Not here, but I do have a resume
6 at home.
7 Q. And you reviewed that in
8 preparation for your deposition here
9 today?
10 A. Yes.
11 MR. MARK KLEIN: I call for
12 production of Dr. Wilson's resume that he
13 reviewed.
14 Q. Besides reviewing your resume,
15 did you do anything else in preparation
16 for your deposition?
17 A. I reviewed my books.
18 Q. What books are you referring to?
19 A. That would include Tearing Down
20 the Color Bar, A Documentary History and
21 Analysis of the Brotherhood of Sleeping
22 Car Porters. That would include Black
23 Labor in America. That would include Race
24 and Labor Matters the New Political
25 Economy. That would include -- because

WILSON

1
2 the actual encyclopedia was taken from me,
3 but the -- my Encyclopedia of Revolution
4 and Protest.
5 Q. When you said the actual
6 encyclopedia was taken from you, what
7 encyclopedia are you referring to?
8 A. The Encyclopedia of Protest and
9 Revolution. It is an eight-volume
10 publication.
11 Q. So you reviewed the Encyclopedia
12 of Protest and Revolution for preparation
13 of your testimony; is that right?
14 A. I went on Amazon and just looked
15 at the Amazon listing.
16 Q. Okay. Besides what you've
17 described, did you do anything else in
18 preparation for your deposition here
19 today?
20 MR. JAMES KLEIN: I am just
21 going to have a standing objection to
22 anything that refers to anything involving
23 privilege.
24 MR. MARK KLEIN: I am entitled
25 to know whether he met with counsel.

3 (Pages 6 - 9)

Page 10

WILSON

1        WILSON
2        MR. JAMES KLEIN:   He met with
3 counsel.  I am saying --
4        MR. MARK KLEIN:   You don't need
5 to repeat it.  I want to know what he did
6 in preparation for his deposition.
7    A.   I met with counsel.
8    Q.   Who did you meet with?
9    A.   I met with John Yong.
10   Q.   Anybody else?
11   A.   I met with Chris Yong.
12   Q.   Anybody else?
13   A.   I met with James Klein.
14   Q.   Anybody else?
15   A.   I met with two other legal
16 associates of John Yong whose -- yes, two
17 other legal associates of John Yong.
18   Q.   What are their names?
19   A.   I am not -- I am not sure of
20 their names.
21   Q.   Anybody else that you met with?
22   A.   There may have been a paralegal
23 who sat in at one of those meetings.
24   Q.   All right.  Did you meet with
25 John Yong, Chris Yong, and James Klein all

Page 11

WILSON

1        WILSON
2 together or separately?
3    A.   I met with them separately and
4 in combinations.
5    Q.   How many meetings did you have
6 with counsel in preparation for your
7 deposition today?
8    A.   I would say a few.
9    Q.   Can you be any more exact?
10   A.   Can you repeat the question?
11   Q.   Can you be any more specific as
12 to how many times you met with counsel in
13 preparation for your deposition here
14 today?
15   A.   Do you mean with each one of
16 those people?
17   Q.   Yes.  How many meetings did you
18 have?
19   A.   Approximately ten.
20   Q.   You had approximately ten
21 meetings in preparation for your
22 deposition here today; is that right?
23   A.   That's right.
24   Q.   When was the most recent meeting
25 you had in preparation with your counsel

Page 12

WILSON

1        WILSON
2 for your deposition here today?
3    A.   Just a few minutes ago James and
4 I had a very brief meeting.
5    Q.   Before today when was your most
6 recent meeting with counsel in preparation
7 for your deposition?
8    A.   Sunday.
9    Q.   And where did you meet Sunday?
10   A.   At my apartment.
11   Q.   Where is your apartment?
12   A.   215 West 91st Street, Apartment
13 83.
14   Q.   And that is in Manhattan?
15   A.   Manhattan, New York City.
16   Q.   And who did you meet with on
17 Sunday at your apartment?
18   A.   James Klein.
19   Q.   And how long did you meet with
20 Mr. Klein?
21   A.   A couple of hours.
22   Q.   Did you meet in the morning or
23 in the afternoon or in the evening?
24   A.   Afternoon.
25   Q.   And it is your testimony that in

Page 13

WILSON

1        WILSON
2 addition to meeting with Mr. Klein on
3 Sunday at your apartment you had
4 approximately another nine meetings with
5 counsel in preparation for your deposition
6 today; is that right?
7    A.   That's correct.
8    Q.   When was the first time you met
9 with any counsel to prepare for your
10 deposition?
11   A.   I don't recall the first day.
12   Q.   What is your best recollection
13 as to when you first met with counsel in
14 preparation for your deposition?
15   A.   Maybe three weeks ago.
16   Q.   So it was in the calendar year
17 2019; is that right?
18   A.   Well, no, there were some
19 meetings in the calendar year of 2018, so
20 that perhaps would have been more than
21 three weeks ago.
22   Q.   Well, were these meetings in the
23 calendar year 2018 in preparation for your
24 deposition?
25   A.   Yes.

4 (Pages 10 - 13)

Page 14

WILSON

2   Q.   All together what is your best
3   approximation of how many hours you spent
4   with counsel preparing for your deposition
5   here today?
6       A.   Maybe eight to ten hours.
7           MR. MARK KLEIN:  I ask that the
8   reporter mark as Wilson Exhibit 1 a
9   document titled "Plaintiff's Initial
10  Disclosures."
11          (Wilson Exhibit 1 marked for
12  identification.)
13          (Document handed to witness.)
14      Q.   Dr. Wilson, I show you what has
15  been marked as Wilson Exhibit 1.  Please
16  take a moment to review the document and
17  tell me when you have done so.
18          (Document handed to witness.)
19          (Pause.)
20      Q.   You don't have to read the whole
21  document now.  I will point you to
22  specific parts I will ask you questions
23  about.
24          MR. JAMES KLEIN:  You shouldn't
25  feel rushed.  You should take whatever

Page 15

WILSON

2   time you need to review the document.
3       Q.   Have you reviewed it, Dr.
4   Wilson?
5       A.   Partially.
6       Q.   Have you seen this document
7   before today?
8       A.   Yes.
9       Q.   Did you have any role in its
10  preparation?
11      A.   Yes.
12      Q.   What role did you have?
13      A.   This information was
14  provided -- I provided much of the
15  information.
16      Q.   How did you go about providing
17  information? Did you type it and send it
18  to counsel?
19      A.   No.
20          MR. JAMES KLEIN:  Again, any
21  privilege issue I object.
22          MR. MARK KLEIN:  It is not
23  privileged how he provided information.
24      A.   Through sitting with counsel and
25  attempting to remember the various

Page 16

WILSON

2   incidents and so forth and the various
3   people.
4       Q.   So you sat with counsel and
5   orally provided information to counsel; is
6   that right?
7       A.   That's correct.
8       Q.   And counsel then prepared a
9   draft of the document; is that right?
10          MR. JAMES KLEIN:  Well, I think
11  that is privileged what counsel did.
12      Q.   Did you see a draft of the
13  document before it was served?
14      A.   Yes, I did.
15      Q.   So the document is dated June 29
16  of 2018.  You saw a draft before it went
17  out; is that right?
18      A.   Yes, I did.
19      Q.   How far in advance of June 29,
20  2018 did you see a draft?
21      A.   I don't recall.
22      Q.   To your knowledge, is there
23  anything in this document that is not
24  accurate?
25      A.   Not to my knowledge.

Page 17

WILSON

2       Q.   Okay.  I would like to direct
3   your attention to the bottom of page 2 of
4   the document.  You identify Natalie
5   Miller as an individual likely to have
6   knowledge of discoverable facts, correct?
7       A.   Correct.
8       Q.   When was the last time you
9   communicated with Natalie Miller?
10      A.   Sometime -- I don't remember the
11  exact date.
12      Q.   What is your best recollection
13  of the last time you spoke with her?
14      A.   Maybe within the last couple of
15  weeks.
16      Q.   For what purpose did you speak
17  with her within the last couple of week?
18      A.   To see how she was doing.
19      Q.   Was that the only purpose?
20      A.   That was the only purpose.
21      Q.   You didn't communicate with her
22  regarding preparation for your deposition?
23      A.   No.
24      Q.   Now, you identify as the subject
25  matter of her knowledge "Search and

5 (Pages 14 - 17)

Page 18

WILSON

1
2 seizure, witnessed seizure and destruction
3 and removal of plaintiff's property and
4 loss of mail delivery."
5       Do you see that?
6    A.   I see that.
7    Q.   What seizure and destruction and
8 removal of plaintiff's property are you
9 referring to?
10   A.   Ms. Miller was present when the
11 raid occurred in the -- when the raid
12 occurred, the initial raid.
13   Q.   And what raid are you referring
14 to?
15   A.   That was the raid conducted by
16 Ms. Isaacson and her staff at 25 Broadway.
17   Q.   Is it your testimony that
18 Ms. Miller was present when Ms. Isaacson
19 and others were there at your office?
20   A.   That's my testimony.
21   Q.   And how do you know that
22 Ms. Miller was present when Ms. Isaacson
23 and others came to your office at 25
24 Broadway?
25   A.   I witnessed it.

Page 19

WILSON

1
2    Q.   You were there as well?
3    A.   Correct.
4    Q.   Do you know the date of the
5 "Raid" that you are referring to?
6    A.   That would have been the end of
7 January 2012 approximately, the last week.
8    Q.   And you were in your office when
9 Ms. Isaacson and others came to conduct
10 the "Raid" to use your word?
11   A.   No.
12   Q.   How is it that you witnessed it
13 if you weren't in your office?
14   A.   Because I entered the premises
15 while the raid was in progress.
16   Q.   What time of day was this?
17   A.   It would have been afternoon,
18 late afternoon I believe.
19   Q.   And you've testified that
20 Ms. Isaacson was present at the time of
21 this "Raid"?
22   A.   Correct.
23   Q.   Who else was present besides
24 Ms. Isaacson?
25   A.   There were other parties, and

Page 20

WILSON

1
2 the others didn't identify themselves, and
3 there was one other individual who I
4 forget.  He may have identified himself.
5    Q.   How many people besides
6 Ms. Isaacson were there?
7    A.   Maybe approximately eight
8 people.
9    Q.   And don't you know the names of
10 any of these approximately eight people
11 besides Ms. Isaacson; is that right?
12   A.   Clarification.  When you say
13 you were there, what do you mean?  With
14 Ms. Isaacson.
15   Q.   With Ms. Isaacson, yes.
16   A.   Yes.  Right.  And I don't know
17 the names of the others.
18   Q.   And you entered the premises
19 while the "Raid" was in progress you
20 testified?
21   A.   Correct.
22   Q.   And Ms. Miller was already
23 there?
24   A.   Yes.
25   Q.   And was anybody else there who

Page 21

WILSON

1
2 worked at the Graduate Center For Worker
3 Education?
4    A.   Yes.
5    Q.   Who?
6    A.   Annie London, Immanuel Ness.
7 There were I believe some students there.
8    Q.   Were students in your office?
9    A.   No.
10   Q.   Was Ms. London in your office?
11   A.   No.
12   Q.   Was Professor Ness in your
13 office?
14   A.   No.
15   Q.   Was Ms. Miller in your office?
16   A.   No.
17   Q.   Was there anyone else in your
18 office besides you and Ms. Isaacson and
19 the others with her?
20   A.   I didn't say I was in the
21 office.
22       MR. JAMES KLEIN:  That is a
23 mischaracterization.
24   Q.   Were you in your office at the
25 time?

Page 22

WILSON

1
2   A.   No.
3   Q.   What, if anything, did you say
4 to Ms. Isaacson when you entered the
5 premises?
6   A.   I believe I said what are you
7 doing here.
8   Q.   And what, if anything, did
9 Ms. Isaacson respond?
10   A.   I don't recall her response.
11   Q.   Do you recall any discussion
12 that you had with any of the -- either
13 with Ms. Isaacson or any of the people who
14 accompanied her?
15   A.   Yes.
16   Q.   What do you recall?
17   A.   I recall Ms. Isaacson leaving
18 with some of my files, and the only file
19 that I could see that was obvious was
20 lecture notes.
21   Q.   And what lecture notes?
22   A.   That would have been lecture
23 notes for a class that I would have been
24 presenting, and that probably would have
25 been, you know, a pending class or an

Page 23

WILSON

1
2 upcoming class but in preparation for a
3 lecture.
4   Q.   How far away from --
5      MR. MARK KLEIN:   Withdrawn.
6   Q.   You have an office at the
7 Graduate Center For Worker Education,
8 correct?
9   A.   Correct.
10   Q.   On what floor of the building at
11 25 Broadway was your office?
12   A.   Seventh.
13   Q.   Seventh floor?
14   A.   But I didn't finish the first
15 question you asked me.   You asked me who
16 else was present, and you didn't let me
17 finish my answer.
18   Q.   Who else was present?
19   A.   Well, there was the -- there
20 are -- I think there were other staff
21 members who I don't recall from -- from
22 the Center For Worker Education -- from
23 the Graduate Center For Worker Education.
24 There were representatives from the
25 Manhattan institute of management.   There

Page 24

WILSON

1
2 were staff and students from City College.
3 They have a large staff, so they were in
4 the area in the vicinity while this was
5 happening.
6   Q.   And I just want to be sure
7 before I move on.   You have no
8 recollection of any discussion that you
9 had with Ms. Isaacson or anybody that was
10 with her?
11   A.   That is not what I said.
12   Q.   Do you have any recollection of
13 any discussion you had with Ms. Isaacson
14 or anyone else who was with her?
15   A.   Yes, I do.
16   Q.   What do you recall?
17   A.   I recall asking Ms. Isaacson why
18 is she taking my lectures, and I said I
19 need my lectures.   I use those for
20 teaching.
21   Q.   Do you recall her response, if
22 any?
23   A.   She didn't tell me why she was
24 taking them.
25   Q.   Do you recall any other

Page 25

WILSON

1
2 discussion you had other than what you've
3 testified to with either Ms. Isaacson or
4 anybody who was with her?
5   A.   Well, the -- she was with a
6 gentleman who introduced himself, but we
7 had no discussion.
8   Q.   Was it somebody from Brooklyn
9 College who introduced himself?
10   A.   No.
11   Q.   Do you recall anything else that
12 was said between you and any -- and
13 Ms. Isaacson and any of the people who
14 were with her besides what you have
15 testified on this day in late January of
16 2012 when you say your office was
17 "Raided"?
18   A.   I do remember one of the members
19 of her raiding party instructing everyone
20 within ear shouting distance not to move.
21 They can't leave.   Don't use any
22 telephones.   You're not allowed to talk.
23   Q.   And have you finished your
24 answer?
25   A.   I am thinking if there was any

7 (Pages 22 - 25)

Page 26

```
1          WILSON
2  other exchanges of information.  No,
3  other than the fact that they had -- I saw
4  no identification, and I am not sure
5  whether they were carrying guns or not,
6  but that was --
7     Q.   Was the person who gave the
8  instructions that you just testified about
9  a man or a woman?
10    A.   A man.
11    Q.   Was it a uniformed person or
12 not?
13    A.   Plain clothes.
14    Q.   Again, other than what you have
15 testified to, do you recall anything else
16 that was said either by you or
17 Ms. Isaacson or the people who were with
18 her on this day in late January that you
19 have been testifying about?
20    A.   Yes.  I recall now that there
21 were two observers present from the
22 professional staff congress.
23    Q.   Well, did either of those
24 observers say anything?
25    A.   They said something to me.
```

Page 27

```
1          WILSON
2     Q.   What did they say?
3     A.   They said we are here to witness
4  and to observe this.
5     Q.   Did they give you their names?
6     A.   One name I remember, first name
7  Renee.  There was also a gentleman whose
8  name I don't recall.
9     Q.   Did you say anything in response
10 to they're telling that they were there to
11 witness and observe this?
12    A.   Yes.  I said what is going on to
13 them.
14    Q.   And what, if anything, did they
15 respond?
16    A.   They said we don't know.
17    Q.   All right.  Other than what you
18 have testified to before, did you or
19 Ms. Isaacson or any of the people that she
20 was with say anything else during this
21 event in late January of 2012 at your
22 office at 25 Broadway?
23    A.   At the moment, at this moment
24 that is all that I can recollect.
25    Q.   Now, you testified before that
```

Page 28

```
1          WILSON
2  Ms. London, Professor Ness, and Ms. Miller
3  were present on the day of the event
4  you've been describing, correct?
5     A.   That's correct.
6     Q.   How far away from your office
7  were these people?
8     A.   They were in different
9  positions, so they weren't equivalent
10 distances away.
11    Q.   Was the door to your office open
12 or closed during the time that
13 Ms. Isaacson and the people with her were
14 in your office?
15    A.   I observed it as being both open
16 and both closed.
17    Q.   How long after the "raid" that
18 you have referred to --
19       MR. MARK KLEIN:  Withdrawn.
20    Q.   How long after the "Raid"
21 started did you arrive?
22    A.   I don't know precisely when it
23 started so -- so I can't answer that the
24 way you phrased it.
25    Q.   Did you ask anybody how long
```

Page 29

```
1          WILSON
2  Ms. Isaacson and the people with her had
3  been there before you arrived?
4     A.   No.
5     Q.   Did anyone at any time explain
6  to you the purpose for entering your
7  office on this day in late January 2012?
8     A.   No, not that I can recall.  You
9  mean on that day?
10    Q.   Yes.
11    A.   No.
12    Q.   How long were Ms. Isaacson and
13 the people with her there during the time
14 that you were also present?
15    A.   Approximately an hour.
16    Q.   And do you know what time of day
17 Ms. Isaacson and the people with her left
18 on that day in late January 2012?
19    A.   What time they left?
20    Q.   Yes.
21    A.   It would have been late
22 afternoon, early evening about an hour or
23 so later after I arrived.
24    Q.   And when they left, did they
25 lock the door to your office?
```

8 (Pages 26 - 29)

WILSON

1
2    A.   No.
3    Q.   Were you able to get into your
4 office?
5    A.   Yes.
6    Q.   And so you went in to your
7 office after they left, and did you
8 observe what, if anything, had been taken?
9    A.   It would have been impossible to
10 know what was taken.
11   Q.   Why was it impossible to know
12 what was taken?
13   A.   When you have an office with
14 hundreds of things, how would you know out
15 of hundred of things what was taken and
16 what wasn't.
17   Q.   Well, let's talk a minute about
18 your office.  What were the dimensions of
19 your office on the 7th floor of 25
20 Broadway back in 2012?
21   A.   I would say approximately 20 by
22 15 approximately.
23   Q.   Dr. Wilson, I am going to give
24 you a blank piece of paper and a pen.
25   A.   I've got a pen.

WILSON

1
2    Q.   What I would like you to do is
3 draw the outlines of your office at -- on
4 the seventh floor at 25 Broadway back in
5 2012.  If you would make it a good size,
6 so we can identify the things in it to the
7 best of your ability.
8    A.   (Witness complies.)
9    Q.   Thank you.
10       Can you direct us to north or
11 south or east or west?
12   A.   North or south.  Let's see.  I
13 think this --
14       MR. JAMES KLEIN:   You don't
15 have to guess.
16   A.   This probably would have been
17 north.
18   Q.   Okay.  And the window, did that
19 look out on Broadway?
20   A.   I'm not sure.  I don't think
21 so.
22   Q.   How long had you occupied that
23 office as of 2012?
24   A.   About three years.
25   Q.   So three years before you had

WILSON

1
2 moved from another office into that one,
3 the one you just drew?
4    A.   Approximately.
5    Q.   Did the office that you just
6 drew for us, did it have an office number
7 or letter, any designation?
8    A.   I believe it was -- maybe it was
9 7 or maybe it was 705 or 75.
10   Q.   Is it 7-5, something like that?
11   A.   I am -- it is either 75 or 705.
12 Something like that approximately.
13   Q.   All right.  So were you inside
14 the office while Ms. Isaacson and the
15 people who were with her were in your
16 office?
17   A.   No.
18   Q.   So you testified that the door
19 was unlocked after Ms. Isaacson and people
20 with her left, correct?
21   A.   Correct.
22   Q.   You then went into your
23 office?
24   A.   Yes, I did.
25   Q.   Did you make any effort to

WILSON

1
2 determine what materials were missing, if
3 any?
4    A.   At that moment, I was rather
5 stunned and met with my staff like what is
6 going on.  What was going on? And that
7 was my initial -- so, no, I wasn't
8 starting to look at what is missing.  No.
9    Q.   What, if anything, did you see
10 Ms. Isaacson and the people with her carry
11 out with them when they left besides the
12 folder which you thought were your lecture
13 notes?
14   A.   Well, Ms. Isaacson had a stack
15 of papers or files.  Other than the
16 lecture notes that is all I know, and I
17 think others carried things out, but I
18 really wasn't focusing on that.
19   Q.   So you said Ms. Isaacson had a
20 stack she carried in her own arms?
21   A.   Correct.
22   Q.   Some files; is that right?
23   A.   She had some files in her arms.
24   Q.   Were these loose papers or were
25 these in folders or manilla folders of any

Page 34

WILSON

1
2 kind?
3     A.    They were in files.
4     Q.    When you say they were in files,
5 what kind of files?
6     A.    These would have been manilla
7 and brown files.
8     Q.    And approximately how many
9 manilla and brown files did Ms. Isaacson
10 have in her arms when she left your office
11 on this day in late January 2012?
12    A.    Well, because I don't know the
13 thickness of each file, I couldn't give
14 you an exact answer.
15    Q.    Well, what is your best
16 approximation as to how many files?
17    A.    Several.
18    Q.    Several being more than five?
19    A.    As I said, I can't tell you
20 exactly, so I don't know if it was five,
21 three, eight.  I can't tell you.
22    Q.    You have no approximation
23 whatsoever as to how many files
24 Ms. Isaacson had in her arms?
25    A.    Well, let's say between 3 and

Page 35

WILSON

1
2 10.
3     Q.    You testified before that
4 Ms. Isaacson had among the papers she took
5 with her your lecture notes; is that
6 right?
7     A.    That's the file that I saw.
8     Q.    Did Ms. Isaacson show the
9 lecture notes to you?
10    A.    No.
11    Q.    How did you know they were
12 lecture notes?
13    A.    Because it was on top of the
14 stack that she was carrying and it had the
15 class or the lecture that I was going to
16 give.
17    Q.    And what class was listed?
18    A.    I don't recall the specific
19 class.
20    Q.    What were you teaching at that
21 time, what courses?
22    A.    Let's see.  I would have to
23 double-check the record.  Public
24 administration probably but --
25    Q.    You're not sure?

Page 36

WILSON

1
2     A.    I've taught many classes.
3     Q.    How many classes were you
4 teaching in January of 2012?
5     A.    Probably two at the Center For
6 Worker Education.
7     Q.    And what were those two classes?
8     A.    I'm not sure.
9     Q.    Now, you testified that after
10 Ms. Isaacson and the people who were with
11 her left your office you were stunned and
12 you talked with your staff but did not at
13 that time try to determine what papers had
14 been taken; is that correct?
15    A.    That's right.
16    Q.    At any time thereafter did you
17 make any effort to determine what papers,
18 if any, had been taken?
19    A.    Well, yes.  I asked -- I asked
20 Ms. Miller and Ms. London what had been
21 taken, and they said that computer hard
22 drives had been taken including one of my
23 computer hard drives.
24    Q.    All right.  Besides the
25 computer hard drives, did you at any time

Page 37

WILSON

1
2 make any effort to determine what files
3 had been taken?
4     A.    Well, I -- you know,
5 subsequently speaking with staff asking
6 what were they looking for, and we didn't
7 know, so I guess that would be the answer.
8 Like what are they looking for, so --
9     Q.    That's not what I asked you, Dr.
10 Wilson.  I asked you at any time after
11 Ms. Isaacson and the people with her left
12 your office on this day in late January
13 2012 did you make any effort to determine
14 what files, if any, were missing from your
15 office?
16    A.    No.
17    Q.    And why didn't you do that?
18    A.    Well, I think just because of
19 the trauma of the situation, and I was
20 most immediately focused on being able to
21 conduct my teaching.  So my main concern
22 was getting back my teaching file.  That
23 was my preeminent concern.  How would I
24 teach without my files.
25    Q.    Did you ever ask for the return

10 (Pages 34 - 37)

WILSON

1
2 of your teaching file?
3   A.   Yes, I did.
4   Q.   When?
5   A.   I actually said to Ms. Isaacson
6 I want my file back.
7   Q.   And when did you say that to
8 Ms. Isaacson?
9   A.   When she was on her way out.
10   Q.   Okay.
11   A.   As I recall.
12   Q.   At any time after the day on
13 which you allege Ms. Isaacson took your
14 teaching file, did you make a request for
15 its return?
16   A.   I -- yes, I did.
17   Q.   And did you make that request in
18 writing or orally?
19   A.   That would have been -- well, at
20 some point I asked in writing for my files
21 back.
22   Q.   And when did you ask in writing
23 for your files back?
24   A.   That would have been in February
25 of 2012, that month, you know, in the next

WILSON

1
2 couple of weeks.
3   Q.   So it is your testimony that
4 sometime in the next couple of weeks you
5 asked for the return of your teaching
6 files; is that right, in writing?
7   A.   Well, yes.  That's correct.
8   Q.   And did you make this request by
9 e-mail or in some other way?
10   A.   By e-mail.
11   Q.   And to whom did you send this
12 request?
13   A.   Pam Pollack.
14   Q.   Now, did you ever ask for a copy
15 of any of the files that had been removed
16 from your office?
17   A.   Yes.
18   Q.   When?
19   A.   That would have been probably in
20 February of 2012.
21   Q.   And to whom did you make that
22 request?
23   A.   That also would have been to
24 Brooklyn College counsel Pam Pollack.
25   Q.   And you made a request for a

WILSON

1
2 copy of your files in writing by e-mail to
3 Pam Pollack; is that right?
4   A.   That is my recollection.
5   Q.   Now, you testified that you saw
6 Ms. Isaacson leave your office
7 with between three and ten files in her
8 arms, correct?
9   A.   Correct.
10   Q.   Did you see what any of the
11 people with her had in their arms, hands,
12 when they left your office that day in
13 late January 2012?
14   A.   I was mainly focused on
15 Ms. Isaacson.
16   Q.   So the answer to the
17 question -- to my question is no, you
18 didn't see whether anybody else had
19 anything else in their hands or arms when
20 they left your office?
21   A.   I'm not sure.  I'm not sure.
22 I think her colleague had some files as
23 well.
24   Q.   And when you say her colleague,
25 who are you referring to?

WILSON

1
2   A.   She was with another gentleman
3 whose name I don't recall.
4   Q.   And can you describe this
5 gentleman?
6   A.   African American.  I think he
7 was middle aged, maybe younger than middle
8 aged, and medium height as I recall.
9   Q.   Have you told me everything you
10 recall about this gentleman who you
11 thought may have had some files in his
12 arms?
13   A.   Repeat the question.
14   Q.   You've described this gentleman
15 as African American, maybe younger than
16 middle aged, and medium height.  Can you
17 describe him in any further way?
18   A.   Yes.
19   Q.   How?
20   A.   He had on a suit and a tie.
21   Q.   And he didn't identify himself
22 to you?
23   A.   He may have or Ms. Isaacson may
24 have introduced him by name, but he didn't
25 have on any identifying badge or anything.

11 (Pages 38 - 41)

WILSON

2    Q.   And how many files, if any, did
3 this gentleman that you've described have
4 in his hands or arms when he left?
5    A.   I don't remember precisely.  I
6 don't remember.
7    Q.   All right.  Now, we started
8 this whole line of questioning because I
9 asked you about the entry at the bottom of
10 page 2 of Wilson Exhibit 1 with regard to
11 Natalie Miller.  By the way Natalie
12 Miller, is that person also known as Pam
13 Miller?
14    A.   Correct.
15    Q.   So other than the raid that --
16 "Raiding" that you've described, did
17 Ms. Miller witness any other "Seizure and
18 destruction and removal of plaintiff's
19 property and loss of mail" other than what
20 you've already testified to?
21    A.   Well, yes.
22    Q.   What?
23    A.   Subsequent to the raid -- do you
24 mean during the raid?
25    Q.   At any other time.

WILSON

2    A.   Yes.  Subsequent to the raid, I
3 believe the last week of January the
4 locks to my door were changed, and -- and
5 Ms. Miller said on the following
6 week -- oh, and I was -- I was banned, so
7 I had no -- no longer had access to my
8 office or to the 7th floor at 25 Broadway.
9 I was told in a meeting that I could no
10 longer go there.
11    Q.   All right.  You said a few
12 things there.  You said that "Raid" took
13 place the last week of January 2012,
14 correct?
15    A.   Correct.
16    Q.   How long thereafter were the
17 locks to your office changed to your
18 knowledge?
19    A.   A few days.
20    Q.   And there was still some time in
21 January of 2012?
22    A.   I believe the last Friday of
23 January.  That's my recollection.
24    Q.   All right.  I want to ask you
25 some more about that, but before we move

WILSON

2 on after this "Raid" that left you stunned
3 to use your word did you attempt to reach
4 out to any member of the Brooklyn College
5 administration to find out what this was
6 all about?
7    A.   Well --
8    Q.   You can answer that yes or no.
9    A.   Yes.
10    Q.   And if so to whom did you
11 attempt to reach out to?
12    A.   I attempted to reach out to Pam
13 Pollack.  I reached out to Barbara
14 Hogstatter.
15    A.   I reached out to Dean Phillips.
16 I reached out to Juan Carlos, who was the
17 dean at City College.
18    Q.   Anybody else?
19    A.   Well, of Brooklyn College
20 administration?
21    Q.   Yes.
22    A.   I think those would have been
23 all that I could recall at the moment.
24    Q.   So you contacted Pam Pollack,
25 Barbara Haugstatter, Dean Phillips, Juan

WILSON

2 Carlos to find out what was going on; is
3 that right?
4    A.   Correct.
5    Q.   Did you contact each of these
6 people orally?
7    A.   By phone.
8    Q.   Did you contact any of them by
9 e-mail?
10    A.   Pam Pollack.
11    Q.   Well, you've testified that you
12 contacted Ms. Pollack a couple of weeks
13 later about trying to get your lecture
14 notes back, right?
15    A.   Right.
16    Q.   Separate from that, did you have
17 e-mail communications with Ms. Pollack?
18    A.   In terms of e-mail, that was the
19 nature of my e-mail to Pam.
20    Q.   What, if anything, did
21 Ms. Pollack tell you when you contacted
22 her to find out what was going on?
23    A.   My recollection is that
24 Ms. Pollack said I can't give you any
25 information, and this is CUNY, the City

12 (Pages 42 - 45)

Page 46

1        WILSON
2  University of New York that is doing this,
3  and -- and that's -- so she was very
4  enigmatic, quite mysterious.
5     Q.   Did Ms. Pollack at any time
6  inform you what was going on?
7     A.   No.
8     Q.   You said you reached out to
9  Barbara Haugstatter?
10    A.   Yes.
11    Q.   And she is the secretary to the
12 chairman of the political science
13 department; is that right?
14    A.   At that time, correct.
15    Q.   And is there a reason you
16 reached out to the secretary to the
17 chairman of the political science
18 department to find out what was going on?
19    A.   Yes.
20    Q.   What is the reason?
21    A.   Well, the reason was again,
22 first, I had no idea what was going on,
23 and so one of my initial concerns was that
24 I had two large potted plans that -- they
25 are personal plants in the office, and I

Page 47

1        WILSON
2  wanted those to make sure that they didn't
3  die from lack of water if it was going to
4  go on for more than a week or two.   I had
5  no idea, and that was my initial concern.
6  Like my plants are going to die if I can't
7  take care of them.
8     Q.   So you're talking about two
9  potted plants in your office at 25
10 Broadway?
11    A.   And an easel that was an oak
12 easel there that was actually my wife's
13 oak easel, a display easel, and the easel
14 was used to put a schedule of daily events
15 and classes and so forth, but it was an
16 art easel solid observing, and so my first
17 concern the first few days was take care
18 of my plants and I I want my easel back
19 for my wife, and that was my initial --
20    Q.   Now, Ms. Shag /STET enter is on
21 the Brooklyn campus at Brooklyn College,
22 correct?
23    A.   At that point, yes.   Correct.
24    Q.   She didn't have anything to do
25 with the Graduate Center For Worker

Page 48

1        WILSON
2  Education, did she?
3     A.   Yes, she did.
4     Q.   What did she do?
5     A.   Well at some points she actually
6  held office, maintained an office or went
7  to 25 Broadway, and then she also
8  interacted with our administration of the
9  program on a regular basis almost daily.
10    Q.   What did you say to
11 Ms. Haugstatter and what did she say to
12 you regarding the pot the /-D plants and
13 large easel?
14    A.   Well, at that point I
15 extended -- my /-P first call was like
16 where are my plants? You know I don't want
17 my plants to die and I got to get my easel
18 back.   And I said you know, let me come
19 by and pick them up.   And initially she
20 said okay I will see what I can do.   And
21 then I called her subsequent to that, a
22 few days later, and I said well I am also
23 concerned about my files.   I need -- I
24 have to conduct teaching, I know, my
25 research.   I need my things.

Page 49

1        WILSON
2     Q.   What did she say?
3     A.   I'll speak to Paisley.
4     Q.   The Paisley you are referring to
5  is Paisley Currah was he chairman of the
6  department at that time of political eye
7  science?
8     A.   Yes, he was the newly elected
9  chair who actually ran against me for the
10 chairmanship in 2011 May.
11    Q.   Did you ever have any full up
12 conversations with Barbara lag /STET enter
13 regard being your plants and your easel
14 and your files?
15    A.   Yes.
16    Q.   When?
17    A.   In the following weeks I called
18 Barbara again that I have had no
19 satisfaction on recovering my property,
20 that now this is you know -- this is
21 getting -- this is getting crazy, and also
22 I am no longer receiving my mail 6789.
23    Q.   And what, if anything, did
24 Ms. Haugstatter respond in your
25 conversations with her in the following

13 (Pages 46 - 49)

WILSON

1
2  weeks regarding those subjects?
3      A.   She said I am sorry Joe.  I'll
4  speak with Paisley.  She didn't say
5  doctor consider a.  She said I'll speak
6  with Paisley.
7      Q.   Now, you testified you also
8  spoke with Dean Phillips?
9      A.   Yes.
10     Q.   Now, what was Dean Phillips dean
11 of?
12     A.   You mean her exact title?
13     Q.   Yes.
14     A.   I think she was the dean of arts
15 and sciences, but I am not sure if she was
16 ungraduate dean.  She may have just been
17 undergraduate.  I am not sure of her full
18 title.  She is either graduate or
19 undergraduate dean in the arts and
20 sciences department, as I recall.
21     Q.   Why did you contact her to find
22 out what was going on?
23     A.   Well, she -- administratively
24 she may have had some understanding of
25 what was going on, and then, you know, she

WILSON

1
2  had meetings with the president and so
3  forth.  So I asked her what was going on.
4      Q.   And how soon after the "Raid"
5  did you contact Dean Phillips?
6      A.   I would say within the next
7  couple of weeks.
8      Q.   You can't be any more specific?
9      A.   No.
10     Q.   And you contacted Dean Phillips
11 by telephone?
12     A.   By telephone.
13     Q.   And as best you can recall what
14 did you say to her and what did she say to
15 you in this telephone conversation?
16     A.   I asked her what is going on,
17 you know, what was up with this raid, what
18 are they looking for? How come I can't
19 have access to my office, to my research,
20 to my files, to my documents, to my
21 hundreds of books, and my recollection is
22 she said that CUNY is conducting an
23 investigation.
24     Q.   Do you remember anything else
25 she said to you?

WILSON

1
2      A.   And I said -- I asked her what
3  are they investigating.
4      Q.   And what did she say?
5      A.   She said I can't discuss that.
6      Q.   Did you have any other
7  conversations with Dean Phillips regarding
8  what was going on besides what you've
9  testified to?
10     A.   At the moment that is all I can
11 recall.
12     Q.   Now, you testified you also
13 spoke with Juan Carlos who is the dean at
14 City College, right?
15     A.   Yes.
16     Q.   And why did you contact him?
17     A.   Well, administratively it was
18 important because we occupied joint space,
19 so he was naturally concerned as I was
20 concerned with this raid because he was
21 aware of the raid.  He also wondered what
22 they were looking for, and so that was the
23 nature of our conversation.
24     Q.   Did you attempt to speak to
25 anyone at CUNY regarding what was going

WILSON

1
2  on?
3      A.   When you say at CUNY, what do
4  you mean?
5      Q.   Separate from Brooklyn College,
6  did you attempt to speak to any CUNY
7  representatives?
8      A.   Well, the union, the
9  professional staff congress, if that's
10 what you mean.
11     Q.   That's not what I meant, but
12 that's fine.  So you spoke -- you
13 contacted someone at the union?
14     A.   Yes, I was in touch with the
15 union.
16     Q.   When?
17     A.   Well, immediately the night of
18 the raid because the union sent two
19 representatives.
20     Q.   Thereafter did you speak with
21 anyone at the union?
22     A.   And -- yes, I spoke on the
23 following Monday with Pete Zwiebach.  He
24 is union counsel for the Professional
25 Staff Congress.

14 (Pages 50 - 53)

Page 54

WILSON

1
2   Q.   And were you able to obtain any
3   information as to what was going on?
4   A.   Pete told me that --
5       MR. JAMES KLEIN:   Hold on.   I
6   think his communications with Pete, who
7   was his counsel, I think those are
8   privileged.
9       MR. MARK KLEIN:   Well, I don't
10  know if there was any communication or
11  advice.   If he asked him what is going
12  on, that is not asking for --
13      MR. JAMES KLEIN:   He was
14  counsel for the union, and he was
15  represented by the union.   What is going
16  on is -- I mean there was an
17  investigation, an internal investigation,
18  which is a formal legal proceeding, and
19  the counsel for the union was representing
20  Joe, and they were having discussions, and
21  I believe that is privileged.
22      MR. MARK KLEIN:   Are you
23  directing him not to answer?
24      MR. JAMES KLEIN:   Yes.
25  Q.   Mr. Zwiebach subsequently

Page 55

WILSON

1
2   represented you in connection with the
3   termination proceedings that Brooklyn
4   College and CUNY brought, correct?
5   A.   Correct.
6   Q.   Did you ever speak to anybody at
7   the union besides Mr. Zwiebach, regarding
8   what was going on?
9   A.   Yes.
10  Q.   Who?
11  A.   Renee.
12  Q.   And Renee was one of the people
13  who was present on the -- at the "Raid" to
14  use your word that you've described?
15  A.   Correct.
16  Q.   And what did Renee tell you
17  about what was going on, if anything?
18  A.   I met with Renee just to figure
19  out what was going on, so she didn't know.
20  Q.   She didn't tell you anything?
21  A.   No.
22  Q.   Did you ask Renee or anyone else
23  at PSC what had led to their sending two
24  representatives to be present when the
25  "Raid" took place?

Page 56

WILSON

1
2   A.   Well, I know why they were
3   present.
4   Q.   Could you answer my question?
5   A.   Yes.
6   Q.   Did you discuss with anyone at
7   PSC what led them to send two
8   representatives to be present on --
9   A.   Yes.
10  Q.   And what did they say to you and
11  what did you say to them?
12  A.   I contacted the union upon
13  entering 25 Broadway to send over
14  representatives, and they were right down
15  the street, and so they came over quickly.
16  Q.   So it is your testimony that
17  there were no PSC representatives before
18  you arrived?
19  A.   That's correct.   That is my
20  recollection.
21  Q.   And did Renee ever provide you
22  any information as to what was going on?
23  A.   No.
24  Q.   Going back to your entry for Pam
25  Miller at the bottom of page 2 of Exhibit

Page 57

WILSON

1
2   1, have you told me everything that
3   Ms. Miller has knowledge of regarding the
4   "Seizure and destruction and removal of
5   plaintiff's property and loss of mail
6   delivery"?
7       MR. JAMES KLEIN:   I think that
8   is a much too confusing compound question.
9   A.   Rephrase it.
10      MR. MARK KLEIN:   He has
11  described for me some facts of which he
12  believes Ms. Miller is aware of regarding
13  that matter.   I am asking if there is
14  anything he hasn't told me.   That is a
15  very straightforward question.
16  A.   Well, Ms. Miller and I --
17      MR. JAMES KLEIN:   No, I don't
18  think that is a straightforward question.
19  Q.   Answer the question, sir.
20  A.   Ms. Miller and I discussed the
21  raid, and we were trying to figure out
22  what the raid was about.
23  Q.   Did Ms. Miller witness any other
24  "Seizure and destruction and removal of
25  plaintiff's property and loss of mail

15 (Pages 54 - 57)

WILSON

1          WILSON
2 delivery" other than what you have
3 testified to?
4      MR. JAMES KLEIN:   That calls
5 for speculation.   He doesn't know
6 everything that she may have witnessed.
7      MR. MARK KLEIN:   I am asking
8 for his knowledge.   He can't testify
9 about what he doesn't know, but he can
10 testify about what he does know.
11      MR. JAMES KLEIN:   You asked him
12 what does she know.
13   Q.   To the best of your knowledge,
14 sir, other than what you have testified
15 are you aware of any other facts of which
16 Ms. Miller is aware --
17      MR. JAMES KLEIN:   I believe
18 that is an improper question.
19      MR. MARK KLEIN:   You are
20 interrupting my question.   That is
21 inappropriate.   You're obstructing the
22 deposition.   Cut it out.   Now, I am
23 going to ask the question again, and I
24 don't want to be interrupted, and there is
25 nothing wrong with the question to begin

1          WILSON
2 with.
3   Q.   Dr. Wilson, other than what
4 you've testified to you, are you aware of
5 any other facts of which Ms. Miller is
6 aware regarding the subject of "Seizure
7 and destruction and removal of plaintiff's
8 property and loss of mail delivery"
9 referred to at the bottom of page 2 of
10 your initial disclosure?
11      MR. JAMES KLEIN:   I am going to
12 object to that question because it calls
13 for speculation.   He is not aware of what
14 she knows.
15      MR. MARK KLEIN:   You've made
16 your record.
17   Q.   You can answer the question, Dr.
18 Wilson.
19   A.   Well, I asked Ms. Miller
20 specifically about my mail.
21   Q.   And what did she tell you?
22   A.   And she said I was no longer
23 receiving mail.
24   Q.   Other than your mail, did you
25 have any other conversations with

1          WILSON
2 Ms. Miller regarding the subject of
3 "Seizure and destruction and removal of
4 plaintiff's property and loss of mail
5 delivery" referred to at the bottom of
6 page 2 of Exhibit 1?
7   A.   Repeat the question.
8   Q.   Other than your mail, did you
9 have any other discussions with
10 Ms. Miller -- please don't write on the
11 document.   That is an exhibit.
12   A.   Do you have one that is not an
13 exhibit that I can write on?
14   Q.   No.
15   A.   Then I will --
16   Q.   You can write on your counsel's
17 copy.
18   A.   I'll write the question.   What
19 is the question?
20   Q.   Is this too complicated for you,
21 Doctor?
22   A.   I just want to be precise.
23      MR. JAMES KLEIN:   There is no
24 reason to harass him.
25   Q.   You have testified about

1          WILSON
2 conversations you had with Pam Miller.   I
3 just want to know if there is anything you
4 haven't told me about that subject matter
5 that is listed here.
6   A.   Yes.   We talked about Cory
7 Robin and Paisley Currah, and their
8 ongoing malice towards the program.
9   Q.   Does what you just responded to
10 my question have anything to do with
11 "Seizure and destruction and loss of
12 plaintiff's mail delivery"?   Yes or no.
13   A.   Yes.
14   Q.   How does that have to do with
15 that?
16   A.   We speculated that Robin and
17 Currah were involved.
18   Q.   Okay.   Have you told me
19 everything that you have discussed with
20 Ms. Miller regarding the subject matter
21 set forth at the bottom?
22   A.   That is all that I can recall.
23   Q.   Okay.   So that wasn't so hard,
24 was it?
25      At the top of page 3, you

16 (Pages 58 - 61)

Page 62

WILSON

1 identify Josh Board, and with regard to
2 him you state in your initial disclosures
3 "Witnessed seizure and destruction of
4 plaintiff's property at 25 Broadway."
5        Do you see that?
6    A.   No.
7    Q.   You don't see that at the top of
8 page 3?
9    A.   Yes, I see it.
10   Q.   Okay.  Now, who is Mr. Board?
11   A.   Josh Board is a graduate student
12 at the Graduate Center For Worker
13 Education, and he was a part-time employee
14 in the capacity of a receptionist and an
15 assistant, as I recall.
16   Q.   Okay.  Was he present on the day
17 of the "Raid" in late January 2012?
18   A.   He may have been.
19   Q.   To the best of your knowledge,
20 what information does he have regarding
21 "Seizure and destruction of plaintiff's
22 property"?
23       MR. JAMES KLEIN:   Again, that
24 calls for speculation.
25

Page 63

WILSON

1        MR. MARK KLEIN:  It is not
2 speculation.  Your client -- please let me
3 finish.  Your client has identified Mr.
4 Board as someone who has "Knowledge of
5 discoverable facts" and has identified him
6 as "Having witnessed the seizure and
7 destruction of plaintiff's property at 25
8 Broadway."  So I am trying to find out
9 why he wrote that down there or why you
10 wrote that down there on page 3.
11       MR. JAMES KLEIN:  I'll object.
12 I did not write it down.  I mean that is a
13 completely improper statement to make.
14       MR. MARK KLEIN:  That is very
15 helpful, Mr. Klein.  Thank you.
16   Q.   What seizure and destruction of
17 plaintiff's property at 25 Broadway did
18 Mr. Board witness?
19   A.   So at that time --
20   Q.   What time?
21   A.   This would have been in February
22 of 2012.  Josh was working at 25 Broadway,
23 and he mentioned to me -- he told me that
24 items were being removed and thrown out

Page 64

WILSON

1 from the administrative offices.
2    Q.   This is in February of 2012?
3    A.   February of 2012.
4    Q.   Did you ask him what items were
5 being removed and thrown out?
6    A.   I didn't ask him specifically.
7    Q.   Did he tell you what items were
8 being removed and thrown out?
9    A.   He just said they were throwing
10 out stuff.
11   Q.   You didn't ask him what they
12 were throwing out?
13   A.   He didn't know.
14   Q.   How did you know he didn't know
15 if you didn't ask him?
16   A.   Well, he didn't describe it to
17 me.  He said they were throwing out
18 stuff, and I took that -- and he said they
19 are throwing out a lot of stuff, papers
20 and -- he was not specific.
21   Q.   Did he say people were throwing
22 out stuff from your office?
23   A.   Yes, from my office, from the
24 administrative offices.
25

Page 65

WILSON

1    Q.   From the administrative offices,
2 not from --
3    A.   Three -- well my -- my property
4 was not only in my office.  My property
5 was in different locations.
6    Q.   So your property was in
7 different locations at --
8    A.   That's correct.
9    Q.   -- 25 Broadway on the 7th floor;
10 is that correct?
11   A.   That's correct.
12   Q.   Let's go back to the drawing of
13 your office.
14       MR. MARK KLEIN:  If I could have
15 that please and ask the reporter to mark
16 this drawing AS Wilson Exhibit 2.
17       (Wilson Exhibit 2 marked for
18 identification.)
19   Q.   By the way, Dr. Wilson, you just
20 said that Mr. Board told you "they" were
21 throwing a lot of stuff out, right?
22   A.   Correct.
23   Q.   Who is the they?
24   A.   The only person he mentioned at

17 (Pages 62 - 65)

WILSON

1
2 that moment was Cory Robin.
3    Q.   Did he mention anyone else at
4 any other time?
5    A.   No.
6    Q.   Now, you've drawn the outlines
7 of your office, and you previously
8 testified that the dimensions were 20 by
9 15 I think you said?
10    A.   Approximately.
11    Q.   So it is approximately 20 feet
12 north to south and 15 feet east to west;
13 is that correct?
14    A.   North to south 20, 15
15 approximately -- no.  No.  No.  Yes, 20
16 north to south and about 15 east to west.
17    Q.   All right.  Now, did you have
18 any furniture inside your office?
19    A.   Yes.
20    Q.   What did you have -- what
21 furniture did you have inside your office?
22    A.   Desks, file cabinets,
23 bookshelves, plants.  Let's see.
24 Chairs.  I think that is it.
25    Q.   How many desks did you have?

WILSON

1
2    A.   It would have been two desks.
3    Q.   Could you draw the location of
4 those two desks, please?
5    A.   (Witness complies.)
6    Q.   And did those desks have chairs?
7    A.   Yes.
8    Q.   So the L indicates a chair
9 behind the desk?
10    A.   Correct.
11    Q.   And did you use both of those
12 desks?
13    A.   I did.
14    Q.   Now, you said there were file
15 cabinets in your office?
16    A.   Yes.
17    Q.   How many file cabinets were
18 there? Just just tell me how many there
19 were first.
20    A.   I have to think about it.
21    MR. MARK KLEIN:  Okay.  Let the
22 record reflect that Dr. Wilson has put Xs
23 in three locations.
24        Does that indicate the location
25 of file cabinets?

WILSON

1
2    A.   I'm not sure.  There may have
3 been four.
4    Q.   What kind of file cabinets were
5 these?
6    A.   Metal.
7    Q.   What were the approximate
8 dimensions of these file cabinets?
9    A.   Let's see.  Maybe three feet in
10 length, maybe two and a half, three feet
11 high, and maybe a foot and a half wide
12 approximately.
13    Q.   And what was in these file
14 cabinets?
15    A.   Records, documents, research.
16    Q.   Were they organized in any
17 particular way?
18    A.   Yes.
19    Q.   What way?
20    A.   By title, by topic, by alphabet,
21 depending on the file by chronology.
22    Q.   Anything else?
23    A.   Anything else in terms of what?
24    Q.   How these files were organized.
25    A.   Title, category, chronology.  I

WILSON

1
2 think those would have been mainly --
3    Q.   Have you finished your answer?
4    A.   Yes.
5    Q.   You also had bookshelves in this
6 office?
7    A.   Yes.
8    Q.   Where were the bookshelves? How
9 many were there first of all?
10    A.   The entire wall was bookshelves
11 wall to wall.
12    Q.   So the entire east wall?
13    A.   Floor to ceiling.  Right.
14    Q.   The entire east wall?
15    A.   Right.
16    Q.   Were these bookshelves wooden or
17 something else?
18    A.   They are wooden.
19    Q.   Were the books in all the
20 shelves?
21    A.   Yes.  Books, files, documents.
22 Yes.
23    Q.   How were the books organized, if
24 at all?
25    A.   Well, there was one shelf of

18 (Pages 66 - 69)

Page 70

WILSON

1
2 what I would consider to be special books.
3 These were, for example, The Encyclopedia
4 of Protest and Revolution, which was an
5 eight-volume encyclopedia and on the shelf
6 with that and -- on that particular shelf
7 would have been other unique books to my
8 own research and my own professional
9 interests that, you know, authors would
10 provide to me and so forth.
11    Q.   Where was the shelf of special
12 books?
13    A.   If you come in through the door
14 and you go to the right, it would have
15 been on the bottom shelf closer to the
16 window.
17    Q.   Could you use the initials SB
18 for special books where this shelf with
19 special books was located.
20    A.   (Witness complies.) And I am not
21 sure whether it was the bottom shelf or
22 middle shelf, but there was -- I had a
23 shelf of special books.
24    Q.   And approximately how many
25 special books were on the shelf of special

Page 71

WILSON

1
2 books?
3    A.   Approximately a hundred.
4    Q.   And approximately how many books
5 all together did you have on those
6 bookshelves?
7    A.   Maybe a thousand books, 7, 800.
8 I can't say exactly.
9    Q.   Did you ever create an inventory
10 of all the books you had on the shelves?
11    A.   No.
12    Q.   Did you ever create an inventory
13 of all the files you had?
14    A.   No.
15    Q.   Now, you had been in that office
16 for only three years; is that right?
17    A.   A few years.
18    Q.   Which was it, three or a few?
19    A.   Approximately three.  Three is
20 a few, isn't it?
21    Q.   So approximately in 2009 you
22 moved into that office?
23    A.   Maybe 2008.
24    Q.   And where had all these files
25 and books been before 2008?

Page 72

WILSON

1
2    A.   Well, some had been accumulated
3 since 2008, so -- so that's the answer.
4 Some -- these were not all from previous.
5 Some of these were accumulated since 2008.
6    Q.   Okay.  Those that you hadn't
7 accumulated since you moved into that
8 office, where had all these books and
9 files been when you moved -- before you
10 moved into that office in 2008?
11    A.   Those were at -- in my office at
12 the Graduate Center For Worker Education
13 located at the 99 Hudson Street, and I
14 believe it was on the third floor.
15    Q.   The space that the Graduate
16 Center For Worker Education had at 99
17 Hudson Street was less than 3,000 square
18 feet, correct?
19    A.   I don't know the exact square
20 footage.
21    Q.   What is your best approximation?
22    A.   I mean I can only guess, so
23 I -- maybe 5,000 square feet.  I don't
24 know exactly.   3,000, 5,000.  I don't
25 know.

Page 73

WILSON

1
2    MR. JAMES KLEIN:   Is that a
3 guess? Don't guess.
4    Q.   You have no idea how many square
5 feet the Graduate Center For Worker
6 Education had at 99 Hudson Street.  Is
7 that what your testimony is?
8    A.   No, that's not my testimony.  I
9 am giving you an approximation.
10    Q.   What is your approximation?
11 What is your best approximation?
12    A.   My approximation is about 3,000
13 to 4,000 square feet.
14    Q.   And how big -- you had an office
15 at 99 Hudson Street, you personally?
16    A.   Yes, personally I had an office.
17    Q.   And what was the size of that
18 office approximately?
19    A.   That office was approximately 20
20 feet by 20 feet.
21    Q.   All right.  Going back to Josh
22 Board, number 2 at the top of page 3 of
23 Exhibit 1, when was the last time you
24 spoke with Mr. Board?
25    A.   I can't remember exactly.

19 (Pages 70 - 73)

Page 74

WILSON

2   Q.   What is your best recollection
3  as to the last time you spoke to Mr.
4  Board?
5   A.   Maybe in 2017.
6   Q.   And what was the occasion that
7  you spoke to him in 2017?
8   A.   So I first asked how he was
9  doing professionally, and he told me about
10  his employment, and then I asked him if he
11  remembered anything about his experience
12  at -- as an employee at the Graduate
13  Center For Worker Education.
14   Q.   And what did he tell you?
15   A.   He said that he remembered that
16  the period when I was banned.  He
17  remembered in that period of time
18  that -- that Cory Robin was insulting
19  towards him.  This is what he told me.
20   Q.   Did he provide you any
21  additional information as to what files or
22  papers were removed and thrown out?
23   A.   Not that I can recall.
24   Q.   Did Mr. Board ever tell you what
25  papers had been removed and thrown out?

Page 75

WILSON

2   A.   Not specifically to my
3  recollection.
4   Q.   The next person on the list is
5  Kevin Guscott, G-U-S-C-O-T-T.
6   A.   Yes.
7   Q.   And he is listed here as having
8  knowledge of "Witness to theft and
9  destruction of plaintiff's property and
10  mail at 25 Broadway." Do you see that?
11   A.   I see that.
12   Q.   To your knowledge, what
13  information does Mr. Guscott have
14  regarding that subject?
15   A.   To my knowledge, Kevin Guscott
16  was an employee at 25 Broadway during that
17  period, and so -- and he also was at the
18  reception desk frequently at 25 Broadway,
19  so he would have been privy to people
20  coming in and out both -- well, let's see.
21  Certainly the front door but also the
22  administrative areas and -- so he would
23  have seen people in and out of various
24  offices.
25   Q.   Did you ever discuss with Mr.

Page 76

WILSON

2  Guscott what information he had regarding
3  what, if anything, was taken and destroyed
4  of your property?
5   A.   Yes.
6   Q.   When?
7   A.   This would have been in February
8  of 2012.
9   Q.   Is that the only conversation
10  you had with Mr. Guscott regarding the
11  theft and destruction of your property and
12  mail?
13   A.   No, I've had a number -- a
14  subsequent conversation with him.
15   Q.   All right.  Let's start with
16  February 2012.  What did Mr. Guscott tell
17  you regarding the alleged theft and
18  destruction of your property at 25
19  Broadway?
20   A.   So.  Repeat the question again
21  on Guscott.
22   Q.   You testified that you spoke
23  with Mr. Guscott in February 2012
24  regarding the alleged theft and
25  destruction of your property at 25

Page 77

WILSON

2  Broadway, right?
3   A.   Correct.
4   Q.   What did he tell you then?
5   A.   He told me that people were in
6  my office, and -- including people he
7  didn't recognize, so that -- and he also
8  mentioned that they were moving things
9  around.  They were throwing things out.
10   Q.   Anything else that he told you?
11   A.   He asked me what is going on.
12   Q.   Did he identify what people were
13  in your office in this conversation of
14  February 2012?
15   A.   I don't recall which people he
16  mentioned, but -- and I am not sure he
17  knew who the people were.
18   Q.   Did he identify any things that
19  were thrown out?
20   A.   He didn't mention anything
21  specifically.
22   Q.   Did you ask him?
23   A.   No, I didn't ask him what is
24  being thrown out.  No.
25   Q.   Did Mr. Guscott ever identify

20 (Pages 74 - 77)

Page 78

WILSON

1           WILSON
2 any of the people who were then in your
3 office?
4     A.   Well, he -- he said he didn't
5 know some of them.
6     Q.   Did he identify any of them?
7     A.   He did not.  People -- no, he
8 didn't identify them specifically.
9     Q.   Did he ever identify anything
10 that had been thrown out?
11    A.   Specifically, no.
12    Q.   Did he identify generally
13 anything that had been thrown out?
14    A.   Papers.
15    Q.   Papers.
16         Now, you testified that you have
17 had conversations with Mr. Guscott since
18 February of 2012.  In any of these
19 conversations, did he identify any of the
20 people who had been in your office?
21    A.   Not to my recollection.
22    Q.   In any of these conversations
23 since February of 2012, did Mr. Guscott
24 identify any of the things that had been
25 thrown out?

Page 79

1           WILSON
2     A.   No.
3     Q.   When was the last time you spoke
4 with Mr. Guscott?
5     A.   At the beginning of this year,
6 around New Year's.
7     Q.   And what was the occasion?
8     A.   New Year's greetings and he gave
9 me an update on his graduate work, his
10 master's program.
11    Q.   Did he call you or did you call
12 him?
13    A.   He called me.
14    Q.   Okay, number 4 is Ron London.
15    A.   Yes.
16    Q.   Do you see that?
17    A.   I see that.
18    Q.   Is Ron London related to Annie
19 London in any way?
20    A.   That's not a yes or no.
21    Q.   How is that?  Is he related to
22 Annie London?
23    A.   At the moment?
24    Q.   Yes.
25    A.   No.

Page 80

1           WILSON
2     Q.   Is it her former husband?
3     A.   Yes.
4     Q.   Okay.  And for Mr. London you
5 say, "Witnessed seizure and destruction of
6 plaintiff's property at 25 Broadway." Do
7 you see?
8     A.   Correct.
9     Q.   To the best of your knowledge,
10 what information does Mr. London have
11 regarding that subject?
12    A.   To the best of my
13 knowledge -- well, first of all, he was an
14 employee at 25 Broadway at the Graduate
15 Center For Worker Education.  He also
16 worked at the front desk in the
17 administrative area, and in that -- in
18 those first few months or weeks following
19 the raid and my banning from the 7th
20 floor, he told me at that time that they
21 were taking out boxes from my office
22 and -- yes.
23    Q.   Did he identify who was taking
24 out boxes?
25    A.   No.

Page 81

1           WILSON
2     Q.   Did you ask him who was taking
3 out boxes?
4     A.   No.
5     Q.   Did he tell you what was in the
6 boxes?
7     A.   He mentioned specifically
8 papers.
9     Q.   Do you know what kind of papers
10 he mentioned?
11    A.   At that time he said students'
12 papers, my students' papers, master
13 seminar papers.
14    Q.   How many boxes --
15         MR. MARK KLEIN:  Withdrawn.
16    Q.   Did Mr. London tell you how many
17 boxes were being taken out?
18    A.   No.
19    Q.   Did you ask him how many boxes
20 were being taken out?
21    A.   No.
22    Q.   When was the last time you spoke
23 with Mr. London?
24    A.   I spoke with Mr. London a couple
25 of weeks ago.

21 (Pages 78 - 81)

Page 82

WILSON

1
2    Q.   What was the occasion?
3    A.   I asked him to reconsider and
4  think hard and remember everything that
5  happened because I may want him to be a
6  witness in this case.
7    Q.   Did he tell you anything that he
8  recalled about what had happened?
9    A.   We didn't discuss the details.
10 He just said he would be willing to be a
11 witness.
12   Q.   Now, other than telling you that
13 master seminar papers had been taken, did
14 Mr. London identify anything else that had
15 been taken out of your office?
16   A.   No, that -- that I can remember.
17   Q.   Now, you testified previously
18 that at a meeting you were informed that
19 you were banned from the Graduate Center
20 For Worker Education, correct?
21   A.   Yes.
22   Q.   When did this meeting take
23 place?
24   A.   That meeting was the last
25 January -- I mean -- I'm sorry.  The last

Page 83

WILSON

1
2  Friday of January 2012.
3    Q.   Where did this meeting take
4  place?
5    A.   On the main campus at Brooklyn
6  College.
7    Q.   At whose office, if anyone's?
8    A.   It may have been -- it was one
9  of the president's offices, president
10 Karen Gould.
11   Q.   And who was present at the
12 meeting?
13   A.   Let's see.  Pete Zwiebach,
14 Karen Gould, Provost Tramontano, Pam
15 Pollack. I think Michael Hewitt was there.
16 Let's see.  I think Dean Phillips was
17 there.  Let's see.  I think that was
18 about it.
19   Q.   And how long after the "Raid"
20 did this meeting take place at President
21 Gould's offices?
22   A.   Several days.
23   Q.   Did anyone tell you what was
24 going on during this meeting in President
25 Gould's office?

Page 84

WILSON

1
2    A.   Yes, President Gould.
3    Q.   What did she tell you?
4    A.   She said I was under
5  investigation.
6    Q.   Did she tell you what you were
7  under investigation for?
8    A.   No.
9    Q.   Did you ask?
10   A.   Yes.
11   Q.   Did your attorney ask?
12   A.   Yes.
13   Q.   And what were you told, if
14 anything?
15   A.   Nothing.  Nothing specific.
16   Q.   Were you banned just from the
17 graduate center or also from the Brooklyn
18 College campus?
19   A.   I was also banned from the main
20 campus.
21   Q.   Do you recall anything that you
22 or your attorney said to the other people
23 who were present at the meeting during
24 this meeting on the last Friday of January
25 2012 in --

Page 85

WILSON

1
2    A.   Yes.
3    Q.   -- in President Gould's office?
4    A.   Yes.
5    Q.   What?
6    A.   There was a particular issue
7  about plagiarism and -- and there were
8  some other remarks that Dean Phillips was
9  making, and my recollection is that at
10 that meeting Zwiebach admonished Dean
11 Phillips for making the accusations of
12 plagiarism, and -- because he had heard
13 that she had been making these to multiple
14 people, and -- and so I think the -- as I
15 recall, the president noted that, and that
16 was the -- I think that was the main issue
17 that I recall at that time. So my
18 understanding was that this -- there was
19 something going on with plagiarism, so
20 that was --
21   Q.   Was there any description of who
22 was allegedly engaging in plagiarism?
23   A.   None.  Me.  Me.
24   Q.   You personally were engaging in
25 plagiarism?

22 (Pages 82 - 85)

WILSON

1
2   A.   Yes.
3   Q.   Do you recall whether the
4   allegation --
5       MR. MARK KLEIN:   Withdrawn.
6   Q.   Did anyone say how you were
7   allegedly engaging in plagiarism?
8   A.   Well, I mean when you say
9   anyone, what do you mean by anyone?
10  Q.   At this meeting.
11  A.   No.  At that meeting, no.
12  Q.   Now, a few minutes ago you
13  testified that Ron London said that boxes
14  were being removed, and that the boxes
15  contained graduate student papers, right?
16  A.   Right.
17  Q.   Did Mr. London tell you how he
18  knew that there were graduate student
19  papers in the boxes?
20  A.   He didn't tell me how he knew.
21  Q.   Did you ask him how he knew?
22  A.   No.
23  Q.   And he didn't tell you how many
24  boxes were being removed?
25  A.   He didn't tell me how many

WILSON

1
2   boxes.
3   Q.   And you didn't ask him?
4   A.   I didn't need to ask him.
5   Q.   Why is that?
6   A.   Because we had hundreds of
7   graduate papers, and one could only
8   imagine it would be many boxes.
9   Q.   And were these graduate student
10  papers in your office, the office that you
11  have drawn and that has been marked as
12  exhibit 2?
13  A.   They were in various areas,
14  including my office.
15  Q.   Where were they in your office?
16  A.   They would have been in various
17  locations in my office on my desk to
18  review student's work.  As I recall,
19  there was a box of student papers in my
20  office.  I can't tell you precisely
21  where, but there was a box of student
22  papers, and then on my bookshelf I had a
23  number of the archived papers that I would
24  have used for references, maybe ten or
25  fifteen bound volumes, because these

WILSON

1
2   are -- we are talking about bound archival
3   records of students' terminal work.
4   Q.   Now, did you consider these
5   students papers, these graduate students
6   papers to be your property?
7   A.   These would be
8   institution -- well two things --
9   Q.   Answer my question.  Did you
10  consider these students --
11  A.   Not personal property.
12  Q.   Okay.  And the ten or fifteen
13  bound volumes, did you consider --
14      MR. MARK KLEIN:   Withdrawn.
15  Q.   These ten or fifteen bound
16  volumes of graduate students papers, did
17  you consider those to be your personal
18  property?
19  A.   No.
20  Q.   Directing your attention back to
21  Exhibit 1, item 5, you identify Jose
22  Vargas, and it says, "Witnessed the
23  seizure of plaintiff's computer equipment
24  at 25 Broadway." Do you see that?
25  A.   Yes.  Sorry. Number 5, "former

WILSON

1
2   employee witness to seizure of plaintiff's
3   computer equipment.  Correct.
4   Q.   And why do you list Mr. Vargas
5   here?
6   A.   Well, Mr. Vargas --
7       MR. JAMES KLEIN:   I think that
8   is a compound question.
9       MR. MARK KLEIN:   Okay.   Your
10  objection is noted.
11  Q.   Can you answer?
12  A.   Mr. Vargas was an employee at
13  that time at 25 Broadway, and he was our
14  tech person, tech support.  Technician.
15  Q.   Did you ever have any
16  conversation with Mr. Vargas regarding the
17  "Seizure of plaintiff's computer equipment
18  at 25 Broadway"?
19  A.   Yes, I did.
20  Q.   When?
21  A.   That would have been in February
22  of 2012.
23  Q.   Now, what is the computer
24  equipment that was yours that was seized?
25  A.   Well, let's -- I would have to

23 (Pages 86 - 89)

Page 90

WILSON

2 make a distinction.  Computer equipment
3 was computer equipment that I was using,
4 but legally it was owned by the City
5 University.  So it wasn't personal
6 property, if that is your question.
7    Q.   Well, I am asking you if you can
8 identify what the "Plaintiff's computer
9 equipment at 25 Broadway" was.
10    A.   There were laptops and an iPad
11 that I used that he told me were seized,
12 and he told me that -- yes.  He told me
13 they were seized.
14    Q.   The laptop and iPad, was those
15 your personal property?
16    A.   They were owned by the
17 university.
18    Q.   Okay.  When was the last time
19 you spoke with Mr. Vargas?
20    A.   Also around New Year's.
21    Q.   Of this year?
22    A.   Yes.
23    Q.   Did you have a New Year's party
24 in which all these people came, and you
25 talked about the case?

Page 91

WILSON

2    A.   I had no New Year's party.
3    Q.   Did you contact him about being
4 a witness in this case?
5    A.   Yes, I did.
6    Q.   What did he tell you?
7    A.   He said he would be happy to
8 cooperate to the best of his recollection.
9    Q.   And so Mr. Vargas is going to
10 testify about how the computer equipment
11 that was owned by Brooklyn College and
12 that you used was taken?
13    A.   Yes.
14    Q.   Is he going to testify about
15 anything else?
16    A.   I don't know.
17    Q.   The next person listed is
18 Madonna Charles?
19    A.   Yes.
20    Q.   And it says here "She
21 participated in confiscation of
22 plaintiff's mail.  Under administrative
23 direction, Charles was told to confiscate
24 Wilson's mail." That is what it says?
25    A.   Right.

Page 92

WILSON

2    Q.   What told Ms. Charles to
3 confiscate the mail?
4    A.   You will have to ask
5 Ms. Charles.
6    Q.   Did Ms. Charles ever tell you
7 who told her to confiscate your mail?
8    A.   She told me the administration
9 directed her.
10    Q.   When did she tell you that?
11    A.   She told me that in 2012.
12    Q.   When was the last time you spoke
13 with Ms. Charles?
14    A.   About a month ago.
15    Q.   Did you ask her if she would be
16 a witness in this case?
17    A.   Yes -- no, I didn't ask her if
18 she would be a witness.
19    Q.   What did you ask her?
20    A.   I asked her if she remembered
21 taking my property, seizing my mail, my
22 U.S. mail.
23    Q.   And what did she say?
24    A.   She remembered.
25    Q.   She said yes, I seized your

Page 93

WILSON

2 mail?
3    A.   No, that is not what she said.
4    Q.   What did she say?
5    A.   She said she remembered.  She
6 was directed to take it.
7    Q.   Did she tell you who had
8 directed her to take your mail?
9    A.   Not specifically.
10    Q.   Did she tell you that she was
11 directed to "Confiscate and take your
12 mail"?
13    A.   She didn't use the word
14 confiscate.  She used the word take.
15    Q.   Did you ask her what was done
16 with the mail that she took?
17    A.   I did.
18    Q.   What did she tell you?
19    A.   She didn't remember.
20    Q.   And at no time has Ms. Charles
21 identified who directed her to take your
22 mail; is that right?
23    A.   No.  Correct.
24    Q.   The next person listed is Mina,
25 M-I-N-A, of the PBM cleaning staff; is

24 (Pages 90 - 93)

Page 94

WILSON
2 that right?
3    A.   Yes.
4    Q.   And under her name it says
5 "witness to destruction of plaintiff's
6 property at 25 Broadway." Right?
7    A.   Correct.
8    Q.   Does Mina presently work at 25
9 Broadway to your knowledge?
10   A.   To my knowledge she does.
11   Q.   And when was the last time you
12 spoke with her?
13   A.   In 2011.
14   Q.   How is it that you spoke to her
15 in 2011?
16   A.   I would see her on a regular
17 basis at 25 Broadway.
18   Q.   So the last time you spoke to
19 her was before the "Raid"?
20   A.   Correct.
21   Q.   How is it that you believe that
22 Mina has --
23      MR. MARK KLEIN:   Withdrawn.
24   Q.   How is it that you believe Mina
25 had "witnessed destruction of plaintiff's

Page 95

WILSON
2 property at 25 Broadway"?
3    A.   Because in 2012 an
4 administrator, and I don't recall who,
5 told me that -- because I -- I was in that
6 area.  I was in the -- I actually was
7 teaching upstairs on the 8th floor.  I was
8 banned on the 7th floor, but I was
9 teaching on the 8th floor, and an
10 administrator or one of the cleaning
11 personnel, somebody told me that Mina
12 complained because they were throwing out
13 such a large volume of material from my
14 office and from the administrative offices
15 that she was unable physically to empty
16 the containers, and that's -- that was the
17 gist of my understanding of what she said.
18   Q.   Do you know what was in the
19 containers that Mina was unable --
20   A.   Papers.  Papers.  Papers.
21   Q.   Do you know what kind of papers?
22   A.   No.
23   Q.   Anything else?
24   A.   No.
25   Q.   And you don't recall who told

Page 96

WILSON
2 you that Mina had complained about there
3 being so many papers in the containers
4 that she couldn't throw them out?
5    A.   It may have been one of the
6 other cleaning personnel on that floor who
7 I ran into on the way to the 8th floor.
8 I don't remember specifically, but I
9 remember the phenomena of her saying that
10 there were so much volume and weight and
11 such an extensive, you know, tossing of
12 material that to me -- I was, you
13 know -- I focused on that.  I was
14 concerned on that, but no, I didn't speak
15 to her directly.
16   Q.   Number 8, you identify Pete
17 Zwiebach -- and by the way that is
18 Z-W-I-E-B-E-C-K at least at it is spelled
19 here, right, Dr. Wilson?
20   A.   That's what appears here.
21   Q.   Is that the correct spelling of
22 his name to your knowledge?
23   A.   I'm not positive if that is a
24 correct spelling.
25   Q.   You identify Mr. Zwiebach as

Page 97

WILSON
2 having "witnessed seizure/conversion of
3 mail and property, witness to defamatory
4 criminal charges." Do you see that?
5    A.   Yes.
6    Q.   What "seizure/conversion of mail
7 and property" did Mr. Zwiebach witness?
8    A.   Well --
9      MR. JAMES KLEIN:   I am going to
10 object as to any issue that arises
11 relative to the attorney-client privilege.
12 Certainly he can talk about facts, but
13 anything regarding any legal conclusion or
14 anything related to their attorney-client
15 relationship I am objecting to.
16      MR. MARK KLEIN:   I asked him to
17 tell me what seizure/conversion of male
18 and property Mr. Zwiebach witnessed.  I
19 am not asking for legal conclusions or
20 communications.  I am asking just what I
21 asked.
22   A.   So Pete had occasion to view the
23 defamatory charges made in the New York
24 Times and in other venues.
25   Q.   All right.  Let's take those

25 (Pages 94 - 97)

Page 98

WILSON

1    WILSON
2 one at a time.   You said that Mr.
3 Zwiebach viewed the property that had been
4 seized?
5    A.   Yes.
6    Q.   When did he view that property?
7    A.   You would have to ask Mr.
8 Zwiebach.
9    Q.   Were these on occasions when
10 when Mr. Zwiebach came to Brooklyn College
11 to look at the boxes of your materials
12 that Brooklyn College was storing?
13    A.   These were occasions when Mr.
14 Zwiebach looked at the materials in
15 different locations of my materials that
16 Brooklyn College seized.
17    Q.   How many different locations did
18 Mr. Zwiebach look at materials?
19       MR. YONG:  If you know.
20       MR. JAMES KLEIN:   I am going to
21 object.  He doesn't know what Mr.
22 Zwiebach looked at.
23    Q.   Did Mr. Zwiebach ever tell you
24 what locations he looked at materials?
25    A.   I think he mentioned three or

Page 99

1    WILSON
2 four different locations.
3    Q.   What three or four locations?
4    A.   I believe he said CUNY Central,
5 and I believe he said Africana studies.
6 In fact, I am sure he said Africana
7 studies, and I am sure he viewed documents
8 in -- in Boylan Hall.   Those are the ones
9 I am aware of.   There may have been
10 others.
11    Q.   Did you ever accompany Mr.
12 Zwiebach in any of the instances in which
13 he viewed the materials that had been
14 taken from your office?
15    A.   Yes, on two occasions as I
16 recall.
17    Q.   And what were those two
18 occasions?
19    A.   Those -- I don't recall the
20 exact dates if that is your question.
21    Q.   Where were the two occasions --
22       MR. MARK KLEIN:  Withdrawn.
23    Q.   What were the locations of the
24 two occasions that you accompanied Mr.
25 Zwiebach and reviewed materials that had

Page 100

1    WILSON
2 been taken from your office?
3    A.   So one was in Boylan Hall.
4    Q.   And that is on the Brooklyn
5 campus of Brooklyn College; is that right?
6    A.   That's correct.   That is the
7 name of the building.
8    Q.   And where in Boylan Hall did you
9 view materials?
10    A.   That would have been on the
11 first floor of Boylan Hall in one of the
12 conference rooms of the Office of Business
13 and Physical Services, as I recall.   That
14 would be -- and I mean there is another
15 location that I recall, but -- nearby,
16 but -- so there was -- and Pete was there
17 as well, but that is another location down
18 the hall in Pam Pollack's office on the
19 first floor of Boylan Hall.
20    Q.   So you are saying that you and
21 Mr. Zwiebach reviewed documents in two
22 different locations in Boylan Hall, one in
23 Pam Pollack's office and one in the
24 conference room?
25    A.   No, that is not what I said.  I

Page 101

1    WILSON
2 said we reviewed them in one office, which
3 was in the conference room of Business and
4 Physical Services.  We reviewed
5 documents, but we went into Pam Pollack's
6 office, and I viewed -- not reviewed.  I
7 saw documents -- my documents, some of my
8 documents in her office.
9    Q.   Okay.  When did you review
10 documents that were in a conference room
11 in Boylan Hall along with Mr. Zwiebach?
12    A.   I think this would have been
13 sometime in 2015 or 2014.
14    Q.   And what files did you review at
15 that time? When you went to the conference
16 room in Boylan Hall?
17    A.   Those were mainly administrative
18 files.
19    Q.   When you say administrative
20 files, what do you mean?
21    A.   I mean personnel records,
22 employee documents, some student files,
23 travel files with passport information,
24 and -- information about various programs
25 I was involved in, you know,

26 (Pages 98 - 101)

1          WILSON
2  like the -- like the mail initiative
3  program.  There were some files at the
4  Center For Diversity and -- but there were
5  no -- my research wasn't there.  My
6  letters weren't there.  My lectures
7  weren't there.  You know, my -- now, I do
8  remember a camera that was my personal
9  camera being in one of the -- the open
10  boxes that we examined, and the boxes were
11  disheveled.  They weren't categorized.
12  Everything was not in an envelope.  So it
13  was like chaotic, irregular boxes stacked
14  up, you know, and I don't know how many
15  boxes there were, but they were open,
16  unnumbered, unlabeled, and I do remember a
17  personal camera that I owned was in one of
18  the boxes.  And --
19      Q.   You say your lecture notes
20  weren't there, and your research wasn't
21  there?
22      A.   No, and my letters weren't
23  there, and -- and my manuscripts weren't
24  there, and in fact my boxes weren't there.
25      Q.   And did you say anything to

1          WILSON
2  anybody about where were your books,
3  manuscripts, lectures and research?
4      A.   Absolutely.  I said to Pete
5  where is my stuff.  Where is my stuff,
6  and he said --
7          MR. JAMES KLEIN:  Don't say it.
8  No.  He is your attorney.
9          THE WITNESS:  Yes.
10      Q.   Did you say anything to anyone
11  besides your attorney besides where is
12  your stuff ?
13      A.   To my other attorney at that
14  time.
15      Q.   Who was your attorney at that
16  time?
17      A.   At that time Collin Moore.
18      Q.   Okay.  To your knowledge, did
19  either Mr. Zwiebach or Mr. Moore say
20  anything to anybody about where your
21  books, manuscripts, lectures, research and
22  letters were?
23          MR. JAMES KLEIN:  I am going to
24  object to that as to any information he
25  has about that based on any conversations

1          WILSON
2  he had.
3      Q.   Do you have any knowledge as to
4  whether Mr. Zwiebach or Mr. Moore
5  complained to anyone about your stuff not
6  being there?
7      A.   Yes, Mr. Zwiebach did.
8      Q.   And did he do that orally or in
9  writing to your knowledge?
10      A.   Both.
11      Q.   And who did he do that to?
12      A.   I don't know all the people he
13  complained to.
14          MR. JAMES KLEIN:  The form of
15  the question is --
16      Q.   Do you know anybody that Mr.
17  Zwiebach complained to about missing
18  stuff?
19          MR. JAMES KLEIN:  When you say
20  know, that's -- does he know the person
21  individually?
22          MR. MARK KLEIN:  Could you read
23  back the question, please.
24          (Record read.)
25      A.   I believe Michael Hewitt.  That

1          WILSON
2  is who I know.  And -- and he also
3  mentioned it to Pam Pollack, and I
4  believe -- and I am sure -- well I can't
5  say I am sure.  I think he spoke to a
6  Ms. --
7          MR. JAMES KLEIN:  Hold on.  If
8  this is -- if any of these are the
9  basis -- you know, based on anything that
10  Mr. Zwiebach told you as your attorney, it
11  is privileged.
12          THE WITNESS:  I see.  Right.
13      Q.   Have you ever seen an e-mail
14  from Mr. Zwiebach to anybody complaining
15  about your books, manuscripts, lecture
16  notes, research or letters being missing?
17      A.   I can't recall at this moment.
18      Q.   Did you ask Mr. Zwiebach to send
19  such an e-mail?
20          MR. JAMES KLEIN:  That is
21  privileged.
22      Q.   Did you review these boxes in
23  one of the conference rooms in Boylan Hall
24  in connection with the arbitration in this
25  case that you had with Brooklyn College

27 (Pages 102 - 105)

Page 106

WILSON

1
2  and CUNY?
3      A.  Yes.
4      Q.  So you reviewed these materials
5  in preparation for that arbitration; is
6  that right?
7          MR. JAMES KLEIN:  I believe
8  that is privileged.
9          MR. MARK KLEIN:  I am trying to
10 set in time when this took place.  He
11 said it was sometime in 2014.
12         MR. JAMES KLEIN:  You are asking
13 for preparations in his legal proceedings.
14     Q.  You said it was sometime in 2014
15 or 2015.  Could you be any more specific?
16     A.  Not at this moment.
17     Q.  Now, you also testified that Mr.
18 Zwiebach reviewed materials in Africana
19 studies, correct?
20     A.  Correct.
21     Q.  That is at James Hall in
22 Brooklyn College at the Brooklyn campus?
23     A.  That's correct.
24     Q.  Were you present when Mr.
25 Zwiebach reviewed materials in Africana

Page 107

WILSON

1
2  studies?
3      A.  On one occasion, yes.
4      Q.  And when was that as best you
5  can recall?
6      A.  I don't remember the exact date.
7  It would have been probably in 2014 or
8  2015.
9      Q.  And what materials did you
10 review in 2014 or 2015 when you and Mr.
11 Zwiebach went to Africana studies?
12     A.  These would have been travel
13 records with, you know, student
14 information, correspondence with the
15 travel agency, maybe ticketing
16 information.  There may have been -- oh,
17 employee timesheets.  There were
18 activities of the various programs,
19 events --
20     Q.  These are all materials in
21 connection with trips you had taken with
22 the Graduate Center For Worker Education
23 students during various summers; is that
24 right?
25     A.  That's correct.  Not during the

Page 108

WILSON

1
2  summers.  That's correct incorrect.
3      Q.  But during the school year?
4      A.  At various times.
5      Q.  All right.  Now, at this
6  occasion that you and Mr. Zwiebach went to
7  Africana studies in 2014 or 2015, did you
8  see any of your books, manuscripts,
9  lectures, research, notes or letters?
10     A.  No.
11     Q.  Who gave you access to these
12 materials in Africana studies?
13     A.  As I recall, a Brooklyn College
14 security guard opened the door for us, as
15 I recall.  I don't know who, but that is
16 my recollection.
17     Q.  Do you have any understanding as
18 to how these materials had gotten to
19 Africana studies in order for you and Mr.
20 Zwiebach to review them?
21     A.  Yes, I do.
22     Q.  And what is your understanding?
23     A.  Let me just think about that for
24 a minute.  Actually my understanding -- I
25 don't know exactly how that stuff got

Page 109

WILSON

1
2  there, so the answer is no.  I don't know
3  exactly how they got there.
4      Q.  Were these materials in George
5  Cunningham's office in Africana studies?
6      A.  I am not sure whose office it
7  was in at that time.  I think it might
8  have been a different office I
9  think or -- but I am not sure which office
10 it was.
11     Q.  Is it your testimony you never
12 asked that your materials be put in George
13 Cunningham's office at Africana studies?
14     A.  Well, my my testimony is that
15 some of my materials were in Paisley
16 Currah's storage closet for some period of
17 time, and I don't know what was in there,
18 and I was contacted, and I don't remember
19 precisely by whom, but that they wanted
20 move my stuff, and so I -- because of
21 the -- because Paisley had been accusing
22 me of stealing millions of dollars,
23 because Paisley had been accusing me of
24 plagiarism and other things that I was
25 very concerned about them moving my stuff

28 (Pages 106 - 109)

WILSON

1
2  anywhere because I figured that is just
3  problematic.  So -- so I went to observe
4  these things, some of the things that were
5  in Paisley's office in the public -- there
6  is like a public lounge and a storage
7  closet.
8      Q.   Okay.
9      A.   So -- yes.
10     Q.   You referred to Paisley's
11  storage closet, right?
12     A.   The department of political
13  science to be more precise.
14     Q.   So what you are talking about is
15  a storage closet off the faculty lounge
16  for the department of political science,
17  right?
18     A.   That's correct.
19     Q.   To your knowledge, is this
20  storage closet locked?
21     A.   Yes and no.
22     Q.   Are you aware of any time in
23  which it was not locked?
24     A.   Of course.
25     Q.   While your materials were in

WILSON

1
2  there?
3      A.   Yes.
4      Q.   And how do you know that?
5      A.   Well, first because of the
6  pattern and practice that it wasn't just
7  for my materials, but it was to store
8  coffee, tea, sugar, garbage bags.  I mean
9  and it was a lounge, and so the practice
10  was that door was open frequently.  For
11  years, for decades it was open and closed,
12  open and closed, so that is how I know.
13  So that was the common practice, and on
14  the day that I arrived there to watch my
15  materials being transferred when I arrived
16  the door was open, and not only was the
17  door open but I recognized that one of my
18  computers was outside in the lounge on the
19  floor.
20     Q.   When did you come to Brooklyn
21  College to look at the movement of your
22  materials from the storage closet?
23     A.   I don't recall the exact date.
24     Q.   Do you know what year it was?
25     A.   Maybe it was 2014.

WILSON

1
2      Q.   You don't know?
3      A.   I am not sure.
4      Q.   If you look at the description
5  on page 3 of Exhibit 1 with regard to Pete
6  Zwiebach, there is a reference to March of
7  2016 there.  Do you see that?
8      A.   Yes.  March of 2016, right.
9      Q.   And it doesn't appear to be a
10  complete sentence, but there is a
11  reference to "obtains his property until
12  March of 2016"?
13     A.   Right.
14     Q.   And so you obtained your
15  property in March of 2016?
16     A.   I never obtained my property.
17     Q.   So what do the words obtains his
18  property until March 2016 mean here?
19     A.   So I was terminated in February
20  of 2016, and I wanted to make arrangements
21  to pick up whatever was left over, the
22  remnants, whatever they had.  Again, I had
23  no idea what was there, and so it took a
24  couple of months for them even to make
25  arrangements for me to pick up the

WILSON

1
2  leftovers.
3      Q.   Going back to when you and Mr.
4  Zwiebach reviews materials at Africana
5  studies, which you said took place in 2014
6  or 2015, you testified, right, that your
7  books, manuscripts, lectures, research
8  notes, and letters were not present then?
9      A.   That's right.
10     MR. JAMES KLEIN:   You said they
11  were not present in Boylan Hall.
12     THE WITNESS:   In Boylan Hall.
13     Q.   Were they also present in
14  Africana studies?
15     A.   I never saw them at any time.
16     Q.   Did you ask anybody where those
17  materials were?
18     A.   Yes, I asked Pete.
19     Q.   And to your knowledge, did Mr.
20  Zwiebach complain to anyone or ask where
21  those materials were?
22     A.   I asked him to complain.
23     Q.   Do you know if he did?
24     A.   I think he did, but I don't know
25  for a fact.

WILSON

2   Q.   So we identified two occasions
3   when you looked at your materials, once at
4   Boylan Hall and once at Africana studies,
5   right?
6   A.   Once in Boylan Hall and once in
7   Africana studies.
8   Q.   And you also testified that you
9   looked at materials at CUNY central?
10   A.   No, I never testified to that.
11   Q.   Did Mr. Zwiebach look at
12   materials at CUNY Central?
13   A.   That is my understanding.
14   Q.   Did you look at any of your
15   materials on any other occasions besides
16   when you went to Africana studies in 2014
17   or 2015 and the time you went to Boylan
18   Hall and looked in a conference room in
19   2014 or 2015?
20   A.   I think there were two other
21   occasions that I can recall.   One was in
22   2015.   It may have been February of 2015,
23   and it was to see if there were additional
24   materials for arbitration, as I recall.
25   Q.   Did you accompany Mr. Zwiebach

WILSON

2   on that occasion?
3   A.   No.
4   Q.   You went by yourself?
5   A.   He arranged for security to let
6   me in; otherwise, I couldn't have gotten
7   on campus, and then I was met by security,
8   and then there was a security
9   representative who sat in front of the
10   door, who told me I couldn't take
11   anything.
12   Q.   Where?  In front of the door
13   where?
14   A.   This would have been in Africana
15   studies.   I think it was in -- Africana
16   studies on the third floor of James Hall.
17   Q.   And was this occasion you went
18   to Africana studies by yourself before or
19   after you went to Africana studies with
20   Mr. Zwiebach?
21   A.   That -- I am not sure if it was
22   before or after.
23   Q.   Did you receive copies of any of
24   the materials that you and Mr. Zwiebach
25   identified as things you wanted copies of?

WILSON

2   A.   Me personally, no.
3   Q.   Do you know if Mr. Zwiebach did?
4   A.   I think Mr. Zwiebach did get
5   copies of some administrative files.
6   Q.   Do you know of any files that
7   you and Mr. Zwiebach asked to be copied
8   that you didn't -- that he didn't receive?
9   A.   In terms of administrative
10   files, I think he -- he got some copies
11   that he asked for.
12       MR. JAMES KLEIN:  Objection.  He
13   doesn't know.   He can't testify to what
14   Mr. Zwiebach got.
15   Q.   Did you personally receive
16   copies of any materials that you reviewed?
17   A.   Not personally, no.
18   Q.   So you testified that there were
19   two other occasions that you went to
20   review materials.  Once was at Africana
21   studies by yourself, and what was the
22   other one?
23   A.   After my termination, and that
24   would have been in March, April, May of
25   2016.

WILSON

2   Q.   And what happened then?
3   A.   What happened then was I looked
4   for my letters.  I found none.  I
5   did -- there were books there but not my
6   prized collection.  I didn't see my
7   lecture notes, which would have been
8   voluminous.  I didn't see my research.
9   So that was my most striking recollection
10   of 2016.
11   Q.   Okay.  When you went in March,
12   April or May of 2016 as you just
13   described, did you go with Mr. Zwiebach
14   or --
15   A.   No.
16   Q.   -- on your own?
17   A.   On my own.  He arranged it, but
18   I went on my own.
19   Q.   Okay.  And you didn't see
20   your prized collection of books.  You
21   didn't see your lecture notes or your
22   research notes according to what you have
23   testified to; is that right?
24   A.   Or my letters.
25   Q.   Or your letters.  Now, first of

Page 118

WILSON

1          WILSON
2 all, you referred previously to
3 administrative files.  What do you mean by
4 administrative files?
5    A.  Well, I was a program
6 administrator for several programs, and so
7 there are always, you know, voluminous
8 administrative files when you have
9 hundreds of students, so these would have
10 been student records.   These would have
11 been affirmative action records,
12 employment -- employee records because I
13 was on numerous search committees
14 including presidential search committees.
15 So if you are an administrator for many,
16 many years, you accumulate many
17 administrative files, activities, events
18 and so forth.
19    Q.  Did you consider these
20 administrative files to be your personal
21 property?
22    A.  No, not at all.
23    Q.  Now, on this occasion in March,
24 April or May of 2016 when you looked for
25 your letters, the prized collection of

Page 119

1          WILSON
2 your books, your lecture notes, your
3 research, and your letters -- I said
4 letters twice -- did you say anything to
5 anybody as to where this stuff was?
6    A.  Yes, actually.
7    Q.  And who did you say something
8 to?
9    A.  At that time, I was met by a
10 faculty member who actually gave me access
11 to at that time, and that would have been
12 Professor Day, and I asked Professor Day
13 have you seen my books? Have you seen my
14 letters? Have you seen my lectures.  I am
15 looking for my property, and she said I
16 don't know anything about that.
17    Q.  When was the last time you
18 talked with Professor Day?
19    A.  Probably weeks ago.
20    Q.  What were the circumstances
21 under which you spoke with her a week ago?
22    A.  I wanted to see if she would be
23 willing to be a witness to the seizure of
24 my property and to, you know, keep fresh
25 in her memory what she witnessed.

Page 120

1          WILSON
2    Q.  And what did she tell you?
3    A.  She said she would assist
4 and -- and what she told me initially was
5 yes, I knew you didn't have access, and
6 that was it.
7    Q.  Other than speaking with
8 Professor Day about whether she saw
9 letters, research notes, your prized book
10 collection, your lecture notes, did you
11 talk to anybody else about where this
12 stuff was?
13    A.  You mean that day?
14    Q.  At any time, that day or after
15 about where this stuff was.
16    A.  Oh.  That is all -- those are
17 the only people I can recall at this
18 moment.
19    Q.  Well --
20    A.  You know --
21    Q.  You were concerned, were you
22 not, that all this prized material wasn't
23 there?  Yes or no.
24    A.  Yes, absolutely.
25    Q.  And did you send an e-mail to

Page 121

1          WILSON
2 somebody; did you send a letter to
3 somebody; did you complain to anyone about
4 this missing material?
5    A.  I -- I told you previously I
6 sent e-mails to Pam Pollack.  I
7 complained to my attorney, and he filed a
8 lawsuit over that, you know.  That was
9 one of the elements of the lawsuit.  So
10 those were -- and the -- let's see.
11 Those would be the main people who I spoke
12 to.  That is it.
13    Q.  So --
14    A.  Well, I mentioned -- I spoke to
15 Hewitt about it, returning my stuff.  I
16 told you I already spoke to Haugstatter,
17 but this was sequential.  This was
18 evolving.  This isn't like -- so if I
19 mentioned people earlier that I raised it
20 with, that's -- but I won't go back to the
21 same people who violated me and ask them.
22 You know, obviously if they kept it for
23 years what am I going to do, keep hitting
24 my head against the wall.
25    Q.  Well, until you went to Brooklyn

31 (Pages 118 - 121)

Page 122

WILSON

1
2 College in March, April or May of 2016,
3 and you are not sure exactly when it was,
4 to get your materials, you didn't know
5 exactly what was missing, did you?
6    A.  Well, that is not exactly
7 correct.
8    Q.  Why is that?
9    A.  That's because when I was there
10 with Mr. Zwiebach, and we had looked in
11 boxes, the issue was where is my letters;
12 where is my notes; where is my research.
13 So I knew that was missing.  I didn't
14 know what else was missing, but I
15 certainly knew major things were missing,
16 but no, I didn't have a definitive list at
17 that time.  And by the way, I still don't
18 have a completely definitive list.
19    Q.  And have you seen any
20 communication either from you or your
21 counsel to anyone at CUNY or Brooklyn
22 College asking about where your research
23 notes and your prized book collection and
24 your research and letters were?
25    A.  I believe I saw an e-mail from

Page 123

WILSON

1
2 Michael Hewitt.  I called him and said
3 Michael, I am not getting my mail.  I
4 haven't been getting my mail for years,
5 for months.  Where is my mail?  And I
6 believe there was an e-mail exchange, and
7 he said he would try to find out.
8    Q.  So now we are talking about your
9 mail?
10    A.  Uh-huh.
11    Q.  I asked you about your research
12 notes, your prized book --
13    A.  But I asked him about my
14 property.
15    Q.  Please.  We can't talk at the
16 same time.
17    A.  Okay.
18    Q.  I asked have you ever seen any
19 written communication from you or your
20 attorney, any of your attorneys to anyone
21 asking where your research notes were,
22 where your prized book collection was,
23 where your manuscripts were, where your
24 letters were, any of that stuff.
25    A.  I may have seen something, but I

Page 124

WILSON

1
2 am not positive. I may have seen
3 communication from Mr. Zwiebach asking
4 about my materials.  Yes.
5    Q.  And this communication from Mr.
6 Zwiebach, when did he send that?
7    A.  Probably it would been in 2013,
8 2014 maybe continuously.
9    Q.  Let's go to the top of page 4 of
10 Exhibit 1.
11    A.  I am going to have to take a
12 break.
13       MR. MARK KLEIN:  Let's go off
14 the record.
15       (Luncheon recess: 12:45 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 125

WILSON

1
2    A F T E R N O O N   S E S S I O N
3          1:30  p.m.
4       MR. MARK KLEIN:  Back on the
5 record.
6 DR. J O S E P H   W I L S O N,
7 having been previously duly sworn,
8 testified further as follows:
9 CONTINUED EXAMINATION
10 BY MARK KLEIN:
11    Q.  Dr. Wilson, directing your
12 attention to page 4 of Exhibit 1, which is
13 plaintiff's initial disclosures in this
14 case.
15    A.  Page 4.
16       MR. JAMES KLEIN:  I apologize.
17 Could we go off the record for one minute.
18 I left my copy inside.
19       THE WITNESS:  I may have taken
20 your copy.
21       MR. JAMES KLEIN:  Okay.
22    Q.  First off, Dr. Wilson, is there
23 any testimony you gave this morning before
24 we took a lunch break that you would like
25 to change or modify?

32 (Pages 122 - 125)

Page 126

WILSON

2  A.  I would have to hear what I
3  said.
4  Q.  Sitting here today, is there any
5  testimony you gave this morning that you
6  would like to change or modify?
7  MR. JAMES KLEIN:  Well, at a
8  later date, we will have an opportunity to
9  correct the record.
10  MR. MARK KLEIN:  Yes, and I am
11  asking him now if there is any testimony
12  that he would like to change or modify
13  that he gave this morning.
14  A.  At a later date I will review it
15  and modify if it if I need to at a later
16  date of.
17  Q.  At this moment you can't think
18  of anything?
19  A.  At this moment, no.
20  Q.  Directing your attention to
21  paragraph 12, there is Barbara Haugstatter
22  listed there, correct?
23  A.  I couldn't hear what you said.
24  Q.  Number 12 is a listing for
25  persons likely to have knowledge of

Page 127

WILSON

2  discoverable facts, and the person that is
3  listed is Barbara Haugstatter, correct?
4  A.  That's correct.
5  Q.  And it says next to her name
6  "Brooklyn College employee participated in
7  search and seizure and conversion."  Do
8  you see that there, sir?
9  A.  I see that.
10  Q.  What search and seizure did
11  Barbara Haugstatter participate in?
12  A.  The -- all of my office
13  materials, my property that was seized at
14  25 Broadway Barbara had access to, and she
15  also had access to the seized property at
16  Brooklyn College.
17  Q.  And you say that Barbara had
18  access to your materials because they were
19  in a storage closet; is that right?
20  A.  I said that she -- I would say
21  she had access because she had access to
22  my offices, and that is why.  In addition
23  to the storage locker.
24  Q.  Besides the fact that
25  Ms. Haugstatter had access to your offices

Page 128

WILSON

2  and the storage closet, do you have any
3  knowledge that Ms. Haugstatter took any of
4  your property?
5  A.  That she personally took.  I
6  don't have knowledge of that.  No.
7  Q.  Do you have an understanding of
8  what the word conversion means?
9  MR. JAMES KLEIN:  Well, that
10  calls for a legal conclusion.
11  A.  Yes, I --
12  Q.  It appears here.  Do you have
13  an understanding of what the word
14  conversion means?
15  A.  My understanding is that that's
16  like when somebody takes something or
17  keeps something from you that is not
18  theirs, and, yes, so I understand it in
19  this context.  I am not sure if that is
20  legal, but that is what I understand.
21  Q.  Do you have any knowledge that
22  Ms. Haugstatter took any of your property
23  and kept it?
24  A.  I have knowledge that she had
25  control over my property and didn't -- for

Page 129

WILSON

2  whatever reason didn't allow me access to
3  it, yes.
4  Q.  Do you have any knowledge that
5  Ms. Haugstatter took your property and
6  hasn't returned it?
7  A.  Well, Ms. Haugstatter told me
8  that they had my property.  She told me
9  we have your stuff.  We have your plant.
10  We have your easel, and she would speak to
11  Paisley about my stuff.  So that is my
12  knowledge of what she knows.
13  Q.  Do you know if Ms. Haugstatter
14  had access to your office at 25 Broadway
15  after the locks were changed?
16  A.  That's my understanding.
17  Q.  And what is the basis of your
18  understanding?
19  A.  Because staff who worked there
20  for a period of time told me that Barbara
21  Haugstatter was situated at 25 Broadway
22  for a period of time in a secretarial
23  capacity.
24  Q.  And when was she situated at 25
25  Broadway?

33 (Pages 126 - 129)

Page 130

WILSON

1
2    A.   I don't know exactly when.
3    Q.   All right.  The next person
4 listed is Karen Gould, and you are
5 referring to Brooklyn College's former
6 president, correct?
7    A.   Correct.
8    Q.   And it says with respect to
9 Karen Gould that she "participated in
10 search and seizure" -- let me try that
11 again.  I am sorry.  That she
12 "participated in search and seizure and
13 conversion."  Do you see that?
14   A.   I see that.
15   Q.   And how did President Gould
16 participate in this search and seizure to
17 your knowledge?
18       MR. JAMES KLEIN:   Again, I am
19 going to object.   It calls for a legal
20 conclusion.
21   Q.   What is the basis for that
22 statement there, sir?
23   A.   That she ordered her employees
24 to change locks on my offices and to
25 restrict -- and forbid my access to my

Page 131

WILSON

1
2 property that was under her administrative
3 control.
4    Q.   And you've already told us what
5 your understanding of the word conversion
6 is.  Are you aware of any facts that
7 President Gould took and failed to return
8 of your property?
9    A.   The fact that my property was
10 under her control, that's the main fact.
11   Q.   All right.  Now, it also says
12 below in the line below her name that she
13 "participated in defamation with Cheng."
14 Do you see that?
15   A.   Yes.
16   Q.   What defamation are you
17 referring to?
18       MR. JAMES KLEIN:   Again, I am
19 going to object.   It calls for a legal
20 conclusion.
21       MR. MARK KLEIN:   Your objection
22 is noted.
23   Q.   What defamation are you
24 referring to?
25   A.   Gould told numerous people that

Page 132

WILSON

1
2 I was a thief, that I was stealing money.
3    Q.   And what defamation with Cheng
4 is referred to there?
5       MR. JAMES KLEIN:   Any time you
6 refer to a legal term like defamation I
7 have an objection that you are calling for
8 a legal conclusion.
9       MR. MARK KLEIN:   This is
10 plaintiff's initial disclosures.
11      MR. JAMES KLEIN:   I understand,
12 but I am making a record of it.
13      MR. MARK KLEIN:   Fine.
14   Q.   What defamation is referred to
15 there?
16   A.   So Gould and her staff including
17 Cheng went around telling people I was a
18 thief.
19   Q.   Are you aware of any defamatory
20 statement made by Mr. Cheng himself?
21   A.   Yes.
22   Q.   What statement?
23   A.   My understanding is that he told
24 Ivy Rich that I was a thief.
25   Q.   And who is Ivy Rich?

Page 133

WILSON

1
2    A.   Ivy Rich was at that time the
3 leader or director or some position in the
4 labor arts program.
5    Q.   And the labor arts program was
6 situated on the 17th -- sorry, on the 7th
7 floor of 25 Broadway?
8    A.   When?
9    Q.   At any time.
10   A.   At that time, no.   At this
11 time, yes.
12   Q.   That time being when?
13   A.   In 2011, early -- in 2012 they
14 were not situated.
15   Q.   All right.  So Ivy Rich told
16 you that Mr. Cheng said you were a
17 "thief"; is that right?
18   A.   No, that's not right.
19   Q.   Ivy Rich told somebody that Mr.
20 Cheng said you were a thief?
21   A.   Correct.
22   Q.   Who did Ivy Rich tell that Mr.
23 Cheng said that?
24   A.   She told Steve Leberstein.?
25   Q.   And Mr. Leberstein told you that

34 (Pages 130 - 133)

Page 134

WILSON

2 Ivy Rich told him that Terrence Cheng said
3 you were a thief?
4     A.   Exactly.
5     Q.   And when did Ivy Rich tell Steve
6 Leberstein that?
7     A.   That would have been in early
8 2012.
9     Q.   And when did Mr. Leberstein tell
10 you that Ivy Rich had told him that
11 Terrence Cheng said you were a thief?
12     A.   Contemporaneously, like the same
13 day that it happened.
14     Q.   Early 2012?
15     A.   Early 2012.
16     Q.   Did Mr. Leberstein tell you at
17 any other time that Terrence Cheng had
18 said in front of Ivy Rich that you were a
19 thief?
20     A.   Yes, later in 2012 he told me,
21 and again in 2013 he told me.
22     Q.   Now, he told you in 2012 and
23 2013 that Terrence Cheng had said to Ivy
24 Rich in early 2012 that you were a thief?
25     A.   He told me in 2012 when it

Page 135

WILSON

2 happened and then repeated it
3 subsequently.
4     Q.   So it only happened once in
5 early 2012?
6     A.   I don't know how many times it
7 happened, but he told me that -- that one
8 occasion, but it was a process.  Anyhow.
9     Q.   I am asking you, sir, to your
10 knowledge and based on what people --
11         MR. MARK KLEIN:   Withdrawn.
12     Q.   Were you ever present when
13 Terrence Cheng said you were a thief?
14     A.   No.
15     Q.   Were you ever present when
16 Terrence Cheng made any defamatory
17 statement about you?
18     A.   No.
19     Q.   Are you aware of --
20         MR. MARK KLEIN:   Withdrawn.
21     Q.   You have testified that Steve
22 Leberstein told you in early 2012 that Ivy
23 Rich had said that Terrence Cheng had said
24 that you were a thief, right?
25     A.   Correct.

Page 136

WILSON

2     Q.   So based on what Steve
3 Leberstein told you, you were aware of one
4 instance in which Terrence Cheng said you
5 were a thief, right?
6     A.   Based on Steve Leberstein, yes.
7 Are you aware of any other instance in
8 which Mr. Cheng allegedly said anything
9 defamatory about you?
10     A.   Yes.
11         MR. JAMES KLEIN:   Again, I am
12 going -- it calls for a legal conclusion.
13         MR. MARK KLEIN:   Your objection
14 is noted.
15     Q.   You know what defamation is,
16 right, sir?
17         MR. JAMES KLEIN:   I object.
18 It calls for a legal conclusion.   You
19 can't ask him what defamation is.
20     Q.   What is your understanding of
21 what defamation is?
22         MR. JAMES KLEIN:   That calls for
23 a legal conclusion.
24         MR. MARK KLEIN:   I am asking for
25 his understanding, Mr. Klein.

Page 137

WILSON

2     A.   When they lie about you in a way
3 that is harmful.
4     Q.   So that is your understanding of
5 defamation, right?
6     A.   Yes.
7     Q.   Now, other than this instance
8 that you described where Steve Leberstein
9 told you in early 2012 that Ivy Rich had
10 told him that Mr. Cheng had said you were
11 a thief, are you aware of any other
12 instances or anything -- where anybody
13 lied and said something bad about you by
14 Mr. Cheng?
15     A.   Yes.
16     Q.   When?
17     A.   Also in 2012.
18     Q.   So another time in 2012?
19     A.   Yes, there were, for example --
20 well, yes.  Yes.
21     Q.   Okay.  How many times in 2012
22 did Mr. Cheng make a defamatory statement
23 about you?
24     A.   I don't know the total number.
25     Q.   Other than in 2012, are you

35 (Pages 134 - 137)

Page 138

WILSON

2 aware of any other instances in which Mr.
3 Cheng made a defamatory statement about
4 you?
5    A.   Yes.
6    Q.   When?
7    A.   In 2012.  You mean what
8 instance?
9    Q.   Other than in 2012 --
10   A.   Beyond 2012.
11   Q.   Right.  Are you aware of
12 any -- let me ask the question again just
13 so we are clear.
14       Other than in 2012 at any time
15 in 2012 are you aware of any instances in
16 which Mr. Cheng allegedly made a
17 defamatory statement about you?
18   A.   No.
19   Q.   Now, the next paragraph is
20 number 14 referring to Terrence Cheng,
21 correct?
22   A.   Yes.
23   Q.   And it says here "Participated
24 in search and seizure and conversion
25 defamation, malice."  Do you see that?

Page 139

WILSON

2    A.   Yes.
3    Q.   Do you have any -- are you aware
4 of any facts supporting an allegation that
5 Mr. Cheng participated in any search and
6 seizure of your property?
7    A.   Yes.
8    Q.   What is the basis of your
9 knowledge?
10   A.   That Terrence Cheng had
11 administrative control over my offices at
12 25 Broadway.
13   Q.   What is the basis of that
14 statement?
15   A.   Because that was his position in
16 the college and because he frequented the
17 Center For Worker Education after I was
18 removed as director.
19   Q.   So when you say here in
20 paragraph 14 on page 4 of Exhibit 1 that
21 Mr. Cheng "Participated in search and
22 seizure", is that based on the fact that
23 he had control over the Graduate Center
24 For Worker Education according to you?
25   A.   Yes.

Page 140

WILSON

2    Q.   Do you know if he authorized the
3 search and seizure of your office?
4    A.   I don't know.
5        MR. JAMES KLEIN:  I believe
6 that calls for a legal conclusion.
7    Q.   Now, you also say he
8 participated in the conversion -- in
9 conversion, correct?
10   A.   Correct.
11   Q.   Are you aware of any property
12 that Mr. Cheng took of yours and didn't
13 return?
14   A.   I am aware that all of my
15 property at 25 Broadway was seized while
16 it was under his administrative control.
17   Q.   Are you aware of any property
18 that he personally took and didn't return?
19   A.   Not specifically.
20   Q.   Now, then it says defamation.
21 We have already -- I have already asked
22 you about that, and you've told me that
23 the only defamation that you are aware of
24 took place in the year 2012; is that
25 right, sir?

Page 141

WILSON

2    A.   That's right.
3    Q.   Number 17 is Professor Linda
4 Day.  We have talked a little bit about
5 her, right?
6    A.   Right.
7    Q.   At the time was she chairperson
8 of the department of Africana studies at
9 Brooklyn College?
10   A.   At what time?
11   Q.   At any time from 2012 to the
12 present.
13   A.   Yes.
14   Q.   When was she chairperson?
15   A.   I don't know the exact dates.
16   Q.   Now, it says with regard to
17 Professor Day, "Witnessed ongoing seizure
18 of plaintiff's property on main campus,
19 seizure, storage at Africana studies." Do
20 you see that?
21   A.   I see that.
22   Q.   To the best of your knowledge,
23 what seizure of your property on the main
24 campus did Professor Day witness?
25       MR. JAMES KLEIN:  Again, it

36 (Pages 138 - 141)

Page 142

1          WILSON
2 calls for a legal conclusion.
3    Q.    You can answer.
4    A.    My property was seized and
5 stored in Africana studies, and so
6 she -- because I was banned from campus I
7 had no access to my property.   She knew
8 that, and she -- so that was the seizure
9 that she witnessed.
10    Q.    Number 18 is Professor George
11 Cunningham, correct?
12    A.    Correct.
13    Q.    In what department was Professor
14 Cunningham a professor?
15    A.    Africana studies.
16    Q.    When was the last time you spoke
17 with Professor Cunningham?
18    A.    Maybe a couple of weeks ago.
19    Q.    Did you talk to him about being
20 a witness in your case?
21    A.    Yes, I did.
22    Q.    And what did he tell you and
23 what did you tell him about any of the
24 events relating to this case?
25    A.    Essentially I said I might want

Page 143

1          WILSON
2 him as a witness to the seizure of my
3 property, and he agreed.
4    Q.    And do you know what seizure of
5 your property he witnessed?
6        MR. JAMES KLEIN:   Again, it
7 calls for a legal conclusion.
8    Q.    You can answer.
9    A.    He witnessed that my property
10 was in Africana studies.
11    Q.    Did he have any role in getting
12 your property into Africana studies?
13    A.    To my knowledge, he allowed
14 property -- the college wanted to move the
15 property, and he allowed the property to
16 be taken to Africana studies.
17    Q.    Did you ever tell anyone at
18 Brooklyn College you wanted your property
19 moved to Africana studies?
20    A.    I don't recall that.
21    Q.    Now, it also says with regard to
22 Professor Cunningham that he was a witness
23 to defamation, correct?
24    A.    Yes.
25    Q.    Do you know if he was a witness

Page 144

1          WILSON
2 to any defamation by Terrence Cheng?
3    A.    I don't know.
4    Q.    Number 20 is Steve Leberstein,
5 correct?
6    A.    Correct.
7    Q.    At the bottom of page 4?
8    A.    That's correct.
9    Q.    Now, you testified that Mr.
10 Leberstein told you what Ivy Rich had told
11 him about what Terrence Cheng supposedly
12 had said about you, right?
13    A.    That's correct.
14    Q.    And that was in early 2012,
15 right?
16    A.    Correct.
17    Q.    Are you aware of any other
18 "defamation" that he witnessed?
19    A.    At that time in 2012, he
20 mentioned that he had a meeting or several
21 meetings with Terrence Cheng.
22    Q.    And that was in 2012?
23    A.    2012 I believe maybe.   Possibly
24 2013.
25    Q.    What did he tell you Mr. Cheng

Page 145

1          WILSON
2 said during these meetings in 2012 and
3 2013?
4    A.    After one of the meetings, he
5 called me to describe the meeting that he
6 had with Terrence Cheng.
7    Q.    And what did he tell you Mr.
8 Cheng had said, if anything?
9    A.    What he said was that Terrence
10 Cheng basically said he was coming in to
11 clean up the criminal stuff at the
12 Graduate Center For Worker Education.
13    Q.    That is what Mr. Leberstein told
14 you?
15    A.    That is what he told me at that
16 time, yes.
17    Q.    And what Mr. Leberstein told you
18 was about meetings that took place in 2012
19 or 2013, right?
20    A.    Right.
21    Q.    Did Mr. Leberstein ever tell you
22 about any meetings that took place after
23 2013?
24    A.    No.
25    Q.    Okay.  If you go to the top of

37 (Pages 142 - 145)

Page 146

WILSON

1           WILSON
2    page 5, Number 21, Professor Robert
3    Cherry.
4        A.   Yes.
5        Q.   And you list him as a defamation
6    witness, correct?
7        A.   Correct.
8        Q.   And then it says "President
9    Gould's husband told him that Gould had no
10   evidence of plaintiff's criminal acts but
11   would go after plaintiff on "Technical
12   ground rules."
13       A.   That's correct.
14       Q.   Is that the -- is that the
15   defamatory statement to which Professor
16   Cherry was a witness?
17           MR. JAMES KLEIN:  Calls for a
18   legal conclusion.
19           MR. MARK KLEIN:  Again, you
20   interrupted my question.  If you can
21   wait, then you can make your silly
22   objection.
23       Q.   Is that the alleged defamatory
24   statement to which Professor cherry is a
25   witness?

Page 147

1           WILSON
2           MR. JAMES KLEIN:  Are you done
3    with your question now?
4           MR. MARK KLEIN:  Yes.
5           MR. JAMES KLEIN:  It calls for
6    a legal conclusion.
7           MR. MARK KLEIN:  Thank you.
8        Q.   You can answer.
9        A.   That is what he told me.
10       Q.   Are you aware of any other
11   defamatory statements to which Professor
12   Cherry was a witness?
13           MR. JAMES KLEIN:  Are you done
14   with your question now? It calls for a
15   legal conclusion.
16           MR. MARK KLEIN:  Do you want me
17   to get the judge on the phone?
18           MR. JAMES KLEIN:  Two people can
19   be unprofessional.
20       Q.   Are you aware of any other
21   defamatory statements to which Professor
22   Cherry was a witness?
23       A.   Yes.
24       Q.   What?
25       A.   I am trying to recall the

Page 148

1           WILSON
2    details.   Well, I am not totally sure,
3    but I think he told Immanuel Ness, another
4    professor, that Gould told him that
5    basically you shouldn't associate with
6    criminals, and, you know, I was a
7    criminal, and then there was also by
8    implication that Ness -- I don't remember
9    all the details, but that was -- yes, that
10   was the sort of -- what I remember.
11       Q.   And to the best of your
12   knowledge, when President Gould's husband
13   tell Professor Cherry this?
14       A.   To the best of my knowledge that
15   would have been in 2012.
16       Q.   Number 22 is Professor Immanuel
17   Ness, correct?
18       A.   Yes.
19       Q.   And according to this "he
20   witnessed defamation".  Did you see that?
21       A.   Yes.
22       Q.   Do you know when Professor Ness
23   witnessed defamation?
24       A.   In 2011 and 2012.
25       Q.   Do you see number 23 Max Azoula?

Page 149

1           WILSON
2        A.   Yes.
3        Q.   And according to the list here
4    he was "told by Cheng's staff, Phillips,
5    "Wilson was a thief." Do you see that?
6        A.   Yes, I see that.
7        Q.   Who is Cheng's staff?
8        A.   Phillips.
9        Q.   So you are saying Dean Phillips
10   was on Terrence Cheng's staff?
11       A.   Dean Phillips reported to
12   Terrence Cheng, yes.
13       Q.   Okay.  To your knowledge did
14   Mr. Azoula --
15           MR. MARK KLEIN:  Withdrawn.
16       Q.   To your knowledge, did Terrence
17   Cheng tell Max Azoula that you were a
18   thief?
19       A.   I don't know.
20       Q.   Number 24 refers to Jose Ohyan,
21   O-H-Y-A-N.  Do you see that?
22       A.   I see that.
23       Q.   And it also says, "Told by
24   Cheng's staff, Phillips, Wilson was
25   stealing." Do you see that?

38 (Pages 146 - 149)

Page 150

WILSON

1
2    A.   I see that.
3    Q.   To your knowledge, did Terrence
4 Cheng tell Mr. Ohyan directly that you
5 were stealing?
6    A.   I don't know.
7    Q.   Number 25 is an entry for
8 Professor Emeritus Nancy Romer, correct?
9    A.   Correct.
10   Q.   And in the entry with respect to
11 her it refers to "Cheng's team admin."
12 Do you see that?
13   A.   Yes.
14   Q.   Now, do you know who is referred
15 to there?
16   A.   No, not specifically.
17   Q.   Do you know what a team's admin
18 is?
19   A.   People who work with an
20 administrator.
21   Q.   Okay.   To your knowledge, was
22 Nancy Romer told by Mr. Cheng directly any
23 defamatory allegation regarding you?
24   A.   I don't know.
25   Q.   Number 26 refers to Jumaane

Page 151

WILSON

1
2 Williams, correct?
3    A.   Correct.
4    Q.   Do you know whether Mr. Williams
5 was told by Terrence Cheng that you were a
6 thief?
7    A.   I don't know.
8    Q.   In the second line it says, "Was
9 told by NY Times defamation in advance."
10 Do you see that?
11   A.   Yes.
12   Q.   What do you mean by that?
13   A.   Council Member Williams told me
14 in advance of the appearance of the New
15 York Times article that Gould told him
16 that an article was going to come out
17 about me.
18   Q.   In the New York Times?
19   A.   He didn't say specifically, but
20 he said there is going to be an article, a
21 big article coming out about me.
22   Q.   Okay.   Number 27 is an entry
23 for Erica Gaskins, correct?
24   A.   Correct.
25   Q.   And who is Ms. Gaskins?

Page 152

WILSON

1
2    A.   Ms. Gaskins is a former student
3 at the graduate center.
4    Q.   And she is now in Atlanta,
5 Georgia?
6    A.   Correct.
7    Q.   When was the last time you spoke
8 with her?
9    A.   A couple of weeks ago.
10   Q.   Did you ask her if she would be
11 a witness for you?
12   A.   Yes, I did.
13   Q.   Now, did you talk with her about
14 what she was going to testify about?
15   A.   I asked her if she remembered
16 defamatory statements she made
17 about -- yes, Cheng.
18   Q.   You asked her whether she
19 remembered Terrence Cheng making
20 defamatory statements; is that right?
21   A.   About me.
22   Q.   And what did she say?
23   A.   She would have to think about
24 it.
25   Q.   It says here "Witnessed Cheng's

Page 153

WILSON

1
2 defamatory statements," right?
3    A.   Well, I will clarify.   At that
4 time in 2012 I spoke to her, and she told
5 me that she was in several meetings with
6 Terrence Cheng, and at that time in 2012
7 she told me that Terrence Cheng
8 criminalized the program, criminalized the
9 students, and criminalized the leadership
10 of the program, and so at that time she
11 told me she felt like she was a criminal
12 and that everybody associated with the
13 program was a criminal.   That is what she
14 told me at that time, but this was years
15 back.
16   Q.   And that was in 2012?
17   A.   2012.
18   Q.   When did --
19       MR. MARK KLEIN:   Withdrawn.
20   Q.   How long was Ms. Gaskins a
21 student at the graduate center?
22   A.   I don't know.
23   Q.   Do you know when she stopped
24 being a student?
25   A.   I don't know.

39 (Pages 150 - 153)

Page 154

1          WILSON
2    Q.    But whatever information you
3  have about what she observed or saw
4  relates to 2012, right?
5    A.    That is right.
6    Q.    If you go to the next page, page
7  6, number 31 the entry for Penny Lewis,
8  and it says "with regard to her repeated
9  defamation." Do you see that?
10   A.    Yes.
11   Q.    What defamation are you
12 referring to?
13   A.    Specifically that I was a thief.
14   Q.    And when did she "repeat this
15 defamation"?
16   A.    That would have been in about
17 2013.
18   Q.    And why do you believe it was in
19 2013?
20   A.    Because I remember it was
21 sometime after this whole thing started,
22 so it wasn't in 2012, but it would have
23 been in 2013 or '14.  It would have been
24 even later.
25   Q.    So you are saying that Penny

Page 155

1          WILSON
2  Lewis repeated somebody else's defamatory
3  statement?
4    A.    Yes.
5    Q.    And do you know whose defamatory
6  statement she repeated?
7    A.    I don't know where she got her
8  information.
9    Q.    Okay.  I direct your attention
10 to paragraph 33, Professor Haroon Kareeam.
11 Did I pronounce his name right?
12   A.    Kareeam.
13   Q.    Kareeam.  Thank you.  That's
14 K-A-R-E-E-A-M.  That is how you spell it?
15   A.    I believe so.
16   Q.    Now, according to this entry it
17 says he "witnessed defamatory statements".
18 Do you see that?
19   A.    I see that.
20   Q.    What defamatory statements are
21 you referring to?
22   A.    In 2012 after he had been
23 interviewed, and I am not sure by who, he
24 told me that he was told that for him to
25 come, you know, to confess -- to speak up

Page 156

1          WILSON
2  about my criminal behavior, my criminal --
3  my stealing and things of that sort.
4    Q.    And who interviewed him?
5    A.    I don't know.
6    Q.    Have you spoken to -- when was
7  the last time you spoke to Mr. Kareeam?
8    A.    Maybe in -- maybe in 2014.
9    Q.    I direct your attention to --
10 did Professor Kareeam use the word
11 criminal?
12   A.    Yes, stealing and criminal.
13 Yes.
14   Q.    And did he tell you who had used
15 those words, if anyone?
16   A.    He said the people who
17 interviewed him.
18   Q.    And he didn't tell you who
19 interviewed him?
20   A.    No, he may have, but I don't
21 recall.
22   Q.    And this was in 2013, right?
23   A.    Well, the view was I think in
24 2012, but -- 2012, 2013.  I don't
25 remember precisely.

Page 157

1          WILSON
2    Q.    Okay.  Directing your attention
3  to the top of page 7.  Page 7.
4    A.    Yes.
5    Q.    You have an entry 41 for Steve
6  Brier, B-R-I-E-R.
7    A.    Yes.
8    Q.    With regard to him it says,
9  "Witnessed attempted intimidation by Cheng
10 team, Phillips," right?
11   A.    Yes.
12   Q.    When was the last time you spoke
13 with Mr. Brier?
14   A.    Maybe 2016.
15   Q.    Who is the Cheng team that is
16 referred to here?
17   A.    Phillips.
18   Q.    Okay.  Have you talked to Mr.
19 Brier about being a witness in this case?
20   A.    No.
21   Q.    The next entry is for Funke
22 Okome.  Did I pronounce his name right?
23   A.    Her name.  Okome.
24   Q.    F-U-N-K-E capital O-K-E-M-E,
25 right?

40 (Pages 154 - 157)

Page 158

1        WILSON
2    A.    Right.
3    Q.    When is the last time you spoke
4 with Professor Okome?
5    A.    Maybe in 2013
6 or -- approximately.
7    Q.    All right.
8    A.    2014 maybe.
9    Q.    It says here "Aware of hostile
10 acts around false plagiarism charges,
11 defamation cause, loss of collaboration
12 and research publishing consulting causing
13 economic damage." Do you see that?
14    A.    I see that.
15    Q.    And what defamation is referred
16 to there, if any?
17    A.    So Professor Wilson told me that
18 Currah --
19    Q.    You're professor Wilson.
20    A.    I'm sorry.  Professor Okome
21 told me.  I might have to have a break in
22 a minute.
23        Professor Okome told me that
24 Currah and Robin stated that Professor
25 Wilson or me was guilty of plagiarism and

Page 159

1        WILSON
2 would have been accused of plagiarism, and
3 that -- I didn't get the details, but that
4 she was asked by Currah and Robin I
5 believe to be on a plagiarism review
6 committee of my students' papers that had
7 been seized.  And so that was -- that was
8 the issue of plagiarism where she
9 was -- either she was on the committee or
10 she told me that a committee, ad hoc
11 committee had been formed to review my
12 students' work that had been seized from
13 my office.
14    Q.    And when did Professor Okome
15 tell you that?
16    A.    At the time that this happened.
17    Q.    When was that?
18    A.    That would have been in 2012,
19 early 2012, and I am just trying to think
20 if it -- it may have also started in 2011.
21 Actually upon reflection I think -- I
22 think it started in the fall of 2011 and
23 carried over.
24    Q.    All right.  I direct your
25 attention to paragraph 44, David Addams,

Page 160

1        WILSON
2 Esq. foundation director.
3    A.    Yes.
4    Q.    Do you see that?
5    A.    Yes.
6    Q.    Is Mr. Addams one of your
7 experts in this case now?
8    A.    Mr. Addams is an expert.
9    Q.    He is one of your experts in
10 this case?
11    A.    He is one of my experts in this
12 case.
13    Q.    Okay.  It says under his name
14 "Found plaintiff unemployable." Do you see
15 that?
16    A.    Correct.
17    Q.    When did Mr. Addams find you
18 unemployable?
19    A.    This was after the appearance of
20 the New York Times article.  I believe
21 that was in 2012 or 2013.
22    Q.    So after the New York Times
23 article came out, Mr. Addams told you that
24 you were unemployable?
25    A.    That it would be difficult to

Page 161

1        WILSON
2 employ me.  Correct.
3    Q.    Did you ask him for a job?
4    A.    I said if there are any
5 positions available I am -- I am
6 available.  Yes.
7    Q.    Any positions in what?
8    A.    In the organization that he
9 was -- he was working at a foundation I
10 believe at that time.
11    Q.    What foundation was that?
12    A.    I don't recall the name.
13    Q.    Is he still with that
14 foundation?
15    A.    I don't know if it is the same
16 foundation, but he is at a foundation.
17    Q.    So at the time of the New York
18 Times article --
19        MR. MARK KLEIN:  Withdrawn.
20    Q.    Had you spoken about employment
21 with Mr. Addams before or after the New
22 York Times article?
23    A.    Not before.
24    Q.    You spoke to him afterwards?
25    A.    Well, I -- no, I spoke to him

41 (Pages 158 - 161)

Page 162

WILSON

1
2 about other opportunities probably
3 starting in maybe right even around the
4 same time, right around the time --
5    Q.   The time of the New York Times
6 article?
7    A.   Yes.
8    Q.   And to the best of your
9 recollection, when was the -- when did the
10 New York times article come out?
11    A.   Maybe 2013.  I'm not sure of
12 the exact date.
13       MR. MARK KLEIN:  I ask that the
14 reporter mark as Wilson 3 a reprint of an
15 article from the New York Times.
16       (Wilson Exhibit 3 marked for
17 identification.)
18       (Document handed to witness.)
19    Q.   Dr. Wilson, I show you what has
20 been marked as Wilson Exhibit 3.  Please
21 take a moment to generally review it and
22 tell me when you have done so.
23    A.   Okay.
24    Q.   Is this the article you were
25 referring to, sir?

Page 163

WILSON

1
2    A.   It may or may not be.  I'm not
3 sure.
4    Q.   So you think there might have
5 been more than one New York Times article?
6    A.   Yes.
7    Q.   According to this exhibit, this
8 article is published on January 12, 2014;
9 is that right?
10    A.   That is according to this,
11 correct, January 14.
12    Q.   And you're not sure if this is
13 the article that Jumaane Williams had told
14 you was going to be coming out; is that
15 right?
16    A.   New York Times published
17 different versions of their article, so I
18 don't know if this is the original
19 version.
20    Q.   Do you think there might have
21 been an article in the New York Times that
22 you have in mind that came out in 2013?
23    A.   I think there may have been
24 versions of this article.
25    Q.   In 2013?

Page 164

WILSON

1
2    A.   And beyond.  I mean this is --
3 this was from 2018 it says on the top
4 here.  It doesn't say it is from 2014.
5    Q.   No, 2018 is when I printed it.
6    A.   Right.  From where?
7    Q.   Online.
8    A.   Right.  So what I am telling you
9 is online is not necessarily the same as
10 what occurred in print that day.
11    Q.   Okay.  When did you first speak
12 with Mr. Addams about employment
13 opportunities?
14    A.   Right around the time of this
15 article coming out.
16    Q.   And when was the last time you
17 spoke to Mr. Addams regarding employment
18 opportunities?
19    A.   Maybe a few months ago.
20    Q.   And what did you say to Mr.
21 Addams about employment opportunities a
22 few months ago?
23    A.   I said I was still interested in
24 employment opportunities, and Mr. Addams
25 said, you know, because of the articles

Page 165

WILSON

1
2 and so forth that it would be difficult
3 for me to get a job.
4    Q.   Does Mr. Addams know that you
5 were terminated by CUNY?
6       MR. JAMES KLEIN:  It calls for
7 speculation.  He can't testify --
8    Q.   To your knowledge, do you know
9 if Mr. Addams knows that you were
10 terminated by CUNY?
11    A.   To my knowledge, he knows he was
12 terminated by CUNY.
13    Q.   And to your knowledge, does Mr.
14 Addams know that a neutral arbitrator
15 upheld your termination?
16    A.   I don't know about that.
17    Q.   You haven't told him; is that
18 right?
19    A.   I didn't mention that, no.
20    Q.   Number 45, could you pronounce
21 the name of that person for me?
22    A.   Page 45.
23    Q.   No, I'm sorry.  Going back to
24 Exhibit 1.
25       MR. JAMES KLEIN:  Paragraph 45.

42 (Pages 162 - 165)

Page 166

WILSON

1
2   Q.   Paragraph 45.
3   A.   Number 45.
4   Q.   Yes.
5   A.   What was your question?
6   Q.   Could you pronounce that
7 person's name for me?
8   A.   Kyung Ji Ree, and it is actually
9 Kyung Ji Kate Ree.
10   Q.   And who was Ms. Ree?
11   A.   Ms. Ree was one of the leaders
12 in -- in a Brooklyn organization called
13 New Leadership.
14   Q.   Now, there is a reference under
15 Ms. Ree's name "Search and seizure at
16 Medgar Evers."   Do you see that?
17   A.   I see that.
18   Q.   Is that a typo?
19   A.   Is what a typo?
20   Q.   Well, was there a search and
21 seizure at Medgar Evers?
22   A.   Yes.
23   Q.   And how did it relate to you, if
24 at all?
25   A.   Her offices were raided.  She

Page 167

WILSON

1
2 had an office at Medgar Evers.   Her
3 office was raided by CUNY.   Her computers
4 and documents were seized.
5   Q.   And did that have something to
6 do with you?
7   A.   Subsequent to that raid she
8 contacted me and asked me to assist at
9 worker education in her organization.
10   Q.   When were her offices at Medgar
11 Evers raided according to you?
12   A.   I don't know the exact date.
13   Q.   What year?
14   A.   I don't know the year.
15   Q.   Was it before or after January
16 of 2012?
17   A.   Before.
18   Q.   Number 46 refers to Dean Juan
19 Marcado.  Do you see that, sir?
20   A.   I see it.
21   Q.   It says "Told by BC
22 administration, Isaacson, Wilson was
23 stealing." Do you see that?
24   A.   Right.
25   Q.   Do you know who the BC

Page 168

WILSON

1
2 administration referred to is there?
3   A.   At that time, this is in 2012 I
4 spoke with him by phone, and he told me he
5 met with a group of Brooklyn College
6 administrators and -- who said that I had
7 been stealing.
8   Q.   And that was in 2012?
9   A.   In 2012.
10   Q.   Have you spoken to Mr. Marcado
11 about being a witness in this case?
12   A.   No.  Actually I did speak to
13 him about being a witness a number of
14 months ago.
15   Q.   What did he say?
16   A.   He said he doesn't remember that
17 much about that time.
18   Q.   Okay.  That time being 2012,
19 right?
20   A.   2012.
21   Q.   The next entry is number 47
22 Ronald Mason, Esquire?
23   A.   Right.
24   Q.   It says, "Witness to economic
25 damage and nonemployability because of

Page 169

WILSON

1
2 defamation deterrent to teaching,
3 consulting positions." Do you see that?
4   A.   Right.
5   Q.   When was the last time you spoke
6 with Ronald Mason?
7   A.   Maybe a year or so ago.
8   Q.   And have you spoken to Mr. Mason
9 about employment opportunities?
10   A.   Yes, I did.
11   Q.   When?
12   A.   A year or so or two years ago.
13 One or two years.
14   Q.   And what did Mr. Mason tell you?
15   A.   Well, not only teaching
16 opportunities but other opportunities, and
17 then a number of months later I spoke to
18 him, and he told me he Googled me and saw
19 the New York Times article.
20   Q.   And?
21   A.   And since that time he hasn't
22 followed up with any opportunities that I
23 think were initially available.
24   Q.   Number 49 at the bottom of page
25 7, Bob Hennelly, H-E-N-N-E-L-L-Y, right?

43 (Pages 166 - 169)

Page 170

WILSON

1
2    A.    That may be misspelled, but yes.
3    Q.    At the top of page 8 it says
4    "Wouldn't use plaintiff's quote for
5    publication because of defamatory
6    publications." Do you see that?
7    A.    Yes.
8    Q.    Do you have an understanding of
9    what that means?
10   A.    I can only tell you what he said
11   to me.
12   Q.    What did he say to you?
13   A.    He asked me for a quote for the
14   newspaper, which I provided.  He said it
15   is a great quote, and then he called me
16   back and said unfortunately my managing
17   editor will not allow us to use your quote
18   because of the New York Times article.
19   Q.    And when did you have this
20   conversation with Mr. Hennelly?
21   A.    In 2019.
22   Q.    When did you give him the quote?
23   A.    They have gave him -- oh, in
24   2019.
25   Q.    Okay.  And number 51, Robin

Page 171

WILSON

1
2    Kelly, Mr. Kelly or Professor Kelly is one
3    of your expert witnesses in this case,
4    correct?
5    A.    That's correct.
6    Q.    Did you seek employment
7    opportunities with Mr. Kelly?
8    A.    I mentioned -- I saw him at a
9    conference, which he may not even recall.
10   He was a panelist, and I mentioned I was
11   looking for work.
12   Q.    When was this?
13   A.    That conference was probably in
14   like 2018.  About 2018 I believe.  2017,
15   2018.  Maybe 2017.
16   Q.    So 2017 or 2018?
17   A.    Uh-huh.
18   Q.    That is a yes?
19   A.    Yes.
20   Q.    So you --
21   A.    Approximately.
22   Q.    You told Dr. Kelly that you were
23   looking for work?
24   A.    I just mentioned it, yes.
25   Q.    What did he say, if anything?

Page 172

WILSON

1
2    A.    He didn't -- he didn't mention
3    much at that time.  He said okay or --
4    Q.    Has he ever gotten back to you
5    about employment opportunities?
6    A.    No.
7    Q.    Did he tell you that he was
8    unable to assist you with academic
9    appointments and referrals?
10   A.    No.
11   Q.    Number 53, Bill Henning,
12   H-E-N-N-I-N-G, it says "Repeated
13   defamatory remarks." Do you see that?
14   A.    Yes.
15   Q.    And what defamatory remarks did
16   he repeat?
17   A.    That I was a thief.
18   Q.    When did he repeat that?
19   A.    That would have been in 2013,
20   2014.
21   Q.    Did he tell you whose defamatory
22   remarks he was repeating?
23   A.    Well, it was based on the New
24   York Times article, so I guess it would
25   be closer to 2014 that he repeated it.

Page 173

WILSON

1
2    Q.    Okay.  So who did he repeat
3    these defamatory remarks to?
4    A.    Numerous people but among them
5    would have been Don Tuminaro.
6    Q.    And he was repeating defamatory
7    remarks that he saw in the New York Times
8    article, correct?
9    A.    Yes, and I am not sure what
10   other sources, but that was at least one
11   of the sources.
12   Q.    All right.  Number 55 there is
13   an entry for Juan Gonzalez, correct?
14   A.    Correct.
15   Q.    And it refers to a "Loss of
16   research grant for labor broadcast
17   project." Do you see that?
18   A.    I see that.
19   Q.    Was that a grant that you had
20   personally?
21   A.    Not a personal grant.  A project
22   grant that I was working on with him.
23   Q.    Where?
24   A.    Well, at that time I was at
25   Brooklyn College.

44 (Pages 170 - 173)

Page 174

WILSON

2  Q.   So when did you lose this
3  research grant?
4    A.   That would have been in 2012.
5  Q.   And what grant was that?
6    A.   It was a -- it was a grant to
7  develop -- we were securing a grant --
8  actually I think we had a grant commitment
9  to develop a proposal for a labor
10 broadcast project.
11   Q.   And this was a grant that you
12 were applying for in 2012 and didnt get;
13 is that right?
14   A.   Correct.
15   Q.   Number 56 is an entry from
16 Professor Emeritus Don Watkins, correct?
17   A.   Correct.
18   Q.   Is Professor Watkins alive?
19   A.   No.
20   Q.   Number 58, James Murray?
21   A.   Yes.
22   Q.   There is a reference to
23 "knowledge regarding collection and
24 historical value of plaintiff's archival
25 work and collections."  Do you see that?

Page 175

WILSON

2    A.   I see that.
3  Q.   When was the last time you spoke
4  with Mr. Murray?
5    A.   Sometime in 2018.
6  Q.   Have you asked Mr. Murray to be
7  a witness in this case?
8    A.   Yes.
9  Q.   Has he agreed to be a witness?
10   A.   No.
11   Q.   Did he tell you why not?
12   A.   Yes.
13   Q.   What did he tell you?
14   A.   Because he signed nondisclosure
15 papers with the New York Public Library,
16 and he wouldn't be able to go into details
17 about his work or my collection.
18   Q.   Okay.  I would like to direct
19 your attention to page 11 of Exhibit 1,
20 "The value of damaged documents and
21 properties by category, Professor Wilson,"
22 and then you have a date 6/3/18.  Do you
23 see that, sir?
24   A.   Not yet.  Where is that?
25   Q.   Page 11.

Page 176

WILSON

2    A.   Page 11.
3    A.   Okay.
4  Q.   Now, am I correct is that a
5  date, June 3, 2018?
6    A.   6/3/18.  Yes.  I believe so.
7  Q.   What is the significance, if
8  any, of that date?
9    A.   That was probably the date that
10 this was drafted.
11   Q.   Okay.  You have a heading
12 "Books" under there, correct?
13   A.   Yes.
14   Q.   And then you list International
15 Encyclopedia of Revolution and Protest
16 eight volumes.
17   A.   Yes.
18   Q.   And you place a value of $1,790
19 on it?
20   A.   Correct.
21   Q.   Where in your office or offices
22 were these books located?
23   A.   That was in my office at the
24 Graduate Center For Worker Education.
25   Q.   So that was in the area of the

Page 177

WILSON

2  special books that you wrote on Exhibit 2?
3    A.   Yes.
4  Q.   How did you arrive at that time
5  value?
6    A.   It is market value.
7  Q.   And how did you determine that
8  that was the market value?
9    A.   Amazon.
10   Q.   Okay.  Now, how big were these
11 books?
12   A.   Regular books like this.  I
13 don't know the exact dimension.
14   Q.   Well, how many pages was in each
15 volume approximately?
16   A.   Approximately 300.
17   Q.   So there were eight volumes of
18 approximately 300 pages each?
19   A.   That's correct.
20   Q.   Under that you have
21 "approximately 50 signed publications
22 acquired from authors, public lectures,"
23 et cetera.  Do you see that, sir?
24   A.   Yes.
25   Q.   Where were these books located?

45 (Pages 174 - 177)

Page 178

WILSON

1
2    A.   Also in this bookshelf.
3    Q.   The same bookshelf where you
4   marked special books on Exhibit 2, right?
5    A.   Correct.
6    Q.   And there were 50 of them,
7   right?
8    A.   Approximately.
9    Q.   Approximately 50.
10        And you ascribe a value of $200
11  per volume for a total of $10,000; is that
12  right?
13   A.   That's correct.
14   Q.   How did you arrive at that
15  value?
16   A.   By looking on Amazon for the
17  value of signed copies, so that was an
18  approximate value for some of
19  these -- some of these.
20   Q.   Well, you have I see twelve
21  names here, correct?
22   A.   Correct.
23   Q.   Did these 12 people write all 50
24  books that you are referring to here?
25   A.   No.  Some of them wrote multiple

Page 179

WILSON

1
2   editions, and then there were others who I
3   couldn't necessarily remember.
4    Q.   How many of the books were you
5   able to look up on Amazon?
6    A.   I don't recall the number.
7    Q.   Was it more than five?
8    A.   Yes, more than five.
9    Q.   Was it more than ten?
10   A.   I don't remember.
11   Q.   Okay.  Below that you list
12  lecture notes, correct?
13   A.   Yes.
14   Q.   And you say there is
15  approximately three cubic feet of lecture
16  notes created from 1979 to 2016, right?
17   A.   Yes.
18   Q.   Where were these lecture notes
19  kept?
20   A.   Actually just to clarify, that
21  was in one location.  I had stored
22  lecture notes in different locations, but
23  in one location at -- at my office at 25
24  Broadway they were kept in a filing
25  cabinet.

Page 180

WILSON

1
2    Q.   All right.
3    A.   In a vertical filing cabinet.
4    Q.   So with reference to Exhibit 2,
5   which is your drawing of your office at 25
6   Broadway, where was this filing cabinet
7   with three cubic feet of lecture notes
8   located?
9    A.   Actually it is not quite that
10  simple.  So some of the lecture notes
11  would have been in my -- in one of my
12  filing cabinets.
13   Q.   You are pointing to the filing
14  cabinet to the right of your desk?
15   A.   To the right.  So that would --
16   Q.   That is the north side of the
17  office as you have drawn it, right?
18   A.   No, it is not north.  That
19  would be --
20        MR. JAMES KLEIN:  He meant just
21  on this side of the page.
22   A.   Yes.  Yes.
23   Q.   You have two desks, one towards
24  the north side and the other one towards
25  the south side?

Page 181

WILSON

1
2    A.   Yes.
3    Q.   So you pointed to an X to the
4   right of the desk that is located towards
5   the north side of the office as you've
6   drawn it, right?
7    A.   Right.
8    Q.   And so some of the lecture notes
9   were in that filing cabinets; is that
10  right?
11   A.   That's correct.
12   Q.   And were any lecture notes
13  located anywhere else in your office?
14   A.   Yes.
15   Q.   Where?
16   A.   I had lecture notes on my
17  bookshelves.
18   Q.   And that is along the east wall
19  of the office?
20   A.   That's correct.
21   Q.   Anywhere else?
22   A.   Yes.  I had lecture notes in my
23  assistant's office.
24   Q.   So outside of this office,
25  correct?

46 (Pages 178 - 181)

Page 182

WILSON

2    A.   Yes.
3    Q.   Anywhere else?
4    A.   Yes.  And I had lecture notes
5 in a storage closet.
6    Q.   A storage closet at 25 Broadway?
7    A.   Yes.
8    Q.   And all together these lecture
9 notes were approximately three cubic feet
10 in volume?
11   A.   No, it just perhaps in my office
12 would have been on the shelves and in the
13 desk, but there were more in my
14 assistant's office, more in the storage,
15 and then more on the main campus.
16   Q.   Now, below that there is a
17 reference to personnel files, right, Dr.
18 Wilson?
19   A.   Yes.
20   Q.   Now, you are referring to files
21 relating to your own employment; is that
22 right, at the bottom of page 11?
23   A.   Personnel files.  And what is
24 your question?
25   Q.   Those relates to files

Page 183

WILSON

2 concerning your own employment history?
3    A.   Well, yes, but it included other
4 personnel as well.  But yes, my --
5    Q.   Where were these personnel files
6 as you've referred to them located?
7    A.   Those would have been maybe in
8 the -- actually most of my personnel
9 files, not all, but most were on the main
10 campus in my office.
11   Q.   And what was in these personnel
12 files?
13   A.   Professional activities, grants.
14 Professional activities, grants, my
15 academic resume, promotion and tenure
16 files, letters of peer review for
17 promotion and tenure from leading experts
18 some of whom I remember.
19   Q.   What letters do you remember?
20   A.   A Yale University historian
21 named David Montgomery.
22   Q.   Anybody else?
23   A.   Yes, I believe Charles Hamilton,
24 who was a professor of government at
25 Columbia University.  I think there was a

Page 184

WILSON

2 letter from David Levering Lewis, who was
3 a distinguished professor at Rutgers
4 University.  There were others, but I
5 can't remember off the top of my head.
6    Q.   You said most of your personal
7 files were located on the main campus,
8 right?
9    A.   Most of my personnel files, not
10 personal.
11   Q.   I meant personnel.
12   A.   Okay.
13   Q.   Where on the main campus?
14   A.   In my office in James Hall in my
15 political science office.
16   Q.   So you had an office at 25
17 Broadway and one in James Hall on the main
18 campus in Brooklyn, correct?
19   A.   Partially correct.
20   Q.   In what way wasn't it accurate?
21   A.   I had an additional office at
22 Brooklyn College at the Center For
23 Diversity.  I was director there.
24   Q.   Did you have any files at your
25 office at the Center for Diversity?

Page 185

WILSON

2    A.   Yes.
3    Q.   What files did you have there?
4    A.   I had one filing cabinet filled
5 with student records, participants in
6 programs I administered, and projects
7 pertaining to the Center For Diversity.
8 And then I also had research files
9 pertaining to issues of race, affirmative
10 action, so forth.
11   Q.   And where were these research
12 files at the Center For Diversity?
13   A.   In the administrative office at
14 the Center For Diversity.
15   Q.   So that wasn't your office?
16   A.   My personal -- it was the
17 director's office.  I was the director,
18 so it was my office.  Yes.
19   Q.   And were these research files
20 locked?
21   A.   I think one was locked, and one
22 was unlocked.
23   Q.   And what volume of research
24 files did you have at this office at the
25 Center For Diversity?

47 (Pages 182 - 185)

Page 186

WILSON

2 A. Both the locked and unlocked
3 would have been maybe six cubic feet file
4 cabinet top and bottom filled.
5 Q. Do you know what research files
6 were in the locked file?
7 A. That would have pertained to
8 student research records pertaining to one
9 of the programs I administered.
10 Q. What was in the unlocked file?
11 A. Issues dealing with racial
12 discrimination, affirmative action,
13 diversity in higher education, also
14 policies that I developed at the City
15 University. There may have been some
16 other research files pertaining to faculty
17 research.
18 Q. Were these research files your
19 personal research files?
20 A. I created them.
21 Q. Were they your personal research
22 files?
23 A. I don't know how to answer that
24 question.
25 Q. When you say you created, what

Page 187

WILSON

2 do you mean?
3 A. Well, the research would consist
4 of taking articles from multiple sources
5 and then making notations adding yellow
6 pads, clipping Post-It notes. So that is
7 what I mean on those articles and notes.
8 What I mean in terms of policies, these
9 were policies that I developed, but the
10 policies were subsequently adopted by the
11 University and by the college, so they
12 weren't my personal policies, but I
13 developed them. I am not sure if that is
14 your question.
15 Q. No, I think you've answered the
16 question.
17 Now, you placed a historical
18 value on your personnel files of 75,000,
19 correct?
20 A. Yes.
21 Q. That's $75,000?
22 A. Yes.
23 Q. How did you arrive at that
24 number?
25 A. Well, my -- it was an estimate

Page 188

WILSON

2 of looking at my manuscripts, which were
3 part of my personnel files, these
4 faculty -- you know, letters of
5 recommendation, teaching evaluations,
6 grants and documents and awards. And so
7 this was an estimate of the historical
8 value that I placed on it, so that is the
9 best I could tell you.
10 Q. Now, the manuscripts that you
11 are referring to, these are the
12 manuscripts of the books that you
13 published?
14 A. They were copies of my published
15 manuscripts, yes.
16 Q. These manuscripts, did you
17 prepare them on a computer or were they
18 hand typed?
19 A. A combination of handwritten
20 notes, typed, typewritten in the old days.
21 We had type writers, and then some were
22 created on a computer.
23 Q. Did you ever scan into a
24 computer any of your manuscripts?
25 A. No.

Page 189

WILSON

2 Q. At the top of page 12, the
3 following sentence appears or phrase
4 "Professional value for future potential
5 employment to document salary," and there
6 is a word B-E-F-I-T enchantment. Do you
7 see that?
8 A. Yes.
9 Q. What IS befit enchantment
10 /SKWR-RBGS?
11 A. I think befit must have been a
12 typo for benefit, and I am not sure what
13 that other word meant.
14 Q. You place a value, a
15 professional value of these materials for
16 future potential employment of $200,000,
17 right?
18 A. Right.
19 Q. How do you arrive at that?
20 A. Well, I was considering the loss
21 of income for foundation work and for
22 research that was immediately related to
23 my loss of employment.
24 Q. And is it your testimony that
25 you couldn't get foundation work because

48 (Pages 186 - 189)

Page 190

WILSON

2 you didn't have access to your manuscripts
3 and your CV?
4    A.   Well, it is more complicated in
5 that when you don't have access to your
6 research data, to your documents, to your
7 ability to document your standing in the
8 profession, basically when the tools of
9 the trade are taken from you it's -- it
10 makes finding future employment in that
11 area significantly more difficult if not
12 impossible.
13    Q.   One of the things you said was
14 in your personnel files was a "Definitive
15 ACV, correct?
16    A.   Yes.
17    Q.   Is that the only copy you had of
18 your --
19    A.   Of that particular -- yes, it is
20 called a -- it is called an academic
21 curriculum vitae.   That was the only
22 copy.
23    Q.   And you are incapable of
24 duplicating it.  Is that it?
25    A.   Impossible.

Page 191

WILSON

2    Q.   All right.   Going to --
3    A.   I am going to --
4    Q.   You want to take a break?
5    A.   Yes.
6    Q.   Fine.
7       (Recess taken.)
8       MR. MARK KLEIN:   Back on the
9 record.
10    Q.   Dr. Wilson, is there any
11 testimony you gave before you just took a
12 break that you would like to change or
13 modify?
14    A.   Not at this moment, but I do
15 have a question.   What time are we going
16 to continue to?
17       MR. MARK KLEIN:   We don't need
18 to do this on the record.   Off the
19 record.
20       (Discussion held off the
21 record.)
22       MR. MARK KLEIN:   Back on the
23 record.
24    Q.   Dr. Wilson, back to Exhibit 1,
25 which is your initial disclosures in this

Page 192

WILSON

2 case, pages 11, 12, and the top, the very
3 top of 13 is set forth the value of
4 damaged documents and property by category
5 with regard to your personal property that
6 you said was taken and not returned; is
7 that correct?
8    A.   That's correct.
9    Q.   And there are various amounts,
10 dollar amounts ascribed to the loss of
11 that personnel property on pages 11 and
12 the very top of page 13, correct?
13    A.   11 and 13.
14    Q.   11, 12.  And the top of 13.
15    A.   Yes.
16    Q.   And those dollar amounts were
17 arrived at before you retained expert
18 witnesses in this case, correct?
19    A.   That's correct.
20    Q.   Now, are you deferring to your
21 expert witnesses for the valuations of the
22 property that was lost and not returned to
23 you?
24    A.   Yes.
25    Q.   So the dollar amounts that are

Page 193

WILSON

2 listed on pages 11, 12, and on top of 13
3 are not the amounts you are seeking for
4 the personal property that you say was
5 taken and not returned, right?
6    A.   Let me just look at this for a
7 second here.
8       (Pause.)
9    A.   Well the oak -- I just lost my
10 place here.  I think for the oak easel and
11 for the Apple monitor, you know, it's
12 pretty accurate.
13       MR. JAMES KLEIN:   I have a
14 question about that.   I mean this is our
15 initial disclosure, and then we submitted
16 the expert reports as a Supplemental
17 Disclosure, so I don't think that having
18 Supplemental Disclosure necessarily means
19 that our initial disclosure is off the
20 table.
21       MR. MARK KLEIN:   That is what I
22 am asking Dr. Wilson.
23    A.   All right.  I mean on the major
24 issues I would defer to the experts, but
25 on the oak easel and the Apple monitor I

49 (Pages 190 - 193)

WILSON

1      WILSON
2  would abide by those, and others I would
3  defer to experts.
4      Q.  Tell me about the oak easel that
5  is an easel you said was your wife's?
6      A.  My wife's oak easel.
7      Q.  And that was an easel that you
8  used to display the schedule at the
9  Graduate Center For Worker Education; is
10 that right?
11     A.  So my -- my wife does art, and
12 she had a -- arts easel, solid oak
13 easel, and she suggested and I asked
14 actually if I could use that because we
15 needed a display for students and for
16 events and so forth, and so it was a very
17 nice solid oak easel, and I looked at
18 easels, solid oak easels, and that was the
19 range.
20     Q.  And you say that easel was never
21 returned to you; is that right?
22     A.  Never returned but I asked for
23 it.
24     Q.  And the Apple 36 inch monitor,
25 is that supposed to be Apple spelled

WILSON

1      WILSON
2  A-P-P-L-E?
3      MR. JAMES KLEIN:  What page are
4  you we on now?
5      MR. MARK KLEIN:  We are on page
6  12.
7      A.  Yes, that is Apple misspelled by
8  the paralegal or whoever ultimately typed
9  it.
10     Q.  And what year monitor was that?
11     A.  That would have been -- that
12 would have been about 2011.  2010, 2011.
13     Q.  And that was your own monitor?
14     A.  My personal monitor, yes.
15     Q.  Where was it?
16     A.  It was in my office at the
17 Graduate Center For Worker Education on
18 one of my desks.
19     Q.  And what size monitor was it?
20     A.  A 36-inch office at the graduate
21 center?
22     A.  The Graduate Center For Worker
23 Education.
24     Q.  Are you guessing or estimating?
25     A.  I am estimating.

WILSON

1      WILSON
2      Q.  Where was that located?
3      A.  On my desk.
4      Q.  On your desk towards the north
5  side of the room?
6      A.  Yes.
7      Q.  Now, going back you refer to
8  further up on the page on page 12 you
9  refer to the loss of 30 years of
10 professional letters, correct?
11     A.  Correct.
12     Q.  And one of those letters was
13 from -- is listed here as quote "from
14 Harry S. Truman to Charles Wilson,"
15 correct?
16     A.  Yes, correct.
17     Q.  Charles Wilson was your father?
18     A.  That's correct.  That's right.
19     Q.  And another of those letters was
20 a letter from Ray Charles; is that right?
21     A.  Yes.
22     Q.  What was that letter?
23     A.  So in the late 1970s Ray Charles
24 was involved in a political controversy,
25 and I wrote him a letter, you know,

WILSON

1      WILSON
2  raising the issue of his politics, and
3  then he wrote a three-page letter back to
4  me pretty much defending himself and -- so
5  that was the nature of that exchange, and
6  so it was a pretty rare exchange, and it
7  was a very passionate letter from Ray
8  Charles, so --
9      Q.  Now, how many letters are you
10 referring to here that you say were lost?
11     A.  Well, I -- I don't know the
12 total because it is over 30 years, but we
13 are talking hundreds, hundreds and
14 hundreds of letters.
15     Q.  And where were these letters
16 kept?
17     A.  I had a letter file on the main
18 campus in my office in political science.
19 There were some letters in the Center For
20 Diversity.  I had letters in -- one of my
21 desk drawers.  I am not sure which one.
22     Q.  You are pointing to the desk
23 towards the north side of your office?
24     A.  Yes, I had some letters there?
25     A.  And then I also had letters in

Page 198

WILSON

1        WILSON
2  storage that would have either been
3  in -- yes, that would have been in the
4  Graduate Center For Worker Education
5  storage closet.
6     Q.   Where was the Ray Charles
7  letter?
8     A.   On the main campus.
9     Q.   In your office in James Hall in
10  the main campus?
11     A.   In my political science office.
12     Q.   And --
13     A.   In James Hall.
14     Q.   And where in your office at
15  James Hall was this letter?
16     A.   That would have been in my file
17  cabinet in -- I had several file cabinets,
18  so it was in one of several file cabinets.
19  I had different desks.   So it was in one
20  of my desk filing cabinets.
21     Q.   Now, the letter from Harry S.
22  Truman to your father, when was that
23  letter written?
24     A.   Actually that was a letter from
25  Roosevelt.

Page 199

1        WILSON
2     Q.   Why does it say from Harry S.
3  Truman instead of Roosevelt because I
4  think the -- the typo said president, and
5  maybe it got lost in the translation by
6  the paralegal, and I -- so but it was just
7  a typo, but it was President Roosevelt,
8  and it was with a series of letters in a
9  folder from my father.
10     Q.   And where was this folder?
11     A.   And that folder was on the main
12  campus.
13     Q.   Where in the main campus?
14     A.   At Brooklyn College in one my
15  files.
16     Q.   Was the file named or labeled?
17     A.   Well, every file that I had, you
18  know, was sequential and organized, so it
19  would have said dad or something on top or
20  my father or father's letters or something
21  to that affect.
22     Q.   Now --
23     A.   I am sorry.   I wrote on your
24  document.
25     Q.   So further down the page there

Page 200

1        WILSON
2  is a reference to a letter from Truman.
3  Do you see that?
4     A.   Same mistake.
5     Q.   So you are talking about the
6  same letter in the first paragraph as well
7  as under archival records?
8     A.   I don't see it on the
9  page -- no, that is the one I was talking
10  about.
11     MR. JAMES KLEIN:  It is up here.
12     Q.   So there are two references to
13  Harry S. Truman, right?
14     A.   Right.
15     Q.   And both of them are intended to
16  refer to a letter from Roosevelt to your
17  father?
18     A.   That's right, correspondence
19  between the two.
20     MR. JAMES KLEIN:  I think he
21  means Franklin Roosevelt to be complete.
22     A.   FDR, not Theodore.
23     Q.   But you place a value on the
24  letter -- it says "letter from Truman."
25  You are referring to the letter from

Page 201

1        WILSON
2  Roosevelt?
3     A.   Correct.
4     Q.   To your father at 150,000,
5  right?
6     A.   Right.
7     Q.   And farther up on the page you
8  refer to loss of over 30 years of
9  professional letters including the one
10  from Harry S. Truman to Charles Wilson,
11  which you said should say from Roosevelt,
12  FDR, to your father at a total of
13  $250,000, right?
14     A.   That is what I mentioned, yes.
15     Q.   Now, also under the heading
16  archival records, do you see that?
17     A.   I do.
18     Q.   There is a reference to Don
19  Watkins papers?
20     A.   Yes.
21     Q.   And what are those?
22     A.   So Don Watkins was a
23  distinguished professor at CUNY, who was
24  aware of my archival expertise, and he was
25  getting up in years, and he wanted me to

51 (Pages 198 - 201)

Page 202

WILSON

2 process and archive and preserve his
3 decades of civil rights work and activism
4 primarily, and so I agreed, and he started
5 giving me boxes of his material to process
6 for archiving.
7    Q.   Where were Don Watkins' papers
8 kept by you?
9    A.   They were kept in boxes at -- in
10 my office at the Graduate Center For
11 Worker Education.
12    Q.   In the office diagram that you
13 have drawn on Exhibit 2?
14    A.   Yes, not on the shelves, but I
15 think they were just in boxes by the side
16 of my desk, and it was a
17 separate -- separate series of two or
18 three boxes, and I believe he -- he had a
19 stack of -- not I believe.  I know he
20 gave me a stack of magazines from the
21 1960s.  As I recall, it was like a Ebony
22 Magazine and Life Magazine and March on
23 Washington.  So there was a stack, and I
24 had one stack on one of my shelves here
25 and then various documents from the

Page 203

WILSON

2 students on violence coordinating
3 committees from different organizations
4 that he worked with, letters,
5 correspondence, you know,
6 things -- important things from that
7 period.
8    Q.   So you had two or three boxes of
9 materials that Don Watkins had given you
10 and a stack of magazines; is that right?
11    A.   That's right.
12    Q.   And what size boxes were these?
13    A.   These boxes would have been like
14 I said about two and a half feet
15 approximately.  So, you know --
16    Q.   Two and a half feet?
17    A.   About two and a half feet by a
18 foot and a half.  They were fairly big
19 boxes.
20    Q.   What color were these boxes?
21    A.   Standard cardboard boxes.
22    Q.   Were they bankers boxes?
23    A.   No, I am not sure what a bankers
24 box is actually.  Maybe they were, but
25 what do you mean by bankers box?

Page 204

WILSON

2    Q.   That is a particular kind of
3 box.
4    A.   I am not familiar with a bankers
5 box.
6       MR. JAMES KLEIN:   It is a box
7 they use for archiving records.
8    Q.   Also under archival records, you
9 refer to a photo of WEB Debevois.  Do you
10 see that?
11    A.   Hold on.  I don't see it yet.
12    Q.   What photo was that?
13    A.   That was a photo that was
14 actually hanging on my wall at the
15 Graduate Center For Worker Education, and
16 it was a photo of WEB Debevois.
17    Q.   And where did you get the photo?
18    A.   That photo was given to me by I
19 believe it was by Benjamin MacLawrence.
20    Q.   Now, did you have insurance on
21 any of these letters, archival records,
22 research papers or books?
23    A.   No.  What do you mean by
24 insurance?
25    Q.   Did you have insurance? You know

Page 205

WILSON

2 what insurance is?
3    A.   My understanding of insurance
4 because whenever this issue came up was
5 that the university itself is insured, so
6 that is my understanding of insurance.
7    Q.   Well, you're claiming that
8 materials for which you are seeking
9 millions of dollars in this case were your
10 personal records and documents and letters
11 and archival records and books, correct?
12    A.   Correct.
13    Q.   Did you personally have any
14 insurance on any of these items?
15    A.   No, I had no personal insurance.
16       MR. MARK KLEIN:  I am going to
17 ask the reporter to mark as Wilson Exhibit
18 4 a document titled "Defendants' First Set
19 of Interrogatories to Plaintiff."
20       (Wilson Exhibit 4 marked for
21 identification.)
22       (Document handed to witness.)
23    Q.   Dr. Wilson, I showed you what
24 has been marked as Exhibit 4.  You can
25 look through it if you would like, but my

52 (Pages 202 - 205)

Page 206

WILSON
1       WILSON
2 first and only question at this point is
3 whether you have seen it before.
4       A.    Is there a date on this?
5       Q.    If you go to page -- to the last
6 page, page 12, it is dated May 22, 2018.
7       A.    I am looking for my signature.
8       Q.    No, these are defendants'
9 interrogatories to you.   My question is
10 whether you have seen this before.
11      MR. JAMES KLEIN:   These are not
12 your responses.  These are things -- the
13 questions that they asked you.   These are
14 just questions.  It doesn't have answers
15 where you are verifying it.
16      Have you seen these questions?
17 Is that the question?
18      MR. MARK KLEIN:   That was the
19 question.
20      A.    Yes, I have seen these.
21      Q.    And did you put together
22 responses to them?
23      A.    Yes, I worked with counsel.
24      Q.    All right.  I ask the reporter
25 to mark as Wilson Exhibit 5 "Plaintiff's

Page 207

1       WILSON
2 Answers to Defendants' First Set of
3 Interrogatories" dated July 13, 2018.
4       (Wilson Exhibit 5 marked for
5 identification.)
6       (Document handed to witness.)
7       Q.    I will show you what has been
8 marked as Exhibit 5, sir, and we will go
9 through this in more detail, but have you
10 seen that before?
11      A.    Yes, I have seen this before.
12      Q.    And under that heading of the
13 various interrogatories there are lists of
14 information, correct?
15      A.    Yes.
16      Q.    Did you have any role in
17 preparing the lists of information under
18 the headings?
19      A.    Yes, I did.
20      Q.    What role did you have?
21      A.    I drew up the list and gave it
22 to the paralegal.
23      Q.    When you say you drew up the
24 list, in what way did you draw up the
25 list? Did you type it?

Page 208

1       WILSON
2       A.    I think I gave the first
3 typewritten draft to the staff.   Right.
4       Q.    Did you review the final
5 document before it went out?
6       A.    I am not sure.
7       Q.    To the best of your knowledge,
8 is Plaintiff's Answer to Defendant's First
9 Set of Interrogatories true and accurate?
10      A.    I would have to go over it again
11 carefully to make sure.
12      Q.    Are you aware of any
13 inaccuracies in the document?
14      A.    Well, I haven't read the
15 document, so I would have to take my time
16 and make sure that everything was correct.
17      MR. MARK KLEIN:  I am going to
18 ask the reporter to mark as Exhibit 6 a
19 document titled "Verification."
20      (Wilson Exhibit 6 marked for
21 identification.)
22      (Document handed to witness.)
23      Q.    Dr. Wilson, I show you what has
24 been marked as Exhibit 6.  Do you recall
25 signing that document?

Page 209

1       WILSON
2       A.    Yes, I do.
3       Q.    That's your signatures on the
4 page?
5       A.    Yes, it is.
6       Q.    And you declared in this
7 Verification under penalty of perjury that
8 the facts stated in plaintiff's answers in
9 the first set of interrogatories were true
10 and correct to the best of your
11 information, knowledge, and belief?
12      A.    To the best of my knowledge.
13      Q.    To the best of your knowledge,
14 information, and belief, right?
15      A.    That's right.  I just have to
16 confirm it and reread it and make sure
17 that is still to the best of my knowledge.
18      Q.    Okay.  Now, we are going to
19 have to read this exhibit and this exhibit
20 together because Exhibit 6 doesn't -- I am
21 sorry.  Exhibit 5 doesn't have the
22 questions that you were asked.
23      A.    This doesn't have these
24 questions?
25      Q.    This doesn't have these

53 (Pages 206 - 209)

WILSON
1
2 questions.
3      MR. JAMES KLEIN:   This is the
4 question, and that is the answer, so you
5 have to refer to both of them.
6    Q.   So if you go to page 6 of
7 Exhibit 4 at the bottom of the page, you
8 see Interrogatory 1, right?
9    A.   Yes.
10   Q.   Okay. And if you go to page 1 of
11 Exhibit 5, you see where it says
12 Interrogatory 1, right?
13   A.   Yes.
14   Q.   And do you understand that the
15 information that appears in A through JJ
16 on pages 1 through 3 of Exhibit 5 is a
17 response to an Interrogatory 1 on page 6
18 of Exhibit 4?
19   A.   Yes.
20   Q.   And you put together the
21 information that appears in A through JJ,
22 correct?
23   A.   Correct.
24   Q.   I think we have gone through
25 Interrogatory 1 or the response in

1           WILSON
2 connection with your initial
3 interrogatories, so I am not going to go
4 through it all again unless you would like
5 me to.
6    A.   So this is now --
7    Q.   I haven't asked you a question
8 yet.
9      MR. JAMES KLEIN:   He hasn't
10 asked you anything yet.
11     THE WITNESS:  Okay.
12   Q.   Let me direct your attention to
13 page 5 of Exhibit 5.
14   A.   Okay. Page 5, Exhibit 5.
15   Q.   Page 5, Exhibit 5 is a response
16 to Interrogatory 3, correct?
17   A.   That would be on a different
18 page.
19   Q.   That is on page 7 of Exhibit 4.
20 All right.
21   A.   Okay.
22   Q.   Interrogatory No. 3 asks that
23 you "Identify each and every wrongful act
24 allegedly taken by Cheng for which
25 plaintiff asserts a claim or seeks damages

1           WILSON
2 in this case." Do you see that sir?
3    A.   I see that.
4    Q.   So are we oriented as to what
5 the information on pages 5 and 6 of
6 Exhibit 5 respond to?
7    A.   Oriented.  I haven't seen them
8 yet, but yes.
9    Q.   Okay.  Directing your attention
10 to paragraph 5 under Interrogatory 3 --
11   A.   Paragraph 5.
12   Q.   -- it says "Cheng made false
13 defamatory statements to Ivy Rich, Don
14 Tumaniro, Steve Leberstein, and Erica
15 Gaskins that plaintiff was stealing ad
16 engaged in criminal conduct at GCWE,"
17 Right?
18   A.   Yes.
19   Q.   Those are statements you
20 testified previously took place in the end
21 of 2012, beginning of 2013, correct?
22   A.   Correct.
23   Q.   Okay.  If you could go to
24 paragraph 12 at the bottom of page 5.
25   A.   Page 5.  I have it.

1           WILSON
2      MR. MARK KLEIN:  For the record,
3 Exhibit 5 also didn't have page numbers,
4 so I handwrote in the page numbers.
5      MR. JAMES KLEIN:   I see that.
6    Q.   So paragraph 12 at the bottom of
7 page 5 says, "Cheng engaged it ongoing
8 defamation of plaintiff to other CUNY
9 professors and published information in
10 New York Times Kingsman," and then it
11 continues on to the next page.  Do you see
12 that, sir?
13   A.   I do.
14   Q.   Can you identify any of the
15 defamatory statements that are referred to
16 in paragraph 12?
17   A.   The same as I mentioned in
18 number 5 pertaining to Wilson stealing and
19 being a criminal that he made, so that
20 is -- that is what the reference is to.
21   Q.   So that was in 2012 and 2013,
22 right?
23   A.   In that time frame.  Let's see.
24 Wait a minute.  Hold on one second.  That
25 would have been in -- this was -- I think

Page 214

WILSON

2 he met with them with these groups, with
3 these people, these individuals in 2014,
4 and so it -- it would have been more
5 accurate to say 2014 is when Cheng --
6 because that is -- we will have to
7 double-check, but that is when they told
8 me they met with him, and they had a
9 series of meetings with Cheng.
10    Q.   You testified earlier today that
11 they told you they met with him in 2012
12 and 2013?
13    A.   Yes, but I am revising that, and
14 it would have been closer to the -- in the
15 time frame of 2014.
16    Q.   Can you identify any defamatory
17 statement that Mr. Cheng made in 2014?
18    A.   Well, what was reported to me
19 was he, Cheng, did not want my
20 photographic representation in the
21 historical documentation of the
22 institutional history of the Graduate
23 Center For Worker Education, which was a
24 project that he hired the Labor Arts
25 Society to conduct, and he said basically

Page 215

WILSON

2 don't use Wilson's photo because he is a
3 crook. He is a thief. This is what was
4 reported to me contemporaneously at that
5 time.
6    Q.   And who reported this to you?
7    A.   I heard it from actually a
8 couple of sources. I heard it from
9 Leberstein. I heard it from Erica
10 Gaskins, and I heard it at that time from
11 Don Tuminaro, and these were widely -- you
12 know, that was going by -- his staff were
13 going around telling everybody I am a
14 crook. I am a thief, and that was in the
15 New York Times article.
16    Q.   I asked you what Mr. Cheng said.
17    A.   Well, my understanding of what
18 Cheng said is in one of the meetings that
19 Leberstein, Gaskins, and Tumaniro had said
20 that he mentioned my name specifically
21 and, you know, criminality, criminal
22 management, criminal acts. I got
23 different stories from people who were
24 there years back at the time that it
25 happened.

Page 216

WILSON

2    Q.   Okay. Previously you told me
3 that Steve Leberstein told you that Ivy
4 Rich told him that Terrence Cheng had said
5 you were a thief, right?
6    A.   That's correct.
7    Q.   Now, are you talking about
8 something different --
9    A.   Well --
10    Q.   -- with regard to Mr.
11 Leberstein?
12    A.   Slightly different. That is
13 Leberstein had ongoing meetings and
14 conflicts with Ivy Rich over the
15 historical representation of the Center
16 For Worker Education. She was supposed
17 to represent it, and Leberstein provided
18 photos, and she didn't want to use my
19 photo because Terrence Cheng said you
20 can't -- he is a crook or he is a thief.
21 You can't use Wilson's photograph.
22    Q.   So what Leberstein was telling
23 you was based on what Ivy Rich had told
24 him in 2012?
25    A.   That is one.

Page 217

WILSON

2    Q.   Yes?
3    A.   Yes. Number two, he made a
4 similar comment to me when he had a
5 meeting or a series of meetings, and it
6 was in one of a series of meetings when he
7 called me up afterwards and he --
8        MR. JAMES KLEIN:   A series of
9 meetings with whom?
10    A.   I'm sorry. He had a series of
11 meetings -- sorry. He had a series of
12 meetings with Terrence Cheng with a small
13 group of people, including these people,
14 including Leberstein, Tumaniro, and
15 Gaskins, and the meetings were around the
16 Center for Worker Education and what was
17 going to happen to it. And so Leberstein
18 told me, and they all told me that Cheng
19 lied to them about the program in the
20 Center For Worker Education, and then they
21 all in their own ways said that the
22 program had been criminalized, and
23 essentially Cheng was there to clean it
24 up, and that was -- so there was
25 criminalization of me but not simply me,

55 (Pages 214 - 217)

Page 218

WILSON

2 but me, the management of the Center For
3 Worker Education, as well as students.
4 It was like there was a criminal cloud
5 over everybody.
6    Q.   Now, when exactly did
7 Leberstein, Tumaniro, and Erica Gaskins
8 tell you that Mr. Cheng had said that?
9    A.   I'll have to go back and
10 double-check the dates.  I am not
11 absolutely positive on the dates.
12    Q.   What are you going to look at to
13 double-check the dates?
14    A.   I actually -- I have to see if
15 there is any documents pertaining to those
16 meetings.  I mean I don't know.  I don't
17 know exactly how I can double-check.
18    Q.   Do you know of any documents
19 pertaining to these meetings sitting here
20 today?
21    A.   Leberstein may have documents
22 about those meetings.
23    Q.   He may or he does?
24    A.   I can't say for sure, but there
25 is -- you know, he was at the meetings,

Page 219

WILSON

2 and so -- and these were years ago, so he
3 may have the agenda, the meetings, the
4 notes.
5    Q.   Did you ever ask him for any
6 such documents?
7    A.   I did ask him for those
8 documents, yes.
9    Q.   And what did he say?
10    A.   He said he would look for them.
11    Q.   When did you ask him for those
12 documents?
13    A.   This would have been a month or
14 two ago.
15    Q.   And has he gotten back to you as
16 to whether he found any documents?
17    A.   No.
18    Q.   I would like to direct your
19 attention to paragraph 19 on page 6 of
20 Exhibit 5.
21    A.   Paragraph 19, page 6.
22    Q.   Right.  Read it to yourself,
23 what is listed there, documentary video
24 evidence.  Do you see that?
25    A.   Yes.

Page 220

WILSON

2    Q.   Okay.  You have read that to
3 yourself?
4    A.   Yes.
5    Q.   What is that a reference to?
6    A.   That's a reference to in maybe
7 2018 I went to the Graduate Center For
8 Worker Education, and I photographed the
9 pictorial representations of the
10 institutional history of the Graduate
11 Center For Worker Education to document
12 how my historical contribution and role in
13 the center had been treated as a result of
14 the defamatory comments by Cheng.
15    Q.   So you're referring to videos
16 that you took in 2018?
17    A.   Yes, of the work that was
18 produced earlier by Ivy Rich.
19    Q.   And what is your understanding
20 of what these videos show?
21    A.   The videos show, as I recall,
22 two very large murals, pictorial and
23 documentary representations of some of the
24 highlights of the 30-year history or some
25 span of time of the Center For Worker

Page 221

WILSON

2 Education, and it showed many of the
3 highlights and accolades, and it had a
4 very large picture of a former director Ed
5 Rogowski, whose picture was prominantly
6 displayed, and then -- but all of the
7 accomplishments were accomplishments under
8 my leadership, and I looked for my
9 picture, and there was a tiny picture with
10 my face with some other people, and it
11 said I think just Joe Wilson, and -- and
12 Leberstein told me he had to actually
13 argue and fight for that.  It was an
14 ongoing tension between him and Ivy Rich
15 because Ivy was told by Cheng not to
16 include my picture, and Leberstein said
17 no, you have to.  This -- all of the
18 things that you are talking about were
19 created by Professor Wilson and under his
20 leadership, and it is just not fair and
21 not historically accurate.  So I think as
22 a compromise after argumentation I think
23 that is what she kind of concluded that
24 Cheng would allow her to do.
25    Q.   So it is your understanding that

56 (Pages 218 - 221)

WILSON

1       WILSON
2   these videos that you personally took
3   reflect your absence from the walls of the
4   graduate center --
5       A.   My exclusion, conscious
6   exclusion, yes.
7       Q.   And besides showing according to
8   you your conscious exclusion on the walls
9   of the Graduate Center For Worker
10  Education, do you they show anything else?
11      A.   Yes, they showed my
12  accomplishments but without attribute.
13      Q.   Okay.  All right.  I would like
14  to go to page 8 of Exhibit 5.
15      A.   Page 8.
16      Q.   Under the heading Interrogatory
17  6.  Do you see that?
18      A.   Yes.
19      Q.   Okay.  And if you go to page
20  7 --
21      A.   I don't have a page 7.  I was on
22  page 7.
23      Q.   You are on page 7 of Exhibit 4.
24  Do you see Interrogatory 6 asks you to
25  "Identify any economic injuries which

1       WILSON
2   plaintiff claims to have sustained as a
3   result of the acts alleged in the
4   complaint," and it continues, right?
5       A.   Yes.
6       Q.   And under Interrogatory 6 in
7   Wilson Exhibit 5, you list a number of
8   people under the sentence "Plaintiff was
9   denied employment and following positions
10  by the following persons." Do you see
11  that, sir?
12      A.   Yes.
13      Q.   Okay.  One is Cunningham.  That
14  is a reference to Professor Cunningham in
15  Africana studies at Brooklyn College,
16  right?
17      A.   Well, Professor Cunningham, yes,
18  was at Brooklyn College, but the
19  opportunity was at Columbia University.
20      Q.   And what opportunity was that?
21      A.   There was a faculty position in
22  the -- I am trying to remember the exact
23  name.  There was an African American
24  Institute at Columbia University,
25  and -- and it was a teaching position that

1       WILSON
2   was available, and Professor Cunningham's
3   professional colleague, who was the chair
4   or was one of the directors of that
5   institute, you know, he spoke to him or
6   contacted him, but he looked to try to get
7   me a position at this institute, and
8   because of that controversy told me that
9   he was just not able to pursue that to
10  fruition because --
11      Q.   When was that?
12      A.   That would have been in 2014,
13  2015.
14      Q.   The next person is David Addams.
15  I believe you talked about that
16  previously?
17      A.   Yes.
18      Q.   Do you have anything to add to
19  what you testified previously about your
20  attempts to get a position from Mr.
21  Addams?
22      A.   Not at this moment.
23      Q.   The next person listed is Warren
24  Whitlock, various positions and
25  consultancy.  Who is Mr. Whitlock?

1       WILSON
2       A.   So Warren Whitlock is a
3   management expert and familiar with EEO
4   policies and affirmative action, and he
5   has had high ranking positions in Columbia
6   University, in the Department of Defense,
7   and I -- actually the army.  I think it
8   was U.S. Army Department of Defense, and
9   maybe one or two other institutions, and
10  so, you know, I asked Whitlock to find a
11  position or identify a position because he
12  was highly ranked, and he said that it
13  wouldn't withstand government review.
14      Q.   When did he tell you this?
15      A.   This would have been starting in
16  2014, 2015.
17      Q.   Did he tell you why it wouldn't
18  withstand government review?
19      A.   Yes, he said the government does
20  ex tentative background checks and as soon
21  as your name comes up in the New York
22  Times you can't get a job.
23      Q.   Does Mr. Whitlock know that the
24  neutral arbitrator in the arbitration
25  between you and CUNY upheld your

57 (Pages 222 - 225)

Page 226

WILSON

2 termination?
3    A.   Well, he knows that there were
4 no criminal acts, and he was aware that I
5 was terminated.
6    Q.   Does he know that a neutral
7 arbitrator upheld your termination?
8    A.   I don't know what he knows.
9    Q.   Who is Joe McDermott?
10    A.   Joe McDermott was the director
11 of the Consortium For Worker Education.
12    Q.   Where is that?
13    A.   It is located in Manhattan and
14 New York City.
15    Q.   And you spoke to Mr. McDermott
16 about employment opportunities?
17    A.   Yes, I did.
18    Q.   When?
19    A.   Starting in probably 2013, '14,
20 '15.
21    Q.   What did Mr. McDermott tell you?
22    A.   Essentially that, you know, they
23 receive government funding, and it is just
24 not a good profile for them to have, you
25 know -- have me working in that type

Page 227

WILSON

2 of -- that type of environment because
3 they seek government funding, and they are
4 very closely monitored, and this is
5 just -- it would be too controversial and
6 so forth.
7    Q.   You list Ronald Mason.  Have
8 you spoken to Mr. Mason about teaching and
9 consulting positions?
10    A.   Yes.
11    Q.   When?
12    A.   This would have been a year or
13 two ago.
14    Q.   What did Mr. Mason tell you?
15    A.   Initially he seemed favorably
16 disposed.  Then on a subsequent
17 conversation he mentioned the New York
18 Times article, and I haven't heard from
19 him since.
20    Q.   Was Mr. Cheng quoted in New York
21 Times article?
22    A.   Not to my knowledge.
23    Q.   Is Dr. Currah quoted in the
24 Times article?
25    A.   Not to my knowledge.

Page 228

WILSON

2    Q.   Is Ms. Isaacson quoted in the
3 Times article?
4    A.   I think so.
5    Q.   You think she is quoted?
6    A.   She is referenced.  Her name is
7 there.
8    Q.   Is she quoted?
9    A.   I would have to look at the
10 article again, but she is the source.   It
11 listed a source for the defamatory
12 comments.
13    Q.   Who is Jack Zevin?
14    A.   Jack Zevin was a professor at
15 Queens College, I believe a professor of
16 education, and he was on the board of a
17 research organization, and -- so he is a
18 professor at Queens College and the name
19 of the research organization escapes me
20 know.
21    Q.   And you spoke to Mr. Zevin about
22 consulting opportunities?
23    A.   No, I actually had a consulting
24 opportunity with him in 2012 that -- that
25 ended.

Page 229

WILSON

2    Q.   Did you work with Mr. Zevin in
3 connection with the Taft Institute?
4    A.   The Taft Institute, yes.
5    Q.   Okay.  So was that consulting
6 relationship with the Taft Institute that
7 you are referring to here --
8    A.   That's correct.
9    Q.   -- that you lost in 2012?
10    A.   That's right.  Yes, 2012 I
11 believe it was.  Yes, 2012.
12    Q.   All right.  Now, you referred
13 to Immanuel Ness, Professor Ness for
14 Publishing Imaging and Consulting.  Do
15 you see that?
16    A.   Yes, I do.
17    Q.   Did you speak with Mr. Professor
18 Ness about employment opportunities?
19    A.   Yes.  Initially early on, yes,
20 in the -- in 2012 Professor Ness said he
21 would look for other opportunities for me,
22 although none materialized, and we
23 collaborated on a number of works,
24 and -- but at the time of the -- and in
25 fact he was a -- well, yes.  I did speak

58 (Pages 226 - 229)

Page 230

WILSON
1
2  with him about publishing, editing, and
3  consulting, yes.
4      Q.   And what, if anything, has
5  happened as a result of your speaking with
6  Professor Ness about that?
7      A.   We no longer speak.
8      Q.   When did you last speak with
9  him?
10     A.   Let's see.   It would have been
11 in early 2016.
12     Q.   Why don't you any longer speak,
13 you and Professor Ness?
14     A.   I called him and reached out to
15 him on numerous occasions, but he -- he
16 never returned my calls.
17     Q.   When was the last time you spoke
18 with Dominick Tumaniro?
19     A.   Maybe a month or so ago.
20     Q.   And what did you say to him and
21 what did he say to you?
22     A.   So actually he told me that he
23 spoke to you.
24     Q.   Right.   And what else did he
25 tell you?

Page 231

WILSON
1
2      A.   And he said that you tricked him
3  into speaking to him.   He told me that
4  you called him and told him that he
5  had -- that you had the right to speak
6  with him, and then he engaged in
7  conversation with you that he thought he
8  had at that moment a legal obligation to
9  speak with you because of your phraseology
10 that you had the right, and he thought it
11 was a legal -- like if you don't do this,
12 you are in trouble.   That is what he
13 felt.
14     Q.   What else did he tell you about
15 our conversation?
16     A.   He said you asked him mainly
17 about Cheng, and he said he couldn't
18 remember much about Cheng, but he
19 remembered that the whole environment,
20 everybody was criminalized.   He was
21 criminalized.   The program was
22 criminalized.   He said, you know, upon
23 reflection that essentially that -- oh,
24 that he mentioned one person in
25 particular, a labor leader, Bill Henning,

Page 232

WILSON
1
2  who told him -- Henning told Tumaniro that
3  I was stealing, and so -- so this was just
4  the whole swirling thing, and then he also
5  told me that he was terminated as a
6  professor there in this whole environment
7  where everybody had been criminalized
8  including him and -- you know, the whole
9  situation with Cheng at the helm,
10 but -- so that is essentially what he told
11 me.
12     Q.   Did Mr. Tumaniro tell you
13 whether he had said whether Mr. Cheng had
14 accused you of engaging in criminal
15 activity?
16     A.   He told me he couldn't recall at
17 that moment.
18     Q.   Have you had any subsequent
19 conversations with him?
20     A.   No.
21     Q.   Now, let's go to Interrogatory
22 14 on page 12 of Exhibit 15.
23     A.   Page -- what page was that?
24     Q.   Page 12.
25     A.   Okay. Page 12.

Page 233

WILSON
1
2      Q.   And under interrogatory 14, and
3  if you can go to interrogatory 14 on page
4  9 of this document, Exhibit 4 --
5      A.   Page 9, Exhibit 4.
6      Q.   Yes.
7      Q.   Interrogatory 14 says,
8  "Identify, one, the content of statements
9  that Cheng allegedly 'repeated' to the
10 Labor Arts Society as alleged in paragraph
11 62 of the complaint."
12     A.   One moment, please.   What are
13 the two references on page 9, which
14 number?
15     Q.   Interrogatory number 14.
16     A.   14.
17     Q.   All right.
18     A.   Yes.
19     Q.   You can read it to yourself,
20 right?
21     A.   Yes.
22     Q.   And one of the things
23 Interrogatory 14 asks is the date on
24 which -- and location at which Cheng
25 allegedly repeated "Such statements." Do

59 (Pages 230 - 233)

Page 234

```
              WILSON
1
2  you see that?
3     A.   Yes.
4     Q.   Now, if you look at page 12 of
5  Exhibit 5, the dates that are given in
6  that response are 2013 and 2012, right?
7     A.   I actually thought that was room
8  2013 meetings -- I thought that was room
9  2013 at BC because what I was told
10 subsequently was that they met, and there
11 was some confusion about that, whether
12 they were meeting at Brooklyn College or
13 at the Graduate Center for Origination,
14 and maybe they met both places.   So --
15    Q.   So you think that is room 2013,
16 not the year 2013? Is that what you are
17 telling me?
18    A.   What I am telling you is I am
19 not sure of the date they had those series
20 of meetings, and I am not positive of the
21 location because I have heard two
22 different things.   I am not sure.
23    Q.   When did the meetings take
24 place?
25    A.   I am not sure.
```

Page 235

```
              WILSON
1
2     Q.   What years?
3     A.   It was either 2013 or 2014, but
4  they would have to confirm.   I am not
5  sure.   I am telling you I don't know for
6  sure --
7     Q.   Okay.
8     A.   -- by the reference at the
9  bottom that asked me about.
10    Q.   Yes.
11    A.   On interrogatory 14, the last
12 question that date is correct in terms of
13 as Max Azoula and Jose Ohyan and Immanuel
14 Ness, so that -- that is correct.
15    Q.   You are referring to statements
16 by "Cheng's administrative team", right?
17    A.   That's correct.
18    Q.   Not by Cheng himself?
19    A.   Well, more specifically by
20 Currah to Ness in particular, specifically
21 Currah to Ness.
22    A.   And I don't know if Ness had any
23 conversations with Cheng at all.   He may
24 have.
25    Q.   This was in 2012 in any event?
```

Page 236

```
              WILSON
1
2     A.   This was in 2012, but he
3  definitely -- but the administrative staff
4  did report it to Cheng specifically Craig
5  Wilson, the administrative staff, and I
6  know Phillips.   There may have been
7  others as well.
8     Q.   Okay.   If you go to page 14 of
9  Exhibit 5, in the middle of the page there
10 is a reference to a letter from president
11 Harry S. Truman to Charles Wilson, right?
12    A.   Right.
13    Q.   And is that the letter that you
14 said should have been described as one
15 from President Roosevelt to Charles
16 Wilson?
17    A.   Right.
18    Q.   So on two different documents
19 you described the letter which you place a
20 value of 150,000 as being from the wrong
21 president, right?
22    A.   It was a president, but it was
23 incorrect.   It was Roosevelt and not
24 Truman.
25    Q.   I know also in that same groupof
```

Page 237

```
              WILSON
1
2  listings you refer to Charles Wilson's
3  oral history tapes.
4     A.   Yes.
5     Q.   Where were those oral history
6  tapes kept?
7     A.   Those were kept at Brooklyn
8  College at my political science office.
9     Q.   Where in Brooklyn College at
10 your political science office?
11    A.   In one of my file cabinets.
12    Q.   And it is your testimony that
13 this is the only copy of those oral
14 history tapes?
15    A.   There is no other copy.
16    Q.   Your father was a professor?
17    A.   No.
18    Q.   What was he?
19    A.   Well, that is a complicated
20 question.   He wasn't simply one thing, so
21 --
22    Q.   Tell me.
23    A.   Well, my father was a political
24 activist.   He was a trade union leader.
25 He was a journalist.   He ran for senate in
```

60 (Pages 234 - 237)

Page 238

```
 1         WILSON
 2 the State of Illinois.  He was a leader
 3 in the American Communist Party on the
 4 Central Committee.
 5    Q.   Okay.  Thank you.
 6    A.   What time do you have?
 7    Q.   4.
 8    A.   I am just going to walk around
 9 the room for a second and stretch.
10         MR. JAMES KLEIN:  Can we take
11 another ten-minute break and then go to
12 the end.
13         MR. MARK KLEIN:  That's fine.
14         (Recess taken.)
15         (Wilson Exhibit 7 marked for
16 identification.)
17 BY MR. MARK KLEIN:
18    Q.   Dr. Wilson, I show you what has
19 been marked as Wilson Exhibit 7.  Please
20 take a moment to review the document
21 generally and tell me when you have done
22 so, and I'll represent to you that I have
23 inserted exhibit tabs and bound this
24 document, but, otherwise, it is what your
25 counsel served on me.
```

Page 239

```
 1         WILSON
 2         MR. JAMES KLEIN:  The copy you
 3 gave me has -- did you give me your copy?
 4         MR. MARK KLEIN:  Yes.  Thank
 5 you.
 6    Q.   My question to you is have you
 7 seen Exhibit 7 before, sir?
 8    A.   Exhibit 7?
 9    Q.   Yes, this is Exhibit 7/?
10    A.   Because it says Exhibit 1, and
11 there is no 7.  This is Exhibit 7.
12 Okay.  I've seen this.
13    Q.   And if you look at the last page
14 before Exhibit 1 of this document.  That's
15 your verification?
16    A.   My signature.  Yes.
17    Q.   Right?
18    A.   Yes.
19    Q.   And you signed that on December
20 20, 2018?
21    A.   Correct.
22    Q.   And you declared under penalty
23 of perjury that the facts stated in
24 Plaintiff's Supplemental Responses to
25 Certain of Defendants' First Set of
```

Page 240

```
 1         WILSON
 2 Interrogatories were true to the best of
 3 your knowledge, information, and belief,
 4 right?
 5    A.   That's correct.
 6    Q.   Now, I am going to ask you a lot
 7 more about this document tomorrow, but I
 8 just want to ask you about Exhibit 5 to
 9 this document, which is a document that is
10 1 through 52, right?  It is 52 pages long?
11    A.   Yes.
12    Q.   This document is titled "Dr.
13 Joseph Wilson's Professional Production
14 and Seized Materials."
15    A.   Yes.
16    Q.   That is correct?
17    A.   That's correct.  That is the
18 title.
19    Q.   Did you prepare this document
20 which is Exhibit 5?
21    A.   Yes, I did.
22    Q.   Did anybody assist you in
23 preparing this document?
24    A.   No.
25    Q.   How did you go about preparing
```

Page 241

```
 1         WILSON
 2 this document?
 3    A.   By focusing on my research, my
 4 work, my starting with my curriculum vitae
 5 and then by reflecting carefully to the
 6 extent possible to try to create in the
 7 absence of a lot of documents the things
 8 that I did over the years.
 9    Q.   Did you refer to any documents
10 in in preparing this Exhibit 5?
11    A.   Yes, I did.
12    Q.   What documents did you refer to?
13    A.   I referred to Tearing Down the
14 Color Bar.
15    Q.   That is one of your books?
16    A.   Yes.
17    Q.   Anything else?
18    A.   Yes.  I referred to Black
19 Labor -- Black Labor and another book.  I
20 refer to several of my books.
21    Q.   Anything else that you refer to
22 besides your books?
23    A.   Yes, I -- I went online to look
24 up some of the events at the worker
25 education center that I directed.  For
```

61 (Pages 238 - 241)

WILSON

1
2 example, I looked up black women in the
3 radicle -- Black Women in the Radicle
4 Tradition in order to see -- to refresh my
5 memory to see who participated
6 and -- so -- and I looked at the -- there
7 is a publication called Dissertation
8 Abstracts, which lists my doctoral thesis.
9 Then I actually made some references to my
10 archival collection.  I went to the --
11 you know, scrolling online to look at
12 Black Workers and my documents, and some
13 of them are -- my archival work/, some of
14 it is cited online and then --
15    Q.   You are talking about your
16 archival work at the Schomburg Center?
17    A.   Yes.  My archival work at the
18 Schomburg Center, and let's see.  I
19 mentioned that I looked online at the
20 International Encyclopedia of Protest and
21 Revolution.   Then of course I had to, you
22 know, reconstruct and kind of
23 re -- rethink some of the collections,
24 and so that's -- that's pretty much what I
25 could think of off the top of my head.

WILSON

1
2    Q.   As I said, I am going to ask you
3 a lot more about this tomorrow, but I just
4 want -- if you go to page 3 of 52.
5    A.   Page 3.
6    Q.   Under the heading "Tearing Down
7 the Color Bar", you have a list of quote
8 "Materials seized and not returned."  Do
9 you see that?
10    A.   Yes, I do.
11    Q.   And then you say "Statement
12 labor times" and you say 600 days over
13 five years?
14    A.   Right.
15    Q.   That is 600 days to do what?
16    A.   Well, that is to -- to do the
17 historical research, the documentation,
18 the annotation, the writing of the
19 manuscript, and then editing of the
20 manuscript, and, you know, finding graphic
21 illustrations, and, you know, looking at
22 the various letters, correspondence, my
23 notes.  So that -- that took
24 approximately that amount of time as a
25 conservative estimate, but yes.

WILSON

1
2    Q.   So is that the estimate of the
3 amount of time it took you to write
4 Tearing Down the Color Bar or is that an
5 estimate of the amount of time that it
6 would take to reproduce the materials that
7 you say were seized and not returned?
8    A.   That would have been a
9 combination of research and writing over a
10 period of five years.
11    Q.   So is this the amount of time
12 that it would take you to reproduce what
13 was lost?
14    A.   It might take longer and -- so,
15 for example, for Volume 2, it could take
16 approximately five years to do a -- or to
17 recreate this volume approximately.
18 So --
19    Q.   Again, I ask you, sir, is that
20 600 days the amount of time you estimate
21 it would take to reproduce what was lost
22 when these materials that you list here
23 were "Seized and not returned"?
24    A.   Yes.  So from --
25    Q.   Yes or no.

WILSON

1
2    A.   Yes.  Yes.
3    Q.   Okay.  All right.  We will
4 come back to that tomorrow.
5    A.   Uh-huh.
6       MR. MARK KLEIN:  I am going to
7 ask the reporter to mark as Wilson Exhibit
8 8 a document bearing the stamps --
9    A.   So actually let me --
10    Q.   Wait.
11    A.   Let me clarify one point.
12       So just for your edification,
13 research is done in stages, so there was a
14 preliminary stage that was required that
15 took a separate amount of time and
16 separate work, and without the preliminary
17 stage I couldn't have done this.  So we
18 could talk about that tomorrow, but this
19 wouldn't have been everything related --
20 This was the writing and the production
21 and research and footnoting and writing
22 out the manuscript, but there was a series
23 of presteps before I could get to the
24 actual writing of the manuscript.  So
25 that's -- I just wanted to clarify that.

62 (Pages 242 - 245)

Page 246

WILSON

2    Q.    Okay.  But again that 600 hours
3  is the amount of time it would take to
4  recreate all those materials?
5    A.    Not 600 hours.  I didn't say
6  hours.
7    Q.    600 --
8    A.    Days.
9    Q.    600 days to recreate what was
10  lost when those materials were "Seized and
11  not returned"?
12    A.    Approximately.  Yes.
13    Q.    Okay.
14        MR. MARK KLEIN:  I am going to
15  ask the reporter to mark as Wilson Exhibit
16  8 a document bearing stamps -- well, I see
17  that in the copying the Bates stamps got
18  removed, but on the original I have the
19  documents were Bates stamped DEF 000571
20  through 590.
21        (Wilson Exhibit 8 marked for
22  identification.)
23        (Document handed to witness.)
24    Q.    Dr. Wilson, I hand you what has
25  been marked as Exhibit 8, and my question,

Page 247

WILSON

2  sir, is whether you have seen these pages
3  before?
4    A.    Yes.
5    Q.    And what are they?
6    A.    This is called the Multiple
7  Position Form, Brooklyn College.
8    Q.    And these are multiple position
9  reports that you filled out and signed at
10  various times while you were employed at
11  Brooklyn College; is that right?
12    A.    That's correct.
13    Q.    And do you recall that this was
14  an exhibit at the arbitration where you
15  were represented by Pete Zwiebach?
16    A.    I do.
17    Q.    And what is your understanding,
18  if any, of when you're required -- when
19  you were required to fill out a multiple
20  position report while you were employed at
21  Brooklyn College?
22    A.    My understanding is in the first
23  place that research is excluded from
24  multiple position reporting, as I wasn't
25  being paid, but even if I was my

Page 248

WILSON

2  understanding is that research is an
3  expectation of employment, and that is not
4  a reportable activity.
5    Q.    If you were being paid in
6  addition to your salary for research, were
7  you required to report that on a multiple
8  position report?
9    A.    I don't think so.
10    Q.    And what is that based on?
11    A.    That research -- well, that
12  research is an expectation whether it is
13  paid or unpaid because, for example,
14  I -- you publish a book, and you get
15  royalties.  They don't ask you for a
16  royalty report or publication report
17  like -- in terms of your remuneration.  So
18  my understanding after all of these years
19  on the faculty is no, that is not a
20  requirement.
21        MR. JAMES KLEIN:  Well, you
22  know, is there a time element? I mean
23  there is no -- I am not certain that what
24  might be standard practice today regarding
25  multiple position reports is the same

Page 249

WILSON

2  practice --
3        MR. MARK KLEIN:  I am not
4  asking --
5        MR. JAMES KLEIN:  You are
6  asking if something was required.  Was it
7  required from 1990 when he was a professor
8  was it required in 1992 when he was a
9  professor?  Was it required in 1997 when
10  he was professor? I mean policies change
11  over time, and they change depending on
12  the context of what position.  So an open
13  ended question of what is required is sort
14  of an unanswerable question.
15        MR. MARK KLEIN:  I ask the
16  reporter to mark as Wilson Exhibit 9
17  documents bearing Bates stamps DEF 196
18  through 210.
19        (Wilson Exhibit 9 marked for
20  identification.)
21        (Document handed to witness.)
22    Q.    Dr. Wilson, I show you what has
23  been marked as Wilson Exhibit 9.  Please
24  take a moment to review that.  I am not
25  going to ask you about specifics at least

63 (Pages 246 - 249)

Page 250

WILSON

1
2 not now, but tell me whether you have seen
3 this before?
4   A.   I don't recall seeing this.
5   Q.   Do you have any recollection of
6 whether this was Exhibit 107 A at the
7 arbitration at which you were represented
8 by Pete Zwiebach?
9   A.   I don't remember, but I see the
10 marking on the top.
11   Q.   Do you recall seeing multiple
12 position policies for Brooklyn College
13 effective in the 2010 to 2011 time period?
14   A.   I do.
15   Q.   Do you recognize that these are
16 Brooklyn College's multiple position
17 policies during that time period?
18   A.   I would have to look at it more
19 carefully because they have changed over
20 several occasions from when I started to
21 this period, so I would have to read it
22 again.
23   Q.   Well, if you look at the fifth
24 page of the document.
25   A.   Of which document?

Page 251

WILSON

1
2   Q.   The one you are looking at.
3   A.   There is no page numbers on
4 this.
5   Q.   I know.  So go to the fifth
6 page, please.  Do you see at the bottom
7 right-hand portion of the page it says
8 "Approved by CUNY Board of Trustees on
9 February 26, 2017"?
10   A.   Yes, I see that.
11   Q.   Does that refresh your
12 recollection that the -- that this policy
13 was in effect while you worked at Brooklyn
14 College?
15   A.   Well, apparently it was.  I
16 can't say it refreshes my recollection.
17   Q.   And if you go to the page that
18 has a Bates stamp DEF 204.
19   A.   Yes.
20   Q.   Do you see that it says page 1
21 of 2 at the bottom revised 4/2011? Do you
22 see that?
23   A.   Yes.  Okay.
24   Q.   Revised April, 4/2011, right?
25   A.   Yes.

Page 252

WILSON

1
2   Q.   And if you go to page 4 under
3 the heading City University of New York
4 Multiple Position Policy Manual.
5   A.   Yes.
6   Q.   Also at policy 5.14 multiple
7 positions, and the document says it was
8 retrieved from the website on April 5,
9 2011.  Do see that, sir?
10   A.   I do.
11   Q.   Okay.  Now, does this refresh
12 your recollection that these were the
13 Multiple Position Policy for Brooklyn
14 College during the time period 2009 to
15 2012 when you were employed at Brooklyn
16 College?
17   A.   I would have to look at it more
18 carefully, but I guess that is -- I guess
19 that is what it was.
20   Q.   Do you recall seeing the
21 Multiple Position Policy for Brooklyn
22 College while you were a professor there?
23   A.   Not like this.  Not in this
24 form, no.
25   Q.   Is it your testimony that this

Page 253

WILSON

1
2 is not the Multiple Position Policy that
3 was in effect from 2009 to 2012?
4   A.   That is not my testimony.  My
5 testimony is I didn't see it in this
6 format.  We were given a -- this, not the
7 policy.  This is what we were given, the
8 multi position form, not the multiple
9 position manual.
10   Q.   So is it your testimony that you
11 didn't look at the Multiple Position
12 Policy as set forth in the Brooklyn
13 College manual --
14   A.   Yes --
15   Q.   -- while you were a professor
16 there?
17   A.   Correct.
18   Q.   And you didn't have access to
19 it.  Is that your testimony?
20   A.   I didn't say that I didn't have
21 access.  I was unaware of it.
22   Q.   How long were you a professor at
23 Brooklyn College?
24   A.   About 30 years.
25   Q.   And it is your testimony that

64 (Pages 250 - 253)

Page 254

WILSON

2 you weren't aware of the Multiple Position
3 Policy?
4    A.   This was the only Multiple
5 Position Form I ever received, and this
6 wasn't even -- this is evolved, but yes, I
7 never received a policy.
8          MR. MARK KLEIN:  I am going to
9 ask that the reporter mark as Wilson
10 Exhibit 10 --
11   A.   That I can remember.
12   Q.   Okay.
13         MR. MARK KLEIN:   -- Wilson 10 a
14 document bearing the Bates stamp DEF
15 000211 through 216.
16         (Wilson Exhibit 10 marked for
17 identification.)
18         (Document handed to witness.)
19   Q.   Dr. Wilson, I show you what has
20 been marked as Wilson Exhibit 10.   Please
21 take a moment to review the document.
22         (Pause.)
23   Q.   Tell me when you have done so.
24   A.   Yes.
25   Q.   These are a series of e-mails

Page 255

WILSON

2 from James Eaton at Brooklyn College to
3 you; is that correct?
4    A.   Correct.
5    Q.   And they run from the period of
6 October of 2008 through February of 2012,
7 right?
8    A.   Correct.
9    Q.   And this was an exhibit at your
10 arbitration at which you were represented
11 by Mr. Zwiebach, correct?
12   A.   Correct.
13   Q.   Do you recall seeing this
14 exhibit during the course of the
15 arbitration?
16   A.   No, not the specific exhibit.
17   Q.   Do you recall receiving any of
18 these e-mails from James Eaton?
19   A.   I received -- I recall receiving
20 e-mails about reminders for multiple
21 positions, and those e-mails were always
22 associated with a hardcopy that we filled
23 out, so I -- that is my recollection.
24   Q.   Do you recall receiving any of
25 the e-mails that have been marked as

Page 256

WILSON

2 Exhibit 10?
3    A.   Yes.  No, not the specific
4 e-mails. I know it was the policy to
5 remind faculty, and I was very diligent
6 about filling out my Multiple Position
7 Form.   That is what I did.
8    Q.   Well, let's look at the first
9 page of Exhibit 10.   It is an e-mail from
10 James Eaton to you dated October 14 of
11 2008, right?
12   A.   Right.
13   Q.   And the first sentence of the
14 e-mail says after "Dear Professor Wilson,
15 we have not received your completed
16 multiple" -- let me try again.
17        "We have not received your
18 completed multiple position report for
19 this semester." Correct?
20   A.   That's correct.
21   Q.   And so he was reminding you that
22 you hadn't submitted your multiple
23 position report for that semester yet,
24 right?
25   A.   That is not right.

Page 257

WILSON

2    Q.   What is inaccurate about this?
3    A.   I happen to remember that I
4 submitted it three times, and the
5 departmental secretary at that time lost
6 it three times because we don't submit it
7 to Eaton.  We submit it to our
8 departmental secretaries.  At first we
9 discuss it with the chair, and then we
10 submit it to the secretary, and I remember
11 on a couple of occasions -- her name was
12 Maria Corazone.  I am not sure of the
13 precise spelling of her name.  Maybe it is
14 Corazone, and I remember being flummoxed
15 not just me but other people that they
16 repeatedly lost our Multiple Position
17 Forms.  So --
18   Q.   If you look at Exhibit 10, there
19 are reminders that you hadn't submitted
20 your form for each of 2008, 2009, 2010,
21 2011, and 2012, correct?
22   A.   Right.
23   Q.   And is it your testimony that
24 the departmental secretary lost the multi
25 position report that you had prepared and

65 (Pages 254 - 257)

1          WILSON
2  submitted each and every time that you had
3  gotten a reminder?
4      A.   At least a couple of times.  Not
5  necessarily each and every time.
6      Q.   Look at just the first page of
7  Exhibit 10.  You will see in the middle of
8  Mr. Eaton's e-mail he says, "The form, the
9  instructions, and the related policies are
10 available via the links below."  Do you
11 see that?
12     A.   Yes.
13     Q.   So he was telling you exactly
14 where you could go on the website to find
15 the Multiple Position Form and the
16 instructions and the policies, correct?
17     A.   That's correct.
18     Q.   And it is your testimony you
19 never looked at the instructions and the
20 policies?
21     A.   Well, I only really looked at
22 the Multiple Position Form.  My
23 understanding was this spelled out the
24 specific policies.   This --
25     Q.   Could you answer my question,

1  sir.  Is it your testimony you never
2  looked at the instructions and the
3  policies relating to the Multiple Position
4  Form while you were a professor at
5  Brooklyn College for 30 years?
6      A.   That is not correct.  What I
7  said was I looked at instructions and
8  policies on the multiple position form
9  itself.  I didn't look at a manual.
10 Correct.
11     Q.   Now, is Exhibit 8 a copy of all
12 the multiple position forms you submitted
13 between the spring of 2005 and the fall of
14 2011?
15     A.   I don't think so.
16     Q.   Do you believe you submitted
17 multiple position forms in addition to the
18 ones that are collected as part of Exhibit
19 8?
20     A.   I haven't had a chance to see if
21 every year that you are mentioning, you
22 know -- I haven't looked at this really,
23 so I don't know precisely.
24     Q.   Take a moment and look at it.

1          WILSON
2      A.   So what were the years you said
3  now?
4      Q.   Let's just focus on from 2009 to
5  2011.  So if you will go to DEF 000583 to
6  the end.
7          MR. JAMES KLEIN:   My copy isn't
8  Bates stamped, so I don't know where you
9  are.
10         MR. MARK KLEIN:   I apologize
11 for that.  As I said, in the copying the
12 Bates stamps --
13         MR. JAMES KLEIN:   Is his Bates
14 stamped?
15     A.   I don't see --
16         MR. JAMES KLEIN:  Does it have a
17 number on it?  No, it doesn't.
18         MR. MARK KLEIN:  Okay.  That's
19 unfortunate.
20     Q.   If you go to the eighth page
21 from the end --
22         MR. JAMES KLEIN:  From the end?
23         MR. MARK KLEIN:  From the back.
24     Q.   So the eighth page from the back
25 is the multiple position report from fall

1          WILSON
2  of 2009; correct?
3      A.   That's correct.
4      Q.   And that is your signatures at
5  about the middle of the page?
6      A.   At the bottom.
7      Q.   And the date next to your
8  signature is September 9, 2009?
9      A.   That's right.
10     Q.   Now, after that there is a
11 multiple position report for the fall of
12 2010, correct?
13     A.   You mean on the next page?
14     Q.   No, two pages.
15     A.   Yes.
16     Q.   And if you go four pages more
17 there is a multiple position report for
18 the fall of 2011, correct?
19     A.   The fall -- right.
20     Q.   So the one in the fall of 2011
21 you signed electronically as indicated at
22 the bottom of the page, correct?
23     A.   Right.
24     Q.   So included here in this exhibit
25 were three multiple position reports that

66 (Pages 258 - 261)

Page 262

WILSON

2 you submitted for the fall of 2009, the
3 fall 2010, and the fall of 2011, correct?
4     A.   Correct.
5     Q.   Are you aware of any other
6 multiple position forms that you submitted
7 during the time period fall of 2009
8 through fall of 2011?
9     A.   As I said, there were multiple
10 position forms that I submitted that I had
11 to resubmit on numerous occasions because
12 the secretary lost them.  So yes, there
13 were other multiple position forms that I
14 submitted to the department that weren't
15 submitted to the provost.
16    Q.   And how do you know that?
17    A.   Because the chair told me at
18 that time.
19    Q.   Who was the chair?
20    A.   Sally Bermanson.
21    Q.   Did you keep a copy of multiple
22 position reports that you filled out?
23    A.   Yes, I kept copies.
24    Q.   Where did you keep those copies?
25    A.   In my office in Brooklyn

Page 263

WILSON

2 College.
3     Q.   And those multiple position
4 reports are among the documents that you
5 didn't get back.  Is that what your
6 testimony is?
7     A.   That's correct.
8     Q.   Are you familiar with something
9 called the Deutsche Bank Foundation?
10    A.   Yes.
11    Q.   What was the Deutsche Bank
12 Foundation?
13    A.   It was a foundation that
14 provided funding for one of the programs
15 that I was a principal investigator on,
16 coprincipal investigator.
17    Q.   And what is a principal
18 investigator?
19    A.   One who is leading an aspect or
20 a research project.
21    Q.   And what was that project on
22 which you were a coprincipal investigator?
23    A.   I believe that was the Urban
24 Community Teachers Program or project.
25    Q.   And what was the Urban Community

Page 264

WILSON

2 Teachers Project?
3     A.   That was a project to recruit
4 and support and provide scholarships and
5 mentorship to African American men to
6 encourage their participation in teaching
7 at Brooklyn College.  Essentially
8 under -- making sure that undergraduate
9 men -- I am actually trying to remember.
10 I think it was both undergraduate and
11 graduate.  I would have to refresh my
12 recollection on that, but we worked with
13 African American men to maintain their
14 GPAs, to give them scholarships to make
15 sure that they would enter the teaching
16 profession.
17    Q.   And what did you personally
18 do --
19        MR. MARK KLEIN:  Withdrawn.
20    Q.   How long did you work as a
21 coprincipal investigator with respect to
22 the Urban Community Teachers Project?
23    A.   Approximately a couple of years.
24    Q.   What years?
25    A.   Maybe 2009 through 2011.

Page 265

WILSON

2     Q.   Now, you just testified that the
3 Deutsche Bank Foundation was a donor in
4 connection with that project?
5     A.   That's correct.
6     Q.   And was there -- are you
7 familiar with something called the Schott,
8 S-C-H-O-T-T, Foundation?
9     A.   Schott Foundation.
10    Q.   And was the Schott Foundation
11 also a donor in connection with the Urban
12 Community Teacher Project?
13    A.   Yes.
14    Q.   And who is the other principal
15 investigator besides yourself?
16    A.   Noel Anderson, Professor
17 Anderson.
18    Q.   Now, did you or anyone on your
19 behalf make requests for payments from the
20 Schott Foundation in connection with
21 administrative support that you did for
22 the Urban Community Teacher Project?
23    A.   Not from the Schott Foundation,
24 from the Brooklyn College Foundation.
25    Q.   Okay.  Was the account named

67 (Pages 262 - 265)

Page 266

WILSON

1            WILSON
2 the Schott Foundation?
3     A.   I don't recall the name of the
4 account.
5     Q.   The funds were housed at the
6 Brooklyn College Foundation?
7     A.   That is my understanding.
8     Q.   So you or someone on your behalf
9 made a request for payment from the
10 Brooklyn College Foundation for
11 administrative support you provided for
12 Urban Community Teachers Project?
13    A.   No, not simply.  The Brooklyn
14 College Foundation as well as college
15 administration and the School of Education
16 reviewed the application, and I think
17 for -- so we didn't apply as individuals.
18 So everything was reviewed by the college
19 and by the Brooklyn College Foundation as
20 well as by human resources, and everything
21 was approved including whatever terms of
22 payment that we were supposed to receive
23 was approved in advance of us receiving
24 any funding.
25    Q.   Okay.  But a request was made

Page 267

1            WILSON
2 for a check payable to you from the
3 Brooklyn College Foundation the purpose
4 for which was to pay you for
5 administrative support you provided for
6 the Urban Community Teachers Program; is
7 that right?
8     A.   That's correct.
9        MR. MARK KLEIN:  I am going to
10 ask the reporter to mark as Exhibit 11 a
11 document bearing Bates Stamps DEF 00546
12 through 5553.
13       (Wilson Exhibit 11 marked for
14 identification.)
15       (Document handed to witness.)
16    Q.   Dr. Wilson, I show you what has
17 been marked as Exhibit 11 in this
18 deposition.  If you could look at that,
19 please, sir.
20    A.   Uh-huh.
21    Q.   Can you tell me what Exhibit 11
22 is?
23    A.   This is a payment request
24 from -- to the account Schott Foundation
25 and a check payable to Joseph Wilson.

Page 268

1            WILSON
2     Q.   Actually it is a series of
3 payment requests, is it not?
4     A.   Yes, it is a series.
5     Q.   And these requests were requests
6 that were made for payment to you for
7 administrative support for the UCT
8 program, correct?
9     A.   That's correct.
10    Q.   And this document was -- you saw
11 this during the course of your arbitration
12 in which you were represented by Mr.
13 Zwiebach, correct?
14    A.   Yes.
15    Q.   This was -- it is written at the
16 top CUNY 29, Exhibit 29, right?
17    A.   Correct.
18    Q.   Now, as a result of these
19 payment requests you received a payment of
20 $5,000 in June of 2010, correct?
21    A.   That's correct.
22    Q.   And you received two 5,000
23 dollar payments in --
24       MR. MARK KLEIN:  Withdrawn.
25    Q.   And you received a payment of

Page 269

1            WILSON
2 5,000 in August of 2010, right?
3     A.   That's correct.
4     Q.   And another payment of 5,000 in
5 October of 2010, right?
6     A.   That's correct.
7        MR. MARK KLEIN:  I ask that the
8 reporter mark as Wilson 12 a document
9 bearing Bates stamps DEF 00546 through
10 553.
11       (Wilson Exhibit 12 marked for
12 identification.)
13       (Document handed to witness.)
14    Q.   Dr. Wilson, I show you what has
15 been marked as Exhibit 12.  Please take a
16 moment to review that document.  My first
17 question is whether you have seen it
18 before?
19    A.   I couldn't recall seeing it, but
20 I see CUNY 30.
21    Q.   Do you recall whether this was
22 an exhibit at the arbitration in which you
23 were represented by Mr. Zwiebach?
24    A.   I don't recall specifically, no.
25       MR. JAMES KLEIN:  Are these

68 (Pages 266 - 269)

WILSON

1 numbers in the upper right-hand corner the
2 exhibit numbers from the arbitration?
3     MR. MARK KLEIN:  Yes, they
4 didn't have tabs.  They apparently just
5 wrote numbers.
6     A.   Let me -- I have to stop you
7 because I remember specifically indicating
8 Urban Community Teachers on my Multiple
9 Position Form and BMI, and I don't see any
10 reference to those, so these documents are
11 not complete.  I absolutely mentioned
12 Urban Community Teachers and the amount of
13 payment and so forth.
14     Q.   Did you disclose the payment you
15 received from the -- for the
16 administrative work you did in the amount
17 of $5,000 on your Multiple Position Form
18 with respect to the payment you got in the
19 spring of 2010?
20     A.   That's my recollection, yes.
21     Q.   It is your testimony that you
22 disclosed on your multiple position report
23 for the spring of 2010 payment of $5,000?
24     A.   My point is I see nothing here

1     WILSON
2 numbers in the upper right-hand corner the
3 exhibit numbers from the arbitration?
4     MR. MARK KLEIN:  Yes, they
5 didn't have tabs.  They apparently just
6 wrote numbers.
7     A.   Let me -- I have to stop you
8 because I remember specifically indicating
9 Urban Community Teachers on my Multiple
10 Position Form and BMI, and I don't see any
11 reference to those, so these documents are
12 not complete.  I absolutely mentioned
13 Urban Community Teachers and the amount of
14 payment and so forth.
15     Q.   Did you disclose the payment you
16 received from the -- for the
17 administrative work you did in the amount
18 of $5,000 on your Multiple Position Form
19 with respect to the payment you got in the
20 spring of 2010?
21     A.   That's my recollection, yes.
22     Q.   It is your testimony that you
23 disclosed on your multiple position report
24 for the spring of 2010 payment of $5,000?
25     A.   My point is I see nothing here

1     WILSON
2 that mentions UCT or BMI, and I know
3 specifically that those were mentioned,
4 and so I see what amounts were mentioned,
5 but the hours were mentioned here.  Yes.
6 Here.  Here it is on page -- there is no
7 page here.  Here you go.  Look.  It says
8 90 hours of work, and it doesn't ask for
9 the compensation amount, but it asks
10 whether you did the work.  That's without
11 looking at it carefully.
12     Q.   You are looking at a form for
13 2007, are you not, sir?
14     A.   Yes.
15     Q.   Okay.  So with respect to the
16 form you submitted for the fall of 2010,
17 could you find that form?
18     A.   I see it.
19     Q.   And in the fall of 2010, you
20 just testified that you received $10,000
21 for the work you did for the Urban
22 Community Teachers Project, correct?
23     A.   Correct.
24     Q.   Is it disclosed on that form the
25 fact that you got $10,000 for that work?

1     WILSON
2     A.   It doesn't call for disclosure.
3 It asks whether you received -- what work
4 you did in that current semester, annual
5 report of activities that are not part of
6 your regular full time.
7     Q.   So it is --
8     A.   So that was --
9     Q.   So it is not disclosed on that
10 form that you received $10,000?
11     A.   The form doesn't ask for that.
12 So yes.
13     Q.   Do you recall testifying at the
14 arbitration regarding --
15     MR. JAMES KLEIN:  Can you
16 identify the place on the form where it
17 should be disclosed?
18     MR. MARK KLEIN:  I am not
19 testifying here.
20     MR. JAMES KLEIN:   I mean you
21 are saying that it is not disclosed on a
22 form where it doesn't ask for it to be
23 disclosed, and you're making a leap that
24 there is no basis for.
25     MR. MARK KLEIN:  Okay.

1     WILSON
2     Q.   If you could go to the form for
3 fall of 2010, Dr. Wilson?
4     A.   Is that this form where it says
5 Brooklyn College ERIS at the top where I
6 list my activities.
7     Q.   Let's start two pages
8 beforehand.
9     A.   Okay.
10     Q.   And you signed that form on
11 September 14, 2010, correct?
12     A.   Correct.
13     Q.   And under B a little more than
14 half way down the page it says, "I am
15 aware of the multiple position regulations
16 governing activities in addition to my
17 regular full-time employment at Brooklyn
18 College CUNY."
19       Do you see that?
20     A.   I see that.
21     Q.   And then you checked the box
22 that says, "In addition to my regular
23 full-time assignment at the college I have
24 supplementary employment, consultative or
25 other work for extra compensation

Page 274

```
1            WILSON
2  including grant-funded activities within
3  CUNY for which complete information
4  follows."  Do you see that?
5     A.   I see that.
6     Q.   And then it says "If you check
7  this statement, complete Section B 1."
8     A.   B 1.
9     Q.   Right.
10    A.   Right.
11    Q.   Now, if you go two pages
12 further, do you see B 1?
13    A.   I do.
14    Q.   And it says "for current
15 semester."
16    A.   Yes.
17    Q.   And it discloses eight hours a
18 week, correct?
19    A.   That's correct.
20    Q.   And eight hours a week of $64.23
21 an hour -- I am sorry eight hours a week
22 at $63.23, correct?
23    A.   I don't know.  Where do you see
24 $64.23?
25    Q.   Actually if you look at the page
```

Page 275

```
1            WILSON
2  before we are looking at before.
3     A.   Page B 4.
4        MR. JAMES KLEIN:  No, looking
5  at --
6     Q.   The previous page.
7        MR. JAMES KLEIN:  The previous
8  page before that.
9     A.   Okay.
10    Q.   Do you see a form that is titled
11 "Instructional Staff Appointment
12 Information"?
13    A.   Yes.
14    Q.   And three quarters or more down
15 the page it reflects an hourly rate of
16 $64.23 for non-teaching time, right?
17    A.   Right.
18    Q.   For a total of $8,221.44?
19    A.   I see that.
20    Q.   Okay.  Now, you testified a
21 little while ago that you received a total
22 of $10,000 in the fall of 2010 in
23 connection with your "Administrative
24 support for the Urban Community Teachers
25 Program," right?
```

Page 276

```
1            WILSON
2     A.   Yes, that's correct.
3     Q.   And the $10,000 is not disclosed
4  on this form in any way, is it?  Yes or
5  no?
6     A.   No, that is not true.  That is
7  not correct because the -- first of all,
8  you see $8,220, so that would have
9  constituted some of the 10,000.
10    A.   But the 10,000 didn't
11 necessarily reflect that particular
12 semester.  It could have been two months
13 over into the following semester.  It
14 could have been two months into the
15 previous semester.  They didn't pay you
16 in advance.  You do the work, and then
17 they pay you, and I disclosed it.
18    Q.   Now, you testified at your
19 arbitration that you got $5,000 in
20 connection with the work you did for Urban
21 Community Teachers Project in the spring
22 of 2010, the following semester, right?
23 Right?
24    A.   I don't know.  If that's what
25 you have a report of, but yes.
```

Page 277

```
1            WILSON
2     Q.   I'll show you your testimony in
3  a minute, but do you recall testifying to
4  that?
5     A.   No, I don't recall testifying to
6  that.
7     Q.   Do you remember testifying that
8  you disclosed the receipt of the
9  $5,000 --
10    A.   Yes.
11    Q.   -- in the spring of 2010 on your
12 Multiple Position Form for spring of 2010?
13    A.   I accept that I said it.  I
14 don't specifically recall it, but I accept
15 that I said it.
16    Q.   But you also testified that
17 you didn't see on the Multiple Position
18 Form for the fall of 2010 disclosure of
19 the $10,000 you received during that
20 semester, correct?
21    A.   It -- the issue is not when I
22 received the money.  The issue is what
23 did the money reflect over a period of
24 months that I worked, so it is not -- it
25 is not when you get paid.  It is for what
```

70 (Pages 274 - 277)

WILSON

1
2 period does it cover.  There is two
3 different questions there.
4       MR. MARK KLEIN:  I am going to
5 ask the reporter to mark as Wilson Exhibit
6 13 a document bearing Bates stamps DEF 143
7 through 171.
8       (Wilson Exhibit 13 marked for
9 identification.)
10      (Document handed to witness.)
11   A.   I would also point out that this
12 is --
13   Q.   Theres no pending question, sir?
14   A.   What?
15   Q.   There is no pending question.
16   A.   Okay.
17      MR. JAMES KLEIN:  Would you
18 like to change one of your previous
19 answers?
20      THE WITNESS:  Yes.
21   Q.   You want to change one of your
22 previous answers.  Go ahead/?
23   A.   Yes.  This form was submitted
24 by my assistant, not by me.  So it's quite
25 possible that she was off by a few hundred

WILSON

1
2 dollars.  There could have been some
3 confusion, but certainly there was nothing
4 intentional between the 10,000 that you
5 mentioned and the 8200 and change that she
6 mentioned, and then the issue of the time
7 lag between when you did it and when you
8 get paid and does it straddle one semester
9 and another semester.  So it is pretty
10 complicated, and it is very easy to make a
11 mistake, but that is the point.
12   Q.   Have you finished changing your
13 answer, sir?
14   A.   I am finished, yes.
15   Q.   Okay.  I would like to show you
16 what has been marked as Exhibit 13, sir.
17 That is Volume 10 from the arbitration on
18 which you were represented by Mr.
19 Zwiebach, correct?
20   A.   That's correct.
21   Q.   And do you recall reviewing this
22 transcript before?
23   A.   I don't recall reviewing this,
24 no.
25   Q.   Let me direct your attention to

WILSON

1
2 page 26 of Exhibit 13.
3   A.   Page 26.
4   Q.   If you see the page numbers in
5 the lower right-hand corner.
6   A.   13 -- no, page 10.  Okay.
7   Q.   I got it.
8   A.   Page 26.
9   Q.   All right.  Now, starting on
10 page 1392 of the transcript, line 6,
11 Ms. Nash, you know who --
12      MR. JAMES KLEIN:  Can you give
13 me the page number again, please.
14      MR. MARK KLEIN:  Page 1392.
15      MR. JAMES KLEIN:  Yes, line 6.
16   Q.   Line 6, Ms. Nash, Rachel Nash
17 who represented CUNY at the arbitration.
18   A.   Yes.
19   Q.   And Mr. Zwiebach was your
20 attorney, right?
21   A.   Not my attorney.  The union's
22 attorney.
23   Q.   Okay.  He was representing you,
24 right?
25   A.   Correct.

WILSON

1
2   Q.   Okay.  So Ms. Nash said, I am
3 going to have to ask you to give him
4 Exhibit 32 again, and exhibit 32 was the
5 multiple position forms, correct?
6   A.   Yes.
7   Q.   And we marked that as Wilson
8 Exhibit 8 here today, correct?
9   A.   Correct.
10   Q.   And then she says: "Question:
11 Can you please turn to the fall of 2010
12 Multiple Position Form.  Turn to the
13 second page of that form, please.
14   "Answer --
15   A.   You are asking me to.
16   Q.   I am reading what is written
17 here.
18   A.   Okay.
19   Q.   "Question: You indicated eight
20 hours a week for ERIS, right?
21   "Answer: Right.
22   "Question: And that is for
23 September to December 2010, right?
24   "Answer: Right.
25   "Question: And if you turn to

Page 282

1      WILSON
2 the next page, that is an important -- an
3 appointment form, right?"
4    A.   Hold on.  You lost me.  The
5 next page meaning -- Okay.
6    Q.   I am just reading what is typed
7 here.
8    A.   Yes, I know.
9      MR. JAMES KLEIN:  When she says
10 next page in the transcript, she is
11 referring to the multiple position report.
12    Q.   She is referring to the first
13 page of Exhibit 32.
14      MR. JAMES KLEIN:  The fall 2010
15 multiple position report.
16    Q.   So I will repeat that.
17      "Question:  And if you turn to
18 the next page, that is an appointment
19 form, right?
20      "Answer:  Nonteaching adjunct
21 appointment, yes." And by the way where
22 ever it says answer A, that is what you
23 testified to, correct?
24    A.   Correct.
25    Q.   "Question:  And it is for

Page 283

1      WILSON
2 September 2010 to December 2010 you see
3 down about three quarters of the way down?
4      "Answer:  Yes.
5      "Question:  It says your hourly
6 rate is $60 an hour, right?
7      "Answer:  Right.
8      "Question:  And it lists a total
9 of 128 hours, right?
10      "Answer:  That's right.
11      "Question:  For $8,221, right?
12      "Answer:  Correct.
13      "Question:  And that corresponds
14 to the eight hours a week that you
15 disclosed on your Multiple Position Form,
16 right?
17      "Answer:  I think so.  Yes.
18 Yes.  That is right.
19      "Question:  Now, in the fall of
20 2010, you also got $10,000 from the Schott
21 Foundation grant, didn't you?"
22      And then going up to the top of
23 page 1394 "Answer:  Yes.
24      "Question:  How was that
25 disclosed on this form?

Page 284

1      WILSON
2      "Answer:  I don't know.
3      "Question:  And that is for UCT,
4 right?
5      "Answer:  That's correct.
6      "Question:  So in fact you did
7 not disclose your UCT payments on your
8 multiple position forms, did you?
9      "Answer:  I don't see it here.
10      "Question:  Now, you've got
11 5,000 from the Schott Foundation in the
12 spring of 2010.  Do you recall that?
13      "Answer:  Yes.
14      "Question:  We actually don't
15 have your spring 2010 form.  It's your
16 position that you disclosed that on your
17 spring 2010 form?
18      "Answer:  I believe so, yes.
19      "Question:  But not on your 2010
20 form.
21      "Answer:  Apparently not."
22      Dr. Wilson, did you give those
23 answers to those questions at your
24 arbitration on June 19, 2015?
25    A.   Yes.

Page 285

1      WILSON
2    Q.   By the way, there was a
3 reference to ERIS, E-R-I-S, right, in the
4 testimony we just read?
5    A.   In this testimony?
6    Q.   Yes.
7    A.   The arbitration, yes.
8    Q.   And what was ERIS?
9    A.   It was the Black Male Initiative
10 Program at Brooklyn College.
11    Q.   And that was the acronym, all
12 capital letters ERIS?
13    A.   Yes.
14    Q.   What did ERIS stand for?
15    A.   I would have to refresh my
16 memory on that, Empower Respect Initiative
17 Empower respect improve -- I have to go
18 back over the acronym.
19      MR. MARK KLEIN:  I am going to
20 ask the reporter to mark as Wilson Exhibit
21 14 a document bearing Bates stamps DEF
22 00650 and 651.
23      (Wilson Exhibit 14 marked for
24 identification.)
25      (Document handed to witness.)

72 (Pages 282 - 285)

WILSON

1

2    Q.   Dr. Wilson, I show you what has
3  been marked as Wilson Exhibit 14.  Please
4  take a moment to review this and tell me
5  when you have done so.
6        (Pause.)
7    A.   Yes, I see that.
8    Q.   It is two pages.  Have you
9  reviewed both pages?
10    A.   Yes, I see that.
11    Q.   Do you recall seeing this series
12  of e-mails, this e-mail chain?
13    A.   I see that I received them.  I
14  actually don't recall them, but I see that
15  I received them.
16    Q.   Do you recall this was an
17  exhibit at your arbitration at which you
18  were represented by Mr. Zwiebach?
19    A.   I do vaguely, but not really
20  actually I have to say.
21    Q.   This e-mail chain relates to a
22  check for a $150,000 from the Deutsche
23  Bank Americas Foundation for a one-year
24  grant for the UCT program, correct?
25    A.   Yes.

WILSON

1

2    Q.   And who is Stephanie Ehrlich,
3  E-H-R-L-I-C-H?
4    A.   I believe she worked with the
5  Brooklyn College Foundation as a grant
6  administrator, you know, with knowledge
7  and expertise in these areas.  That is my
8  recollection.  I am not sure if I ever
9  met her.  Maybe I did.  I don't know.
10    Q.   And Ms. Ehrlich is asking some
11  questions of Mr. Anderson regarding how
12  the Deutsche Bank Foundation check is
13  going to be spent, right?
14    A.   That's correct.
15    Q.   And do you see anywhere in Mr.
16  Anderson's response to Ms. Ehrlich that he
17  mentions that you and he would be a
18  recipient of the funds that were part of
19  the 150,000 dollar grant from the Deutsche
20  Bank Americas Foundation?
21    A.   My understanding is it wouldn't
22  necessarily be in this letter, but it
23  would have been in the administrative
24  category of the foundation application
25  that was approved by the college and

WILSON

1

2  approved by the School of Education, so --
3    Q.   Did you ever --
4    A.   So it may not have been in this
5  letter, but it was known by the college.
6    Q.   Did you ever disclose to anyone
7  that you were receiving monies from the
8  Brooklyn Foundation bank account that
9  housed the 150,000 dollar grant?
10    A.   I couldn't have been paid
11  without the college drawing up contracts
12  and approving including the top financial
13  officers who approved it and the president
14  and the provost who would review it.  So
15  yes, so I didn't have to disclose it.
16  They knew it in advance, and they approved
17  it.
18    Q.   Now, in response to the second
19  page is an e-mail from Stephanie Ehrlich
20  to Noah Anderson, Emily Gavel, and you,
21  correct?
22    A.   Correct.
23    Q.   And on the first page Mr.
24  Anderson responds to Stephanie Ehrlich's
25  e-mail, right?

WILSON

1

2    A.   On the first page he
3  responds -- you mean on the second page?
4    Q.   No.  The first page of Exhibit
5  14 contains an e-mail from Mr. Anderson to
6  Stephanie Ehrlich?
7    A.   Yes, I see it.
8    Q.   This was sent on Tuesday, August
9  23, 2011 at 18:53 military time?
10    A.   I see that.  Yes.
11    Q.   And then you respond to Mr.
12  Anderson at the top of the first page,
13  right?
14    A.   Yes.
15    Q.   And you wrote you roll'in G,"
16  R-O-L-L 'I-N G dash "money," M-O-N-E-Y?
17    A.   Correct.
18    Q.   What do you mean when you wrote
19  you roll'in G-money?
20    A.   Essentially congratulations.
21  You are doing great work for getting the
22  grant.
23    Q.   Does G-money mean gangster
24  money?
25    A.   No, it means you are getting

73 (Pages 286 - 289)

Page 290

WILSON

1 thousands of dollars.   G doesn't mean
2
3 gangster.
4    Q.   Okay.
5    A.   And just to clarify because you
6 asked me the question this is African
7 American vernacular, and it is not to be
8 inferred with any criminal or subversive
9 intent.  I just need point that out to
10 you.
11    Q.   Okay.
12        MR. MARK KLEIN:  I am going to
13 ask the reporter to mark as Exhibit 15
14 --
15    A.   I am kind of getting lost in all
16 these documents.   Which ones are we
17 focusing on?
18    Q.   At the moment you don't have to
19 worry about any of these.
20    A.   What about this one?
21    Q.   Put it here/?
22    A.   This one?
23    Q.   No.
24        MR. MARK KLEIN:  I am going to
25 ask the reporter to mark as Wilson Exhibit

Page 291

WILSON

1
2 15 a document that was Bates stamped DEF
3 957 through 980.  In the copying the Bates
4 stamped didn't show up.  It is a document
5 that was marked as CUNY 91 at the
6 arbitration.
7        (Wilson Exhibit 15 marked for
8 identification.)
9        (Document handed to witness.)
10    Q.   Dr. Wilson, I show you what has
11 been marked as Wilson Exhibit 15.  Please
12 review this quickly and tell me whether
13 you have ever seen it before.
14    A.   What was your question?
15    Q.   Just review this and tell me
16 when you have done so.
17        (Pause.)
18        MR. JAMES KLEIN:  Will I
19 receive a copy of all these exhibits or
20 are these my copies to take?
21        MR. MARK KLEIN:   These are your
22 copies to take.
23        MR. JAMES KLEIN:  And will I
24 have the marked copies, so I know what
25 exhibit numbers they are? Can I get copies

Page 292

WILSON

1
2 of the marked copies?
3        MR. MARK KLEIN:   We can talk
4 about that later.  Yes.
5    A.   All right.
6    Q.   Just tell me when you have
7 reviewed Exhibit 15, sir.
8    A.   Well, I note that there are
9 several pages of e-mails.  So I am just
10 trying to read through all of them here.
11        (Pause.)
12    Q.   I will direct you to particular
13 parts, but just tell me when you Have
14 looked through this.
15    A.   Okay.
16        (Pause.)
17    A.   Yes, I -- let me get to the last
18 page.  Hold on.
19    Q.   Okay.
20    A.   Yes, I see that now.
21    Q.   Okay.   Do you recall seeing
22 this exhibit during the arbitration at
23 which you were represented by Mr.
24 Zwiebach?
25    A.   No.

Page 293

WILSON

1
2    Q.   Let me direct your attention to
3 the bottom of the second page of Exhibit
4 15, an e-mail from Marjorie Lewis to you
5 on January 14, 2010?
6    A.   Yes.
7    Q.   And the e-mail says "Dear
8 Professor Wilson, we received your payment
9 request," and it gives a number for
10 $309.84 on an account number which it
11 identifies, right?
12    A.   Yes.
13    Q.   And then she says we cannot
14 process this payment because PSC dash CUNY
15 awards do not support iPod, and you
16 purchased an iPod for $179 from the Apple
17 store on December 19, 2009?
18    A.   That's correct.
19    Q.   And you made this request for
20 payment from the research foundation,
21 right?
22    A.   That's correct.
23    Q.   And Marjorie Lewis worked at the
24 research foundation?
25    A.   Yes, she did.

74 (Pages 290 - 293)

Page 294

WILSON

2  Q.  Okay.  Then you submitted -- I'm
3  sorry.  That e-mail was on January 14,
4  correct?
5  A.  Correct.
6  Q.  Now, on January 17 --
7  A.  Where do you see January 17?
8  Q.  On the first page of Exhibit 15.
9  A.  Okay.
10  Q.  It is an e-mail from you to
11  Annie London, right, toward the bottom of
12  the page?
13  A.  Yes.
14  Q.  And Annie London was your
15  assistant at the graduate center?
16  A.  That's correct.
17  Q.  And you copied yourself and Mr.
18  Anderson, correct?
19  A.  That's correct.
20  Q.  And your e-mail says "Annie no
21  wants a Macbook with all the bells and
22  whistles, and for his office I assume Noah
23  wants a laser color copier.  We will also
24  need a Dell laptop for Amber, new staff
25  person.  Funding is from BC Foundation -

Page 295

WILSON

2  Deutsche Bank grant," right?
3  A.  Yes.
4  Q.  BC Foundation Deutsche Bank
5  Grant was the grant for the United
6  Community Teachers Program?
7  A.  Urban Community.
8  Q.  Urban Community Teachers
9  Program.  Thank you.  Right?
10  A.  Correct.
11  Q.  And you were asking Ms. London
12  to purchase for you -- for Mr. Anderson a
13  Macbook with all the bells and whistles
14  and a printer?
15  A.  Correct.
16  Q.  A laser jet printer?
17  A.  That's right.
18  Q.  And a Dell laptop for Amber, a
19  new staff person, right?
20  A.  Right.
21  Q.  Who was Amber?
22  A.  Amber was a staff person who was
23  assigned -- she was actually a doctoral
24  student working with our students in the
25  program.

Page 296

WILSON

2  Q.  Okay.
3  A.  Who didn't have a computer.
4  Q.  And you said you -- it also says
5  in this e-mail, "I may want the new Apple
6  iTouch." Right?
7  A.  That's correct.
8  Q.  And then it says "Order two
9  Kidels." Did you mean Kindels from
10  Amazon?
11  A.  Probably Kindels.  That's
12  correct.
13  Q.  Who was that supposed to be for?
14  A.  I don't recall at the time.
15  Maybe one for me and one for Annie.  I am
16  not sure.
17  Q.  And payment for all these things
18  were supposed to come out BC Foundation
19  Deutsche Bank grant account, right?
20  A.  Apparently.  Yes.
21  Q.  And did you receive those or any
22  of them?
23  A.  Me, no.  Noah received the
24  Macbook I believe.  I don't know actually
25  what he received, but -- so I didn't get

Page 297

WILSON

2  Amber's -- you asked me if I received
3  these.  I didn't receive Amber's laptop.
4  Q.  Did you get an Apple iTouch?
5  A.  I am not sure.
6  Q.  All right.  But you --
7  A.  I am not even sure what an Apple
8  iTouch is to tell you the truth, so I am
9  not sure if I got an Apple iTouch.  If it
10  is an iPad, I am not positive.  I don't
11  know what an iTouch is, and that is what I
12  wrote.  Maybe I meant IPad.  I don't
13  know.
14  Q.  In any event you instructed
15  Annie London your assistant to purchase
16  these things using funding from BC
17  Foundation Deutsche Bank Grant Fund?
18  A.  Yes, I did.  Yes.
19  MR. MARK KLEIN:  Okay. It is
20  5:21.  Why don't we break for the day.
21  What time do you want to start tomorrow,
22  9:30 or 10?
23  MR. JAMES KLEIN:  Our
24  preference would be 10.
25  THE WITNESS:  10 would be fine.

75 (Pages 294 - 297)

Page 298

1          WILSON
2      MR. MARK KLEIN:   Okay.  Let's
3  start at 10.
4          (Time noted:  5:20 p.m.)
5
6
7
8
9
10
11          JOSEPH WILSON, PhD
12
13  Subscribed and sworn to before me
14  this      day of          , 2019
15
16                  .
17
18
19
20
21
22
23
24
25

Page 300

1          WILSON
2        E X H I B I T S
3
4  WILSON
5  EXHIBIT       DESCRIPTION        PAGE
6  1     Plaintiff's Initial
7        Disclosures          14
8  2       Drawing         65
9  3     New York Times article
10        Reprint          162
11  4    Defendants' First Set of
12        Interrogatories to
13        Plaintiff         205
14  5     Plaintiff's Answers to
15        Defendants' First Set of
16        Interrogatories        207
17  6      Verification        208
18  7    plaintiff's Supplemental
19        Responses to Certain of
20        Defendants' First Set of
21        Interrogatories         238
22  8     DEF 000571 through 590      246
23  9     DEF 196 through 210        249
24  10     DEF 000211 through 216      254
25  11     DEF 00546 through 5553      267

Page 299

1          WILSON
2      C E R T I F I C A T I O N
3
4
5      I, DEBBIE ZAROMATIDIS, a Shorthand
6  Reporter and a Notary Public, do hereby
7  certify that the foregoing witness, JOSEPH
8  WILSON, PhD, was duly sworn on the date
9  indicated, and that the foregoing is a
10  true and accurate transcription of my
11  stenographic notes.
12      I further certify that I am not
13  employed by nor related to any party to
14  this action.
15
16
17
18
19
20
21      *Debbie Zaromatidis*
22
23      DEBBIE ZAROMATIDIS
24
25

Page 301

1          WILSON
2        E X H I B I T S
3
4  WILSON
5  EXHIBIT       DESCRIPTION        PAGE
6  12     DEF 00546 through 553      269
7  13     DEF 143 through 171       278
8  14     DEF 00650 and 651        285
9  15     DEF 957 through 980       291
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

76 (Pages 298 - 301)

Page 302

1       WILSON
2           LITIGATION SUPPORT INDEX
3
4
5       DIRECTION TO WITNESS NOT TO ANSWER
6       Page    Line    Page    Line
7        54     24
8
9
10      REQUEST FOR PRODUCTION OF DOCUMENTS
11      Page    Line    Page    Line
12       8      11
13
14
15
16      QUESTIONS MARKED FOR A RULING
17      Page    Line    Page    Line
18       54     2
19
20
21
22
23
24
25

Page 303

1           WILSON
2           ERRATA SHEET
              VERITEXT/NEW YORK REPORTING, LLC
3           CASE NAME:  WILSON V. CUNY
              DATE OF DEPOSITION: JANUARY 29, 2019
4           WITNESSES' NAME:  JOSEPH WILSON, PhD
              PAGE LINE CHANGE        REASON
5       _____|____|_____ _____
         _____|____|_____ _____
6       _____|____|_____ _____
         _____|____|_____ _____
7       _____|____|_____ _____
         _____|____|_____ _____
8       _____|____|_____ _____
         _____|____|_____ _____
9       _____|____|_____ _____
         _____|____|_____ _____
10      _____|____|_____ _____
         _____|____|_____ _____
11      _____|____|_____ _____
         _____|____|_____ _____
12      _____|____|_____ _____
         _____|____|_____ _____
13      _____|____|_____ _____
         _____|____|_____ _____
14      _____|____|_____ _____
         _____|____|_____ _____
15      _____|____|_____ _____
         _____|____|_____ _____
16      _____|____|_____ _____
         _____|____|_____ _____
17      _____|____|_____ _____
         _____|____|_____ _____
18      _____|____|_____ _____
19      _____
20      JOSEPH WILSON, PhD
21      SUBSCRIBED AND SWORN TO BEFORE ME
         THIS ____ DAY OF _____, 2019.
22
23      _____
24      (NOTARY PUBLIC)
25      MY COMMISSION EXPIRES:

77 (Pages 302 - 303)

|  |
| --- |
| **0** |

**000211**   254:15
300:24
**000571**   246:19
300:22
**000583**   260:5
**0023**   1:4
**00546**   267:11
269:9 300:25
301:6
**00650**   285:22
301:8

|  |
| --- |
| **1** |

**1**   14:8,11,15 42:10
57:2 60:6 73:23
88:21 112:5
124:10 125:12
139:20 165:24
175:19 191:24
210:8,10,12,16,17
210:25 239:10,14
240:10 251:20
274:7,8,12 300:6
**1,790**   176:18
**10**   35:2 254:10,13
254:16,20 256:2,9
257:18 258:7
279:17 280:6
297:22,24,25
298:3 300:24
**10,000**   178:11
271:20,25 272:10
275:22 276:3,9,10
277:19 279:4
283:20
**107**   250:6
**11**   175:19,25 176:2
182:22 192:2,11
192:13,14 193:2
267:10,13,17,21

300:25 302:12
**12**   126:21,24 163:8
178:23 189:2
192:2,14 193:2
195:6 196:8 206:6
212:24 213:6,16
232:22,24,25
234:4 269:8,11,15
301:6
**128**   283:9
**12:45**   124:15
**13**   192:3,12,13,14
193:2 207:3 278:6
278:8 279:16
280:2,6 301:7
**1392**   280:10,14
**1394**   283:23
**14**   138:20 139:20
154:23 163:11
226:19 232:22
233:2,3,7,15,16,23
235:11 236:8
256:10 273:11
285:21,23 286:3
289:5 293:5 294:3
300:7 301:8
**143**   278:6 301:7
**15**   1:4 30:22 66:9
66:12,14,16
226:20 232:22
290:13 291:2,7,11
292:7 293:4 294:8
301:9
**150,000**   201:4
236:20 286:22
287:19 288:9
**162**   300:10
**17**   141:3 294:6,7
**171**   278:7 301:7
**179**   293:16

**17th**   133:6
**18**   142:10
**18:53**   289:9
**19**   219:19,21
284:24 293:17
**196**   249:17 300:23
**1960s**   202:21
**1970s**   196:23
**1979**   179:16
**1990**   249:7
**1992**   249:8
**1997**   249:9
**1:30**   125:3

|  |
| --- |
| **2** |

**2**   17:3 42:10 56:25
59:9 60:6 65:17
65:18 73:22 87:12
177:2 178:4 180:4
202:13 244:15
251:21 300:8
302:18
**20**   30:21 66:8,11
66:14,15 73:19,20
144:4 239:20
**200**   178:10
**200,000**   189:16
**2005**   259:14
**2007**   271:13
**2008**   71:23,25 72:3
72:5,10 255:6
256:11 257:20
**2009**   71:21 252:14
253:3 257:20
260:4 261:2,8
262:2,7 264:25
293:17
**2010**   195:12
250:13 257:20
261:12 262:3
268:20 269:2,5
270:20,24 271:16

271:19 273:3,11
275:22 276:22
277:11,12,18
281:11,23 282:14
283:2,2,20 284:12
284:15,17,19
293:5
**2011**   49:10 94:13
94:15 133:13
148:24 159:20,22
195:12,12 250:13
252:9 257:21
259:15 260:5
261:18,20 262:3,8
264:25 289:9
**2012**   19:7 25:16
27:21 29:7,18
30:20 31:5,23
34:11 36:4 37:13
38:25 39:20 40:13
43:13,21 62:18
63:23 64:3,4 76:8
76:16,23 77:14
78:18,23 83:2
84:25 89:22 92:11
95:3 133:13 134:8
134:14,15,20,22
134:24,25 135:5
135:22 137:9,17
137:18,21,25
138:7,9,10,14,15
140:24 141:11
144:14,19,22,23
145:2,18 148:15
148:24 153:4,6,16
153:17 154:4,22
155:22 156:24,24
159:18,19 160:21
167:16 168:3,8,9
168:18,20 174:4
174:12 212:21

[2012 - 590]                                                                                    Page 2

213:21 214:11
216:24 228:24
229:9,10,11,20
234:6 235:25
236:2 252:15
253:3 255:6
257:21
**2013**   124:7 134:21
134:23 144:24
145:3,19,23
154:17,19,23
156:22,24 158:5
160:21 162:11
163:22,25 172:19
212:21 213:21
214:12 226:19
234:6,8,9,15,16
235:3
**2014**   101:13
106:11,14 107:7
107:10 108:7
111:25 113:5
114:16,19 124:8
156:8 158:8 163:8
164:4 172:20,25
214:3,5,15,17
224:12 225:16
235:3
**2015**   101:13
106:15 107:8,10
108:7 113:6
114:17,19,22,22
224:13 225:16
284:24
**2016**   112:7,8,12,15
112:18,20 116:25
117:10,12 118:24
122:2 157:14
179:16 230:11
**2017**   74:5,7 171:14
171:15,16 251:9

**2018**   13:19,23
16:16,20 164:3,5
171:14,14,15,16
175:5 176:5 206:6
207:3 220:7,16
239:20
**2019**   1:12 13:17
170:21,24 298:14
303:3,21
**204**   251:18
**205**   300:13
**207**   300:16
**208**   300:17
**21**   146:2
**210**   249:18 300:23
**215**   12:12
**216**   254:15 300:24
**22**   148:16 206:6
**23**   148:25 289:9
**238**   300:21
**24**   149:20 302:7
**246**   300:22
**249**   300:23
**25**   18:16,23 23:11
27:22 30:19 31:4
43:8 47:9 48:7
56:13 62:5 63:8
63:18,23 65:10
75:10,16,18 76:18
76:25 80:6,14
88:24 89:13,18
90:9 94:6,8,17
95:2 127:14
129:14,21,24
133:7 139:12
140:15 150:7
179:23 180:5
182:6 184:16
**250,000**   201:13
**254**   300:24

**26**   6:15 150:25
251:9 280:2,3,8
**267**   300:25
**269**   301:6
**27**   151:22
**278**   301:7
**28**   2:15
**285**   301:8
**29**   1:12 16:15,19
268:16,16 303:3
**291**   301:9

**3**

**3**   34:25 61:25 62:9
63:11 73:22 112:5
162:14,16,20
176:5 210:16
211:16,22 212:10
243:4,5 300:9
**3,000**   72:17,24
73:12
**30**   196:9 197:12
201:8 220:24
253:24 259:6
269:20
**300**   177:16,18
**309.84**   293:10
**31**   154:7
**32**   281:4,4 282:13
**33**   155:10
**36**   194:24 195:20
**39**   1:17 2:6
**3919**   299:21

**4**

**4**   79:14 124:9
125:12,15 139:20
144:7 205:18,20
205:24 210:7,18
211:19 222:23
233:4,5 238:7
252:2 275:3

300:11
**4,000**   73:13
**4/2011**   251:21,24
**41**   157:5
**44**   159:25
**45**   165:20,22,25
166:2,3
**46**   167:18
**47**   168:21
**49**   169:24

**5**

**5**   88:21,25 146:2
206:25 207:4,8
209:21 210:11,16
211:13,13,14,14
211:15,15 212:5,6
212:10,11,24,25
213:3,7,18 219:20
222:14 223:7
234:5 236:9 240:8
240:20 241:10
252:8 300:14
**5,000**   72:23,24
268:20,22 269:2,4
270:18,24 276:19
277:9 284:11
**5.14**   252:6
**50**   177:21 178:6,9
178:23
**51**   170:25
**52**   240:10,10 243:4
**53**   172:11
**54**   302:7,18
**55**   173:12
**553**   269:10 301:6
**5553**   267:12
300:25
**56**   174:15
**58**   174:20
**590**   246:20 300:22

**5:20** 298:4
**5:21** 297:20

**6**

**6** 154:7 208:18,20
208:24 209:20
210:6,17 212:5
219:19,21 222:17
222:24 223:6
280:10,15,16
300:17
**6/3/18** 175:22
176:6
**60** 283:6
**600** 243:12,15
244:20 246:2,5,7,9
**62** 233:11
**63.24** 274:22
**64.23** 274:20,24
275:16
**65** 300:8
**651** 285:22 301:8
**6789** 49:22

**7**

**7** 32:9 71:7 157:3
157:3 169:25
211:19 222:20,21
222:22,23 238:15
238:19 239:7,8,9
239:11,11 300:18
**7-5** 32:10
**705** 32:9,11
**75** 32:9,11
**75,000** 187:18,21
**7th** 30:19 43:8
65:10 80:19 95:8
133:6

**8**

**8** 96:16 170:3
222:14,15 245:8
246:16,21,25

259:12,20 281:8
300:22 302:12
**8,220** 276:8
**8,221** 283:11
**8,221.44** 275:18
**800** 71:7
**8200** 279:5
**83** 12:13
**8th** 95:7,9 96:7

**9**

**9** 233:4,5,13
249:16,19,23
261:8 300:23
**90** 271:8
**91** 291:5
**91st** 12:12
**957** 291:3 301:9
**980** 291:3 301:9
**99** 72:13,16 73:6
73:15
**9:30** 1:12 297:22

**a**

**a.m.** 1:12
**abide** 194:2
**ability** 5:11,20 6:5
31:7 190:7
**able** 30:3 37:20
54:2 175:16 179:5
224:9
**absence** 222:3
241:7
**absolutely** 103:4
120:24 218:11
270:12
**abstracts** 242:8
**academic** 172:8
183:15 190:20
**accept** 277:13,14
**access** 43:7 51:19
108:11 119:10

120:5 127:14,15
127:18,21,21,25
129:2,14 130:25
142:7 190:2,5
253:18,21
**accolades** 221:3
**accompanied**
22:14 99:24
**accompany** 99:11
114:25
**accomplishments**
221:7,7 222:12
**account** 265:25
266:4 267:24
288:8 293:10
296:19
**accumulate**
118:16
**accumulated** 72:2
72:5,7
**accurate** 16:24
184:20 193:12
208:9 214:5
221:21 299:11
**accusations** 85:11
**accused** 159:2
232:14
**accusing** 109:21
109:23
**acquired** 177:22
**acronym** 285:11
285:18
**act** 211:23
**action** 118:11
185:10 186:12
225:4 299:15
**activism** 202:3
**activist** 237:24
**activities** 107:18
118:17 183:13,14
272:5 273:6,16

274:2
**activity** 232:15
248:4
**acts** 146:10 158:10
215:22 223:3
226:4
**actual** 9:2,5
245:24
**acv** 190:15
**ad** 159:10 212:15
**add** 224:18
**addams** 159:25
160:6,8,17,23
161:21 164:12,17
164:21,24 165:4,9
165:14 224:14,21
**adding** 187:5
**addition** 13:2
127:22 248:6
259:18 273:16,22
**additional** 74:21
114:23 184:21
**adjunct** 282:20
**admin** 150:11,17
**administered**
185:6 186:9
**administration**
35:24 44:5,20
48:8 92:8 167:22
168:2 266:15
**administrative**
64:2,25 65:2
75:22 80:17 91:22
95:14 101:17,19
116:5,9 118:3,4,8
118:17,20 131:2
139:11 140:16
185:13 235:16
236:3,5 265:21
266:11 267:5
268:7 270:17

275:23 287:23
**administratively**
50:23 52:17
**administrator**
95:4,10 118:6,15
150:20 287:6
**administrators**
168:6
**admonished** 85:10
**adopted** 187:10
**advance** 16:19
151:9,14 266:23
276:16 288:16
**advice** 54:11
**affect** 199:21
**affirmative** 118:11
185:9 186:12
225:4
**african** 41:6,15
223:23 264:5,13
290:6
**africana** 99:5,6
106:18,25 107:11
108:7,12,19 109:5
109:13 113:4,14
114:4,7,16 115:14
115:15,18,19
116:20 141:8,19
142:5,15 143:10
143:12,16,19
223:15
**afternoon** 12:23
12:24 19:17,18
29:22
**aged** 41:7,8,16
**agency** 107:15
**agenda** 219:3
**ago** 12:3 13:15,21
81:25 86:12 92:14
119:19,21 142:18
152:9 164:19,22

168:14 169:7,12
219:2,14 227:13
230:19 275:21
**agreed** 3:5,10,14
5:3,4 143:3 175:9
202:4
**ahead** 278:22
**al** 1:9
**alive** 174:18
**allegation** 86:4
139:4 150:23
**allege** 38:13
**alleged** 76:17,24
146:23 223:3
233:10
**allegedly** 85:22
86:7 136:8 138:16
211:24 233:9,25
**allow** 6:8 129:2
170:17 221:24
**allowed** 25:22
143:13,15
**alphabet** 68:20
**amazon** 9:14,15
177:9 178:16
179:5 296:10
**amber** 294:24
295:18,21,22
**amber's** 297:2,3
**america** 8:23
**american** 41:6,15
223:23 238:3
264:5,13 290:7
**americas** 286:23
287:20
**amount** 243:24
244:3,5,11,20
245:15 246:3
270:13,17 271:9
**amounts** 192:9,10
192:16,25 193:3

271:4
**analysis** 8:21
**anderson** 265:16
265:17 287:11
288:20,24 289:5
289:12 294:18
295:12
**anderson's** 287:16
**annie** 21:6 79:18
79:22 294:11,14
294:20 296:15
297:15
**annotation** 243:18
**annual** 272:4
**answer** 4:14 5:5
5:18 6:6 7:15
23:17 25:24 28:23
34:14 37:7 40:16
44:8 54:23 56:4
57:19 59:17 69:3
72:3 88:9 89:11
109:2 142:3 143:8
147:8 186:23
208:8 210:4
258:25 279:13
281:14,21,24
282:20,22 283:4,7
283:10,12,17,23
284:2,5,9,13,18,21
302:5
**answered** 187:15
**answering** 6:10
**answers** 5:12,16
5:21 206:14 207:2
209:8 278:19,22
284:23 300:14
**anybody** 10:10,12
10:14,21 20:25
24:9 25:4 28:25
40:18 44:18 55:6
103:2,20 104:16

105:14 113:16
119:5 120:11
137:12 183:22
240:22
**anyone's** 83:7
**apartment** 12:10
12:11,12,17 13:3
**apologize** 125:16
260:10
**apparently** 251:15
270:5 284:21
296:20
**appear** 112:9
**appearance**
151:14 160:19
**appears** 96:20
128:12 189:3
210:15,21
**apple** 193:11,25
194:24,25 195:7
293:16 296:5
297:4,7,9
**application** 266:16
287:24
**apply** 266:17
**applying** 174:12
**appointment**
275:11 282:3,18
282:21
**appointments**
172:9
**approved** 251:8
266:21,23 287:25
288:2,13,16
**approving** 288:12
**approximate** 68:7
178:18
**approximately**
11:19,20 13:4
19:7 20:7,10
29:15 30:21,22

32:4,12 34:8
66:10,11,15 68:12
70:24 71:3,4,19,21
73:18,19 158:6
171:21 177:15,16
177:18,21 178:8,9
179:15 182:9
203:15 243:24
244:16,17 246:12
264:23

**approximation**
14:3 34:16,22
72:21 73:9,10,11
73:12

**april**  116:24
117:12 118:24
122:2 251:24
252:8

**arbitration**  105:24
106:5 114:24
225:24 247:14
250:7 255:10,15
268:11 269:22
270:3 272:14
276:19 279:17
280:17 284:24
285:7 286:17
291:6 292:22

**arbitrator**  165:14
225:24 226:7

**archival**  88:2
174:24 200:7
201:16,24 204:8
204:21 205:11
242:10,13,16,17

**archive**  202:2

**archived**  87:23

**archiving**  202:6
204:7

**area**  24:4 80:17
95:6 176:25

190:11

**areas**  75:22 87:13
287:7

**argue**  221:13

**argumentation**
221:22

**arises**  97:10

**arms**  33:20,23
34:10,24 40:8,11
40:19 41:12 42:4

**army**  225:7,8

**arranged**  115:5
117:17

**arrangements**
112:20,25

**arrive**  28:21 177:4
178:14 187:23
189:19

**arrived**  29:3,23
56:18 111:14,15
192:17

**art**  47:16 194:11

**article**  151:15,16
151:20,21 160:20
160:23 161:18,22
162:6,10,15,24
163:5,8,13,17,21
163:24 164:15
169:19 170:18
172:24 173:8
215:15 227:18,21
227:24 228:3,10
300:9

**articles**  164:25
187:4,7

**arts**  50:14,19
133:4,5 194:12
214:24 233:10

**ascribe**  178:10

**ascribed**  192:10

**aside**  5:24

**asked**  23:15,15
36:19,19 37:9,10
38:20 39:5 42:9
51:3,16 52:2
54:11 58:11 59:19
74:8,10 77:11
82:3 92:20 97:16
97:21 109:12
113:18,22 116:7
116:11 119:12
123:11,13,18
140:21 152:15,18
159:4 167:8
170:13 175:6
194:13,22 206:13
209:22 211:7,10
215:16 225:10
231:16 235:9
290:6 297:2

**asking**  4:13 24:17
37:5 54:12 57:13
58:7 90:7 97:19
97:20 106:12
122:22 123:21
124:3 126:11
135:9 136:24
193:22 249:4,6
281:15 287:10
295:11

**asks**  211:22
222:24 233:23
271:9 272:3

**aspect**  263:19

**asserts**  211:25

**assigned**  295:23

**assignment**  273:23

**assist**  120:3 167:8
172:8 240:22

**assistant**  62:16
278:24 294:15

297:15

**assistant's**  181:23
182:14

**associate**  148:5

**associated**  153:12
255:22

**associates**  10:16
10:17

**assume**  5:6 294:22

**atlanta**  152:4

**attempt**  44:3,11
52:24 53:6

**attempted**  44:12
157:9

**attempting**  15:25

**attempts**  224:20

**attention**  17:3
88:20 125:12
126:20 155:9
156:9 157:2
159:25 175:19
211:12 212:9
219:19 279:25
293:2

**attorney**  2:13
84:11,22 97:11,14
103:8,11,13,15
105:10 121:7
123:20 280:20,21
280:22

**attorneys**  2:5,14
3:5 123:20

**attribute**  222:12

**august**  269:2
289:8

**authorized**  140:2

**authors**  70:9
177:22

**available**  161:5,6
169:23 224:2
258:10

**awards** 188:6 293:15

**aware** 52:21 57:12 58:15,16 59:4,6,13 99:9 110:22 131:6 132:19 135:19 136:3,7 137:11 138:2,11,15 139:3 140:11,14,17,23 144:17 147:10,20 158:9 201:24 208:12 226:4 254:2 262:5 273:15

**azoula** 148:25 149:14,17 235:13

**b**

**b** 2:10 96:18 157:6 189:6 273:13 274:7,8,12 275:3 300:2 301:2

**back** 30:20 31:4 37:22 38:6,21,23 45:14 47:18 48:18 56:24 65:13 73:21 88:20 104:23 113:3 121:20 125:4 153:15 165:23 170:16 172:4 191:8,22,24 196:7 197:3 215:24 218:9 219:15 245:4 260:23,24 263:5 285:18

**background** 225:20

**bad** 5:17,19 137:13

**badge** 41:25

**bags** 111:8

**bank** 263:9,11 265:3 286:23 287:12,20 288:8 295:2,4 296:19 297:17

**bankers** 203:22,23 203:25 204:4

**banned** 43:6 74:16 82:19 84:16,19 95:8 142:6

**banning** 80:19

**bar** 8:20 241:14 243:7 244:4

**barbara** 44:13,25 46:9 49:12,18 126:21 127:3,11 127:14,17 129:20

**base** 7:8

**based** 103:25 105:9 135:10 136:2,6 139:22 172:23 216:23 248:10

**basically** 145:10 148:5 190:8 214:25

**basis** 48:9 94:17 105:9 129:17 130:21 139:8,13 272:24

**bates** 246:17,19 249:17 251:18 254:14 260:8,12 260:13 267:11 269:9 278:6 285:21 291:2,3

**bc** 167:21,25 234:9 294:25 295:4 296:18 297:16

**bearing** 245:8 246:16 249:17 254:14 267:11 269:9 278:6 285:21

**befit** 189:9,11

**beginning** 79:5 212:21

**behalf** 265:19 266:8

**behavior** 156:2

**belief** 209:11,14 240:3

**believe** 7:4 19:18 21:7 22:6 32:8 43:3,22 54:21 58:17 72:14 94:21 94:24 99:4,5 104:25 105:4 106:7 122:25 123:6 140:5 144:23 154:18 155:15 159:5 160:20 161:10 171:14 176:6 183:23 202:18,19 204:19 224:15 228:15 229:11 259:17 263:23 284:18 287:4 296:24

**believes** 57:12

**bells** 294:21 295:13

**benefit** 189:12

**benjamin** 204:19

**bermanson** 262:20

**best** 4:25 13:12 14:2 17:12 31:7 34:15 51:13 58:13 62:20 72:21 73:11

74:2 80:9,12 91:8 107:4 141:22 148:11,14 162:8 188:9 208:7 209:10,12,13,17 240:2

**beyond** 138:10 164:2

**big** 73:14 151:21 177:10 203:18

**bill** 172:11 231:25

**bit** 141:4

**black** 8:22 241:18 241:19 242:2,3,12 285:9

**blank** 30:24

**blow** 5:22,24

**bmi** 270:10 271:2

**board** 62:2,11,12 63:5,19 65:21 73:22,24 74:4,24 228:16 251:8

**bob** 169:25

**book** 120:9 122:23 123:12,22 241:19 248:14

**books** 8:17,18 51:21 69:19,21,23 70:2,7,12,18,19,23 70:25 71:2,4,7,10 71:25 72:8 103:2 103:21 105:15 108:8 113:7 117:5 117:20 119:2,13 176:12,22 177:2 177:11,12,25 178:4,24 179:4 188:12 204:22 205:11 241:15,20 241:22

**bookshelf** 87:22
178:2,3
**bookshelves** 66:23
69:5,8,10,16 71:6
181:17
**bottom** 17:3 42:9
56:25 59:9 60:5
61:21 70:15,21
144:7 169:24
182:22 186:4
210:7 212:24
213:6 235:9 251:6
251:21 261:6,22
293:3 294:11
**bound** 87:25 88:2
88:13,15 238:23
**box** 87:19,21
203:24,25 204:3,5
204:6 273:21
**boxes** 80:21,24
81:3,6,14,17,19
86:13,14,19,24
87:2,8 98:11
102:10,10,13,15
102:18,24 105:22
122:11 202:5,9,15
202:18 203:8,12
203:13,19,20,21
203:22
**boylan** 99:8 100:3
100:8,11,19,22
101:11,16 105:23
113:11,12 114:4,6
114:17
**break** 6:3 124:12
125:24 158:21
191:4,12 238:11
297:20
**brief** 12:4
**brier** 157:6,13,19

**broadcast** 173:16
174:10
**broadway** 1:17
2:6 18:16,24
23:11 27:22 30:20
31:4,19 43:8
47:10 48:7 56:13
62:5 63:9,18,23
65:10 75:10,16,18
76:19 77:2 80:6
80:14 88:24 89:13
89:18 90:9 94:6,9
94:17 95:2 127:14
129:14,21,25
133:7 139:12
140:15 179:24
180:6 182:6
184:17
**brooklyn** 25:8
39:24 44:4,19
47:21,21 53:5
55:3 83:5 84:17
91:11 98:10,12,16
100:4,5 105:25
106:22,22 108:13
111:20 121:25
122:21 127:6,16
130:5 141:9
143:18 166:12
168:5 173:25
184:18,22 199:14
223:15,18 234:12
237:7,9 247:7,11
247:21 250:12,16
251:13 252:13,15
252:21 253:12,23
255:2 259:6
262:25 264:7
265:24 266:6,10
266:13,19 267:3
273:5,17 285:10

287:5 288:8
**brotherhood** 8:21
**brought** 55:4
**brown** 34:7,9
**building** 23:10
100:7
**business** 100:12
101:3

**c**

**c** 2:2 6:16 75:5
96:18 265:8 287:3
299:2,2
**cabinet** 179:25
180:3,6,14 185:4
186:4 198:17
**cabinets** 66:22
67:15,17,25 68:4,8
68:14 180:12
181:9 198:17,18
198:20 237:11
**calendar** 13:16,19
13:23
**call** 8:11 48:15
79:11,11 272:2
**called** 48:21 49:17
79:13 123:2 145:5
166:12 170:15
190:20,20 217:7
230:14 231:4
242:7 247:6 263:9
265:7
**calling** 132:7
**calls** 58:4 59:12
62:25 128:10
130:19 131:19
136:12,18,22
140:6 142:2 143:7
146:17 147:5,14
165:6 230:16
**camera** 102:8,9,17

**campus** 47:21
83:5 84:18,20
100:5 106:22
115:7 141:18,24
142:6 182:15
183:10 184:7,13
184:18 197:18
198:8,10 199:12
199:13
**capacity** 62:15
129:23
**capital** 157:24
285:12
**car** 8:22
**cardboard** 203:21
**care** 47:7,17
**carefully** 7:22
208:11 241:5
250:19 252:18
271:11
**carlos** 44:16 45:2
52:13
**carried** 33:17,20
159:23
**carry** 33:10
**carrying** 26:5
35:14
**case** 1:4 6:17 82:6
90:25 91:4 92:16
105:25 125:14
142:20,24 157:19
160:7,10,12
168:11 171:3
175:7 192:2,18
205:9 212:2 303:3
**categorized**
102:11
**category** 68:25
175:21 192:4
287:24

cause  158:11
causing  158:12
cba  1:4
ceiling  69:13
center  21:2 23:7
  23:22,23 36:5
  47:25 62:13 72:12
  72:16 73:5 74:13
  80:15 82:19 84:17
  102:4 107:22
  139:17,23 145:12
  152:3 153:21
  176:24 184:22,25
  185:7,12,14,25
  194:9 195:17,21
  195:22 197:19
  198:4 202:10
  204:15 214:23
  216:15 217:16,20
  218:2 220:7,11,13
  220:25 222:4,9
  234:13 241:25
  242:16,18 294:15
central  99:4 114:9
  114:12 238:4
certain  239:25
  248:23 300:19
certainly  75:21
  97:12 122:15
  279:3
certify  299:8,13
cetera  177:23
chain  286:12,21
chair  49:9 67:8
  224:3 257:9
  262:17,19
chairman  46:12
  46:17 49:5
chairmanship
  49:10

chairperson  141:7
  141:14
chairs  66:24 67:6
chance  259:21
change  125:25
  126:6,12 130:24
  191:12 249:10,11
  278:18,21 279:5
  303:4
changed  43:4,17
  129:15 250:19
changing  279:12
chaotic  102:13
charges  97:4,23
  158:10
charles  91:18,23
  92:2,5,6,13 93:20
  183:23 196:14,17
  196:20,23 197:8
  198:6 201:10
  236:11,15 237:2
check  35:23 214:7
  218:10,13,17
  267:2,25 274:6
  286:22 287:12
checked  273:21
checks  225:20
cheng  131:13
  132:3,17,20
  133:16,20,23
  134:2,11,17,23
  135:13,16,23
  136:4,8 137:10,14
  137:22 138:3,16
  138:20 139:5,10
  139:21 140:12
  144:2,11,21,25
  145:6,8,10 149:12
  149:17 150:4,22
  151:5 152:17,19
  153:6,7 157:9,15

211:24 212:12
  213:7 214:5,9,17
  214:19 215:16,18
  216:4,19 217:12
  217:18,23 218:8
  220:14 221:15,24
  227:20 231:17,18
  232:9,13 233:9,24
  235:18,23 236:4
cheng's  149:4,7,10
  149:24 150:11
  152:25 235:16
cherry  146:3,16
  146:24 147:12,22
  148:13
chris  2:8 10:11,25
chronology  68:21
  68:25
circumstances
  119:20
cited  242:14
city  12:15 24:2
  44:17 45:25 52:14
  90:4 186:14
  226:14 252:3
civil  202:3
claim  211:25
claiming  205:7
claims  223:2
clarification  20:12
clarify  153:3
  179:20 245:11,25
  290:5
class  22:23,25 23:2
  35:15,17,19
classes  36:2,3,7
  47:15
clean  145:11
  217:23
cleaning  93:25
  95:10 96:6

clear  6:2 138:13
client  63:3,4 97:11
  97:14
clipping  187:6
closed  28:12,16
  111:11,12
closely  227:4
closer  70:15
  172:25 214:14
closet  109:16
  110:7,11,15,20
  111:22 127:19
  128:2 182:5,6
  198:5
clothes  26:13
cloud  218:4
coffee  111:8
cold  5:18,19 6:5
collaborated
  229:23
collaboration
  158:11
colleague  40:22,24
  224:3
collected  259:19
collection  117:6
  117:20 118:25
  120:10 122:23
  123:22 174:23
  175:17 242:10
collections  174:25
  242:23
college  24:2 25:9
  39:24 44:4,17,19
  47:21 52:14 53:5
  55:4 83:6 84:18
  91:11 98:10,12,16
  100:5 105:25
  106:22 108:13
  111:21 122:2,22
  127:6,16 139:16

[college - consulting]

Page 9

141:9 143:14,18
168:5 173:25
184:22 187:11
199:14 223:15,18
228:15,18 234:12
237:8,9 247:7,11
247:21 250:12
251:14 252:14,16
252:22 253:13,23
255:2 259:6 263:2
264:7 265:24
266:6,10,14,14,18
266:19 267:3
273:5,18,23
285:10 287:5,25
288:5,11
**college's** 130:5
250:16
**collin** 103:17
**color** 8:20 203:20
241:14 243:7
244:4 294:23
**columbia** 183:25
223:19,24 225:5
**combination**
188:19 244:9
**combinations** 11:4
**come** 48:18 51:18
70:13 111:20
151:16 155:25
162:10 245:4
296:18
**comes** 225:21
**coming** 75:20
145:10 151:21
163:14 164:15
**comment** 217:4
**comments** 220:14
228:12
**commission**
303:25

**commitment**
174:8
**committee** 159:6,9
159:10,11 238:4
**committees**
118:13,14 203:3
**common** 111:13
**communicate**
17:21
**communicated**
17:9
**communication**
54:10 122:20
123:19 124:3,5
**communications**
45:17 54:6 97:20
**communist** 238:3
**community**
263:24,25 264:22
265:12,22 266:12
267:6 270:9,13
271:22 275:24
276:21 295:6,7,8
**compensation**
271:9 273:25
**complain** 113:20
113:22 121:3
**complained** 95:12
96:2 104:5,13,17
121:7
**complaining**
105:14
**complaint** 223:4
233:11
**complete** 5:11,15
5:21 6:6 112:10
200:21 270:12
274:3,7
**completed** 256:15
256:18

**completely** 7:8
63:14 122:18
**complicated** 60:20
237:19 279:10
**complicatedin**
190:4
**complies** 31:8 67:5
70:20
**compound** 57:8
89:8
**compromise**
221:22
**computer** 36:21
36:23,25 88:23
89:3,17,23 90:2,3
90:8 91:10 188:17
188:22,24 296:3
**computers** 111:18
167:3
**concern** 37:21,23
47:5,17
**concerned** 48:23
52:19,20 96:14
109:25 120:21
**concerning** 183:2
**concerns** 46:23
**concluded** 221:23
**conclusion** 97:13
128:10 130:20
131:20 132:8
136:12,18,23
140:6 142:2 143:7
146:18 147:6,15
**conclusions** 97:19
**conduct** 19:9
37:21 48:24
212:16 214:25
**conducted** 18:15
**conducting** 51:22
**conference** 100:12
100:24 101:3,10

101:15 105:23
114:18 171:9,13
**confess** 155:25
**confirm** 209:16
235:4
**confiscate** 91:23
92:3,7 93:11,14
**confiscation** 91:21
**conflicts** 216:14
**confusing** 57:8
**confusion** 234:11
279:3
**congratulations**
289:20
**congress** 26:22
53:9,25
**connection** 55:2
105:24 107:21
211:2 229:3 265:4
265:11,20 275:23
276:20
**conscious** 222:5,8
**conservative**
243:25
**consider** 50:5 70:2
88:4,10,13,17
118:19
**considering**
189:20
**consist** 187:3
**consortium**
226:11
**constituted** 276:9
**consultancy**
224:25
**consultative**
273:24
**consulting** 158:12
169:3 227:9
228:22,23 229:5
229:14 230:3

**contact** 45:5,8
50:21 51:5 52:16
91:3
**contacted** 44:24
45:12,21 51:10
53:13 56:12
109:18 167:8
224:6
**contained** 86:15
**containers** 95:16
95:19 96:3
**contains** 289:5
**contemporaneou...**
134:12 215:4
**content** 233:8
**context** 128:19
249:12
**continue** 191:16
**continued** 125:9
**continues** 213:11
223:4
**continuously**
124:8
**contracts** 288:11
**contribution**
220:12
**control** 128:25
131:3,10 139:11
139:23 140:16
**controversial**
227:5
**controversy**
196:24 224:8
**conversation**
51:15 52:23 76:9
76:14 77:13 89:16
170:20 227:17
231:7,15
**conversations**
49:12,25 52:7
59:25 61:2 78:17

78:19,22 103:25
232:19 235:23
**conversion** 97:2,6
97:17 127:7 128:8
128:14 130:13
131:5 138:24
140:8,9
**cooperate** 91:8
**coordinating**
203:2
**copied** 116:7
294:17
**copier** 294:23
**copies** 115:23,25
116:5,10,16
178:17 188:14
262:23,24 291:20
291:22,24,25
292:2
**coprincipal**
263:16,22 264:21
**copy** 39:14 40:2
60:17 125:18,20
190:17,22 237:13
237:15 239:2,3
259:12 260:7
262:21 291:19
**copying** 246:17
260:11 291:3
**corazone** 257:12
257:14
**corner** 270:2
280:5
**correct** 13:7 16:7
17:6,7 19:3,22
20:21 23:8,9 28:4
28:5 32:20,21
33:21 36:14 39:7
40:8,9 42:14
43:14,15 45:4
46:14 47:22,23

55:4,5,15 56:19
65:9,11,12,23
66:13 67:10 72:18
77:3 80:8 82:20
89:3 93:23 94:7
94:20 96:21,24
100:6 106:19,20
106:23 107:25
108:2 110:18
122:7 126:9,22
127:3,4 130:6,7
133:21 135:25
138:21 140:9,10
142:11,12 143:23
144:5,6,8,13,16
146:6,7,13 148:17
150:8,9 151:2,3,23
151:24 152:6
160:16 161:2
163:11 171:4,5
173:8,13,14
174:14,16,17
176:4,12,20
177:19 178:5,13
178:21,22 179:12
181:11,20,25
184:18,19 187:19
190:15 192:7,8,12
192:18,19 196:10
196:11,15,16,18
201:3 205:11,12
207:14 208:16
209:10 210:22,23
211:16 212:21,22
216:6 229:8
235:12,14,17
239:21 240:5,16
240:17 247:12
253:17 255:3,4,8
255:11,12 256:19
256:20 257:21

258:16,17 259:7
259:11 261:2,3,12
261:18,22 262:3,4
263:7 265:5 267:8
268:8,9,13,17,20
268:21 269:3,6
271:22,23 273:11
273:12 274:18,19
274:22 276:2,7
277:20 279:19,20
280:25 281:5,8,9
282:23,24 283:12
284:5 286:24
287:14 288:21,22
289:17 293:18,22
294:4,5,16,18,19
295:10,15 296:7
296:12
**correspondence**
107:14 200:18
203:5 243:22
**corresponds**
283:13
**cory** 61:6 66:2
74:18
**council** 151:13
**counsel** 9:25 10:3
10:7 11:6,12,25
12:6 13:5,9,13
14:4 15:18,24
16:4,5,8,11 39:24
53:24 54:7,14,19
122:21 206:23
238:25
**counsel's** 60:16
**couple** 12:21
17:14,17 39:2,4
45:12 51:7 81:24
112:24 142:18
152:9 215:8
257:11 258:4

264:23
**course** 110:24
242:21 255:14
268:11
**courses** 35:21
**court** 1:2 3:18
4:20 6:10
**cover** 278:2
**craig** 236:4
**crazy** 49:21
**create** 71:9,12
241:6
**created** 179:16
186:20,25 188:22
221:19
**criminal** 97:4
145:11 146:10
148:7 153:11,13
156:2,2,11,12
212:16 213:19
215:21,22 218:4
226:4 232:14
290:8
**criminality** 215:21
**criminalization**
217:25
**criminalized**
153:8,8,9 217:22
231:20,21,22
232:7
**criminals** 148:6
**crook** 215:3,14
216:20
**cubic** 179:15
180:7 182:9 186:3
**cunningham**
142:11,14,17
143:22 223:13,14
223:17
**cunningham's**
109:5,13 224:2

**cuny** 7:18,21
45:25 51:22 52:25
53:3,6 55:4 99:4
106:2 114:9,12
122:21 165:5,10
165:12 167:3
201:23 213:8
225:25 251:8
268:16 269:20
273:18 274:3
280:17 291:5
293:14 303:3
**cuny's** 6:23
**currah** 49:5 61:7
61:17 158:18,24
159:4 227:23
235:20,21
**currah's** 109:16
**current** 272:4
274:14
**curriculum**
190:21 241:4
**cut** 58:22
**cv** 1:4 190:3

**d**

**d** 48:12
**dad** 199:19
**daily** 47:14 48:9
**damage** 158:13
168:25
**damaged** 175:20
192:4
**damages** 211:25
**dash** 289:16
293:14
**data** 190:6
**date** 17:11 19:4
107:6 111:23
126:8,14,16
162:12 167:12
175:22 176:5,8,9

206:4 233:23
234:19 235:12
261:7 299:9 303:3
**dated** 16:15 206:6
207:3 256:10
**dates** 99:20 141:15
218:10,11,13
234:5
**david** 159:25
183:21 184:2
224:14
**day** 13:11 19:16
25:15 26:18 28:3
29:7,9,16,18 34:11
37:12 38:12 40:12
62:17 111:14
119:12,12,18
120:8,13,14
134:13 141:4,17
141:24 164:10
297:20 298:14
303:21
**days** 43:19 47:17
48:22 83:22
188:20 243:12,15
244:20 246:8,9
**dealing** 186:11
**dean** 44:15,17,25
50:8,10,10,14,16
50:19 51:5,10
52:7,13 83:16
85:8,10 149:9,11
167:18
**dear** 256:14 293:7
**debbie** 1:18 299:6
299:23
**debevois** 204:9,16
**decades** 111:11
202:3
**december** 239:19
281:23 283:2

293:17
**declared** 209:6
239:22
**def** 246:19 249:17
251:18 254:14
260:5 267:11
269:9 278:6
285:21 291:2
300:22,23,24,25
301:6,7,8,9
**defamation**
131:13,16,23
132:3,6,14 136:15
136:19,21 137:5
138:25 140:20,23
143:23 144:2,18
146:5 148:20,23
151:9 154:9,11,15
158:11,15 169:2
213:8
**defamatory** 97:3
97:23 132:19
135:16 136:9
137:22 138:3,17
146:15,23 147:11
147:21 150:23
152:16,20 153:2
155:2,5,17,20
170:5 172:13,15
172:21 173:3,6
212:13 213:15
214:16 220:14
228:11
**defendant's** 208:8
**defendants** 1:10
1:15 2:14 205:18
206:8 207:2
239:25 300:11,15
300:20
**defending** 197:4

**defense** 225:6,8
**defer** 193:24 194:3
**deferring** 192:20
**definitely** 236:3
**definitive** 122:16
  122:18 190:14
**delivery** 18:4 57:6
  58:2 59:8 60:5
  61:12
**dell** 294:24 295:18
**denied** 223:9
**department** 46:13
  46:18 49:6 50:20
  110:12,16 141:8
  142:13 225:6,8
  262:14
**departmental**
  257:5,8,24
**depending** 68:21
  249:11
**deposed** 4:9
**deposition** 1:14
  7:12 8:8,16 9:18
  10:6 11:7,13,22
  12:2,7 13:5,10,14
  13:24 14:4 17:22
  58:22 267:18
  303:3
**describe** 41:4,17
  64:17 145:5
**described** 9:17
  41:14 42:3,16
  55:14 57:11
  117:13 137:8
  236:14,19
**describing** 28:4
**description** 85:21
  112:4 300:5 301:5
**designation** 32:7
**desk** 67:9 75:18
  80:16 87:17

180:14 181:4
  182:13 196:3,4
  197:21,22 198:20
  202:16
**desks** 66:22,25
  67:2,4,6,12 180:23
  195:18 198:19
**destroyed** 76:3
**destruction** 18:2,7
  42:18 57:4,24
  59:7 60:3 61:11
  62:4,22 63:8,17
  75:9 76:11,18,25
  80:5 94:5,25
**detail** 207:9
**details** 82:9 148:2
  148:9 159:3
  175:16
**determine** 33:2
  36:13,17 37:2,13
  177:7
**deterrent** 169:2
**deutsche** 263:9,11
  265:3 286:22
  287:12,19 295:2,4
  296:19 297:17
**develop** 174:7,9
**developed** 186:14
  187:9,13
**diagram** 202:12
**die** 47:3,6 48:17
**different** 28:8 65:6
  65:8 98:15,17
  99:2 100:22 109:8
  163:17 179:22
  198:19 203:3
  211:17 215:23
  216:8,12 234:22
  236:18 278:3
**difficult** 160:25
  165:2 190:11

**diligent** 256:5
**dimension** 177:13
**dimensions** 30:18
  66:8 68:8
**direct** 17:2 31:10
  155:9 156:9
  159:24 175:18
  211:12 219:18
  279:25 292:12
  293:2
**directed** 92:9 93:6
  93:8,11,21 241:25
**directing** 54:23
  88:20 125:11
  126:20 157:2
  212:9
**direction** 91:23
  302:5
**directly** 96:15
  150:4,22
**director** 133:3
  139:18 160:2
  184:23 185:17
  221:4 226:10
**director's** 185:17
**directors** 224:4
**disclose** 270:15
  284:7 288:6,15
**disclosed** 6:15
  270:23 271:24
  272:9,17,21,23
  276:3,17 277:8
  283:15,25 284:16
**discloses** 274:17
**disclosure** 6:14
  59:10 193:15,17
  193:18,19 272:2
  277:18
**disclosures** 14:10
  62:3 125:13
  132:10 191:25

300:7
**discoverable** 17:6
  63:6 127:2
**discovery** 7:5
**discrimination**
  186:12
**discuss** 52:5 56:6
  75:25 82:9 257:9
**discussed** 57:20
  61:19
**discussion** 22:11
  24:8,13 25:2,7
  191:20
**discussions** 54:20
  60:9
**disheveled** 102:11
**display** 47:13
  194:8,15
**displayed** 221:6
**disposed** 227:16
**dissertation** 242:7
**distance** 25:20
**distances** 28:10
**distinction** 90:2
**distinguished**
  184:3 201:23
**district** 1:2,3
**diversity** 102:4
  184:23,25 185:7
  185:12,14,25
  186:13 197:20
**doctor** 50:5 60:21
**doctoral** 242:8
  295:23
**document** 14:9,13
  14:16,18,21 15:2,6
  16:9,13,15,23 17:4
  60:11 162:18
  189:5 190:7
  199:24 205:18,22
  207:6 208:5,13,15

208:19,22,25
220:11 233:4
238:20,24 239:14
240:7,9,9,12,19,23
241:2 245:8
246:16,23 249:21
250:24,25 252:7
254:14,18,21
267:11,15 268:10
269:8,13,16 278:6
278:10 285:21,25
291:2,4,9
**documentary** 8:20
219:23 220:23
**documentation**
214:21 243:17
**documents** 6:22
51:20 68:15 69:21
99:7 100:21 101:5
101:7,7,8,10,22
167:4 175:20
188:6 190:6 192:4
202:25 205:10
218:15,18,21
219:6,8,12,16
236:18 241:7,9,12
242:12 246:19
249:17 263:4
270:11 290:16
302:10
**doing** 17:18 22:7
46:2 74:9 289:21
**dollar** 192:10,16
192:25 268:23
287:19 288:9
**dollars** 109:22
205:9 279:2 290:2
**dominick** 230:18
**don** 173:5 174:16
201:18,22 202:7
203:9 212:13

215:11
**donor** 265:3,11
**door** 28:11 29:25
32:18 43:4 70:13
75:21 108:14
111:10,16,17
115:10,12
**double** 35:23
214:7 218:10,13
218:17
**dr** 1:6,14 4:2,7
7:10 8:12 14:14
15:3 30:23 37:9
59:3,17 65:20
67:22 96:19 125:6
125:11,22 162:19
171:22 182:17
191:10,24 193:22
205:23 208:23
227:23 238:18
240:12 246:24
249:22 254:19
267:16 269:14
273:3 284:22
286:2 291:10
**draft** 16:9,12,16
16:20 208:3
**drafted** 176:10
**draw** 31:3 67:3
207:24
**drawers** 197:21
**drawing** 65:13,17
180:5 288:11
300:8
**drawn** 66:6 87:11
180:17 181:6
202:13
**drew** 32:3,6
207:21,23
**drives** 36:22,23,25

**duly** 4:3 125:7
299:9
**duplicating**
190:24

**e**

**e** 2:2,2,17 4:2 6:19
39:9,10 40:2 45:9
45:17,18,19 96:18
96:18 105:13,19
120:25 121:6
122:25 123:6
125:2,2,6 155:14
155:14 157:6,24
157:24,24 169:25
169:25 172:12
189:6 195:2
254:25 255:18,20
255:21,25 256:4,9
256:14 258:8
285:3 286:12,12
286:21 287:3
288:19,25 289:5
289:16 292:9
293:4,7 294:3,10
294:20 296:5
299:2 300:2 301:2
**ear** 25:20
**earlier** 121:19
214:10 220:18
**early** 29:22 133:13
134:7,14,15,24
135:5,22 137:9
144:14 159:19
229:19 230:11
**easel** 47:11,12,13
47:13,13,16,18
48:13,17 49:13
129:10 193:10,25
194:4,5,6,7,12,13
194:17,20

**easels** 194:18,18
**east** 1:17 2:6 31:11
66:12,16 69:12,14
181:18
**easy** 279:10
**eaton** 255:2,18
256:10 257:7
**eaton's** 258:8
**ebony** 202:21
**economic** 158:13
168:24 222:25
**economy** 8:25
**ed** 221:4
**edification** 245:12
**editing** 230:2
243:19
**editions** 179:2
**editor** 170:17
**education** 21:3
23:7,22,23 36:6
48:2 62:14 72:12
72:16 73:6 74:13
80:15 82:20
107:22 139:17,24
145:12 167:9
176:24 186:13
194:9 195:17,23
198:4 202:11
204:15 214:23
216:16 217:16,20
218:3 220:8,11
221:2 222:10
226:11 228:16
241:25 266:15
288:2
**eeo** 225:3
**effect** 3:16 251:13
253:3
**effective** 250:13
**effort** 32:25 36:17
37:2,13

**ehrlich** 287:2,10
287:16 288:19
289:6
**ehrlich's** 288:24
**eight** 9:9 14:6 20:7
20:10 34:21 70:5
176:16 177:17
274:17,20,21
281:19 283:14
**eighth** 260:20,24
**either** 8:4 22:12
25:3 26:16,23
32:11 50:18
103:19 122:20
159:9 198:2 235:3
**elected** 49:8
**electronically**
261:21
**element** 248:22
**elements** 121:9
**else's** 155:2
**emeritus** 150:8
174:16
**emily** 288:20
**employ** 161:2
**employed** 247:10
247:20 252:15
299:14
**employee** 62:14
74:12 75:16 80:14
89:2,12 101:22
107:17 118:12
127:6
**employees** 130:23
**employment** 7:18
7:20 74:10 118:12
161:20 164:12,17
164:21,24 169:9
171:6 172:5
182:21 183:2
189:5,16,23

190:10 223:9
226:16 229:18
248:3 273:17,24
**empower** 285:16
285:17
**empty** 95:15
**enchantment**
189:6,9
**encourage** 264:6
**encyclopedia** 9:2,3
9:6,7,8,11 70:3,5
176:15 242:20
**ended** 228:25
249:13
**engaged** 212:16
213:7 231:6
**engaging** 85:22,24
86:7 232:14
**enigmatic** 46:4
**enter** 47:20 49:12
264:15
**entered** 19:14
20:18 22:4
**entering** 29:6
56:13
**entire** 69:10,12,14
**entitled** 9:24
**entry** 42:9 56:24
150:7,10 151:22
154:7 155:16
157:5,21 168:21
173:13 174:15
**envelope** 102:12
**environment**
227:2 231:19
232:6
**equipment** 88:23
89:3,17,24 90:2,3
90:9 91:10
**equivalent** 28:9

**erica** 151:23
212:14 215:9
218:7
**eris** 273:5 281:20
285:3,8,12,14
**errata** 303:2
**escapes** 228:19
**esq** 2:8,10,17
160:2
**esquire** 168:22
**essentially** 142:25
217:23 226:22
231:23 232:10
264:7 289:20
**estimate** 187:25
188:7 243:25
244:2,5,20
**estimating** 195:24
195:25
**et** 1:9 177:23
**evaluations** 188:5
**evening** 12:23
29:22
**event** 27:21 28:3
235:25 297:14
**events** 47:14
107:19 118:17
142:24 194:16
241:24
**evers** 166:16,21
167:2,11
**everybody** 153:12
215:13 218:5
231:20 232:7
**evidence** 146:10
219:24
**evolved** 254:6
**evolving** 121:18
**ex** 225:20
**exact** 11:9 17:11
34:14 50:12 72:19

99:20 107:6
111:23 141:15
162:12 167:12
177:13 223:22
**exactly** 34:20 71:8
72:24 73:25
108:25 109:3
122:3,5,6 130:2
134:4 218:6,17
258:13
**examination** 3:14
4:6 125:9
**examined** 4:5
102:10
**example** 70:3
137:19 242:2
244:15 248:13
**exchange** 123:6
197:5,6
**exchanges** 26:2
**excluded** 247:23
**exclusion** 222:5,6
222:8
**exhibit** 14:8,11,15
42:10 56:25 60:6
60:11,13 65:17,18
73:23 87:12 88:21
112:5 124:10
125:12 139:20
162:16,20 163:7
165:24 175:19
177:2 178:4 180:4
191:24 202:13
205:17,20,24
206:25 207:4,8
208:18,20,24
209:19,19,20,21
210:7,11,16,18
211:13,14,15,19
212:6 213:3
219:20 222:14,23

223:7 232:22
233:4,5 234:5
236:9 238:15,19
238:23 239:7,8,9
239:10,11,14
240:8,20 241:10
245:7 246:15,21
246:25 247:14
249:16,19,23
250:6 254:10,16
254:20 255:9,14
255:16 256:2,9
257:18 258:7
259:12,19 261:24
267:10,13,17,21
268:16 269:11,15
269:22 270:3
278:5,8 279:16
280:2 281:4,4,8
282:13 285:20,23
286:3,17 289:4
290:13,25 291:7
291:11,25 292:7
292:22 293:3
294:8 300:5 301:5
**exhibits** 291:19
**expectation** 248:3
248:12
**experience** 74:11
**expert** 160:8 171:3
192:17,21 193:16
225:3
**expertise** 201:24
287:7
**experts** 160:7,9,11
183:17 193:24
194:3
**expires** 303:25
**explain** 29:5
**extended** 48:15

**extensive** 96:11
**extent** 241:6
**extra** 273:25
**eye** 49:6

**f**

**f** 125:2 157:24
189:6 299:2
**face** 221:10
**fact** 6:4 26:3 99:6
102:24 113:25
127:24 131:9,10
139:22 229:25
271:25 284:6
**facts** 17:6 57:11
58:15 59:5 63:6
97:12 127:2 131:6
139:4 209:8
239:23
**faculty** 110:15
119:10 186:16
188:4 223:21
248:19 256:5
**failed** 131:7
**fair** 221:20
**fairly** 203:18
**fall** 159:22 259:14
260:25 261:11,18
261:19,20 262:2,3
262:3,7,8 271:16
271:19 273:3
275:22 277:18
281:11 282:14
283:19
**false** 158:10
212:12
**familiar** 204:4
225:3 263:8 265:7
**far** 16:19 23:4
28:6
**farther** 201:7

**father** 196:17
198:22 199:9,20
200:17 201:4,12
237:16,23
**father's** 199:20
**favorably** 227:15
**fdr** 200:22 201:12
**february** 38:24
39:20 63:22 64:3
64:4 76:7,16,23
77:14 78:18,23
89:21 112:19
114:22 251:9
255:6
**federal** 6:15
**feel** 14:25
**feet** 66:11,12 68:9
68:10 72:18,23
73:5,13,20,20
179:15 180:7
182:9 186:3
203:14,16,17
**felt** 153:11 231:13
**fifteen** 87:25 88:12
88:15
**fifth** 250:23 251:5
**fight** 221:13
**figure** 55:18 57:21
**figured** 110:2
**file** 22:18 34:13
35:7 37:22 38:2,6
38:14 66:22 67:14
67:17,25 68:4,8,13
68:21 186:3,6,10
197:17 198:16,17
198:18 199:16,17
237:11
**filed** 121:7
**files** 22:18 33:15
33:22,23 34:3,4,5
34:7,9,16,23 37:2

37:14,24 38:20,23
39:6,15 40:2,7,22
41:11 42:2 48:23
49:14 51:20 68:24
69:21 71:13,24
72:9 74:21 101:14
101:18,20,22,23
102:3 116:5,6,10
118:3,4,8,17,20
182:17,20,23,25
183:5,9,12,16
184:7,9,24 185:3,8
185:12,19,24
186:5,16,18,19,22
187:18 188:3
190:14 199:15
**filing** 3:6 179:24
180:3,6,12,13
181:9 185:4
198:20
**fill** 247:19
**filled** 185:4 186:4
247:9 255:22
262:22
**filling** 256:6
**final** 208:4
**financial** 288:12
**find** 44:5 45:2,22
46:18 50:21 63:9
123:7 160:17
225:10 258:14
271:17
**finding** 190:10
243:20
**fine** 53:12 132:13
191:6 238:13
297:25
**finish** 6:9 23:14,17
63:4
**finished** 25:23
69:3 279:12,14

**first** 4:3 6:16 13:8
13:11,13 23:14
27:6 46:22 47:16
47:17 48:15 67:19
69:9 74:8 80:13
80:18 100:11,19
111:5 117:25
125:22 164:11
200:6 205:18
206:2 207:2 208:2
208:8 209:9
239:25 247:22
256:8,13 257:8
258:6 269:16
276:7 282:12
288:23 289:2,4,12
294:8 300:11,15
300:20
**five** 34:18,20
179:7,8 243:13
244:10,16
**floor** 23:10,13
30:19 31:4 43:8
65:10 69:13 72:14
80:20 95:7,8,9
96:6,7 100:11,19
111:19 115:16
133:7
**flummoxed**
257:14
**focus** 260:4
**focused** 37:20
40:14 96:13
**focusing** 33:18
241:3 290:17
**folder** 33:12 199:9
199:10,11
**folders** 33:25,25
**followed** 169:22
**following** 43:5
49:17,25 53:23

80:18 189:3 223:9
223:10 276:13,22
**follows** 4:5 125:8
274:4
**foot** 68:11 203:18
**footage** 72:20
**footnoting** 245:21
**forbid** 130:25
**force** 3:16
**foregoing** 299:8
299:10
**forget** 20:4
**form** 3:11 104:14
247:7 252:24
253:8 254:5 256:7
257:20 258:8,15
258:22 259:5,9
270:10,18 271:12
271:16,17,24
272:10,11,16,22
273:2,4,10 275:10
276:4 277:12,18
278:23 281:12,13
282:3,19 283:15
283:25 284:15,17
284:20
**formal** 54:18
**format** 253:6
**formed** 159:11
**former** 80:2 88:25
130:5 152:2 221:4
**forms** 257:17
259:13,18 262:6
262:10,13 281:5
284:8
**forth** 5:23 16:2
47:15 51:3 61:21
70:10 118:18
165:2 185:10
192:3 194:16
227:6 253:12

270:14
**found** 117:4
160:14 219:16
**foundation** 160:2
161:9,11,14,16,16
189:21,25 263:9
263:12,13 265:3,8
265:9,10,20,23,24
266:2,6,10,14,19
267:3,24 283:21
284:11 286:23
287:5,12,20,24
288:8 293:20,24
294:25 295:4
296:18 297:17
**four** 68:3 99:2,3
261:16
**frame** 213:23
214:15
**franklin** 200:21
**frequented** 139:16
**frequently** 75:18
111:10
**fresh** 119:24
**friday** 43:22 83:2
84:24
**front** 75:21 80:16
115:9,12 134:18
**fruition** 224:10
**full** 49:11 50:17
272:6 273:17,23
**fund** 297:17
**funded** 274:2
**funding** 226:23
227:3 263:14
266:24 294:25
297:16
**funds** 266:5
287:18
**funke** 157:21

**furniture** 66:18,21
**further** 3:9,13
41:17 125:8 196:8
199:25 274:12
299:13
**future** 189:4,16
190:10

**g**

**g** 75:5 172:12
289:15,16,19,23
290:2
**gangster** 289:23
290:3
**garbage** 111:8
**gaskins** 151:23,25
152:2 153:20
212:15 215:10,19
217:15 218:7
**gavel** 288:20
**gcwe** 212:16
**general** 2:13
**generally** 78:12
162:21 238:21
**gentleman** 25:6
27:7 41:2,5,10,14
42:3
**george** 109:4,12
142:10
**georgia** 152:5
**getting** 37:22
49:21,21 123:3,4
143:11 201:25
289:21,25 290:15
**gist** 95:17
**give** 5:11,15,20 6:5
27:5 30:23 34:13
35:16 45:24
170:22 239:3
264:14 280:12
281:3 284:22

**given** 203:9
204:18 234:5
253:6,7
**gives** 293:9
**giving** 73:9 202:5
**go** 7:19 15:16
43:10 47:4 65:13
70:14 117:13
121:20 124:9,13
125:17 145:25
146:11 154:6
175:16 206:5
207:8 208:10
210:6,10 211:3
212:23 218:9
222:14,19 232:21
233:3 236:8
238:11 240:25
243:4 251:5,17
252:2 258:14
260:5,20 261:16
271:7 273:2
274:11 278:22
285:17
**going** 6:25 9:21
27:12 30:23 33:6
33:6 35:15 45:2
45:22 46:6,18,22
47:3,6 50:22,25
51:3,16 52:8,25
54:3,11,15 55:8,17
55:19 56:22,24
58:23 59:11 73:21
77:11 83:24 85:19
91:9,14 97:9
98:20 103:23
113:3 121:23
124:11 130:19
131:19 136:12
151:16,20 152:14
163:14 165:23

191:2,3,15 196:7
205:16 208:17
209:18 211:3
215:12,13 217:17
218:12 238:8
240:6 243:2 245:6
246:14 249:25
254:8 267:9 278:4
281:3 283:22
285:19 287:13
290:12,24
**gonzalez** 173:13
**good** 4:7,8 31:5
226:24
**googled** 169:18
**gotten** 108:18
115:6 172:4
219:15 258:3
**gould** 83:10,14
84:2 130:4,9,15
131:7,25 132:16
146:9 148:4
151:15
**gould's** 83:21,25
85:3 146:9 148:12
**governing** 273:16
**government**
183:24 225:13,18
225:19 226:23
227:3
**gpas** 264:14
**graduate** 21:2
23:7,23 47:25
50:18 62:12,13
72:12,15 73:5
74:12 79:9 80:14
82:19 84:17 86:15
86:18 87:7,9 88:5
88:16 107:22
139:23 145:12
152:3 153:21

176:24 194:9
195:17,20,22
198:4 202:10
204:15 214:22
220:7,10 222:4,9
234:13 264:11
294:15
**grant** 173:16,19
173:21,22 174:3,5
174:6,7,8,11 274:2
283:21 286:24
287:5,19 288:9
289:22 295:2,5,5
296:19 297:17
**grants** 183:13,14
188:6
**graphic** 243:20
**great** 170:15
289:21
**greetings** 79:8
**ground** 146:12
**group** 168:5
217:13
**groupof** 236:25
**groups** 214:2
**guard** 108:14
**guess** 31:15 37:7
72:22 73:3,3
172:24 252:18,18
**guessing** 195:24
**guilty** 158:25
**guns** 26:5
**guscott** 75:5,13,15
76:2,10,16,21,23
77:25 78:17,23
79:4

| **h** |
| --- |

**h** 4:2 125:6 149:21
169:25 172:12
265:8 287:3,3
300:2 301:2

**half** 68:10,11
203:14,16,17,18
273:14
**hall** 99:8 100:3,8
100:11,18,19,22
101:11,16 105:23
106:21 113:11,12
114:4,6,18 115:16
184:14,17 198:9
198:13,15
**hamilton** 183:23
**hand** 188:18
246:24 251:7
270:2 280:5
**handed** 14:13,18
162:18 205:22
207:6 208:22
246:23 249:21
254:18 267:15
269:13 278:10
285:25 291:9
**hands** 40:11,19
42:4
**handwritten**
188:19
**handwrote** 213:4
**hanging** 204:14
**happen** 217:17
257:3
**happened** 82:5,8
117:2,3 134:13
135:2,4,7 159:16
215:25 230:5
**happening** 24:5
**happy** 91:7
**harass** 60:24
**hard** 36:21,23,25
61:23 82:4
**hardcopy** 255:22
**harmful** 137:3

**haroon** 155:10
**harry** 196:14
  198:21 199:2
  200:13 201:10
  236:11
**haugstatter** 44:25
  46:9 48:11 49:24
  121:16 126:21
  127:3,11,25 128:3
  128:22 129:5,7,13
  129:21
**head** 121:24 184:5
  242:25
**heading** 176:11
  201:15 207:12
  222:16 243:6
  252:3
**headings** 207:18
**hear** 7:9 126:2,23
**heard** 85:12 215:7
  215:8,9,10 227:18
  234:21
**height** 41:8,16
**held** 1:16 48:6
  191:20
**helm** 232:9
**helpful** 63:16
**hennelly** 169:25
  170:20
**henning** 172:11
  231:25 232:2
**hereto** 3:6
**hewitt** 83:15
  104:25 121:15
  123:2
**high** 68:11 225:5
**higher** 186:13
**highlights** 220:24
  221:3
**highly** 225:12

**hired** 214:24
**historian** 183:20
**historical** 174:24
  187:17 188:7
  214:21 216:15
  220:12 243:17
**historically**
  221:21
**history** 7:17,20
  8:20 183:2 214:22
  220:10,24 237:3,5
  237:14
**hitting** 121:23
**hoc** 159:10
**hogstatter** 44:14
**hold** 54:5 105:7
  204:11 213:24
  282:4 292:18
**home** 8:4,6
**hostile** 158:9
**hour** 29:15,22
  274:21 283:6
**hourly** 275:15
  283:5
**hours** 12:21 14:3,6
  246:2,5,6 271:5,8
  274:17,20,21
  281:20 283:9,14
**housed** 266:5
  288:9
**hudson** 72:13,17
  73:6,15
**huh** 123:10 171:17
  245:5 267:20
**human** 266:20
**hundred** 30:15
  71:3 278:25
**hundreds** 30:14
  51:21 87:6 118:9
  197:13,13,14

**husband** 80:2
  146:9 148:12

**i**

**idea** 46:22 47:5
  73:4 112:23
**identification**
  14:12 26:4 65:19
  162:17 205:21
  207:5 208:21
  238:16 246:22
  249:20 254:17
  267:14 269:12
  278:9 285:24
  291:8
**identified** 20:4
  63:4,6 93:21
  114:2 115:25
**identifies** 293:11
**identify** 17:4,24
  20:2 31:6 41:21
  62:2 77:12,18,25
  78:6,8,9,12,19,24
  80:23 82:14 88:21
  90:8 96:16,25
  211:23 213:14
  214:16 222:25
  225:11 233:8
  272:16
**identifying** 41:25
**illinois** 238:2
**illustrations**
  243:21
**imagine** 87:8
**imaging** 229:14
**immanuel** 21:6
  148:3,16 229:13
  235:13
**immediately** 37:20
  53:17 189:22
**implication** 148:8

**important** 6:8
  52:18 203:6 282:2
**impossible** 30:9,11
  190:12,25
**improper** 58:18
  63:14
**improve** 285:17
**inaccuracies**
  208:13
**inaccurate** 257:2
**inappropriate**
  58:21
**incapable** 190:23
**inch** 194:24
  195:20
**incidents** 16:2
**include** 8:19,22,23
  8:25 221:16
**included** 183:3
  261:24
**including** 36:22
  77:6 87:14 118:14
  132:16 201:9
  217:13,14 232:8
  266:21 274:2
  288:12
**income** 189:21
**incorrect** 108:2
  236:23
**index** 302:2
**indicate** 67:24
**indicated** 261:21
  281:19 299:10
**indicates** 67:8
**indicating** 270:8
**individual** 17:5
  20:3
**individually**
  104:21
**individuals** 214:3
  266:17

**inferred** 290:8
**inform** 46:6
**information** 15:13
15:15,17,23 16:5
26:2 45:25 54:3
56:22 62:21 74:21
75:13 76:2 80:10
101:23,24 103:24
107:14,16 154:2
155:8 207:14,17
209:11,14 210:15
210:21 212:5
213:9 240:3 274:3
275:12
**informed** 82:18
**initial** 14:9 18:12
33:7 46:23 47:5
47:19 59:10 62:3
125:13 132:10
191:25 193:15,19
211:2 300:6
**initially** 48:19
120:4 169:23
227:15 229:19
**initials** 70:17
**initiative** 102:2
285:9,16
**injuries** 222:25
**inserted** 238:23
**inside** 32:13 66:18
66:21 125:18
**instance** 136:4,7
137:7 138:8
**instances** 99:12
137:12 138:2,15
**institute** 23:25
223:24 224:5,7
229:3,4,6
**institution** 88:8
**institutional**
214:22 220:10

**institutions** 225:9
**instructed** 297:14
**instructing** 25:19
**instructional**
275:11
**instructions** 26:8
258:9,16,19 259:3
259:8
**insulting** 74:18
**insurance** 204:20
204:24,25 205:2,3
205:6,14,15
**insured** 205:5
**intended** 200:15
**intent** 290:9
**intentional** 279:4
**interacted** 48:8
**interested** 164:23
**interests** 70:9
**interfere** 5:10,20
6:5
**interject** 6:13
**internal** 54:17
**international**
176:14 242:20
**interrogatories**
205:19 206:9
207:3,13 208:9
209:9 211:3 240:2
300:12,16,21
**interrogatory**
210:8,12,17,25
211:16,22 212:10
222:16,24 223:6
232:21 233:2,3,7
233:15,23 235:11
**interrupted** 58:24
146:20
**interrupting** 58:20
**interviewed**
155:23 156:4,17

156:19
**intimidation** 157:9
**introduced** 25:6,9
41:24
**inventory** 71:9,12
**investigating** 52:3
**investigation** 6:22
6:23 51:23 54:17
54:17 84:5,7
**investigator**
263:15,16,18,22
264:21 265:15
**involved** 61:17
101:25 196:24
**involving** 9:22
**ipad** 90:10,14
297:10,12
**ipod** 293:15,16
**irregular** 102:13
**isaacson** 18:16,18
18:22 19:9,20,24
20:6,11,14,15
21:18 22:4,9,13,17
24:9,13,17 25:3,13
26:17 27:19 28:13
29:2,12,17 32:14
32:19 33:10,14,19
34:9,24 35:4,8
36:10 37:11 38:5
38:8,13 40:6,15
41:23 167:22
228:2
**issue** 15:21 85:6
85:16 97:10
122:11 159:8
197:2 205:4
277:21,22 279:6
**issues** 7:14 185:9
186:11 193:24
**item** 88:21

**items** 63:25 64:5,8
205:14
**itouch** 296:6 297:4
297:8,9,11
**ivy** 132:24,25
133:2,15,19,22
134:2,5,10,18,23
135:22 137:9
144:10 212:13
216:3,14,23
220:18 221:14,15

**j**

**j** 4:2 125:6
**jack** 228:13,14
**james** 2:10 6:12,20
7:13 9:20 10:2,13
10:25 12:3,18
14:24 15:20 16:10
21:22 31:14 54:5
54:13,24 57:7,17
58:4,11,17 59:11
60:23 62:24 63:12
73:2 89:7 97:9
98:20 103:7,23
104:14,19 105:7
105:20 106:7,12
106:21 113:10
115:16 116:12
125:16,21 126:7
128:9 130:18
131:18 132:5,11
136:11,17,22
140:5 141:25
143:6 146:17
147:2,5,13,18
165:6,25 174:20
180:20 184:14,17
193:13 195:3
198:9,13,15
200:11,20 204:6
206:11 210:3

211:9 213:5 217:8
238:10 239:2
248:21 249:5
255:2,18 256:10
260:7,13,16,22
269:25 272:15,20
275:4,7 278:17
280:12,15 282:9
282:14 291:18,23
297:23
**january** 1:12 19:7
25:15 26:18 27:21
29:7,18 34:11
36:4 37:12 40:13
43:3,13,21,23
62:18 82:25 83:2
84:24 163:8,11
167:15 293:5
294:3,6,7 303:3
**jet** 295:16
**ji** 166:8,9
**jj** 210:15,21
**joan** 6:16
**job** 161:3 165:3
225:22
**joe** 50:3 54:20
221:11 226:9,10
**john** 1:16 2:4 10:9
10:16,17,25
**joint** 52:18
**jose** 88:21 149:20
235:13
**joseph** 1:6,14
240:13 267:25
298:11 299:8
303:4,20
**josh** 62:2,12 63:23
73:21
**journalist** 237:25
**juan** 44:16,25
52:13 167:18

173:13
**judge** 147:17
**july** 207:3
**jumaane** 150:25
163:13
**june** 16:15,19
176:5 268:20
284:24

## k

**k** 96:18 155:14
157:24,24
**kareeam** 155:10
155:12,13 156:7
156:10
**karen** 83:10,14
130:4,9
**kate** 166:9
**keep** 119:24
121:23 262:21,24
**keeps** 128:17
**kelly** 171:2,2,2,7
171:22
**kept** 121:22
128:23 179:19,24
197:16 202:8,9
237:6,7 262:23
**kevin** 75:5,15
**kidels** 296:9
**kind** 34:2,5 68:4
81:9 95:21 204:2
221:23 242:22
290:15
**kindels** 296:9,11
**kingsman** 213:10
**klein** 2:10,17 4:6
6:12,18,20 7:7,13
8:11 9:20,24 10:2
10:4,13,25 12:18
12:20 13:2 14:7
14:24 15:20,22
16:10 21:22 23:5

28:19 31:14 54:5
54:9,13,22,24 57:7
57:10,17 58:4,7,11
58:17,19 59:11,15
60:23 62:24 63:2
63:12,15,16 65:15
67:21 73:2 81:15
86:5 88:14 89:7,9
94:23 97:9,16
98:20 99:22 103:7
103:23 104:14,19
104:22 105:7,20
106:7,9,12 113:10
116:12 124:13
125:4,10,16,21
126:7,10 128:9
130:18 131:18,21
132:5,9,11,13
135:11,20 136:11
136:13,17,22,24
136:25 140:5
141:25 143:6
146:17,19 147:2,4
147:5,7,13,16,18
149:15 153:19
161:19 162:13
165:6,25 180:20
191:8,17,22
193:13,21 195:3,5
200:11,20 204:6
205:16 206:11,18
208:17 210:3
211:9 213:2,5
217:8 238:10,13
238:17 239:2,4
245:6 246:14
248:21 249:3,5,15
254:8,13 260:7,10
260:13,16,18,22
260:23 264:19
267:9 268:24

269:7,25 270:4
272:15,18,20,25
275:4,7 278:4,17
280:12,14,15
282:9,14 285:19
290:12,24 291:18
291:21,23 292:3
297:19,23 298:2
**knew** 77:17 86:18
86:20,21 120:5
122:13,15 142:7
288:16
**know** 6:24 9:25
10:5 18:21 19:4
20:9,16 22:25
27:16 28:22 29:16
30:10,11,14 33:16
34:12,20 35:11
37:4,7 38:25
48:16,18,24 49:20
50:25 51:17 54:10
55:19 56:2 58:5,9
58:10,12 61:3
64:14,15,15 70:9
72:19,24,25 78:5
81:9 91:16 95:18
95:21 96:11,13
98:19,21 101:25
102:7,14,14
104:12,16,20,20
105:2,9 107:13
108:15,25 109:2
109:17 111:4,12
111:24 112:2
113:23,24 116:3,6
116:13 118:7
119:16,24 120:20
121:8,22 122:4,14
129:13 130:2
135:6 136:15
137:24 140:2,4

141:15 143:4,25
144:3 148:6,22
149:19 150:6,14
150:17,24 151:4,7
153:22,23,25
155:5,7,25 156:5
161:15 163:18
164:25 165:4,8,14
165:16 167:12,14
167:25 177:13
186:5,23 188:4
193:11 196:25
197:11 199:18
202:19 203:5,15
204:25 215:12,21
218:16,17,18,25
224:5 225:10,23
226:6,8,22,25
228:20 231:22
232:8 235:5,22
236:6,25 242:11
242:22 243:20,21
248:22 251:5
256:4 259:23,24
260:8 262:16
271:2 274:23
276:24 280:11
282:8 284:2 287:6
287:9 291:24
296:24 297:11,13
**knowledge** 16:22
16:25 17:6,25
43:18 57:3 58:8
58:13 62:20 63:5
75:8,12,15 80:9,13
94:9,10 96:22
103:18 104:3,9
110:19 113:19
126:25 128:3,6,21
128:24 129:4,12
130:17 135:10

139:9 141:22
143:13 148:12,14
149:13,16 150:3
150:21 165:8,11
165:13 174:23
208:7 209:11,12
209:13,17 227:22
227:25 240:3
287:6
**known** 42:12
288:5
**knows** 59:14
129:12 165:9,11
226:3,8
**kyung** 166:8,9

**l**

**l** 3:2 4:2 67:8
125:6 169:25,25
195:2 287:3
289:16,16
**labeled** 199:16
**labor** 8:23,24
133:4,5 173:16
174:9 214:24
231:25 233:10
241:19,19 243:12
**lack** 47:3
**lag** 49:12 279:7
**laptop** 90:14
294:24 295:18
297:3
**laptops** 90:10
**large** 24:3 46:24
48:13 95:13
220:22 221:4
**laser** 294:23
295:16
**late** 19:18 25:15
26:18 27:21 29:7
29:18,21 34:11
37:12 40:13 62:18

196:23
**law** 1:16 2:4
**lawsuit** 121:8,9
**leader** 133:3
231:25 237:24
238:2
**leaders** 166:11
**leadership** 153:9
166:13 221:8,20
**leading** 183:17
263:19
**leap** 272:23
**leave** 25:21 40:6
**leaving** 22:17
**leberstein** 133:24
133:25 134:6,9,16
135:22 136:3,6
137:8 144:4,10
145:13,17,21
212:14 215:9,19
216:3,11,13,17,22
217:14,17 218:7
218:21 221:12,16
**lecture** 22:20,21
22:22 23:3 33:12
33:16 35:5,9,12,15
45:13 102:19
105:15 117:7,21
119:2 120:10
179:12,15,18,22
180:7,10 181:8,12
181:16,22 182:4,8
**lectures** 24:18,19
102:6 103:3,21
108:9 113:7
119:14 177:22
**led** 55:23 56:7
**left** 29:17,19,24
30:7 32:20 33:11
34:10 36:11 37:11
40:12,20 42:4

44:2 112:21
125:18
**leftovers** 113:2
**legal** 10:15,17
54:18 97:13,19
106:13 128:10,20
130:19 131:19
132:6,8 136:12,18
136:23 140:6
142:2 143:7
146:18 147:6,15
231:8,11
**legally** 90:4
**length** 68:10
**letter** 32:7 121:2
184:2 196:20,22
196:25 197:3,7,17
198:7,15,21,23,24
200:2,6,16,24,24
200:25 236:10,13
236:19 287:22
288:5
**letters** 102:6,22
103:22 105:16
108:9 113:8 117:4
117:24,25 118:25
119:3,4,14 120:9
122:11,24 123:24
183:16,19 188:4
196:10,12,19
197:9,14,15,19,20
197:24,25 199:8
199:20 201:9
203:4 204:21
205:10 243:22
285:12
**levering** 184:2
**lewis** 154:7 155:2
184:2 293:4,23
**liberty** 2:15

**library** 175:15
**lie** 137:2
**lied** 137:13 217:19
**life** 202:22
**linda** 141:3
**line** 42:8 131:12
  151:18 280:10,15
  280:16 302:6,6,11
  302:11,17,17
  303:4
**links** 258:10
**list** 75:4 89:4
  122:16,18 146:5
  149:3 176:14
  179:11 207:21,24
  207:25 223:7
  227:7 243:7
  244:22 273:6
**listed** 35:17 61:5
  75:7 91:17 93:24
  126:22 127:3
  130:4 193:2
  196:13 219:23
  224:23 228:11
**listing** 9:15 126:24
**listings** 237:2
**lists** 207:13,17
  242:8 283:8
**litigation** 302:2
**little** 141:4 273:13
  275:21
**llc** 303:2
**located** 70:19
  72:13 176:22
  177:25 180:8
  181:4,13 183:6
  184:7 196:2
  226:13
**location** 67:3,24
  100:15,17 179:21
  179:23 233:24

234:21
**locations** 65:6,8
  67:23 87:17 98:15
  98:17,24 99:2,3,23
  100:22 179:22
**lock** 29:25
**locked** 110:20,23
  185:20,21 186:2,6
**locker** 127:23
**locks** 43:4,17
  129:15 130:24
**london** 21:6,10
  28:2 36:20 79:14
  79:18,19,22 80:4
  80:10 81:16,23,24
  82:14 86:13,17
  294:11,14 295:11
  297:15
**long** 12:19 28:17
  28:20,25 29:12
  31:22 43:16 83:19
  153:20 240:10
  253:22 264:20
**longer** 43:7,10
  49:22 59:22 230:7
  230:12 244:14
**look** 31:19 33:8
  98:11,18 111:21
  112:4 114:11,14
  179:5 193:6
  205:25 218:12
  219:10 228:9
  229:21 234:4
  239:13 241:23
  242:11 250:18,23
  252:17 253:11
  256:8 257:18
  258:6 259:10,25
  267:18 271:7
  274:25

**looked** 9:14 98:14
  98:22,24 114:3,9
  114:18 117:3
  118:24 122:10
  194:17 221:8
  224:6 242:2,6,19
  258:19,21 259:3,8
  259:23 292:14
**looking** 37:6,8
  51:18 52:22
  119:15 171:11,23
  178:16 188:2
  206:7 243:21
  251:2 271:11,12
  275:2,4
**loose** 33:24
**lose** 174:2
**loss** 18:4 42:19
  57:5,25 59:8 60:4
  61:11 158:11
  173:15 189:20,23
  192:10 196:9
  201:8
**lost** 192:22 193:9
  197:10 199:5
  229:9 244:13,21
  246:10 257:5,16
  257:24 262:12
  282:4 290:15
**lot** 64:20 65:22
  240:6 241:7 243:3
**lounge** 110:6,15
  111:9,18
**lower** 280:5
**lunch** 125:24
**luncheon** 124:15

**m**

**m** 93:25 155:14
  157:24 289:16
**macbook** 294:21
  295:13 296:24

**maclawrence**
  204:19
**madonna** 91:18
**magazine** 202:22
  202:22
**magazines** 202:20
  203:10
**mail** 18:4 39:9,10
  40:2 42:19 45:9
  45:17,18,19 49:22
  57:5,25 59:8,20,23
  59:24 60:4,8
  61:12 75:10 76:12
  91:22,24 92:3,7,21
  92:22 93:2,8,12,16
  93:22 97:3,6
  102:2 105:13,19
  120:25 122:25
  123:3,4,5,6,9
  256:9,14 258:8
  286:12,21 288:19
  288:25 289:5
  293:4,7 294:3,10
  294:20 296:5
**mailed** 6:19
**mails** 121:6
  254:25 255:18,20
  255:21,25 256:4
  286:12 292:9
**main** 37:21 83:5
  84:19 85:16
  121:11 131:10
  141:18,23 182:15
  183:9 184:7,13,17
  197:17 198:8,10
  199:11,13
**maintain** 264:13
**maintained** 48:6
**major** 122:15
  193:23

**making** 85:9,11,13 132:12 152:19 187:5 264:8 272:23

**male** 97:17 285:9

**malice** 61:8 138:25

**man** 26:9,10

**management** 23:25 215:22 218:2 225:3

**managing** 170:16

**manhattan** 12:14 12:15 23:25 226:13

**manilla** 33:25 34:6 34:9

**manual** 252:4 253:9,13 259:10

**manuscript** 243:19,20 245:22 245:24

**manuscripts** 102:23 103:3,21 105:15 108:8 113:7 123:23 188:2,10,12,15,16 188:24 190:2

**marcado** 167:19 168:10

**march** 112:6,8,12 112:15,18 116:24 117:11 118:23 122:2 202:22

**maria** 257:12

**marjorie** 293:4,23

**mark** 2:17 6:18 7:7 8:11 9:24 10:4 14:7,8 15:22 23:5 28:19 54:9,22 57:10 58:7,19

59:15 63:2,15 65:15,16 67:21 81:15 86:5 88:14 89:9 94:23 97:16 99:22 104:22 106:9 124:13 125:4,10 126:10 131:21 132:9,13 135:11,20 136:13 136:24 146:19 147:4,7,16 149:15 153:19 161:19 162:13,14 191:8 191:17,22 193:21 195:5 205:16,17 206:18,25 208:17 208:18 213:2 238:13,17 239:4 245:6,7 246:14,15 249:3,15,16 254:8 254:9,13 260:10 260:18,23 264:19 267:9,10 268:24 269:7,8 270:4 272:18,25 278:4,5 280:14 285:19,20 290:12,13,24,25 291:21 292:3 297:19 298:2

**marked** 14:11,15 65:18 87:11 162:16,20 178:4 205:20,24 207:4,8 208:20,24 238:15 238:19 246:21,25 249:19,23 254:16 254:20 255:25 267:13,17 269:11 269:15 278:8 279:16 281:7 285:23 286:3

291:5,7,11,24 292:2 302:16

**market** 177:6,8

**marking** 250:10

**mason** 168:22 169:6,8,14 227:7,8 227:14

**master** 81:12 82:13

**master's** 79:10

**material** 95:13 96:12 120:22 121:4 202:5

**materialized** 229:22

**materials** 33:2 98:11,14,15,18,24 99:13,25 100:9 106:4,18,25 107:9 107:20 108:12,18 109:4,12,15 110:25 111:7,15 111:22 113:4,17 113:21 114:3,9,12 114:15,24 115:24 116:16,20 122:4 124:4 127:13,18 189:15 203:9 205:8 240:14 243:8 244:6,22 246:4,10

**matter** 7:3 17:25 57:13 61:4,20

**matters** 8:24

**max** 148:25 149:17 235:13

**mcdermott** 226:9 226:10,15,21

**mean** 11:15 20:13 29:9 42:24 50:12 53:4,10 54:16

63:13 72:22 82:25 86:8,9 100:14 101:20,21 111:8 112:18 118:3 120:13 138:7 151:12 164:2 187:2,7,8 193:14 193:23 203:25 204:23 218:16 248:22 249:10 261:13 272:20 289:3,18,23 290:2 296:9

**meaning** 282:5

**means** 128:8,14 170:9 193:18 200:21 289:25

**meant** 53:11 180:20 184:11 189:13 297:12

**medgar** 166:16,21 167:2,10

**medication** 5:9

**medium** 41:8,16

**meet** 10:8,24 12:9 12:16,19,22

**meeting** 11:24 12:4,6 13:2 43:9 82:18,22,24 83:3 83:12,20,24 84:23 84:24 85:10 86:10 86:11 144:20 145:5 217:5 234:12

**meetings** 10:23 11:5,17,21 13:4,19 13:22 51:2 144:21 145:2,4,18,22 153:5 214:9 215:18 216:13 217:5,6,9,11,12,15

218:16,19,22,25
219:3 234:8,20,23
**member** 44:4
119:10 151:13
**members** 23:21
25:18
**memory** 119:25
242:5 285:16
**men** 264:5,9,13
**mention** 66:3
77:20 165:19
172:2
**mentioned** 63:24
65:25 77:8,16
81:7,10 98:25
105:3 121:14,19
144:20 171:8,10
171:24 201:14
213:17 215:20
227:17 231:24
242:19 270:12
271:3,4,5 279:5,6
**mentioning**
259:22
**mentions** 271:2
287:17
**mentorship** 264:5
**met** 9:25 10:2,7,9
10:11,13,15,21
11:3,12 13:8,13
33:5 55:18 115:7
119:9 168:5 214:2
214:8,11 234:10
234:14 287:9
**metal** 68:6
**michael** 83:15
104:25 123:2,3
**middle** 41:7,7,16
70:22 236:9 258:7
261:5

**military** 289:9
**miller** 17:5,9
18:10,18,22 20:22
21:15 28:2 36:20
42:11,12,13,17
43:5 56:25 57:3
57:12,16,20,23
58:16 59:5,19
60:2,10 61:2,20
**millions** 109:22
205:9
**mina** 93:24 94:8
94:22,24 95:11,19
96:2
**mind** 163:22
**minute** 30:17
108:24 125:17
158:22 213:24
238:11 277:3
**minutes** 12:3
86:12
**mischaracterizat...**
21:23
**missing** 33:2,8
37:14 104:17
105:16 121:4
122:5,13,14,15
**misspelled** 170:2
195:7
**mistake** 200:4
279:11
**modify** 125:25
126:6,12,15
191:13
**moment** 14:16
27:23,23 33:4
44:23 52:10 66:2
79:23 105:17
106:16 120:18
126:17,19 162:21
191:14 224:22

231:8 232:17
233:12 238:20
249:24 254:21
259:25 269:16
286:4 290:18
**monday** 53:23
**money** 132:2
277:22,23 289:16
289:19,23,24
**monies** 288:7
**monitor** 193:11,25
194:24 195:10,13
195:14,19
**monitored** 227:4
**montgomery**
183:21
**month** 38:25
92:14 219:13
230:19
**months** 80:18
112:24 123:5
164:19,22 168:1
169:17 276:12,14
277:24
**moore** 103:17,19
104:4
**morning** 4:7,8
12:22 125:23
126:5,13
**move** 24:7 25:20
43:25 109:20
143:14
**moved** 32:2 71:22
72:7,9,10 143:19
**movement** 111:21
**moving** 77:8
109:25
**multi** 253:8
257:24
**multiple** 85:13
178:25 187:4

247:6,8,19,24
248:7,25 250:11
250:16 252:4,6,13
252:21 253:2,8,11
254:2,4 255:20
256:6,16,18,22
257:16 258:15,22
259:4,9,13,18
260:25 261:11,17
261:25 262:6,9,13
262:21 263:3
270:9,18,23
273:15 277:12,17
281:5,12 282:11
282:15 283:15
284:8
**murals** 220:22
**murray** 174:20
175:4,6
**mysterious** 46:4

**n**

**n** 2:2 3:2 4:2 93:25
125:2,2,2,6 149:21
157:24 169:25,25
172:12,12,12
289:16,16 299:2
**name** 27:6,6,8
41:3,24 94:4
96:22 100:7 127:5
131:12 155:11
157:22,23 160:13
161:12 165:21
166:7,15 215:20
223:23 225:21
228:6,18 257:11
257:13 266:3
303:3,4
**named** 183:21
199:16 265:25
**names** 10:18,20
20:9,17 27:5

178:21
**nancy**  150:8,22
**nash**  280:11,16,16
  281:2
**natalie**  17:4,9
  42:11,11
**naturally**  52:19
**nature**  45:19
  52:23 197:5
**nearby**  100:15
**necessarily**  164:9
  179:3 193:18
  258:5 276:11
  287:22
**need**  10:4 15:2
  24:19 48:23,25
  87:4 126:15
  191:17 290:9
  294:24
**needed**  194:15
**ness**  21:6,12 28:2
  148:3,8,17,22
  229:13,13,18,20
  230:6,13 235:14
  235:20,21,22
**neutral**  165:14
  225:24 226:6
**never**  109:11
  112:16 113:15
  114:10 194:20,22
  230:16 254:7
  258:19 259:2
**new**  1:3,9,17,18,20
  2:7,7,12,16,16 4:4
  8:24 12:15 46:2
  79:6,8 90:20,23
  91:2 97:23 151:14
  151:18 160:20,22
  161:17,21 162:5
  162:10,15 163:5
  163:16,21 166:13

169:19 170:18
  172:23 173:7
  175:15 213:10
  215:15 225:21
  226:14 227:17,20
  252:3 294:24
  295:19 296:5
  300:9 303:2
**newly**  49:8
**newspaper**  170:14
**nice**  194:17
**night**  6:13,24 7:6
  53:17
**nine**  13:4
**noah**  288:20
  294:22 296:23
**noel**  265:16
**non**  275:16
**nondisclosure**
  175:14
**nonemployability**
  168:25
**nonteaching**
  282:20
**north**  31:10,12,17
  66:12,14,16
  180:16,18,24
  181:5 196:4
  197:23
**nose**  5:22,25
**notary**  1:19 3:15
  4:3 299:7 303:24
**notations**  187:5
**note**  292:8
**noted**  85:15 89:10
  131:22 136:14
  298:4
**notes**  22:20,21,23
  33:13,16 35:5,9,12
  45:14 102:19
  105:16 108:9

113:8 117:7,21,22
  119:2 120:9,10
  122:12,23 123:12
  123:21 179:12,16
  179:18,22 180:7
  180:10 181:8,12
  181:16,22 182:4,9
  187:6,7 188:20
  219:4 243:23
  299:12
**notice**  1:16
**number**  32:6
  73:22 76:13 79:14
  87:23 88:25 96:16
  126:24 137:24
  138:20 141:3
  142:10 144:4
  146:2 148:16,25
  149:20 150:7,25
  151:22 154:7
  165:20 166:3
  167:18 168:13,21
  169:17,24 170:25
  172:11 173:12
  174:15,20 179:6
  187:24 213:18
  217:3 223:7
  229:23 233:14,15
  260:17 280:13
  293:9,10
**numbers**  213:3,4
  251:3 270:2,3,6
  280:4 291:25
**numerous**  118:13
  131:25 173:4
  230:15 262:11
**ny**  151:9

**o**

**o**  3:2 4:2,2 75:5
  125:2,2,2,6,6
  149:21 157:24

265:8 289:16,16
  299:2
**oak**  47:11,13
  193:9,10,25 194:4
  194:6,12,17,18
**oath**  4:15,19
**object**  7:14 15:21
  59:12 63:12 97:10
  98:21 103:24
  130:19 131:19
  136:17
**objecting**  97:15
**objection**  6:25 7:8
  9:21 89:10 116:12
  131:21 132:7
  136:13 146:22
**objections**  3:10
**obligation**  231:8
**observe**  27:4,11
  30:8 110:3
**observed**  28:15
  154:3
**observers**  26:21
  26:24
**observing**  47:16
**obstructing**  58:21
**obtain**  54:2
**obtained**  6:22
  112:14,16
**obtains**  112:11,17
**obvious**  22:19
**obviously**  121:22
**occasion**  74:6 79:7
  82:2 97:22 107:3
  108:6 115:2,17
  118:23 135:8
**occasions**  98:9,13
  99:15,18,21,24
  114:2,15,21
  116:19 230:15
  250:20 257:11

262:11
**occupied** 31:22
52:18
**occurred** 18:11,12
164:10
**october** 255:6
256:10 269:5
**office** 2:4,13 18:19
18:23 19:8,13
21:8,10,13,15,18
21:21,24 23:6,11
25:16 27:22 28:6
28:11,14 29:7,25
30:4,7,13,18,19
31:3,23 32:2,5,6
32:14,16,23 34:10
36:11 37:12,15
39:16 40:6,12,20
43:8,17 46:25
47:9 48:6,6 51:19
64:23,24 65:5,14
66:7,18,21 67:15
69:6 71:15,22
72:8,10,11 73:14
73:16,18,19 77:6
77:13 78:3,20
80:21 82:15 83:7
83:25 85:3 87:10
87:10,14,15,17,20
95:14 99:14 100:2
100:12,18,23
101:2,6,8 109:5,6
109:8,9,13 110:5
127:12 129:14
140:3 159:13
167:2,3 176:21,23
179:23 180:5,17
181:5,13,19,23,24
182:11,14 183:10
184:14,15,16,21
184:25 185:13,15

185:17,18,24
195:16,20 197:18
197:23 198:9,11
198:14 202:10,12
237:8,10 262:25
294:22
**officers** 288:13
**offices** 1:16 64:2
64:25 65:2 75:24
83:9,21 95:14
127:22,25 130:24
139:11 166:25
167:10 176:21
**oh** 43:6 107:16
120:16 170:23
231:23
**ohyan** 149:20
150:4 235:13
**okay** 6:11 9:16
17:2 31:18 38:10
48:20 61:18,23
62:11,17 67:21
72:6 79:14 80:4
88:12 89:9 90:18
101:9 103:18
110:8 117:11,19
123:17 125:21
137:21 145:25
149:13 150:21
151:22 155:9
157:2,18 160:13
162:23 164:11
168:18 170:25
172:3 173:2
175:18 176:3,11
177:10 179:11
184:12 209:18
210:10 211:11,14
211:21 212:9,23
216:2 220:2
222:13,19 223:13

229:5 232:25
235:7 236:8 238:5
239:12 245:3
246:2,13 251:23
252:11 254:12
260:18 265:25
266:25 271:15
272:25 273:9
275:9,20 278:16
279:15 280:6,23
281:2,18 282:5
290:4,11 292:15
292:19,21 294:2,9
296:2 297:19
298:2
**okome** 157:22,23
158:4,20,23
159:14
**old** 188:20
**once** 114:3,4,6,6
116:20 135:4
**ones** 99:8 259:19
290:16
**ongoing** 61:8
141:17 213:7
216:13 221:14
**online** 164:7,9
241:23 242:11,14
242:19
**open** 28:11,15
102:9,15 111:10
111:11,12,16,17
249:12
**opened** 108:14
**opportunities**
162:2 164:13,18
164:21,24 169:9
169:16,16,22
171:7 172:5
226:16 228:22
229:18,21

**opportunity** 7:5
126:8 223:19,20
228:24
**oral** 237:3,5,13
**orally** 16:5 38:18
45:6 104:8
**order** 108:19
242:4 296:8
**ordered** 130:23
**organization**
161:8 166:12
167:9 228:17,19
**organizations**
203:3
**organized** 68:16
68:24 69:23
199:18
**oriented** 212:4,7
**original** 163:18
246:18
**origination** 234:13
**outlines** 31:3 66:6
**outside** 111:18
181:24
**owned** 90:4,16
91:11 102:17

**p**

**p** 2:2,2 3:2 4:2
48:15 125:6 195:2
195:2
**p.c.** 1:17 2:4
**p.m.** 124:15 125:3
298:4
**pads** 187:6
**page** 17:3 42:10
56:25 59:9 60:6
61:25 62:9 63:11
73:22 112:5 124:9
125:12,15 139:20
144:7 146:2 154:6
154:6 157:3,3

165:22 169:24
170:3 175:19,25
176:2 180:21
182:22 189:2
192:12 195:3,5
196:8,8 197:3
199:25 200:9
201:7 206:5,6,6
209:4 210:6,7,10
210:17 211:13,14
211:15,18,19
212:24,25 213:3,4
213:7,11 219:19
219:21 222:14,15
222:19,21,22,23
232:22,23,23,24
232:25 233:3,5,13
234:4 236:8,9
239:13 243:4,5
250:24 251:3,6,7
251:17,20 252:2
256:9 258:6
260:20,24 261:5
261:13,22 271:6,7
273:14 274:25
275:3,6,8,15 280:2
280:3,4,6,8,10,13
280:14 281:13
282:2,5,10,13,18
283:23 288:19,23
289:2,3,4,12
292:18 293:3
294:8,12 300:5
301:5 302:6,6,11
302:11,17,17
303:4
**pages**  177:14,18
192:2,11 193:2
210:16 212:5
240:10 247:2
261:14,16 273:7

274:11 286:8,9
292:9
**paid**  247:25 248:5
248:13 277:25
279:8 288:10
**paisley**  49:3,4,5
50:4,6 61:7
109:15,21,23
129:11
**paisley's**  110:5,10
**pam**  39:13,24 40:3
42:12 44:12,24
45:10,19 56:24
61:2 83:14 100:18
100:23 101:5
105:3 121:6
**panelist**  171:10
**paper**  30:24
**papers**  33:15,24
35:4 36:13,17
64:20 74:22,25
78:14,15 81:8,9,12
81:12,13 82:13
86:15,19 87:7,10
87:19,22,23 88:5,6
88:16 95:20,20,20
95:21 96:3 159:6
175:15 201:19
202:7 204:22
**paragraph**  126:21
138:19 139:20
155:10 159:25
165:25 166:2
200:6 212:10,11
212:24 213:6,16
219:19,21 233:10
**paralegal**  10:22
195:8 199:6
207:22
**part**  62:14 188:3
259:19 272:5

287:18
**partially**  15:5
184:19
**participants**  185:5
**participate**  127:11
130:16
**participated**  91:21
127:6 130:9,12
131:13 138:23
139:5,21 140:8
242:5
**participation**
264:6
**particular**  68:17
70:6 85:6 190:19
204:2 231:25
235:20 276:11
292:12
**parties**  3:6 19:25
**parts**  14:22 292:13
**party**  25:19 90:23
91:2 238:3 299:14
**passionate**  197:7
**passport**  101:23
**pattern**  111:6
**pause**  14:19 193:8
254:22 286:6
291:17 292:11,16
**pay**  267:4 276:15
276:17
**payable**  267:2,25
**payment**  266:9,22
267:23 268:3,6,19
268:19,25 269:4
270:14,15,19,24
293:8,14,20
296:17
**payments**  265:19
268:23 284:7
**pbm**  93:25

**peer**  183:16
**pen**  30:24,25
**penalty**  209:7
239:22
**pending**  22:25
278:13,15
**penny**  154:7,25
**people**  11:16 16:3
20:5,8,10 22:13
25:13 26:17 27:19
28:7,13 29:2,13,17
32:15,19 33:10
36:10 37:11 40:11
45:6 55:12 64:22
75:19,23 77:5,6,12
77:15,17 78:2,7,20
84:22 85:14 90:24
104:12 120:17
121:11,19,21
131:25 132:17
135:10 147:18
150:19 156:16
173:4 178:23
214:3 215:23
217:13,13 221:10
223:8 257:15
**period**  74:16,17
75:17 109:16
129:20,22 203:7
244:10 250:13,17
250:21 252:14
255:5 262:7
277:23 278:2
**perjury**  209:7
239:23
**person**  26:7,11
42:12 65:25 75:4
89:14 91:17 93:24
104:20 127:2
130:3 165:21
224:14,23 231:24

294:25 295:19,22
**person's** 166:7
**personal** 46:25
88:11,17 90:5,15
102:8,17 118:20
173:21 184:6,10
185:16 186:19,21
187:12 192:5
193:4 195:14
205:10,15
**personally** 73:15
73:16 85:24 116:2
116:15,17 128:5
140:18 173:20
205:13 222:2
264:17
**personnel** 95:11
96:6 101:21
182:17,23 183:4,5
183:8,11 184:9,11
187:18 188:3
190:14 192:11
**persons** 126:25
223:10
**pertained** 186:7
**pertaining** 185:7,9
186:8,16 213:18
218:15,19
**pete** 53:23 54:4,6
83:13 96:16 97:22
100:16 103:4
112:5 113:18
247:15 250:8
**phd** 1:6 298:11
299:9 303:4,20
**phenomena** 96:9
**phillips** 44:15,25
50:8,10 51:5,10
52:7 83:16 85:8
85:11 149:4,8,9,11
149:24 157:10,17

236:6
**phone** 45:7 147:17
168:4
**photo** 204:9,12,13
204:16,17,18
215:2 216:19
**photograph**
216:21
**photographed**
220:8
**photographic**
214:20
**photos** 216:18
**phrase** 189:3
**phrased** 28:24
**phraseology** 231:9
**physical** 100:13
101:4
**physically** 95:15
**pick** 48:19 112:21
112:25
**pictorial** 220:9,22
**picture** 221:4,5,9
221:9,16
**piece** 30:24
**place** 43:13 55:25
82:23 83:4,20
106:10 113:5
140:24 145:18,22
176:18 189:14
193:10 200:23
212:20 234:24
236:19 247:23
272:16
**placed** 187:17
188:8
**places** 234:14
**plagiarism** 85:7
85:12,19,22,25
86:7 109:24
158:10,25 159:2,5

159:8
**plain** 26:13
**plaintiff** 1:7 2:5
146:11 160:14
205:19 211:25
212:15 213:8
223:2,8 300:13
**plaintiff's** 14:9
18:3,8 42:18 57:5
57:25 59:7 60:4
61:12 62:5,22
63:8,18 75:9 80:6
88:23 89:2,17
90:8 91:22 94:5
94:25 125:13
132:10 141:18
146:10 170:4
174:24 206:25
208:8 209:8
239:24 300:6,14
300:18
**plans** 46:24
**plant** 129:9
**plants** 46:25 47:6
47:9,18 48:12,16
48:17 49:13 66:23
**please** 4:25 14:15
60:10 63:3 65:16
67:4 104:23
123:15 162:20
233:12 238:19
249:23 251:6
254:20 267:19
269:15 280:13
281:11,13 286:3
291:11
**point** 5:23 14:21
38:20 47:23 48:14
206:2 245:11
270:25 278:11
279:11 290:9

**pointed** 181:3
**pointing** 180:13
197:22
**points** 48:5
**policies** 186:14
187:8,9,10,12
225:4 249:10
250:12,17 258:9
258:16,20,24
259:4,9
**policy** 251:12
252:4,6,13,21
253:2,7,12 254:3,7
256:4
**political** 8:24
46:12,17 49:6
110:12,16 184:15
196:24 197:18
198:11 237:8,10
237:23
**politics** 197:2
**pollack** 39:13,24
40:3 44:13,24
45:10,12,17,21,24
46:5 83:15 105:3
121:6
**pollack's** 100:18
100:23 101:5
**porters** 8:22
**portion** 251:7
**position** 133:3
139:15 223:21,25
224:7,20 225:11
225:11 247:7,8,20
247:24 248:8,25
249:12 250:12,16
252:4,13,21 253:2
253:8,9,11 254:2,5
256:6,18,23
257:16,25 258:15
258:22 259:4,9,13

259:18 260:25
261:11,17,25
262:6,10,13,22
263:3 270:10,18
270:23 273:15
277:12,17 281:5
281:12 282:11,15
283:15 284:8,16
**positions** 28:9
161:5,7 169:3
223:9 224:24
225:5 227:9 252:7
255:21
**positive** 96:23
124:2 218:11
234:20 297:10
**possession** 8:4
**possible** 241:6
278:25
**possibly** 6:3
144:23
**post** 187:6
**pot** 48:12
**potential** 6:17 7:3
189:4,16
**potted** 46:24 47:9
**practice** 111:6,9
111:13 248:24
249:2
**precise** 60:22
110:13 257:13
**precisely** 28:22
42:5 87:20 109:19
156:25 259:24
**preeminent** 37:23
**preference** 297:24
**preliminary**
245:14,16
**premises** 19:14
20:18 22:5

**preparation** 8:8
8:15 9:12,18 10:6
11:6,13,21,25 12:6
13:5,14,23 15:10
17:22 23:2 106:5
**preparations**
106:13
**prepare** 13:9
188:17 240:19
**prepared** 16:8
257:25
**preparing** 7:11
14:4 207:17
240:23,25 241:10
**present** 18:10,18
18:22 19:20,23
23:16,18 26:21
28:3 29:14 55:13
55:24 56:3,8
62:17 83:11 84:23
106:24 113:8,11
113:13 135:12,15
141:12
**presenting** 22:24
**presently** 94:8
**preserve** 202:2
**president** 51:2
83:9,20,24 84:2
85:3,15 130:6,15
131:7 146:8
148:12 199:4,7
236:10,15,21,22
288:13
**president's** 83:9
**presidential**
118:14
**presteps** 245:23
**pretty** 193:12
197:4,6 242:24
279:9

**previous** 72:4
275:6,7 276:15
278:18,22
**previously** 66:7
82:17 118:2 121:5
125:7 212:20
216:2 224:16,19
**primarily** 202:4
**principal** 263:15
263:17 265:14
**print** 164:10
**printed** 164:5
**printer** 295:14,16
**privilege** 9:23
15:21 97:11
**privileged** 7:14
15:23 16:11 54:8
54:21 105:11,21
106:8
**privy** 75:19
**prized** 117:6,20
118:25 120:9,22
122:23 123:12,22
**probably** 22:24
31:16 35:24 36:5
39:19 107:7
119:19 124:7
162:2 171:13
176:9 226:19
296:11
**problematic** 110:3
**proceeding** 54:18
**proceedings** 55:3
106:13
**process** 135:8
202:2,5 293:14
**produced** 220:18
**production** 8:12
240:13 245:20
302:10

**profession** 190:8
264:16
**professional** 26:22
53:9,24 70:8
183:13,14 189:4
189:15 196:10
201:9 224:3
240:13
**professionally**
74:9
**professor** 21:12
28:2 119:12,12,18
120:8 141:3,17,24
142:10,13,14,17
143:22 146:2,15
146:24 147:11,21
148:4,13,16,22
150:8 155:10
156:10 158:4,17
158:19,20,23,24
159:14 171:2
174:16,18 175:21
183:24 184:3
201:23 221:19
223:14,17 224:2
228:14,15,18
229:13,17,20
230:6,13 232:6
237:16 249:7,9,10
252:22 253:15,22
256:14 259:5
265:16 293:8
**professors** 213:9
**profile** 226:24
**program** 48:9
61:8 79:10 102:3
118:5 133:4,5
153:8,10,13
217:19,22 231:21
263:24 267:6
268:8 275:25

285:10 286:24 295:6,9,25

**programs** 101:24 107:18 118:6 185:6 186:9 263:14

**progress** 19:15 20:19

**project** 173:17,21 174:10 214:24 263:20,21,24 264:2,3,22 265:4 265:12,22 266:12 271:22 276:21

**projects** 185:6

**prominantly** 221:5

**promotion** 183:15 183:17

**pronounce** 155:11 157:22 165:20 166:6

**properties** 175:21

**property** 18:3,8 42:19 49:19 57:5 57:25 59:8 60:4 62:5,23 63:8,18 65:4,5,7 75:9 76:4 76:11,18,25 80:6 88:6,11,18 90:6,15 92:21 94:6 95:2 97:3,7,18 98:3,6 112:11,15,16,18 118:21 119:15,24 123:14 127:13,15 128:4,22,25 129:5 129:8 131:2,8,9 139:6 140:11,15 140:17 141:18,23 142:4,7 143:3,5,9 143:12,14,15,15

143:18 192:4,5,11 192:22 193:4

**proposal** 174:9

**protest** 9:4,8,12 70:4 176:15 242:20

**provide** 56:21 70:10 74:20 264:4

**provided** 15:14,14 15:23 16:5 170:14 216:17 263:14 266:11 267:5

**providing** 15:16

**provost** 83:14 262:15 288:14

**psc** 55:23 56:7,17 293:14

**public** 1:19 3:16 4:4 35:23 110:5,6 175:15 177:22 299:7 303:24

**publication** 9:10 170:5 242:7 248:16

**publications** 170:6 177:21

**publish** 248:14

**published** 163:8 163:16 188:13,14 213:9

**publishing** 158:12 229:14 230:2

**purchase** 295:12 297:15

**purchased** 293:16

**purpose** 17:16,19 17:20 29:6 267:3

**pursuant** 1:15

**pursue** 224:9

**put** 47:14 67:22 109:12 206:21

210:20 290:21

## q

**quarters** 275:14 283:3

**queens** 228:15,18

**question** 3:11 4:24 5:5,7 6:9 7:15 8:2 11:10 23:15 40:17 40:17 41:13 56:4 57:8,15,18,19 58:18,20,23,25 59:12,17 60:7,18 60:19 61:10 76:20 88:9 89:8 90:6 99:20 104:15,23 138:12 146:20 147:3,14 166:5 182:24 186:24 187:14,16 191:15 193:14 206:2,9,17 206:19 210:4 211:7 235:12 237:20 239:6 246:25 249:13,14 258:25 269:17 278:13,15 281:10 281:19,22,25 282:17,25 283:5,8 283:11,13,19,24 284:3,6,10,14,19 290:6 291:14

**questioning** 42:8

**questions** 4:13,15 5:12,16 14:22 206:13,14,16 209:22,24 210:2 278:3 284:23 287:11 302:16

**quickly** 56:15 291:12

**quite** 46:4 180:9 278:24

**quote** 170:4,13,15 170:17,22 196:13 243:7

**quoted** 227:20,23 228:2,5,8

## r

**r** 2:2 125:2 155:14 157:6,6 285:3 287:3 289:16 299:2

**race** 8:23 185:9

**rachel** 280:16

**racial** 186:11

**radicle** 242:3,3

**raid** 18:11,11,12 18:13,15 19:5,10 19:15,21 20:19 28:17,20 42:15,23 42:24 43:2,12 44:2 51:4,17 52:20,21 53:18 55:13,25 57:21,22 62:18 80:19 83:19 94:19 167:7

**raided** 25:17 166:25 167:3,11

**raiding** 25:19 42:16

**raised** 121:19

**raising** 197:2

**ran** 49:9 96:7 237:25

**range** 194:19

**ranked** 225:12

**ranking** 225:5

**rare** 197:6

**rate** 275:15 283:6

**ray** 196:20,23 197:7 198:6

**rbgs** 189:10
**reach** 44:3,11,12
**reached** 44:13,15
  44:16 46:8,16
  230:14
**read** 14:20 104:22
  104:24 208:14
  209:19 219:22
  220:2 233:19
  250:21 285:4
  292:10
**reading** 281:16
  282:6
**really** 33:18
  258:21 259:23
  286:19
**reason** 5:14 46:15
  46:20,21 60:24
  129:2 303:4
**recall** 13:11 16:21
  22:10,11,16,17
  23:21 24:16,17,21
  24:25 25:11 26:15
  26:20 27:8 29:8
  35:18 38:11 41:3
  41:8,10 44:23
  50:20 51:13 52:11
  61:22 62:16 74:23
  77:15 84:21 85:15
  85:17 86:3 87:18
  95:4,25 99:16,19
  100:13,15 105:17
  107:5 108:13,15
  111:23 114:21,24
  120:17 143:20
  147:25 156:21
  161:12 171:9
  179:6 202:21
  208:24 220:21
  232:16 247:13
  250:4,11 252:20

255:13,17,19,24
  266:3 269:19,21
  269:24 272:13
  277:3,5,14 279:21
  279:23 284:12
  286:11,14,16
  292:21 296:14
**recalled** 82:8
**receipt** 277:8
**receive** 115:23
  116:8,15 226:23
  266:22 291:19
  296:21 297:3
**received** 6:14,21
  254:5,7 255:19
  256:15,17 268:19
  268:22,25 270:16
  271:20 272:3,10
  275:21 277:19,22
  286:13,15 293:8
  296:23,25 297:2
**receiving** 49:22
  59:23 255:17,19
  255:24 266:23
  288:7
**reception** 75:18
**receptionist** 62:15
**recess** 124:15
  191:7 238:14
**recipient** 287:18
**recognize** 77:7
  250:15
**recognized** 111:17
**recollect** 27:24
**recollection** 13:12
  17:12 24:8,12
  40:4 43:23 45:23
  51:21 56:20 74:2
  75:3 78:21 85:9
  91:8 108:16 117:9
  162:9 250:5

251:12,16 252:12
  255:23 264:12
  270:21 287:8
**recommendation**
  188:5
**reconsider** 82:3
**reconstruct**
  242:22
**record** 35:23
  59:16 67:22
  104:24 124:14
  125:5,17 126:9
  132:12 191:9,18
  191:19,21,23
  213:2
**records** 68:15 88:3
  101:21 107:13
  118:10,11,12
  185:5 186:8 200:7
  201:16 204:7,8,21
  205:10,11
**recovering** 5:17
  6:4 49:19
**recreate** 244:17
  246:4,9
**recruit** 264:3
**ree** 166:8,9,10,11
**ree's** 166:15
**refer** 132:6 196:7
  196:9 200:16
  201:8 204:9 210:5
  237:2 241:9,12,20
  241:21
**reference** 112:6,11
  166:14 174:22
  180:4 182:17
  200:2 201:18
  213:20 220:5,6
  223:14 235:8
  236:10 270:11
  285:3

**referenced** 228:6
**references** 87:24
  200:12 233:13
  242:9
**referrals** 172:9
**referred** 28:18
  59:9 60:5 110:10
  118:2 132:4,14
  150:14 157:16
  158:15 168:2
  183:6 213:15
  229:12 241:13,18
**referring** 7:25
  8:18 9:7 18:9,13
  19:5 40:25 49:4
  130:5 131:17,24
  138:20 154:12
  155:21 162:25
  178:24 182:20
  188:11 197:10
  200:25 220:15
  229:7 235:15
  282:11,12
**refers** 9:22 149:20
  150:11,25 167:18
  173:15
**reflect** 67:22 222:3
  276:11 277:23
**reflecting** 241:5
**reflection** 159:21
  231:23
**reflects** 275:15
**refresh** 242:4
  251:11 252:11
  264:11 285:15
**refreshes** 251:16
**regard** 42:10
  49:13 62:2 112:5
  141:16 143:21
  154:8 157:8 192:5
  216:10

**regarding** 17:22
48:12 50:2 52:7
52:25 55:7 57:3
57:12 59:6 60:2
61:20 62:21 75:14
76:2,10,17,24
80:11 89:16 97:13
150:23 164:17
174:23 248:24
272:14 287:11
**regards** 7:2
**regular** 48:9 94:16
177:12 272:6
273:17,22
**regulations** 273:15
**relate** 166:23
**related** 79:18,21
97:14 189:22
245:19 258:9
299:14
**relates** 154:4
182:25 286:21
**relating** 142:24
182:21 259:4
**relationship** 97:15
229:6
**relative** 97:11
**remarks** 85:8
172:13,15,22
173:3,7
**remember** 15:25
17:10 25:18 27:6
42:5,6 51:24
73:25 82:4,16
93:19 96:8,9
102:8,16 107:6
109:18 148:8,10
154:20 156:25
168:16 179:3,10
183:18,19 184:5
223:22 231:18

250:9 254:11
257:3,10,14 264:9
270:8 277:7
**remembered**
74:11,15,17 92:20
92:24 93:5 152:15
152:19 231:19
**remind** 256:5
**reminder** 258:3
**reminders** 255:20
257:19
**reminding** 256:21
**remnants** 112:22
**removal** 18:3,8
42:18 57:4,24
59:7 60:3
**removed** 39:15
63:25 64:6,9
74:22,25 86:14,24
139:18 246:18
**remuneration**
248:17
**renee** 27:7 55:11
55:12,16,18,22
56:21
**repeat** 10:5 11:10
41:13 60:7 76:20
154:14 172:16,18
173:2 282:16
**repeated** 135:2
154:8 155:2,6
172:12,25 233:9
233:25
**repeatedly** 257:16
**repeating** 172:22
173:6
**rephrase** 5:2 57:9
**report** 236:4
247:20 248:7,8,16
248:16 256:18,23
257:25 260:25

261:11,17 270:23
272:5 276:25
282:11,15
**reportable** 248:4
**reported** 149:11
214:18 215:4,6
**reporter** 1:19 6:10
14:8 65:16 162:14
205:17 206:24
208:18 245:7
246:15 249:16
254:9 267:10
269:8 278:5
285:20 290:13,25
299:7
**reporting** 247:24
303:2
**reports** 193:16
247:9 248:25
261:25 262:22
263:4
**represent** 216:17
238:22
**representation**
214:20 216:15
**representations**
220:9,23
**representative**
115:9
**representatives**
23:24 53:7,19
55:24 56:8,14,17
**represented** 54:15
55:2 247:15 250:7
255:10 268:12
269:23 279:18
280:17 286:18
292:23
**representing**
54:19 280:23

**reprint** 162:14
300:10
**reproduce** 244:6
244:12,21
**request** 38:14,17
39:8,12,22,25
266:9,25 267:23
293:9,19 302:10
**requests** 265:19
268:3,5,5,19
**required** 4:14
245:14 247:18,19
248:7 249:6,7,8,9
249:13
**requirement**
248:20
**reread** 209:16
**research** 48:25
51:19 68:15 70:8
102:5,20 103:3,21
105:16 108:9
113:7 117:8,22
119:3 120:9
122:12,22,24
123:11,21 158:12
173:16 174:3
185:8,11,19,23
186:5,8,16,17,18
186:19,21 187:3
189:22 190:6
204:22 228:17,19
241:3 243:17
244:9 245:13,21
247:23 248:2,6,11
248:12 263:20
293:20,24
**reserved** 3:12
**resources** 266:20
**respect** 130:8
150:10 264:21
270:19 271:15

285:16,17
**respective** 3:6
**respond** 22:9
  27:15 49:24 212:6
  289:11
**responded** 61:9
**responds** 288:24
  289:3
**response** 22:10
  24:21 27:9 210:17
  210:25 211:15
  234:6 287:16
  288:18
**responses** 206:12
  206:22 239:24
  300:19
**restrict** 130:25
**resubmit** 262:11
**result** 220:13
  223:3 230:5
  268:18
**resume** 7:23,24
  8:3,5,12,14 183:15
**retained** 192:17
**rethink** 242:23
**retrieved** 252:8
**return** 37:25
  38:15 39:5 131:7
  140:13,18
**returned** 129:6
  192:6,22 193:5
  194:21,22 230:16
  243:8 244:7,23
  246:11
**returning** 121:15
**review** 14:16 15:2
  87:18 101:9,14
  105:22 107:10
  108:20 116:20
  126:14 159:5,11
  162:21 183:16

208:4 225:13,18
238:20 249:24
254:21 269:16
286:4 288:14
291:12,15
**reviewed** 7:17 8:7
  8:13,17 9:11 15:3
  99:25 100:21
  101:2,4,6 106:4,18
  106:25 116:16
  266:16,18 286:9
  292:7
**reviewing** 7:20,22
  8:14 279:21,23
**reviews** 113:4
**revised** 251:21,24
**revising** 214:13
**revolution** 9:3,9
  9:12 70:4 176:15
  242:21
**rich** 132:24,25
  133:2,15,19,22
  134:2,5,10,18,24
  135:23 137:9
  144:10 212:13
  216:4,14,23
  220:18 221:14
**right** 7:10 9:13
  10:24 11:22,23
  13:6,17 16:6,9,17
  20:11,16 27:17
  32:13 33:22 35:6
  36:15,24 39:6
  40:3 42:7 43:11
  43:24 45:3,14,15
  46:13 52:14 56:14
  65:22 66:17 69:13
  69:15 70:14 71:16
  73:21 76:15 77:2
  86:15,16 91:25
  93:22 94:2,6

96:19 97:25 100:5
105:12 106:6
107:24 108:5
110:11,17 112:8
112:13 113:6,9
114:5 117:23
127:19 130:3
131:11 133:15,17
133:18 135:24
136:5,16 137:5
138:11 140:25
141:2,5,6 144:12
144:15 145:19,20
152:20 153:2
154:4,5 155:11
156:22 157:10,22
157:25 158:2,7
159:24 162:3,4
163:9,15 164:6,8
164:14 165:18
167:24 168:19,23
169:4,25 173:12
174:13 178:4,7,12
179:16 180:2,14
180:15,17 181:4,6
181:7,10 182:17
182:22 184:8
189:17,18 191:2
193:5,23 194:10
194:21 196:18,20
200:13,14,18
201:5,6,13 203:10
203:11 206:24
208:3 209:14,15
210:8,12 211:20
212:17 213:22
216:5 219:22
222:13 223:4,16
229:10,12 230:24
231:5,10 233:17
233:20 234:6

235:16 236:11,12
236:17,21 239:17
240:4,10 243:14
245:3 247:11
251:7,24 255:7
256:11,12,24,25
257:22 261:9,19
261:23 267:7
268:16 269:2,5
270:2 274:9,10
275:16,17,25
276:22,23 280:5,9
280:20,24 281:20
281:21,23,24
282:3,19 283:6,7,9
283:10,11,16,18
284:4 285:3
287:13 288:25
289:13 292:5
293:11,21 294:11
295:2,9,17,19,20
296:6,19 297:6
**rights** 202:3
**robert** 146:2
**robin** 61:7,16 66:2
  74:18 158:24
  159:4 170:25
**rogowski** 221:5
**role** 15:9,12
  143:11 207:16,20
  220:12
**roll'in** 289:15,19
**romer** 150:8,22
**ron** 79:14,18 86:13
**ronald** 168:22
  169:6 227:7
**room** 100:24
  101:3,10,16
  114:18 196:5
  234:7,8,15 238:9

**rooms** 100:12 105:23
**roosevelt** 198:25 199:3,7 200:16,21 201:2,11 236:15 236:23
**royalties** 248:15
**royalty** 248:16
**rule** 6:15
**rules** 146:12
**ruling** 302:16
**run** 255:5
**rushed** 14:25
**rutgers** 184:3

**s**

**s** 1:16 2:2,4 3:2,2 4:2,2 75:5 125:2,2 125:2,6,6 196:14 198:21 199:2 200:13 201:10 236:11 265:8 285:3 300:2 301:2
**salary** 189:5 248:6
**sally** 262:20
**sat** 10:23 16:4 115:9
**satisfaction** 49:19
**saw** 16:16 26:3 35:7 40:5 101:7 113:15 120:8 122:25 154:3 169:18 171:8 173:7 268:10
**saying** 10:3 96:9 100:20 149:9 154:25 272:21
**says** 88:22 91:20 91:24 94:4 127:5 130:8 131:11 138:23 140:20 141:16 143:21

146:8 149:23 151:8 152:25 154:8 155:17 157:8 158:9 160:13 164:3 167:21 168:24 170:3 172:12 200:24 210:11 212:12 213:7 233:7 239:10 251:7,20 252:7 256:14 258:8 271:7 273:4,14,22 274:6,14 281:10 282:9,22 283:5 293:7,13 294:20 296:4,8
**sb** 70:17
**scan** 188:23
**schedule** 47:14 194:8
**scholarships** 264:4 264:14
**schomburg** 242:16 242:18
**school** 108:3 266:15 288:2
**schott** 265:7,9,10 265:20,23 266:2 267:24 283:20 284:11
**science** 46:12,17 49:7 110:13,16 184:15 197:18 198:11 237:8,10
**sciences** 50:15,20
**scrolling** 242:11
**sealing** 3:7
**search** 17:25 118:13,14 127:7 127:10 130:10,12

130:16 138:24 139:5,21 140:3 166:15,20
**second** 151:8 193:7 213:24 238:9 281:13 288:18 289:3 293:3
**secretarial** 129:22
**secretaries** 257:8
**secretary** 46:11,16 257:5,10,24 262:12
**section** 274:7
**securing** 174:7
**security** 108:14 115:5,7,8
**see** 16:12,20 17:18 18:5,6 22:19 31:12 33:9 35:22 40:10,18 48:20 62:6,8,10 66:23 68:9 75:10,11,20 79:16,17 80:7 83:13,16,17 88:24 94:16 97:4 105:12 108:8 112:7 114:23 117:6,8,19 117:21 119:22 121:10 127:8,9 130:13,14 131:14 138:25 141:20,21 148:20,25 149:5,6 149:21,22,25 150:2,12 151:10 154:9 155:18,19 158:13,14 160:4 160:14 166:16,17 167:19,20,23 169:3 170:6 172:13 173:17,18

174:25 175:2,23 177:23 178:20 189:7 200:3,8 201:16 204:10,11 210:8,11 212:2,3 213:5,11,23 218:14 219:24 222:17,24 223:10 229:15 230:10 234:2 242:4,5,18 243:9 246:16 250:9 251:6,10,20 251:22 252:9 253:5 258:7,11 259:21 260:15 269:20 270:10,25 271:4,18 273:19 273:20 274:4,5,12 274:23 275:10,19 276:8 277:17 280:4 283:2 284:9 286:7,10,13,14 287:15 289:7,10 292:20 294:7
**seeing** 250:4,11 252:20 255:13 269:19 286:11 292:21
**seek** 171:6 227:3
**seeking** 193:3 205:8
**seeks** 211:25
**seen** 6:24 15:6 75:23 105:13 119:13,13,14 122:19 123:18,25 124:2 206:3,10,16 206:20 207:10,11 212:7 239:7,12 247:2 250:2 269:17 291:13

**seized** 89:24 90:11 90:13 92:25 98:4 98:16 127:13,15 140:15 142:4 159:7,12 167:4 240:14 243:8 244:7,23 246:10

**seizing** 92:21

**seizure** 18:2,2,7 42:17 57:4,24 59:6 60:3 61:11 62:4,22 63:7,17 80:5 88:23 89:2 89:17 97:2,6,17 119:23 127:7,10 130:10,12,16 138:24 139:6,22 140:3 141:17,19 141:23 142:8 143:2,4 166:15,21

**semester** 256:19 256:23 272:4 274:15 276:12,13 276:15,22 277:20 279:8,9

**seminar** 81:13 82:13

**senate** 237:25

**send** 15:17 39:11 56:7,13 105:18 120:25 121:2 124:6

**sending** 55:23

**sent** 53:18 121:6 289:8

**sentence** 112:10 189:3 223:8 256:13

**separate** 45:16 53:5 202:17,17 245:15,16

**separately** 11:2,3

**september** 261:8 273:11 281:23 283:2

**sequential** 121:17 199:18

**series** 4:13 199:8 202:17 214:9 217:5,6,8,10,11 234:19 245:22 254:25 268:2,4 286:11

**served** 16:13 238:25

**services** 100:13 101:4

**set** 61:21 106:10 192:3 205:18 207:2 208:9 209:9 239:25 253:12 300:11,15,20

**seventh** 23:12,13 31:4

**shag** 47:20

**sheet** 303:2

**shelf** 69:25 70:5,6 70:11,15,18,21,22 70:23,25

**shelves** 69:20 71:10 182:12 202:14,24

**shorthand** 1:19 299:6

**shouting** 25:20

**show** 14:14 35:8 162:19 207:7 208:23 220:20,21 222:10 238:18 249:22 254:19 267:16 269:14 277:2 279:15

286:2 291:4,10

**showed** 205:23 221:2 222:11

**showing** 222:7

**side** 180:16,21,24 180:25 181:5 196:5 197:23 202:15

**signature** 206:7 239:16 261:8 299:21

**signatures** 209:3 261:4

**signed** 3:15,17 175:14 177:21 178:17 239:19 247:9 261:21 273:10

**significance** 176:7

**significantly** 190:11

**signing** 208:25

**silly** 146:21

**similar** 217:4

**simple** 180:10

**simply** 217:25 237:20 266:13

**sir** 4:10,12 7:16 57:19 58:14 127:8 130:22 135:9 136:16 140:25 162:25 167:19 175:23 177:23 207:8 212:2 213:12 223:11 239:7 244:19 247:2 252:9 259:2 267:19 271:13 278:13 279:13,16 292:7

**sitting** 15:24 126:4 218:19

**situated** 129:21,24 133:6,14

**situation** 37:19 232:9

**six** 186:3

**size** 31:5 73:17 195:19 203:12

**skwr** 189:10

**sleeping** 8:21

**slightly** 216:12

**small** 217:12

**society** 214:25 233:10

**solid** 47:16 194:12 194:17,18

**somebody** 25:8 95:11 121:2,3 128:16 133:19 155:2

**soon** 51:4 225:20

**sorry** 50:3 82:25 88:25 130:11 133:6 158:20 165:23 199:23 209:21 217:10,11 274:21 294:3

**sort** 148:10 156:3 249:13

**source** 228:10,11

**sources** 173:10,11 187:4 215:8

**south** 31:11,12 66:12,14,16 180:25

**southern** 1:3

**space** 52:18 72:15

**span** 220:25

**speak** 17:16 49:3 50:4,5 52:24 53:6

53:20 55:6 96:14
129:10 155:25
164:11 168:12
229:17,25 230:7,8
230:12 231:5,9
**speaking** 37:5
120:7 230:5 231:3
**special** 70:2,11,18
70:19,23,25,25
177:2 178:4
**specific** 11:11
14:22 35:18 51:8
64:21 84:15
106:15 255:16
256:3 258:24
**specifically** 59:20
64:7 75:2 77:21
78:8,11 81:7 93:9
96:8 140:19
150:16 151:19
154:13 215:20
235:19,20 236:4
269:24 270:8
271:3 277:14
**specifics** 249:25
**speculated** 61:16
**speculation** 58:5
59:13 62:25 63:3
165:7
**spell** 155:14
**spelled** 96:18
194:25 258:23
**spelling** 96:21,24
257:13
**spent** 14:3 287:13
**spoke** 17:13 50:8
52:13 53:12,22
73:24 74:3,7
76:22 79:3 81:22
81:24 90:19 92:12
94:12,14,18 105:5

119:21 121:11,14
121:16 142:16
152:7 153:4 156:7
157:12 158:3
161:24,25 164:17
168:4 169:5,17
175:3 224:5
226:15 228:21
230:17,23
**spoken** 156:6
161:20 168:10
169:8 227:8
**spring** 259:14
270:20,24 276:21
277:11,12 284:12
284:15,17
**square** 72:17,19
72:23 73:4,13
**stack** 33:14,20
35:14 202:19,20
202:23,24 203:10
**stacked** 102:13
**staff** 18:16 23:20
24:2,3 26:22 33:5
36:12 37:5 53:9
53:25 93:25
129:19 132:16
149:4,7,10,24
208:3 215:12
236:3,5 275:11
294:24 295:19,22
**stage** 245:14,17
**stages** 245:13
**stamp** 251:18
254:14
**stamped** 246:19
260:8,14 291:2,4
**stamps** 245:8
246:16,17 249:17
260:12 267:11
269:9 278:6

285:21
**stand** 285:14
**standard** 203:21
248:24
**standing** 6:25 9:21
190:7
**start** 6:9 76:15
273:7 297:21
298:3
**started** 28:21,23
42:7 154:21
159:20,22 202:4
250:20
**starting** 33:8
162:3 225:15
226:19 241:4
280:9
**state** 1:9,20 2:12
4:4 62:3 238:2
**stated** 158:24
209:8 239:23
**statement** 63:14
130:22 132:20,22
135:17 137:22
138:3,17 139:14
146:15,24 155:3,6
214:17 243:11
274:7
**statements** 147:11
147:21 152:16,20
153:2 155:17,20
212:13,19 213:15
233:8,25 235:15
**states** 1:2
**stealing** 109:22
132:2 149:25
150:5 156:3,12
167:23 168:7
212:15 213:18
232:3

**stenographic**
299:12
**stephanie** 287:2
288:19,24 289:6
**stet** 47:20 49:12
**steve** 133:24 134:5
135:21 136:2,6
137:8 144:4 157:5
212:14 216:3
**stipulated** 3:4,9,13
**stop** 270:7
**stopped** 153:23
**storage** 109:16
110:6,11,15,20
111:22 127:19,23
128:2 141:19
182:5,6,14 198:2,5
**store** 111:7 293:17
**stored** 142:5
179:21
**stories** 215:23
**storing** 98:12
**straddle** 279:8
**straightforward**
57:15,18
**street** 2:15 12:12
56:15 72:13,17
73:6,15
**stretch** 238:9
**striking** 117:9
**student** 62:12
86:15,18 87:9,19
87:21 101:22
107:13 118:10
152:2 153:21,24
185:5 186:8
295:24
**student's** 87:18
**students** 21:7,8
24:2 81:11,12
88:3,5,5,10,16

107:23 118:9
153:9 159:6,12
194:15 203:2
218:3 295:24
**studies** 99:5,7
106:19 107:2,11
108:7,12,19 109:5
109:13 113:5,14
114:4,7,16 115:15
115:16,18,19
116:21 141:8,19
142:5,15 143:10
143:12,16,19
223:15
**stuff** 64:11,19,20
64:23 65:22 103:5
103:5,12 104:5,18
108:25 109:20,25
119:5 120:12,15
121:15 123:24
129:9,11 145:11
**stunned** 33:5
36:11 44:2
**subject** 7:2 17:24
59:6 60:2 61:4,20
75:14 80:11
**subjects** 50:2
**submit** 257:6,7,10
**submitted** 193:15
256:22 257:4,19
258:2 259:13,17
262:2,6,10,14,15
271:16 278:23
294:2
**subscribed** 298:13
303:21
**subsequent** 6:21
42:23 43:2 48:21
76:14 167:7
227:16 232:18

**subsequently** 37:5
54:25 135:3
187:10 234:10
**subversive** 290:8
**sugar** 111:8
**suggested** 194:13
**suit** 41:20
**summers** 107:23
108:2
**sunday** 12:8,9,17
13:3
**supplemental** 6:14
193:16,18 239:24
300:18
**supplementary**
273:24
**support** 89:14
264:4 265:21
266:11 267:5
268:7 275:24
293:15 302:2
**supporting** 139:4
**supposed** 194:25
216:16 266:22
296:13,18
**supposedly** 144:11
**sure** 5:18 10:19
24:6 26:4 31:20
35:25 36:8 40:21
40:21 47:2 50:15
50:17 68:2 70:21
77:16 99:6,7
105:4,5 109:6,9
112:3 115:21
122:3 128:19
148:2 155:23
162:11 163:3,12
173:9 187:13
189:12 197:21
203:23 208:6,11
208:16 209:16

218:24 234:19,22
234:25 235:5,6
257:12 264:8,15
287:8 296:16
297:5,7,9
**sustained** 223:2
**swirling** 232:4
**sworn** 3:15,17 4:3
125:7 298:13
299:9 303:21

**t**

**t** 3:2,2 75:5,5
125:2 189:6 265:8
265:8 299:2,2
300:2 301:2
**table** 193:20
**tabs** 238:23 270:5
**taft** 229:3,4,6
**take** 6:10 14:16,25
47:7,17 82:22
83:3,20 93:6,8,11
93:14,21 97:25
115:10 124:11
162:21 191:4
208:15 234:23
238:10,20 244:6
244:12,14,15,21
246:3 249:24
254:21 259:25
269:15 286:4
291:20,22
**taken** 1:15 9:2,6
30:8,10,12,15
36:14,18,21,22
37:3 76:3 81:17
81:20 82:13,15
91:12 99:14 100:2
107:21 125:19
143:16 190:9
191:7 192:6 193:5
211:24 238:14

**takes** 128:16
**talk** 25:22 30:17
97:12 120:11
123:15 142:19
152:13 245:18
292:3
**talked** 36:12 61:6
90:25 119:18
141:4 157:18
224:15
**talking** 47:8 88:2
110:14 123:8
197:13 200:5,9
216:7 221:18
242:15
**tapes** 237:3,6,14
**taught** 36:2
**tea** 111:8
**teach** 37:24
**teacher** 265:12,22
**teachers** 263:24
264:2,22 266:12
267:6 270:9,13
271:22 275:24
276:21 295:6,8
**teaching** 24:20
35:20 36:4 37:21
37:22 38:2,14
39:5 48:24 95:7,9
169:2,15 188:5
223:25 227:8
264:6,15 275:16
**team** 150:11
157:10,15 235:16
**team's** 150:17
**tearing** 8:19
241:13 243:6
244:4
**tech** 89:14,14
**technical** 146:11

**technician** 89:14
**telephone** 51:11
51:12,15
**telephones** 25:22
**tell** 4:25 14:17
24:23 34:19,21
45:21 55:16,20
59:21 64:8 67:18
74:14,24 76:16
77:4 81:5,16 82:7
83:23 84:3,6
86:17,20,23,25
87:20 91:6 92:6
92:10 93:7,10,18
97:17 98:23 120:2
133:22 134:5,9,16
142:22,23 143:17
144:25 145:7,21
148:13 149:17
150:4 156:14,18
159:15 162:22
169:14 170:10
172:7,21 175:11
175:13 188:9
194:4 218:8
225:14,17 226:21
227:14 230:25
231:14 232:12
237:22 238:21
250:2 254:23
267:21 286:4
291:12,15 292:6
292:13 297:8
**telling** 27:10 82:12
132:17 164:8
215:13 216:22
234:17,18 235:5
258:13
**ten** 11:19,20 14:6
40:7 87:24 88:12
88:15 179:9

238:11
**tension** 221:14
**tentative** 225:20
**tenure** 183:15,17
**term** 132:6
**terminal** 88:3
**terminated** 112:19
165:5,10,12 226:5
232:5
**termination** 55:3
116:23 165:15
226:2,7
**terms** 45:18 68:23
116:9 187:8
235:12 248:17
266:21
**terrence** 134:2,11
134:17,23 135:13
135:16,23 136:4
138:20 139:10
144:2,11,21 145:6
145:9 149:10,12
149:16 150:3
151:5 152:19
153:6,7 216:4,19
217:12
**testified** 4:5 19:19
20:20 25:3,15
26:8,15 27:18,25
32:18 35:3 36:9
40:5 42:20 45:11
50:7 52:9,12 58:3
58:14 59:4 60:25
66:8 76:22 78:16
82:17 86:13
106:17 113:6
114:8,10 116:18
117:23 125:8
135:21 144:9
212:20 214:10
224:19 265:2

271:20 275:20
276:18 277:16
282:23
**testify** 58:8,10
91:10,14 116:13
152:14 165:7
**testifying** 4:20
26:19 272:13,19
277:3,5,7
**testimony** 7:3 9:13
12:25 18:17,20
39:3 56:16 73:7,8
109:11,14 125:23
126:5,11 189:24
191:11 237:12
252:25 253:4,5,10
253:19,25 257:23
258:18 259:2
263:6 270:22
277:2 285:4,5
**thank** 31:9 63:16
147:7 155:13
238:5 239:4 295:9
**theft** 75:8 76:11,17
76:24
**theirs** 128:18
**theodore** 200:22
**thesis** 242:8
**thickness** 34:13
**thief** 132:2,18,24
133:17,20 134:3
134:11,19,24
135:13,24 136:5
137:11 149:5,18
151:6 154:13
172:17 215:3,14
216:5,20
**thing** 154:21 232:4
237:20
**things** 30:14,15
31:6 33:17 43:12

48:25 77:8,9,18
78:24 88:8 109:24
110:4,4 115:25
122:15 156:3
190:13 203:6,6
206:12 221:18
233:22 234:22
241:7 296:17
297:16
**think** 5:19 6:20
16:10 23:20 31:13
31:20 33:17 37:18
40:22 41:6 44:22
50:14 54:6,7 57:7
57:18 66:9,24
67:20 69:2 82:4
83:15,16,17 85:14
85:16 89:7 98:25
101:12 105:5
108:23 109:7,9
113:24 114:20
115:15 116:4,10
126:17 148:3
152:23 156:23
159:19,21,22
163:4,20,23
169:23 174:8
183:25 185:21
187:15 189:11
193:10,17 199:4
200:20 202:15
208:2 210:24
213:25 221:11,21
221:22 225:7
228:4,5 234:15
242:25 248:9
259:16 264:10
266:16 283:17
**thinking** 25:25
**third** 72:14 115:16

**thought** 33:12
41:11 231:7,10
234:7,8
**thousand** 71:7
**thousands** 290:2
**three** 13:15,21
31:24,25 34:21
40:7 65:4 67:23
68:9,10 71:16,18
71:19,19 98:25
99:3 179:15 180:7
182:9 197:3
202:18 203:8
257:4,6 261:25
275:14 283:3
**throat** 6:2
**throw** 96:4
**throwing** 64:10,13
64:18,20,22 65:22
77:9 95:12
**thrown** 63:25 64:6
64:9 74:22,25
77:19,24 78:10,13
78:25
**ticketing** 107:15
**tie** 41:20
**time** 3:12 4:23
6:11,16 13:8 15:2
17:8,13 19:16,20
21:25 28:12 29:5
29:13,16,19 35:21
36:13,16,25 37:10
38:12 42:25 43:20
46:5,14 49:6
62:14 63:20,21
66:4 73:23 74:3
74:17 79:3 80:20
81:11,22 85:17
89:13 90:18 92:12
93:20 94:11,18
98:2 101:15

103:14,16,17
106:10 109:7,17
110:22 113:15
114:17 119:9,11
119:17 120:14
122:17 123:16
129:20,22 132:5
133:2,9,10,11,12
134:17 137:18
138:14 141:7,10
141:11 142:16
144:19 145:16
152:7 153:4,6,10
153:14 156:7
157:12 158:3
159:16 161:10,17
162:4,4,5 164:14
164:16 168:3,17
168:18 169:5,21
172:3 173:24
175:3 177:4
191:15 208:15
213:23 214:15
215:5,10,24
220:25 229:24
230:17 238:6
243:24 244:3,5,11
244:20 245:15
246:3 248:22
249:11 250:13,17
252:14 257:5
258:2,5 262:7,18
272:6 273:17,23
275:16 279:6
289:9 296:14
297:21 298:4
**times** 11:12 97:24
108:4 135:6
137:21 151:9,15
151:18 160:20,22
161:18,22 162:5

162:10,15 163:5
163:16,21 169:19
170:18 172:24
173:7 213:10
215:15 225:22
227:18,21,24
228:3 243:12
247:10 257:4,6
258:4 300:9
**timesheets** 107:17
**tiny** 221:9
**title** 50:12,18
68:20,25 240:18
**titled** 14:9 205:18
208:19 240:12
275:10
**today** 4:13,19 5:12
5:16 7:12 8:9 9:19
11:7,14,22 12:2,5
13:6 14:5 15:7
126:4 214:10
218:20 248:24
281:8
**told** 41:9 43:9 54:4
57:2,14 61:4,18
63:24 65:21 74:9
74:19 77:5,10
80:20 84:13 90:11
90:12,12 91:23
92:2,7,8,11 95:5
95:11,25 105:10
115:10 120:4
121:5,16 129:7,8
129:20 131:4,25
132:23 133:15,19
133:24,25 134:2
134:10,20,21,22
134:25 135:7,22
136:3 137:9,10
140:22 144:10,10
145:13,15,17

146:9 147:9 148:3
148:4 149:4,23
150:22 151:5,9,13
151:15 153:4,7,11
153:14 155:24,24
158:17,21,23
159:10 160:23
163:13 165:17
167:21 168:4
169:18 171:22
214:7,11 216:2,3,4
216:23 217:18,18
221:12,15 224:8
230:22 231:3,4
232:2,2,5,10,16
234:9 262:17
**tomorrow** 240:7
243:3 245:4,18
297:21
**tools** 190:8
**top** 35:13 61:25
62:8 73:22 124:9
145:25 157:3
164:3 170:3 184:5
186:4 189:2 192:2
192:3,12,14 193:2
199:19 242:25
250:10 268:16
273:5 283:22
288:12 289:12
**topic** 68:20
**tossing** 96:11
**total** 137:24
178:11 197:12
201:12 275:18,21
283:8
**totally** 148:2
**touch** 53:14
**trade** 190:9
237:24

**tradition** 242:4
**tramontano** 83:14
**transcript** 279:22
　280:10 282:10
**transcription**
　299:11
**transferred**
　111:15
**translation** 199:5
**trauma** 37:19
**travel** 101:23
　107:12,15
**treated** 220:13
**trial** 3:12
**tricked** 231:2
**trips** 107:21
**trouble** 231:12
**true** 208:9 209:9
　240:2 276:6
　299:11
**truman** 196:14
　198:22 199:3
　200:2,13,24
　201:10 236:11,24
**trustees** 251:8
**truth** 297:8
**truthful** 5:11,16
　5:21 6:6
**try** 36:13 123:7
　130:10 224:6
　241:6 256:16
**trying** 45:13 57:21
　63:9 106:9 147:25
　159:19 223:22
　264:9 292:10
**tuesday** 289:8
**tumaniro** 212:14
　215:19 217:14
　218:7 230:18
　232:2,12

**tuminaro** 173:5
　215:11
**turn** 281:11,12,25
　282:17
**twelve** 178:20
**twice** 119:4
**two** 10:15,16
　26:21 36:5,7
　46:24 47:4,8
　53:18 55:23 56:7
　67:2,4 68:10 88:8
　99:15,17,21,24
　100:21 114:2,20
　116:19 147:18
　169:12,13 180:23
　200:12,19 202:17
　203:8,14,16,17
　217:3 219:14
　220:22 225:9
　227:13 233:13
　234:21 236:18
　261:14 268:22
　273:7 274:11
　276:12,14 278:2
　286:8 296:8
**type** 15:17 188:21
　207:25 226:25
　227:2
**typed** 188:18,20
　195:8 282:6
**typewritten**
　188:20 208:3
**typo** 166:18,19
　189:12 199:4,7

**u**

**u** 3:2 75:5 157:24
**u.s.** 92:22 225:8
**uct** 268:7 271:2
　284:3,7 286:24
**uh** 123:10 171:17
　245:5 267:20

**ultimately** 195:8
**unable** 5:15 95:15
　95:19 172:8
**unanswerable**
　249:14
**unaware** 253:21
**undergraduate**
　50:17,19 264:8,10
**understand** 4:12
　4:15,18,21,22,24
　5:7,8 8:2 128:18
　128:20 132:11
　210:14
**understanding**
　50:24 85:18 95:17
　108:17,22,24
　114:13 128:7,13
　128:15 129:16,18
　131:5 132:23
　136:20,25 137:4
　170:8 205:3,6
　215:17 220:19
　221:25 247:17,22
　248:2,18 258:23
　266:7 287:21
**understood** 5:6
**unemployable**
　160:14,18,24
**unfortunate**
　260:19
**unfortunately**
　170:16
**ungraduate** 50:16
**uniformed** 26:11
**union** 53:8,13,15
　53:18,21,24 54:14
　54:15,19 55:7
　56:12 237:24
**union's** 280:21
**unique** 70:7

**united** 1:2 295:5
**university** 46:2
　90:5,17 183:20,25
　184:4 186:15
　187:11 205:5
　223:19,24 225:6
　252:3
**unlabeled** 102:16
**unlocked** 32:19
　185:22 186:2,10
**unnumbered**
　102:16
**unpaid** 248:13
**unprofessional**
　147:19
**upcoming** 23:2
**update** 79:9
**upheld** 165:15
　225:25 226:7
**upper** 270:2
**upstairs** 95:7
**urban** 263:23,25
　264:22 265:11,22
　266:12 267:6
　270:9,13 271:21
　275:24 276:20
　295:7,8
**use** 19:10 24:19
　25:21 44:3 55:14
　67:11 70:17 93:13
　156:10 170:4,17
　194:14 204:7
　215:2 216:18,21

**v**

**v** 303:3
**vaguely** 286:19
**valuations** 192:21
**value** 174:24
　175:20 176:18
　177:5,6,8 178:10
　178:15,17,18

187:18 188:8 189:4,14,15 192:3 200:23 236:20

**vargas**  88:22 89:4 89:6,12,16 90:19 91:9

**various**  15:25 16:2 75:23 87:13,16 101:24 107:18,23 108:4 192:9 202:25 207:13 224:24 243:22 247:10

**venues**  97:24

**verification**  208:19 209:7 239:15 300:17

**verifying**  206:15

**veritext**  303:2

**vernacular**  290:7

**version**  163:19

**versions**  163:17,24

**vertical**  180:3

**vicinity**  24:4

**video**  219:23

**videos**  220:15,20 220:21 222:2

**view**  97:22 98:6 100:9 156:23

**viewed**  98:3 99:7 99:13 101:6

**violated**  121:21

**violence**  203:2

**vitae**  190:21 241:4

**vms**  1:4

**volume**  9:9 70:5 95:13 96:10 177:15 178:11 182:10 185:23 244:15,17 279:17

**volumes**  87:25 88:13,16 176:16 177:17

**voluminous**  117:8 118:7

## w

**w**  4:2 96:18 125:6

**wait**  146:21 213:24 245:10

**waived**  3:8

**walk**  238:8

**wall**  69:10,11,11 69:12,14 121:24 181:18 204:14

**walls**  222:3,8

**want**  10:5 24:6 38:6 43:24 47:18 48:16 58:24 60:22 61:3 82:5 142:25 147:16 191:4 214:19 216:18 240:8 243:4 278:21 296:5 297:21

**wanted**  47:2 109:19 112:20 115:25 119:22 143:14,18 201:25 245:25

**wants**  294:21,23

**warren**  224:23 225:2

**washington**  202:23

**watch**  111:14

**water**  47:3

**waters**  6:16 7:3

**watkins**  174:16,18 201:19,22 202:7 203:9

**way**  28:24 38:9 39:9 41:17 42:11 65:20 68:17,19 79:19 96:7,17 122:17 137:2 184:20 207:24 273:14 276:4 282:21 283:3 285:2

**ways**  217:21

**web**  204:9,16

**website**  252:8 258:14

**week**  6:19 17:17 19:7 43:3,6,13 47:4 119:21 274:18,20,21 281:20 283:14

**weeks**  13:15,21 17:15 39:2,4 45:12 49:17 50:2 51:7 80:18 81:25 119:19 142:18 152:9

**weight**  96:10

**went**  9:14 16:16 30:6 32:22 48:6 101:5,15 107:11 108:6 110:3 114:16,17 115:4 115:17,19 116:19 117:11,18 121:25 132:17 208:5 220:7 241:23 242:10

**west**  12:12 31:11 66:12,16

**whatsoever**  34:23

**whistles**  294:22 295:13

**whitlock**  224:24 224:25 225:2,10 225:23

**wide**  68:11

**widely**  215:11

**wife**  47:19 194:11

**wife's**  47:12 194:5 194:6

**williams**  151:2,4 151:13 163:13

**willing**  82:10 119:23

**wilson**  1:6,14 4:1,7 5:1 6:1 7:1,10 8:1 9:1 10:1 11:1 12:1 13:1 14:1,8,11,14 14:15 15:1,4 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1,23 31:1 32:1 33:1 34:1 35:1 36:1 37:1,10 38:1 39:1 40:1 41:1 42:1,10 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1,3,18 60:1 61:1 62:1 63:1 64:1 65:1,17,18,20 66:1 67:1,22 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1

| | | | |
|---|---|---|---|
| 87:1 88:1 89:1 | 196:14,17 197:1 | 284:22 285:1,20 | 211:11 246:23 |
| 90:1 91:1 92:1 | 198:1 199:1 200:1 | 285:23 286:1,2,3 | 249:21 254:18 |
| 93:1 94:1 95:1 | 201:1,10 202:1 | 287:1 288:1 289:1 | 267:15 269:13 |
| 96:1,19 97:1 98:1 | 203:1 204:1 205:1 | 290:1,25 291:1,7 | 278:10,20 285:25 |
| 99:1 100:1 101:1 | 205:17,20,23 | 291:10,11 292:1 | 291:9 297:25 |
| 102:1 103:1 104:1 | 206:1,25 207:1,4 | 293:1,8 294:1 | 299:8 302:5 |
| 105:1 106:1 107:1 | 208:1,20,23 209:1 | 295:1 296:1 297:1 | **witnessed**   18:2,25 |
| 108:1 109:1 110:1 | 210:1 211:1 212:1 | 298:1,11 299:1,9 | 19:12 58:6 62:4 |
| 111:1 112:1 113:1 | 213:1,18 214:1 | 300:1,4 301:1,4 | 63:7 80:5 88:22 |
| 114:1 115:1 116:1 | 215:1 216:1 217:1 | 302:1 303:1,3,4,20 | 94:25 97:2,18 |
| 117:1 118:1 119:1 | 218:1 219:1 220:1 | **wilson's**   8:12 | 119:25 141:17 |
| 120:1 121:1 122:1 | 221:1,11,19 222:1 | 91:24 215:2 | 142:9 143:5,9 |
| 123:1 124:1 125:1 | 223:1,7 224:1 | 216:21 237:2 | 144:18 148:20,23 |
| 125:11,22 126:1 | 225:1 226:1 227:1 | 240:13 | 152:25 155:17 |
| 127:1 128:1 129:1 | 228:1 229:1 230:1 | **window**   31:18 | 157:9 |
| 130:1 131:1 132:1 | 231:1 232:1 233:1 | 70:16 | **witnesses**   171:3 |
| 133:1 134:1 135:1 | 234:1 235:1 236:1 | **withdrawn**   23:5 | 192:18,21 |
| 136:1 137:1 138:1 | 236:5,11,16 237:1 | 28:19 81:15 86:5 | **witnesses'**   303:4 |
| 139:1 140:1 141:1 | 238:1,15,18,19 | 88:14 94:23 99:22 | **woman**   26:9 |
| 142:1 143:1 144:1 | 239:1 240:1 241:1 | 135:11,20 149:15 | **women**   242:2,3 |
| 145:1 146:1 147:1 | 242:1 243:1 244:1 | 153:19 161:19 | **wondered**   52:21 |
| 148:1 149:1,5,24 | 245:1,7 246:1,15 | 264:19 268:24 | **wooden**   69:16,18 |
| 150:1 151:1 152:1 | 246:21,24 247:1 | **withstand**   225:13 | **word**   19:10 44:3 |
| 153:1 154:1 155:1 | 248:1 249:1,16,19 | 225:18 | 55:14 93:13,14 |
| 156:1 157:1 158:1 | 249:22,23 250:1 | **witness**   6:17 14:13 | 128:8,13 131:5 |
| 158:17,19,25 | 251:1 252:1 253:1 | 14:18 27:3,11 | 156:10 189:6,13 |
| 159:1 160:1 161:1 | 254:1,9,13,16,19 | 31:8 42:17 57:23 | **words**   112:17 |
| 162:1,14,16,19,20 | 254:20 255:1 | 63:19 67:5 70:20 | 156:15 |
| 163:1 164:1 165:1 | 256:1,14 257:1 | 75:8 82:6,11 89:2 | **work**   79:9 87:18 |
| 166:1 167:1,22 | 258:1 259:1 260:1 | 91:4 92:16,18 | 88:3 94:8 150:19 |
| 168:1 169:1 170:1 | 261:1 262:1 263:1 | 94:5 97:3,7 103:9 | 159:12 171:11,23 |
| 171:1 172:1 173:1 | 264:1 265:1 266:1 | 105:12 113:12 | 174:25 175:17 |
| 174:1 175:1,21 | 267:1,13,16,25 | 119:23 125:19 | 189:21,25 202:3 |
| 176:1 177:1 178:1 | 268:1 269:1,8,11 | 141:24 142:20 | 220:17 229:2 |
| 179:1 180:1 181:1 | 269:14 270:1 | 143:2,22,25 146:6 | 241:4 242:13,16 |
| 182:1,18 183:1 | 271:1 272:1 273:1 | 146:16,25 147:12 | 242:17 245:16 |
| 184:1 185:1 186:1 | 273:3 274:1 275:1 | 147:22 152:11 | 264:20 270:17 |
| 187:1 188:1 189:1 | 276:1 277:1 278:1 | 157:19 162:18 | 271:8,10,21,25 |
| 190:1 191:1,10,24 | 278:5,8 279:1 | 168:11,13,24 | 272:3 273:25 |
| 192:1 193:1,22 | 280:1 281:1,7 | 175:7,9 205:22 | 276:16,20 289:21 |
| 194:1 195:1 196:1 | 282:1 283:1 284:1 | 207:6 208:22 | |

**worked** 21:2 80:16
129:19 203:4
206:23 251:13
264:12 277:24
287:4 293:23
**worker** 21:2 23:7
23:22,23 36:6
47:25 62:13 72:12
72:16 73:5 74:13
80:15 82:20
107:22 139:17,24
145:12 167:9
176:24 194:9
195:17,22 198:4
202:11 204:15
214:23 216:16
217:16,20 218:3
220:8,11,25 222:9
226:11 241:24
**workers** 242:12
**working** 63:23
161:9 173:22
226:25 295:24
**works** 229:23
**worry** 290:19
**write** 60:10,13,16
60:18 63:13
178:23 244:3
**writers** 188:21
**writing** 38:18,20
38:22 39:6 40:2
104:9 243:18
244:9 245:20,21
245:24
**written** 123:19
198:23 268:15
281:16
**wrong** 58:25
236:20
**wrongful** 211:23

**wrote** 63:10,11
177:2 178:25
196:25 197:3
199:23 270:6
289:15,18 297:12

| x |
| --- |

**x** 1:5,11 181:3
300:2 301:2
**xs** 67:22

| y |
| --- |

**y** 149:21 169:25
289:16
**yale** 183:20
**year** 13:16,19,23
79:5 90:21 108:3
111:24 140:24
167:13,14 169:7
169:12 195:10
220:24 227:12
234:16 259:22
286:23
**year's** 79:6,8
90:20,23 91:2
**years** 31:24,25
71:16,17 111:11
118:16 121:23
123:4 153:14
169:12,13 196:9
197:12 201:8,25
215:24 219:2
235:2 241:8
243:13 244:10,16
248:18 253:24
259:6 260:2
264:23,24
**yellow** 187:5
**yong** 1:17 2:4,8
10:9,11,16,17,25
10:25 98:19

**york** 1:3,9,17,18
1:20 2:7,7,12,16
2:16 4:4 12:15
46:2 97:23 151:15
151:18 160:20,22
161:17,22 162:5
162:10,15 163:5
163:16,21 169:19
170:18 172:24
173:7 175:15
213:10 215:15
225:21 226:14
227:17,20 252:3
300:9 303:2
**younger** 41:7,15

| z |
| --- |

**z** 96:18
**zaromatidis** 1:18
299:6,23
**zevin** 228:13,14,21
229:2
**zwiebach** 53:23
54:25 55:7 83:13
85:10 96:17,25
97:7,18 98:3,8,10
98:14,18,22,23
99:12,25 100:21
101:11 103:19
104:4,7,17 105:10
105:14,18 106:18
106:25 107:11
108:6,20 112:6
113:4,20 114:11
114:25 115:20,24
116:3,4,7,14
117:13 122:10
124:3,6 247:15
250:8 255:11
268:13 269:23
279:19 280:19
286:18 292:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.