# EXHIBIT 2

Page 304

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 15-cv-0023(CBA)(VMS)

5    ----------------------------------------x

6    DR. JOSEPH WILSON, PhD,

7                            Plaintiff,

8            - against -

9    THE STATE OF NEW YORK, et al.,

10                           Defendants.

11   ----------------------------------------x

12                           January 30, 2019

                             10:00  a.m.

13

14           CONTINUED DEPOSITION of DR.

15   JOSEPH WILSON, taken by the Defendants,

16   pursuant to Notice, held at the Law

17   Offices of John S. Yong, P.C., 39 East

18   Broadway, New York, New York, before

19   Debbie Zaromatidis, a Shorthand Reporter

20   and Notary Public of the State of New

21   York.

22

23

24

25

Page 305

1
2 A P P E A R A N C E S :
3
4      LAW OFFICE OF JOHN S. YONG, P.C.
5      Attorneys for Plaintiff
6         39 East Broadway
7         New York, New York
8      BY:  CHRIS YONG, ESQ.
9         - and -
10        JAMES B. KLEIN, ESQ.
11
12 STATE OF NEW YORK
13 OFFICE OF THE ATTORNEY GENERAL
14 Attorneys for Defendants
15     28 Liberty Street
16     New York, New York
17 BY: MARK E. KLEIN, ESQ.
18
19
20
21
22
23
24
25

Page 306

1               WILSON
2 J O S E P H   W I L S O N, PhD,
3 having first been duly sworn by a Notary
4 Public of the State of New York, was
5 examined and testified as follows:
6 EXAMINATION BY MR. MARK KLEIN:
7    Q.   Good morning, Dr. Wilson.
8    A.   Good morning.
9    Q.   You recall that yesterday your
10 attorney Mr. Klein made a number of
11 objections yesterday when I asked you
12 about the words "Conversion" and
13 "defamation" that appeared in your initial
14 disclosures?
15    A.   Your question is do I recall
16 that?
17    Q.   Yes.  Do you recall that?
18    A.   I do recall that.
19    Q.   And you recall that you filed a
20 49-page second amended complaint in this
21 case, right?
22    A.   I do recall that.
23    Q.   And that complaint asserted
24 claims, actually more than fifteen claims
25 against nineteen defendants, right?

Page 307

1               WILSON
2    A.   That's right.
3    Q.   And that complaint included
4 claims for defamation and conversion,
5 right?
6    A.   I would have to review the
7 record.
8       MR. MARK KLEIN:  I am going to
9 ask the reporter to mark as the next
10 exhibit, Wilson Exhibit 16 a copy of a
11 document titled "Amended Complaint" filed
12 on June 12, 2015.
13      (Wilson Exhibit 16 marked for
14 identification.)
15      (Document handed to witness.)
16    Q.   Dr. Wilson, I show you what has
17 been marked as Exhibit 16.  Please take a
18 moment to review it generally.  If you
19 would like, I can direct you to the claims
20 for conversion and defamation that you
21 asserted on the case if you would like me
22 to.
23      (Pause.)
24    Q.   You are not going to read all 49
25 pages, are you?

Page 308

1               WILSON
2    A.   I am going to familiarize myself
3 with this.  It has been a while since I
4 have seen it, a few years actually.
5    Q.   I am not going to ask you about
6 it in any detail.
7    A.   Okay.  So what is the page?
8    Q.   Well, if you go to page
9 28 -- let me first ask you is Exhibit 16
10 the Amended Complaint that you filed in
11 this case on June 12, 2015?
12    A.   You want me to see if I signed
13 this?
14    Q.   You didn't sign it, did you?
15    A.   No, I didn't sign it.
16    Q.   Your attorney Collin Moore
17 signed it, right?
18    A.   My attorney signed it.
19    Q.   And that was Collin Moore at the
20 time, right?
21    A.   That was Collin Moore at the
22 time.
23    Q.   Okay.  If you go to page 28 of
24 this document, there is a claim for
25 defamation, right, among other claims, Dr.

2 (Pages 305 - 308)

WILSON

1      WILSON
2  Wilson?
3      A.   Page 28?
4      Q.   Yes.
5      A.   That would be number 54.
6      Q.   If you look at the title above
7  paragraph 53 it says, "Third cause of
8  action for defamation, malice and
9  intentional infliction of emotional harm."
10 Do you see that?
11     A.   I see that.
12     Q.   So your Second Amended Complaint
13 contained a complaint for defamation?
14     A.   Right.
15     Q.   That is a yes?
16     A.   Yes.
17     Q.   And if you go to page 46 --
18     A.   Of the same document?
19     Q.   Of the same document.  Do you
20 see there is a seventh cause of action for
21 conversion of personal property, correct?
22     A.   46 and -- yes.
23     Q.   Okay.  Now, did you prepare any
24 portions of Exhibit 16, sir?
25     A.   I mean my attorney drafted this,

1      WILSON
2  so I don't know --
3      Q.   Let me ask you in particular if
4  you could go through pages 2 through 7 of
5  the second amended claim.
6      A.   Pages 2 through 7.
7      Q.   Pages 2 through 7.  There is a
8  portion of that document that is titled
9  "Preliminary Statement," right?
10     A.   7 --
11     A.   2 through 7.
12     A.   2 through 7.  Yes.
13     Q.   Did you prepare any portion of
14 the preliminary statement?
15     A.   Yes.
16     Q.   You prepared the entire
17 preliminary statement, correct?
18     A.   Yes.
19     Q.   And if you go to pages 7 through
20 10.
21     A.   Let me -- you are jumping
22 around.  Give me a chance to look.
23     Q.   Okay.
24     A.   7 through 10.
25     Q.   There is a section called

1      WILSON
2  Summary of facts, right?
3      A.   Yes.
4      Q.   And you prepared the summary of
5  facts, correct?
6      A.   Yes.
7      Q.   And on pages 11 through 19,
8  there is something called "Nature of the
9  Claims," right?
10     A.   Uh-huh.
11     Q.   That is a yes?
12     A.   Yes.
13     Q.   And did you prepare the section
14 titled "Nature of the Claims"?
15     A.   I actually don't recall.  I
16 would have to spend more time reading
17 these in detail.
18     Q.   And then on pages 20 through 23
19 there is a section called "Factual
20 Background," correct?
21     A.   Page -- what was it?
22     Q.   20 through 23.
23          MR. JAMES KLEIN:  Could you
24 define prepare?
25     A.   Yes.

1           WILSON
2           MR. JAMES KLEIN:  I mean this
3  is a document that is signed by an
4  attorney and submitted to the court.  It
5  is legally the attorney's work.  So when
6  you say did he prepare, did he prepare a
7  draft that he gave to his attorney or did
8  he review the final version? I mean what
9  does prepare mean in the context that you
10 are saying it?
11          MR. MARK KLEIN:  I think he
12 understood the word "prepare."  I think
13 we all understand the word "prepare."  HE
14 answered the questions.
15          MR. JAMES KLEIN:  No, it is --
16          MR. MARK KLEIN:  You have your
17 objection.  Please don't interfere with
18 the deposition.
19     A.   So I would like to ask then
20 what --
21          MR. JAMES KLEIN:  No, you are
22 not here to ask him questions.
23          THE WITNESS:  Well, it is --
24          MR. JAMES KLEIN:  Joe, I am
25 your lawyer.

3 (Pages 309 - 312)

WILSON

1            WILSON
2            THE WITNESS:  Okay.
3            MR. JAMES KLEIN:   These
4    questions are all under objection that it
5    is confusing that you have not defined the
6    word "prepare."
7            MR. MARK KLEIN:   Your objection
8    is noted, counsel.  Here is a man with
9    two masters degrees, a doctorate, and you
10   need a definition of the word "prepare."
11           MR. JAMES KLEIN:   It is a legal
12   document, and it is signed by an attorney
13   and submitted to the court.
14           MR. MARK KLEIN:   I am not going
15   to have a conversation with you about
16   this.  You have your objection.
17       Q.   Dr. Wilson, on pages 20 through
18   23 there is a section called "Factual
19   Background," right?
20       A.   20 through 23?
21       Q.   Yes.
22       A.   Factual background, correct.
23       Q.   Did you prepare that?
24       A.   I would have to read it to let
25   you know.

WILSON

1            WILSON
2        Q.   In fact, you prepared major
3    portions of this complaint and provided it
4    to your attorney to include in a
5    complaint, correct?
6        A.   What basis -- no, that's not
7    correct, no.  Not correct.
8        Q.   Did you review Exhibit 16 before
9    it was filed with the court?
10       A.   No, I did not.
11       Q.   No, you didn't?
12       A.   No, I didn't.
13       Q.   Even though you just testified
14   that you prepared at least two sections of
15   the complaint, you said you didn't review
16   it before it was filed?
17       A.   That's correct.
18       Q.   That's your testimony?
19       A.   That's my testimony.
20       Q.   Okay.  You are aware that
21   defendants moved to dismiss Exhibit 16,
22   correct?
23       A.   I am aware.
24       Q.   And you are aware as a result of
25   that motion and subsequent motion practice

WILSON

1            WILSON
2    with respect to your Third Amended
3    Complaint the court significantly reduced
4    the claims in this case, correct?
5        A.   I am aware of that, yes.
6        Q.   What claims remain in the case?
7            MR. JAMES KLEIN:   I am going to
8    object.  I mean you're asking him is
9    there any document that he could review.
10   I mean he is not sitting here with a full
11   record of the case, and you are asking him
12   to remember a three or four-year record of
13   the case.
14       Q.   Do you know what claims remain
15   in the case, sir?
16       A.   I would have to review the
17   record.
18       Q.   You don't know any of the claims
19   that remain in the case? Is that your
20   testimony now?
21       A.   My testimony is I know
22   conversion is one of the claims.
23       Q.   And who is your conversion claim
24   against?
25       A.   I would have to review the

WILSON

1            WILSON
2    record.
3        Q.   You don't know anybody that your
4    conversion claim is against; is that
5    right, sir?
6            MR. JAMES KLEIN:   This is
7    harassing.  He has asked to review the
8    record.  He has a right to do so.
9        Q.   Do you know anybody that your
10   conversion claim is against?
11       A.   I believe -- may I look at the
12   record? May I look at the claim?
13       Q.   Can you answer -- I will show
14   you your Third Amended Complaint.  I want
15   to know whether you know whether --
16       A.   I --
17       Q.   -- who the defendants in your
18   conversion claim are?
19       A.   The defendants, as I recall,
20   were Paisley Currah, Terrence Cheng, and
21   Marcia Isaacson.
22       Q.   Marcia Isaacson?
23       A.   I thought it was Marcia.
24       Q.   So it is your understanding you
25   have a conversion claim against Mr. Cheng?

4 (Pages 313 - 316)

WILSON

1
2   A.   I am -- I am not sure on that
3   point.
4   Q.   Do you know does the defamation
5   claim remain in the case?
6   A.   Yes, it does as far as my
7   understanding.
8   Q.   Against who is that defamation
9   claim against?
10   A.   Against Terrence Cheng.
11   Q.   Okay.  Now, so you are aware
12   that your claims against you are
13   Ms. Isaacson, Mr. Cheng, and Mr. Currah
14   are against them personally, correct?
15   A.   I am aware that it's -- that
16   they are against them personally.
17   Q.   And you are aware that the State
18   of New York --
19       MR. JAMES KLEIN:  Again, I am
20   going to object.  You are asking about
21   claims, which is a legal matter, and he
22   has asked to review the record, and you
23   refused to give him a document.
24       MR. MARK KLEIN:  I will give him
25   a document.

WILSON

1
2       MR. JAMES KLEIN:  I am asking
3   for the document now.
4       MR. MARK KLEIN:  Your request
5   is noted.  I'll conduct my deposition the
6   way I want to.
7   Q.   You are aware that the State of
8   New York, the City University of New York
9   and Brooklyn College are no longer in the
10   case, right, Dr. Wilson?
11   A.   No, I am not aware of that.
12   Q.   You are not aware of that.
13       Now, are you aware of any
14   evidence that -- let's take them one at a
15   time.  Ms. Isaacson seized and failed to
16   return to your wife's oak easel?  I don't
17   know why you are writing Dr. Wilson.  I
18   am asking you a question.
19   A.   I am focusing on what you are
20   asking, and I would like to answer it
21   completely.
22   Q.   Listen to my question.
23   A.   That is what I am listening to.
24   I am writing.  Oak easel Isaacson, and
25   your question is am I aware of --

WILSON

1
2   Q.   Okay.  If you wouldn't write and
3   listen to the question, we might be able
4   to move along better.
5       Are you aware of any evidence
6   that Ms. Isaacson seized and failed to
7   return your wife's oak easel?  Yes or no.
8   A.   I -- yes.
9   Q.   What evidence are you aware of?
10   A.   The evidence that she was in
11   charge of the investigation and in control
12   of all of these activities.
13   Q.   Other than that, are you aware
14   of any other evidence?
15   A.   That is the main evidence.
16   Q.   Are you aware of any other
17   evidence?
18   A.   At this moment, no.
19   Q.   Are you aware of any evidence
20   that Ms. Isaacson seized and failed to
21   return your Apple monitor?
22   A.   I can't answer that.  I don't
23   know for sure.
24   Q.   Are you aware of any evidence
25   that Ms. Isaacson seized and failed to

WILSON

1
2   return your professional letters including
3   the letter you said President Roosevelt
4   sent to your father?
5   A.   I am aware that she seized,
6   personally seized files of mine, and I
7   don't know what was in those files that
8   she seized.
9   Q.   Are you aware of any evidence
10   that Ms. Isaacson seized and failed to
11   return your "Special books"?
12   A.   I don't know what she seized.
13   Q.   Are you aware of any evidence
14   that Ms. Isaacson seized and failed to
15   return your jazz albums?
16   A.   I don't know what she seized.
17   Q.   Are you aware of any evidence
18   that Ms. Isaacson seized and failed to
19   return your manuscripts?
20   A.   Again, I don't know what she
21   seized.
22   Q.   Are you aware of any evidence
23   that Ms. Isaacson failed to
24   return -- seized and failed to return any
25   of your personal documents?

5 (Pages 317 - 320)

WILSON

1           WILSON
2     A.   I am aware that she was in
3 control of those premises where all of
4 these things were taken and seized.  So
5 yes.  She was responsible for seizing
6 everything that you just iterated.  Yes.
7     Q.   That is your position?
8     A.   That's my understanding. She was
9 there.  She was in charge.  They took
10 over.  She was in charge of the -- of the
11 whole investigation and operation.  So
12 yes, that is my understanding, and that is
13 the evidence.
14    Q.   All right.  I am going to ask
15 you the same questions with regard to Mr.
16 Currah and Mr. Cheng unless you want to
17 tell me that your answers are the same,
18 but are you aware of any evidence that
19 Professor Currah seized and failed to
20 return your wife's oak easel?
21    A.   Yes.
22    Q.   What evidence are you aware of?
23    A.   The evidence is that Paisley's
24 secretary told me that they had my stuff
25 and Paisley's secretary, Barbara

1           WILSON
2 Haugstatter spoke to Paisley about my
3 things that they had been seized.
4     Q.   And did you discuss with --
5          MR. MARK KLEIN:  Withdrawn.
6     Q.   Paisley's secretary that you are
7 referring to is Ms. Haugstatter?
8     A.   Correct.
9     Q.   Did you specifically discuss
10 with Ms. Haugstatter your wife's oak
11 easel?
12    A.   Specifically, yes, I did.
13    Q.   And did she specifically tell
14 you that Paisley Currah had it in his
15 possession?
16    A.   She specifically said they had
17 it.
18    Q.   They had what?
19    A.   My oak easel, my plants.  They
20 had all of my things.
21    Q.   That is -- they went through
22 everything that they have?
23    A.   Not everything but she said they
24 have my stuff.  That was a blanket --
25    Q.   I want to know exactly what she

1           WILSON
2 said to you?
3     A.   Specifically they had
4 the -- first of all, this was how
5 many -- seven years ago.  So you have to
6 give me a chance to think about this, but
7 I do remember specifically raising
8 questions about the oak easel.  I
9 mentioned -- what else? I mentioned my
10 plants initially.  I mentioned my
11 letters.  I mentioned my files.  So
12 mentioned my documents very specifically
13 to Barbara Haugstatter, and she said that
14 she would speak to Paisley.  I called her
15 back, and she said that, you know -- she
16 was just unresponsive, and I asked on
17 numerous occasions very specifically.
18    Q.   How many occasions?
19    A.   Numerous.
20    Q.   And these were all by telephone
21 with Barbara Haugstatter, the secretary to
22 the chairman of the political science
23 department, right?
24    A.   There may have been face to face
25 communications as well, but certainly

1           WILSON
2 numerous times by telephone.  Yes.
3     Q.   And are you aware of any written
4 documents either by e-mail or letter in
5 which you listed the items that you said
6 you had -- had been taken from you and you
7 wanted returned?
8     A.   Yes.
9     Q.   And where did you do that?
10    A.   I don't understand your
11 question.
12    Q.   What e-mail or written document
13 did you list that said what was missing?
14    A.   I sent an e-mail to Pam Pollack.
15 I sent e-mails to Michael Hewitt.
16    Q.   Have you produced copies of
17 those e-mails?
18    A.   I'm not sure.  I would have to
19 look at the -- the e-mails.
20    Q.   Are you aware of any evidence
21 that Mr. -- that Professor Currah seized
22 and failed to return your Apple monitor?
23 Yes or no.
24    A.   I am not sure.
25    Q.   Are you aware of any evidence

6 (Pages 321 - 324)

Page 325

WILSON

2 that Professor Currah seized and failed to
3 return your professional letters,
4 including the letter that you said
5 President Roosevelt sent to your father?
6    A.   I am aware Paisley Currah
7 destroyed thousands of pages of documents
8 in my office according to Paisley Currah's
9 testimony.
10    Q.   Other than Paisley's -- what
11 testimony are you referring to?
12    A.   The arbitration.
13    Q.   So other than Paisley Currah's
14 own testimony at the arbitration, are you
15 aware of any evidence that Professor
16 Currah seized and failed to return your
17 professional letters, your special books,
18 your jazz albums, manuscripts, your
19 research, and research notes, and your
20 lectures and lecture notes?
21    A.   I am aware that Paisley Currah
22 was on the premises in my office over a
23 significant period of time going through
24 my documents, my letters, my books, my
25 research, handled all of my things,

Page 326

WILSON

2 everything, and I am aware that while
3 Paisley Currah was there masses, volumes
4 of material from my office and from the
5 administrative offices were discarded,
6 were trashed.  That is what I am
7 absolutely aware of by --
8    Q.   And how are you aware of that?
9    A.   From the witnesses who told me
10 that.
11    Q.   Okay.  Are you aware of any
12 evidence that your wife's oak easel was at
13 the Graduate Center for Worker Education
14 in January of 2012?
15    A.   Yes.
16    Q.   Besides your own testimony?
17    A.   I am sure my staff would know
18 that there was a display, oak easel
19 display.  Yes, other people would be
20 aware of that.
21    Q.   Are you aware of any evidence
22 that your professional letters as you
23 referred to them yesterday, including the
24 letter you said President Roosevelt sent
25 to your father was in any of your offices?

Page 327

WILSON

2    A.   I am aware that my assistants
3 and staff knew that my letters were in my
4 offices, yes.
5    Q.   Assistants and staff meaning
6 whom?
7    A.   Employees of the college.
8    Q.   What employees are you referring
9 to?
10    A.   Well, Annie London.
11    Q.   Anybody else?
12    A.   Pam Miller.
13    Q.   Anybody else?
14    A.   I would have to go to the list
15 of witnesses, but, yes, there are others.
16 Absolutely there are others.
17    Q.   Now, you took home -- you were
18 given the opportunity to take home a lot
19 of the -- of your personal materials that
20 were in your offices, right?
21    A.   Wrong.
22    Q.   You were not?
23    A.   What opportunity are you talking
24 about?
25    Q.   Is it your testimony, Dr.

Page 328

WILSON

2 Wilson, that you didn't take home a lot of
3 materials that had been in your offices at
4 Brooklyn College in the graduate center
5 for worker education.  Is that what you
6 are telling me?
7    A.   I didn't have -- my testimony is
8 that my office at 25 Broadway was seized,
9 and I had no opportunity to take a single
10 thing.  I had zero opportunity.  That's a
11 fact.
12    Q.   At any time.  At any time, sir.
13    A.   At the time of the seizure and
14 in this period of time, right.  I had no
15 opportunity at all.
16    Q.   Is it your testimony that
17 between January of 2012 and today you
18 didn't take -- have an opportunity to take
19 home any of the materials that had been in
20 your offices at Brooklyn --
21    A.   That is a different question --
22    Q.   You're interrupting me.  Let me
23 finish my question.
24        Is it your testimony sitting
25 here today that between January of 2012

7 (Pages 325 - 328)

WILSON

1
2 and today you had no opportunity to take
3 home any of the materials that had been in
4 your office either at the Graduate Center
5 For Worker Education at 25 Broadway or
6 Brooklyn College?
7     A.   No, that is not my testimony.
8     Q.   So you did take some materials
9 home, right?
10     MR. JAMES KLEIN:   No, your
11 question was did he have the opportunity
12 to.   You're asking a different question
13 now.
14     Q.   Did you take home any of the
15 materials that had been in your office in
16 25 Broadway and at Brooklyn College?  Yes
17 or no.
18     A.   That is not a yes or no
19 question.
20     Q.   Yes, it is a yes or no question.
21 Did you take home any of those materials?
22     MR. JAMES KLEIN:   This is very
23 vague.
24     A.   I --
25     MR. JAMES KLEIN:   Any of those

WILSON

1
2 materials?
3     MR. MARK KLEIN:   Any of those
4 materials.
5     MR. JAMES KLEIN:   He is saying
6 that it is not a yes or no question, and
7 you are not giving him the opportunity to
8 answer.
9     MR. MARK KLEIN:   Mr. Klein, if
10 you continue obstructing this deposition,
11 I'll get the magistrate on the phone.
12 You are entitled to make objections as to
13 form, not speaking objections, not
14 coaching, and if you continue we will get
15 the magistrate on the phone.   Is that
16 understood?
17     MR. JAMES KLEIN:   I am making
18 an objection as to form.
19     MR. MARK KLEIN:   Say objection
20 as to form.   That is it.   That is all
21 you are allowed to do.
22     MR. JAMES KLEIN:   I think I am
23 allowed to explain what the form objection
24 is.
25     MR. MARK KLEIN:   Only if I ask,

WILSON

1
2 and I didn't ask you.   Are we understood?
3 You can make an objection as to form;
4 otherwise, we will get the magistrate on
5 the phone.
6     Q.   Dr. Wilson, is it your testimony
7 that you never took home any of the
8 materials that had been either in your
9 office at 25 Broadway or on the Brooklyn
10 College campus?
11     MR. JAMES KLEIN:   Objection as
12 to form.
13     A.   That is not my testimony.
14     Q.   Okay.   So you did take
15 some -- take home some materials that had
16 been in your office --
17     MR. JAMES KLEIN:   Objection.
18     MR. MARK KLEIN:   Wait.   Now you
19 are interrupting my question.
20     MR. JAMES KLEIN:   That
21 assumes -- that misstates his prior
22 testimony.
23     MR. MARK KLEIN:   I'll use my
24 cell phone, and we will call the
25 magistrate.

WILSON

1
2     (Pause.)
3     (Conference call with the
4 magistrate judge as follows:
5     MR. MARK KLEIN:   We are on the
6 record.   The witness has left the room,
7 and our conversation is being taken down.
8     THE LAW CLERK:   Is the reporter
9 there?
10     MR. MARK KLEIN:   Yes, the court
11 reporter is taking it down.
12     THE LAW CLERK:   You are
13 plaintiff's counsel?
14     MR. MARK KLEIN:   I am
15 defendants' counsel, Mark Klein,
16 K-L-E-I-N, from the New York State
17 Attorney General's Office.
18     THE LAW CLERK:   And it is your
19 application?
20     MR. MARK KLEIN:   Yes, I am
21 taking the deposition.
22     THE LAW CLERK:   Okay.   So if
23 you could summarize for me the dispute,
24 and I will give that information to the
25 judge.

8 (Pages 329 - 332)

WILSON

1         WILSON
2      MR. MARK KLEIN:  I am asking
3 questions of the witness, and Mr. Klein,
4 James Klein, a different Klein, who is
5 representing Dr. Wilson at the deposition
6 is making speaking objections.  I've told
7 him he is entitled to state objection as
8 to form but not make speaking objections,
9 number one.  And, number two, lastly he
10 has been interrupting my questions, so I
11 can't even get my questions out on the
12 record before he starts interrupting and
13 making objections which are more than
14 objections as to form.
15      MR. JAMES KLEIN:  Do I get to
16 respond to that.
17      THE LAW CLERK:  Yes, you do.
18 Go ahead, Mr. Klein.
19      MR. JAMES KLEIN:  First of all,
20 I do have the opportunity to make
21 objections, but I do have objections as to
22 form.  Those objections as to form have
23 aspects to them.  I explained what is the
24 form that is objectionable, and then,
25 second, I've made an objection

1         WILSON
2 specifically as to that he is
3 mischaracterizing the previous testimony,
4 which is obviously a different objection
5 because he continually asks my client
6 questions, and then he rephrases it into a
7 different form that misstates the question
8 and then badgers my client into saying yes
9 or no answers, which my client refuses to
10 do, and then he is badgering him, and then
11 the second statement is that his conduct
12 is just totally outrageous and
13 unprofessional.  He is standing up,
14 banging books on the table in an
15 attempt -- every aspect that he is doing
16 is an attempt to intimidate both me and my
17 client, and I will not be intimidated by
18 banging books on the table and by him
19 standing around pointing his finger at me.
20 It is an attempt to physically and
21 emotional intimidate me and my client, and
22 I will not stand for it.
23      MR. MARK KLEIN:  First of all,
24 when what Mr. Klein said is not accurate.
25 The last time he interrupted after I said

1         WILSON
2 don't interrupt my questions and restrict
3 your objections to form, I got angry, and
4 I said I am calling the magistrate.  That
5 is the extent of any conduct --
6      MR. JAMES KLEIN:  And then he
7 stood up, and he threw the --
8      MR. MARK KLEIN:  And he is
9 interrupting me again like he does
10 repeatedly.  The record will reflect the
11 fact that I am not misstating the witness'
12 testimony, and if I am the record will
13 reflect that, and Mr. Klein can make his
14 objections as to that, but this --
15      THE LAW CLERK:  Okay.
16      MR. MARK KLEIN:  --
17 interrupting me and making speaking
18 objections is totally inappropriate.  It
19 is interfering with my ability to
20 answer -- to ask this witness questions,
21 and it is interfering with the deposition,
22 and I think it ought to be stopped.
23      THE LAW CLERK:  Okay.  I think
24 I have everything I need.  I am just
25 going to put you guys on hold, and let the

1         WILSON
2 judge know what the circumstances are.
3      MR. MARK KLEIN:  Thank you.
4      (Pause.)
5      JUDGE SCANLAN:  Hi, this is
6 Judge Scanlan.
7      MR. MARK KLEIN:  Good morning,
8 Judge Scanlan.  I understand in you are
9 in a deposition.  Is the court reporter
10 there?
11      MR. MARK KLEIN:  Yes.
12      JUDGE SCANLAN:  If she or he
13 could take down this conversation, I would
14 appreciate it, and then is the witness in
15 the room?
16      MR. MARK KLEIN:  No, he is not.
17      MR. MARK KLEIN:  No.
18      JUDGE SCANLAN:  Okay.  All
19 right.  So could you -- so what is -- I
20 have a summary from my law clerk, but if
21 you could tell me what your respective
22 positions are.
23      MR. MARK KLEIN:  This is Mark
24 Klein, your Honor, for defendants.  I am
25 deposing Dr. Wilson.  This is the second

9 (Pages 333 - 336)

Page 337

WILSON

1 day of his deposition, and I have been
2 asking him a series of questions to which
3 James Klein, who is representing Dr.
4 Wilson at the deposition has been making
5 speaking objections, and on top of that
6 interrupting me during my questions with
7 objections, so that I can't even finish
8 the question on the record.  I told him
9 that he was entitled to make an objection
10 as to form and put that on the record, but
11 he was not entitled to make speaking
12 objections, and if he continued to do that
13 I was going to have to call the judge.
14       He continued to make speaking
15 objections, and then the last thing that
16 happened before I called -- decided to
17 call the court is he didn't even let me
18 finish the last question I was asking.
19 He started to make an objection in the
20 middle of my question, and I said I am
21 calling the judge, and we called your
22 Honor.
23       JUDGE SCANLAN:  Okay.
24       MR. JAMES KLEIN:  My view is,

Page 338

WILSON

1 your Honor, and this is James Klein, Mr.
2 Klein has been continually badgering my
3 client into making statements that are
4 not -- are totally mischaracterized.  He
5 asks incredibly vague questions, and then
6 he asks -- and then he mischaracterizes
7 the response and then says give me a yes
8 or no answer.  So I have been increasingly
9 upset about his tactics, and my client,
10 not me, my client has asked for
11 clarification.  My client has said yes or
12 no answers are not responsive, and then
13 Mr. Klein does not give him an opportunity
14 to give his full response, and then he
15 continues to mischaracterize the previous
16 testimony as a way to badger my client
17 into giving answers that are not a true
18 and accurate reflection of the evidence in
19 this case, and so I have been increasingly
20 strong in my objection of him allowing him
21 to do that, and then in connection with
22 that both yesterday and today Mr. Klein's
23 response to that has to been acting in a
24 both physically and emotionally

Page 339

WILSON

1 intimidating maner.  We got into this
2 morning on issues we spoke about, and he
3 literally stood up and threw a book down
4 on the table and started pointing at me
5 and pointing at me in a intimidating
6 manner in an attempt to intimidate me and
7 my client physically and emotionally
8 throughout yesterday and today, and I just
9 will not allow him to do that.
10       MR. MARK KLEIN:  Your honor,
11 what Mr. Klein just said is inaccurate.
12 I didn't have a book.  I didn't throw a
13 book --
14       MR. JAMES KLEIN:  The book is
15 in front of you.
16       JUDGE SCANLA:  All right.
17 Stop.  You could continue this deposition
18 if you want, but each side needs to let
19 the other side finish the statement, so
20 the court reporter can get an accurate
21 transcript.  There are no speaking
22 objections allowed.  The only objection
23 you can make is to form or instruct your
24 client not to answer if you have a

Page 340

WILSON

1 legitimate basis for doing it.  It is
2 very, very simple.  There shouldn't be any
3 physical interaction of the kind you are
4 describing if it in fact happened.  You
5 all know what the rules are here, and if
6 there is a problem with
7 mischaracterization, alleged
8 mischaracterization of the testimony you
9 can submit the testimony for a ruling on
10 whether the -- if that answer, question
11 and answer should stand or not.  You can
12 mark it as you are going along.  You can
13 do it there or you can come and do the
14 deposition here in the courthouse and
15 reserve a room with the clerk's office,
16 and I will have one of my clerk's sit in
17 with you, and if you really can't do it,
18 you can do it in front of me.
19       You know, this case is
20 contentious.  You have very different
21 ideas about your clients.  Your clients
22 have very different ideas about what
23 happened, but this needs to get done, so
24 it is up to you to conduct it in a

10 (Pages 337 - 340)

WILSON

1
2 professional manner, and doing it calmly
3 seems to be the best way given the
4 allegations you are making about each
5 other --
6          MR. JAMES KLEIN:  Your honor --
7          JUDGE SCANLAN:  If you want to
8 continue the deposition now or not --
9          MR. JAMES KLEIN:  Your honor,
10 this is James Klein.  I have one point of
11 clarification.  When you say I can make an
12 objection as to form, do I have any
13 opportunity to actually explain what
14 my --
15          JUDGE SCANLAN:  No.  You are
16 not.  You object to form.  That is it.
17          MR. JAMES KLEIN:  Okay.  That
18 is clarified.  Thank you, Judge.
19          MR. MARK KLEIN:  Thank you,
20 your Honor.
21          JUDGE SCANLAN:  Anything else?
22          MR. MARK KLEIN:  Not at this
23 time, your Honor.  Thank you.
24          JUDGE SCANLAN:  All right.  I
25 will tell you if you call again you may

1               WILSON
2 not be able to get me.  If this continues
3 like I said, if there are problems like I
4 said, we can continue the deposition here.
5          MR. JAMES KLEIN:  Thank you,
6 your Honor.
7          MR. MARK KLEIN:  Thank you.
8          JUDGE SCANLAN:  Thanks.  Take
9 care.
10          (End of conference call.)
11          MR. MARK KLEIN:  Would you
12 bring Dr. Wilson back in.
13          (Dr. Wilson returns to the
14 conference room.)
15          MR. MARK KLEIN:  Could I hear
16 the last question, please.
17          (Record read.)
18     A.   I would like to amend a previous
19 answer.
20     Q.   Did you discuss your answer that
21 you would like to amend with your counsel
22 out of the room just now?
23     A.   No.
24     Q.   What answer would you like to
25 amend?

1               WILSON
2     A.   You asked me if I reviewed -- if
3 I created this document, this -- what is
4 the number?  16, Exhibit 16, which is the
5 the Amended Complaint.  So the answer is
6 I didn't review this before it was
7 submitted.  I didn't approve it before it
8 was submitted.  I protested with my
9 attorney after it was submitted, and I
10 asked him to withdraw it and to -- because
11 he missed many important things and -- and
12 so -- so the answer is that it was
13 submitted it, but over my protest and
14 without my review and without adequate
15 input.  That is my answer to one of the
16 things that you asked.
17     Q.   Actually I asked you whether you
18 prepared any portions of it, and you
19 answered those questions.
20     A.   No, I -- I amended that.  That
21 these portions I did not -- the attorney
22 submitted these.  I didn't prepare any
23 portion of this document here.
24     Q.   Okay.  Well, your testimony
25 previously was otherwise, but I understand

1               WILSON
2 your answer now.
3          MR. MARK KLEIN:  Could I hear
4 the partial question again, please.
5          (Record read.)
6     Q.   After the "raid" that you
7 testified about yesterday in January 2012
8 at any point between then and today, did
9 you take home any of the materials that
10 had been in your office either at 25
11 Broadway or at the campus on -- at
12 Brooklyn College?
13     A.   After April or approximately in
14 April 2016 whatever was left over on the
15 main campus that is the only access I had
16 to it to have opportunity to take what was
17 left over.
18     Q.   So in April 2016 you took home
19 some materials, correct?
20     A.   That's correct.
21     Q.   Do you have any evidence that
22 you did not take home your oak easel?
23     A.   My oak easel was not present.
24     Q.   Do you have any evidence that
25 you didn't take home your Apple monitor?

11 (Pages 341 - 344)

WILSON

1
2    A.   I would not have been able to
3  carry those physically.  I am physically
4  unable to carry heavy weight.  So that is
5  the evidence.  I couldn't carry it even if
6  it was there, but it wasn't there.  So I
7  couldn't take it, and I also know that it
8  wasn't there because other people didn't
9  see things of that nature in that office.
10 For example, when I went there on -- in
11 April of 2016 I was looking specifically
12 for any of my personal objects, and so I
13 didn't see them.  So how do you have
14 evidence of something that is not there?
15    Q.   Do you have any evidences that
16 you didn't take home your professional
17 letters including the letter you said
18 President Wilson sent to your father?
19    A.   I didn't say President Wilson.
20 You said President Wilson.
21    Q.   I'm sorry.  President Roosevelt.
22 Your attorney found that humorous, but do
23 you have any evidence that you didn't take
24 home any of your professional letters
25 including the letter that you said

WILSON

1
2  President Roosevelt sent to your father?
3    A.   Yes, because the evidence was
4  that when I went to Africana studies I
5  specifically asked Linda Day where my --
6  where are my letters?  Where is my
7  research?  Where is my documents?  She
8  said I don't know anything.  I haven't
9  seen those.  So they were not present.
10    Q.   Do you have any evidence that
11 Mr. Cheng seized and failed to return your
12 wife's oak easel?
13    A.   I have evidence that Mr. Cheng
14 was in charge of the facility
15 probably -- well, he was provost or
16 associate provost in charge of the
17 facilities at both -- at all three of my
18 offices.  So the evidence is he was in
19 charge of that stuff, so --
20    Q.   Do you have any charge --
21    MR. MARK KLEIN:  Withdrawn.
22    Q.   Do you have any evidence that
23 Mr. Cheng personally seized and failed to
24 return your wife's oak easel? Yes or no.
25    A.   I didn't see him personally do

WILSON

1
2  that, so the answer is no on that.
3    Q.   Do you have any evidence
4  that -- well, you said --
5    A.   But he was in charge of the
6  facility.  He was in control of it,
7  so --
8    Q.   Do you have any evidence besides
9  Mr. Cheng supposedly being in charge of
10 the facility that he personally seized and
11 failed to return your Apple monitor?
12    A.   First of all, he wasn't
13 supposedly.  He was actually in charge.
14 So he would have been responsible for any
15 type of seizure of property that was on
16 the premises on -- on either campus.
17    Q.   Do you have any evidence that
18 Mr. Cheng personally seized and failed to
19 return your professional letters including
20 the letter you said President Roosevelt
21 sent to your father?
22    A.   Other than that he was
23 personally in charge of the offices as an
24 administrator.
25    Q.   Other than that assertion, no,

WILSON

1
2  you don't have any evidence?
3    A.   That's correct.
4    Q.   Do you have any evidence that
5  Mr. Cheng personally seized and failed to
6  return your "Special books"?
7    A.   Other than the fact that he was
8  on the premises at 25 Broadway and in my
9  office at 25 Broadway on numerous
10 occasions, and he was in control of the
11 premises, and he would have access to all
12 of those materials, which I had zero
13 access to that, that is the evidence.
14    Q.   Do you have any evidence that
15 Mr. Cheng personally seized and failed to
16 return your jazz albums, your manuscripts,
17 your research and research notes, and your
18 lecture and lecture notes?
19    A.   I have evidence that he was in
20 my office at 25 Broadway.  He was on that
21 campus, that he was in charge where all of
22 my items and property were stored.
23    Q.   So that is the only evidence you
24 have, correct?
25    A.   That is the evidence.

12 (Pages 345 - 348)

WILSON

1
2    Q.   All right.   Now, you recall
3  that you testified yesterday that sometime
4  in 2014 Mr. Cheng according to you made a
5  defamatory statement, correct?
6    A.   That's correct.
7    Q.   Do you know when in 2014 he made
8  that statement allegedly?
9    A.   I don't know precisely, and as I
10  said I believe yesterday I said 2013.  So
11  it was -- I have to be approximate because
12  I don't know the exact date, but it was
13  2013, 2014, and I know that based on what
14  people who were in meetings with Cheng
15  told me at that time that he made
16  defamatory comments about me.
17    Q.   Do you know what words Mr. Cheng
18  used that you characterized as defamatory
19  --
20    A.   Criminal.
21    Q.   Please --
22    A.   I'am sorry. Go ahead.
23    Q.   Let me finish the question.
24  Then you can talk.
25    A.   Yes.

WILSON

1
2    Q.   I won't interrupt you.  Please
3  don't interrupt me.  Okay.  It just
4  makes the deposition take longer.
5        Do you know what words Mr. Cheng
6  used when you say he made defamatory
7  statements?
8    A.   Criminal is the word that I
9  recall.
10    Q.   So he used the word criminal?
11    A.   Right.
12    Q.   That is a yes?
13    A.   Yes.
14    Q.   Do you know any other words that
15  he used?
16    A.   That is the word that I recall
17  in that period of time, that people
18  recalled to me.
19    Q.   Now, who told you that Mr. Cheng
20  used the word criminal in reference to you
21  and are we talking about both 2013 and
22  2014?
23    A.   There are different instances.
24    Q.   Do you know of any instanced in
25  2014 where according to you Mr. Cheng used

WILSON

1
2  the word "Criminal" in reference to you?
3    A.   I can describe the instances and
4  we will have to figure out the dates, but
5  I can describe the instances.  Do you
6  want to know the instances?
7    Q.   Please.
8    A.   The instance was with Steve
9  Leberstein meeting with Ivy Rich on
10  numerous meetings, and Ivy Rich repeating
11  Cheng's defamation that I was to use
12  another word, thief, criminal and not to
13  use my image or photo in a photographic
14  display that Cheng commissioned with the
15  Labor Arts Society, and they had a series
16  of meetings and confrontations over that
17  issue, and Dr. Leberstein provided
18  photographs of my participation and
19  development at the Center For Worker
20  Education, and those photographs were
21  rejected by Ivy, and there was another
22  woman with Ivy, who -- whose name I don't
23  recall at the moment, but Leberstein
24  mentioned that there was another woman
25  there working with Ivy, and this was a

WILSON

1
2  hotly debated issue because of my
3  understanding Terrence Cheng's directive
4  not to portray me because I was a
5  criminal.  So that was one incident, a
6  series but connected to Leberstein and
7  Labor Arts Society.
8    Q.   Again, Dr. Wilson, my question
9  was in what instance in 2014 were you told
10  Mr. Cheng used the word criminal with
11  regard to you?
12    A.   So that was one instance that I
13  just told you, thief and criminal.   Yes.
14    Q.   So, now, it is two words, thief
15  and criminal?
16    A.   That was what I recall, thief
17  and criminal.
18    Q.   And what you recall is based on
19  what Steve Leberstein told you?
20    A.   At that time, correct.
21    Q.   Did anybody else tell you that?
22    A.   No.  And let me just say I
23  appreciate when you modulate your voice,
24  and you say please and thank you, and I
25  appreciate the professional demeanor.  I

WILSON

1 don't appreciate slamming papers on the
2 table and screaming because I view that as
3 an attempt at intimidation, and maybe you
4 have reason to be upset, but I took
5 personal affront to that.
6 
7   Q.   Well, I took personal affront to
8 your counsel interrupting my questions and
9 making inappropriate objections.  I admit
10 I got angry at the point at which I said I
11 am calling the judge, and I apologize for
12 that.
13       So if you and your counsel will
14 follow the rules, I am happy to follow the
15 rules, and I apologize for getting angry
16 at the point at which I said I needed to
17 call the judge.
18   A.   Your apology is accepted, and
19 now I have to amend a previous answer.
20   Q.   You want to amend another
21 answer?
22   A.   Yes.
23   Q.   Okay.  What's that?
24   A.   You asked about Dr. Currah and
25 my Apple monitor, and -- and my oak easel,

WILSON

1 and I told you that Dr. Currah was in my
2 office where the Apple monitor was on the
3 desk, so that is -- was
4 specifically -- and not just the Apple
5 monitor but all of my files, all of my
6 books, my research.  So that's the
7 evidence that Dr. Currah with others but
8 certainly Dr. Currah under his own
9 admission had my things.  What they did
10 with them I have no idea, but they had
11 them, and I had no access, and I had no
12 opportunity to retrieve a single thing of
13 voluminous amounts of material.  We are
14 talking about tens of thousands of pages
15 of documents, sir.
16   Q.   Are you finished with your
17 answer?
18   A.   Yes.
19   Q.   Your amendments?
20   A.   Yes, that amendment.  Yes.
21   MR. MARK KLEIN:  I ask that the
22 court reporter mark as Wilson Exhibit 17 a
23 document titled "Third Amended Complaint."
24       (Wilson Exhibit 17 marked for

WILSON

1 identification.)
2   Q.   Dr. Wilson, I show you what has
3 been marked as Wilson Exhibit 17.  Please
4 take a moment to review it and tell me
5 when you have done so.
6       (Pause.)
7   A.   Okay.  I have looked at
8 document 17.
9   Q.   Have you seen Exhibit 17 before,
10 sir?
11   A.   Yes, I have seen Exhibit 17.
12   Q.   Did you review it before it was
13 filed?
14   A.   No, I did not.
15   Q.   Did you prepare any portion of
16 this document?
17   A.   No, I did not.
18   Q.   You testified before that you
19 were displeased with the Amended
20 Complaint, which has been marked as
21 Exhibit 16, right?
22   A.   I am not sure what I precisely
23 said.  Maybe I could hear that played
24 back.

WILSON

1   Q.   Well, you used the word that you
2 protested its filing, right?
3   A.   Yes, you mean number 16.
4 That's correct.
5   Q.   And have you brought a
6 malpractice claim against your former
7 attorney Collin Moore?
8   A.   I replaced my attorney Collin
9 Moore.
10   Q.   That is not what I asked you.
11 Have you brought a malpractice claim
12 against Collin Moore?
13   A.   Not yet.
14   Q.   Do you intend to?
15   A.   Speculation.
16   Q.   When did you protest the filing
17 of Exhibit 16?
18   A.   Immediately after it was filed.
19 When I was notified that it was filed.
20   Q.   Okay.  So it is your testimony
21 that after protesting the filing of
22 Exhibit 16 you didn't review Exhibit 17,
23 the Third Amended Complaint, before it was
24 filed; is that right?

14 (Pages 353 - 356)

Page 357

WILSON

1     WILSON
2     A.   That's correct.  I didn't
3  review it, and it was filed without my
4  review.
5     Q.   I would like to direct your
6  attention to paragraph 62 of Exhibit 17 on
7  page 16.
8     A.   Page -- repeat that, please.
9     Q.   Page 16.
10    A.   Page 16.
11    Q.   Paragraph 62, which is at the
12  bottom of the page.
13    A.   Yes.
14    Q.   Please read that paragraph to
15  yourself.
16    A.   Yes.  I see that.
17    Q.   All right.  Now, that makes
18  reference to a date of March 12, 2014 when
19  Cheng allegedly told BC faculty members
20  and Professor Jocelyn Wills and Plaintiff
21  Wilson that 'Wilson was engaging in
22  criminal activity.'"  Do you see that
23  there?
24    A.   I see that.
25    Q.   Where did you get that March 12,

Page 358

WILSON

1     WILSON
2  2014 date?
3     A.   So this is a two-part -- the
4  March 12, 2014 was when Jocelyn Wills told
5  me that Terrence Cheng said I was engaged
6  in criminal activity.  However, and I
7  didn't write this, I never said or saw or
8  heard directly Terrence Cheng, and I don't
9  believe I ever met Terrence Cheng, so this
10  is not a representation of what I said.
11    Q.   So let's take it one step at a
12  time.  Who is Professor Jocelyn Wills?
13    A.   Jocelyn wills is a professor of
14  history at Brooklyn College, and she also
15  worked at the Graduate Center For Worker
16  Education.
17    Q.   And it is your testimony, and
18  please tell me if I understand it
19  correctly, that on March 12, 2014 she told
20  you that Mr. Cheng had said that you were
21  "Engaging in criminal activity"; is that
22  right?
23    A.   That is correct.  That would
24  have been contemporaneous notes that I
25  made to myself when I spoke to Jocelyn

Page 359

WILSON

1     WILSON
2  Wills on that day about what Terrence
3  Cheng said to her.
4     Q.   So where is that contemporaneous
5  note?
6     A.   I have to check.  I have
7  voluminous notes, so I have -- I have
8  notes on the -- on what was said on fact
9  sheets.  I have to look for that.
10    Q.   That is interesting because no
11  notes whatsoever have been produced by you
12  in this case.  Did you provide those
13  notes to your counsel?
14    A.   I provided my notes to my
15  previous counsel.
16    Q.   So Collin Moore has your notes?
17    A.   Collin Moore has some of my
18  notes, if not many or most, if he has
19  those.
20    Q.   Now, there is also a reference
21  in paragraph 62 to BC faculty members.
22  Do you see that, sir, in the second line?
23    A.   Yes.
24    Q.   What BC faculty members are
25  referred to there?

Page 360

WILSON

1     WILSON
2     A.   Jocelyn Wills on that day told
3  me she was meeting with Terrence Cheng and
4  other faculty members, and I don't know
5  who else was there.
6     Q.   Now, the second sentence of that
7  paragraph 62 says "Defendant Cheng
8  repeated these defamatory statements to
9  the Labor Arts Society a 501C 3
10  organization."  Do you see that?
11    A.   I see that.
12    Q.   And do you know when Mr. Cheng
13  supposedly repeated those defamatory
14  statements?
15    A.   I don't believe the exact date.
16    Q.   Do you know in what year it was?
17    A.   I am guessing it would have been
18  2014.
19    Q.   Why were you guessing it was
20  2014?
21    A.   Well, I am looking at 2014 as
22  one of the dates when Cheng made those
23  comments, so I would say it was -- because
24  he made a series of defamatory comments
25  that I heard, and as I said these were on

15 (Pages 357 - 360)

Page 361

WILSON

1        WILSON
2 different occasions, and that was one
3 occasion.  So 2013, 2014 would have been
4 in that time frame.
5     Q.    You just said that Mr. Cheng
6 made a series of defamatory comments.
7 You're saying that people told you that he
8 had made those statements, right?
9     A.    That's correct.  People told me
10 and seeing this document actually
11 refreshed my memory about the conversation
12 with Professor Jocelyn Wills and what
13 Terrence Cheng said to Jocelyn Wills.
14     Q.    But you also testified that you
15 never met Mr. Cheng, and you never heard
16 him say anything about you, right?
17     A.    I've never met him, and I've
18 never heard him directly speak.
19     Q.    Okay.
20        MR. MARK KLEIN:  I am going to
21 ask the reporter to mark as Wilson Exhibit
22 18 a document titled "Opinion and Award."
23        (Wilson Exhibit 18 marked for
24 identification.)
25        (Document handed to witness.)

Page 362

1        WILSON
2     Q.    Dr. Wilson, I show you what has
3 been marked as Exhibit 18.  I am not
4 going to ask you any details about this
5 document.  My first question is whether
6 you have seen this before?
7     A.    Yes.  I have seen this before.
8     Q.    Did you provide this document to
9 any of your expert witnesses in this case?
10     A.    No.
11     Q.    So just to be clear you didn't
12 provide it to Dr. Kelly, right?
13     A.    Correct.
14     Q.    You didn't provide it to Dr.
15 Horn, right?
16     A.    Right.
17     Q.    You didn't provide it to Mr.
18 Addams, right?
19     A.    That's correct.
20     Q.    And you didn't provide it to Mr.
21 Day?
22     A.    No.
23     Q.    Did you provide it to any of the
24 prospective employers that you talked to
25 about employment opportunities?

Page 363

WILSON

1        WILSON
2     A.    No.
3     Q.    Did you file any appeal from
4 this Opinion and Award?
5     A.    You mean did my Attorney Collin
6 Moore file any appeal.
7     Q.    Or your attorney Mr. Zwiebach.
8 Let's be clear.  Mr. Zwiebach represented
9 you in connection with the arbitration,
10 right?
11     A.    Yes.
12     Q.    And were you aware that you had
13 a right to appeal this Opinion and Award?
14     A.    Not until you made mention of
15 this.
16     Q.    When did I make mention of it?
17     A.    Just now.
18     Q.    Okay.  Did you ever ask to
19 anyone about whether you had the right to
20 appeal this Opinion and Award?
21     A.    Yes, I actually directed Mr.
22 Moore to appeal this decision, and he
23 never did it.
24     Q.    I am going to give you another
25 blank piece of paper, and I would like to

Page 364

1        WILSON
2 employ your drawing skills again.  If you
3 would draw a picture or a depiction of
4 your office on the Brooklyn College
5 campus.
6     A.    Well, first I would like to
7 amend the previous drawing.
8     Q.    You want to amend the previous
9 drawing?
10     A.    Yes.
11     Q.    The one you made yesterday?
12     A.    That's correct.
13     Q.    In what way do you want to
14 change it?
15     A.    The orientation was wrong, and
16 there was an additional window.
17     Q.    Okay.  I am going to give
18 you --
19     A.    Here it is.
20     Q.    That is a copy of it.  Actually
21 that is a good idea.  I am going to give
22 you a copy of what was marked as Exhibit 2
23 yesterday, and I am going to ask the
24 reporter to mark this copy as Exhibit 19.
25        (Wilson Exhibit 19 marked for

16 (Pages 361 - 364)

WILSON

1   identification.)
2   Q.   Now, using a blue pen, if you
3   could change what you think needs
4   changing.
5   A.   So this window faced Broadway.
6   Q.   So that is the window that you
7   said was on the north side yesterday?
8   A.   That is what I said.   So
9   this -- so Broadway from my window would
10  face east.
11  Q.   Okay.  Instead of north it
12  should have said east, right?
13  A.   That's correct.
14  Q.   You can put a cross or an X
15  through the N as you did.
16  A.   And to my left there was another
17  window, and so I guess this would have
18  been north.  So this would have been
19  north, and then this would have been
20  south. So there was an extra window
21  facing walls and buildings to my, left and
22  then in front of me would have been facing
23  east.
24  Q.   Which was --

WILSON

1   A.   Towards Broadway.
2   Q.   Which was on Broadway?
3   A.   That's correct.
4   Q.   So the wall of bookshelves that
5   you testified to yesterday was on the
6   south side of the building?
7   A.   Where the door -- where the
8   doorway was.  Correct.
9   Q.   Okay.  Are there any other
10  changes you want to make to that drawing?
11  A.   No, but there may have been
12  other file cabinets in here, but -- so
13  file cabinets.
14  Q.   So what did you write?
15  A.   FC, file cabinets.
16  Q.   FC and question mark?
17  A.   Question mark.
18  Q.   Because you are not sure?
19  A.   Here is a file cabinet, but yes,
20  and then I had -- I had other file
21  cabinets, but I am not sure -- the issue
22  for me is when you have a library with
23  hundreds of thousands of pages of books,
24  hundreds of thousands of pages of

WILSON

1   documents, or tens of thousands of
2   documents, hundreds of projects that I am
3   working on when someone seized this and
4   smashes it and mixes it up, and, you know,
5   it is hard to remember exactly everything
6   that was there, sorry, it is like -- but
7   this was to the best of my recollection.
8   The bookshelf was here.  My desk was here.
9   Broadway was here.  My desk was here.  The
10  dimensions were approximate.
11  Q.   I think yesterday you said they
12  were approximately 20 by 15; is that
13  right?
14  A.   But I -- I can't, you
15  know -- that is approximate.   It could
16  have been 20.  It could have been 25.   I
17  don't know exactly.  So.   --
18  Q.   Just so we are clear, which was
19  the longer dimension?
20  A.   The longer dimension would have
21  been from east to west.
22  Q.   So along the wall where your
23  bookshelves were?
24  A.   That's right.

WILSON

1   Q.   All right.  So I've given you
2   another blank piece of paper.  Could you
3   please draw your office on the Brooklyn
4   College campus?
5   A.   Uh-huh.  Well, I had more than
6   one office, so which office are you
7   referring to?
8   Q.   The one in the political science
9   department.
10  A.   All right.  See so this would
11  have been the door.  This would have been
12  window.
13  Q.   What was the number of your
14  office?
15  A.   So the third floor.  I don't
16  recall the number off the top of my head.
17  Q.   How long had you been in that
18  office?
19  A.   Maybe ten, fifteen years.
20  Q.   You have drawn an outline of the
21  office, and you have indicated where the
22  door and the window were?
23  A.   Yes.
24  Q.   Can you orient us as to north

17 (Pages 365 - 368)

WILSON

1
2 and south, east and west.
3    A.   I am not certain of the north
4 and south.  This one faced the courtyard,
5 and this one faced the hallway.
6    Q.   Okay.  The window looked out on
7 to a courtyard?
8    A.   Yes.
9    Q.   And the courtyard being where?
10    A.   Brooklyn College campus.
11    Q.   All right.
12    A.   I don't know which --
13    Q.   So from that window you could
14 see the other buildings where James Hall
15 was, correct?
16    A.   No, you can't see James Hall.
17 James Hall was in this direction.  This
18 is located in James Hall.
19    Q.   Correct.  But if you looked at
20 your window, you could see other buildings
21 in the Brooklyn College campus.
22    A.   Yes.
23    Q.   What buildings could you see?
24    A.   Each building had a name, and,
25 you know, I don't remember the names of

WILSON

1
2 each particular building.  There was a
3 student activity center which would have
4 been in this direction.  It was a new
5 building.  Student activities, and then
6 -- and in the other direction there
7 was -- in the opposite.  I don't know the
8 name, but there was a gymnasium.
9    Q.   Okay.  That is good.  Let's
10 talk about what was inside your office.
11    A.   Okay.
12    Q.   Do you remember the dimensions
13 of your office that you are drawing?
14    A.   I would say roughly 20 by 25.
15    Q.   Which was the long dimension?
16    A.   This would have been the long.
17 This is it.  Right.
18    Q.   Okay.  Now, what furniture did
19 you have in the office?
20    A.   I had two desks.
21    Q.   Where were the chairs to those
22 desks?
23    A.   There is a chair here, a chair
24 here, a chair here, chair here, chair
25 here.

WILSON

1
2    Q.   You have indicated chairs by
3 marking an X on the diagram?
4    A.   Yes.
5    Q.   Now, which of the chairs did you
6 sit on behind the desk?
7    A.   These two.
8    Q.   Okay. How should we note that?
9 Why don't you put JW there.  Is that
10 okay?
11    A.   Okay.
12    Q.   Now, besides two desks and four
13 chairs, you have indicated what other
14 furniture was in the office?
15    A.   There were file cabinets.
16    Q.   Where were the file cabinets?
17    A.   The file cabinets were located
18 under the desk.  I believe there were two
19 file cabinets here, and I had file
20 cabinets on either side of the desk, and
21 the desk also had files.
22    Q.   You are putting FC for file
23 cabinets?
24    A.   Correct.
25    Q.   How big were they?

WILSON

1
2    A.   Standard size.
3    Q.   What is standard size?
4    A.   These would have been three
5 drawers.  I think these were -- these
6 were two drawers, two drawers, as I
7 recall.  I am not positive.  Two or
8 three.
9    Q.   Were these metal or wooden file
10 cabinets or both?
11    A.   Those were metal.
12    Q.   So all the file cabinets you've
13 noted as being under or next to the two
14 desks were metal file cabinets?
15    A.   That's correct.
16    Q.   And they had two drawers?
17    A.   Approximately top and bottom
18 draw.  Right.
19    Q.   What was in the file cabinets,
20 the four file cabinets that you've noted
21 thus far?
22    A.   It would have been letters,
23 personnel files, some research.
24    Q.   What research?
25    A.   Any articles that I was reading

18 (Pages 369 - 372)

Page 373

WILSON

2 at that particular moment.
3    Q.   What other furniture was in your
4 office at James Hall?
5    A.   This entire wall was wooden
6 bookcases with glass doors.
7    Q.   Why don't you put BC -- book
8 case is fine.   Why don't you write it.
9 That's fine.   Thank you.
10    A.   Glass doors.
11    Q.   And what books were in there?
12    A.   Academic books, books that I
13 read over the years.
14    Q.   Can you identify any books that
15 were there?
16    A.   I can tell you there were
17 hundreds and hundreds of books.
18    Q.   Were there any books located on
19 that -- on the bookcases that you have
20 noted that weren't returned to you?
21    A.   It is hard to say what was
22 returned and what wasn't.   It was such a
23 jumble.   When you -- I don't know what
24 was returned and what was not because I
25 don't know -- anyhow, I can't be certain.

Page 374

WILSON

2    Q.   All right.   Any other furniture
3 in your office?
4    A.   Yes.   The -- the back
5 wall -- the door wall had a vertical --
6 very large vertical file cabinet, and that
7 would have been four or five.   It was a
8 very tall, wide vertical cabinet.
9    Q.   And how big was that cabinet?
10    A.   It was very big.
11    Q.   Was that made out metal or --
12    A.   Metal.   Made out of metal.
13    Q.   How many shelves did it have?
14    A.   It was draws, you know, that
15 fold open.
16    Q.   How many drawers?
17    A.   At least four or five maybe.
18 It was taller than I was, so maybe it was
19 five.
20    Q.   Do you know the dimensions?
21    A.   Not off the top of my head.
22    Q.   Do you know the approximate
23 dimensions of that file cabinet?
24    A.   Maybe four feet or five feet.
25    Q.   Five feet wide.

Page 375

WILSON

2    A.   Maybe five feet wide, maybe six
3 feet tall.
4    Q.   You are approximating; is that
5 right?
6    A.   Maybe seven feet.   They were
7 tall.   I don't know.   I don't know
8 exactly.   It was slightly taller than me
9 is my recollection.
10    Q.   And what did you have in
11 that -- those file drawers?
12    A.   Those were mainly student papers
13 that I accumulated over the years,
14 undergraduate student records, and
15 miscellaneous research would have been on
16 one of the shelves having to do with the
17 various issues like issues of race
18 affirmative action, labor issues.   So it
19 was a combination of student files or
20 student papers particularly, and probably
21 half of it was my newspaper articles and
22 clippings and writings and with -- in
23 folders.   So that would be in this file in
24 the back here.
25    Q.   Was there any other furniture in

Page 376

WILSON

2 your office?
3    A.   Yes.
4    Q.   What?
5    A.   This wall was lined with
6 bookcases, metal bookcases.
7    Q.   And how many shelves to these
8 bookcases were there?
9    A.   Maybe five or six shelves going
10 across the length of the -- of the room.
11    Q.   Approximately how many books did
12 you have in those bookcases?
13    A.   In entirety?
14    Q.   Well, break them down by
15 bookshelves.
16    A.   It is hard to speculate.   I
17 can't give you an answer.   There
18 were -- my estimate is that there were two
19 to 3,000 books in that office.
20    Q.   And what is that estimate based
21 on?
22    A.   Just based on years of
23 accumulating and knowing like if you could
24 put 50 books or a hundred books, and that
25 is hundreds of slots of shelves.   So there

19 (Pages 373 - 376)

WILSON

1        WILSON
2   were a lot of books there.  I never
3   counted exactly.  If that is your question
4   did I count how many books, no, I didn't
5   count my books.
6        Q.   And you didn't have an inventory
7   of your books or a list of any kind of
8   your books; is that right?
9        A.   That's not what academics do.
10       Q.   Okay.
11       A.   If you don't mind, if we could
12   take a ten-minute break.
13       Q.   That's fine.
14            (Recess taken.)
15            (Wilson Exhibits 20 through 23
16   marked for identification.)
17            MR. MARK KLEIN:   Back on the
18   record.
19       Q.   Dr. Wilson, I show you what has
20   been marked as Wilson Exhibit 20, which is
21   a document titled "Plaintiff's Responses
22   and Objections to Defendants' First Set of
23   document Production Requests."
24            (Document haded to witness.)
25       Q.   Please take a moment to briefly

1        WILSON
2   familiarize yourself with the document.
3   I will direct you to specific portions of
4   it, and my first question to you is
5   whether you have ever seen this before.
6        A.   Yes.  Yes, I have seen this
7   before.
8        Q.   You have seen the entire
9   document before; is that right?
10       A.   Let me look at the entire
11   document to make sure.
12       Q.   You are certainly free to do
13   that, but let me point you to page 42.
14   Maybe that will help?
15            MR. JAMES KLEIN:   Page 42 you
16   said?
17            MR. MARK KLEIN:   Yes.
18       A.   Okay.
19       Q.   That is a verification you
20   signed?
21       A.   I don't see that here.
22            MR. JAMES KLEIN:   42.
23            MR. MARK KLEIN:   Page 42.
24       A.   I am looking at page 42.
25            MR. JAMES KLEIN:   It got

1        WILSON
2   missed --
3            MR. MARK KLEIN:   Is there more
4   than --
5            MR. JAMES KLEIN:   Yes.
6            MR. MARK KLEIN:   That is
7   interesting.   Apparently there is a
8   second page 42.
9            MR. JAMES KLEIN:   The last page
10   of the document, Joe.
11       Q.   The third page from the back.
12            MR. JAMES KLEIN:   The page
13   before that.
14       Q.   Okay.  Now we are looking at a
15   page that says 42, but it is actually the
16   third page from the back of the document,
17   correct?
18       A.   Correct.
19       Q.   And that is your signature?
20       A.   That is my signature.
21       Q.   And you signed this verification
22   on August 23, 2018; is that right?
23       A.   That's correct.  That's right.
24       Q.   And you declared under penalty
25   of perjury that the facts stated in

1        WILSON
2   foregoing Plaintiff's responses and
3   objections to Defendants' first set of
4   document production requests are true and
5   correct to the best of my knowledge,
6   information, and belief, correct?
7        A.   That's correct.
8        Q.   Do you have any idea why you
9   were asked to sign such a verification?
10            MR. JAMES KLEIN:   I am going to
11   object as to form.
12       A.   I am not totally sure.
13       Q.   Do you have any idea?
14       A.   Well, it's -- to verify it.
15       Q.   Okay.  I would like to direct
16   your attention to page 4 of Exhibit 20,
17   sir.  I hope there is only one page 4.
18       A.   Okay.
19       Q.   All right.  Now, I am directing
20   your attention to the first paragraph of
21   the response to Request Number 1.  Do you
22   see that?
23       A.   Not yet.  The first paragraph
24   of response number 1.  Yes, all policies.
25       Q.   Request Number 1 requests --

20 (Pages 377 - 380)

Page 381

WILSON

2 asks for all policies, and then it goes on
3 for several lines. Do you see that?
4    A.   Yes, I see that.
5    Q.   And then it says response to
6 request number one below that, correct?
7    A.   Correct.
8    Q.   And the first paragraph says
9 "Subject to and without waiving the
10 objections in this response below or the
11 general objections, Plaintiff states that
12 while following a reasonable search, the
13 plaintiff has not identified any documents
14 responsive to this request."
15       Do you see that?
16    A.   I see that.
17    Q.   Okay. What do you mean by you
18 haven't identified any documents?
19    A.   I don't understand the question.
20    Q.   Well, you said you made a
21 reasonable search; is that right, for
22 documents responsive to this request?
23    A.   Let me just reread the question.
24 Policies, handbooks, manuals.
25    A.   Yes, I see that, and --

Page 382

WILSON

2    Q.   What I want to know is whether
3 you have any documents in your possession
4 or control that are responsive to that
5 request?
6    A.   Not to my knowledge. Not at
7 the moment that I can tell you.
8    Q.   You used the expression several
9 times in this document "Plaintiff has not
10 identified any documents responsive to
11 this request." Are you aware of that?
12    A.   Yes.
13    Q.   And by that expression do you
14 mean that you don't have any documents
15 responsive to the request?
16    A.   The policies, handbooks,
17 manuals, instructions, agreements and so
18 forth I did not have those personally. So
19 no, I don't have those if that is your
20 question.
21    Q.   My question is any time you have
22 used words "Plaintiff has not identified
23 any documents responsive to this request"
24 does that mean that you don't have any of
25 those documents --

Page 383

WILSON

2    A.   That's correct.
3       MR. JAMES KLEIN:   Objection to
4 the form.
5    Q.   -- responsive to the question.
6 You both interrupted my question.
7       So my question again is, Dr.
8 Wilson, any time you use the words
9 "Plaintiff has not identified any
10 documents responsive to this request", do
11 you mean that you do not have any
12 documents in your possession or control
13 responsive to the request for documents
14 that is being made?
15       MR. JAMES KLEIN:   Object as to
16 form.
17       MR. MARK KLEIN:   Your objection
18 is noted.
19    Q.   Can you answer the question,
20 sir?
21    A.   I don't have the items listed.
22 I don't have all of the policies, the
23 handbooks, the manuals. I don't have
24 instructions. I don't have agreements.
25    Q.   All right.t I guess you want me

Page 384

WILSON

2 to go through these requests one by one
3 and ask you what those words mean. Is
4 that what you are telling me?
5    A.   That would be helpful.
6    Q.   Okay. Let's look at request
7 number 32 on page 5. Do you see request
8 number 32?
9    A.   Yes.
10    Q.   And do you see in the response
11 to request number 2 you say "Plaintiff
12 states that following a reasonable search
13 the plaintiff has not identified any
14 documents responsive to this request." Do
15 you see that, sir?
16    A.   Yes.
17    Q.   Do you have any documents in
18 your possession or control responsive to
19 request number 2, yes or no?
20    A.   No.
21    Q.   All right.
22    Q.   Let's go to request number 3 on
23 page 6?
24    A.   Uh-huh.
25    Q.   Do you see request number 3?

21 (Pages 381 - 384)

Page 385

WILSON
1
2   A.   Yes.
3   Q.   And you see in response to
4  request number 3 below that you use the
5  same express "Plaintiff has not identified
6  any documents responsive to this request".
7  Do you see that, sir?
8   A.   I see that.
9   Q.   Do you have any documents in
10 your possession or control responsive to
11 request number 3?
12   A.   We submitted to you so that
13 would be under your control a photograph
14 of 25 Broadway of the photographic
15 representation.  So -- so that was
16 submitted to you, and so I don't know --
17   Q.   My question, Dr. Wilson --
18   A.   I am not clear on what you are
19 trying --
20   Q.   Do you have -- the question was
21 and if you could focus on the question,
22 please --
23   A.   Uh-huh.
24   Q.   -- do you have any documents in
25 your possession or control responsive to

Page 386

WILSON
1
2  request number 3?  Yes or no.
3   A.   My answer is we submitted
4  documents related to this question to your
5  office, and I don't have those documents
6  under my control at this moment, no.
7  Correct.  I don't have those documents,
8  but we submitted them to your office.
9   Q.   So you are saying you did have
10 documents responsive to request number 3
11 in your possession and control which you
12 submitted to -- which your counsel
13 submitted to me?
14   A.   Documents were submitted to your
15 office that --
16   Q.   So if that's the case, why did
17 you say in response to request number 3
18 that "Plaintiff has not identified any
19 documents responsive to this request"?
20   A.   I'm not sure.
21   Q.   What documents did you give to
22 your counsel to produce in this case that
23 were responsive to request number 3?
24   A.   A photograph of the murals at
25 the Graduate Center For Worker Education

Page 387

WILSON
1
2  that eliminated my representation.
3      MR. MARK KLEIN:  Okay.  I call
4  for production of that photo which was not
5  produced.
6      MR. JAMES KLEIN:  I believe
7  that was in a video.
8   A.   It was in a video.
9   Q.   So now you are talking about
10 videos?  Yes?
11   A.   Yes.
12   Q.   Videos I got.  When you refer
13 to a photo, I didn't get any photo.
14   A.   It is just if you stop the
15 frame, that is a photo, so --
16   Q.   So you're referring to videos
17 that contain a picture of the photo?
18   A.   That is what I am talking about,
19 yes.
20   Q.   All right.  Let's go to request
21 number 4.
22   A.   Uh-huh.
23   Q.   Do you see request number 4?
24   A.   I do.
25   Q.   And do you see in response to

Page 388

WILSON
1
2  request number 4 you use the words again
3  "Plaintiff has not identified the
4  following documents responsive to this
5  request" -- I'm sorry.  It says "has
6  identified."  All right.  And your --
7  I'm sorry.  My mistake.  Your response to
8  request number 4 refers to arbitration
9  testimony of Defendant Currah, the
10 retaliatory teaching schedules, which were
11 assigned and a point of a grievance which
12 you filed, correct?
13   A.   Correct.
14   Q.   Other than that do you have any
15 other documents in your possession or
16 control responsive to that request?
17   A.   No.
18   Q.   Do you have in your possession
19 copies of the arbitration testimony
20 through -- in the entire case?
21   A.   You mean arbitration testimony,
22 do I have copies of that?
23   Q.   Yes.
24   A.   Yes, I do have copies of that.
25   Q.   Okay.  Now, request number 5 on

22 (Pages 385 - 388)

WILSON

1
2  page 8, do you see that, sir?
3  A.  Yes.
4  Q.  And do you see in your response
5  to request number 5 you used the words
6  "Plaintiff has not identified any
7  documents responsive to this request"?  Do
8  you see that?
9  A.  Yes.
10  Q.  Does that mean that you don't
11  have any documents in your possession or
12  control responsive to request number 5?
13  A.  That's correct.
14  Q.  Okay.  Now, we can keep going
15  through every time you used the words
16  "Plaintiff has not identified any
17  documents responsive to this request",
18  which you continue to use many times
19  further in this, but again my question was
20  every time you use those words do you mean
21  that you don't have any documents in your
22  possession or control responsive to the
23  request?
24  MR. JAMES KLEIN:  I am going to
25  object as to form.

WILSON

1
2  MR. MARK KLEIN:  Your objection
3  is noted.
4  Q.  Can you answer?
5  A.  Yes.
6  Q.  Yes what?
7  A.  Yes, I don't have documents that
8  are responsive to the request.
9  Q.  All right.  Let me try one last
10  time.  Dr. Wilson, most parties when they
11  answer a document request if they don't
12  have any documents responsive to a request
13  they say that we don't have any documents
14  requested in our possession or control.
15  They don't use the words "Plaintiff has
16  not identified any documents responsive to
17  this request", and I am just trying to
18  understand and get on record what you
19  meant when you said each time in this
20  document that "Plaintiff has not
21  identified any documents responsive to
22  this request", and I've asked over and
23  over again whether when you use those
24  words does that mean, is it the same as
25  saying I don't have in my possession, I

WILSON

1
2  being you, don't have in your possession
3  or control any documents responsive to
4  that request.
5  Can you tell me whether those
6  phrases, those words are equivalent or not
7  or do we have to keep going through every
8  time you use those words?
9  A.  I don't have those documents,
10  and so that's my -- that's my testimony.
11  Q.  And every time you said the
12  words "Plaintiff has not identified any
13  documents responsive to this request" you
14  meant that you didn't have in your
15  possession or control any documents
16  responsive to this request to which you
17  were responding; is that right?
18  A.  I meant that I haven't
19  identified.
20  MR. JAMES KLEIN:  Excuse me.
21  Object as to form.
22  Q.  Your objection is noted?
23  A.  I haven't identified.
24  Q.  What does identified mean?  That
25  is what I am trying to understand.  Does

WILSON

1
2  that mean that you don't have in your
3  possession or control documents that were
4  requested or does it mean something else?
5  A.  It means that I haven't
6  identified the documents.
7  Q.  So you might have documents in
8  your possession or control, but you are
9  not providing them, is that it?
10  A.  I guess I looked, didn't find
11  any, but that doesn't mean that I couldn't
12  find another document, but I looked.  I
13  made a good search effort, and so -- that
14  is my -- that is my answer.
15  Q.  All right.  I would like to
16  direct your attention to page 17.  In
17  response to request number 13, you refer
18  to four videos that you recorded
19  documenting your attempts to obtain your
20  property from the defendants, correct?
21  A.  Number 14?
22  Q.  13 on page 17.
23  A.  That is not what it says on my
24  page 17.
25  Q.  I think you are looking at the

WILSON

1
2 request, not the response to the request.
3 You understand that the request was my
4 request, and the response to the request
5 is your response?
6    A.   You mean me to look at the
7 response, is that what you are saying?
8    Q.   Yes, that is what I am saying.
9    Q.   Your response makes reference to
10 four videos that were recorded, right?
11    That's correct.
12    Q.   And these were of the videos you
13 testified about yesterday that you made in
14 2016?
15    A.   No.
16    Q.   When did you make the four
17 videos?
18    A.   One -- two of the videos I
19 believe were made in 2015.
20    Q.   And where did you -- and did you
21 personally make those videos?
22    A.   Personally.
23    Q.   And where did you make those
24 videos of?
25    A.   That would have been at Brooklyn

WILSON

1
2 College.
3    Q.   Where in Brooklyn College?
4    A.   James Hall Africana studies.
5    Q.   So did you make these videos --
6 I believe you testified you were there in
7 April 2015; is that right?
8    A.   I don't recall.
9    Q.   You don't recall when in 2015
10 you made these videos?
11    A.   Not exactly.
12    Q.   On what device did you make
13 these videos?
14    A.   On a cell phone.
15    Q.   Your personal cell phone?
16    A.   Personal cell phone.
17    Q.   Does your personal cell phone
18 reflect when you made those videos?
19    A.   I believe the tapes reflect it.
20    Q.   Okay.  And in your mind, what do
21 these two videos that you made sometime in
22 2015 show?
23    A.   It shows that I didn't have
24 access to any of my books or documents,
25 that whatever papers were there were

WILSON

1
2 unidentifiable or disheveled, trashed, in
3 garbage bags, kept with other people's
4 unknown personal stuff, so that is what it
5 shows.
6    Q.   Now, you made two other videos,
7 right?
8    A.   Correct.
9    Q.   And when did you make those two
10 other videos?
11    A.   I believe those were either in
12 2016 or 2017.  They are time stamped I
13 think.
14    Q.   And you personally made those
15 videos?
16    A.   Personally.
17    Q.   And where did you make those
18 videos?
19    A.   At the Graduate Center For
20 Worker Education.
21    Q.   And what do those videos show
22 according to your viewpoint?
23    A.   It shows the mural by Labor Arts
24 Society, and it shows one of the areas
25 where my documents were -- in my office

WILSON

1
2 things were placed and trashed and so
3 forth.
4       MR. MARK KLEIN:  Could you read
5 that answer back, please.
6       (Record read.)
7    Q.   Could you see what documents
8 were in your office?  You are referring to
9 the office that you had previously
10 occupied in the Graduate Center For Worker
11 Education?
12    A.   That's correct.
13    Q.   And could you see what papers
14 were in there from where you took the
15 videos?
16    A.   That was the staging area where
17 they trashed them by witness testimony.
18    Q.   I am not sure you answered my
19 question.
20    A.   No, I didn't see them.
21    Q.   So you don't know what papers
22 were there; is that right?
23    A.   No.
24    Q.   So you went over to your office
25 or the office you had formerly, and you

24 (Pages 393 - 396)

WILSON

1 opened the door and took a video; is that
2 right?
4 A. No.
5 Q. Was the door open?
6 A. This was the administrative
7 area.
8 Q. So this wasn't the office that
9 you personally occupied and that you drew
10 a depiction of on Exhibit 2, right?
11 A. It is the area immediately in
12 front of my office door.
13 Q. So it was the area outside the
14 door to your office that you drew on
15 Exhibit 2 and Exhibit 19, correct?
16 A. Correct.
17 Q. All right. I would like to
18 direct your attention to page 20.
19 A. And after this I would like to
20 break for lunch.
21 Q. We have only been going two
22 hours. I would like to go a little longer
23 before we break. Can we break at quarter
24 of 1?
25 A. Too long.

WILSON

2 Q. Why is that?
3 A. I am tired, and this is
4 exhausting, and I need to stretch my back
5 and so --
6 Q. So you want to break for lunch
7 now and come back when?
8 A. We can finish this one question,
9 and then we can come back in 45 minutes to
10 an hour.
11 Q. I've got more than one question
12 about this page.
13 A. So ask a couple. Go ahead.
14 Q. I'll agree to take a 45-minute
15 lunch break, but we have a lot to cover,
16 and we have already wasted some time with
17 having to call the judge today. So if you
18 are tired and you want to break, we can
19 stop the deposition and come back for
20 another day. Would you like to do that?
21 MR. JAMES KLEIN: No, we are
22 not going to do that.
23 A. I didn't ask for that.
24 Q. Request number 16 says "All
25 documents relating to economic injuries

WILSON

2 which plaintiff claims he sustained as a
3 result of acts alleged in the complaint."
4 And do you see the response on the next
5 page?
6 A. Yes. Yes, I see it. I haven't
7 read it at this sitting.
8 Q. All right. If you would read
9 the first two paragraphs on page 21 or you
10 can read the whole response, whatever you
11 want to do.
12 A. Yes, I see that.
13 Q. Okay. Now yesterday we marked
14 as Exhibit 7 Plaintiffs' Supplemental
15 Responses to Certain of Defendants First
16 Set of Interrogatories, correct?
17 A. Right.
18 Q. And you looked through that
19 yesterday briefly, correct?
20 A. Correct.
21 Q. And annexed as Exhibits 1
22 through 4 to Exhibit 7 are your expert
23 witness reports, correct?
24 A. Well, this -- you are looking at
25 Exhibit 7?

WILSON

2 Q. Yes.
3 A. And you're asking me what is
4 annexed to it?
5 Q. Do you see these exhibit tabs?
6 It says Exhibit 1, Exhibit 2, Exhibit 3,
7 Exhibit 4, right?
8 A. I see it.
9 Q. I am asking you with regard to
10 Exhibits 1 through 4, are those your
11 expert reports?
12 A. Yes, they are.
13 Q. Have you seen those before?
14 A. Yes, I have.
15 Q. Okay. And Exhibit 5 was the
16 production -- I'm sorry. Is a document
17 titled "Dr. Joseph Wilson professional
18 production and seized materials" that I
19 asked you about yesterday, correct?
20 A. Correct.
21 Q. All right. Other than these
22 five documents, 1 through 5 annexed to
23 Wilson Exhibit 7, do you have any other
24 documents responsive to the request for
25 any documents relating to any economic

25 (Pages 397 - 400)

Page 401

WILSON

1          WILSON
2 injuries which plaintiff claims he
3 sustained as a result of the acts alleged
4 in the complaint?
5     A.   Yes, I do.
6     Q.   What do you have?
7     A.   A document that you sent to my
8 attorney a couple of days ago that had a
9 bunch of file names on it that I haven't
10 thoroughly reviewed yet but that may add
11 to these items and claims.
12    Q.   What document are you talking
13 about?
14    A.   I don't know the name or title,
15 but it was your document, and you sent it
16 a couple of days ago, a few days ago, and
17 it had file names on it from one of my
18 computers.
19    Q.   Okay.  So these are file names
20 of materials that were on the hard drive
21 to your computer, right?
22    A.   File names of materials on a
23 hard drive of one of my computers.
24    Q.   Okay.  And did you ever ask for
25 access to your hard drive?

Page 402

1          WILSON
2     A.   Yes, I did.  I did.  I asked
3 for access to my data, to my research.
4     Q.   Did you know whether the hard
5 drive is still in existence?
6     A.   I don't know.
7     Q.   Well, it is, and earlier in this
8 case Judge Scanlan said to both parties if
9 Dr. Wilson would like to get access to his
10 hard drive he can do that.  Do you know
11 whether your counsel have asked for that?
12    A.   I don't know.
13    Q.   Would you like to get access to
14 your hard drive?
15        MR. JAMES KLEIN:  We would like
16 to have production of the hard drive.
17    A.   I would like to --
18    Q.   We are not going to produce it.
19 You can get access to it.
20    A.   I would like to get access to
21 the hard drive.
22    Q.   Okay.  We can arrange that.
23        So other than the document that
24 -- the index to the hard drive that I
25 produced a few days ago and --

Page 403

1          WILSON
2        MR. JAMES KLEIN:  I just want
3 to clarify that I am asking for
4 production.  If you say you are not going
5 to produce it, that is up to you, but I am
6 asking for production.
7        MR. JAMES KLEIN:  We are not
8 going to give you the original hard drive.
9        MR. JAMES KLEIN:  I am asking
10 for a copy of all the files on the hard
11 drive.
12        MR. MARK KLEIN:  This is not a
13 time for your document requests or your
14 discovery requests.  It is not an
15 appropriate time.
16        MR. JAMES KLEIN:  I am just
17 putting that on the record.
18        MR. MARK KLEIN:  Yes.  And you
19 interrupted a question that I was asking
20 Dr. Wilson.
21    Q.   So other than the index of the
22 hard drive that defendants produced in
23 discovery in this case and Exhibits 1
24 through 5 to Exhibit 7, are you aware of
25 any additional documents that are

Page 404

1          WILSON
2 responsive to request number 16?
3     A.   No.
4     Q.   The same questions for request
5 number 17 on page 22.
6     A.   On the different document?
7     Q.   Of Exhibit 20.
8     A.   Request 17 on page 22.
9     Q.   On page 22.  The request is on
10 the previous page.  "All documents relied
11 upon or considered in calculating the
12 nature and amount of any economic injuries
13 the plaintiff claims he sustained as a
14 result of the acts alleged in the
15 complaint."  Do you see that at the
16 bottom of page 21?
17    A.   You mean the bottom of page 22?
18    Q.   No, I said the bottom of page
19 21.
20    A.   Okay.  Yes.
21    Q.   And at the top of page 22, it is
22 the same statement we saw in response to
23 request number 16 where you said that
24 plaintiff anticipates he will begin
25 producing additional materials responsive

26 (Pages 401 - 404)

WILSON

1
2 to this request within the next 60 to a
3 hundred days?
4     A.   Yes, I see that.
5     Q.   My question to you is other than
6 Exhibits 1 through 5 to Exhibit 7, are you
7 aware of any other documents responsive to
8 request number 17?
9     A.   At this moment, no.
10    Q.   All right.  Now, request number
11 18 asks for all documents relating to any
12 noneconomic injuries which plaintiff
13 claims he sustained as a result of the act
14 alleged in the complaint.
15         Do you see that at the bottom of
16 page 22?
17    A.   I see that.
18    Q.   You are not making any
19 noneconomic claims in this case, correct?
20    A.   Is that -- I am not sure.
21    Q.   Well, you were asked for
22 identification of any psychologists,
23 social workers, psychiatrists or any other
24 doctors that you saw as a result of the
25 acts alleged in the complaint, correct?

WILSON

1
2     A.   Correct.
3     Q.   And you are not making any
4 claims with regard to any social worker,
5 psychiatrist, psychologist or doctor you
6 saw, correct?
7     A.   Correct.
8     Q.   And you are not making any claim
9 for emotional injury damages in this case,
10 correct?
11    A.   Correct.
12         MR. JAMES KLEIN:   Well, that
13 calls for a legal conclusion.
14         MR. MARK KLEIN:   All right.
15 You made the objection after your client
16 answered.  That's fine.
17    Q.   Page 25.
18    A.   Let me amend my -- my statement.
19 You may appreciate that having 40 years of
20 your work, your research, your books, your
21 documents, and your letters trashed and
22 your livelihood smashed as a result of
23 people's recklessness, that that is a
24 traumatic situation, and I don't preclude
25 the consideration of the anguish and

WILSON

1
2 emotional distress and damage that this
3 has inflected upon me, so that is -- that
4 is my response to your question.
5     Q.   And sitting here --
6         MR. JAMES KLEIN:   And
7 further --
8         MR. MARK KLEIN:   No.  No.  No
9 speaking objections.  You can object as
10 to form.  You can't make speeches.
11        MR. JAMES KLEIN:   I wasn't
12 going to make a speech.
13        MR. MARK KLEIN:   Don't say
14 anything other than object to form, Mr.
15 Klein.  Judge Scanlan directed that that
16 is the way --
17        MR. JAMES KLEIN:   That is not
18 the only objection that I can make, and I
19 am entitled to make another objection.  I
20 can object to any issue that you ask him
21 about claims in the case.  I am objecting
22 that it calls for a legal conclusion.
23        MR. MARK KLEIN:   Your objection
24 is noted.
25    Q.   With regard to anguish and other

WILSON

1
2 things you just testified about, do you
3 have any documents or any other evidence
4 relating to any claimed damage in that
5 connection?
6     A.   With regards to anguish and
7 trauma I would have to think about that.
8     Q.   Sitting here today, can you
9 think of any?
10    A.   It is a complicated question, so
11 let me think about that.  Anguish and
12 trauma.
13    Q.   Well, rather than taking any
14 more time on this if you come up with any
15 documents, you'll provide them to your
16 counsel.
17        MR. MAKR KLEIN:  And, Mr. Klein,
18 you'll produce them in this case; is that
19 right?
20        MR. JAMES KLEIN:   Any documents
21 that are provided to me I will produce.
22    Q.   All right.  Request number 20
23 on page 25.
24    A.   Request 20 on 25, page 25.
25    Q.   That requests documents relating

27 (Pages 405 - 408)

Page 409

WILSON

1
2 to any attempts to mitigate the economic
3 and/or noneconomic injuries that plaintiff
4 claims he sustained as a result of the
5 acts alleged in the complaint.  Do you
6 see that, sir?
7    A.   I see that.
8    Q.   Do you have any documents in
9 your possession responsive to that
10 request?
11    A.   If I do, I'll provide them to my
12 counsel, and he will provide them to you.
13    Q.   Sitting here today are you aware
14 of any such documents?
15    A.   Well, I can think of one
16 document recently.
17    Q.   What is that?
18    A.   That was a -- an attempt at
19 employment at Cornell University recently,
20 correspondence.
21    Q.   Have you produced that attempted
22 employment at Cornell?
23    A.   That happened after this was
24 completed.
25    Q.   By the way, who did you -- what

Page 410

WILSON

1
2 position did you apply for at Cornell
3 University?
4    A.   A teaching position.
5    Q.   What teaching position?
6    A.   That would have been an adjunct
7 position in the School of Industrial
8 Relations.
9    Q.   Did you fill out an application
10 in connection with that application --
11       MR. MARK KLEIN:  Withdrawn.
12    Q.   Did you fill out a written
13 application in connection with that
14 attempt at employment?
15    A.   No, I had verbal communications
16 with the director of the program.
17    Q.   Who did you have verbal
18 communications with?
19    A.   His name escapes me at the
20 moment.
21    Q.   Did you submit anything in
22 writing?
23    A.   I submitted my resume I think.
24    Q.   Anything else?
25    A.   And I gave him courses that I

Page 411

WILSON

1
2 would like to teach.
3    Q.   You put that in writing?
4    A.   In writing.
5    Q.   You put that in writing in a
6 cover letter to the CV?
7    A.   Not in -- well, I don't know
8 formally a cover letter, but it
9 accompanied my CV.
10    Q.   So you sent your resume or your
11 CV.  Are you using the term
12 interchangeably?
13    A.   Yes.
14    Q.   And some sort of communication
15 that set out the kinds of courses you
16 wanted to teach?
17    A.   Correct.
18    Q.   Did you get a written response?
19    A.   No.
20    Q.   Did you get any kind of
21 response?
22    A.   No.
23    Q.   And what position did the person
24 you communicated with about this job have,
25 since you can't remember his name?

Page 412

WILSON

1
2    A.   This would have been an adjunct
3 teaching -- adjunct teaching position in
4 the school of industrial and labor
5 relations.
6    Q.   I asked you the title of the
7 person you communicated to.
8    A.   I believe he was the director.
9    Q.   Does the letter that you sent
10 have a person's name that you spoke with?
11    A.   Yes.
12    Q.   Either when speaking to the
13 director that you spoke with or in the
14 written materials that you provided, did
15 you tell him about the arbitration that
16 resulted in Exhibit 18?
17    A.   Clarify the question.
18    Q.   You don't understand the
19 question?
20    A.   No.
21    Q.   In your verbal communications
22 with the director or in the written
23 materials that you provided -- that you
24 provided him, did you tell that director
25 about the arbitration that resulted in the

28 (Pages 409 - 412)

Page 413

WILSON

1          WILSON
2 opinion and award that has been marked as
3 Exhibit 18?
4     A.   No, but he was aware of the
5 general events.
6     Q.   How do you know he was aware of
7 the general events?
8     A.   He mentioned it to me.
9     Q.   What did he tell you about what
10 he was aware of?
11    A.   That he was aware of, you know,
12 the actions that the university had taken
13 against me.   He was aware that the
14 program had been pretty much destroyed,
15 and he said he would see what he could do.
16    Q.   What does --
17    A.   In terms of employment.
18    Q.   Was he aware that CUNY had
19 terminated you?
20    A.   I am not precisely aware of what
21 he was aware of.
22    Q.   Did you tell him that you had
23 been terminated?
24    A.   I don't recall.
25    Q.   Did you tell him that your

Page 414

1          WILSON
2 termination by CUNY had been upheld by a
3 neutral arbitrator in the arbitration?
4     A.   I don't recall.
5     Q.   All right.  Request number 23 on
6 page 29, please.
7     A.   Page 29.
8     Q.   That asks for any applications
9 for and/or receipt of any insurance or
10 other benefits from January 1, 2010 to the
11 present including without limitation
12 unemployment insurance, workers comp
13 benefits, disability insurance or any
14 other benefit or insurance compensating
15 for replacing lost income." Do you see
16 that?
17    A.   I see that.
18    Q.   In response you use that phrase
19 again "Plaintiff has not identified any
20 documents responsive to this request." Do
21 you see that?
22    A.   I see that.
23    Q.   Did you apply for unemployment
24 insurance?
25    A.   I did.

Page 415

1          WILSON
2     Q.   Do you have a copy of that?
3     A.   No, I don't.
4     Q.   Why?
5     A.   My attorney Collin Moore had all
6 of my unemployment documents.
7     Q.   Did you request these documents
8 from your attorney?
9     A.   I could not -- he was unable to
10 provide my documents.  I have asked him
11 for documents.
12    Q.   So you've asked him for your
13 documents, but he hasn't given them to
14 you?
15    A.   That's correct.
16    Q.   Did he tell you why he wouldn't
17 give them to you?
18    A.   I think he has been ill.  He
19 was hospitalized for a period of time,
20 so --
21    Q.   Did you ask anybody else in his
22 office for your papers?
23    A.   I don't think he has an office.
24    Q.   So you applied for unemployment
25 insurance; is that right?

Page 416

1          WILSON
2     A.   Unemployment compensation,
3 correct.
4     Q.   Did you get it?
5     A.   No.
6     Q.   Do you know why?
7     A.   Yes, because CUNY imposed it.
8     Q.   Did you apply for workers
9 compensation benefits?
10    A.   No.
11    Q.   Did you apply for disability
12 insurance?
13    A.   No.
14    Q.   Did you apply for anything else?
15    A.   What do you mean by anything
16 else?
17    Q.   Any other benefits or insurance
18 compensating or replacing lost income.
19    A.   No.
20    Q.   Are you presently receiving
21 Medicare or Medicaid benefits?
22    A.   Yes.
23    Q.   What? What benefits are you
24 receiving?
25    A.   I believe that would be

29 (Pages 413 - 416)

Page 417

1      WILSON
2  Medicare.
3      Q.   Since when have you been
4  receiving Medicare benefits?
5      A.   Since the legal age of
6  eligibility, which I believe was 65.
7      Q.   So since you turned 65 you have
8  been get being Medicare benefits?
9      A.   That is my understanding.
10     Q.   Well, have you been receiving
11 Medicare benefits?
12     A.   Yes.
13     Q.   And when did you turn 65?
14     A.   Approximately three years ago.
15     Q.   When was your birthday?
16     A.   December 2, 1951.
17         MR. JAMES KLEIN:  I think we
18 are going to break for lunch now.
19         MR. MARK KLEIN:  So we will
20 come back at 1:05.
21         MR. JAMES KLEIN:  What time is
22 it now?
23         MR. MARK KLEIN:  12:21 I think.
24     A.   Is that 45 minutes?
25     Q.   Yes, that is 45 minutes.

Page 418

1      WILSON
2      A.   1:05?
3      Q.   1:05.
4         (Luncheon recess: 12:21 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 419

1      WILSON
2      A F T E R N O O N   S E S S I O N
3         1:05  p.m.
4  DR. J O S E P H   W I L S O N,
5  having been previously duly sworn,
6  testified further as follows:
7  CONTINUED EXAMINATION
8  BY MR. KLEIN:
9      Q.   Dr. Wilson, is there any
10 testimony you gave this morning that you
11 would like to change or modify?
12     A.   Yes, there is.
13     Q.   What is that?
14     A.   The testimony that I gave this
15 morning that would pertain to my responses
16 found on my preliminary statement and --
17     Q.   What preliminary statement are
18 you talking about?
19     A.   Where it says on page 1 --
20     Q.   You are looking at Exhibit 20;
21 is that right?
22     A.   Yes.
23     Q.   That is plaintiff's responses
24 and objections to defendants' first set of
25 requests for production of documents?

Page 420

1      WILSON
2      A.   Yes.  Any time you asked me was
3  I aware or can I identify, you know,
4  documents and so on and so forth, the
5  answer is that there may have been
6  documents in my offices.  In fact, I had
7  hundreds, thousands of documents, and
8  those documents were all seized from me.
9  So I didn't control that information, and
10 I don't know what evidence was in those
11 documents that could confirm the roles
12 that the three defendants had in this
13 case.
14     Q.   Was the statement you just gave
15 something you discussed with your counsel
16 over lunch?
17         MR. JAMES KLEIN:  There is an
18 objection.  It's privileged.
19         MR. MARK KLEIN:  It is not.
20 When you discuss your client's testimony
21 with him, that is not privileged.
22         MR. JAMES KLEIN:  I believe you
23 can ask if we spoke, but you can't ask him
24 the substance of the --
25         MR. MARK KLEIN:  I just asked if

30 (Pages 417 - 420)

Page 421

WILSON

1     WILSON
2  what you just said was something you
3  discussed with your counsel over lunch.
4         MR. JAMES KLEIN:  No, I think
5  you can say whether or not he spoke with
6  me over lunch.   That is the substance of
7  it.
8         MR. MARK KLEIN:   Are you
9  directing him not to answer?
10        MR. JAMES KLEIN:   Yes.
11        MR. MARK KLEIN:  I may bring it
12  it up with Magistrate Scanlan.
13    A.   If I may --
14    Q.   What I asked you, Dr. Wilson,
15  repeatedly this morning was whether you had
16  in your possession or control documents
17  responsive to various requests I directed
18  your attention to.
19    A.   Yes.
20    Q.   Now, you are telling me you
21  don't have possession and control of the
22  materials that you say were --
23    A.   No, that's not --
24    Q.   -- were taken from you, and that
25  is not responsive to what I asked you.

Page 422

WILSON

1     WILSON
2  So you're telling me something I didn't
3  ask you to tell me.
4         MR. JAMES KLEIN:   That is not
5  entirely true.   You asked him --
6         MR. MARK KLEIN:   If you have an
7  objection to form, state it on the record.
8    Q.   My question --
9         MR. JAMES KLEIN:   He you said
10  was he aware.
11        MR. MARK KLEIN:   No, I asked
12  him, repeatedly asked him when he used the
13  words "Plaintiff has not identified any
14  documents responsive to this request"
15  whether that meant the same as he did not
16  have in his possession or control
17  documents responsive to that request.
18  That's what I asked over and over again.
19    Q.   And I think the statement you
20  just made doesn't change that, right?
21    A.   My statement is I may have had
22  those documents.  I had many, many
23  documents that may have been evidence of
24  what these people did, but all of my
25  documents were seized.  So at the moment I

Page 423

WILSON

1     WILSON
2  don't have them.
3    Q.   You've already said that.   You
4  don't need to repeat it.
5    A.   Okay.
6    Q.   I would like to direct your
7  attention to page 31 of Exhibit 20, sir.
8    A.   Well, there is two other
9  amendments to a previous answer.
10    Q.   Okay.   You want to make more
11  amendments?
12    A.   Yes.
13    Q.   Go ahead.
14    A.   Yesterday you asked me about
15  conversations that I have had with people.
16    Q.   Yes.
17    A.   And we went down a list, and we
18  would have to double-check the record, but
19  I am fairly sure you asked me if I had a
20  conversation or any conversations with
21  Ms. Gaskins.
22    Q.   Erica Gaskins?
23    A.   Erica Gaskins, yes.
24    Q.   So subsequent to yesterday --
25    A.   And I remember speaking to Erica

Page 424

WILSON

1     WILSON
2  in January, but upon further reflection I
3  spoke to Erica, and this would have been a
4  couple of weeks ago, and she told me that
5  she received a call from my attorney, and
6  I asked her what was the name, and so she
7  said a Mr. Klein, and I said my attorney
8  didn't call you.
9    Q.   I contacted Ms. Gaskins.
10    A.   Yes.
11    Q.   And she didn't talk to me.
12    A.   Well, for the record,
13  Ms. Gaskins told me that she did speak to
14  you.   She told me that you identified
15  yourself as my attorney, and she -- and
16  that you asked her or she said that she
17  would call you back, and she --
18    Q.   I didn't identify myself as your
19  attorney.   I said I was an assistant
20  attorney general representing defendants
21  in this case, and she said she would call
22  me back, and she never did.
23    A.   So you did talk to her.
24    Q.   I told you I called her and
25  spoke to her.

31 (Pages 421 - 424)

Page 425

```
1              WILSON
2      A.   No, you said you didn't talk to
3  her.
4      Q.   She wouldn't speak to me.
5          MR. JAMES KLEIN:  Don't get
6  into a conversation.  Just --
7      Q.   Is there anything else you want
8  to change or modify, sir?
9      A.   No, I just wanted that for the
10 record.
11     Q.   You think there is something
12 wrong with contacting people that you have
13 identified as witnesses having knowledge?
14         MR. JAMES KLEIN:  Don't --
15     Just stating facts.
16     Q.   Do you think there is something
17 wrong --
18         MR. JAMES KLEIN:  That calls for
19 a legal conclusion.
20         MR. MARK KLEIN:  I am not asking
21 for a legal conclusion.
22     Q.   Do you think there is something
23 wrong with my contacting witnesses that
24 you represented as having personal
25 knowledge?
```

Page 426

```
1              WILSON
2      A.   There is something wrong with
3  you misrepresenting yourself.
4      Q.   I didn't misrepresent myself.
5  I identified myself as an assistant
6  attorney general for New York State.
7      A.   That is not what Ms. Gaskins
8  told me.
9      Q.   Well, she got it wrong just as
10 you seem to repeatedly.
11         MR. JAMES KLEIN:  That is
12 harassment.
13     Q.   Is there any other changes you
14 want to make?
15     A.   Note that harassment.
16     Q.   Is there any other changes you
17 want to make?
18     A.   There will be, but not at this
19 moment.
20     Q.   You testified regarding your
21 conversation with Dominic Tumaniro
22 yesterday, right?
23     A.   Mr. Tumaniro.  I did.
24     Q.   Mr. Tumaniro is a former
25 assistant attorney general at the New York
```

Page 427

```
1              WILSON
2  State Attorney General's Office?
3      A.   Yes.
4      Q.   And to your knowledge, he
5  litigated for 30, 40 years?
6      A.   I don't know how long he
7  litigated.
8      Q.   And you accused me of tricking
9  this long-time, now retired attorney,
10 former assistant attorney general; is that
11 right?
12         MR. JAMES KLEIN:  That
13 misrepresents --
14     A.   That is wrong.  That is wrong.
15 I repeated what he told me.  That you
16 tricked him.
17     Q.   Okay.  Directing your attention
18 to page 31 of Exhibit 20, sir.
19     A.   Page 31.
20     Q.   Yes.
21     A.   Of this exhibit.
22     Q.   Right.
23     A.   Is this 20?
24     Q.   Yes, that is 20.
25     A.   Okay.
```

Page 428

```
1              WILSON
2      Q.   Page 31.  Are you on page 31?
3      A.   Yes, I am now.  Wait a minute.
4          THE WITNESS:  This is yours.
5          MR. JAMES KLEIN:  It is yours.
6  I just didn't bring mine back.
7      Q.   Request number 25 is requesting
8  tax returns, W-2 forms, and 1099 forms,
9  correct?  That is what it says?
10     A.   Correct.  That is correct.
11     Q.   For the years 2010 through the
12 day of trial in this action, right?
13     A.   That's correct.
14     Q.   And in the response it says
15 "Plaintiff has identified all of the
16 documents potentially responsive to this
17 request.  However, he is not currently in
18 personal possession or control of any of
19 the potentially responsive documents."  Do
20 you see that there?  Sir, do you see that?
21     A.   Yes, I am looking at it now.
22 Yes, I see that.
23     Q.   What did you mean by that?
24     A.   That meant that I was not in
25 possession or control of any of those
```

32 (Pages 425 - 428)

Page 429

1         WILSON
2  potentially responsive documents.
3     Q.   Who was in possession or control
4  of your tax returns, W-2 forms, and 1099
5  forms from the years 2010 through the
6  present?
7     A.   My accountant.
8     Q.   Did you ask your accountant for
9  those documents?
10    A.   I did, and he provided a few but
11 not all.
12    Q.   Do you know why he didn't
13 provide all of them?
14    A.   No.
15    Q.   Have you provided to your
16 counsel for production to defendants in
17 this case those tax returns?
18    A.   No.
19    Q.   Why not?
20    A.   Just with the work and preparing
21 for this, so it's -- it will happen.
22    Q.   And did you request your
23 accountant to provide the other tax
24 returns that he hasn't already provided
25 you?

Page 430

1         WILSON
2     A.   I am not sure.
3     Q.   Will you request from him the
4  rest of the tax returns in his possession?
5     A.   Yes, but there is a question
6  that these are not just my personal tax
7  returns. There are other parties involved
8  who aren't subject to this, and so there
9  is privacy issues.
10    Q.   Other parties being your wife?
11    A.   Yes.  And my son, so forth.
12 So --
13    Q.   Your son --
14    A.   Strike that.  I take that back.
15 My wife is on my tax returns.
16       MR. MARK KLEIN:  Okay.  I call
17 for production of the tax returns
18 requested in request number 25.
19    Q.   Now, I direct your attention to
20 page 35 of this exhibit, sir.
21    A.   Uh-huh.
22    Q.   In the response to request
23 number 30 it states "Plaintiff has
24 attached electronic e-mails in response to
25 this document request."  I simply want to

Page 431

1         WILSON
2  understand what you mean by electronic
3  e-mails.  Are you saying you provided
4  copies of e-mails or is electronic e-mails
5  something different from e-mails?
6     A.   Well, your question was
7  electronic, so the answer is electronic
8  e-mails.  Yes.  Plaintiff has attached
9  electronic e-mails.
10    Q.   Okay.  My question is:  Is there
11 anything different between your use of the
12 words electronic e-mails and e-mails?
13    A.   I think they are substantially
14 the same.
15    Q.   Are they substantially the same
16 or are they the same? Substantially the
17 same or the same, which is it?
18    A.   Well, the -- my attorney
19 provided it is my understanding videos
20 which were electronic.
21    Q.   Are videos e-mails, sir?
22    A.   Well, I was focusing on
23 electronic.  That was your question.
24    Q.   My question was what are
25 electronic e-mails? You understand the

Page 432

1         WILSON
2  word e-mails the E refers to electronic,
3  right? So there is redundancy.  I am
4  trying to clarify are electronic e-mails
5  different or the same as e-mails?
6     A.   I think they are the same as
7  e-mails.
8     Q.   Thank you.
9        Page 36, request number 31 asks
10 for all documents relating to the
11 statement referred to in paragraph 62 of
12 the complaint that Cheng allegedly made on
13 March 12, 2014 that Wilson was engaged in
14 criminal activity." Do you see that?
15    A.   I see that.
16    Q.   On the next page you say
17 "Plaintiff states that following a
18 reasonable search, the plaintiff has not
19 identified any documents responsive to
20 this request." Do you see that?
21    A.   I see that.
22    Q.   Okay.  My question is do you
23 have in your possession or control any
24 documents responsive to exhibit -- to
25 request number 31?

33 (Pages 429 - 432)

WILSON

2  A.   My documents that may have been
3  responsive were seized by the plaintiffs.
4  Q.   So you don't have them in your
5  possession or control, right? Yes or no.
6  A.   They were seized by the
7  defendants.
8  Q.   Are they in your possession or
9  control? Yes or no.
10  A.   My answer is they were seized by
11  your defendants.   That's my answer.
12  Q.   So you can't answer a simple
13  question. Is that what you are saying,
14  Dr. Wilson?
15  A.   I am simply telling you that all
16  documents are seized by defendants, so
17  they may be in your defendants' control.
18  Q.   My question is: Do you have in
19  your possession -- you understand the
20  difference between mine and yours, right?
21  They are two different words, right?  I am
22  going to break this down as simple as I
23  can, so I can try to get a straight
24  answer.
25      Do you have in your possession

WILSON

2  and control any documents responsive
3  to request 31?  Yes or no.
4  A.   I am not sure.
5  Q.   You have searched for them,
6  right?
7  A.   Yes, I have searched.
8  Q.   And you haven't found any,
9  right?
10  A.   They were seized, and they were
11  under the control of your defendants,
12  so --
13  Q.   Can you identify any documents
14  that that might be, and I emphasize might
15  be in defendants' possession or control
16  responsive to request number 31?
17  A.   That they may have seized? I
18  don't understand the question.
19  Q.   Can you identify any documents
20  that you do not have in your possession or
21  control that might be responsive to
22  request number 31?
23  A.   Well, let's see out of the
24  thousands of documents that they seized
25  could I identify documents that I can't

WILSON

2  see? The answer is I can't answer that
3  question at this moment.
4  Q.   You know, you're
5  obstreperousness is going to show up on
6  the transcript, but you will have to live
7  with that, Dr. Wilson.
8      Now, with respect to request
9  number 32, that asks for all documents
10  relating to the statements that Cheng
11  allegedly "repeated"to the Labor Arts
12  Society as alleged in paragraph 62 of the
13  complaint, and again and your in your
14  response you say "Following a reasonable
15  search, the plaintiff has not identified
16  any documents responsive to this request."
17      My question to you, sir, is what
18  does that mean?  Does that mean that you
19  do not have in your possession and control
20  any documents responsive to that request?
21  A.   Well, this request may seek
22  documents that have attorney-client
23  privilege.
24      MR. JAMES KLEIN:   That is not
25  the question.

WILSON

2  A.   That is not the question.  I am
3  sorry.  Repeat the question again.   Go
4  ahead.  Sorry.
5  Q.   Do you have in your possession
6  and control any documents responsive to
7  request number 32?  Yes or no.
8  A.   Was this about Terrence Cheng?
9  Q.   Yes.
10  A.   I believe those documents were
11  provided to you, so everything -- even
12  though you said in the response to request
13  number 32 that you verified, even though
14  you said "The plaintiff has not identified
15  any documents responsive to this request,"
16  you are now telling me responsive
17  documents were provided to me?
18  A.   The video is what I am referring
19  to, which we have discussed earlier, and
20  that would have been a video of a
21  representation of Terrence Cheng's
22  defamation, the defamatory actions, the
23  results of his defamatory actions, and
24  those were provided to you.
25  Q.   Request number 32 doesn't ask

34 (Pages 433 - 436)

Page 437

WILSON

1          WILSON
2 for any documents relating to the results
3 of his alleged defamatory actions, does
4 it?
5     A.   They were responsive, and so I
6 provided responsive information to you.
7     Q.   Okay.  Now, I am going to show
8 you Exhibit 21.
9          (Document handed to witness.)
10    Q.   Exhibit 21 are the documents
11 that your counsel provided to me.  They
12 were not Bates stamped, so I Bates stamped
13 them.  I Bates stamped them P 1 through P
14 50.
15          So I would ask that you briefly
16 look through Exhibit 21 and tell me
17 whether these were the documents that you
18 provided to your counsel to produce in
19 this case besides the videos that we have
20 already talked about?
21          MR. JAMES KLEIN:   This is
22 marked 21?
23          THE WITNESS:   21.
24    A.   I saw -- I am looking at them
25 now.  So what is your question again?

Page 438

1          WILSON
2     Q.   Are these the documents you
3 provided to your counsel as documents
4 responsive to the various document
5 requests that defendants sent to you?
6     A.   Yes.  They -- they are
7 documents I provided to my counsel in
8 response.
9     Q.   Okay.  Now, going back for a
10 moment to Exhibit 20, if you go to page
11 40.
12    A.   Of this?
13    Q.   Page 40 of Exhibit 20.
14    A.   Uh-huh.
15    Q.   Request 34 asks for all
16 documents relating to the "numerous and
17 repeated oral and written demands" for the
18 return of the "confiscated property" as
19 alleged in paragraph 37 of the Complaint.
20 You see that, sir, right?
21    A.   I do.
22    Q.   And you provided to your counsel
23 copies of all documents relating to any
24 oral and written demands for return of
25 your confiscated property, right?

Page 439

1          WILSON
2     A.   To my recollection.
3     Q.   And included in the 50 pages of
4 production documents in this case were
5 copies of all documents related to your
6 numerous and repeated oral and written
7 demands for return of your confiscated
8 property?
9          MR. JAMES KLEIN:   All documents
10 in his possession.
11          MR. MARK KLEIN:   Yes.  You
12 know, it is kind of hard to prove what is
13 not in his possession, but, yes, all
14 documents in your possession.
15    A.   Yes.
16    Q.   Okay.  I would like to turn
17 your attention to page 31 of Exhibit 21.
18    A.   Yes.
19    Q.   Now, P 21 consists of an e-mail
20 to you --
21    A.   You said P 31 or B 21?
22    Q.   P 21.
23          MR. JAMES KLEIN:   I think you
24 said 21.
25    A.   You said 31.  I apologize P 21.

Page 440

1          WILSON
2     Q.   Are you on page 21, sir?
3     A.   Yes.
4     Q.   That consists of an e-mail
5 exchange between you and Pamela Pollack on
6 February 8 and February 9 regarding the
7 subject "pecking my things," right?
8     A.   Correct.
9     Q.   Now, who is Donna Devose,
10 D-E-V-O-S-E, who is indicated as a CC on
11 these e-mails?
12    A.   I am not sure.
13    Q.   You copied her on your original
14 e-mail to Pam Pollack, correct?
15    A.   Apparently.
16    Q.   All right.  Now, in your e-mail
17 to Pam Pollack on February 8, the first
18 sentence --
19          MR. JAMES KLEIN:   Well, on his
20 original e-mail, I mean this is the first
21 e-mail you are showing us with a CC on it,
22 so you mischaracterized it.  There is no
23 evidence --
24          MR. MARK KLEIN:   Objection to
25 form.  Okay.

35 (Pages 437 - 440)

Page 441

WILSON

1
2       He sent an e-mail to Pamela
3   Pollack.  He copied Donna Devose.  Right.
4   That is what I asked him.  I asked him
5   who Donna Devose was.  He doesn't know.
6       MR. JAMES KLEIN:  You showed
7   him an e-mail from Pam Pollack, and then
8   you said he copied her on the original he
9   e-mail.
10      MR. MARK KLEIN:  I am helping
11  you out Mr. Klein, since this seems to be
12  too difficult.  There are two e-mails on
13  page P 21.  The bottom is an e-mail from
14  Joseph Wilson to Pam Pollack and a copy to
15  Donna Devose.
16      MR. JAMES KLEIN:  Now I see it.
17  Thank you.
18      Q.   Okay.  The first sentence of
19  your e-mail to Pam Pollack says, "I need
20  to arrange to peck books and papers and
21  boxes and remove from 25 Broadway."
22      A.   Yes.
23      Q.   You didn't ask anything about
24  the materials in your office on the
25  Brooklyn College campus in this e-mail,

Page 442

WILSON

1
2   right?
3       A.   In this e-mail, that is right.
4       Q.   Okay.  Can you go to the next
5   page?
6       A.   Page P 22.
7       Q.   P 22 and P 23.
8       A.   Uh-huh.
9       Q.   Those are a series of e-mails
10  between Pamela Pollack and Pete Zwiebach,
11  your attorney on which you were copied,
12  correct?
13      A.   Correct.
14      Q.   And in the e-mail in the middle
15  of the page on P 22, Ms. Pollack stated
16  "Please let me know what files Professor
17  Wilson needs from his computer to teach
18  his classes, and I will arrange to have
19  them sent to him." Do you see that, sir?
20      A.   I see that.
21      Q.   Did Pam Pollack arrange to get
22  the files from your computer that you
23  needed to teach your courses?
24      A.   I don't recall that.
25      Q.   If you could go to P 34.

Page 443

WILSON

1
2       A.   Yes.
3       Q.   Do you see toward the bottom of
4   page P 34 there is an e-mail from you to
5   Pamela Pollack?  Do you see that?
6       A.   Yes.
7       Q.   And it is dated February 20,
8   2012, right?
9       A.   Yes.
10      Q.   And in that e-mail in the second
11  paragraph you say "I did receive the
12  computer files."
13      A.   Yes, I see that.
14      Q.   Does that refresh your
15  recollection that you received computer
16  files?
17      A.   I believe I received a computer
18  disk.  Correct.
19      Q.   And what was on that computer
20  disk?
21      A.   I believe that was the disk or
22  the list of files that you provided my
23  counsel recently.  I think that was the
24  same thing.
25      Q.   So you got a computer disk, the

Page 444

WILSON

1
2   same thing you are asking us to provide
3   another copy of today to you?
4       A.   Because they were seized.  That
5   was seized again.  That was another
6   seizure of everything that I had in my
7   office on the main campus.  So yes, I had
8   it at one time, and it was seized again.
9       Q.   The computer disk that Pam
10  Pollack sent you and you acknowledged
11  receipt of in February of 2012, you are
12  saying it was seized again?
13      A.   That's correct.
14      Q.   The computer disk that was sent
15  to your home was seized again?  Is that
16  what you are saying?
17      A.   That's correct.
18      Q.   How was it seized again?
19      A.   Because I had the computer disk
20  in my office at Brooklyn College, and
21  everything from my office at Brooklyn
22  College was seized.
23      Q.   Okay.  I'll direct your
24  attention to P 24.
25      A.   P 24, not 34?

36 (Pages 441 - 444)

Page 445

WILSON

1
2    Q.   I said 24.
3    A.   Because we were on 34.
4    Q.   Okay.
5    A.   P 24.  Okay.
6    Q.    Now, that indicates toward the
7  bottom of the page that there is a page --
8  that is page 1, correct?
9    A.   Correct.
10    Q.   And if you go to P 25, it
11  indicates that that is page 3, right?
12    A.   Right.
13    Q.   And then the next page is page
14  4?
15    A.   Correct.
16       MR. MARK KLEIN:  You didn't
17  provide page 2 of this stream of e-mails.
18  I call for production of page 2.
19    Q.   Now --
20    A.   Let me just -- this is where it
21  says "Pam, I need my computer and printed
22  documents" --
23       MR. JAMES KLEIN:  No, 24.
24    A.   Page 24.
25       MR. JAMES KLEIN:  That is 3.

Page 446

WILSON

1
2  This is 1.
3    A.   Okay.
4       MR. JAMES KLEIN:  So there is
5  no page 2.
6    A.   Okay.  Page 2, but there is a
7  page 3.
8    Q.   And it could be that P 24 is one
9  page of an e-mail, and then there is 3 and
10  4.  We are missing pages, which appears to
11  be the case.
12       MR. JAMES KLEIN:  You are
13  missing page 2?
14       MR. MARK KLEIN:  No, I
15  think -- if you look at page P 24, that is
16  the same as page 3 on P 29.
17    A.   That is the same as page 3 on P
18  25.  P 25.
19       MR. JAMES KLEIN:  No that is
20  what it says on P 25.  Mr. Klein, I
21  understand your question and --
22    Q.   I think page 2 is missing from
23  the e-mail chain.  It appears on page P 25
24  and P 26.
25       MR. JAMES KLEIN:  The only thing

Page 447

WILSON

1
2  I will say, and I don't have direct
3  knowledge of this myself, since this is an
4  e-mail chain involving Mr. Zwiebach, there
5  may have been e-mails or portions of the
6  e-mail chain that were privileged.   I
7  don't know since I was not the attorney on
8  the case at the time.  So what I will say
9  is I will look into the circumstances of
10  missing pages and get you either the pages
11  themselves or a response as to why they
12  were not produced.
13    Q.   Okay.
14    A.   But just to clarify --
15    Q.   I haven't asked you a question,
16  sir.
17    A.   You asked me about the e-mail,
18  and I was just pointing out -- okay.
19  Sorry.
20    Q.   Did you provide to me all of the
21  e-mails that your attorney Pete Zwiebach
22  sent requesting that you get access to
23  your files and personal documents and
24  personal property at either 25 Broadway or
25  Brooklyn College?

Page 448

WILSON

1
2    A.   I cannot speak to all of the
3  e-mails that Pete Zwiebach sent on my
4  behalf concerning my documents.
5    Q.   So did you provide me all of the
6  e-mails in your possession that Pete
7  Zwiebach sent requesting that you get
8  access or possession of your personal
9  property and materials?
10    A.   Pete Zwiebach may be in
11  possession of additional documents, and we
12  will look to find that out.
13    Q.   Dr. Wilson, could you answer a
14  straight question with a straight answer?
15  Have you provided to me all of the e-mails
16  in your possession that Pete Zwiebach sent
17  requesting that you get access to your
18  documents and personal property?
19    A.   To the best of my knowledge, but
20  that doesn't mean there may not be more
21  e-mails.
22    Q.   I understand that.  I just
23  asked a simple question, and I asked for a
24  simple answer, which you apparently are
25  not able to do.

37 (Pages 445 - 448)

Page 449

WILSON

2  A.  I object to that because I find
3  that insulting, and I am not trying to
4  insult you.
5  Q.  Well, I'm sorry you find it
6  insulting, but if could you answer a
7  question that I ask you in a
8  straightforward fashion then I won't have
9  to keep asking the same question over and
10 over again.
11     A.  The only reason why I ask
12 questions is because I need clarification,
13 and because I need clarification that is a
14 professional request.  It is not
15 insulting.
16     Q.  I direct your attention to page
17 P 27.  There is an e-mail at the bottom of
18 the page sent on Wednesday, February 15,
19 2012 at 2:34 p.m. by you to Pam Pollack
20 with a copy to Pete Zwiebach, right?
21     A.  Correct.
22     Q.  And for the record Zwiebach is
23 spelled Z-W-I-E-B-A-C-H.
24        Okay.  Now, you asked for
25 materials from your office at Brooklyn

Page 450

WILSON

2  College 3608 James, correct?
3     A.  Incorrect.
4     Q.  Well, the first sentence refers
5  to your office at 3608 James, right? Yes
6  or no.
7     A.  Yes, that is my office, 3608
8  James.  Yes.
9     Q.  Does that refresh your
10 recollection as to the office number of
11 your office?
12     A.  On the main campus, correct.
13     Q.  Now, you asked for your lecture
14 notes on your desk at 25 Broadway, right?
15     A.  That's correct.
16     Q.  And you said you need course
17 related documentary videos and DVDs and a
18 few books on your bookshelf.  That is
19 what you asked for in the next sentence,
20 right?
21     A.  That's correct.
22     Q.  And you claim that you hadn't
23 been able to adequately teach your classes
24 in the interim, right?
25     A.  That's correct.

Page 451

WILSON

2     Q.  Ms. Pollack responded in the
3  e-mail above, right, sent on February 15
4  the same day at 4:10 p.m.?
5     A.  That's correct.
6     Q.  And she said "Can you tell me
7  which books you need now? Also are there a
8  lot of DVDs and video or a few?  If there
9  are only a few, we will pack all of them
10 tomorrow.  If there are many, please give
11 me the names of the DVDs and videos." Do
12 you see that, sir?
13     A.  I see that.
14     Q.  Did you respond?
15     A.  I believe I did.
16     Q.  Did you respond by e-mail?
17     A.  I don't recall.
18        MR. MARK KLEIN:  I don't see a
19 copy of that response in the documents you
20 produced, so I call for production.
21     A.  I didn't say I responded by
22 e-mail.  I just said --
23        MR. MARK KLEIN:  If you
24 responded by e-mail or other writing, I
25 call for production.

Page 452

WILSON

2     Q.  You don't recall responding by
3  e-mail.  Is that what you are telling me?
4     A.  I don't recall how I responded.
5     Q.  I direct your attention to page
6  P 30.
7     A.  P 30.
8     Q.  At the top of the page, there is
9  an e-mail from Pam Pollack to you and
10 Peter Zwiebach, which states it -- and
11 this was sent on February 15, 2012 at 4:51
12 p.m., correct?
13     A.  Correct.
14     Q.  "Joe, the items that were taken
15 from your office by the university have
16 been copied and will be sent to you at
17 your home addressed." Do you see that?
18     A.  I see that.
19     Q.  Did you receive anything?
20     A.  Other than the video for the
21 class, I don't recall receiving anything
22 from the university.
23     Q.  Okay.  Now, going again to P
24 34.
25     A.  P 34.

38 (Pages 449 - 452)

Page 453

WILSON

1
2    Q.   Have you found P 34, sir?
3    A.   Yes.
4    Q.   You see at the bottom of P 34
5  there is an e-mail from you to Pamela
6  Pollack, correct?
7    A.   Yes.
8    Q.   And the subject of the e-mail is
9  "Delivery of office materials"?
10   A.   Yes.
11   Q.   And you say "Hi, Pam.  I would
12 prefer to have my books and files
13 delivered to my office in James Hall.
14 The plant and easel could be delivered to
15 my home.  I did receive the computer
16 files."
17   A.   Yes.
18   Q.   Were your books and files
19 delivered to your office at James Hall?
20   A.   No, I don't recall seeing those.
21 I don't believe I received them.
22   Q.   Do you know of ay e-mail
23 between -- well, go to the next page.  Do
24 you see there is an exchange of e-mails
25 between you and Pam Pollack on March 22,

Page 454

WILSON

1
2  2012?
3    A.   So this would be the following
4  months, February, March.  Yes.
5    Q.   Do you know of any e-mail
6  communications or other
7  communications -- I'll ask one at a time.
8       Do you know of any
9  communications with Pam Pollack regarding
10 your office materials between February 22
11 and March 22?
12   A.   No.
13   Q.   You don't know of any
14 communications either orally or by e-mail;
15 is that right?
16   A.   I don't recall, no.
17   Q.   Okay.  On March 22 on the next
18 page there is an exchange of e-mails
19 between you and Pam Pollack, correct?
20   A.   March 24?
21      MR. JAMES KLEIN:   Are we on P
22 35 now?
23      MR. MARK KLEIN:   We are on P
24 35.
25   A.   P 35.

Page 455

WILSON

1
2    Q.   Okay.  That is an exchange of
3  e-mails between you and Pam Pollack on
4  March 22, 2015 -- 2012.  I'm sorry.
5  Correct?
6    A.   Wait.  Let me just get the time
7  frame.  So this was -- so this is three
8  months after my documents were seized, and
9  I am saying what is the status of these.
10 Okay.
11   Q.   The question, Dr. Wilson, was,
12 and it only was, is this an exchange of
13 e-mails on March 22, 2012?
14   A.   Yes.
15   Q.   Can you answer that yes or no?
16   A.   Yes.
17   Q.   Okay.  And you say in the e-mail
18 from you sent on March 22 from you at
19 11:07, "Hi, Pam.  What is the status of my
20 books, papers, files, and personal items
21 that should have been returned by now?
22 This lack of access is limiting my ability
23 to carry out my professional
24 responsibilities including research and
25 teaching." You said that, correct?

Page 456

WILSON

1
2    A.   Yes.
3    Q.   And Ms. Pollack responded in the
4  e-mail on that same page at the top "Joe,
5  we will return all of your belongings by
6  next week.  I believe, however, that we
7  returned the items you needed for
8  teaching." Do you see that?
9    A.   I see that.
10   Q.   Did you receive that e-mail?
11   A.   Did I receive that e-mail?
12   Q.   Did you receive anything the
13 next week?
14   A.   No.
15   Q.   Yes or no?
16   A.   No.
17   Q.   All right.  If you go to P 36.
18   A.   Yes.
19   Q.   There is an e-mail about a third
20 of the page down sent on March 23, 2012 at
21 7:33 a.m.  Do you see that?
22   A.   Yes.
23   Q.   And you say "Pam, I was given
24 minimal materials that actually only
25 helped on a limited basis for a few class

Page 457

WILSON

2 sessions. I was told that my materials
3 would be returned in a few days in order
4 to teach and conduct research. I need
5 access to all of my books and documents."
6 You said that to Ms. Pollack, right?
7    A.  Yes.
8    Q.  And she responded in the e-mail
9 above, correct?
10    A.  Correct.
11    Q.  Now, did you receive any of your
12 books and papers or other items after
13 March 23, 2012?
14    A.  Other than those items that I
15 confirmed, no.
16    Q.  If you could go to page P 40.
17    A.  Uh-huh.
18    Q.  P 40 is an exchange of e-mails
19 between and you Michael Hewitt on April 14
20 and April 17, 2014, correct?
21    A.  Uh-huh.
22    Q.  That's a yes?
23    A.  That's a yes.
24    Q.  So do you have any -- the
25 e-mails we were looking at previously, the

Page 458

WILSON

2 latest one was May of 2013, correct? If
3 you go to page P 38.
4    A.  P 38.
5    Q.  Those e-mails were exchanged in
6 May of 2013, right?
7    A.  Right.
8    Q.  And P 40 is an e-mail exchange
9 in April of 2014 almost a year later,
10 right?
11    A.  Correct.
12    Q.  Are you aware of any
13 communications either oral or by document
14 or e-mail between May of 2013 and April of
15 2014?
16    A.  What do you mean by any
17 communications?
18    Q.  Are you aware of any
19 communications regarding recovery of your
20 files and materials --
21       MR. JAMES KLEIN:
22    Communications between whom?
23    Q.  With anyone at Brooklyn College
24 or CUNY between May of 2013 and April of
25 2014.

Page 459

WILSON

2    A.  I am aware that I communicated
3 with my -- with Pete Zwiebach about not
4 having my documents yet, so I -- I
5 communicated with him.
6    Q.  My question was are you aware of
7 any communications between you including
8 your attorney and representatives of CUNY
9 or Brooklyn College regarding recovering
10 your belongings between May of 2013 and
11 April of 2014?
12    A.  Yes.  There were previous
13 communications here.
14    Q.  Were they between May of 2013
15 and April of 2014 or were they before May
16 2013?
17    A.  I see one that says May 29,
18 2013.
19    Q.  That is May of 2013, right?
20    A.  Yes.
21    Q.  So after May 29, 2013 and before
22 after 14, 2014, are you aware of any
23 communications between you and including
24 your attorney and representatives of
25 Brooklyn College or CUNY regarding

Page 460

WILSON

2 recovering your belongings?
3    A.  I can't recall.
4    Q.  The e-mail on page 40 towards
5 the bottom of the page, it is from --
6    A.  14 --
7    Q.  P 40 toward the bottom of the
8 page.
9    A.  P 40 at the bottom of the page.
10    Q.  There is an e-mail from you to
11 Michael Hewitt sent on April 14, 2014 at
12 5:16 p.m., correct?
13    A.  Yes.
14    Q.  You said "Hi, Michael.  Please
15 confirm May 8 is the day I could recover
16 my books, papers, et cetera, taken by
17 Paisley." Do you see that?
18    A.  That's correct.
19    Q.  Did you go to Brooklyn College
20 on May 8 to attempt to recover your
21 belongings?
22    A.  It was an unsuccessful attempt,
23 but I attempted to.
24    Q.  So you didn't go to Brooklyn
25 College on May 8 to recover your

40 (Pages 457 - 460)

Page 461

WILSON

1          WILSON
2  belonging?
3     A.   I did go, but I didn't involve
4  my belongings.
5     Q.   Why is that?
6     A.   Because I was prohibited from
7  taking my belongings other than a couple
8  of items, but I was not allowed to take
9  papers and documents.
10    Q.   Did there come a time that you
11 were allowed to take your belongings and
12 boxes?
13    A.   I believe in 2016, sometime in
14 2016 March, April around April or May of
15 2016 whatever was left over I was -- I had
16 access to.
17    Q.   All right.  If you go to P 41.
18 You are on that page?
19    A.   Uh-huh.
20    Q.   That is a yes?
21    A.   Correct.
22    Q.   Toward the bottom of the page
23 there is an e-mail that was sent on May 5,
24 2016 at 4:03 p.m. from you to Michael,
25 right?

Page 462

1          WILSON
2     A.   Right.  Yes.
3     Q.   And that is Michael Hewitt,
4  right?
5     A.   Correct.
6     Q.   And you say "If you can get
7  somebody to help move boxes, that would be
8  helpful," right?
9     A.   That's correct.
10    Q.   And then you make specific
11 reference to a wooden easel.
12    A.   Uh-huh.
13    Q.   Correct?
14    A.   Correct.
15    Q.   And your Apple monitor, right?
16    A.   That's correct.
17    Q.   And a copy of a receipt
18 for -- in connection with a reception on
19 November of 2011, right?
20    A.   That's correct.
21    Q.   And that is what you directed
22 Mr. Hewitt's attention to, right?
23    A.   That's correct.
24    Q.   Okay.  If you could go to P 42.
25 Have you seen that -- the e-mail on page P

Page 463

1          WILSON
2  42 before?
3     A.   Yes.
4     Q.   That is an e-mail from your
5  attorney Pete Zwiebach to Michael Hewitt
6  on which you were copied, correct?
7     A.   Correct.
8     Q.   And the first sentence of that
9  e-mail says, "I apologize for dropping the
10 ball the last time we arranged for Joe to
11 pick up his personal possessions from BC."
12 Do you see that?
13    A.   That's correct.
14    Q.   Do you know what Mr. Zwiebach
15 meant when he said he was apologizing for
16 dropping the ball?
17    A.   Yes, I do.
18    Q.   What do you understand that to
19 refer to?
20    A.   That after February 2016, after
21 I was terminated, the college -- Pete was
22 negotiating with the college to come and
23 get whatever was left over.
24    Q.   And what did he mean when he
25 said that he was apologizing for dropping

Page 464

1          WILSON
2  the ball?
3     A.   Because I think, and I am not
4  sure, but technically after the 29th of
5  February 2016 I think that after that
6  point the college didn't care about what
7  happened to my materials.  They didn't
8  care before, and they didn't care at that
9  point.
10    Q.   So that's your response to my
11 question about what Mr. Zwiebach meant
12 when he apologized for dropping the ball?
13    A.   Right.  Yes.  That is my
14 response.
15    Q.   That is your response, and you
16 think that is a response to the question I
17 asked you?
18    A.   Repeat the question.
19    Q.   I have already asked it twice.
20         I show you of what has been
21 marked as Exhibit 22, and for the record
22 Exhibit 22 is a document entitled
23 "Plaintiff's Responses and Objections to
24 Defendants' Second Set of Document
25 Production Requests."

41 (Pages 461 - 464)

WILSON

1
2    A.   What is the date on this?
3    Q.   I draw your attention to the
4 second to last page.   That is the date.
5 November 2, 2018.
6    A.   So this is from you?
7    Q.   No, this is from you.
8        MR. JAMES KLEIN:   No.
9    Q.   If you go to the third to last
10 page, Dr. Wilson.
11       MR. JAMES KLEIN:   Third to
12 last.
13   Q.   Third to the last page.
14   A.   Okay.   Do you see your
15 signature?
16   A.   Yes.
17   Q.   And that is a copy of your
18 signature, sir?
19   A.   Correct.
20   Q.   And it is a verification you
21 signed in connection with responses to the
22 defendants' second set of document
23 requests?
24   A.   Correct.
25   Q.   And you signed this on December

WILSON

1
2 2018?
3    A.   That's correct.
4    Q.   So have you seen the document
5 that precedes your verification where you
6 signed?
7    A.   Yes.
8    Q.   And did you review this before
9 it was produced?
10   A.   Before it was produced?   You
11 can't review something before it was
12 produced.
13   Q.   Did you review this before your
14 counsel provided it to me?
15   A.   Yes.
16   Q.   And did you approve it before
17 your counsel provided it to me?
18   A.   Yes, I did.
19   Q.   Now, again, this document
20 contains the expression in response to
21 numerous document requests that "Plaintiff
22 states that" --
23   A.   What page are you on?
24   Q.   Let's go to page 5.   On page 5,
25 there is a response to request number 1

WILSON

1
2 that appears on the preceding page,
3 correct?
4    A.   Let me just see.   You are
5 talking about starting on page 4.
6    Q.   On page 4 there is request
7 number 1, right?
8    A.   Yes, page 4.
9    Q.   And at the very bottom of page
10 4, there is words that say response to
11 request number 1, but the actual response
12 is on page 5, right?
13   A.   I see that, yes.
14   Q.   Okay.   And the first paragraph
15 in the response to request number 1 states
16 "Plaintiff states that following a
17 responsible search" --
18   A.   I don't see that now.   I just
19 missed that.  I'm sorry.  Show me where.
20   Q.   Do you see that in the second
21 line of the first --
22   A.   Plaintiff states --
23   Q.   -- first paragraph of the
24 response?
25   A.   Yes.

WILSON

1
2    Q.   "Plaintiff states that
3 following a responsible search, the
4 plaintiff has not identified any documents
5 responsive to this request."  Do you see
6 that?
7    A.   I see that.
8    Q.   And do you recall that in
9 connection with your response to
10 defendant's first set of document
11 requests, you had the same or similar
12 response over and over again about
13 plaintiff not identifying any documents
14 responsive to the request.   Do you
15 remember that?
16   A.   Yes.
17   Q.   And I asked you whether those
18 words when you say plaintiff has not
19 identified any documents responsive to
20 this request are the same as saying you do
21 not have in your possession or control any
22 documents responsive to the request?
23   A.   My response is the same.   The
24 documents that may have been responsive
25 were seized by the University or by these

42 (Pages 465 - 468)

WILSON

1          WILSON
2 individuals or both and were under their
3 control, not mine.  So --
4     Q.   All right.  I see we are going
5 to have to do this again because I can't
6 get a straight answer to my question.
7          My question is, sir, do you have
8 any documents in your possession and
9 control as opposed to what might have been
10 at the University and that you no longer
11 have possession or control of, any
12 documents responsive to request number 1?
13 Yes or no.
14     A.   Not to my understanding at this
15 moment.
16     Q.   Okay.  And with respect to
17 request number 2, would you look at
18 request number 2 at the bottom of page 5?
19     A.   Yes.
20     Q.   And my question --
21     A.   First I have to look at the
22 request to number 2.  Let's see.
23     Q.   I just asked you to.
24     A.   I didn't look at it, so give me
25 a chance to look at it.  Well --

1          WILSON
2     Q.   I haven't asked you a question
3 yet.
4     A.   Okay.
5     Q.   My question is do you have in
6 your possession or control as opposed to
7 what might have been at the University
8 that you no longer have possession or
9 control of any documents responsive to
10 request number 2? Yes or no.
11     A.   Not that I am aware of at this
12 moment, but I have to amend a -- an
13 earlier response to an e-mail that was a
14 list of items for Michael Hewitt.  And
15 those items were never returned.  All of
16 the items that were listed were never
17 returned.
18     Q.   So your testimony is other than
19 documents you've already produced, you
20 don't have anything in your possession or
21 control responsive to exhibit -- to
22 request number 2?
23     A.   That is not what I said.  I
24 said to the best of my knowledge at this
25 moment.

1          WILSON
2     Q.   Okay.  All right.  Could you
3 look at request number 3 on page 6.  Now,
4 I asked you yesterday about whether you
5 had any property casualty or other
6 insurance policy covering the "damaged
7 documents and properties" referred to on
8 pages 11 and 12 of your initial
9 disclosures, and you told me you didn't
10 have any insurance, right?
11     A.   That is what I told you.  I
12 don't have insurance.
13     Q.   And request number 4 on page 7
14 asks --
15     A.   Hold on one second.  4 on page
16 7.
17     Q.   -- asks for documents relating
18 to any claim that you made under any
19 property casualty or other insurance
20 policy, and you made no claim under any
21 insurance policy; is that right?
22     A.   That is correct.
23     Q.   All right.  If you go to
24 request number 7 on page 10.
25     A.   Just one quick moment.  I am

1          WILSON
2 just going to stretch for a minute.
3          (Pause.)
4     A.   Okay.
5     Q.   Are you at request number 7 on
6 page 10?
7     A.   Number 7, yes, on page 10.
8     Q.   Okay.  Now, could you read that
9 request to yourself.
10     A.   Number 7?
11     Q.   Yes.  Tell me when you have
12 done so.
13          (Pause.)
14     A.   Yes, I have read number 7 on
15 page 10, the request.
16     Q.   Okay.  Now, the response to
17 request number 7 says in part "Plaintiff
18 states that following a responsible search
19 the plaintiff has not identified any
20 documents responsive to this request." Do
21 you see that, sir?
22     A.   I see that.
23     Q.   Do you have any documents in
24 your possession or control responsive to
25 request number 7?

43 (Pages 469 - 472)

Page 473

WILSON

2    A.   At this moment I haven't
3 identified any documents.
4    Q.   That is not what I asked you.
5 I didn't ask you whether you identified
6 any.  I asked whether you have in your
7 possession or control any documents
8 responsive to that request.  Yes or no.
9    A.   The answer is I am unaware at
10 this moment of those documents.
11    Q.   And if you find any such
12 documents, you'll provide them to your
13 counsel to be produced in this case; is
14 that right, sir?
15    A.   Yes.  I will provide any
16 documents that I find that are responsive
17 to this.
18    Q.   All right.  Now, request number
19 8 on page 11, could you read request
20 number 8 to yourself.
21        (Pause.)
22    A.   Yes, I have read the request.
23    Q.   And in response to that request,
24 you say in the first paragraph in part
25 "Plaintiff states that following a

Page 474

WILSON

2 responsible search the plaintiff has not
3 identified any documents responsive to
4 this request." Do you see that?
5    A.   I see that.
6    Q.   I will ask you the same
7 question.  Do you have in your possession
8 or control any documents responsive to
9 request number 8?  Yes or no.
10    A.   The answer is I'll look again to
11 see if there is anything else.  I'll
12 provide it to my counsel, and I'll provide
13 it to you.
14    Q.   Are you aware sitting here today
15 of any documents in your possession or
16 control responsive to request number 8?
17    A.   At this moment, no, but I don't
18 preclude the possibility.
19    Q.   Now, each of the responses say
20 that a "responsible search" was made for
21 documents, right?
22    A.   That's correct.
23    Q.   Did you conduct personally a
24 search?
25    A.   Yes, I did.

Page 475

WILSON

2    Q.   And where did you search for
3 documents?
4    A.   Documents that I had at home.
5    Q.   Where at home?
6    A.   In my bedroom.
7    Q.   Did you look anywhere else
8 besides your bedroom?
9    A.   No.
10    Q.   Do you have any files elsewhere
11 in your apartment?
12    A.   I do have one other file, yes.
13    Q.   What other file do you have?
14    A.   Family stuff.
15    Q.   Did you look in that file for
16 any documents responsive to these
17 requests?
18    A.   Not in my family stuff, no.
19    Q.   Is there any reason you didn't
20 look in those files?
21    A.   It didn't occur to me.
22    Q.   Are you going to look in those
23 files to see if there is anything
24 responsive?
25    A.   I will.

Page 476

WILSON

2    Q.   Thank you.
3    A.   Can I ask for a five-minute
4 bathroom break?
5    Q.   Okay.
6        (Recess taken.)
7        (Wilson Exhibit 23 marked for
8 identification.)
9        MR. MARK KLEIN:  For the record,
10 I marked -- had the reporter mark as
11 Exhibit 23 the drawing Dr. Wilson made of
12 his Brooklyn College office at James Hall.
13 I'll provide you a copy of that.
14        I am going to ask the reporter
15 to mark as Exhibit 24 documents bearing
16 the Bates stamp DEF 0001174 through 1178.
17        (Wilson Exhibit 24 marked for
18 identification.)
19        (Document handed to witness.)
20    Q.   Dr. Wilson, I show you what has
21 been marked as Exhibit 24.  Please take a
22 look at it.  I will direct your attention
23 to pages after you have reviewed it
24 generally.
25    A.   Just the first one or all of

44 (Pages 473 - 476)

WILSON

1
2 them?
3    Q.   All of them.  Actually let's
4 just go page by page.   It will probably
5 be easier.
6    A.   Okay.
7    Q.   If you look at the first page of
8 Exhibit 24.
9    A.   Yes.
10    Q.   It is an e-mail between Rachel
11 Nash and Peter Zwiebach, correct?
12    A.   Yes.
13    Q.   And Peter Zwiebach was your
14 attorney, correct?
15    A.   Correct.
16    Q.   And who is Rachel Nash?
17    A.   Rachel Nash was legal counsel
18 for CUNY.
19    Q.   And have you seen -- this
20 appears to be an e-mail sent on August 7,
21 2014, correct?
22    A.   Yes.
23    Q.   Have you seen this e-mail
24 before?
25    A.   I don't recall.

WILSON

1
2    Q.   The second sentence of the
3 e-mail after it says, "Hi, Peter, it says
4 "I have been in touch with Brooklyn
5 College about your review of the remaining
6 boxes."  Do you see that?
7    A.   Yes.
8    Q.   Do you know whether Mr. Zwiebach
9 reviewed some boxes prior to August 7,
10 2014?
11    A.   I don't know.
12    Q.   If you go to the next two pages,
13 the next two pages are e-mails exchanged
14 starting on April 6 and ending on April
15 20, 2016, correct?
16    A.   Correct.
17    Q.   Have you seen any of those
18 e-mails before?
19    A.   Let's see.  I don't
20 recall -- yes, I don't recall seeing it.
21    Q.   If you go to the e-mail on page
22 1176, do you see 1176 on the bottom
23 right-hand corner?
24    A.   1176 I see it.
25    Q.   That is the e-mail from Mr.

WILSON

1
2 Zwiebach to Michael Hewitt copying you in
3 which he apologized for dropping the ball,
4 correct?
5    A.   Didn't we just see this?
6    Q.   That is what I said.  We looked
7 at that before, right?
8    A.   Yes.
9    Q.   Okay.
10    A.   Page 1177?
11    Q.   Correct.  That is an e-mail from
12 Rachel Nash to Michael Hewitt?
13    A.   Uh-huh.
14    Q.   And that is dated April 20,
15 2016?
16    A.   Yes.
17    Q.   Have you seen this e-mail
18 before?
19    A.   I don't think so.
20    Q.   If you go to the last page of
21 this exhibit, 1178?
22    A.   Yes.
23    Q.   At the bottom there is an e-mail
24 from Rachel Nash from Pam Pollack to
25 Rachel Nash, correct?

WILSON

1
2    A.   Correct.
3    Q.   And it was sent on December 4,
4 2016.  It says "FYI, I am waiting for the
5 chair of Africana studies to send me a
6 date.   She is eager to have these items
7 removed."  Do you see that?
8    A.   I see that.
9    Q.   And then she has a smily face.
10 Do you see that?
11    A.   I see that.
12    Q.   Did you understand the chairman
13 of Africana studies to be Linda Day?
14       MR. JAMES KLEIN:   This wasn't
15 from him.
16    Q.   I am asking if at this time the
17 chair of Africana studies was Linda Day?
18    A.   I understand Linda Day was
19 chair.
20    Q.   Did Ms. Day -- Professor Day
21 ever tell you that she was eager to have
22 your items removed?  Yes or no.
23    A.   Yes.
24    Q.   When did he she tell you that?
25    A.   Right around that time.

45 (Pages 477 - 480)

Page 481

```
 1           WILSON
 2     Q.  Did she tell you why she was
 3 eager to have your personal items removed?
 4     A.  No.
 5     Q.  Did you ask her?
 6     A.  No.
 7         MR. KLEIN:  I am going to ask
 8 that the reporter mark --
 9     A.  Let me --
10     Q.   There is no question pending.
11     A.   Let's me amend this.  Neither
12 Professor Day nor I knew what personal
13 items were, and I didn't know, and I had
14 no way of knowing until I arrived on
15 campus sometime as they made the
16 arrangements.  So the answer is no.
17     Q.   You just answered a question I
18 didn't ask you.
19     A.   Okay.
20         MR. MARK KLEIN:   I am going to
21 ask the reporter to mark as Exhibit 25 a
22 multi-page document bearing Bates stamps
23 DEF 00770 through DEF 000859.
24         (Wilson Exhibit 25 marked for
25 identification.)
```

Page 482

```
 1           WILSON
 2         (Document handed to witness.)
 3     Q.  Dr. Wilson, I show you what has
 4 been marked as Exhibit 25.   Obviously
 5 there are many pages here.  I am just
 6 going to ask you to page through it and
 7 generally familiarize yourself with what
 8 this is.
 9         MR. JAMES KLEIN:  Since it is a
10 compendium, is there any way you are going
11 to characterize it for the record?
12         MR. MARK KLEIN:  No.  I don't
13 know what you mean by compendium.
14         MR. JAMES KLEIN:   It is a
15 collection of a whole bunch of unrelated
16 documents, and it has no index or
17 contents.  So I was wondering if you were
18 going to characterize it as such and such
19 documents, so I could write that down next
20 to 25, but if the answer is no then I will
21 come up with my own characterization.
22         (Pause.)
23     A.   I am getting close to the end.
24 This is rather voluminous, so I want to
25 make sure I see everything.
```

Page 483

```
 1           WILSON
 2         (Pause.)
 3     A.   Okay.   Now I have an
 4 understanding of these documents.
 5     Q.   All right.  Do you recall
 6 seeing these documents during the course
 7 of your arbitration?
 8     A.   No.  Not during the course of
 9 the arbitration.
10     Q.   Do you see at the top of the
11 first page of this document it is
12 handwritten CUNY 84?
13     A.   Yes, I see that.
14     Q.   Does that indicate to you that
15 this was CUNY's Exhibit 84 during the
16 arbitration?
17     A.   Yes.
18     Q.   And were you shown CUNY Exhibit
19 84 during the course of the arbitration?
20     A.   I don't really recall, but I
21 will assume that it was here.
22     Q.   And this exhibit consists of
23 copies of various requests for payment
24 that you made from member organization
25 accounts at Brooklyn College, correct?
```

Page 484

```
 1           WILSON
 2     A.   That is correct.
 3     Q.   For example, if you look at the
 4 third page of this document, the one that
 5 has the number 772 at the bottom
 6 right-hand corner?
 7     A.   772.
 8     Q.   The third page of the document.
 9 Count 1, 2, 3 from the front.  Have you
10 gotten to 772?
11     A.   That is what it looks like.
12     Q.   Okay.  Good.
13         Tell me what that page is, 772?
14     A.   Page 772 dated September 1, 2009
15 is an e-mail from me as director of the
16 graduate Center For Worker Education to
17 vice president for finance Steve Little.
18 If I didn't say it, I will repeat it
19 September 1, 2009.
20     Q.   You did say it.
21     A.   I did say it.  And it says
22 "Please pay $9,451.20 for August
23 administrative support services at the
24 Graduate Center For Worker Education 160
25 hours at $59.07 per hour."
```

46 (Pages 481 - 484)

WILSON

1      WILSON
2   A.  That is what it says.
3   Q.  So this is a request for payment
4 of $9,451.20 to you, correct?
5   A.  That is correct.  Payments to
6 me.
7   Q.  And that was for according to
8 the re line in this document
9 "Administrative support services/GCWE",
10 right?
11   A.  That is correct.
12   Q.  Okay.  And if you look at the
13 prior page, the one before page 2 of this
14 document 771, there is a -- a memo from
15 Steve Little, correct?
16   A.  Let's see.  Yes.
17   Q.  And have you seen that memo
18 before?
19   A.  I don't recall seeing it.
20   Q.  This memo relates to payment of
21 the invoice that you submitted that we
22 just talked about on page 772, correct?
23   A.  Yes.  On 772, correct.
24   Q.  Okay.  Now, next to the amount
25 on this page, it says in parentheses

1      WILSON
2 "Return check to Jay Fogerty." Do you see
3 that?
4   A.  I see that.
5   Q.  Who is Jay Fogerty?
6   A.  Jay Fogerty to the best of my
7 recollection was a long-time secretary in
8 the Department of Business and Fiscal
9 Services, who was Michael Hewitt's
10 secretary for many years.  So that is
11 where the check would have been sent.
12   Q.  Is there a reason the check
13 wasn't sent to your home?
14   A.  That is just the arrangement
15 that the college made.
16   Q.  You didn't ask for the check to
17 be sent to Jay Fogerty?
18   A.  I wouldn't have known Jay
19 Fogerty to that extent.  So no, I don't
20 recall asking it to be sent to Jay
21 Fogerty.
22   Q.  The rest of this document, and
23 you paged through it page by page --
24   A.  Yes.
25   Q.  -- consists of other requests

1      WILSON
2 for payment that you made --
3   A.  Right.
4   Q.  -- through the membership -- the
5 member organization account Graduate
6 Center For Worker Education, correct?
7   A.  Correct.
8   Q.  By the way, going back to 772
9 for a second.
10   A.  772.
11   Q.  You asked for payment of
12 $9,451.20, 160 hours at $59.07 an hour,
13 correct?
14   A.  Correct.
15   Q.  Where did you get that $59.07 an
16 hour rate?
17   A.  That rate was provided by the
18 college.  I was instructed that that is
19 the rate I should request for payment for
20 nonteaching work.
21   Q.  And who instructed you to do
22 that?
23   A.  That would have been human
24 resources and the Office of Business and
25 Fiscal Services.

1      WILSON
2   Q.  Now, you paged through each of
3 these requests that consists of pages 770
4 through 8 59, about 90 pages of requests,
5 correct?
6   A.  Correct.
7   Q.  And these requests relate to
8 tens of thousands of dollars of requests
9 for payment --
10     MR. JAMES KLEIN:  Object to
11 form.
12     MR. MARK KLEIN:  You
13 interrupted me again.
14   Q.  Does this this request, these
15 requests relate to hundreds of thousands
16 of dollars of requests for payment that
17 you made from the member organization
18 account in the name of the graduate center
19 for worker education?
20     MR. JAMES KLEIN:  I object as
21 to form.
22   A.  If you are talking about over a
23 period of a number years, I haven't
24 calculated the total.
25   Q.  Well, we saw one request that

47 (Pages 485 - 488)

Page 489

1          WILSON
2 was in the amount of $9,451.20, right?
3     A.   In one month.  Right.
4     Q.   In one month.  And so you
5 haven't calculated the total.  So you're
6 telling me you don't know how much is
7 encompassed by this entire document; is
8 that right?
9          MR. JAMES KLEIN:  I am
10 objecting.  That mischaracterizes earlier
11 testimony, and I object as to form.
12    A.   I am telling you I haven't
13 calculated the total.
14    Q.   Okay.  Now, I show you what was
15 marked as an exhibit yesterday, Exhibit
16 32 -- I'm sorry.  Exhibit 8, which was
17 CUNY 32 at the arbitration.  Do you
18 remember that?
19    A.   Yes.
20    Q.   These are copies of multiple
21 position reports that you submitted,
22 correct?
23    A.   These are not copies -- well, I
24 don't know if it is correct or not
25 actually.

Page 490

1          WILSON
2     Q.   You don't know whether these are
3 copies of multiple position reports that
4 you submitted?
5     A.   These seem to be incomplete.
6     Q.   That is not what I asked.  I
7 asked are these multiple position reports
8 that you submitted, Dr. Wilson.  Let's
9 see if you can answer a straightforwards
10 question with a strait answer.  Yes or
11 no.  Is the answer yes?
12    A.   Yes.
13    Q.   On any of these multiple
14 position reports did you disclose the
15 payments that you were receiving as
16 indicated by Exhibit 25?
17         MR. JAMES KLEIN:  Object as to
18 form.
19    A.   What is exhibit 25?
20    Q.   This.
21    A.   This?
22    Q.   Yes.
23    A.   So the first point, this is --
24    Q.   Can you answer the question,
25 sir?

Page 491

1          WILSON
2     A.   Repeat the question.
3     Q.   In any of the multiple position
4 forms that have been marked as Defendants'
5 Exhibit -- Wilson Exhibit 8, in any of
6 those multiple position reports did you
7 disclose your receipt of payments from the
8 member organization account of the
9 Graduate Center For Worker Education
10 reflected by the documents that are part
11 of Wilson Exhibit 25? Yes or no.
12    A.   Yes and no.
13    Q.   Okay.  How did you -- how did
14 you disclose it?
15    A.   First for the record these
16 documents are incomplete because they
17 don't include my summer salaries.  There
18 is nothing here, and the summer salaries
19 would have been approximately $40,0000.
20 Those would have been signed off by the
21 provost.  I don't see that here.  So
22 that would -- so that is first.
23    Q.   Besides the summer salaries, did
24 you disclose in any of the member --
25         MR. MARK KLEIN:  Withdrawn.

Page 492

1          WILSON
2     Q.   Besides the summer salaries, did
3 you disclose in the multiple position
4 reports that are in part of Exhibit 8,
5 Wilson Exhibit 8, any of the requests for
6 payment that you made that appear in
7 Wilson Exhibit 25?
8          MR. JAMES KLEIN:  I object as
9 to form.
10         MR. MARK KLEIN:  What is the
11 basis for the objection?
12         MR. JAMES KLEIN:  You gave him
13 a 90-page document, and now you are asking
14 if some other document refers to anything
15 in those 90 pages.  I mean it is totally
16 absurd.
17         MR. MARK KLEIN:  Your objection
18 IS noted.  Thank you.
19    Q.   Can you answer the question, Dr.
20 Wilson?
21    A.   Repeat the question.
22    Q.   In Wilson Exhibit 8, the
23 multiple position reports that you
24 submitted that are included in Exhibit 8,
25 did you disclose the payment requests that

48 (Pages 489 - 492)

Page 493

WILSON

1 appear in Exhibit 25 putting aside any
2 requests for payment you made with respect
3 to summer salary?
4     A.   Well, if you look at Exhibit 8,
5 if you look at line 2, page B or letter B.
6     Q.   What page are you looking at?
7     A.   Let's see.
8         MR. JAMES KLEIN:   You are on
9 the first page.
10     A.   The first page.
11     Q.   571?
12     A.   I don't see a page number on my
13 page.
14         MR. JAMES KLEIN:   I think it
15 might be covered by the stamp.
16     Q.   You are looking at the first
17 page.
18     A.   Let me point to it.  Yes.
19     Q.   Yes.  Right.
20     A.   Right.
21     Q.   So where it says in addition to
22 my regular full-time assignment at the
23 college, I have supplementary compensated
24 or uncompensated employment, consultative

Page 494

WILSON

1 or other work including grant-funded
2 activities outside of CUNY for which
3 complete information follows."  So the
4 answer is that being a director was part
5 of for 15 years my full-time
6 responsibilities from September to May.
7 So I didn't need to report these on this
8 form.  My understanding and the
9 interpretation that I knew, and my counsel
10 at that time made this argument, if it is
11 part of your regular duties, and I was
12 appointed by the provost, then obviously
13 the provost knows what I am getting paid
14 because the provost appointed me to that
15 position.  However -- well, that
16 is -- and so it wasn't required for me to
17 report that as part of my regular duties.
18     Q.   So the shorthand answer that you
19 just gave is no, you didn't report it on
20 your multiple position reports because you
21 didn't think you had to because your being
22 a director of the Graduate Center for
23 Worker Education was a full-time
24 assignment, and, therefore, you didn't

Page 495

WILSON

1 have to disclose it in these reports?
2     A.   I will make it even shorter for
3 you.
4     Q.   Answer my question though.  It
5 wasn't required according to you?
6     A.   Correct.
7     Q.   And you made that argument at
8 the arbitration, correct?
9     A.   Correct.
10     Q.   And your attorney Mr. Zwiebach
11 made that arguments at the arbitration,
12 correct?
13     A.   Correct.
14     Q.   And the arbitrator rejected that
15 argument, correct?
16     A.   I don't know.
17     Q.   You don't know.
18         Let me ask you a few more
19 questions about Exhibit 25.  If you could
20 go to page 814.
21     A.   In which document?
22     Q.   814.
23         MR. JAMES KLEIN:   It is the
24 other document, the big one.

Page 496

WILSON

1     A.   This one.
2     Q.   In Exhibit 25, do you have
3 Exhibit 25?
4     A.   25.  If you look -- this is 25
5 you said.
6     Q.   Yes.
7     A.   That is what I am looking at.
8     Q.   Okay.  If you could go to page
9 814 if you look at the --
10     A.   8 --
11     Q.   If you look in the lower
12 right-hand corner.
13     A.   Got it.
14     Q.   814.
15     A.   Okay.  Page 814.
16     Q.   All right.  Now, this is
17 another invoice that you sent to Steve
18 Little; is that right?
19     A.   That is correct.
20     Q.   And this one is dated November
21 4, 2010?
22     A.   That is correct.
23     Q.   And you're asking for $4,725 for
24 October 2010 for administrative support

49 (Pages 493 - 496)

Page 497

WILSON

1
2 services for the graduate Center For
3 Worker Education, correct?
4     A.   That's correct.
5     Q.   And you have there a nonteaching
6 rate of $67.50, correct?
7     A.   That's correct.
8     Q.   The one we looked at before had
9 a nonteaching rate of $59.07, right?
10    A.   I would have to look at it
11 again, but I assume you are correct.
12    Q.   What accounts for the different
13 nonteaching rate?
14    A.   Where is the first reference,
15 and maybe I can explain it?  What page is
16 it?
17    Q.   On the third page of the
18 document.
19    A.   Hold on.  What accounts for it?
20 My understanding is there there was a
21 change in the collective bargaining
22 agreement, and the college increased its
23 rate from the previous year to the
24 following year the rate that they paid for
25 nonteaching work.

Page 498

WILSON

1
2     Q.   All right.  If you could go to
3 page 830 in Exhibit 25.
4     A.   830.  Yes.
5     Q.   830 is a document entitled "Time
6 Sheet," right?
7     A.   Yes.
8     Q.   And is this time sheet filled
9 out in your handwriting?
10    A.   Yes, it is.  Well, yes, I
11 signed it.
12    Q.   Well, did you -- the time sheet
13 itself has dates and time arrived and time
14 departed?
15    A.   Yes.
16    Q.   And the total hours, correct?
17    A.   Correct.
18    Q.   Did you fill out that part of
19 the time sheet?  Is that in your
20 handwriting?
21    A.   I am not sure, but I signed it.
22    Q.   And there is a department
23 chairman who signed it, right?
24    A.   That's correct.
25    Q.   And who is that?

Page 499

WILSON

1
2     A.   That would have been the
3 department chair Sally Bermanson.
4     Q.   Now, on the upper right-hand
5 corner of the document, there is some
6 handwriting in quotations.  Do you see
7 that?
8     A.   I do.  I see that.
9     Q.   And it appears to say, and
10 correct me if you read it differently, "do
11 not take benefits." Do you see that?
12    A.   I see that.
13    Q.   Did you write that?
14    A.   I believe so, yes.
15    Q.   And why did you write "do not
16 take benefits"?
17    A.   That has to do with withholding
18 of taxes that the college withholds on
19 payments that they make after it goes
20 through review from HR and business and
21 fiscal accounting.
22    Q.   Why were you asking not to take
23 benefits?
24    A.   I don't recall -- I do recall.
25 I was instructed by the Office of Business

Page 500

WILSON

1
2 and Fiscal Services to put that on
3 the -- on the form, and I am not sure why,
4 but I was instructed to do that, as I
5 recall.
6     Q.   Who at the office of Business
7 and Fiscal Services instructed you to put
8 that on the form?
9     A.   I don't recall, but one of their
10 staff members.
11    Q.   And you don't recall the name of
12 the person; is that right?
13    A.   There were several people, and
14 it could have been one of several.  I
15 know several names that I could provide to
16 you that I remember at this moment.
17    Q.   Do you know who told you to put
18 that on the form?
19    A.   I can give you some
20 possibilities.
21    Q.   I am not asking you for
22 possibilities.  I am asking who told you
23 to put that on the form.
24    A.   I -- I can give you a couple of
25 names, but I don't know.  So the answer

50 (Pages 497 - 500)

WILSON

1 is I am not sure.
2
3    Q.   Okay.  If you could go to 833.
4    Q.   833, yes.
5    A.   Okay.
6    Q.   833 is another time sheet that
7 you signed, right?
8    A.   Yes.
9    Q.   Did you fill out the information
10 on the time sheet besides signing it?
11    A.   No.
12    Q.   Do you know who did?
13    A.   Annie London.
14    Q.   Do you recognize her
15 handwriting?
16    A.   I don't recognize her
17 handwriting, but she would have completed
18 my time sheets.
19    Q.   On the upper right-hand corner
20 of the document, we are looking at page
21 833 of Exhibit 25.  It says "children
22 services - 4729."  Do you see that?
23    A.   I see that.
24    Q.   What is children services?
25    A.   That would have been related to

WILSON

1 an account set up for a specific grant to
2 provide services for one of the programs I
3 was running.
4    Q.   And who was that grant from?
5    A.   That would have been from the
6 children's services -- I believe that
7 would have been -- it could have been
8 from -- I am not sure exactly.
9    Q.   Are you familiar with a grant
10 from the Office of Family and Children's
11 Services?
12    A.   That would have been it.
13    Q.   And that was a New York City
14 entity that provided funds to provide
15 services for disadvantaged families and
16 children in New York City?
17    A.   I am not sure of their
18 mission,but that is where it came from.
19    Q.   You are not sure of the mission
20 of the New York City Office of Family and
21 Children Service?
22    A.   I am not sure that is precisely
23 where it came from.  I actually have a
24 different understanding of it.
25

WILSON

1
2    Q.   So you're telling me you don't
3 know whether notwithstanding what you
4 testified a few moments ago you are not
5 sure that the reference to children
6 services is to a grant from the New York
7 City Office of Family and Children
8 Services?
9    MR. JAMES KLEIN:   I am going to
10 object.  That mischaracterizes the
11 testimony.  He didn't testify that it
12 was.  He testified he wasn't sure, and
13 then you added additional information.
14    MR. MARK KLEIN:   You can make
15 your objection as to form Mr. Klein.  You
16 were making another speaking objection,
17 which is improper.  I don't want to get
18 the judge on the phone again.
19    Q.   Are you saying, Dr. Wilson, that
20 you don't know thhat the reference to
21 children services is a reference to a
22 grant from the New York City Office of
23 Family and Children Services?
24    A.   What I am saying this may have
25 been the state office that provides these

WILSON

1
2 services and not the city office to my
3 recollection as I am thinking about it
4 now.
5    Q.   Well, you got a grant that -- a
6 moment ago you said you were in charge of
7 supervising this, right?
8    A.   Let me amend that.  The College
9 received a grant.  I didn't get the
10 grant, so that had to be clarified.  The
11 College received it.
12    Q.   That is actually a very helpful
13 clarification.  The College got a grant,
14 and you were put in charge of
15 administering that grant, right?
16    A.   That is correct.
17    Q.   What was the purpose of that
18 grant?
19    A.   The purpose of the grant, which
20 is exactly what happened, was to support
21 African American students to provide in
22 this instance counseling and social work
23 services and mentoring services.
24    Q.   And were you a principal
25 investigator with regard to that grant?

51 (Pages 501 - 504)

Page 505

```
1          WILSON
2    A.   Yes, I was.
3    Q.   Was there another principal
4 investigator, a co principal investigator?
5    A.   Not to my recollection.
6    Q.   Was Noel Anderson a coprincipal
7 investigator?
8    A.   He may have been, but I don't
9 remember that.
10   Q.   Now, I made reference yesterday
11 to an entity called Manhattan Institute of
12 Management, correct?
13   A.   Correct.
14   Q.   And that is an entity that made
15 money for the use of the Graduate Center
16 For Worker Education during the day; is
17 that right?
18   A.   That is an entity that paid to
19 use the Graduate Center For Worker
20 Education for 30 years predating my
21 directorship and following my
22 directorship.  That is correct.
23   Q.   Well, again you answered a
24 question I didn't ask, but did you
25 negotiate agreements with Manhattan
```

Page 506

```
1          WILSON
2 Institute of Management for their use of
3 the Graduate Center For Worker Education?
4 Yes or no.
5    A.   With the approval of legal
6 counsel Pam Pollack and the executive vice
7 president for finance at Brooklyn College,
8 yes.
9    Q.   So you negotiated agreements,
10 right?
11   A.   With their approval and review,
12 yes.
13   Q.   And where did the monies that
14 Manhattan Institute of Management paid for
15 the use of the Graduate Center For Worker
16 Education go?
17   A.   They didn't go to me personally.
18 They went to Brooklyn College.
19   Q.   And the monies were deposited in
20 the member organization account for the
21 Graduate Center For Worker Education,
22 correct?
23   A.   That is correct.
24   Q.   And Wilson Exhibit 25, which was
25 Exhibit 84, CUNY Exhibit 84 at the
```

Page 507

```
1          WILSON
2 arbitration were -- is a series of your
3 requests for disbursement from that
4 account for payments to you, correct?
5    A.   Correct.
6    Q.   Okay.  Now, another --
7    A.   But let me just clarify --
8    Q.   You've answered the question.
9    A.   No, this is the same question.
10 I am amending it.  You said the payments
11 went to this account, to the worker
12 education account.  The college
13 administration took money from that
14 account on a quarterly basis, so they
15 didn't simply go to work for the the
16 Graduate Center for Worker Education.
17 They went to college administration
18 including Karen Gould.  They went into
19 their -- into the president's account and
20 their general disbursement account.  So
21 no, it didn't go to just this account.
22 It went to other accounts as well.
23   Q.   Did you make that argument at
24 the arbitration?
25   A.   I don't recall.
```

Page 508

```
1          WILSON
2    Q.   If you did, did the arbitrator
3 reject the argument?
4        MR. JAMES KLEIN:  It calls for
5 speculation.
6    A.   I don't recall, but --
7    Q.   There is no question.
8    A.   I don't recall.
9    Q.   There is no question, Dr.
10 Wilson?
11   A.   You --
12   Q.   I am not interested in
13 filibustering.  I am interested in you
14 answering my questions.  Did you also
15 negotiate agreements with something called
16 ESRA Film School of New York?
17   A.   With the approval of the
18 college, yes, I did.
19       MR. MARK KLEIN:  I am going to
20 ask the court reporter to mark as Wilson
21 Exhibit 26 a document bearing the Bates
22 stamp DEF 376.
23       (Wilson Exhibit 26 marked for
24 identification.)
25       (Document handed to witness.)
```

52 (Pages 505 - 508)

WILSON
2   Q.   Dr. Wilson, I show you what has
3   been marked as Exhibit 26.   Please review
4   it and tell me when you have done so.
5        (Pause.)
6   A.   Yes, I recognize this.
7   Q.   Did you negotiate this
8   Memorandum of Understanding between the
9   Graduate Center For Worker Education and
10  ERSA Film School of New York?
11  A.   Yes, I did with full approval of
12  Brooklyn College administration.
13  Q.   And you signed this, right?
14  A.   On behalf of the Brooklyn
15  College administration.
16  Q.   Actually you signed it in your
17  capacity as director GWCE, correct?
18  A.   Appointed by the Brooklyn
19  College administration.
20  Q.   And this is dated April 6, 2011,
21  correct, your signature?
22  A.   That's correct.
23  Q.   And the monies from ESRA Film
24  School that they paid for the use of the
25  Graduate Center For Worker Education also

WILSON
2   went into the member organization accounts
3   for the Graduate Center For Worker
4   Education, correct?
5   A.   And also went into Karen Gould
6   and other administrator's accounts,
7   correct, and was fully audited.
8   Q.   Dr. Wilson, if you could just
9   answer my questions, you'll have the
10  opportunity later in this case to make
11  your points, but you are not answering my
12  questions, so I would appreciate if you
13  could do that.   Just exercise a little
14  discipline and answer what you are being
15  asked.   Okay.
16       Now, Exhibit 26 is not a
17  Memorandum of Understanding between
18  Brooklyn College and the ESRA Film School
19  of New York, is it?
20  A.   The graduate Center For Worker
21  Education is a part of Brooklyn College.
22  Q.   Does the Graduate Center For
23  Worker Education have any status as a
24  legal entity to your knowledge?
25  A.   Yes.

WILSON
2   Q.   Is it a corporation?
3   A.   No.
4   Q.   Is it any other kind of legal
5   entity?
6   A.   Well, it is an entity that was
7   recognized by the board of trustees as an
8   institution.
9   Q.   How did the board of trustees
10  recognize it as an institution?
11  A.   By resolution of the full board
12  of trustees and by approval of the
13  chairman of the board of trustees.
14       MR. MARK KLEIN:  I am going to
15  ask the reporter to mark as Wilson Exhibit
16  27 a document bearing the Bates stamps,
17  and it appears that part of the stamp has
18  been cut off in the copying, but it
19  appears to be DEF 613 and 614.
20       (Wilson Exhibit 27 marked for
21  identification.)
22       (Document handed to witness.)
23  Q.   Dr. Wilson, I show you what has
24  been marked as Exhibit 27.   Please review
25  it and tell me when you have done so.

WILSON
2        (Pause.)
3   A.   Page 2 appears to be -- yes.   I
4   see it.   There is one name on it.
5   Q.   Do you recall seeing Exhibit 27
6   before?
7   A.   I do.
8   Q.   This was an exhibit at the
9   arbitration, was it not?
10  A.   Yes, it was.
11  Q.   And it is noted at the top it
12  was CUNY Exhibit 32 A.  Do you see that?
13  A.   That's correct.
14  Q.   Do you recall seeing Exhibit 32
15  A at the arbitration?
16  A.   I do.
17  Q.   Now, at the bottom of the page,
18  there is an e-mail sent on December 23,
19  2009 to Eleanor Ortiz, correct?
20  A.   Correct.
21  Q.   And who is Jerry -- that e-mail
22  was from Jerry Mirotznik,
23  M-I-R-O-T-Z-N-I-K?
24  A.   Mirotznik.
25  Q.   Thank you.  Who is Mr.

53 (Pages 509 - 512)

Page 513

WILSON

1        WILSON
2 Mirotznik?
3      A.   He was a provost at Brooklyn
4 College.
5      Q.   And who is Elenor Ortiz,
6 O-R-T-I-Z?
7      A.   I believe Elenor, in fact I am
8 sure Elenor was -- was Mr. Mirotznik's
9 secretary.
10      Q.   Okay.   And Ms. Ortiz forwarded
11 Mr. Mirotznik's e-mail to you on January
12 4, 2010, correct?
13      A.   That is correct.
14      Q.   And then in fact Ms. Ortiz
15 forwarded the e-mail to you and Noel
16 Anderson, right?
17      A.   That is correct.
18      Q.   And at the top of the first page
19 of Exhibit 27, there is an e-mail sent on
20 January 4, 2010 from Noel Anderson to you,
21 right?
22      A.   That is correct.
23      Q.   And in that e-mail Noel Anderson
24 says, "Hey, Joe, these seam odd to me
25 since we did winter session last year.

Page 514

WILSON

1        WILSON
2 Why/how does it change now? You and I need
3 to think about how to build in our
4 financial compensation even if through the
5 BC Foundation given all this work we are
6 doing." Do you see that, sir?
7      A.   I see that.
8      Q.   Did you and Mr. Anderson think
9 about how to build in your financial
10 compensation even if through the BC
11 Foundation?
12      A.   Yes, we did.
13      Q.   And what did you do?
14      A.   We checked with the Brooklyn
15 College Foundation and the office that
16 controls all of the financing and the top
17 financial offices at Brooklyn College and
18 whatever agreement resulted, and the issue
19 was apparently the policy changed for a
20 winter multiple position, but my -- that
21 year they eliminated winter, but there was
22 some issue that I don't recall, but the
23 previous year it was winter, and then the
24 following year they didn't have winter,
25 and so it became an issue.   So everything

Page 515

WILSON

1        WILSON
2 was routed through the financial
3 leadership and then approved by HR by
4 human resources.
5      Q.   Are you aware of any documents
6 that support the testimony you just gave?
7      A.   I am aware of the testimony in
8 arbitration by Beth Levine and by Lisa
9 DeStefano where Beth Levine said that
10 everything was approved, every check that
11 went through Brooklyn College Foundation
12 issued to me was approved directly by the
13 vice president for finance, who reported
14 to the president, and according to her
15 testimony with the full knowledge of the
16 president and the provost, and, secondly,
17 I am aware that Lisa DeStefano an official
18 in the Office of Business and Fiscal
19 Services said that her office maintained
20 the funds, but the funds were actually
21 controlled by human resources, and no
22 funds could be disbursed by a single
23 office to me without the approval of human
24 resources, and human resources was led by
25 Mr. Michael Hewitt, who had the express

Page 516

WILSON

1        WILSON
2 authority as being the president's labor
3 designee to modify and approve any
4 contracts that went out in all -- and all
5 of this was done under contract, under
6 review by contracts issued with their
7 approval that they drew up.
8      Q.   And you made these arguments at
9 the arbitration, correct?
10      A.   I'm not sure.
11      Q.   Other than --
12      A.   No, actually that is incorrect.
13 That is incorrect because at the time of
14 arbitration Michael Hewitt withheld
15 information about his role as being the
16 president's labor designee and his direct
17 role and knowledge of my payments for over
18 a decade because he personally provided
19 the -- now I am forgetting the name of his
20 secretary that we referred to.
21      MR. JAMES KLEIN:   Ortiz.
22      THE WITNESS:  Ms. Ortiz.   No.
23      MR. MARK KLEIN:  Counsel, wait.
24      A.   No, but it is in these
25 documents.  We can go back and find it.

54 (Pages 513 - 516)

Page 517

WILSON

2    Q.   My question to you, sir, is:
3  Other than the arbitration testimony that
4  you referred to, are you aware of any
5  documentation reflecting that, what you
6  testified to?
7    A.   Yes, I am aware that the college
8  has ample documentation that Michael
9  Hewitt was the president's labor designee,
10 and he withheld that information, and he
11 had the exclusive ability to review and
12 approve any contracts and payments, which
13 he did in every instance in my case, and
14 it -- and so that is my -- and I didn't
15 know that at the time of arbitration or I
16 was aware of it.  I knew he was head of
17 HR, and I knew he approved everything, but
18 I didn't also know he had the dual titles
19 as president's labor designee officially
20 with the specific designation of approving
21 and reviewing -- including waiving any
22 collective bargaining agreements
23 superseding multiple positions as well.
24    Q.   Mr. Hewitt testified at the
25 arbitration, right?

Page 518

WILSON

2    A.   Yes, he did.
3    Q.   And your counsel cross-examined
4  him; is that right?
5    A.   Yes, he did.
6    Q.   All right.  Are you familiar
7  with something called the Taft Institute?
8    A.   Yes, I am.
9    Q.   What is the Taft Institute?
10    A.   The Taft Institute was an
11 educational research institute, and it was
12 located at -- in Queens College.
13    Q.   And did the Taft Institute give
14 a grant to Brooklyn College?
15    A.   I'm not sure.
16    Q.   Well, did you have any role in
17 disbursing monies provided by the Taft
18 Institute?
19    A.   Yes, I did.
20    Q.   What was your role?
21    A.   I believe I was a project
22 director working with the directors of the
23 Taft Institute, so I was a grant
24 administrator and researcher primarily for
25 the Taft Institute.

Page 519

WILSON

2    Q.   And what was the project that
3  was being administered by the Taft
4  Institute grant?
5    A.   Well, as I recall, there were
6  different projects, but one was we were
7  working on a documentary film for high
8  school educators, and, number 2, there was
9  a research project that was being
10 conducted by the new leadership.  I don't
11 remember the full name of the leadership
12 organization, and they were attempting to
13 have an impact on recidivism, as I recall
14 it in the African American community, so
15 that is my recollection.
16    Q.   Do you know what the amount of
17 the Taft Institute grant was?
18    A.   Off -- off the top of my head I
19 don't recall the amount.
20    Q.   And what was your role as a
21 grant administrator?
22    A.   My role was to review the
23 expenditures and the research results and
24 the results of the work that the center
25 for new leadership did to make sure that

Page 520

WILSON

2  the funds that they spent were
3  appropriately expended.
4         MR. MARK KLEIN:  I ask that the
5  reporter mark as Wilson Exhibit 28 a
6  document bearing the Bates stamp DEF 656.
7         (Wilson Exhibit 28 marked for
8  identification.)
9         (Document handed to witness.)
10    Q.   Dr. Wilson, I show you what has
11 been marked as Exhibit 28.  Please review
12 the document and tell me when you have
13 done so.
14         (Pause.)
15    A.   I have done so.
16    Q.   Have you seen this document
17 before?
18    A.   Yes, I have.
19    Q.   This was Exhibit CUNY 35 C at
20 the arbitration, correct?
21    A.   Correct.
22    Q.   And this was a copy of the front
23 and back of a check made payable to you in
24 the amount of $252.46?
25    A.   That's correct.

55 (Pages 517 - 520)

Page 521

WILSON

2   Q.   And it says on the front of the
3 check where it says "for", F-O-R,
4 "reimbursement holiday event and staff
5 fee." Do you see that?
6   A.   That's correct.
7   Q.   Who signed this check?
8   A.   I did.
9   Q.   So you sign a check to yourself
10 for a holiday event and staff fee, right?
11   A.   That's correct.
12   Q.   What was the staff fee?
13   A.   For the holiday event I am
14 assuming -- and then I don't recall the
15 detail because I don't have any supporting
16 documents here because all of my
17 supporting documents were confiscated, but
18 that would have been for fee services for
19 music or to have staff there, and I can't
20 remember which event, but it probably
21 would have been at the Graduate Center For
22 Worker Education, and we have to have
23 staff, and we have to pay our people.  So
24 I paid the people, and this was
25 reimbursement.  So that is what it was,

Page 522

WILSON

2 as I recall.
3   Q.   So you paid the staff for a
4 holiday event using funds from the Taft
5 Institute grant; is that correct? Yes or
6 no.
7   A.   Well, this was a reimbursement
8 for a related event to the Taft Institute.
9 This was one of the programs that we were
10 involved in at that time, as I recall.
11   Q.   And you paid yourself as
12 reimbursement for a holiday event in the
13 amount of over $2,000 in January of 2012,
14 correct?
15   A.   That's correct.
16   Q.   And you believed that was an
17 appropriate expenditure from the monies
18 provided by the Taft Institute that you
19 were the grant's administrator for? Yes or
20 no.
21   A.   I do, but I would need to see
22 supporting documents which you have not
23 provided.
24   Q.   Are you familiar with something
25 called the University Committee on

Page 523

WILSON

2 Research Awards?
3   A.   Yes, I am.
4   Q.   And that is commonly referred to
5 as UCRA?
6   A.   Wait.  Wait.  Let me amend
7 this.  Let me amend this.
8   Q.   You want to amend your testimony
9 with regard to Wilson Exhibit 28?
10   A.   Yes, I do.
11   Q.   Okay.  What do you want to say?
12   A.   My recollection is that the bulk
13 of these funds went to the building
14 employees as part of their holiday for
15 lack of a better word recognition for
16 building security, maintenance that I
17 provided a check that they then
18 distributed amongst many of their
19 employees, and so this would have been a
20 reimbursement for funds that went to
21 multiple employees.  That is my
22 recollection.
23   Q.   Are you talking about employees
24 of the building of --
25        MR. MARK KLEIN:  Withdrawn.

Page 524

WILSON

2   Q.   Are you referring to employees
3 of 25 Broadway?
4   A.   Yes, that's correct.
5   Q.   So you're talking about
6 employees of the landlord in which the
7 Graduate Center For Worker Education was
8 located?
9   A.   That's correct.
10   Q.   And you thought it was an
11 appropriate payment for you to reimburse
12 yourself for monies that you gave to the
13 employees of 25 Broadway from the Taft
14 Institute Grant; is that right? Yes or no.
15   A.   I thought -- it is not a yes or
16 no question.  They provided services to
17 Taft to the center and specifically to
18 events, and, yes, so I thought it was
19 absolutely fair to reimburse the employees
20 the security guards, the staff, the
21 receptionists, et cetera, a large number,
22 the cleaning personnel, and that is who
23 received the funds, and that was
24 appropriate because they provided services
25 that helped with the functioning of the

56 (Pages 521 - 524)

WILSON

1
2 research and efforts of Taft Institute at
3 that time.
4     Q.   The question is whether you
5 thought it was appropriate to provide
6 these monies to the employees at 25
7 Broadway from the Taft Institute grant?
8 Did you think that was appropriate?
9     A.   Yes, because it helped the Taft
10 Institute to function and continue
11 research projects and events and so forth.
12 Yes, it was absolutely appropriate.
13    Q.   Okay.  Now, let's go back to my
14 question about UCRA.  That is the
15 University Committee on Research Awards,
16 correct?
17    A.   UCRA, Yes.  And what document
18 are we looking at now?
19    Q.   I am not.  I haven't given you
20 one yet.
21        Were you a member of the
22 University Committee on Research Awards
23 between 2005 and 2010?
24    A.   Yes.
25    Q.   And what was your role on that

WILSON

1
2 committee?
3     A.   I played various roles.
4     Q.   What roles did you play?
5     A.   Well, first UCRA administered
6 research foundation grants over 18
7 campuses, and so I was -- one of the roles
8 was as the director or co-director of
9 unit -- university wide UCRA -- university
10 wide research.  That was one of the roles
11 that I played.
12    Q.   Did you have any role in
13 evaluating grant applications to determine
14 who would get grants, research grants from
15 the Professional Staff Congress of CUNY?
16    A.   Yes, I had a role.  I had
17 multiple roles.
18    Q.   Well, again I asked you a simple
19 question.
20    A.   Yes.
21    Q.   Did you have a role reviewing
22 grant applications that people submitted
23 to obtain grants from CUNY-Professional
24 Staff Congress?
25    A.   Yes, I did.

WILSON

1
2     Q.   And because you were a member of
3 the committee that was reviewing grant
4 applications, you were not eligible for a
5 grant award yourself, right?
6     A.   That is correct.
7     Q.   And in that recognition of the
8 fact that you could not apply for an award
9 of a grant, UCRA members were given a
10 certain amount annually as in service
11 research allotment, correct? Yes or no.
12    A.   That is only partially correct.
13    Q.   In what way is it only partially
14 correct?
15    A.   I served in that role for a
16 number of years.  They paid a salary for
17 my role in research, and then they changed
18 the way leadership was to be compensated
19 from a regular straight salary with
20 pensionable funds and so forth, and then
21 they changed it to like an in service
22 award but with the same -- at a reduced
23 rate, no benefits.  So it was a way to
24 change the payment that I would receive to
25 save money for the foundation.

WILSON

1
2     Q.   When did UCRA change the manner
3 in which they compensated members of the
4 committee that reviewed grant
5 applications?
6     A.   Well, I don't remember the
7 precise date, but Derek Lee who was --
8     Q.   You've answered the question.
9 You don't remember the date, right?
10    A.   Right.
11    Q.   Okay.  And at a certain point
12 you received --
13        MR. MARK KLEIN:  Withdrawn.
14    Q.   The appointment you received to
15 review grant applications to be part of
16 the process in determining who would get
17 grant awards was a three-year appointment,
18 correct?
19    A.   To my recollection.
20    Q.   And as an in service research
21 allotment for your service on that
22 committees you received a certain amount
23 per year?
24    A.   That is correct.  Well, there
25 was -- yes.  Right.  That is right.

57 (Pages 525 - 528)

Page 529

1        WILSON
2    Q.   How much did you receive per
3 year?
4    A.   I'm thinking 2 or $3,000.  I
5 don't remember the precise amount.
6    Q.   And the 2 or $3,000 that you
7 got, were there any restrictions on how
8 you could spend that money?
9    A.   Well, my understanding was that
10 any expenditure of money had to be
11 submitted, first discussed, submitted and
12 advanced reviewed by their various layers
13 of review, and then they would either
14 approve or reject it based on their
15 review.  So everything was submitted,
16 approved or rejected, and they approved
17 some and rejected some.
18    Q.   So is it your testimony that
19 UCRA didn't provide any guidelines for
20 disbursement of the amount you received
21 annually as your in service research
22 allotment?
23    A.   What I am saying is that the
24 CUNY research foundation was in control of
25 all of the fiscal matters and reviews and

Page 530

1        WILSON
2 audits and approvals.  They provided it,
3 not the committee itself.  We didn't have
4 oversight over the money.  We could
5 recommend, but it was up to them to
6 approve or reject.
7    Q.   So is it your testimony, sir,
8 that you submitted requests to get
9 reimbursed for whatever you could, and
10 whatever slipped through the cracks was
11 okay with you?
12        MR. JAMES KLEIN:  I am going to
13 object.  That is a total
14 mischaracterization of his testimony.
15        MR. MARK KLEIN:  I am going to
16 ask the reporter to mark as Wilson Exhibit
17 29 a document bearing Bates stamps DEF 226
18 to 229.
19        (Wilson Exhibit 29 marked for
20 identification.)
21    A.   So if I could respond to that,
22 the complete answer is my original form of
23 payment was a direct cash payment.  They
24 instituted a new payment procedure and
25 their -- their research foundation, Derek

Page 531

1        WILSON
2 Lee said it is just a technical change.
3 You could continue getting reimbursed for
4 your travel, for your research, for all of
5 your books, and any books that I asked for
6 and any requests that I made was
7 transparently reviewed, was openly
8 discussed, was evaluated, and then they
9 decided whether or not to approve it.  So
10 there was nothing that slipped through the
11 cracks.  There was an extensive auditing
12 system, and on occasion I remember for a
13 certain electronic device, which I don't
14 recall off the top of my head, they didn't
15 approve it.  Fine.  That is their
16 policy, and I abided by their policies.
17    Q.   I show you what is marked at
18 exhibit 29, sir.  Please take a moment to
19 review it and tell me when you have done
20 so.
21        (Document handed to witness.)
22    A.   I don't see a year on this.
23    Q.   Just tell me when you have
24 reviewed it, please.
25    A.   There is 20 pages here.

Page 532

1        WILSON
2    Q.   I appreciate if you didn't read
3 out loud.
4    A.   Okay.  I reviewed this.
5    Q.   Okay.  Now, Exhibit 29 you have
6 seen before, correct?
7    A.   No, I don't recall seeing this.
8    Q.   You don't recall that this was
9 Exhibit CUNY 111 at the arbitration?
10    A.   No, at this moment I don't
11 recall that.
12    Q.   Directing your attention to the
13 last page of this exhibit, toward the
14 bottom of the page under the heading "In
15 Service Research Allotment," do you see
16 that paragraph that follows?
17    A.   Yes, I do.
18    Q.   And it says, "The In Service
19 Research Allotments are funds for UCRA
20 members to conduct their own research
21 while serving on the committee since they
22 cannot apply for an award.  Beginning in
23 2004 UCRA liaisons serving a full
24 three-year term receives $6,2000 annually.
25 An individual account is set up each year

58 (Pages 529 - 532)

Page 533

WILSON

1       WILSON
2  and each account is active for three
3  years.   Monies can be used for anything
4  allowable under the current PSC-CUNY
5  research award guidelines except summer
6  salary." Do you see that, sir?
7      A.   I see that.
8      Q.   So were you aware that in
9  service research allotments were funds for
10 UCRA members like yourself to conduct your
11 own research?
12     A.   Well, now that I see the year
13 beginning in 2004, that would have been
14 the year that the policy changed from a
15 straight cash payment to a different type
16 of payment, yes.   So I see that, yes.
17 Now I do.
18     Q.   And you served on UCRA between
19 2005 and 2010 you testified earlier today?
20     A.   Prior to that as well.
21     Q.   And you served on UCRA between
22 2005 and 2010, correct?
23     A.   That's correct.
24     Q.   Okay.
25     A.   Under both policies apparently.

Page 534

1       WILSON
2  We are not -- actually not just
3  apparently.
4           MR. MARK KLEIN:  All right.  I
5  ask the court reporter to mark as Wilson
6  Exhibit 30 a document that bears Bates
7  stamps DEF 669 through 676, and
8  unfortunately some of the Bates numbers
9  have been cut off in the copying.
10          MR. JAMES KLEIN:  What number
11 is this?
12          MR. MARK KLEIN:  This is 30.
13          (Wilson Exhibit 30 marked for
14 identification.)
15          (Document handed to witness.)
16     Q.   Dr. Wilson, I show you what has
17 been marked as Wilson Exhibit 30.   Please
18 review it and tell me when you have done
19 so.
20          (Pause.)
21     A.   Yes.
22     Q.   Can you tell me what Exhibit 30
23 is?
24     A.   Let me just take a look.  Yes.
25 So Exhibit 30 is a series of invoices that

Page 535

1       WILSON
2  I submitted that included book purchases,
3  research, research supplies, copy
4  expenses, school supplies from various
5  places and -- and this is also including a
6  fully disclosed list of books that were
7  purchased for Marlboro College that was
8  reviewed, and I spoke to the reviewing
9  officer in advance who approved this,
10 however.
11     Q.   I asked what this is, sir?
12     A.   That is what it is.   It is a
13 detailed and approved payment request that
14 was carefully audited.
15     Q.   So this is a payment request
16 that you made for the disbursement of
17 funds from the account that had been set
18 up for you in connection with your service
19 as a reviewer of grant applications in
20 connection with UCRA, correct?
21     A.   That's correct.
22     Q.   And this included a request for
23 reimbursement of a number of boxes
24 purchased from -- at Marlboro College,
25 correct?

Page 536

1       WILSON
2      A.   That's correct.
3      Q.   And Marlboro College is where
4  your daughter attended school?
5      A.   That's correct.
6      Q.   And if you look at the third
7  page of this document, which bears the
8  stamp DEF 671.  Maybe the Bates stamp
9  doesn't show up.  If you just go to the
10 third page.
11     A.   One, two, three.   Yes.
12     Q.   It appears to be a book
13 purchased from Barnes & Nobel Ordeal by
14 Hunger.  Is that what that says in the
15 upper right-hand corner for $16.28.  Can
16 you read what that says?
17          MR. JAMES KLEIN:   What page are
18 we on?
19          MR. MARK KLEIN:   The third
20 page.
21          MR. JAMES KLEIN:   You are on
22 the fourth page -- you are on the wrong
23 page.
24          MR. MARK KLEIN:   You are
25 talking to your client, Mr. Klein?

Page 537

1          WILSON
2     MR. JAMES KLEIN:   Yes.  Excuse
3 me.
4     Q.   Okay.  Can you read what that
5 says, Barnes & Nobel?
6     A.   It looks like Ordeal by Hunger.
7     Q.   Is that a book that you had
8 purchased personally?
9     A.   Let's see.  If it was at Barnes
10 & Nobel, yes, I purchased it personally.
11    Q.   Okay.  If you go to the next
12 page, there is a purchase from the Frick
13 Collection Museum Shop.  Do you see that
14 in the upper right-hand corner on that
15 page?
16    A.   Yes.
17    Q.   And that is a purchase for New
18 York 50 Best Places, correct?
19    A.   I don't know exactly what that
20 would refer to.
21    Q.   Is that something you sought
22 reimbursement for?
23    A.   Yes.  I don't know what it was
24 for.
25    Q.   Was that in connection with your

Page 538

1          WILSON
2 research?  Yes or no.
3     A.   Yes, absolutely.
4     Q.   And what was your research into
5 New York 50 Best Places?
6     A.   I don't know what the 50 Best
7 Places is, but I recall going to the Frick
8 Collection with one of the members of the
9 Taft Institute, and for whatever reason I
10 purchased or we purchased, and I don't
11 know what 50 Best Places refers to.  It
12 was a book or the name of a shop or I
13 don't know.
14    MR. MARK KLEIN:   I ask that the
15 reporter mark as Wilson Exhibit 31 a
16 document bearing the Bates stamp DEF 677
17 through 684, and again some of the Bates
18 stamps have been cut off in the copying.
19    (Wilson Exhibit 31 marked for
20 identification.)
21    (Document handed to witness.)
22    Q.   Dr. Wilson, I show you what has
23 been marked as Exhibit 31.
24    (Document handed to witness.)
25    Q.   Please review the document and

Page 539

1          WILSON
2 let me know when you have done so.
3     (Pause.)
4     Q.   Is there a reason you are making
5 notes, Dr. Wilson?
6     A.   Yes, because I want to remember
7 what I am going to tell you in a minute.
8 Is that okay?
9     Q.   Could you look at Exhibit 31 and
10 tell me when you have done so?
11    A.   Uh-huh.  Wait a minute.  I am
12 not done yet.  One second.
13    (Pause.)
14    A.   Okay.
15    Q.   You have reviewed it?
16    A.   Yes.
17    Q.   This is another request, payment
18 request that you submitted for
19 reimbursement in connection with your
20 services as a reviewer of grant
21 applications for UCRA?
22    A.   Uh-huh.
23    Q.   That is a yes?
24    A.   Yes.
25    A.   And if you go to page -- the

Page 540

1          WILSON
2 fourth page of the document, sir.
3     A.   Let's see what -- what is the
4 top of the page?
5     Q.   Can you just count to four from
6 the first page, please?
7     A.   On number 31?
8     Q.   Yes, that is where we are.
9     A.   Okay.
10    Q.   Okay.  On the right-hand side
11 of the fourth page, there is a copy of a
12 customer receipt from Barnes & Nobel on
13 June 5, 2007, correct?
14    A.   Yes.
15    Q.   And there is a list of books
16 that are -- that were purchased at that
17 time, correct?
18    A.   That's correct.
19    Q.   And were these books purchased
20 by you or your daughter for your
21 daughter's schooling?  Yes or no.
22    A.   That is not the -- that is not a
23 yes or no.  I participated with my
24 daughter's schooling and research.  I
25 worked on her with papers in a direct

60 (Pages 537 - 540)

Page 541

WILSON

2 research capacity, and, yes, I purchased
3 these books, and, yes, they were used for
4 research.  That is the answer.
5    Q.   And your daughter's name is
6 Leslie Wilson?
7    A.   That's correct.
8    Q.   L-E-S-L-I-E; is that right?
9    A.   That's correct.
10   Q.   In 2007, how old was your
11 daughter?
12   A.   I don't know.
13   Q.   You don't know how old your
14 daughter was in --
15   A.   In 2007.  I -- let's see.
16   Q.   When was she born?
17   A.   Don't ask me hard questions.  I
18 think 1990.
19   Q.   You are not sure?
20   A.   Yes, 1990.
21   Q.   How many children do you have,
22 sir?
23   A.   Two.
24   Q.   Your daughter Leslie?
25   A.   Yes.

Page 542

WILSON

2    Q.   And you have a son?
3    A.   I do.
4    Q.   When was your son burn?
5    A.   1994.
6    Q.   Okay.  So your daughter is now
7 28; is that right?
8    A.   That sounds right.
9    Q.   And in 2007 she was about 17,
10 right?
11   A.   That's right.
12   Q.   So listed on the customer
13 receipt from Barnes & Nobel on June 5,
14 2007 is a book called "The Earth, My Butt,
15 and Other Round Things" it appears to be?
16   A.   That is what it appears to be.
17   Q.   That is one of the books you
18 asked to get reimbursed for, right?
19   A.   That's correct.
20   Q.   And there is also a book How To
21 Write a Research, and it is not finished,
22 but do you know if that was How to Write a
23 Research Paper?
24   A.   I don't recall the complete
25 sentence, but it says How to Write a

Page 543

WILSON

2 ReSearch.
3    Q.   And the last book listed is
4 Garden Style Ideas, correct?
5    A.   That's correct.
6    Q.   If you go to the third page from
7 the end, the third page from the end is a
8 copy of a Summary of Debit Transactions by
9 the Putney School, correct?
10   A.   That's correct.
11   Q.   And your daughter attended
12 Putney School in Putney, Vermont?
13   A.   That's correct.
14   Q.   Did she go there for high
15 school?
16   A.   Yes, she did.
17   Q.   That was a boarding school?
18   A.   That's correct.
19   Q.   Did she attend there all four
20 years?
21   A.   Yes, she did.
22   Q.   Okay.  And listed on this
23 Summary of Debit Transactions are a number
24 of books for which you sought to be
25 reimbursed as part of this payment request

Page 544

WILSON

2 that has been marked as Exhibit 31,
3 correct, sir?
4    A.   Correct.
5    Q.   And included in those books are
6 a number of Shakespeare books, right?
7    A.   That's correct.
8    Q.   And a book for Spanish Verb
9 Tenses, correct?
10   A.   That's correct.
11   Q.   And these are books your
12 daughter used while she was at the Putney
13 School; is that right?
14   A.   That's correct.
15   Q.   Now, do you recall exchanging an
16 e-mail with your daughter in April of 2009
17 about getting receipts in connection with
18 the books she was purchasing?
19   A.   Yes, that is -- I do recall
20 that.
21       MR. MARK KLEIN:  I am going to
22 ask the reporter to mark as Wilson Exhibit
23 32 a document bearing Bates stamp DEF
24 000685.
25       (Wilson Exhibit 32 marked for

61 (Pages 541 - 544)

Page 545

WILSON
1
2 identification.)
3      (Document handed to witness.)
4      Q.   Dr. Wilson, I show you what has
5 been marked as Exhibit 32.  Please take a
6 moment to review it and tell me when you
7 have done so.
8      (Pause.)
9      A.   Yes, I see that.
10     Q.   This is an e-mail exchange
11 between you and your daughter sent in
12 April of 2009, correct?
13     A.   Correct.
14     Q.   And at that point your daughter
15 was approximately 20 years old; is that
16 right?
17     A.   I believe so.
18     Q.   And this consists of an e-mail
19 from you to Leslie and one in which she
20 responds, correct?
21     A.   That's correct.  And in your
22 e-mail to your daughter Leslie, you say
23 "You must keep receipts for each book you
24 purchase or I will not get reimbursed.
25 The statement/printout that you got from

Page 546

WILSON
1
2 the book store doesn't work for me.  Ask
3 the lady at the book store if you can
4 return the books, repurchase same book,
5 and get a receipt."
6      A.   Right.
7      Q.   "This will save me hundreds of
8 dollars."  Do you see that, sir?
9      A.   That's correct.
10     Q.   That is because you wanted to
11 submit receipts for books that your
12 daughter purchased in connection with her
13 schooling for reimbursement under the
14 account set up for you for your UCRA
15 service?
16     MR. JAMES KLEIN:  I object.
17     Q.   You can answer, sir.
18     A.   Repeat the question.
19     MR. MARK KLEIN:  Read back the
20 question.
21     (Record read.)
22     A.   So --
23     Q.   Yes or no.
24     A.   It is not a yes or no.  My
25 understanding is that any research that I

Page 547

WILSON
1
2 was involved in, and I was intimately
3 involved with my drawer's research, she
4 was always asking me questions about
5 research, including Spanish, Shakespeare,
6 and African American history if I
7 participate in her academic work, and this
8 was submitted under an account that I
9 received based on my labor that I thought
10 it was absolutely appropriate to do that.
11 And so yes, the answer is yes, given
12 those -- that context.
13     MR. MARK KLEIN:  I am going to
14 ask the reporter to mark as Wilson Exhibit
15 33 a document bearing Bates stamps DEF
16 000253.
17     (Wilson Exhibit 33 marked for
18 identification.)
19     (Document handed to witness.)
20     Q.   Dr. Wilson, I show you what has
21 been marked as Exhibit 33.  Please take a
22 moment to review the document and tell me
23 when you have done so.
24     A.   Let's see.
25     (Pause.)

Page 548

WILSON
1
2      A.   Okay.
3      Q.   Exhibit 33 is an e-mail from
4 Noel Anderson to you, correct?
5      A.   That is correct.
6      Q.   And it was sent on April 1,
7 2011, right?
8      A.   Yes.
9      Q.   Do you recall receiving this
10 e-mail?
11     A.   Yes, I do.
12     Q.   And this --
13     A.   Well, but who -- I am not sure
14 who Glenn Amico is.  Actually so -- so I
15 don't recall Glenn Amico.  I don't know
16 who that is.
17     Q.   Well --
18     A.   So I don't recall receiving this
19 e-mail.  So no.  There is portions of it
20 that I recall but not this e-mail
21 specifically.
22     Q.   You recall everything below
23 where it says Glenn Amico, right?
24     A.   Yes.
25     Q.   Okay.  And this was Exhibit 34 H

62 (Pages 545 - 548)

Page 549

1            WILSON
2  at the arbitration, right?
3      A.   Yes.
4      Q.   Now, the subject of this is
5  titled "time sheets/pay period."   Do you
6  see that?
7      A.   Under the topic -- where is
8  this?
9      Q.   Subject.
10     A.   Subject, yes.
11     Q.   The first paragraph of the
12  e-mail says, "Hey, Joe, here is the pay
13  schedule and time sheet for the nontaxing
14  levy payments."   Let's stop there.   What
15  are nontaxing levy payments?
16     A.   These are payments processed and
17  approved and reviewed by the college under
18  college contract that are not tax levy
19  funds.   So they are other than tax levy
20  funds, and it is usually grants and things
21  of that sort.
22     Q.   What are tax levy funds?
23     A.   My understanding of tax levy
24  funds is funds that are appropriated by
25  the City or the State.   That is my

Page 550

1            WILSON
2  understanding or by CUNY directly.
3      Q.   Do you know what nontaxing levy
4  funds are?
5      A.   Tax levy -- nontaxing levy funds
6  would be funds that go to the central
7  accounting office at Brooklyn College for
8  review and auditing before disbursement
9  based on review and contracts according to
10  whatever agreement under those -- under
11  those funds and so forth.   Under -- I
12  should say under those grants.
13     Q.   Okay. The second sentence of
14  this e-mail says, "You are budgeted for
15  $4500 from RBA and $15,000 from Children's
16  Services." Do you see that sentence?
17     A.   I see that.
18     Q.   What is RBA?
19     A.   RBA my recollection -- well, I
20  don't know what -- I am going to speculate
21  on the A, but I know the R was Results
22  Based.   It could be Results Based
23  Analysis.
24     Q.   Yes, are you familiar with
25  something called Results Based Analysis?

Page 551

1            WILSON
2      A.   Yes.
3      Q.   And what was Results Based
4  Analysis?
5      A.   It was a management training
6  program.  It was a management training
7  program that provides expertise to improve
8  management and -- and I think also to
9  connect with community groups, as I
10  recall.
11     Q.   And what role, if any, did you
12  have with RBA? Was it referred to as RBA?
13     A.   RB -- Results Based Analysis I
14  believe if that is your question.
15     Q.   Well, Mr. Anderson referred to
16  it at RBA here, right?
17     A.   Right.
18     Q.   And you referred to it as RBA as
19  well, right?
20     A.   I was just giving the full
21  title.
22     Q.   What role, if any, did you have
23  in connection with RBA?
24     A.   So I underwent training.   We
25  had intensive training sessions, myself

Page 552

1            WILSON
2  and my staff, and we had a number of
3  meetings with community organizations to,
4  you know, develop the RBA methodology.
5      Q.   Okay.   And this says you were
6  budgeted for 4500 from RBA, right?
7      A.   That's correct.
8      Q.   Did you get payment of $4500
9  from RBA?
10     A.   I received a contract.  I
11  received a contract approved by Central
12  Budgeting Office and human resources and
13  by Michael Hewitt that specifically
14  delineated all of the actions that I did
15  with RBA in order to be paid for my time
16  and efforts on this particular project
17  that benefited the college.
18     Q.   Again, I asked a simple
19  question, and I ask for a simple answer.
20  Did you get paid $4500 for RBA?
21     A.   I believe so, yes.
22     Q.   And what did you do to justify
23  getting paid $4500 for RBA?
24     A.   So I underwent intensive
25  training where we reviewed the RBA

63 (Pages 549 - 552)

Page 553

WILSON

1 literature, RBA methodology, where we had
2 team breakout sessions, and that was a
3 period of numerous days, and then we
4 attended -- I specifically attended
5 meetings of community organizations over a
6 hundred organizations on the main campus
7 to incorporate the RBA method and to
8 spread it through the community groups to
9 make them more effective in terms of their
10 own management as a way to show the
11 university support for community service
12 and community efforts, so that was the
13 gist of RBA and my role.
14    Q.   Did you spend a lot of time in
15 connection with your role relating to RBA?
16    A.   What does a lot of time mean?
17    Q.   How much time did you spend?
18    A.   Many days.
19    Q.   How many days?
20    A.   I don't recall the precise
21 number but intensive meetings, training
22 sessions, literature to review.   As a
23 matter of fact, after a series of
24 intensive all day sessions at a certain

Page 554

WILSON

1 point after -- after weeks or, you know,
2 actually I think this spread over a period
3 of months I was actually -- I became a
4 certified RBA trainer, so I was -- I
5 received a certification as a result of
6 this training.
7    Q.   Isn't it a fact Dr. Wilson that
8 you testified at the arbitration that you
9 did not spend a lot of time in connection
10 with your role relating to RBA?
11    A.   That is just actually not
12 accurate, and I can itemize that time.   So
13 that was either an error on my part or a
14 different understanding, but I actually
15 spent a good -- a significant amount of
16 time on that, me and my staff.
17    Q.   Now, what did you understand Mr.
18 Wilson to say --
19    A.   Mr. Wilson.
20    Q.   I'm sorry.   What did you
21 understand Mr. Anderson to mean when he
22 said that you were "Budgeted for $4500
23 from RBA and $15,000 from Children's
24 Services"?

Page 555

WILSON

1    A.   My understanding is that as a
2 result of the time we spent on RBA as one
3 program, and the time I spent on
4 Children's Services under another -- under
5 a budget approved by the college budget
6 office and human resources that we were
7 allocated those sums of money.   That is
8 my understanding.
9    Q.   Who allocated -- who allocated
10 those sums of money to you?
11    A.   Well, the college drew up
12 specific contracts for each one of these
13 that would have been the budget -- the
14 Office of Business and Fiscal Services
15 Alan Gilbert, who was an expert at all of
16 the college's rules and regulations, and
17 he knows the regulations better than I do.
18 So he reviewed them.   He approved them,
19 and then they would have gone to human
20 resources for additional review before any
21 funds could be disbursed.
22    Q.   Now, the reference to children's
23 services, is that a reference to the funds
24 that were provided by the New York City

Page 556

WILSON

1 Office of Family and Children's Services?
2    A.   That is my understanding.
3 Correct.
4    Q.   And those are monies that were
5 allocated by the New York City Council; is
6 that right?
7    A.   I don't believe so, no.
8    Q.   Do you have an understanding of
9 the purpose of the funds that came from
10 the Office of Family and Children
11 Services?
12    A.   My understanding is that the
13 funds and the actual activities went to
14 the precise programs and the end users,
15 including to cover my administrative time
16 for running a program that directly
17 benefitted at risk students who did
18 receive the benefits and the mentoring and
19 counseling and so forth.
20    Q.   Now, the next sentence of
21 Mr. -- by the way, Noel Anderson he was a
22 professor of political science at Brooklyn
23 College as well, right?
24    A.   That is correct.

64 (Pages 553 - 556)

Page 557

WILSON
2    Q.   And CUNY began an investigation
3 into him as well, right?
4    A.   I don't know.
5    Q.   You don't know?
6    A.   No.
7    Q.   Did Noel Anderson resign from
8 his position at --
9         MR. JAMES KLEIN:  I object.
10        MR. MARK KLEIN:   You
11 interrupted me again.
12   Q.   Did Noel Anderson resign from
13 his position at Brooklyn College?
14   A.   I am not completely sure of the
15 terms of his separation, but I know he IS
16 no longer at the college.  So I don't know
17 what happened to him exactly.
18   Q.   So you never had any
19 conversation with Mr. Anderson regarding
20 any investigation that was begun with
21 respect to him?
22   A.   I had -- no.  No.  About his
23 specific investigation, no, i don't know
24 whether he was being investigated or not.
25   Q.   Did you ever have a discussion

Page 558

WILSON
2 with him about CUNY's investigation of
3 you?
4    A.   Yes, I did.
5    Q.   So you talked to him about your
6 investigation -- CUNY's investigation of
7 you, but you didn't talk to him about
8 CUNY's investigation of him.  Is that your
9 testimony?
10   A.   Well, I spoke to him after he
11 was no longer at CUNY, and so I had no
12 reason to understand CUNY would
13 investigate somebody who was no longer at
14 CUNY.  So --
15   Q.   Okay.  The next sentence of Mr.
16 Anderson's e-mail says, "You can draw on
17 this money now cuz it is there and have
18 Sally sign off.  Just make sure they
19 don't overlap with your work hours and
20 time sheets."
21        What did you understand those
22 two -- that sentence to mean?
23   A.   It is very clear and
24 transparent.  We followed college
25 guidelines that the work that we got paid

Page 559

WILSON
2 for should not be time when we were
3 actually doing other work and to be very
4 careful on our time sheets that we make
5 sure that there is no overlap to follow
6 the college's procedures.  So the work is
7 done over many, many hours, and we wanted
8 to make sure that our time sheets
9 corresponded in a way that didn't conflict
10 with the other things just to be
11 technically correct.  So we were
12 following college guidelines.
13   Q.   Who is Deitre, D-E-I-T-R-E,
14 referred to in the next sentence?
15   A.   I believe she was one of
16 the -- one of the graduate students
17 involved with the -- with one of the
18 programs with the Urban Community of
19 Teachers, as I recall.
20   Q.   Do you know Deitre's last name?
21   A.   No, I don't.
22   Q.   Do you have an understanding of
23 why Mr. Anderson was telling you that
24 Deitre had invoiced for her 5,000 while
25 you were gone?

Page 560

WILSON
2    A.   Well, because we were directing
3 these projects, and he was keeping me
4 apprised of one of the employees, and I
5 believe -- let's see.  Maybe I was out of
6 the country at the time, and he wanted to
7 let me know that one of the employees was
8 getting paid.
9    Q.   I would like to direct your
10 attention to the third paragraph of Mr.
11 Anderson's e-mail.  It says, "I will tap
12 the rest of my RBA money next week ($2900)
13 and just wait until May to tap my 15,000
14 from children's services and 10,000 from
15 UCT." Do you see that there, sir?
16   A.   I do.
17   Q.   And then he says in parentheses,
18 "You should wait until summer session one
19 also to tap your UCT 10,000 K since salary
20 needs to sign off as well."
21   A.   Yes.
22   Q.   And why did salary need to sign
23 off?
24   A.   Well, first of all, the work is
25 ongoing and continuous, but in order to

65 (Pages 557 - 560)

WILSON

1 WILSON
2 follow university guidelines you may do
3 the work in one semester, but you have to
4 get paid in the following time period, and
5 so the budget has to be approved by
6 the -- by the department chair as the
7 first layer of approval on a multilayer
8 approval process, and so the point is the
9 work was done, but you have to follow
10 guidelines in terms of compensation in
11 order to correspond with the multiple
12 position form. So we did the work, but
13 you can't get paid at that moment that you
14 are doing the work. So you get paid the
15 following semester as compensation for the
16 work previously done. That was --
17 Q. Did you have an understanding of
18 why Mr. Anderson was telling you "Salary
19 needs to sign off as well."?
20 A. Yes, because that is the first
21 layer of review. It starts in the
22 department because what you -- you don't
23 understand, and I am just going to have to
24 explain it to you.
25 Q. Just answer my question. I

1 WILSON
2 don't --
3 A. No, you need to hear the answer.
4 This goes to the multiple position form,
5 and you asked me yesterday you have been
6 there for 30 years, and you didn't look at
7 this multiple position form. So the point
8 is multiple position -- the purpose was
9 instituted because faculty members in
10 the -- in the finance division in
11 accounting had businesses on the side, and
12 so the multiple position policy was
13 instituted to make sure that faculty did
14 their teaching, their research, and their
15 community service, and their publications,
16 and if they didn't do their main research
17 this was a way to hold them accountable,
18 and it starts with the department chair,
19 and the department chair reviews your
20 activities, and you have an annual meeting
21 with your department chair, and they ask
22 you are you doing your research. You
23 discuss your research. They review your
24 teaching that has to do with your teaching
25 appraisals. They ask you about community

1 WILSON
2 service and college service, and every
3 meeting that I had with all of my chairs
4 with the exception of Paisley I had the
5 highest teaching ratings. I did
6 the -- the most amount of community
7 service. I worked on -- I did
8 publication, and I had many, many
9 university committees that I served on.
10 So I fulfilled all of my requirements, and
11 anything related to research since the
12 beginning of my employment I was told by
13 the department chair this is not about
14 research. Do all your research? This is
15 to find professors who aren't working at
16 CUNY who have businesses on the side.
17 So my final thought is it is
18 like when you take your driver's test, and
19 you get your license, and you read the
20 rules of the road. It was read and
21 discussed in every year verbally these are
22 the rules. What are you doing to comply
23 with the rules? So I was always in full
24 compliance based on the department chair,
25 and then the they only come up at this

1 WILSON
2 point with trying to find some technical
3 reason not to -- they never questioned my
4 teaching, never questioned my service,
5 never questioned -- although they tried to
6 attack my research by saying it is
7 plagiarized and so forth, but they didn't
8 question my publications other than
9 subversively. So the context is that this
10 was really a witchhunt looking for a
11 needle in a haystack. In any event, that
12 is the answer to your question.
13 Q. Are you familiar with something
14 called reassigned time?
15 A. Yes, I am.
16 Q. What is reassigned time?
17 A. Reassigned time is -- is time
18 that the college -- let me just clarify.
19 So if you are doing administrative work,
20 the college will provide reassigned time,
21 so that there -- let's say they will give
22 you a course off. So you could do
23 administrative work, so it is called
24 reassigned because you are reassigned to
25 do administrative work instead of

Page 565

1        WILSON
2  teaching.
3      Q.   And because you are not doing
4  teaching, the college has to hire an
5  adjunct or another professor to teach the
6  course that you are not teaching because
7  you are being given reassigned time,
8  correct?
9      A.   You are still teaching, but they
10 give you one course or two, whatever the
11 number is, to -- to assist you in your
12 administrative responsibilities.
13        MR. MARK KLEIN:  I am going to
14 ask the reporter to mark as Wilson Exhibit
15 34 a document bearing Bates stamps DEF 186
16 through 193 although some of the Bates
17 numbers have been cut off in the copying.
18        (Wilson Exhibit 34 marked for
19 identification.)
20        (Document handed to witness.)
21     Q.   Dr. Wilson, I show you what has
22 been marked as Wilson Exhibit 34.  Please
23 review it and tell me when you have done
24 so.
25     A.   Can we take a five-minute break?

Page 566

1        WILSON
2      Q.   Sure.
3        (Recess taken.)
4  BY MR. MARK KLEIN:
5      Q.   Dr. Wilson, I want to ask you
6  another question or two about Exhibit 33
7  that we were talking about before.
8      A.   Hold on, please.
9      Q.   You have Exhibit 33 in front of
10 you, right?
11     A.   Not yet.  Okay.  33.  It says
12 34.  33, yes.
13     Q.   And Wilson Exhibit 33, directing
14 your attention to the paragraph toward the
15 end of Mr. Anderson's e-mail to you where
16 he says, "I am keeping the budgets.  So
17 you and I should set up weekly meetings to
18 watch our bottom lines...  No more Annie
19 responsible for all our shit.  E got to
20 step into this."  Do you see that?
21     A.   I see that.
22     Q.   Why was it necessary for you and
23 Mr. Anderson to set up weekly meetings to
24 watch your bottom lines?
25     A.   Well, as grant administrators,

Page 567

1        WILSON
2  you have to carefully monitor how the
3  grant is administered, so we had to meet
4  weekly and make sure that the grant
5  that -- that all of the actions and all of
6  the programs and all of the staff were
7  doing everything they were supposed to do,
8  and then that is what we did to watch the
9  bottom line.
10     Q.   It wasn't important to have
11 weekly meetings to make sure you and Mr.
12 Anderson coordinated the payments that you
13 received from RBA and Children's Services?
14     A.   We didn't need to have weekly
15 meetings to coordinate payments, but we
16 had regular meetings almost daily every
17 other day, and of course budgets would be
18 part of that, but the bulk of our work and
19 what we did and what we discussed was to
20 make sure that all of the services were
21 provided and we were quite successful.
22 We were externally evaluated.  Everything
23 was appraised -- and I am not sure what
24 the no more Annie shit -- I sort of
25 recall.  I think some of the staff didn't

Page 568

1        WILSON
2  receive payments, and I think that might
3  have been some problem about making sure
4  that the people who were working are
5  getting their contractual agreement.
6      Q.   All right.  Now, let's go back
7  to Exhibit 34.  Can you identify Exhibit
8  34, sir?
9      A.   This is a workload summary
10 report.
11     Q.   And --
12     A.   CUNY 1.
13     Q.   CUNY 1 refers to Exhibit CUNY 1
14 at the arbitration, right?
15     A.   Correct.
16     Q.   Do you recall seeing this
17 document at the arbitration?
18     A.   I recall seeing the document,
19 not necessarily at the arbitration.
20     Q.   What is a workload summary
21 report?
22     A.   So I believe this would list the
23 teaching -- yes.  So it shows the number
24 of students we had in a particular
25 class --

67 (Pages 565 - 568)

Page 569

WILSON

2    Q.   Dr. Wilson, maybe I can help you
3  here.  I just want to get through this as
4  quickly as we can.
5    A.   Okay.
6    Q.   Do these summary reports show
7  classes that you taught and your
8  reassigned time for each semester at
9  Brooklyn College?
10    A.   Yes.
11    Q.   So the first page of Exhibit 34
12  shows that you taught three courses in the
13  fall of 2008, and that you received
14  reassigned time of three hours for the
15  semester for your work as director of
16  worker education, correct?
17    A.   That's correct.
18    Q.   Now, the three courses, can you
19  identify what those courses were?
20    A.   One was a master seminar.
21    Q.   Which one was that?
22    A.   That would be 717, and I am not
23  sure what the other two were.  The college
24  courses for -- they would have been
25  probably undergraduate.  That is --

Page 570

WILSON

2    Q.   Do you know what undergraduate
3  courses those were?
4    A.   No.
5    Q.   All right.  If you go to the
6  next page.  Are you on the second page?
7    A.   Yes.
8    Q.   That is your workload summary
9  report for the spring of 2009, correct?
10    A.   Correct.
11    Q.   That shows your teaching and
12  reassigned time for the spring 2009
13  semester, right?
14    A.   Correct.
15    Q.   And it shows that you had -- you
16  taught four courses that semester, right?
17    A.   Yes.
18    Q.   And what were those courses?
19    A.   The master seminar, 717.  I
20  happened to know that 745 was public
21  administration at the graduate level, and
22  791 I believe was a policy class, and the
23  first -- so those three were graduate, and
24  the first one would have been an
25  undergraduate class, and I am not sure

Page 571

WILSON

2  which one -- what the first one was.
3    Q.   All right.  And for reassigned
4  time you received reassigned time at three
5  hours, and that means three credit hours,
6  in other words, a course, right?
7    A.   One course.
8    Q.   One course for your role as
9  director of the diversity center, right?
10    A.   Yes, and not the Center for
11  Worker Education, correct.  So I received
12  no time for worker education.
13    Q.   Now, your work as director of
14  the diversity center related to the Black
15  Male Initiative Program; is that right?
16    A.   No, not precisely.  That is not
17  right.
18    Q.   So what did you do as director
19  of the diversity center?
20    A.   At the diversity center, I
21  developed and implemented and oversaw
22  diversity policies at Brooklyn College.
23  I sat on various committees.  I created a
24  diversity counsel, and I also had
25  university-wide responsibilities that grew

Page 572

WILSON

2  out of the diversity center to go to all
3  of the campuses looking at their
4  employment practices in terms of
5  affirmative action and diversity,
6  evaluating every campus in CUNY.
7    Q.   All right.  Now, if you go to
8  the next page of this Exhibit 34, this was
9  your workload summary for the fall of
10  2009, the next year, correct?
11    A.   Yes.
12    Q.   And it shows that you taught one
13  course, course 717, right?
14    A.   Yes.  Graduate.
15    Q.   And that was the master's thesis
16  course?
17    A.   Master's seminar, correct.
18    Q.   And you got reassigned time of
19  three credit hours, a full course for
20  being director of worker education and
21  three credit hours for being director of
22  the the diversity center, correct?
23    A.   That's correct.
24    Q.   And if you go to spring 2010,
25  that refers -- that is the next page,

68 (Pages 569 - 572)

Page 573

WILSON

1
2 right?
3    A.   Yes, spring 2010.
4    Q.   That reflects that you taught
5 four courses; is that right?
6    A.   That's correct.
7    Q.   And 717 you identified
8 previously as the master seminar, correct?
9    A.   Correct.
10    Q.   And course 2.3 was an
11 undergraduate course; is that right?
12    A.   Yes, college undergraduate.
13    Q.   And do you know what
14 undergraduate course that was?
15    A.   That may have been a core -- a
16 core class, college-wide class as opposed
17 to political science, yes.  It wasn't a
18 political science class.  It was a
19 college-wide class.
20    Q.   And do you know the name of that
21 class?
22    A.   I believe it was People Power in
23 Politics.
24    Q.   And what were courses 740 and
25 745?

Page 574

WILSON

1
2    A.   745 would have been public
3 administration, and 740 -- I don't
4 remember what 740 was.
5    Q.   All right.  And this page also
6 reflects that in the spring of 2010 you
7 received reassigned time for three credit
8 hours with respect to your role as
9 director of the diversity center, correct?
10    A.   That is correct.
11    Q.   In the fall of 2010, which
12 appears on the next page, right?
13    A.   Fall 2010.
14    Q.   It shows that you taught one
15 class, right??
16    A.   That's correct.
17    Q.   And that class was course 7170
18 X, right?
19    A.   That's correct.
20    Q.   Do you know what course that
21 was?
22    A.   It was a graduate course.  I
23 don't recall.
24    Q.   And it shows that you received
25 reassigned time of three credit hours in

Page 575

WILSON

1
2 connection with your role as director of
3 the diversity center, right?
4    A.   That's correct.
5    Q.   And the next page is spring
6 2011, correct?
7    A.   Correct.
8    Q.   And you taught four courses that
9 semester, right?
10    A.   That's correct.
11    Q.   And what were those courses?
12    A.   I don't recall the specific
13 courses.
14    Q.   Can you identify any of the four
15 courses listed there? If you can't, that
16 is fine.  Just tell me.
17    A.   Well, I think -- I think they
18 changed -- yes, they changed the course
19 numbering.  So now that I am looking at
20 it, I could see a public administration
21 class.
22    Q.   Which one is that?
23    A.   That would have been 745.
24    Q.   Okay.
25    Q.   Can you identify any of the

Page 576

WILSON

1
2 other classes?
3    A.   The top two were graduate, and
4 then I am not sure of the bottom one.
5    Q.   All right.  Besides identifying
6 them as graduate, can you identify them in
7 any other way?
8    A.   No.
9    Q.   And it shows that under
10 reassigned time you received three credit
11 hours of resigned time in connection with
12 your role as director of the diversity
13 center and another three hours of
14 reassigned time in connection with your
15 role as director of worker education,
16 correct?
17    A.   That's correct.
18    Q.   If you go to the last page.
19    A.   Yes.
20    Q.   The last page, sir.
21    A.   That is your workload summary
22 for the fall of 2011, right?
23    A.   Yes.
24    Q.   And that shows that you taught
25 two courses that semester, right?

69 (Pages 573 - 576)

Page 577

WILSON

1
2   A.   Yes.
3   Q.   And what were those two courses?
4   A.   717 would have been the masters.
5   717 would have been the masters seminar,
6   and I am not sure what other one was.
7   Q.   Do you know what the X stands
8   for in the course names?
9   A.   Maybe graduate.  I don't know.
10   Q.   And it shows under reassigned
11   time that you received three credit hours
12   of reassigned time equivalent to a course
13   in connection with your role as director
14   of the diversity center, correct?
15   A.   That's correct.
16   Q.   Okay.  Now, you testified
17   previously that you went on various trips
18   with students from the Graduate Center For
19   Worker Education; is that right?
20   A.   This was research travel,
21   correct, with students.   That is right.
22   Q.   And these were students from the
23   graduate Center For Worker Education?
24   A.   Primarily.
25   Q.   Not totally?

Page 578

WILSON

1
2   A.   There may have been students
3   from other programs, but I just don't want
4   to be absolute.
5   Q.   Okay.  And you submitted
6   applications to get reimbursed for your
7   expenses in connection with those trips,
8   correct?
9   A.   That's correct.
10   MR. MARK KLEIN:  I ask that the
11   reporter mark as Wilson Exhibit 35 a
12   document bearing the Bates stamp DEF
13   000290 through 294.
14   (Wilson Exhibit 35 marked for
15   identification.)
16   (Document handed to witness.)
17   Q.   Dr. Wilson, I show you what has
18   been marked as Wilson Exhibit 35.   Please
19   review it briefly and tell me when you are
20   done so.  I will ask you specific
21   questions.
22   (Document handed to witness.)
23   (Pause.)
24   A.   Okay.  I have reviewed it.
25   Q.   Have you seen this document

Page 579

WILSON

1
2   before, sir?
3   A.   Well, I see my signature on the
4   first -- let's see.  Is this my signature?
5   I am not sure if I have seen this or not.
6   Actually this is not my signature.
7   Q.   It is not your signature?
8   A.   It is not my signature.
9   Q.   Did somebody sign your name?
10   A.   Annie London signed that.
11   Q.   Now, this was a travel request
12   reimbursement form that was submitted on
13   your behalf in connection with a trip to
14   Egypt and Greece in April of 2010,
15   correct?
16   A.   That says -- it says May.
17   January, February, March, April May.
18   Q.   The dates of the trip were in
19   April of 2010, correct?
20   A.   Yes, April 2010.
21   Q.   The actual travel request
22   reimbursement form is dated May 13, 2010,
23   right?
24   A.   Correct.
25   Q.   And you were seeking

Page 580

WILSON

1
2   reimbursement of $1500 in connection with
3   the expenses you incurred in connection
4   with that trip, right?
5   A.   That's correct.
6   Q.   And on the last page of this
7   document there is a box around your name.
8   Do you see that, sir?
9   A.   I do.
10   Q.   You're identified as a director
11   and professor of Brooklyn College, right?
12   A.   That's correct.
13   Q.   You weren't a director of
14   Brooklyn College, were you?
15   A.   Absolutely.  I was a director
16   of the Graduate Center For Worker
17   Education, a director of the center for
18   diversity, and I directed other programs
19   as well, but, yes, he was a director of
20   course.
21   Q.   Now, did you submit another
22   application for reimbursement of $1500 in
23   connection with your trip to Egypt and
24   Greece in April of 2010?
25   A.   I believe my assistant submitted

70 (Pages 577 - 580)

1        WILSON
2  an application.  Maybe this one was the
3  one that she submitted, and maybe I
4  submitted one, so I would have to check
5  the details.
6     Q.   Did you submit an application
7  before for reimbursement of $1500 in
8  connection with this trip that was
9  rejected?
10    A.   Not that I recall.
11    Q.   Do you see in about the middle
12 of the first page of this document,
13 Exhibit 35 --
14    A.   Yes.
15    Q.   -- where it says purpose?
16    A.   Uh-huh.
17    Q.   That's a yes?
18    A.   Yes.
19    Q.   And you see there is a
20 checkmark?
21    A.   Yes.
22    Q.   Next to where it says presenting
23 paper/poster/lecture?
24    A.   Right.
25    Q.   And do you see about three lines

1        WILSON
2  down to the right it says "Attending but
3  not presenting," and there appears to be a
4  checkmark that was crossed out there,
5  right?
6     A.   That's right.
7     Q.   Did you present a paper or a
8  lecture or a poster at a conference during
9  your trip to Egypt and Greece in April of
10 2010?
11    A.   Yes, I did.  I -- yes, I did.
12    Q.   You presented a paper?
13    A.   No, I didn't say I presented a
14 paper.  I was -- I discussed it on a
15 panel at the conference.
16    Q.   That is why my name is here.
17        MR. MARK KLEIN:  I am going to
18 ask the reporter to mark as Wilson Exhibit
19 36 a document bearing Bates stamps DEF
20 287.
21        (Wilson Exhibit 36 marked for
22 identification.)
23        (Document handed to witness.)
24    Q.   Dr. Wilson, I show you what has
25 been marked as Wilson Exhibit 36.  Please

1        WILSON
2  take a moment to review it and tell me
3  when you have done so.
4        (Pause.)
5     A.   Yes, I see that.
6     Q.   Now, this is a travel request
7  reimbursement form that you did sign,
8  correct?
9     A.   That is correct.  That is my
10 signature.
11    Q.   And the travel request
12 reimbursement date is April 5, 2010,
13 right?
14    A.   That's correct.
15    Q.   And this is in connection with a
16 trip to Athens, Greece on April 28 to 30th
17 2010, right?
18    A.   That's correct.
19    Q.   Okay.  And you put a checkmark
20 in the section of the form where it says
21 purpose for attending but not presenting,
22 right?
23    A.   That's correct.
24    Q.   Did this -- and you were
25 requesting reimbursement of $1500 for

1        WILSON
2  airfare/train transportation, correct?
3     A.   That's correct.
4     Q.   Did this application get
5  rejected?
6     A.   Yes, it did get rejected.
7     Q.   Why did it get rejected?
8     A.   Because at the time I was
9  attending the conference but not
10 presenting.
11    Q.   So you are saying that your
12 participation on a panel at which you
13 talked constituted presenting.  Is that
14 what you are saying?
15    A.   Yes.  That was not confirmed at
16 that time, so at the time I applied for
17 this I would have been attending but not
18 presenting.  By the time we went I
19 actually participated on the panel hence
20 the difference because I presented.  I
21 spoke, so that was -- that was what
22 happened.
23    Q.   And did you get paid $1500 on
24 your second request for reimbursement of
25 your airfare and train transportation for

71 (Pages 581 - 584)

WILSON
1
2 the trip to Greece?
3    A.   I don't recall.
4       MR. MARK KLEIN:   I am going to
5 ask that the reporter mark as Exhibit 37 a
6 document bearing the Bates stamp DEF
7 00652.
8       (Wilson Exhibit 37 marked for
9 identification.)
10       (Document handed to witness.)
11    A.   Just one --
12    Q.   There is no question pending.
13    A.   It is not a question, but it is
14 what you call it an amendment comment.
15 If you look at the exhibit that you just
16 gave me on -- let's see.  It is page 293.
17 This is the conference in the global
18 agenda and if you turn -- it says speakers
19 biographies and sponsors profiles.  If you
20 look at the next page, it lists me as a
21 speaker.
22    Q.   At least that is what you
23 intended to convey when you submitted the
24 last page as part of Exhibit 35; is that
25 right?

WILSON
1
2    A.   No, that is false.
3       MR. JAMES KLEIN:   Objection.
4    A.   That is totally false.
5       MR. JAMES KLEIN:   Objection.
6 He didn't testify to that.
7    Q.   That is what I just asked.
8    A.   That is false.  This is what
9 actually happened.  This is what I
10 actually did, and that is why I am
11 actually in the brochure published by The
12 Economist.  This is not my document.
13 This is The Economist document.
14    Q.   Dr. Wilson, I showed you what
15 has been marked as Exhibit 37.  Please
16 take a moment to review this and tell me
17 when you have done.
18       (Pause.)
19    A.   Okay.  I have reviewed it.
20    Q.   Exhibit 37 is an exchange of
21 e-mails between you and Noel Anderson,
22 correct?
23    A.   That is correct.
24    Q.   And these e-mails were exchanged
25 on July 28, 2011, correct?

WILSON
1
2    A.   That is correct.
3    Q.   And the subject of the e-mails
4 is ERIS, E-R-I-S, slash Bob Scott, right?
5    A.   That is correct.
6    Q.   And ERIS is an acronym for the
7 Black Male Initiative Program, correct?
8    A.   Correct.
9    Q.   Do you recall today what ERIS
10 stood for?
11    A.   I know the first one is empower,
12 and I am at a loss for the rest.
13    Q.   Who is Bob Scott?
14    A.   Bob Scott was an African
15 American employee, a senior employee at
16 Brooklyn College, who worked in the dean's
17 office and who knew a lot about mentoring,
18 and he was very good at giving academic
19 support to the cohort of African American
20 students essentially black men to ensure
21 that they would graduate and succeed.  So
22 we asked Bob Scott to help us and to play
23 a -- an administrative role.  So that is
24 who Bob Scott was.
25    Q.   Now, the e-mail from Noel, which

WILSON
1
2 was sent at 2:15 p.m. starts "Hey, Joe.
3 Don't stop.  Won't stop even from
4 Turkey.... Wanted to put some budgetary
5 ideas in your ear." Do you see that?
6    A.   I see that.
7    Q.   And so is it your understanding
8 that Mr. Anderson was sending you an
9 e-mail when he was in Turkey?
10    A.   That is my understanding.
11    Q.   Do you know if Mr. Anderson went
12 to Turkey using funds from a trip that he
13 had purchased to South Africa but then
14 didn't go to South Africa and instead used
15 the money to go to Turkey?
16    A.   I have no idea.
17    Q.   All right.  Now, what did you
18 understand when he said he wanted to put
19 some budgetary idea in your ear?
20    A.   So let's just see.  So the
21 first issue was that Bob -- we were
22 looking for ways to compensate Bob.  He
23 was very helpful to the program, so how
24 can we make sure that Bob gets
25 compensated.  He was -- he was not good

72 (Pages 585 - 588)

Page 589

WILSON

1    WILSON
2  at administrative -- you know, dealing
3  with budgets because he just didn't know
4  how.  So -- so we were trying to set up a
5  micro budget -- as I recall, for -- for
6  every like little thing, and there were a
7  lot of little things dealing with our
8  students.  He would come to us, come to
9  us, come to us, and it was like listen.
10  Let's give Bob a micro budget and let him
11  manage that because it is overwhelming.
12  You are dealing with hundreds of students
13  as we were in multiple programs.   So we
14  set up -- so Noel's idea was give him a
15  micro budget, and then he doesn't have to
16  keep coming to us every time he has to buy
17  a pencil or -- or purchase a book for the
18  students.
19     Q.   Did you give Bob Scott money in
20  the form of a salary for him to use?
21     A.   Well, I personally never gave
22  it.  So, no.  I never gave Bob Scott
23  money.
24     Q.   Do you know if Bob Scott got a
25  salary as suggested by Noel in this

Page 590

WILSON

1    WILSON
2  e-mail?
3     A.   I don't know whether he actually
4  got a salary.  I know we talked about it,
5  but I don't know whether he got it.
6     Q.   Okay.  In the second paragraph
7  from the bottom of Noel's e-mail, he says
8  "If we get 100 K from Elliott, the
9  additional 75 K can be devoted to Jamell's
10  salary, and he can report to Noel
11  administratively while keeping you and me
12  aabreast of goings on."
13        First of all, who is Elliott?
14     A.   Elliott would have been Elliott
15  Dawes, and at that time he was the CUNY
16  wide director of the Black Male
17  Initiative.
18     Q.   So was Mr. Dawes the person who
19  allocated money for the Black Male
20  Initiative Program?
21     A.   No.
22     Q.   What was he?
23     A.   He was the director of the
24  CUNY-wide Black Male Initiative Program.
25     Q.   So do you have an understanding

Page 591

WILSON

1    WILSON
2  of what Noel said when he said to you in
3  this e-mail "If we get 100 K from
4  Elliott"?
5     A.   Yes, I have an idea.
6     Q.   What is your idea?
7     A.   The idea is we would propose a
8  budget to Elliott Dawes, and then Elliott
9  Dawes would seek approval from the
10  chancery, and then the chancery would seek
11  the college's approval, and then if all of
12  those approvals were approved then the
13  college would receive the budget to be
14  overseeing and dispensed by the college in
15  ways that would have been approved through
16  DMI, through the chancery and through the
17  college and then distributed by the
18  college, and that is my understanding.
19     Q.   Who is Jamell, J-A-M-E-L-L?
20     A.   He was a graduate student at the
21  the Center For Worker Education, Master's
22  student.
23     Q.   So Mr. Anderson was asking you
24  whether $25,000 should go to Jamell; is
25  that right?

Page 592

WILSON

1    WILSON
2     A.   Well, I see two different
3  numbers, but yes, 20 -- because I see the
4  first one says 75,000, and that was
5  a -- you know, then I see a second one
6  that says 25,000 for Jamell.   I see that.
7  Yes.
8     Q.   And then it says, "I could also
9  give him an extra 5 K," and you understand
10  that to mean $5,000, right?
11     A.   Yes.  K is I believe Latin for
12  thousand.
13     Q.   Okay.  So he says here, "I
14  could also give him an extra $5,000 from
15  Deutsche funds for his work for a total of
16  30 K." Do you see that?
17     A.   I see that.
18     Q.   And the reference to Deutsche
19  funds is monies from the Deutsche Bank
20  Foundation Grant; is that correct?
21     A.   From the Deutsche Fund Brooklyn
22  College Foundation, these were not
23  directly -- I don't know if I am answering
24  your question.
25     Q.   Was the donor -- is the

73 (Pages 589 - 592)

Page 593

1        WILSON
2    reference to Deutsche Funds the Deutsche
3    Bank Foundation?
4        A.   Yes.
5        Q.   Okay.  And I remind me again,
6    sir, if you would what was the purpose of
7    the Deutsche Bank Foundation grant?
8        A.   It was to help graduate students
9    get masters degrees, African American,
10   especially African American males but not
11   exclusively graduate degrees in education,
12   and because Jamell was a graduate student
13   we thought he could help with the graduate
14   program, and the other grant you
15   see -- and so it says he will be covering
16   all of our shops.  So that has to do with
17   graduate and undergraduate work.  That is
18   the reference.
19       Q.   Okay.  So after going through
20   how the hundred thousand dollars from Mr.
21   Dawes could be given to Bob Scott and to
22   Jamell and others it says in the last
23   paragraph "That would leave approx 50 K
24   for you and I to spread for us and show
25   Annie some love, too." Do you see that?

Page 594

1        WILSON
2        A.   I see that.
3        Q.   So you understood that Noel
4    Anderson was suggesting that you and I,
5    that being you and him, could share the
6    $50,000 between you and show Annie some
7    love meaning give her some money as well;
8    is that right?
9        A.   No, that is not right.
10       Q.   How do you understand that?
11       A.   I understand that as we are
12   administering programs.
13   It -- administrative fees were earmarked
14   for the programs written into the grants
15   and proposals that the college approved,
16   and -- and so Annie was assisting with the
17   administration.  So we thought that Annie
18   should be compensated.  So I understand
19   your concern about African American
20   colloquialism, but showing a little love
21   meant to compensate Annie for her work and
22   as well as compensating us for our
23   administrative time, and then there is
24   more information that follows.
25       Q.   Did you go to -- go on a trip to

Page 595

1        WILSON
2    Venezuela with students from the Graduate
3    Center For Worker Education?
4        A.   Yes, I did.
5        Q.   And when did you do that?
6        A.   I don't recall the date.
7        Q.   Do you know the year?
8        A.   Off the top of my head, I don't
9    recall the year.
10       MR. MARK KLEIN:  I am going to
11   ask that the reporter mark as Wilson
12   Exhibit 38 --
13       A.   If I may just amend.
14       Q.   There is no question pending.
15       A.   No, but I am amending.
16       Q.   There is no question pending?
17       A.   You asked me a question on this,
18   and I didn't give you a complete answer.
19   I just want to amend because you stopped
20   at 50 K for the -- for me, Annie, and
21   Noel, and this includes Mr. Patterson, who
22   is our social worker, and then also to
23   hire an administrative assistant to help
24   manage complex programs, and then he -- I
25   am not sure if this was just asking for my

Page 596

1        WILSON
2    opinion.  This is an opinion.  He is
3    asking what do I think about this.
4        Q.   What did you tell him in
5    response?
6        A.   I don't recall what my response
7    was.
8        Q.   Okay.
9        MR. MARK KLEIN:  I ask that the
10   reporter mark as Wilson Exhibit 38 a
11   document bearing the Bates stamps DEF
12   00348 through 470.  Actually that should
13   be through 364.
14       (Wilson Exhibit 38 marked for
15   identification.)
16       (Document handed to witness.)
17       A.   So I just want to amend.
18       Q.   You want to amend again?
19       A.   Yes.
20       Q.   There is no pending question and
21   you want TO amend some more.  Go ahead.
22       A.   Because you asked me what was my
23   response.  And my response was hay Noel
24   perfect so I thought it was a good idea.
25       Q.   Okay.  Thank you.

74 (Pages 593 - 596)

Page 597

```
1          WILSON
2      MR. MARK KLEIN:  I just want to
3  clarify that exhibit 38 includes documents
4  that bear the stamp DEF 000348 through
5  364.
6      (Wilson Exhibit 38 marked for
7  identification.)
8      (Document handed to witness.)
9   Q.   Dr. Wilson, I show you what has
10 been marked as Exhibit 38.   Please review
11 it and tell me when you have done so.
12      (Pause.)
13  Q.   Is that your phone, Dr. Wilson?
14 Would you mind turning that off, please?
15  A.   Excuse me for that.
16      (Pause.)
17  Q.   You have reviewed Exhibit 38,
18 sir?
19  A.   Yes.  It is CUNY 19, Exhibit
20 38.  I have reviewed it.
21  Q.   When you say CUNY 19, this was
22 CUNY Exhibit 19 at the arbitration, right?
23  A.   That's correct.
24  Q.   And you saw it at the
25 arbitration?
```

Page 598

```
1          WILSON
2   A.   Yes, I did.
3   Q.   Okay.  Now, Exhibit 38 is a
4  payment request that you submitted or was
5  submitted on your behalf in connection
6  with your expenses for the class field
7  trip to Venezuela in March of 2009,
8  correct?
9   A.   That's correct.
10  Q.   And Exhibit 38 requests
11 reimbursement for meals, airfare, and
12 lodging, correct?
13  A.   That's correct.
14  Q.   And you received an advance of
15 $3500 for this trip, correct?
16  A.   That's correct.
17  Q.   And then you received another
18 $1,578.71 for a total of $5,078.71,
19 correct?
20  A.   That's correct.
21  Q.   And was that reimbursement for
22 all of your expenses for meals, airfare,
23 and lodging in connection with that trip?
24  A.   No.
25  Q.   Can you identify any meal,
```

Page 599

```
1          WILSON
2  airfare, or lodging expenses that you
3  didn't get reimbursed for?
4   A.   I had other expenses that I
5  didn't get reimbursed for.  So for travel
6  for all the baggage handling and all the
7  trips because there are multiple air
8  trips, ground trips, so I was responsible
9  for tipping for all of the baggage in and
10 out of hotels, which was a significant
11 amount of money, and we had local tour
12 guides.  So I was responsible for tipping
13 which was recommended by the travel agency
14 to -- as a custom you pay them cash.  So
15 those would be big categories that I was
16 not reimbursed for, cash expenditures.
17  Q.   Okay.  Now what students went on
18 this trip?
19  A.   Can I see a roster here?
20  Q.   I don't know.
21  A.   I am asking to take a quick
22 look.
23  Q.   If you go to page 357 at the top
24 of the page, it says this was core 745 G
25 field work Venezuela Graduate Center For
```

Page 600

```
1          WILSON
2  Worker Education, right?
3   A.   Right.  So it would have been
4  graduate students taking 745 G field work
5  in political science.
6   Q.   So graduate center worker
7  education students, right?
8   A.   Correct.
9   Q.   And pages 357 through 360 is
10 itinerary for the course starting on March
11 7 and ending on March 14, correct?
12  A.   That is correct.
13  Q.   Did you receive 5,700 -- I'm
14 sorry.  $5,078.71 in response to your
15 payment request to the Graduate Center For
16 Worker Education account?
17  A.   Well, as it -- as it says on the
18 document, I received $3,500 in advance,
19 and so I gave receipts for that amount,
20 and the additional receipts were provided
21 for $15,789.71, so some was paid in
22 advance.
23  Q.   My question is:  Did you receive
24 a total of $5,078.71 cents from the
25 Graduate Center For Worker Education
```

75 (Pages 597 - 600)

Page 601

```
1          WILSON
2  account in response to your payment
3  request in connection with your trip to
4  Venezuela in March of 2009?
5     A.   Yes.
6     Q.   Okay.  Now, did you make
7  another request for reimbursement for
8  meals and hotel for the same trip? Yes or
9  no.
10    A.   Where do you see that?
11    Q.   I am asking you.  Can you
12 answer the question?
13    A.   Not for the same things, no.
14 The answer is no.
15        MR. MARK KLEIN:  I am going to
16 ask the reporter to mark as Exhibit 39,
17 Wilson 39 a document bearing the stamps
18 DEF 472 through 479.
19        (Wilson Exhibit 39 marked for
20 identification.)
21        (Document handed to witness.)
22    Q.   Dr. Wilson, I show you what has
23 been marked as Wilson Exhibit 39.   Please
24 review it and tell me when you have done
25 so.
```

Page 602

```
1          WILSON
2     (Pause.)
3     A.   I see it.
4     Q.   All right.  Wilson Exhibit 39
5  is a payment request that you submitted to
6  the Brooklyn College travel fund in
7  connection with the same trip to Venezuela
8  in March of 2009, correct?
9     A.   That is correct.
10    Q.   And you sought an additional
11 $500 for reimbursement of expenses in
12 connection with that trip, right?
13    A.   That's correct.
14    Q.   And in this -- if you go to page
15 DEF 0000474.
16    A.   Yes.
17    Q.   Are you there?
18    A.   Yes.
19    Q.   On that form you checked the box
20 that said you were delivering a lecture,
21 right?
22    A.   Yes.
23    Q.   Did you deliver a lecture?
24    A.   Multiple lectures.
25    Q.   To your students?
```

Page 603

```
1          WILSON
2     A.   No, we met with university
3  officials.   We had -- yes -- a number of
4  academic meetings with the university
5  officials, university leaders.  So sure.
6     Q.   So you characterize your
7  meetings with university officials as
8  delivering a lecture?
9     A.   No, as speaking publically with
10 students and their officials, and, yes, so
11 I spoke publically about educational
12 policy, U.S. Venezuelan relations and
13 politics.  Sure.  I spoke on numerous
14 occasions publically.
15    Q.   And you characterize your
16 speaking publically at various meetings
17 with university officials as "delivering a
18 lecture"; is that right?
19    A.   Yes, sure.  Public lectures.
20    Q.   Okay.  Farther down on this
21 page, do you see where it says on the same
22 page, "The fund is almost never able to
23 cover hotel and food costs, but you can
24 list them here." Do you see that?
25    A.   I do.
```

Page 604

```
1          WILSON
2     Q.   And you listed "Hotel 2000,
3  includes hotel two meals," and what is the
4  next word? Something fees, custodial fees?
5  Am I reading that right?
6     A.   I can't quite make it out.
7     Q.   Is that in your handwriting?
8     A.   Maybe conference fees.
9  Conference fees, yes.
10    Q.   So you had identified the total
11 registration and travel fees as $3,000,
12 right?
13    A.   That's correct.
14    Q.   In Wilson Exhibit 38, you sought
15 reimbursement and received reimbursement
16 for $5,078.71; is that right?
17    A.   That's correct.
18    Q.   Going back to Wilson Exhibit 38,
19 pages 357 through 360 sets forth --
20    A.   Hold on.  I am not with you.
21 357.
22    Q.   Through 360.  It sets forth the
23 itinerary for the trip, right?
24    A.   Yes.
25    Q.   Does that identify any instance
```

76 (Pages 601 - 604)

Page 605

1          WILSON
2  in which you were to give a lecture?
3      A.   I lectured every day.
4      Q.   Can you answer my question, sir?
5      A.   Let's just see here.  Yes.
6      Q.   Where?
7      A.   It says on bullet point 2 "Both
8  class pretrip orientation and field
9  participation are key elements of this
10  course.  I was the leader of the class.
11  I conducted the pretrip orientation, and I
12  conducted and orchestrated the field
13  participation, so that is the first
14  elements that I see.
15      Q.   So the pretrip orientation, that
16  was before the trip, right?
17      A.   That's right, as a leader of the
18  course.
19      Q.   Now, you claim in Exhibit 39
20  that between March 9 -- on the trip on
21  March 9 to March 13 you delivered a
22  lecture, right?  Yes or no.
23      A.   Yes.
24      Q.   Okay.  So what happened in the
25  pretrip orientation isn't relevant to your

Page 606

1          WILSON
2  application for $500 set forth in Wilson
3  Exhibit 39, right?
4      A.   No.
5      Q.   Yes or no?
6      A.   No, because it is -- the answer
7  is no.
8          MR. JAMES KLEIN:  I object to
9  the form of all these questions.
10          MR. MARK KLEIN:  Okay.  Your
11  objection is noted, counsel.
12      A.   The answer is no.
13      Q.   So you're telling me today that
14  when you wrote on Exhibit 39 that you
15  delivered a lecture in connection with --
16      A.   Wait.  Show me.  I have to
17  find the exhibit you are talking about.
18      Q.   You have it open in your right
19  hand, sir.
20      A.   Okay.  What page?
21      Q.   374.
22      A.   Okay.
23      Q.   That is a travel request for the
24  2008-2009 academic year, right?
25      A.   Yes.

Page 607

1          WILSON
2      Q.   The date of the travel request
3  form that you filled out is 2/18, February
4  18, correct?
5      A.   Okay.  February 18.
6      Q.   Yes?
7      A.   Yes.
8      Q.   And you signed it.  That is your
9  signature towards the bottom of the page,
10  right?
11      A.   Correct.
12      Q.   And the date that you put next
13  to your signature was 2/18/09, 2009,
14  right?
15      A.   Correct.  2019.  Yes, 2018,
16  correct.
17      Q.   And on that form you put an X
18  next to the word delivering a lecture,
19  right?
20      A.   Yes.
21      Q.   And you are telling me that when
22  you put that X next to the words
23  delivering a lecture you were referring to
24  pretrip orientation; is that right, sir?
25          MR. JAMES KLEIN:  I am

Page 608

1          WILSON
2  objecting to the form of the question.
3      Q.   Yes or no?
4      A.   No.
5      Q.   Okay.  Now, again, I ask you on
6  pages 357 through 360 is there any
7  reference to you delivering a lecture?
8          MR. JAMES KLEIN:  I am objecting
9  to the form of the question.
10          MR. MARK KLEIN:  Your objection
11  is noted, counsel.
12      A.   Yes.
13      Q.   Where?
14      A.   Field PARTICIPATION.  I was
15  field leader.  Field leaders deliver
16  lectures.  That is what they do.
17      Q.   All right.  Well, I am not
18  going to spend a lot more time on this,
19  but the bullet point that you are
20  referring to says in full on page 357
21  "Both class pretrip orientation and field
22  participation are a key element of this
23  course and will represent 40 percent of
24  the final grade."  Right?  That is what it
25  says, right, Dr. Wilson?

77 (Pages 605 - 608)

Page 609

WILSON

1
2   A.   That is what it says.
3   Q.   So you were telling your
4   students who were going to take this
5   course and go on the trip to Venezuela
6   that they had to participate in the
7   pretrip orientation and field
8   participation during the trip because that
9   was going to represent 40 percent of their
10  grade, right?
11  A.   Right.
12  Q.   That didn't have anything to do
13  with what you were going to do, right,
14  sir?
15       MR. JAMES KLEIN:   I object to
16  form.
17       MR. MARK KLEIN:   Your objection
18  is noted counsel.
19  A.   False.
20  Q.   So --
21  A.   That is not true.
22  Q.   You think that bullet point
23  refers to what you are requesting to do;
24  is that right, sir? Is that what you are
25  telling me?

Page 610

WILSON

1
2   A.   In part, yes.  Running the trip
3   and speaking, lecturing every day.
4   Q.   Is there anything else besides
5   the bullet point we just talked about on
6   pages 356 through 360 that identified your
7   delivering a lecture?
8        MR. JAMES KLEIN:   I object to
9   the form of the question.
10       MR. MARK KLEIN:   Your objection
11  is noted.
12  A.   As the leader of the trip,
13  faculty leader who spoke every single day
14  at every event and forum, let me see if my
15  name is on the syllabus, yes.  Here it is
16  on the top, Professor Joseph Wilson.  That
17  means that I was conducting lectures.
18  That is what professors do, so that is
19  what I did, yes, lectured every day.
20  Q.   Okay.  That is your answer?
21  A.   That is my answer.
22       MR. MARK KLEIN:   I am going to
23  ask the reporter to mark as Exhibit 40 a
24  document bearing Bates stamps DEF 295
25  through 297.

Page 611

WILSON

1
2        (Wilson Exhibit 40 marked for
3   identification.)
4        (Document handed to witness.)
5        THE WITNESS:  By the way, let's
6   keep track of the time.
7   Q.   We haven't gone 7 hours today,
8   and we are going to go 7 hours today.
9   A.   So what time would that be.
10  Q.   I don't know.
11  A.   Let's figure it out.  I need to
12  know.
13  Q.   I am almost done, and if you
14  cooperate we will be done very soon, but
15  if you don't we won't be done soon.
16       I show you what has been marked
17  as Exhibit 40, Dr. Wilson.  Please take a
18  moment to review that.
19  A.   Are you done with these?
20  Q.   Yes.
21       (Pause.)
22  A.   Okay.  Let's see.
23  Q.   I didn't ask you anything, sir.
24  Have you reviewed this document?
25  A.   Not yet.

Page 612

WILSON

1
2   Q.   My question to you is have
3   you -- have you seen this before?
4   A.   I don't recall it at the moment.
5   Q.   Do you see that it was Exhibit
6   13 A at the arbitration?
7   A.   Yes, I do.
8   Q.   Do you recall this being an
9   exhibit at the arbitration?
10  A.   I don't, but I see it was.
11  So --
12  Q.   Do you recall that PSC/CUNY
13  provided travel fund for partial financial
14  reimbursement to members of the bargaining
15  unit for attendance at professional
16  meetings and conferences related to their
17  work at the college?  Do you recall that,
18  sir?
19  A.   I recall these were PSC/CUNY
20  staff funds, Professional Staff Congress.
21  They defended my use of these funds.
22  That is what I recall.
23  Q.   Exhibit 39, sir, were you
24  applying for $500 for PSC/CUNY funds?
25  A.   Yes.

78 (Pages 609 - 612)

Page 613

WILSON

1
2      MR. MARK KLEIN:  I am going to
3  ask the reporter to mark as Exhibit 41 a
4  document bearing the Bates stamp DEF 346
5  and 347, and it appears that some of the
6  Bates stamp numbers have been cut off in
7  the copying.
8          (Wilson Exhibit 41 marked for
9  identification.)
10          (Document handed to witness.)
11      Q.   Dr. Wilson, I show you what has
12  been marked as Exhibit 41, sir.  Could
13  you look at the document I have handed
14  you?
15      Q.   You are looking at two other
16  exhibits, which I am not asking you about.
17      A.   So 41.  I see it.  Let me look
18  at it.  Hold on.  This is from Noel
19  Anderson.
20      Q.   These are a series of e-mails
21  which you can see.
22      A.   Yes, I see it.
23      Q.   All right.  Now, do you recall
24  seeing this document before today?
25      A.   No, but I see it was in a -- in

Page 614

WILSON

1
2  arbitration.
3      Q.   It was Exhibit 17 D in the
4  arbitration, correct?
5      A.   Yes.
6      Q.   Now, the e-mail at the bottom of
7  the first page is an e-mail from Noel
8  Anderson to Annie London, correct?
9      A.   Yes.
10      Q.   And it was sent on Thursday, May
11  5, 2011 at 1:27 p.m., correct?
12      A.   That's correct.
13      Q.   And Mr. Anderson said to
14  Ms. London "Tell Joe to rearrange the
15  budget, so that there is a travel 'line'
16  within the Children's Services account and
17  BFACF.  That means he can rework the
18  numbers, so he can draw on let's say 2,000
19  for 'Field trips/travel' or why not have
20  the money transferred to member org, so he
21  could draw on it that way through
22  reimbursement."
23          Do you recall any discussion
24  with Ms. London about that subject matter,
25  sir?

Page 615

WILSON

1
2      A.   No.
3      Q.   Now, do you have an
4  understanding of what Mr. Anderson meant
5  when he referred to a "travel line within
6  the Children's Services account at BCF"?
7      A.   No.
8      Q.   BCF refers to Brooklyn College
9  Foundation, right?
10      A.   That is correct.
11      Q.   And the Children's Services
12  account --
13          MR. MARK KLEIN:  Withdrawn.
14      Q.   The trips that you went on for
15  field work involved graduate center worker
16  education students, correct?
17      A.   That's correct.
18      Q.   And so those trips were
19  unrelated to ERIS programs, correct?
20      A.   One second.  Yes, that's
21  correct.
22      Q.   And the Office of Family and
23  Children's Services grant was for ERIS
24  programs, right?
25      A.   That is correct.

Page 616

WILSON

1
2      Q.   Mr. Anderson was suggesting that
3  you put in a travel line within the
4  children services account even though the
5  children services account related to ERIS
6  and not the Graduate Student of Worker
7  Education, right?
8      A.   My understanding from -- from
9  this because -- I am not sure what he was
10  referring to.  Let's see -- I don't see a
11  comment from me on this, so I don't know
12  what this is.  It has to do with me.
13      Q.   So it is your testimony that you
14  never had a discussion with Ms. London
15  concerning that subject matter; is that
16  right?
17      A.   I don't recall that.
18      Q.   Okay.
19          MR. MARK KLEIN:  I am going to
20  ask the reporter to mark as Wilson Exhibit
21  42 a document that bears the Bates stamps
22  DEF 000242 through -- it looks like it is
23  DEF 000240 through 242.  It looks like
24  the numbers have been cut off in the
25  copying.

79 (Pages 613 - 616)

Page 617

WILSON

1
2     (Wilson Exhibit 42 marked for
3 identification.)
4     (Document handed to witness.)
5     Q.   Dr. Wilson, I show you what has
6 been marked as Wilson Exhibit 42?
7     A.   Before we do that, I have an
8 amendment to a previous comment.
9     Q.   Yes.
10    A.   If you refer to Exhibit No. 39,
11 if you look at the second page, if you
12 read the letter from the executive
13 director of the Venezuelan Information
14 Office addressed to me, Dear Professor
15 Wilson on behalf of the information office
16 it confirms our invitation to participate
17 in conference addressing issues of urban
18 policy north/south perspective.  It says
19 the meeting will be held in Caracas.  We
20 have discussed conference and exchange
21 will include policy makers, scholars, and
22 professions from a range of fields and
23 disciplines.   We look forward to the
24 presentations and perspectives from your
25 delegation of which I was the delegation

Page 618

WILSON

1
2 leader.   Then they continue that this was
3 a bilateral exchange meaning an academic
4 education exchange.  Page 0471.
5     Q.   All right.   So as long as you
6 brought that up, I am going to show you
7 what was marked as Exhibit 38 that we
8 talked about before.  Do you have that in
9 front of you, sir?
10    A.   I do.
11    Q.   And if you go to page 358.
12    A.   358.
13    Q.   That is the itinerary you
14 prepared for this trip for March 9, 2009,
15 correct?
16    A.   That is correct.
17    Q.   And that reflected that in the
18 morning you were going to have breakfast
19 at the hotel.   You were going to visit
20 Fabrizio Ojeda, correct?
21    A.   I'm sorry.  Which page are you
22 on now, 358?
23    Q.   Yes?
24    A.   What line?
25    Q.   The itinerary for Tuesday, March

Page 619

WILSON

1
2 9.  You see that, don't you, sir?
3     A.   Tuesday, March 9.
4     Q.   We are talking about March 9?
5     A.   I see it.
6     Q.   And you pointed out to me that
7 this letter that you submitted in
8 connection with your application for $500
9 from the Brooklyn College Fund college
10 travel fund referred to a conference and
11 meeting on March 9, 2009, correct?
12    A.   That's correct.
13    Q.   So the itinerary that you
14 prepared and submitted in connection with
15 your request for payment of $5,078.71
16 including the advance that you had gotten
17 set forth an itinerary for March 9, right?
18    A.   Yes, it did.
19    Q.   And does that itinerary include
20 any reference to a conference and meeting
21 at the Bolivian University?  Yes or no,
22 sir.
23    A.   The following day, absolutely it
24 does.
25    Q.   On March 10?

Page 620

WILSON

1
2     A.   That's correct.
3     Q.   So the letter that you submitted
4 in connection with your request for $500
5 had the wrong date on it, is that it?
6     A.   No.   What it says is the letter
7 of February 10 says we will be in touch
8 with the logistical specifics as we firm
9 up the list of Venezuelan participants
10 meaning when you travel things change a
11 little bit, and things changed slightly
12 when we were actually on the ground.   So
13 that is what that means.  It is a
14 confirmation of what I said originally
15 that, yes, this was an academic event that
16 I presented lectures, and this is
17 confirmation of that in advance in the
18 itinerary.
19    Q.   Okay.  Well, first of all, the
20 February 10, 2009 letter that appears at
21 DEF 471 that you submitted in connection
22 with your request for $500 reimbursement
23 from the Brooklyn College travel fund
24 refers to a quote conference and meeting
25 at the Bolivian University the week of

80 (Pages 617 - 620)

WILSON

1
2 March 9, 2009, correct?
3    A.   That's correct.
4    Q.   Now, your itinerary for
5 Wednesday, March 10 refers to "Meet with
6 representatives from Bolivian University
7 to discuss programs for community
8 involvement, community health, and
9 environmental studies and gain overview of
10 the university's mission, discussion with
11 director of cooperation, Professor Julio
12 Veras to learn about the new community
13 development/social work degree program."
14 Right?
15    A.   That's correct.
16    Q.   Does that refer to your
17 delivering a lecture?  Yes or no.
18    A.   In those days of deliberations
19 we had public lectures and exchanges,
20 absolutely, through and -- and if you look
21 through the afternoon.  So yes.
22    Q.   Lunch at the university, meeting
23 with representatives of the ministry and
24 discuss mission of popular democracy.  So
25 I spoke publically at every one of these

WILSON

1
2 events.
3    Q.   And you consider that delivering
4 a will speech justifying your request for
5 $500 for travel funds from the Brooklyn
6 College travel fund organization; is that
7 correct?
8    A.   These --
9    Q.   Yes or no.
10    A.   It is not a yes or no.  These
11 are scholarly lectures.  They require
12 research, preparation, understanding of
13 policy, collaborating with other scholars.
14 So the answer is absolutely yes. This is
15 scholarly and academic.
16    Q.   Was this something you attorney
17 pointed out to you, the page from Exhibit
18 39 that you wanted to bring to my
19 attention?  Is that something that Mr.
20 Klein pointed out to you a moment ago?
21    A.   I didn't hear him say anything,
22 if that is your question, but I am glad I
23 noticed it.
24       MR. JAMES KLEIN:  Just for the
25 record, he pointed it out to me.

WILSON

1
2    Q.   All right.  Now, directing your
3 attention to Exhibit 42, sir.
4    A.   I am lost.
5    Q.   If could you look at Exhibit 42
6 and tell me when you are done.
7       (Pause.)
8    A.   Okay. 42, yes.
9    Q.   Have you seen Exhibit 42 before?
10    A.   Yes, I see that.  Well, I didn't
11 read all of it.  I just read the first
12 page.  So give me a minute.
13    Q.   I am directing your attention to
14 the first page of Exhibit 42?
15    A.   Yes.
16    Q.   I am frankly not clear whether
17 the second and third pages are part of
18 this exhibit or not or should be.  In
19 fact, why don't we just remove the second
20 and third pages.
21    A.   From this evidence or exhibit or
22 whatever? You want me to --
23    Q.   Hold on.
24       MR. JAMES KLEIN:  You don't do
25 anything.

WILSON

1
2       THE WITNESS:  He said --
3       MR. JAMES KLEIN:  It is his
4 exhibit.  He will do what he thinks is
5 right.
6    A.   I thought he asked me.
7    Q.   Let's keep it all part of one
8 exhibit.
9    Q.   The first page of Exhibit 42
10 below Rachel Nash's name appears.
11    A.   Yes.
12    Q.   There is an e-mail from Paisley
13 Currah to you dated September 27, 2011.
14    A.   Yes.
15    Q.   Do you recall -- and the subject
16 of the e-mail is multiple position form,
17 right?
18    A.   Yes.
19    Q.   Do you recall getting that
20 e-mail?
21    A.   I do.
22    Q.   And did you respond to it?
23    A.   Yes, I did.
24    Q.   How did you respond?
25    A.   I had a meeting with Paisley.

WILSON

2  Q.  And what did you say at the
3  meeting?
4    A.  I said why are you attacking my
5  ability to manage and administer this
6  program, and, you know, there had never
7  been any issues about my program
8  administration, the grants.  The
9  university approved it, the faculty,
10 provost, et cetera, et cetera, and
11 suddenly Paisley was elected.  So I viewed
12 this as a form of harassment to attack the
13 Black Male Initiative Project and me
14 personally to undermine it and sabotage
15 it.
16   Q.  When was this meeting with
17 Professor Currah?
18   A.  It would have been shortly after
19 I got the e-mail, maybe the following week
20 or that week.
21   Q.  Do you have any notes of that
22 meeting?
23   A.  No.
24   Q.  That is a no?
25   A.  That is a no.

WILSON

2  Q.  Did you respond to Professor
3  Currah's e-mail in writing?
4    A.  I don't recall.  I may have.
5    Q.  Now, the last two sentences of
6  the first paragraph of Professor Currah's
7  e-mail says, "You have been getting
8  compensated for work for ERIS for quite
9  some time, and the situation is no longer
10 'Short term'.  We wanted to give you
11 plenty of advance notice, so that you will
12 have time to make other arrangements for
13 next semester either using the grant money
14 to buy yourself out of teaching or hiring
15 individuals to do the work." Do you see
16 that?
17   A.  I am just asking if you see
18 that?
19   A.  Yes, I see that.
20   Q.  And did you make any other
21 arrangements as Professor Currah
22 suggested?  Yes or no.
23   A.  Yes.
24   Q.  What other arrangements did you
25 make?

WILSON

2    A.  We were looking to bring in
3  additional help, additional staffing
4  because we had a very active program that
5  we were successfully administering and
6  then suddenly short term Paisley Currah
7  decided to essentially attack me and stop
8  my ability to receive compensation for
9  work that I was doing, and if you look at
10 the -- it says urgently needed, yes.  My
11 work was urgently needed because without
12 my work the program would have collapsed.
13 So it was urgent, but Paisley didn't care
14 about the urgency or who I was helping or
15 what I was doing.  It was about, you
16 know, retaliation.  Paisley was chair,
17 newly elected chair I might add.   No.
18 No strike that.
19   Q.  When was Paisley Currah elected
20 chairman of the political science
21 department?
22   A.  I am not sure of the data on
23 that, but it would have been that time
24 frame.
25   Q.  You and he ran against each

WILSON

2  other, right?
3    A.  That is correct.
4    Q.  And he won; is that right?
5    A.  Yes, he won.
6    Q.  Do you know what the vote was?
7    A.  It was close.  I don't remember
8  what the exact vote was.
9    Q.  On a different subject, did
10 Professor Day send you a thank you note
11 for donating your hundreds of books which
12 you could potentially use for tax
13 purposes?
14   A.  May I see what you are referring
15 to?
16   Q.  Can you answer my question?
17   A.  May I see what you are referring
18 to?
19   Q.  Answer my question.
20   A.  Show me the document, and I will
21 answer your question.
22   Q.  Did professor -- yes or no.
23 Did Professor Day send you a thank you
24 note for donating your hundreds of books?
25   A.  That is my recollection.

82 (Pages 625 - 628)

Page 629

WILSON

1
2    Q.   Have you produced the thank you
3 note that Professor Day sent you?
4    A.   Well, I can tell you that the
5 thank you note is not one of the 50 pages
6 of documents that we looked at earlier
7 today.
8    A.   Okay.
9    Q.   Right?
10   A.   Apparently.
11       MR. MARK KLEIN:  I ask that you
12 produce that thank you note.
13       MR. MARK KLEIN:  All right.  I
14 have no further questions of Dr. Wilson at
15 this time.  I reserve the right to ask
16 further questions of him when I receive
17 production of the various categories of
18 documents I have asked for during the
19 course of this deposition and that were
20 asked for in our document request in this
21 case.  So thank you Dr. Wilson.
22   A.   May see that?
23   Q.   I am not marking it as an
24 exhibit.  It is a document we produced.
25   A.   Okay.

Page 630

WILSON

1
2       MR. JAMES KLEIN:   Can I get a
3 reference from the reporter --
4       MR. MARK KLEIN:  On or off the
5 record.
6       MR. JAMES KLEIN:   There is a
7 question I have.  I made an objection at
8 some point with regard to Exhibit 25 when
9 he asked for the reference from one
10 document to -- one document he wanted to
11 know whether there was anything related to
12 Exhibit 25 mand I didn't write down what
13 that other document was that he was asking
14 the reference about.
15       MR. MARK KLEIN:  I don't know
16 why this should be on the record.  I
17 don't want to pay for you to ask a
18 question of the court reporter.  I have
19 no objection to the court reporter giving
20 you the information if she can find it,
21 but I don't want this on the record.
22   A.   I just wanted to amend one point
23 that --
24   Q.   I have no further questions at
25 this time.  So there is nothing to amend,

Page 631

WILSON

1
2 Dr. Wilson.
3    A.   I don't have the right to amend?
4    Q.   Not at the moment.  There are
5 no pending questions.  If your counsel
6 wants to ask you questions, he has that
7 right.
8 EXAMINATION BY MR. JAMES KLEIN:
9    Q.   Would you like to amend your
10 answer with regard to Kevin Guscott?
11   A.   I would like to amend my answer
12 with regard to Kevin Guscott.
13   Q.   Please do.
14   A.   Are you typing?
15       So I recall that in response to
16 a question that -- about contact with
17 Kevin Guscott and within the last few
18 weeks -- I can't tell you the precise date
19 -- but it was in January, which was what I
20 originally said I spoke to Mr. Guscott.
21 Mr. Guscott contacted me and said that Mr.
22 Klein had contacted him, and -- and
23 about -- I don't know all of the details;
24 however, I do remember that Mr. Guscott
25 called and asked me if the CUNY attorney,

Page 632

WILSON

1
2 you know, is supposed to be reaching out
3 to him or why is he getting calls from the
4 CUNY attorney.  What does this have to do
5 with, and so I said to my understanding
6 Mr. Klein is not CUNY's attorney, and he
7 said well, you know, do I have to speak to
8 this guy, and I said that is your choice,
9 but I don't think you have to speak to
10 him, and I didn't understand -- I said
11 that it is not my understanding that he is
12 CUNY's attorney.  So my understanding was
13 that that was a misrepresentation that he
14 was representing -- that he is
15 representing CUNY.  I don't think CUNY is
16 a party but anyhow.  That is all I wanted
17 to add.
18       MR. JAMES KLEIN:  Okay.
19 EXAMINATION BY MR. MARK KLEIN:
20   Q.   So you recommended to Mr.
21 Guscott that he not talk with me; is that
22 it?
23       THE WITNESS:  I said it is up to
24 him, no, but he doesn't have to speak with
25 you.

83 (Pages 629 - 632)

WILSON

1
2  Q.   So you told him that he didn't
3  have to speak with me; is that right?  Yes
4  or no, sir.
5  A.   Yes.  I said that he didn't have
6  to speak with you.  That's correct.
7  MR. MARK KLEIN:  All right.
8  Thank you.  I am glad that you provided
9  that modification of your testimony.
10  All right.  Thank you.  We are
11  done for the day subject to my reservation
12  of rights to depose you when I get the
13  documents that you haven't fully produced.
14  (Time noted: 5:40 p.m.)
15
16
17
18
19
20  JOSEPH WILSON, PhD
21
22  Subscribed and sworn to before me
23  this     day of          , 2019
24
25  .

WILSON

1
2  C E R T I F I C A T I O N
3
4
5
6  I, DEBBIE ZAROMATIDIS, a Shorthand
7  Reporter and a Notary Public, do hereby
8  certify that the foregoing witness, JOSEPH
9  WILSON, PhD, was duly sworn on the date
10  indicated, and that the foregoing is a
11  true and accurate transcription of my
12  stenographic notes.
13  I further certify that I am not
14  employed by nor related to any party to
15  this action.
16
17
18
19
20
21
22
23  DEBBIE ZAROMATIDIS
24
25

WILSON

1
2  E X H I B I T S
3
4  WILSON
5  EXHIBIT      DESCRIPTION        PAGE
6  16    Amended Complaint      307
7  17    Third Amended Complaint    354
8  18    Opinion and award      361
9  19    Copy of drawing      364
10  20    Plaintiff's Responses
11  And Objections to
12  Defendants' First Set
13  Of document Production
14  Requests      377
15  21    P 1 through P 50      377
16  22    Plaintiff's Responses and
17  Objections to Defendants'
18  Second Set of Document
19  Production Requests      377
20  23    Drawing      476
21  24    DEF 0001174 through 1178    476
22  25    DEF 00700 through DEF
23  000859      481
24  26    Memorandum of understanding 508
25

WILSON

1
2  E X H I B I T S
3
4  WILSON
5  EXHIBIT      DESCRIPTION        PAGE
6  27    DEF 613 and DEF 614      511
7  28    DEF 656      520
8  29    DEF 226 to 229      530
9  30    DEF 669 through 676      534
10  31    DEF 677 through 684      538
11  32    DEF 000685      544
12  33    DEF 000253      547
13  34    DEF 186 through 193      565
14  35    DEF 000290 through 294    578
15  36    DEF 287      582
16  37    DEF 00652      585
17  38    DEF 00348 through 470      596
18  39    DEF 472 through 479      601
19  40    DEF 295 through 297      611
20  41    DEF 346 and 347      613
21  42    DEF 000240 through 242    617
22
23
24
25

84 (Pages 633 - 636)

Page 637

```
 1        WILSON
 2     LITIGATION SUPPORT INDEX
 3
 4
 5
 6     REQUEST FOR PRODUCTION OF DOCUMENTS
 7     Page    Line    Page    Line
 8     387     3       430     16
 9     445     18      451     18
10     629     11
11
12
13     QUESTIONS MARKED FOR A RULING
14     Page    Line    Page    Line
15     420     14
16
17
18
19
20
21
22
23
24
25
```

Page 638

```
 1        WILSON
 2     ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS
 3     CASE NAME:  WILSON V. CUNY
       DATE OF DEPOSITION: JANUARY 30, 2019
 4     WITNESSES' NAME:  JOSEPH WILSON, PhD
       PAGE LINE CHANGE        REASON
 5     _____
       _____
 6     _____
       _____
 7     _____
       _____
 8     _____
       _____
 9     _____
       _____
10     _____
       _____
11     _____
       _____
12     _____
       _____
13     _____
       _____
14     _____
       _____
15     _____
       _____
16     _____
       _____
17     _____
       _____
18     _____
19     _____
20     JOSEPH WILSON, Phd
21     SUBSCRIBED AND SWORN TO BEFORE ME
       THIS ____ DAY OF _____, 20__.
22
23     _____
24     (NOTARY PUBLIC)
25     MY COMMISSION EXPIRES:
```

85 (Pages 637 - 638)

[& - 2010]                                                                 Page 1

| & |
| --- |
| **&**   536:13 537:5,10 540:12 542:13 |

| **0** |
| --- |
| **0000474**   602:15 |
| **0001174**   476:16 635:21 |
| **000240**   616:23 636:21 |
| **000242**   616:22 |
| **000253**   547:16 636:12 |
| **000290**   578:13 636:14 |
| **000348**   597:4 |
| **000685**   544:24 636:11 |
| **000859**   481:23 635:23 |
| **0023**   304:4 |
| **00348**   596:12 636:17 |
| **00652**   585:7 636:16 |
| **00700**   635:22 |
| **00770**   481:23 |
| **0471**   618:4 |

| **1** |
| --- |
| **1**   380:21,24,25 397:24 399:21 400:6,10,22 403:23 405:6 414:10 419:19 437:13 445:8 446:2 466:25 467:7,11,15 469:12 484:9,14 484:19 548:6 568:12,13,13 635:15 |

**1,578.71**   598:18
**10**   310:20,24 471:24 472:6,7,15 619:25 620:7,20 621:5
**10,000**   560:14,19
**100**   590:8 591:3
**1099**   428:8 429:4
**10:00**   304:12
**11**   311:7 471:8 473:19 637:10
**111**   532:9
**1176**   478:22,22,24
**1177**   479:10
**1178**   476:16 479:21 635:21
**11:07**   455:19
**12**   307:12 308:11 357:18,25 358:4 358:19 432:13 471:8
**12:21**   417:23 418:4
**13**   392:17,22 579:22 605:21 612:6
**14**   392:21 457:19 459:22 460:6,11 600:11 637:15
**15**   304:4 367:13 449:18 451:3 452:11 494:6
**15,000**   550:15 554:24 560:13
**15,789.71**   600:21
**1500**   580:2,22 581:7 583:25 584:23
**16**   307:10,13,17 308:9 309:24 314:8,21 343:4,4

355:22 356:4,18 356:23 357:7,9,10 398:24 404:2,23 635:6 637:8
**16.28.**   536:15
**160**   484:24 487:12
**17**   354:23,25 355:4 355:9,10,12 356:23 357:6 392:16,22,24 404:5,8 405:8 457:20 542:9 614:3 635:7
**18**   361:22,23 362:3 405:11 412:16 413:3 526:6 607:4 607:5 635:8 637:9 637:9
**186**   565:15 636:13
**19**   311:7 364:24,25 397:15 597:19,21 597:22 635:9
**193**   565:16 636:13
**1951**   417:16
**1990**   541:18,20
**1994**   542:5
**1:05**   417:20 418:2 418:3 419:3
**1:27**   614:11

| **2** |
| --- |
| **2**   310:4,6,7,11,12 364:22 384:11,19 397:10,15 400:6 417:16 428:8 429:4 445:17,18 446:5,6,13,22 465:5 469:17,18 469:22 470:10,22 484:9 485:13 493:6 512:3 519:8 529:4,6 605:7 |

**2,000**   522:13 614:18
**2.3**   573:10
**2/18**   607:3
**2/18/09**   607:13
**20**   311:18,22 313:17,20 367:13 367:17 370:14 377:15,20 380:16 397:18 404:7 408:22,24 419:20 423:7 427:18,23 427:24 438:10,13 443:7 478:15 479:14 531:25 545:15 592:3 635:10 638:21
**2000**   604:2
**2004**   532:23 533:13
**2005**   525:23 533:19,22
**2007**   540:13 541:10,15 542:9 542:14
**2008**   569:13
**2008-2009**   606:24
**2009**   484:14,19 512:19 544:16 545:12 570:9,12 572:10 598:7 601:4 602:8 607:13 618:14 619:11 620:20 621:2
**2010**   414:10 428:11 429:5 496:22,25 513:12 513:20 525:23 533:19,22 572:24 573:3 574:6,11,13

**579:**14,19,20,22 580:24 582:10 583:12,17

**2011** 462:19 509:20 548:7 575:6 576:22 586:25 614:11 624:13

**2012** 326:14 328:17,25 344:7 443:8 444:11 449:19 452:11 454:2 455:4,13 456:20 457:13 522:13

**2013** 349:10,13 350:21 361:3 458:2,6,14,24 459:10,14,16,18 459:19,21

**2014** 349:4,7,13 350:22,25 352:9 357:18 358:2,4,19 360:18,20,21 361:3 432:13 457:20 458:9,15 458:25 459:11,15 459:22 460:11 477:21 478:10

**2015** 307:12 308:11 393:19 394:7,9,22 455:4

**2016** 344:14,18 345:11 393:14 395:12 461:13,14 461:15,24 463:20 464:5 478:15 479:15 480:4

**2017** 395:12

**2018** 379:22 465:5 466:2 607:15

**2019** 304:12 607:15 633:23 638:3

**21** 399:9 404:16,19 437:8,10,16,22,23 439:17,19,21,22 439:24,25 440:2 441:13 635:15

**22** 404:5,8,9,17,21 405:16 442:6,7,15 453:25 454:10,11 454:17 455:4,13 455:18 464:21,22 635:16

**226** 530:17 636:8

**229** 530:18 636:8

**23** 311:18,22 313:18,20 377:15 379:22 414:5 442:7 456:20 457:13 476:7,11 512:18 635:20

**24** 444:24,25 445:2 445:5,23,24 446:8 446:15 454:20 476:15,17,21 477:8 635:21

**242** 616:23 636:21

**25** 328:8 329:5,16 331:9 344:10 348:8,9,20 367:17 370:14 385:14 406:17 408:23,24 408:24 428:7 430:18 441:21 445:10 446:18,18 446:20,23 447:24 450:14 481:21,24 482:4,20 490:16 490:19 491:11 492:7 493:2

**495:**20 496:3,4,5,5 498:3 501:21 506:24 524:3,13 525:6 630:8,12 635:22

**25,000** 591:24 592:6

**252.46** 520:24

**26** 446:24 508:21 508:23 509:3 510:16 635:24

**27** 449:17 511:16 511:20,24 512:5 513:19 624:13 636:6

**28** 305:15 308:9,23 309:3 520:5,7,11 523:9 542:7 583:16 586:25 636:7

**287** 582:20 636:15

**29** 414:6,7 446:16 459:17,21 530:17 530:19 531:18 532:5 636:8

**2900** 560:12

**293** 585:16

**294** 578:13 636:14

**295** 610:24 636:19

**297** 610:25 636:19

**29th** 464:4

**2:15** 588:2

**2:34** 449:19

**3**

**3** 360:9 384:22,25 385:4,11 386:2,10 386:17,23 400:6 445:11,25 446:7,9 446:16,17 471:3 484:9 637:8

**3,000** 376:19 529:4 529:6 604:11

**3,500** 600:18

**30** 304:12 427:5 430:23 452:6,7 505:20 534:6,12 534:13,17,22,25 562:6 592:16 636:9 638:3

**307** 635:6

**30th** 583:16

**31** 423:7 427:18,19 428:2,2 432:9,25 434:3,16,22 439:17,21,25 538:15,19,23 539:9 540:7 544:2 636:10

**32** 384:7,8 435:9 436:7,13,25 489:16,17 512:12 512:14 544:23,25 545:5 636:11

**33** 547:15,17,21 548:3 566:6,9,11 566:12,13 636:12

**34** 438:15 442:25 443:4 444:25 445:3 452:24,25 453:2,4 548:25 565:15,18,22 566:12 568:7,8 569:11 572:8 636:13

**346** 613:4 636:20

**347** 613:5 636:20

**35** 430:20 454:22 454:24,25 520:19 578:11,14,18 581:13 585:24 636:14

**[3500 - 7]**

| | | | |
|---|---|---|---|
| **3500** 598:15 | 467:5,6,8,10 | **5** | **59** 488:4 |
| **354** 635:7 | 471:13,15 480:3 | | **59.07** 484:25 |
| **356** 610:6 | 496:22 513:12,20 | **5** 384:7 388:25 | 487:12,15 497:9 |
| **357** 599:23 600:9 | **4,725** 496:24 | 389:5,12 400:15 | **596** 636:17 |
| 604:19,21 608:6 | **40** 406:19 427:5 | 400:22 403:24 | **5:16** 460:12 |
| 608:20 | 438:11,13 457:16 | 405:6 461:23 | **5:40** 633:14 |
| **358** 618:11,12,22 | 457:18 458:8 | 466:24,24 467:12 | |
| **36** 432:9 456:17 | 460:4,7,9 608:23 | 469:18 540:13 | **6** |
| 582:19,21,25 | 609:9 610:23 | 542:13 583:12 | **6** 384:23 471:3 |
| 636:15 | 611:2,17 636:19 | 592:9 614:11 | 478:14 509:20 |
| **360** 600:9 604:19 | **40,0000** 491:19 | **5,000** 559:24 | **6,2000** 532:24 |
| 604:22 608:6 | **41** 461:17 613:3,8 | 592:10,14 | **60** 405:2 |
| 610:6 | 613:12,17 636:20 | **5,078.71** 598:18 | **601** 636:18 |
| **3608** 450:2,5,7 | **42** 378:13,15,22,23 | 600:14,24 604:16 | **611** 636:19 |
| **361** 635:8 | 378:24 379:8,15 | 619:15 | **613** 511:19 636:6 |
| **364** 596:13 597:5 | 462:24 463:2 | **5,700** 600:13 | 636:20 |
| 635:9 | 616:21 617:2,6 | **50** 376:24 437:14 | **614** 511:19 636:6 |
| **37** 438:19 585:5,8 | 623:3,5,8,9,14 | 439:3 537:18 | **617** 636:21 |
| 586:15,20 636:16 | 624:9 636:21 | 538:5,6,11 593:23 | **62** 357:6,11 359:21 |
| **374** 606:21 | **420** 637:15 | 595:20 629:5 | 360:7 432:11 |
| **376** 508:22 | **430** 637:8 | 635:15 | 435:12 |
| **377** 635:14,15,19 | **445** 637:9 | **50,000** 594:6 | **629** 637:10 |
| **38** 458:3,4 595:12 | **45** 398:9,14 417:24 | **500** 602:11 606:2 | **65** 417:6,7,13 |
| 596:10,14 597:3,6 | 417:25 | 612:24 619:8 | **656** 520:6 636:7 |
| 597:10,17,20 | **4500** 550:15 552:6 | 620:4,22 622:5 | **669** 534:7 636:9 |
| 598:3,10 604:14 | 552:8,20,23 | **501c** 360:9 | **67.50** 497:6 |
| 604:18 618:7 | 554:23 | **508** 635:24 | **671** 536:8 |
| 636:17 | **451** 637:9 | **511** 636:6 | **676** 534:7 636:9 |
| **387** 637:8 | **46** 309:17,22 | **520** 636:7 | **677** 538:16 636:10 |
| **39** 304:17 305:6 | **470** 596:12 636:17 | **53** 309:7 | **684** 538:17 636:10 |
| 601:16,17,19,23 | **471** 620:21 | **530** 636:8 | |
| 602:4 605:19 | **472** 601:18 636:18 | **534** 636:9 | **7** |
| 606:3,14 612:23 | **4729** 501:22 | **538** 636:10 | **7** 310:4,6,7,10,11 |
| 617:10 622:18 | **476** 635:20,21 | **54** 309:5 | 310:12,19,24 |
| 636:18 | **479** 601:18 636:18 | **544** 636:11 | 399:14,22,25 |
| **3919** 634:22 | **481** 635:23 | **547** 636:12 | 400:23 403:24 |
| | **49** 306:20 307:24 | **565** 636:13 | 405:6 471:13,16 |
| **4** | **4:03** 461:24 | **571** 493:12 | 471:24 472:5,7,10 |
| **4** 380:16,17 387:21 | **4:10** 451:4 | **578** 636:14 | 472:14,17,25 |
| 387:23 388:2,8 | | **582** 636:15 | 477:20 478:9 |
| 399:22 400:7,10 | | **585** 636:16 | 600:11 611:7,8 |
| 445:14 446:10 | | | |

**717** 569:22 570:19
572:13 573:7
577:4,5
**7170** 574:17
**740** 573:24 574:3,4
**745** 570:20 573:25
574:2 575:23
599:24 600:4
**75** 590:9
**75,000** 592:4
**770** 488:3
**771** 485:14
**772** 484:5,7,10,13
484:14 485:22,23
487:8,10
**791** 570:22
**7:33** 456:21

**8**

**8** 389:2 440:6,17
460:15,20,25
473:19,20 474:9
474:16 488:4
489:16 491:5
492:4,5,22,24
493:5 496:11
**814** 495:21,23
496:10,15,16
**830** 498:3,4,5
**833** 501:3,4,6,21
**84** 483:12,15,19
506:25,25

**9**

**9** 440:6 605:20,21
618:14 619:2,3,4
619:11,17 621:2
**9,451.20** 484:22
485:4 487:12
489:2
**90** 488:4 492:13,15

**a**

**a.m.** 304:12
456:21
**aabreast** 590:12
**abided** 531:16
**ability** 335:19
455:22 517:11
625:5 627:8
**able** 319:3 342:2
345:2 448:25
450:23 603:22
**absolute** 578:4
**absolutely** 326:7
327:16 524:19
525:12 538:3
547:10 580:15
619:23 621:20
622:14
**absurd** 492:16
**academic** 373:12
547:7 587:18
603:4 606:24
618:3 620:15
622:15
**academics** 377:9
**accepted** 353:18
**access** 344:15
348:11,13 354:12
394:24 401:25
402:3,9,13,19,20
447:22 448:8,17
455:22 457:5
461:16
**accompanied**
411:9
**account** 487:5
488:18 491:8
502:2 506:20
507:4,11,12,14,19
507:20,21 532:25
533:2 535:17

546:14 547:8
600:16 601:2
614:16 615:6,12
616:4,5
**accountable**
562:17
**accountant** 429:7
429:8,23
**accounting** 499:21
550:7 562:11
**accounts** 483:25
497:12,19 507:22
510:2,6
**accumulated**
375:13
**accumulating**
376:23
**accurate** 334:24
338:19 339:21
554:13 634:11
**accused** 427:8
**acknowledged**
444:10
**acronym** 587:6
**act** 405:13
**acting** 338:24
**action** 309:8,20
375:18 428:12
572:5 634:15
**actions** 413:12
436:22,23 437:3
552:14 567:5
**active** 533:2 627:4
**activities** 319:12
370:5 494:3
556:14 562:20
**activity** 357:22
358:6,21 370:3
432:14
**acts** 399:3 401:3
404:14 405:25

409:5
**actual** 467:11
556:14 579:21
**add** 401:10 627:17
632:17
**addams** 362:18
**added** 503:13
**addition** 493:22
**additional** 364:16
403:25 404:25
448:11 503:13
555:21 590:9
600:20 602:10
627:3,3
**addressed** 452:17
617:14
**addressing** 617:17
**adequate** 343:14
**adequately** 450:23
**adjunct** 410:6
412:2,3 565:5
**administer** 625:5
**administered**
519:3 526:5 567:3
**administering**
504:15 594:12
627:5
**administration**
507:13,17 509:12
509:15,19 570:21
574:3 575:20
594:17 625:8
**administrative**
326:5 397:6
484:23 485:9
496:25 556:16
564:19,23,25
565:12 587:23
589:2 594:13,23
595:23

[administratively - answer]                                              Page 5

administratively
590:11
administrator
347:24 518:24
519:21 522:19
administrator's
510:6
administrators
566:25
admission 354:10
admit 353:9
advance 535:9
598:14 600:18,22
619:16 620:17
626:11
advanced 529:12
affirmative 375:18
572:5
affront 353:6,7
africa 588:13,14
african 504:21
519:14 547:6
587:14,19 593:9
593:10 594:19
africana 346:4
394:4 480:5,13,17
afternoon 621:21
age 417:5
agency 599:13
agenda 585:18
ago 323:5 401:8,16
401:16 402:25
417:14 424:4
503:4 504:6
622:20
agree 398:14
agreement 497:22
514:18 550:10
568:5
agreements
382:17 383:24

505:25 506:9
508:15 517:22
ahead 333:18
349:22 398:13
423:13 436:4
596:21
air 599:7
airfare 584:2,25
598:11,22 599:2
al 304:9
alan 555:16
albums 320:15
325:18 348:16
allegations 341:4
alleged 340:8
399:3 401:3
404:14 405:14,25
409:5 435:12
437:3 438:19
allegedly 349:8
357:19 432:12
435:11
allocated 555:8,10
555:10 556:6
590:19
allotment 527:11
528:21 529:22
532:15
allotments 532:19
533:9
allow 339:10
allowable 533:4
allowed 330:21,23
339:23 461:8,11
allowing 338:21
amend 342:18,21
342:25 353:19,20
364:7,8 406:18
470:12 481:11
504:8 523:6,7,8
595:13,19 596:17

596:18,21 630:22
630:25 631:3,9,11
amended 306:20
307:11 308:10
309:12 310:5
315:2 316:14
343:5,20 354:24
355:20 356:24
635:6,7
amending 507:10
595:15
amendment
354:21 585:14
617:8
amendments
354:20 423:9,11
american 504:21
519:14 547:6
587:15,19 593:9
593:10 594:19
amico 548:14,15
548:23
amount 404:12
485:24 489:2
519:16,19 520:24
522:13 527:10
528:22 529:5,20
554:16 563:6
599:11 600:19
amounts 354:14
ample 517:8
analysis 550:23,25
551:4,13
anderson 505:6
513:16,20,23
514:8 548:4
551:15 554:22
556:22 557:7,12
557:19 559:23
561:18 566:23
567:12 586:21

588:8,11 591:23
594:4 613:19
614:8,13 615:4
616:2
anderson's 558:16
560:11 566:15
angry 335:3
353:10,15
anguish 406:25
407:25 408:6,11
annexed 399:21
400:4,22
annie 327:10
501:13 566:18
567:24 579:10
593:25 594:6,16
594:17,21 595:20
614:8
annual 562:20
annually 527:10
529:21 532:24
answer 316:13
318:20 319:22
330:8 335:20
338:9 339:25
340:11,12 342:19
342:20,24 343:5
343:12,15 344:2
347:2 353:19,21
354:18 376:17
383:19 386:3
390:4,11 392:14
396:5 420:5 421:9
423:9 431:7
433:10,11,12,24
435:2,2 448:13,14
448:24 449:6
455:15 469:6
473:9 474:10
481:16 482:20
490:9,10,11,24

492:19 494:5,19
495:5 500:25
510:9,14 530:22
541:4 546:17
547:11 552:19
561:25 562:3
564:12 595:18
601:12,14 605:4
606:6,12 610:20
610:21 622:14
628:16,19,21
631:10,11
**answered** 312:14
343:19 396:18
406:16 481:17
505:23 507:8
528:8
**answering** 508:14
510:11 592:23
**answers** 321:17
334:9 338:13,18
**anticipates** 404:24
**anybody** 316:3,9
327:11,13 352:21
415:21
**apartment** 475:11
**apologize** 353:11
353:15 439:25
463:9
**apologized** 464:12
479:3
**apologizing**
463:15,25
**apology** 353:18
**apparently** 379:7
440:15 448:24
514:19 533:25
534:3 629:10
**appeal** 363:3,6,13
363:20,22

**appear** 492:6
493:2
**appeared** 306:13
**appears** 446:10,23
467:2 477:20
499:9 511:17,19
512:3 536:12
542:15,16 574:12
582:3 613:5
620:20 624:10
**apple** 319:21
324:22 344:25
347:11 353:25
354:3,5 462:15
**application** 332:19
410:9,10,13
580:22 581:2,6
584:4 606:2 619:8
**applications** 414:8
526:13,22 527:4
528:5,15 535:19
539:21 578:6
**applied** 415:24
584:16
**apply** 410:2
414:23 416:8,11
416:14 527:8
532:22
**applying** 612:24
**appointed** 494:13
494:15 509:18
**appointment**
528:14,17
**appraisals** 562:25
**appraised** 567:23
**appreciate** 336:14
352:23,25 353:2
406:19 510:12
532:2
**apprised** 560:4

**appropriate**
403:15 522:17
524:11,24 525:5,8
525:12 547:10
**appropriated**
549:24
**appropriately**
520:3
**approval** 506:5,11
508:17 509:11
511:12 515:23
516:7 561:7,8
591:9,11
**approvals** 530:2
591:12
**approve** 343:7
466:16 516:3
517:12 529:14
530:6 531:9,15
**approved** 515:3
515:10,12 517:17
529:16,16 535:9
535:13 549:17
552:11 555:6,19
561:5 591:12,15
594:15 625:9
**approving** 517:20
**approx** 593:23
**approximate**
349:11 367:11,16
374:22
**approximately**
344:13 367:13
372:17 376:11
417:14 491:19
545:15
**approximating**
375:4
**april** 344:13,14,18
345:11 394:7
457:19,20 458:9

458:14,24 459:11
459:15 460:11
461:14,14 478:14
478:14 479:14
509:20 544:16
545:12 548:6
579:14,17,19,20
580:24 582:9
583:12,16
**arbitration** 325:12
325:14 363:9
388:8,19,21
412:15,25 414:3
483:7,9,16,19
489:17 495:9,12
507:2,24 512:9,15
515:8 516:9,14
517:3,15,25
520:20 532:9
549:2 554:9
568:14,17,19
597:22,25 612:6,9
614:2,4
**arbitrator** 414:3
495:15 508:2
**area** 396:16 397:7
397:11,13
**areas** 395:24
**argument** 494:11
495:8,16 507:23
508:3
**arguments** 495:12
516:8
**arrange** 402:22
441:20 442:18,21
**arranged** 463:10
**arrangement**
486:14
**arrangements**
481:16 626:12,21
626:24

**arrived** 481:14
  498:13
**articles** 372:25
  375:21
**arts** 351:15 352:7
  360:9 395:23
  435:11
**aside** 493:2
**asked** 306:11
  316:7 317:22
  323:16 338:11
  343:2,10,16,17
  346:5 353:24
  356:11 380:9
  390:22 400:19
  402:2,11 405:21
  412:6 415:10,12
  420:2,25 421:14
  421:25 422:5,11
  422:12,18 423:14
  423:19 424:6,16
  441:4,4 447:15,17
  448:23,23 449:24
  450:13,19 464:17
  464:19 468:17
  469:23 470:2
  471:4 473:4,6
  487:11 490:6,7
  510:15 526:18
  531:5 535:11
  542:18 552:18
  562:5 586:7
  587:22 595:17
  596:22 624:6
  629:18,20 630:9
  631:25
**asking** 315:8,11
  317:20 318:2,18
  318:20 329:12
  333:2 337:3,19
  400:3,9 403:3,6,9

403:19 425:20
  444:2 449:9
  480:16 486:20
  492:13 496:24
  499:22 500:21,22
  547:4 591:23
  595:25 596:3
  599:21 601:11
  613:16 626:17
  630:13
**asks** 334:5 338:6,7
  381:2 405:11
  414:8 432:9 435:9
  438:15 471:14,17
**aspect** 334:15
**aspects** 333:23
**asserted** 306:23
  307:21
**assertion** 347:25
**assigned** 388:11
**assignment** 493:23
  494:25
**assist** 565:11
**assistant** 424:19
  426:5,25 427:10
  580:25 595:23
**assistants** 327:2,5
**assisting** 594:16
**associate** 346:16
**assume** 483:21
  497:11
**assumes** 331:21
**assuming** 521:14
**athens** 583:16
**attached** 430:24
  431:8
**attack** 564:6
  625:12 627:7
**attacking** 625:4
**attempt** 334:15,16
  334:20 339:7

353:4 409:18
  410:14 460:20,22
**attempted** 409:21
  460:23
**attempting** 519:12
**attempts** 392:19
  409:2
**attend** 543:19
**attendance** 612:15
**attended** 536:4
  543:11 553:5,5
**attending** 582:2
  583:21 584:9,17
**attention** 357:6
  380:16,20 392:16
  397:18 421:18
  423:7 427:17
  430:19 439:17
  444:24 449:16
  452:5 462:22
  465:3 476:22
  532:12 560:10
  566:14 622:19
  623:3,13
**attorney** 305:13
  306:10 308:16,18
  309:25 312:4,7
  313:12 314:4
  332:17 343:9,21
  345:22 356:8,9
  363:5,7 401:8
  415:5,8 424:5,7,15
  424:19,20 426:6
  426:25 427:2,9,10
  431:18 435:22
  442:11 447:7,21
  459:8,24 463:5
  477:14 495:11
  622:16 631:25
  632:4,6,12

**attorney's** 312:5
**attorneys** 305:5,14
**audited** 510:7
  535:14
**auditing** 531:11
  550:8
**audits** 530:2
**august** 379:22
  477:20 478:9
  484:22
**authority** 516:2
**award** 361:22
  363:4,13,20 413:2
  527:5,8,22 532:22
  533:5 635:8
**awards** 523:2
  525:15,22 528:17
**aware** 314:20,23
  314:24 315:5
  317:11,15,17
  318:7,11,12,13,25
  319:5,9,13,16,19
  319:24 320:5,9,13
  320:17,22 321:2
  321:18,22 324:3
  324:20,25 325:6
  325:15,21 326:2,7
  326:8,11,20,21
  327:2 363:12
  382:11 403:24
  405:7 409:13
  413:4,6,10,11,13
  413:18,20,21
  420:3 422:10
  458:12,18 459:2,6
  459:22 470:11
  474:14 515:5,7,17
  517:4,7,16 533:8
**ay** 453:22

**b**

**b** 305:10 439:21
449:23 493:6,6
635:2 636:2
**back** 323:15
342:12 355:25
374:4 375:24
377:17 379:11,16
396:5 398:4,7,9,19
417:20 424:17,22
428:6 430:14
438:9 487:8
516:25 520:23
525:13 546:19
568:6 604:18
**background**
311:20 313:19,22
**badger** 338:17
**badgering** 334:10
338:3
**badgers** 334:8
**baggage** 599:6,9
**bags** 395:3
**ball** 463:10,16
464:2,12 479:3
**banging** 334:14,18
**bank** 592:19 593:3
593:7
**barbara** 321:25
323:13,21
**bargaining** 497:21
517:22 612:14
**barnes** 536:13
537:5,9 540:12
542:13
**based** 349:13
352:18 376:20,22
529:14 547:9
550:9,22,22,25
551:3,13 563:24

**basis** 314:6 340:2
456:25 492:11
507:14
**bates** 437:12,12,13
476:16 481:22
508:21 511:16
520:6 530:17
534:6,8 536:8
538:16,17 544:23
547:15 565:15,16
578:12 582:19
585:6 596:11
610:24 613:4,6
616:21
**bathroom** 476:4
**bc** 357:19 359:21
359:24 373:7
463:11 514:5,10
**bcf** 615:6,8
**bear** 597:4
**bearing** 476:15
481:22 508:21
511:16 520:6
530:17 538:16
544:23 547:15
565:15 578:12
582:19 585:6
596:11 601:17
610:24 613:4
**bears** 534:6 536:7
616:21
**bedroom** 475:6,8
**began** 557:2
**beginning** 532:22
533:13 563:12
**begun** 557:20
**behalf** 448:4
509:14 579:13
598:5 617:15
**belief** 380:6

**believe** 316:11
349:10 358:9
360:15 371:18
387:6 393:19
394:6,19 395:11
412:8 416:25
417:6 420:22
436:10 443:17,21
451:15 453:21
456:6 461:13
499:14 502:7
513:7 518:21
545:17 551:14
552:21 556:8
559:15 560:5
568:22 570:22
573:22 580:25
592:11
**believed** 522:16
**belonging** 461:2
**belongings** 456:5
459:10 460:2,21
461:4,7,11
**benefit** 414:14
**benefited** 552:17
**benefits** 414:10,13
416:9,17,21,23
417:4,8,11 499:11
499:16,23 527:23
556:19
**benefitted** 556:18
**bermanson** 499:3
**best** 341:3 367:8
380:5 448:19
470:24 486:6
537:18 538:5,6,11
**beth** 515:8,9
**better** 319:4
523:15 555:18
**bfacf** 614:17

**big** 371:25 374:9
374:10 495:25
599:15
**bilateral** 618:3
**biographies**
585:19
**birthday** 417:15
**bit** 620:11
**black** 571:14
587:7,20 590:16
590:19,24 625:13
**blank** 363:25
368:3
**blanket** 322:24
**blue** 365:3
**board** 511:7,9,11
511:13
**boarding** 543:17
**bob** 587:4,13,14
587:22,24 588:21
588:22,24 589:10
589:19,22,24
593:21
**bolivian** 619:21
620:25 621:6
**book** 339:4,13,14
339:15 373:7
535:2 536:12
537:7 538:12
542:14,20 543:3
544:8 545:23
546:2,3,4 589:17
**bookcases** 373:6
373:19 376:6,6,8
376:12
**books** 320:11
325:17,24 334:14
334:18 348:6
354:7 366:24
373:11,12,12,14
373:17,18 376:11

376:19,24,24
377:2,4,5,7,8
394:24 406:20
441:20 450:18
451:7 453:12,18
455:20 457:5,12
460:16 531:5,5
535:6 540:15,19
541:3 542:17
543:24 544:5,6,11
544:18 546:4,11
628:11,24
**bookshelf** 367:9
450:18
**bookshelves** 366:5
367:24 376:15
**born** 541:16
**bottom** 357:12
372:17 404:16,17
404:18 405:15
441:13 443:3
445:7 449:17
453:4 460:5,7,9
461:22 467:9
469:18 478:22
479:23 484:5
512:17 532:14
566:18,24 567:9
576:4 590:7 607:9
614:6
**box** 580:7 602:19
**boxes** 441:21
461:12 462:7
478:6,9 535:23
**break** 376:14
377:12 397:20,23
397:23 398:6,15
398:18 417:18
433:22 476:4
565:25

**breakfast** 618:18
**breakout** 553:3
**briefly** 377:25
399:19 437:15
578:19
**bring** 342:12
421:11 428:6
622:18 627:2
**broadway** 304:18
305:6 328:8 329:5
329:16 331:9
344:11 348:8,9,20
365:6,10 366:2,3
367:10 385:14
441:21 447:24
450:14 524:3,13
525:7
**brochure** 586:11
**brooklyn** 318:9
328:4,20 329:6,16
331:9 344:12
358:14 364:4
368:4 369:10,21
393:25 394:3
441:25 444:20,21
447:25 449:25
458:23 459:9,25
460:19,24 476:12
478:4 483:25
506:7,18 509:12
509:14,18 510:18
510:21 513:3
514:14,17 515:11
518:14 550:7
556:23 557:13
569:9 571:22
580:11,14 587:16
592:21 602:6
615:8 619:9
620:23 622:5

**brought** 356:6,12
618:6
**budget** 555:6,6,14
561:5 589:5,10,15
591:8,13 614:15
**budgetary** 588:4
588:19
**budgeted** 550:14
552:6 554:23
**budgeting** 552:12
**budgets** 566:16
567:17 589:3
**build** 514:3,9
**building** 366:7
369:24 370:2,5
523:13,16,24
**buildings** 365:22
369:14,20,23
**bulk** 523:12
567:18
**bullet** 605:7
608:19 609:22
610:5
**bunch** 401:9
482:15
**burn** 542:4
**business** 486:8
487:24 499:20,25
500:6 515:18
555:15
**businesses** 562:11
563:16
**butt** 542:14
**buy** 589:16 626:14

**c**

**c** 305:2 449:23
520:19 634:2,2
**cabinet** 366:20
374:6,8,9,23
**cabinets** 366:13,14
366:16,22 371:15

371:16,17,19,20
371:23 372:10,12
372:14,19,20
**calculated** 488:24
489:5,13
**calculating** 404:11
**call** 331:24 332:3
337:14,18 341:25
342:10 353:17
387:3 398:17
424:5,8,17,21
430:16 445:18
451:20,25 585:14
**called** 310:25
311:8,19 313:18
323:14 337:17,22
424:24 505:11
508:15 518:7
522:25 542:14
550:25 564:14,23
631:25
**calling** 335:4
337:22 353:11
**calls** 406:13
407:22 425:18
508:4 632:3
**calmly** 341:2
**campus** 331:10
344:11,15 347:16
348:21 364:5
368:5 369:10,21
441:25 444:7
450:12 481:15
553:7 572:6
**campuses** 526:7
572:3
**capacity** 509:17
541:2
**caracas** 617:19
**care** 342:9 464:6,8
464:8 627:13

careful  559:4
carefully  535:14
  567:2
carry  345:3,4,5
  455:23
case  304:4 306:21
  307:21 308:11
  315:4,6,11,13,15
  315:19 317:5
  318:10 338:20
  340:20 359:12
  362:9 373:8
  386:16,22 388:20
  402:8 403:23
  405:19 406:9
  407:21 408:18
  420:13 424:21
  429:17 437:19
  439:4 446:11
  447:8 473:13
  510:10 517:13
  629:21 638:3
cash  530:23
  533:15 599:14,16
casualty  471:5,19
categories  599:15
  629:17
cause  309:7,20
cba  304:4
cc  440:10,21
cell  331:24 394:14
  394:15,16,17
center  326:13
  328:4 329:4
  351:19 358:15
  370:3 386:25
  395:19 396:10
  484:16,24 487:6
  488:18 491:9
  494:23 497:2
  505:15,19 506:3

506:15,21 507:16
509:9,25 510:3,20
510:22 519:24
521:21 524:7,17
571:9,10,14,19,20
572:2,22 574:9
575:3 576:13
577:14,18,23
580:16,17 591:21
595:3 599:25
600:6,15,25
615:15
central  550:6
  552:11
cents  600:24
certain  369:3
  373:25 399:15
  527:10 528:11,22
  531:13 553:25
certainly  323:25
  354:9 378:12
certification  554:6
certified  554:5
certify  634:8,13
cetera  460:16
  524:21 625:10,10
chain  446:23
  447:4,6
chair  370:23,23,24
  370:24,24 480:5
  480:17,19 499:3
  561:6 562:18,19
  562:21 563:13,24
  627:16,17
chairman  323:22
  480:12 498:23
  511:13 627:20
chairs  370:21
  371:2,5,13 563:3
chance  310:22
  323:6 469:25

chancery  591:10
  591:10,16
change  364:14
  365:4 419:11
  422:20 425:8
  497:21 514:2
  527:24 528:2
  531:2 620:10
  638:4
changed  514:19
  527:17,21 533:14
  575:18,18 620:11
changes  366:11
  426:13,16
changing  365:5
characterization
  482:21
characterize
  482:11,18 603:6
  603:15
characterized
  349:18
charge  319:11
  321:9,10 346:14
  346:16,19,20
  347:5,9,13,23
  348:21 504:6,14
check  359:6
  423:18 486:2,11
  486:12,16 515:10
  520:23 521:3,7,9
  523:17 581:4
checked  514:14
  602:19
checkmark  581:20
  582:4 583:19
cheng  316:20,25
  317:10,13 321:16
  346:11,13,23
  347:9,18 348:5,15
  349:4,14,17 350:5

350:19,25 351:14
  352:10 357:19
  358:5,8,9,20 359:3
  360:3,7,12,22
  361:5,13,15
  432:12 435:10
  436:8
cheng's  351:11
  352:3 436:21
children  501:21
  501:24 502:17,22
  503:5,7,21,23
  541:21 556:11
  616:4,5
children's  502:7
  502:11 550:15
  554:24 555:5,23
  556:2 560:14
  567:13 614:16
  615:6,11,23
choice  632:8
chris  305:8
circumstances
  336:2 447:9
city  318:8 502:14
  502:17,21 503:7
  503:22 504:2
  549:25 555:25
  556:6
claim  308:24
  310:5 315:23
  316:4,10,12,18,25
  317:5,9 356:7,12
  406:8 450:22
  471:18,20 605:19
claimed  408:4
claims  306:24,24
  307:4,19 308:25
  311:9,14 315:4,6
  315:14,18,22
  317:12,21 399:2

[claims - complete]                                                                                                    Page 11

401:2,11 404:13
405:13,19 406:4
407:21 409:4
**clarification**
338:12 341:11
449:12,13 504:13
**clarified** 341:18
504:10
**clarify** 403:3
412:17 432:4
447:14 507:7
564:18 597:3
**class** 452:21
456:25 568:25
570:22,25 573:16
573:16,18,19,21
574:15,17 575:21
598:6 605:8,10
608:21
**classes** 442:18
450:23 569:7
576:2
**cleaning** 524:22
**clear** 362:11 363:8
367:19 385:18
558:23 623:16
**clerk** 332:8,12,18
332:22 333:17
335:15,23 336:20
**clerk's** 340:16,17
**client** 334:5,8,9,17
334:21 338:4,10
338:11,12,17
339:8,25 406:15
435:22 536:25
**client's** 420:20
**clients** 340:22,22
**clippings** 375:22
**close** 482:23 628:7
**coaching** 330:14

**cohort** 587:19
**collaborating**
622:13
**collapsed** 627:12
**collection** 482:15
537:13 538:8
**collective** 497:21
517:22
**college** 318:9
327:7 328:4 329:6
329:16 331:10
344:12 358:14
364:4 368:5
369:10,21 394:2,3
441:25 444:20,22
447:25 450:2
458:23 459:9,25
460:19,25 463:21
463:22 464:6
476:12 478:5
483:25 486:15
487:18 493:24
497:22 499:18
504:8,11,13 506:7
506:18 507:12,17
508:18 509:12,15
509:19 510:18,21
513:4 514:15,17
515:11 517:7
518:12,14 535:7
535:24 536:3
549:17,18 550:7
552:17 555:6,12
556:24 557:13,16
558:24 559:12
563:2 564:18,20
565:4 569:9,23
571:22 573:12,16
573:19 580:11,14
587:16 591:13,14
591:17,18 592:22

594:15 602:6
612:17 615:8
619:9,9 620:23
622:6
**college's** 555:17
559:6 591:11
**collin** 308:16,19
308:21 356:8,9,13
359:16,17 363:5
415:5
**colloquialism**
594:20
**combination**
375:19
**come** 340:14 398:7
398:9,19 408:14
417:20 461:10
463:22 482:21
563:25 589:8,8,9
**coming** 589:16
**comment** 585:14
616:11 617:8
**comments** 349:16
360:23,24 361:6
**commission**
638:25
**commissioned**
351:14
**committee** 522:25
525:15,22 526:2
527:3 528:4 530:3
532:21
**committees**
528:22 563:9
571:23
**commonly** 523:4
**communicated**
411:24 412:7
459:2,5
**communication**
411:14

**communications**
323:25 410:15,18
412:21 454:6,7,9
454:14 458:13,17
458:19,22 459:7
459:13,23
**community**
519:14 551:9
552:3 553:6,9,12
553:13 559:18
562:15,25 563:6
621:7,8,12
**comp** 414:12
**compendium**
482:10,13
**compensate**
588:22 594:21
**compensated**
493:24 527:18
528:3 588:25
594:18 626:8
**compensating**
414:14 416:18
594:22
**compensation**
416:2,9 514:4,10
561:10,15 627:8
**complaint** 306:20
306:23 307:3,11
308:10 309:12,13
314:3,5,15 315:3
316:14 343:5
354:24 355:21
356:24 399:3
401:4 404:15
405:14,25 409:5
432:12 435:13
438:19 635:6,7
**complete** 494:4
530:22 542:24
595:18

completed 409:24 501:17
completely 318:21 557:14
complex 595:24
compliance 563:24
complicated 408:10
comply 563:22
computer 401:21 442:17,22 443:12 443:15,17,19,25 444:9,14,19 445:21 453:15
computers 401:18 401:23
concern 594:19
concerning 448:4 616:15
conclusion 406:13 407:22 425:19,21
conduct 318:5 334:11 335:5 340:25 457:4 474:23 532:20 533:10
conducted 519:10 605:11,12
conducting 610:17
conference 332:3 342:10,14 582:8 582:15 584:9 585:17 604:8,9 617:17,20 619:10 619:20 620:24
conferences 612:16
confirm 420:11 460:15

confirmation 620:14,17
confirmed 457:15 584:15
confirms 617:16
confiscated 438:18 438:25 439:7 521:17
conflict 559:9
confrontations 351:16
confusing 313:5
congress 526:15 526:24 612:20
connect 551:9
connected 352:6
connection 338:22 363:9 408:5 410:10,13 462:18 465:21 468:9 535:18,20 537:25 539:19 544:17 546:12 551:23 553:16 554:10 575:2 576:11,14 577:13 578:7 579:13 580:2,3,23 581:8 583:15 598:5,23 601:3 602:7,12 606:15 619:8,14 620:4,21
consider 622:3
consideration 406:25
considered 404:11
consists 439:19 440:4 483:22 486:25 488:3 545:18
constituted 584:13

consultative 493:25
contact 631:16
contacted 424:9 631:21,22
contacting 425:12 425:23
contain 387:17
contained 309:13
contains 466:20
contemporaneous 358:24 359:4
contentious 340:21
contents 482:17
context 312:9 547:12 564:9
continually 334:5 338:3
continue 330:10 330:14 339:18 341:8 342:4 389:18 525:10 531:3 618:2
continued 304:14 337:13,15 419:7
continues 338:16 342:2
continuous 560:25
contract 516:5 549:18 552:10,11
contracts 516:4,6 517:12 550:9 555:13
contractual 568:5
control 319:11 321:3 347:6 348:10 382:4 383:12 384:18 385:10,13,25 386:6,11 388:16

389:12,22 390:14 391:3,15 392:3,8 420:9 421:16,21 422:16 428:18,25 429:3 432:23 433:5,9,17 434:2 434:11,15,21 435:19 436:6 468:21 469:3,9,11 470:6,9,21 472:24 473:7 474:8,16 529:24
controlled 515:21
controls 514:16
conversation 313:15 332:7 336:13 361:11 423:20 425:6 426:21 557:19
conversations 423:15,20
conversion 306:12 307:4,20 309:21 315:22,23 316:4 316:10,18,25
convey 585:23
cooperate 611:14
cooperation 621:11
coordinate 567:15
coordinated 567:12
copied 440:13 441:3,8 442:11 452:16 463:6
copies 324:16 388:19,22,24 431:4 438:23 439:5 483:23 489:20,23 490:3

| | | | |
|---|---|---|---|
| **coprincipal**  505:6 | 395:8 396:12 | 516:9 520:20,21 | 620:2 621:2,3,15 |
| **copy**  307:10 | 397:15,16 399:16 | 520:25 521:6,11 | 622:7 628:3 633:6 |
| 364:20,22,24 | 399:19,20,23 | 522:5,14,15 524:4 | **correctly**  358:19 |
| 403:10 415:2 | 400:19,20 405:19 | 524:9 525:16 | **correspond** |
| 441:14 444:3 | 405:25 406:2,6,7 | 527:6,11,12,14 | 561:11 |
| 449:20 451:19 | 406:10,11 411:17 | 528:18,24 532:6 | **corresponded** |
| 462:17 465:17 | 415:15 416:3 | 533:22,23 535:20 | 559:9 |
| 476:13 520:22 | 428:9,10,10,13 | 535:21,25 536:2,5 | **correspondence** |
| 535:3 540:11 | 440:8,14 442:12 | 537:18 540:13,17 | 409:20 |
| 543:8 635:9 | 442:13 443:18 | 540:18 541:7,9 | **costs**  603:23 |
| **copying**  479:2 | 444:13,17 445:8,9 | 542:19 543:4,5,9 | **council**  556:6 |
| 511:18 534:9 | 445:15 449:21 | 543:10,13,18 | **counsel**  313:8 |
| 538:18 565:17 | 450:2,12,15,21,25 | 544:3,4,7,9,10,14 | 332:13,15 342:21 |
| 613:7 616:25 | 451:5 452:12,13 | 545:12,13,20,21 | 353:8,13 359:13 |
| **core**  573:15,16 | 453:6 454:19 | 546:9 548:4,5 | 359:15 386:12,22 |
| 599:24 | 455:5,25 457:9,10 | 552:7 556:4,25 | 402:11 408:16 |
| **cornell**  409:19,22 | 457:20 458:2,11 | 559:11 565:8 | 409:12 420:15 |
| 410:2 | 460:12,18 461:21 | 568:15 569:16,17 | 421:3 429:16 |
| **corner**  478:23 | 462:5,9,13,14,16 | 570:9,10,14 | 437:11,18 438:3,7 |
| 484:6 496:13 | 462:20,23 463:6,7 | 571:11 572:10,17 | 438:22 443:23 |
| 499:5 501:19 | 463:13 465:19,24 | 572:22,23 573:6,8 | 466:14,17 473:13 |
| 536:15 537:14 | 466:3 467:3 | 573:9 574:9,10,16 | 474:12 477:17 |
| **corporation**  511:2 | 471:22 474:22 | 574:19 575:4,6,7 | 494:10 506:6 |
| **correct**  309:21 | 477:11,14,15,21 | 575:10 576:16,17 | 516:23 518:3 |
| 310:17 311:5,20 | 478:15,16 479:4 | 577:14,15,21 | 571:24 606:11 |
| 313:22 314:5,7,7 | 479:11,25 480:2 | 578:8,9 579:15,19 | 608:11 609:18 |
| 314:17,22 315:4 | 483:25 484:2 | 579:24 580:5,12 | 631:5 |
| 317:14 322:8 | 485:4,5,11,15,22 | 583:8,9,14,18,23 | **counseling**  504:22 |
| 344:19,20 348:3 | 485:23 487:6,7,13 | 584:2,3 586:22,23 | 556:20 |
| 348:24 349:5,6 | 487:14 488:5,6 | 586:25 587:2,5,7,8 | **count**  377:4,5 |
| 352:20 356:5 | 489:22,24 495:7,9 | 592:20 597:23 | 484:9 540:5 |
| 357:2 358:23 | 495:10,13,14,16 | 598:8,9,12,13,15 | **counted**  377:3 |
| 361:9 362:13,19 | 496:20,23 497:3,4 | 598:16,19,20 | **country**  560:6 |
| 364:12 365:14 | 497:6,7,11 498:16 | 600:8,11,12 602:8 | **couple**  398:13 |
| 366:4,9 369:15,19 | 498:17,24 499:10 | 602:9,13 604:13 | 401:8,16 424:4 |
| 371:24 372:15 | 504:16 505:12,13 | 604:17 607:4,11 | 461:7 500:24 |
| 379:17,18,23 | 505:22 506:22,23 | 607:15,16 614:4,8 | **course**  450:16 |
| 380:5,6,7 381:6,7 | 507:4,5 509:17,21 | 614:11,12 615:10 | 483:6,8,19 564:22 |
| 383:2 386:7 | 509:22 510:4,7 | 615:16,17,19,21 | 565:6,10 567:17 |
| 388:12,13 389:13 | 512:13,19,20 | 615:25 618:15,16 | 571:6,7,8 572:13 |
| 392:20 393:11 | 513:12,13,17,22 | 618:20 619:11,12 | 572:13,16,19 |

573:10,11,14
574:17,20,22
575:18 577:8,12
580:20 600:10
605:10,18 608:23
609:5 629:19
**courses** 410:25
411:15 442:23
569:12,18,19,24
570:3,16,18 573:5
573:24 575:8,11
575:13,15 576:25
577:3
**court** 304:2 312:4
313:13 314:9
315:3 332:10
336:9 337:18
339:21 354:23
508:20 534:5
630:18,19
**courthouse** 340:15
**courtyard** 369:4,7
369:9
**cover** 398:15
411:6,8 556:16
603:23
**covered** 493:16
**covering** 471:6
593:15
**cracks** 530:10
531:11
**created** 343:3
571:23
**credit** 571:5
572:19,21 574:7
574:25 576:10
577:11
**criminal** 349:20
350:8,10,20 351:2
351:12 352:5,10
352:13,15,17

357:22 358:6,21
432:14
**cross** 365:15 518:3
**crossed** 582:4
**cuny** 413:18 414:2
416:7 458:24
459:8,25 477:18
483:12,18 489:17
494:3 506:25
512:12 520:19
526:15,23 529:24
532:9 533:4 550:2
557:2 558:11,12
558:14 563:16
568:12,13,13
572:6 590:15,24
597:19,21,22
612:12,19,24
631:25 632:4,15
632:15 638:3
**cuny's** 483:15
558:2,6,8 632:6,12
**currah** 316:20
317:13 321:16,19
322:14 324:21
325:2,6,16,21
326:3 353:24
354:2,8,9 388:9
624:13 625:17
626:21 627:6,19
**currah's** 325:8,13
626:3,6
**current** 533:4
**currently** 428:17
**custodial** 604:4
**custom** 599:14
**customer** 540:12
542:12
**cut** 511:18 534:9
538:18 565:17
613:6 616:24

**cuz** 558:17
**cv** 304:4 411:6,9
411:11

**d**

**d** 440:10 559:13
614:3
**daily** 567:16
**damage** 407:2
408:4
**damaged** 471:6
**damages** 406:9
**data** 402:3 627:22
**date** 349:12
357:18 358:2
360:15 465:2,4
480:6 528:7,9
583:12 595:6
607:2,12 620:5
631:18 634:9
638:3
**dated** 443:7
479:14 484:14
496:21 509:20
579:22 624:13
**dates** 351:4 360:22
498:13 579:18
**daughter** 536:4
540:20 541:11,14
541:24 542:6
543:11 544:12,16
545:11,14,22
546:12
**daughter's** 540:21
540:24 541:5
**dawes** 590:15,18
591:8,9 593:21
**day** 337:2 346:5
359:2 360:2
362:21 398:20
428:12 451:4
460:15 480:13,17

480:18,20,20
481:12 505:16
553:25 567:17
605:3 610:3,13,19
619:23 628:10,23
629:3 633:11,23
638:21
**days** 401:8,16,16
402:25 405:3
457:3 553:4,19,20
621:18
**dealing** 589:2,7,12
**dean's** 587:16
**dear** 617:14
**debated** 352:2
**debbie** 304:19
634:6,23
**debit** 543:8,23
**decade** 516:18
**december** 417:16
465:25 480:3
512:18
**decided** 337:17
531:9 627:7
**decision** 363:22
**declared** 379:24
**def** 476:16 481:23
481:23 508:22
511:19 520:6
530:17 534:7
536:8 538:16
544:23 547:15
565:15 578:12
582:19 585:6
596:11 597:4
601:18 602:15
610:24 613:4
616:22,23 620:21
635:21,22,22
636:6,6,7,8,9,10
636:11,12,13,14

636:15,16,17,18
636:19,20,21
**defamation**
306:13 307:4,20
308:25 309:8,13
317:4,8 351:11
436:22
**defamatory** 349:5
349:16,18 350:6
360:8,13,24 361:6
436:22,23 437:3
**defendant** 360:7
388:9
**defendant's**
468:10
**defendants** 304:10
304:15 305:14
306:25 314:21
316:17,19 332:15
336:24 377:22
380:3 392:20
399:15 403:22
419:24 420:12
424:20 429:16
433:7,11,16,17
434:11,15 438:5
464:24 465:22
491:4 635:12,17
**defended** 612:21
**define** 311:24
**defined** 313:5
**definition** 313:10
**degree** 621:13
**degrees** 313:9
593:9,11
**deitre** 559:13,24
**deitre's** 559:20
**delegation** 617:25
617:25
**deliberations**
621:18

**delineated** 552:14
**deliver** 602:23
608:15
**delivered** 453:13
453:14,19 605:21
606:15
**delivering** 602:20
603:8,17 607:18
607:23 608:7
610:7 621:17
622:3
**delivery** 453:9
**demands** 438:17
438:24 439:7
**demeanor** 352:25
**democracy** 621:24
**departed** 498:14
**department**
323:23 368:10
486:8 498:22
499:3 561:6,22
562:18,19,21
563:13,24 627:21
**depiction** 364:3
397:10
**depose** 633:12
**deposing** 336:25
**deposited** 506:19
**deposition** 304:14
312:18 318:5
330:10 332:21
333:5 335:21
336:9 337:2,5
339:18 340:15
341:8 342:4 350:4
398:19 629:19
638:3
**derek** 528:7
530:25
**describe** 351:3,5

**describing** 340:5
**description** 635:5
636:5
**designation**
517:20
**designee** 516:3,16
517:9,19
**desk** 354:4 367:9
367:10 371:6,18
371:20,21 450:14
**desks** 370:20,22
371:12 372:14
**destefano** 515:9
515:17
**destroyed** 325:7
413:14
**detail** 308:6
311:17 521:15
**detailed** 535:13
**details** 362:4
581:5 631:23
**determine** 526:13
**determining**
528:16
**deutsche** 592:15
592:18,19,21
593:2,2,7
**develop** 552:4
**developed** 571:21
**development**
351:19 621:13
**device** 394:12
531:13
**devose** 440:9
441:3,5,15
**devoted** 590:9
**diagram** 371:3
**difference** 433:20
584:20
**different** 328:21
329:12 333:4

334:4,7 340:21,23
350:23 361:2
404:6 431:5,11
432:5 433:21
497:12 502:25
519:6 533:15
554:15 592:2
628:9
**differently** 499:10
**difficult** 441:12
**dimension** 367:20
367:21 370:15
**dimensions** 367:11
370:12 374:20,23
**direct** 307:19
357:5 378:3
380:15 392:16
397:18 423:6
430:19 444:23
447:2 449:16
452:5 476:22
516:16 530:23
540:25 560:9
**directed** 363:21
407:15 421:17
462:21 580:18
**directing** 380:19
421:9 427:17
532:12 560:2
566:13 623:2,13
**direction** 369:17
370:4,6
**directive** 352:3
**directly** 358:8
361:18 515:12
550:2 556:17
592:23
**director** 410:16
412:8,13,22,24
484:15 494:5,23
509:17 518:22

526:8,8 569:15
571:9,13,18
572:20,21 574:9
575:2 576:12,15
577:13 580:10,13
580:15,17,19
590:16,23 617:13
621:11
**directors**  518:22
**directorship**
505:21,22
**disability**  414:13
416:11
**disadvantaged**
502:16
**disbursed**  515:22
555:22
**disbursement**
507:3,20 529:20
535:16 550:8
**disbursing**  518:17
**discarded**  326:5
**discipline**  510:14
**disciplines**  617:23
**disclose**  490:14
491:7,14,24 492:3
492:25 495:2
**disclosed**  535:6
**disclosures**  306:14
471:9
**discovery**  403:14
403:23
**discuss**  322:4,9
342:20 420:20
562:23 621:7,24
**discussed**  420:15
421:3 436:19
529:11 531:8
563:21 567:19
582:14 617:20

**discussion**  557:25
614:23 616:14
621:10
**disheveled**  395:2
**disk**  443:18,20,21
443:25 444:9,14
444:19
**dismiss**  314:21
**dispensed**  591:14
**display**  326:18,19
351:14
**displeased**  355:20
**dispute**  332:23
**distress**  407:2
**distributed**  523:18
591:17
**district**  304:2,3
**diversity**  571:9,14
571:19,20,22,24
572:2,5,22 574:9
575:3 576:12
577:14 580:18
**division**  562:10
**dmi**  591:16
**doctor**  406:5
**doctorate**  313:9
**doctors**  405:24
**document**  307:11
307:15 308:24
309:18,19 310:8
312:3 313:12
315:9 317:23,25
318:3 324:12
343:3,23 354:24
355:9,17 361:10
361:22,25 362:5,8
377:21,23,24
378:2,9,11 379:10
379:16 380:4
382:9 390:11,20
392:12 400:16

401:7,12,15
402:23 403:13
404:6 409:16
430:25 437:9
438:4 458:13
464:22,24 465:22
466:4,19,21
468:10 476:19
481:22 482:2
483:11 484:4,8
485:8,14 486:22
489:7 492:13,14
495:22,25 497:18
498:5 499:5
501:20 508:21,25
511:16,22 520:6,9
520:12,16 525:17
530:17 531:21
534:6,15 536:7
538:16,21,24,25
540:2 544:23
545:3 547:15,19
547:22 565:15,20
568:17,18 578:12
578:16,22,25
580:7 581:12
582:19,23 585:6
585:10 586:12,13
596:11,16 597:8
600:18 601:17,21
610:24 611:4,24
613:4,10,13,24
616:21 617:4
628:20 629:20,24
630:10,10,13
635:13,18
**documentary**
450:17 519:7
**documentation**
517:5,8

**documenting**
392:19
**documents**  320:25
323:12 324:4
325:7,24 346:7
354:16 367:2,3
381:13,18,22
382:3,10,14,23,25
383:10,12,13
384:14,17 385:6,9
385:24 386:4,5,7
386:10,14,19,21
388:4,15 389:7,11
389:17,21 390:7
390:12,13,16,21
391:3,9,13,15
392:3,6,7 394:24
395:25 396:7
398:25 400:22,24
400:25 403:25
404:10 405:7,11
406:21 408:3,15
408:20,25 409:8
409:14 414:20
415:6,7,10,11,13
419:25 420:4,6,7,8
420:11 421:16
422:14,17,22,23
422:25 428:16,19
429:2,9 432:10,19
432:24 433:2,16
434:2,13,19,24,25
435:9,16,20,22
436:6,10,15,17
437:2,10,17 438:2
438:3,7,16,23
439:4,5,9,14
445:22 447:23
448:4,11,18
451:19 455:8
457:5 459:4 461:9

468:4,13,19,22,24
469:8,12 470:9,19
471:7,17 472:20
472:23 473:3,7,10
473:12,16 474:3,8
474:15,21 475:3,4
475:16 476:15
482:16,19 483:4,6
491:10,16 515:5
516:25 521:16,17
522:22 597:3
629:6,18 633:13
637:6
**doing** 334:15
340:2 341:2 514:6
559:3 561:14
562:22 563:22
564:19 565:3
567:7 627:9,15
**dollars** 488:8,16
546:8 593:20
**dominic** 426:21
**donating** 628:11
628:24
**donna** 440:9 441:3
441:5,15
**donor** 592:25
**door** 366:8 368:12
368:23 374:5
397:2,5,12,14
**doors** 373:6,10
**doorway** 366:9
**double** 423:18
**dr** 304:6,14 306:7
307:16 308:25
313:17 318:10,17
327:25 331:6
333:5 336:25
337:4 342:12,13
351:17 352:8
353:24 354:2,8,9

355:3 362:2,12,14
377:19 383:7
385:17 390:10
400:17 402:9
403:20 419:4,9
421:14 433:14
435:7 448:13
455:11 465:10
476:11,20 482:3
490:8 492:19
503:19 508:9
509:2 510:8
511:23 520:10
534:16 538:22
539:5 545:4
547:20 554:8
565:21 566:5
569:2 578:17
582:24 586:14
597:9,13 601:22
608:25 611:17
613:11 617:5
629:14,21 631:2
**draft** 312:7
**drafted** 309:25
**draw** 364:3 368:4
372:18 465:3
558:16 614:18,21
**drawer's** 547:3
**drawers** 372:5,6,6
372:16 374:16
375:11
**drawing** 364:2,7,9
366:11 370:13
476:11 635:9,20
**drawn** 368:21
**draws** 374:14
**drew** 397:9,14
516:7 555:12
**drive** 401:20,23,25
402:5,10,14,16,21

402:24 403:8,11
403:22
**driver's** 563:18
**dropping** 463:9,16
463:25 464:12
479:3
**dual** 517:18
**duly** 306:3 419:5
634:9
**duties** 494:12,18
**dvds** 450:17 451:8
451:11

**e**

**e** 305:2,2,17 306:2
324:4,12,14,15,17
324:19 332:16
419:2,2,4 430:24
431:3,4,4,5,8,9,12
431:12,21,25
432:2,2,4,5,7
439:19 440:4,10
440:10,11,14,16
440:20,21 441:2,7
441:9,12,13,19,25
442:3,9,14 443:4
443:10 445:17
446:9,23 447:4,5,6
447:17,21 448:3,6
448:15,21 449:17
449:23 451:3,16
451:22,24 452:3,9
453:5,8,22,24
454:5,14,18 455:3
455:13,17 456:4
456:10,11,19
457:8,18,25 458:5
458:8,14 460:4,10
461:23 462:25
463:4,9 470:13
477:10,20,23
478:3,13,18,21,25

479:11,17,23
484:15 512:18,21
513:11,15,19,23
541:8,8 544:16
545:10,18,22
548:3,10,19,20
549:12 550:14
558:16 559:13,13
560:11 566:15,19
586:21,24 587:3,4
587:25 588:9
590:2,7 591:3,19
613:20 614:6,7
624:12,16,20
625:19 626:3,7
634:2 635:2 636:2
**eager** 480:6,21
481:3
**ear** 588:5,19
**earlier** 402:7
436:19 470:13
489:10 533:19
629:6
**earmarked** 594:13
**earth** 542:14
**easel** 318:16,24
319:7 321:20
322:11,19 323:8
326:12,18 344:22
344:23 346:12,24
353:25 453:14
462:11
**easier** 477:5
**east** 304:17 305:6
365:11,13,24
367:22 369:2
**economic** 398:25
400:25 404:12
409:2
**economist** 586:12
586:13

**education** 326:13
328:5 329:5
351:20 358:16
386:25 395:20
396:11 484:16,24
487:6 488:19
491:9 494:24
497:3 505:16,20
506:3,16,21
507:12,16 509:9
509:25 510:4,21
510:23 521:22
524:7 569:16
571:11,12 572:20
576:15 577:19,23
580:17 591:21
593:11 595:3
600:2,7,16,25
615:16 616:7
618:4
**educational**
518:11 603:11
**educators** 519:8
**effective** 553:10
**effort** 392:13
**efforts** 525:2
552:16 553:13
**egypt** 579:14
580:23 582:9
**either** 324:4 329:4
331:8 344:10
347:16 371:20
395:11 412:12
447:10,24 454:14
458:13 529:13
554:14 626:13
**eleanor** 512:19
**elected** 625:11
627:17,19
**electronic** 430:24
431:2,4,7,7,9,12

431:20,23,25
432:2,4 531:13
**element** 608:22
**elements** 605:9,14
**elenor** 513:5,7,8
**eligibility** 417:6
**eligible** 527:4
**eliminated** 387:2
514:21
**elliott** 590:8,13,14
590:14 591:4,8,8
**emotional** 309:9
334:21 406:9
407:2
**emotionally**
338:25 339:8
**emphasize** 434:14
**employ** 364:2
**employed** 634:14
**employee** 587:15
587:15
**employees** 327:7,8
523:14,19,21,23
524:2,6,13,19
525:6 560:4,7
**employers** 362:24
**employment**
362:25 409:19,22
410:14 413:17
493:25 563:12
572:4
**empower** 587:11
**encompassed**
489:7
**engaged** 358:5
432:13
**engaging** 357:21
358:21
**ensure** 587:20
**entire** 310:16
373:5 378:8,10

388:20 489:7
**entirely** 422:5
**entirety** 376:13
**entitled** 330:12
333:7 337:10,12
407:19 464:22
498:5
**entity** 502:15
505:11,14,18
510:24 511:5,6
**environmental**
621:9
**equivalent** 391:6
577:12
**erica** 423:22,23,25
424:3
**eris** 587:4,6,9
615:19,23 616:5
626:8
**errata** 638:2
**error** 554:14
**ersa** 509:10
**escapes** 410:19
**especially** 593:10
**esq** 305:8,10,17
**esra** 508:16
509:23 510:18
**essentially** 587:20
627:7
**estimate** 376:18
376:20
**et** 304:9 460:16
524:21 625:10,10
**evaluated** 531:8
567:22
**evaluating** 526:13
572:6
**event** 521:4,10,13
521:20 522:4,8,12
564:11 610:14
620:15

**events** 413:5,7
524:18 525:11
622:2
**evidence** 318:14
319:5,9,10,14,15
319:17,19,24
320:9,13,17,22
321:13,18,22,23
324:20,25 325:15
326:12,21 338:19
344:21,24 345:5
345:14,23 346:3
346:10,13,18,22
347:3,8,17 348:2,4
348:13,14,19,23
348:25 354:8
408:3 420:10
422:23 440:23
623:21
**evidences** 345:15
**exact** 349:12
360:15 628:8
**exactly** 322:25
367:6,18 375:8
377:3 394:11
502:9 504:20
537:19 557:17
**examination** 306:6
419:7 631:8
632:19
**examined** 306:5
518:3
**example** 345:10
484:3
**exception** 563:4
**exchange** 440:5
453:24 454:18
455:2,12 457:18
458:8 545:10
586:20 617:20
618:3,4

**exchanged** 458:5 478:13 586:24
**exchanges** 621:19
**exchanging** 544:15
**exclusive** 517:11
**exclusively** 593:11
**excuse** 391:20 537:2 597:15
**executive** 506:6 617:12
**exercise** 510:13
**exhausting** 398:4
**exhibit** 307:10,10 307:13,17 308:9 309:24 314:8,21 343:4 354:23,25 355:4,10,12,22 356:18,23,23 357:6 361:21,23 362:3 364:22,24 364:25 377:20 380:16 397:10,15 397:15 399:14,22 399:25 400:5,6,6,6 400:7,15,23 403:24 404:7 405:6 412:16 413:3 419:20 423:7 427:18,21 430:20 432:24 437:8,10,16 438:10,13 439:17 464:21,22 470:21 476:7,11,15,17,21 477:8 479:21 481:21,24 482:4 483:15,18,22 489:15,15,16 490:16,19 491:5,5 491:11 492:4,5,7

492:22,24 493:2,5 495:20 496:3,4 498:3 501:21 506:24,25,25 508:21,23 509:3 510:16 511:15,20 511:24 512:5,8,12 512:14 513:19 520:5,7,11,19 523:9 530:16,19 531:18 532:5,9,13 534:6,13,17,22,25 538:15,19,23 539:9 544:2,22,25 545:5 547:14,17 547:21 548:3,25 565:14,18,22 566:6,9,13 568:7,7 568:13 569:11 572:8 578:11,14 578:18 581:13 582:18,21,25 585:5,8,15,24 586:15,20 595:12 596:10,14 597:3,6 597:10,17,19,22 598:3,10 601:16 601:19,23 602:4 604:14,18 605:19 606:3,14,17 610:23 611:2,17 612:5,9,23 613:3,8 613:12 614:3 616:20 617:2,6,10 618:7 622:17 623:3,5,9,14,18,21 624:4,8,9 629:24 630:8,12 635:5 636:5
**exhibits** 377:15 399:21 400:10

403:23 405:6 613:16
**existence** 402:5
**expended** 520:3
**expenditure** 522:17 529:10
**expenditures** 519:23 599:16
**expenses** 535:4 578:7 580:3 598:6 598:22 599:2,4 602:11
**expert** 362:9 399:22 400:11 555:16
**expertise** 551:7
**expires** 638:25
**explain** 330:23 341:13 497:15 561:24
**explained** 333:23
**express** 385:5 515:25
**expression** 382:8 382:13 466:20
**extensive** 531:11
**extent** 335:5 486:19
**externally** 567:22
**extra** 365:21 592:9 592:14

**f**

**f** 419:2 521:3 634:2
**fabrizio** 618:20
**face** 323:24,24 365:11 480:9
**faced** 365:6 369:4 369:5
**facilities** 346:17

**facility** 346:14 347:6,10
**facing** 365:22,23
**fact** 314:2 328:11 335:11 340:5 348:7 359:8 420:6 513:7,14 527:8 553:24 554:8 623:19
**facts** 311:2,5 379:25 425:15
**factual** 311:19 313:18,22
**faculty** 357:19 359:21,24 360:4 562:9,13 610:13 625:9
**failed** 318:15 319:6,20,25 320:10,14,18,23 320:24 321:19 324:22 325:2,16 346:11,23 347:11 347:18 348:5,15
**fair** 524:19
**fairly** 423:19
**fall** 569:13 572:9 574:11,13 576:22
**false** 586:2,4,8 609:19
**familiar** 502:10 518:6 522:24 550:24 564:13
**familiarize** 308:2 378:2 482:7
**families** 502:16
**family** 475:14,18 502:11,21 503:7 503:23 556:2,11 615:22

**far** 317:6 372:21
**farther** 603:20
**fashion** 449:8
**father** 320:4 325:5
  326:25 345:18
  346:2 347:21
**fc** 366:16,17
**fcfor** 371:22
**february** 440:6,6
  440:17 443:7
  444:11 449:18
  451:3 452:11
  454:4,10 463:20
  464:5 579:17
  607:3,5 620:7,20
**fee** 521:5,10,12,18
**fees** 594:13 604:4
  604:4,8,9,11
**feet** 374:24,24,25
  375:2,3,6
**field** 598:6 599:25
  600:4 605:8,12
  608:14,15,15,21
  609:7 614:19
  615:15
**fields** 617:22
**fifteen** 306:24
  368:20
**figure** 351:4
  611:11
**file** 363:3,6 366:13
  366:14,16,20,21
  371:15,16,17,19
  371:19,22 372:9
  372:12,14,19,20
  374:6,23 375:11
  375:23 401:9,17
  401:19,22 475:12
  475:13,15
**filed** 306:19
  307:11 308:10

314:9,16 355:14
  356:19,20,25
  357:3 388:12
**files** 320:6,7
  323:11 354:6
  371:21 372:23
  375:19 403:10
  442:16,22 443:12
  443:16,22 447:23
  453:12,16,18
  455:20 458:20
  475:10,20,23
**filibustering**
  508:13
**filing** 356:3,17,22
**fill** 410:9,12
  498:18 501:9
**filled** 498:8 607:3
**film** 508:16 509:10
  509:23 510:18
  519:7
**final** 312:8 563:17
  608:24
**finance** 484:17
  506:7 515:13
  562:10
**financial** 514:4,9
  514:17 515:2
  612:13
**financing** 514:16
**find** 392:10,12
  448:12 449:2,5
  473:11,16 516:25
  563:15 564:2
  606:17 630:20
**fine** 373:8,9
  377:13 406:16
  531:15 575:16
**finger** 334:19
**finish** 328:23
  337:8,19 339:20

349:23 398:8
**finished** 354:17
  542:21
**firm** 620:8
**first** 306:3 308:9
  323:4 333:19
  334:23 347:12
  362:5 364:6
  377:22 378:4
  380:3,20,23 381:8
  399:9,15 419:24
  440:17,20 441:18
  450:4 463:8
  467:14,21,23
  468:10 469:21
  473:24 476:25
  477:7 483:11
  490:23 491:15,22
  493:10,11,17
  497:14 513:18
  526:5 529:11
  540:6 549:11
  560:24 561:7,20
  569:11 570:23,24
  571:2 579:4
  581:12 587:11
  588:21 590:13
  592:4 605:13
  614:7 620:19
  623:11,14 624:9
  626:6 635:12
**fiscal** 486:8 487:25
  499:21 500:2,7
  515:18 529:25
  555:15
**five** 374:7,17,19
  374:24,25 375:2
  376:9 400:22
  476:3 565:25
**floor** 368:16

**focus** 385:21
**focusing** 318:19
  431:22
**fogerty** 486:2,5,6
  486:17,19,21
**fold** 374:15
**folders** 375:23
**follow** 353:14,14
  559:5 561:2,9
**followed** 558:24
**following** 381:12
  384:12 388:4
  432:17 435:14
  454:3 467:16
  468:3 472:18
  473:25 497:24
  505:21 514:24
  559:12 561:4,15
  619:23 625:19
**follows** 306:5
  332:4 419:6 494:4
  532:16 594:24
**food** 603:23
**foregoing** 380:2
  634:8,10
**forgetting** 516:19
**form** 330:13,18,20
  330:23 331:3,12
  333:8,14,22,22,24
  334:7 335:3
  337:11 339:24
  341:12,16 380:11
  383:4,16 389:25
  391:21 407:10,14
  422:7 440:25
  488:11,21 489:11
  490:18 492:9
  494:9 500:3,8,18
  500:23 503:15
  530:22 561:12
  562:4,7 579:12,22

583:7,20 589:20
602:19 606:9
607:3,17 608:2,9
609:16 610:9
624:16 625:12
**formally**  411:8
**former**  356:7
426:24 427:10
**formerly**  396:25
**forms**  428:8,8
429:4,5 491:4
**forth**  382:18 396:3
420:4 430:11
525:11 527:20
550:11 556:20
564:7 604:19,22
606:2 619:17
**forum**  610:14
**forward**  617:23
**forwarded**  513:10
513:15
**found**  345:22
419:16 434:8
453:2
**foundation**  514:5
514:11,15 515:11
526:6 527:25
529:24 530:25
592:20,22 593:3,7
615:9
**four**  315:12
371:12 372:20
374:7,17,24
392:18 393:10,16
540:5 543:19
570:16 573:5
575:8,14
**fourth**  536:22
540:2,11
**frame**  361:4
387:15 455:7

627:24
**frankly**  623:16
**free**  378:12
**frick**  537:12 538:7
**front**  339:16
340:19 365:23
397:12 484:9
520:22 521:2
566:9 618:9
**fulfilled**  563:10
**full**  315:10 338:15
493:23 494:6,24
509:11 511:11
515:15 519:11
532:23 551:20
563:23 572:19
608:20
**fully**  510:7 535:6
633:13
**function**  525:10
**functioning**
524:25
**fund**  592:21 602:6
603:22 612:13
619:9,10 620:23
622:6
**funded**  494:2
**funds**  502:15
515:20,20,22
520:2 522:4
523:13,20 524:23
527:20 532:19
533:9 535:17
549:19,20,22,24
549:24 550:4,5,6
550:11 555:22,24
556:10,14 588:12
592:15,19 593:2
612:20,21,24
622:5

**furniture**  370:18
371:14 373:3
374:2 375:25
**further**  389:19
407:7 419:6 424:2
629:14,16 630:24
634:13
**fyi**  480:4

## g

**g**  599:24 600:4
**gain**  621:9
**garbage**  395:3
**garden**  543:4
**gaskins**  423:21,22
423:23 424:9,13
426:7
**gcwe**  485:9
**general**  305:13
381:11 413:5,7
424:20 426:6,25
427:10 507:20
**general's**  332:17
427:2
**generally**  307:18
476:24 482:7
**getting**  353:15
482:23 494:14
531:3 544:17
552:23 560:8
568:5 624:19
626:7 632:3
**gilbert**  555:16
**gist**  553:14
**give**  310:22 317:23
317:24 323:6
332:24 338:8,14
338:15 363:24
364:17,21 376:17
386:21 403:8
415:17 451:10
469:24 500:19,24

518:13 564:21
565:10 589:10,14
589:19 592:9,14
594:7 595:18
605:2 623:12
626:10
**given**  327:18
341:3 368:2
415:13 456:23
514:5 525:19
527:9 547:11
565:7 593:21
**giving**  330:7
338:18 551:20
587:18 630:19
**glad**  622:22 633:8
**glass**  373:6,10
**glenn**  548:14,15
548:23
**global**  585:17
**go**  308:8,23 309:17
310:4,19 327:14
333:18 349:22
384:2,22 387:20
397:22 398:13
423:13 436:3
438:10 442:4,25
445:10 453:23
456:17 457:16
458:3 460:19,24
461:3,17 462:24
465:9 466:24
471:23 477:4
478:12,21 479:20
495:21 496:9
498:2 501:3
506:16,17 507:15
507:21 516:25
525:13 536:9
537:11 539:25
543:6,14 550:6

568:6 570:5 572:2
572:7,24 576:18
588:14,15 591:24
594:25,25 596:21
599:23 602:14
609:5 611:8
618:11
**goes** 381:2 499:19
562:4
**going** 307:8,24
308:2,5 313:14
315:7 317:20
321:14 325:23
335:25 337:14
340:13 361:20
362:4 363:24
364:17,21,23
376:9 380:10
389:14,24 391:7
397:21 398:22
402:18 403:4,8
407:12 417:18
433:22 435:5
437:7 438:9
452:23 469:4
472:2 475:22
476:14 481:7,20
482:6,10,18 487:8
503:9 508:19
511:14 530:12,15
538:7 539:7
544:21 547:13
550:20 561:23
565:13 582:17
585:4 593:19
595:10 601:15
604:18 608:18
609:4,9,13 610:22
611:8 613:2
616:19 618:6,18
618:19

**goings** 590:12
**good** 306:7,8
336:7 364:21
370:9 392:13
484:12 554:16
587:18 588:25
596:24
**gotten** 484:10
619:16
**gould** 507:18
510:5
**grade** 608:24
609:10
**graduate** 326:13
328:4 329:4
358:15 386:25
395:19 396:10
484:16,24 487:5
488:18 491:9
494:23 497:2
505:15,19 506:3
506:15,21 507:16
509:9,25 510:3,20
510:22 521:21
524:7 559:16
570:21,23 572:14
574:22 576:3,6
577:9,18,23
580:16 587:21
591:20 593:8,11
593:12,13,17
595:2 599:25
600:4,6,15,25
615:15 616:6
**grant** 494:2 502:2
502:5,10 503:6,22
504:5,9,10,13,15
504:18,19,25
518:14,23 519:4
519:17,21 522:5
524:14 525:7

526:13,22 527:3,5
527:9 528:4,15,17
535:19 539:20
566:25 567:3,4
592:20 593:7,14
615:23 626:13
**grant's** 522:19
**grants** 526:6,14,14
526:23 549:20
550:12 594:14
625:8
**greece** 579:14
580:24 582:9
583:16 585:2
**grew** 571:25
**grievance** 388:11
**ground** 599:8
620:12
**groups** 551:9
553:9
**guards** 524:20
**guess** 365:18
383:25 392:10
**guessing** 360:17
360:19
**guidelines** 529:19
533:5 558:25
559:12 561:2,10
**guides** 599:12
**guscott** 631:10,12
631:17,20,21,24
632:21
**guy** 632:8
**guys** 335:25
**gwce** 509:17
**gymnasium** 370:8

h

**h** 306:2 419:4
449:23 548:25
635:2 636:2

**haded** 377:24
**half** 375:21
**hall** 369:14,16,17
369:18 373:4
394:4 453:13,19
476:12
**hallway** 369:5
**hand** 478:23 484:6
496:13 499:4
501:19 536:15
537:14 540:10
606:19
**handbooks** 381:24
382:16 383:23
**handed** 307:15
361:25 437:9
476:19 482:2
508:25 511:22
520:9 531:21
534:15 538:21,24
545:3 547:19
565:20 578:16,22
582:23 585:10
596:16 597:8
601:21 611:4
613:10,13 617:4
**handled** 325:25
**handling** 599:6
**handwriting**
498:9,20 499:6
501:15,17 604:7
**handwritten**
483:12
**happen** 429:21
**happened** 337:17
340:5,24 409:23
464:7 504:20
557:17 570:20
584:22 586:9
605:24

| | | | i |
|---|---|---|---|

**happy** 353:14
**harassing** 316:7
**harassment**
  426:12,15 625:12
**hard** 367:6 373:21
  376:16 401:20,23
  401:25 402:4,10
  402:14,16,21,24
  403:8,10,22
  439:12 541:17
**harm** 309:9
**haugstatter** 322:2
  322:7,10 323:13
  323:21
**hay** 596:23
**haystack** 564:11
**head** 368:17
  374:21 517:16
  519:18 531:14
  595:8
**heading** 532:14
**health** 621:8
**hear** 342:15 344:3
  355:24 562:3
  622:21
**heard** 358:8
  360:25 361:15,18
**heavy** 345:4
**held** 304:16
  617:19
**help** 378:14 462:7
  569:2 587:22
  593:8,13 595:23
  627:3
**helped** 456:25
  524:25 525:9
**helpful** 384:5
  462:8 504:12
  588:23
**helping** 441:10
  627:14

**hewitt** 324:15
  457:19 460:11
  462:3 463:5
  470:14 479:2,12
  515:25 516:14
  517:9,24 552:13
**hewitt's** 462:22
  486:9
**hey** 513:24 549:12
  588:2
**hi** 336:5 453:11
  455:19 460:14
  478:3
**high** 519:7 543:14
**highest** 563:5
**hire** 565:4 595:23
**hiring** 626:14
**history** 358:14
  547:6
**hold** 335:25
  471:15 497:19
  562:17 566:8
  604:20 613:18
  623:23
**holiday** 521:4,10
  521:13 522:4,12
  523:14
**home** 327:17,18
  328:2,19 329:3,9
  329:14,21 331:7
  331:15 344:9,18
  344:22,25 345:16
  345:24 444:15
  452:17 453:15
  475:4,5 486:13
**honor** 336:24
  337:23 338:2
  339:11 341:6,9,20
  341:23 342:6
**hope** 380:17

**horn** 362:15
**hospitalized**
  415:19
**hotel** 601:8 603:23
  604:2,3 618:19
**hotels** 599:10
**hotly** 352:2
**hour** 398:10
  484:25 487:12,16
**hours** 397:22
  484:25 487:12
  498:16 558:19
  559:7 569:14
  571:5,5 572:19,21
  574:8,25 576:11
  576:13 577:11
  611:7,8
**hr** 499:20 515:3
  517:17
**huh** 311:10 368:6
  384:24 385:23
  387:22 430:21
  438:14 442:8
  457:17,21 461:19
  462:12 479:13
  539:11,22 581:16
**human** 487:23
  515:4,21,23,24
  552:12 555:7,20
**humorous** 345:22
**hundred** 376:24
  405:3 553:7
  593:20
**hundreds** 366:24
  366:25 367:3
  373:17,17 376:25
  420:7 488:15
  546:7 589:12
  628:11,24
**hunger** 536:14
  537:6

**i'am** 349:22
**idea** 354:11
  364:21 380:8,13
  588:16,19 589:14
  591:5,6,7 596:24
**ideas** 340:22,23
  543:4 588:5
**identification**
  307:14 355:2
  361:24 365:2
  377:16 405:22
  476:8,18 481:25
  508:24 511:21
  520:8 530:20
  534:14 538:20
  545:2 547:18
  565:19 578:15
  582:22 585:9
  596:15 597:7
  601:20 611:3
  613:9 617:3
**identified** 381:13
  381:18 382:10,22
  383:9 384:13
  385:5 386:18
  388:3,6 389:6,16
  390:16,21 391:12
  391:19,23,24
  392:6 414:19
  422:13 424:14
  425:13 426:5
  428:15 432:19
  435:15 436:14
  468:4,19 472:19
  473:3,5 474:3
  573:7 580:10
  604:10 610:6
**identify** 373:14
  420:3 424:18
  434:13,19,25

568:7 569:19 575:14,25 576:6 598:25 604:25
**identifying** 468:13 576:5
**image** 351:13
**immediately** 356:19 397:11
**impact** 519:13
**implemented** 571:21
**important** 343:11 567:10
**imposed** 416:7
**improper** 503:17
**improve** 551:7
**inaccurate** 339:12
**inappropriate** 335:18 353:9
**incident** 352:5
**include** 314:4 491:17 617:21 619:19
**included** 307:3 439:3 492:24 535:2,22 544:5
**includes** 595:21 597:3 604:3
**including** 320:2 325:4 326:23 345:17,25 347:19 414:11 455:24 459:7,23 494:2 507:18 517:21 535:5 547:5 556:16 619:16
**income** 414:15 416:18
**incomplete** 490:5 491:16

**incorporate** 553:8
**incorrect** 450:3 516:12,13
**increased** 497:22
**increasingly** 338:9 338:20
**incredibly** 338:6
**incurred** 580:3
**index** 402:24 403:21 482:16 637:2
**indicate** 483:14
**indicated** 368:22 371:2,13 440:10 490:16 634:10
**indicates** 445:6,11
**individual** 532:25
**individuals** 469:2 626:15
**industrial** 410:7 412:4
**inflected** 407:3
**infliction** 309:9
**information** 332:24 380:6 420:9 437:6 494:4 501:9 503:13 516:15 517:10 594:24 617:13,15 630:20
**initial** 306:13 471:8
**initially** 323:10
**initiative** 571:15 587:7 590:17,20 590:24 625:13
**injuries** 398:25 401:2 404:12 405:12 409:3
**injury** 406:9

**input** 343:15
**inside** 370:10
**instance** 351:8 352:9,12 504:22 517:13 604:25
**instanced** 350:24
**instances** 350:23 351:3,5,6
**institute** 505:11 506:2,14 518:7,9 518:10,11,13,18 518:23,25 519:4 519:17 522:5,8,18 524:14 525:2,7,10 538:9
**instituted** 530:24 562:9,13
**institution** 511:8 511:10
**instruct** 339:24
**instructed** 487:18 487:21 499:25 500:4,7
**instructions** 382:17 383:24
**insult** 449:4
**insulting** 449:3,6 449:15
**insurance** 414:9 414:12,13,14,24 415:25 416:12,17 471:6,10,12,19,21
**intend** 356:15
**intended** 585:23
**intensive** 551:25 552:24 553:22,25
**intentional** 309:9
**interaction** 340:4
**interchangeably** 411:12

**interested** 508:12 508:13
**interesting** 359:10 379:7
**interfere** 312:17
**interfering** 335:19 335:21
**interim** 450:24
**interpretation** 494:10
**interrogatories** 399:16
**interrupt** 335:2 350:2,3
**interrupted** 334:25 383:6 403:19 488:13 557:11
**interrupting** 328:22 331:19 333:10,12 335:9 335:17 337:7 353:8
**intimately** 547:2
**intimidate** 334:16 334:21 339:7
**intimidated** 334:17
**intimidating** 339:2 339:6
**intimidation** 353:4
**inventory** 377:6
**investigate** 558:13
**investigated** 557:24
**investigation** 319:11 321:11 557:2,20,23 558:2 558:6,6,8
**investigator** 504:25 505:4,4,7

invitation 617:16

invoice 485:21
496:18
invoiced 559:24
invoices 534:25
involve 461:3
involved 430:7
522:10 547:2,3
559:17 615:15
involvement 621:8
involving 447:4
isaacson 316:21
316:22 317:13
318:15,24 319:6
319:20,25 320:10
320:14,18,23
issue 351:17 352:2
366:22 407:20
514:18,22,25
588:21
issued 515:12
516:6
issues 339:3
375:17,17,18
430:9 617:17
625:7
itemize 554:13
items 324:5
348:22 383:21
401:11 452:14
455:20 456:7
457:12,14 461:8
470:14,15,16
480:6,22 481:3,13
iterated 321:6
itinerary 600:10
604:23 618:13,25
619:13,17,19
620:18 621:4
ivy 351:9,10,21,22
351:25

**j**

j 306:2 419:4
591:19
jamell 591:19,24
592:6 593:12,22
jamell's 590:9
james 305:10
311:23 312:2,15
312:21,24 313:3
313:11 315:7
316:6 317:19
318:2 329:10,22
329:25 330:5,17
330:22 331:11,17
331:20 333:4,15
333:19 335:6
336:17 337:4,25
338:2 339:15
341:6,9,10,17
342:5 369:14,16
369:17,18 373:4
378:15,22,25
379:5,9,12 380:10
383:3,15 387:6
389:24 391:20
394:4 398:21
402:15 403:2,7,9
403:16 406:12
407:6,11,17
408:20 417:17,21
420:17,22 421:4
421:10 422:4,9
425:5,14,18
426:11 427:12
428:5 435:24
437:21 439:9,23
440:19 441:6,16
445:23,25 446:4
446:12,19,25
450:2,5,8 453:13
453:19 454:21

458:21 465:8,11
476:12 480:14
482:9,14 488:10
488:20 489:9
490:17 492:8,12
493:9,15 495:24
503:9 508:4
516:21 530:12
534:10 536:17,21
537:2 546:16
557:9 586:3,5
606:8 607:25
608:8 609:15
610:8 622:24
623:24 624:3
630:2,6 631:8
632:18
january 304:12
326:14 328:17,25
344:7 414:10
424:2 513:11,20
522:13 579:17
631:19 638:3
jay 486:2,5,6,17
486:18,20
jazz 320:15 325:18
348:16
jerry 512:21,22
job 411:24
jocelyn 357:20
358:4,12,13,25
360:2 361:12,13
joe 312:24 379:10
452:14 456:4
463:10 513:24
549:12 588:2
614:14
john 304:17 305:4
joseph 304:6,15
400:17 441:14
610:16 633:20

634:8 638:4,20
judge 332:4,25
336:2,5,6,8,12,18
337:14,22,24
339:17 341:7,15
341:18,21,24
342:8 353:11,17
398:17 402:8
407:15 503:18
julio 621:11
july 586:25
jumble 373:23
jumping 310:21
june 307:12
308:11 540:13
542:13
justify 552:22
justifying 622:4
jw 371:9

**k**

k 332:16 512:23
560:19 590:8,9
591:3 592:9,11,16
593:23 595:20
karen 507:18
510:5
keep 389:14 391:7
449:9 545:23
589:16 611:6
624:7
keeping 560:3
566:16 590:11
kelly 362:12
kept 395:3
kevin 631:10,12
631:17
key 605:9 608:22
kind 340:4 377:7
411:20 439:12
511:4

**kinds** 411:15
**klein** 305:10,17
306:6,10 307:8
311:23 312:2,11
312:15,16,21,24
313:3,7,11,14
315:7 316:6
317:19,24 318:2,4
322:5 329:10,22
329:25 330:3,5,9,9
330:17,19,22,25
331:11,17,18,20
331:23 332:5,10
332:14,15,20
333:2,3,4,4,15,18
333:19 334:23,24
335:6,8,13,16
336:3,7,11,16,17
336:23,24 337:4
337:25 338:2,3,14
339:11,12,15
341:6,9,10,17,19
341:22 342:5,7,11
342:15 344:3
346:21 354:22
361:20 377:17
378:15,17,22,23
378:25 379:3,5,6,9
379:12 380:10
383:3,15,17 387:3
387:6 389:24
390:2 391:20
396:4 398:21
402:15 403:2,7,9
403:12,16,18
406:12,14 407:6,8
407:11,13,15,17
407:23 408:17,17
408:20 410:11
417:17,19,21,23
419:8 420:17,19

420:22,25 421:4,8
421:10,11 422:4,6
422:9,11 424:7
425:5,14,18,20
426:11 427:12
428:5 430:16
435:24 437:21
439:9,11,23
440:19,24 441:6
441:10,11,16
445:16,23,25
446:4,12,14,19,20
446:25 451:18,23
454:21,23 458:21
465:8,11 476:9
480:14 481:7,20
482:9,12,14
488:10,12,20
489:9 490:17
491:25 492:8,10
492:12,17 493:9
493:15 495:24
503:9,14,15 508:4
508:19 511:14
516:21,23 520:4
523:25 528:13
530:12,15 534:4
534:10,12 536:17
536:19,21,24,25
537:2 538:14
544:21 546:16,19
547:13 557:9,10
565:13 566:4
578:10 582:17
585:4 586:3,5
595:10 596:9
597:2 601:15
606:8,10 607:25
608:8,10 609:15
609:17 610:8,10
610:22 613:2

615:13 616:19
622:20,24 623:24
624:3 629:11,13
630:2,4,6,15 631:8
631:22 632:6,18
632:19 633:7
**klein's** 338:23
**knew** 327:3
481:12 494:10
517:16,17 587:17
**know** 310:2
313:25 315:14,18
315:21 316:3,9,15
316:15 317:4
318:17 319:23
320:7,12,16,20
322:25 323:15
326:17 336:2
340:6,20 345:7
346:8 349:7,9,12
349:13,17 350:5
350:14,24 351:6
360:4,12,16 367:5
367:16,18 369:12
369:25 370:7
373:23,25 374:14
374:20,22 375:7,7
382:2 385:16
396:21 401:14
402:4,6,10,12
411:7 413:6,11
416:6 420:3,10
427:6 429:12
435:4 439:12
441:5 442:16
447:7 453:22
454:5,8,13 463:14
478:8,11 481:13
482:13 489:6,24
490:2 495:17,18
500:15,17,25

501:12 503:3,20
517:15,18 519:16
537:19,23 538:6
538:11,13 539:2
541:12,13 542:22
548:15 550:3,20
550:21 552:4
554:2 557:4,5,15
557:16,23 559:20
560:7 570:2,20
573:13,20 574:20
577:7,9 587:11
588:11 589:2,3,24
590:3,4,5 592:5,23
595:7 599:20
611:10,12 616:11
625:6 627:16
628:6 630:11,15
631:23 632:2,7
**knowing** 376:23
481:14
**knowledge** 380:5
382:6 425:13,25
427:4 447:3
448:19 470:24
510:24 515:15
516:17
**known** 486:18
**knows** 494:14
555:18

---

**l**

**l** 306:2 332:16
419:4 541:8,8
591:19,19
**labor** 351:15
352:7 360:9
375:18 395:23
412:4 435:11
516:2,16 517:9,19
547:9

**lack** 455:22
523:15
**lady** 546:3
**landlord** 524:6
**large** 374:6 524:21
**lastly** 333:9
**latest** 458:2
**latin** 592:11
**law** 304:16 305:4
332:8,12,18,22
333:17 335:15,23
336:20
**lawyer** 312:25
**layer** 567:7,21
**layers** 529:12
**leader** 605:10,17
608:15 610:12,13
618:2
**leaders** 603:5
608:15
**leadership** 515:3
519:10,11,25
527:18
**learn** 621:12
**leave** 593:23
**leberstein** 351:9
351:17,23 352:6
352:19
**lecture** 325:20
348:18,18 450:13
581:23 582:8
602:20,23 603:8
603:18 605:2,22
606:15 607:18,23
608:7 610:7
621:17
**lectured** 605:3
610:19
**lectures** 325:20
602:24 603:19
608:16 610:17

620:16 621:19
622:11
**lecturing** 610:3
**led** 515:24
**lee** 528:7 531:2
**left** 332:6 344:14
344:17 365:17,22
461:15 463:23
**legal** 313:11
317:21 406:13
407:22 417:5
425:19,21 477:17
506:5 510:24
511:4 638:2
**legally** 312:5
**legitimate** 340:2
**length** 376:10
**leslie** 541:6,24
545:19,22
**letter** 320:3 324:4
325:4 326:24
345:17,25 347:20
411:6,8 412:9
493:6 617:12
619:7 620:3,6,20
**letters** 320:2
323:11 325:3,17
325:24 326:22
327:3 345:17,24
346:6 347:19
372:22 406:21
**level** 570:21
**levine** 515:8,9
**levy** 549:14,15,18
549:19,22,23
550:3,5,5
**liaisons** 532:23
**liberty** 305:15
**library** 366:23
**license** 563:19

**limitation** 414:11
**limited** 456:25
**limiting** 455:22
**linda** 346:5 480:13
480:17,18
**line** 359:22 467:21
485:8 493:6 567:9
614:15 615:5
616:3 618:24
637:7,7,14,14
638:4
**lined** 376:5
**lines** 381:3 566:18
566:24 581:25
**lisa** 515:8,17
**list** 324:13 327:14
377:7 423:17
443:22 470:14
535:6 540:15
568:22 603:24
620:9
**listed** 324:5
383:21 470:16
542:12 543:3,22
575:15 604:2
**listen** 318:22
319:3 589:9
**listening** 318:23
**lists** 585:20
**literally** 339:4
**literature** 553:2
553:23
**litigated** 427:5,7
**litigation** 637:2
**little** 397:22
484:17 485:15
496:19 510:13
589:6,7 594:20
620:11
**live** 435:6

**livelihood** 406:22
**local** 599:11
**located** 369:18
371:17 373:18
518:12 524:8
**lodging** 598:12,23
599:2
**logistical** 620:8
**london** 327:10
501:13 579:10
614:8,14,24
616:14
**long** 368:18
370:15,16 397:25
427:6,9 486:7
618:5
**longer** 318:9 350:4
367:20,21 397:22
469:10 470:8
557:16 558:11,13
626:9
**look** 309:6 310:22
316:11,12 324:19
359:9 378:10
384:6 393:6
437:16 446:15
447:9 448:12
469:17,21,24,25
471:3 474:10
475:7,15,20,22
476:22 477:7
484:3 485:12
493:5,6 496:5,10
496:12 497:10
534:24 536:6
539:9 562:6
585:15,20 599:22
613:13,17 617:11
617:23 621:20
623:5 627:9

**looked** 355:8
369:6,19 392:10
392:12 399:18
479:6 497:8 629:6
**looking** 345:11
360:21 378:24
379:14 392:25
399:24 419:20
428:21 437:24
457:25 493:7,17
496:8 501:20
525:18 564:10
572:3 575:19
588:22 613:15
627:2
**looks** 484:11 537:6
616:22,23
**loss** 587:12
**lost** 414:15 416:18
623:4
**lot** 327:18 328:2
377:2 398:15
451:8 553:15,17
554:10 587:17
589:7 608:18
**loud** 532:3
**love** 593:25 594:7
594:20
**lower** 496:12
**lunch** 397:20
398:6,15 417:18
420:16 421:3,6
621:22
**luncheon** 418:4

**m**

**m** 512:23 591:19
**magistrate** 330:11
330:15 331:4,25
332:4 335:4
421:12

**mail** 324:4,12,14
439:19 440:4,14
440:16,20,21
441:2,7,9,13,19,25
442:3,14 443:4,10
446:9,23 447:4,6
447:17 449:17
451:3,16,22,24
452:3,9 453:5,8,22
454:5,14 455:17
456:4,10,11,19
457:8 458:8,14
460:4,10 461:23
462:25 463:4,9
470:13 477:10,20
477:23 478:3,21
478:25 479:11,17
479:23 484:15
512:18,21 513:11
513:15,19,23
544:16 545:10,18
545:22 548:3,10
548:19,20 549:12
550:14 558:16
560:11 566:15
587:25 588:9
590:2,7 591:3
614:6,7 624:12,16
624:20 625:19
626:3,7
**mails** 324:15,17,19
430:24 431:3,4,4,5
431:8,9,12,12,21
431:25 432:2,4,5,7
440:11 441:12
442:9 445:17
447:5,21 448:3,6
448:15,21 453:24
454:18 455:3,13
457:18,25 458:5
478:13,18 586:21

586:24 587:3
613:20
**main** 319:15
344:15 444:7
450:12 553:7
562:16
**maintained**
515:19
**maintenance**
523:16
**major** 314:2
**makers** 617:21
**making** 330:17
333:6,13 335:17
337:5 338:4 341:4
353:9 405:18
406:3,8 503:16
539:4 568:3
**makr** 408:17
**male** 571:15 587:7
590:16,19,24
625:13
**males** 593:10
**malice** 309:8
**malpractice** 356:7
356:12
**man** 313:8
**manage** 589:11
595:24 625:5
**management**
505:12 506:2,14
551:5,6,8 553:11
**mand** 630:12
**maner** 339:2
**manhattan** 505:11
505:25 506:14
**manner** 339:7
341:2 528:2
**manuals** 381:24
382:17 383:23

**manuscripts**
320:19 325:18
348:16
**march** 357:18,25
358:4,19 432:13
453:25 454:4,11
454:17,20 455:4
455:13,18 456:20
457:13 461:14
579:17 598:7
600:10,11 601:4
602:8 605:20,21
605:21 618:14,25
619:3,4,11,17,25
621:2,5
**marcia** 316:21,22
316:23
**mark** 305:17
306:6 307:8,9
312:11,16 313:7
313:14 317:24
318:4 322:5 330:3
330:9,19,25
331:18,23 332:5
332:10,14,15,20
333:2 334:23
335:8,16 336:3,7
336:11,16,23,23
339:11 340:13
341:19,22 342:7
342:11,15 344:3
346:21 354:22,23
361:20,21 364:24
366:17,18 377:17
378:17,23 379:3,6
383:17 387:3
390:2 396:4
403:12,18 406:14
407:8,13,23
410:11 417:19,23
420:19,25 421:8

[mark - methodology]                                          Page 29

421:11 422:6,11
425:20 430:16
439:11 440:24
441:10 445:16
446:14 451:18,23
454:23 476:9,10
476:15 481:8,20
481:21 482:12
488:12 491:25
492:10,17 503:14
508:19,20 511:14
511:15 516:23
520:4,5 523:25
528:13 530:15,16
534:4,5,12 536:19
536:24 538:14,15
544:21,22 546:19
547:13,14 557:10
565:13,14 566:4
578:10,11 582:17
582:18 585:4,5
595:10,11 596:9
596:10 597:2
601:15,16 606:10
608:10 609:17
610:10,22,23
613:2,3 615:13
616:19,20 629:11
629:13 630:4,15
632:19 633:7
**marked**  307:13,17
354:25 355:4,21
361:23 362:3
364:22,25 377:16
377:20 399:13
413:2 437:22
464:21 476:7,10
476:17,21 481:24
482:4 489:15
491:4 508:23
509:3 511:20,24

520:7,11 530:19
531:17 534:13,17
538:19,23 544:2
544:25 545:5
547:17,21 565:18
565:22 578:14,18
582:21,25 585:8
586:15 596:14
597:6,10 601:19
601:23 611:2,16
613:8,12 617:2,6
618:7 637:13
**marking**  371:3
629:23
**marlboro**  535:7
535:24 536:3
**masses**  326:3
**master**  569:20
570:19 573:8
**master's**  572:15
572:17 591:21
**masters**  313:9
577:4,5 593:9
**material**  326:4
354:14
**materials**  327:19
328:3,19 329:3,8
329:15,21 330:2,4
331:8,15 344:9,19
348:12 400:18
401:20,22 404:25
412:14,23 421:22
441:24 448:9
449:25 453:9
454:10 456:24
457:2 458:20
464:7
**matter**  317:21
553:24 614:24
616:15

**matters**  529:25
**meal**  598:25
**meals**  598:11,22
601:8 604:3
**mean**  309:25
312:2,8,9 315:8,10
356:4 363:5
381:17 382:14,24
383:11 384:3
388:21 389:10,20
390:24 391:24
392:2,4,11 393:6
404:17 416:15
428:23 431:2
435:18,18 440:20
448:20 458:16
463:24 482:13
492:15 553:17
554:22 558:22
592:10
**meaning**  327:5
594:7 618:3
620:10
**means**  392:5 571:5
610:17 614:17
620:13
**meant**  390:19
391:14,18 422:15
428:24 463:15
464:11 594:21
615:4
**medicaid**  416:21
**medicare**  416:21
417:2,4,8,11
**meet**  567:3 621:5
**meeting**  351:9
360:3 562:20
563:3 617:19
619:11,20 620:24
621:22 624:25
625:3,16,22

**meetings**  349:14
351:10,16 552:3
553:6,22 566:17
566:23 567:11,15
567:16 603:4,7,16
612:16
**member**  483:24
487:5 488:17
491:8,24 506:20
510:2 525:21
527:2 614:20
**members**  357:19
359:21,24 360:4
500:10 527:9
528:3 532:20
533:10 538:8
562:9 612:14
**membership**
487:4
**memo**  485:14,17
485:20
**memorandum**
509:8 510:17
635:24
**memory**  361:11
**men**  587:20
**mention**  363:14,16
**mentioned**  323:9,9
323:10,11,12
351:24 413:8
**mentoring**  504:23
556:19 587:17
**met**  358:9 361:15
361:17 603:2
**metal**  372:9,11,14
374:11,12,12
376:6
**method**  553:8
**methodology**
552:4 553:2

michael 324:15
457:19 460:11,14
461:24 462:3
463:5 470:14
479:2,12 486:9
515:25 516:14
517:8 552:13
micro 589:5,10,15
middle 337:21
442:14 581:11
miller 327:12
mind 377:11
394:20 597:14
mine 320:6 428:6
433:20 469:3
minimal 456:24
ministry 621:23
minute 377:12
398:14 428:3
472:2 476:3 539:7
539:11 565:25
623:12
minutes 398:9
417:24,25
mirotznik 512:22
512:24 513:2
mirotznik's 513:8
513:11
miscellaneous
375:15
mischaracterizat...
340:8,9 530:14
mischaracterize
338:16
mischaracterized
338:5 440:22
mischaracterizes
338:7 489:10
503:10
mischaracterizing
334:3

misrepresent
426:4
misrepresentation
632:13
misrepresenting
426:3
misrepresents
427:13
missed 343:11
379:2 467:19
missing 324:13
446:10,13,22
447:10
mission 502:19,20
621:10,24
misstates 331:21
334:7
misstating 335:11
mistake 388:7
mitigate 409:2
mixes 367:5
modification
633:9
modify 419:11
425:8 516:3
modulate 352:23
moment 307:18
319:18 351:23
355:5 373:2
377:25 382:7
386:6 405:9
410:20 422:25
426:19 435:3
438:10 469:15
470:12,25 471:25
473:2,10 474:17
500:16 504:6
531:18 532:10
545:6 547:22
561:13 583:2
586:16 611:18

612:4 622:20
631:4
moments 503:4
money 505:15
507:13 527:25
529:8,10 530:4
555:8,11 558:17
560:12 588:15
589:19,23 590:19
594:7 599:11
614:20 626:13
monies 506:13,19
509:23 518:17
522:17 524:12
525:6 533:3 556:5
592:19
monitor 319:21
324:22 344:25
347:11 353:25
354:3,6 462:15
567:2
month 489:3,4
months 454:4
455:8 554:4
moore 308:16,19
308:21 356:8,10
356:13 359:16,17
363:6,22 415:5
morning 306:7,8
336:7 339:3
419:10,15 421:15
618:18
motion 314:25,25
move 319:4 462:7
moved 314:21
multi 481:22
multilayer 561:7
multiple 489:20
490:3,7,13 491:3,6
492:3,23 494:21
514:20 517:23

523:21 526:17
561:11 562:4,7,8
562:12 589:13
599:7 602:24
624:16
mural 395:23
murals 386:24
museum 537:13
music 521:19

**n**

n 305:2 306:2
332:16 365:16
419:2,2,2,4 512:23
634:2
name 351:22
369:24 370:8
401:14 410:19
411:25 412:10
424:6 488:18
500:11 512:4
516:19 519:11
538:12 541:5
559:20 573:20
579:9 580:7
582:16 610:15
624:10 638:3,4
names 369:25
401:9,17,19,22
451:11 500:15,25
577:8
nash 477:11,16,17
479:12,24,25
nash's 624:10
nature 311:8,14
345:9 404:12
necessarily 568:19
necessary 566:22
need 313:10
335:24 398:4
423:4 441:19
445:21 449:12,13

**450**:16 **451**:7
**457**:4 **494**:8 **514**:2
**522**:21 **560**:22
**562**:3 **567**:14
**611**:11
**needed** 353:16
**442**:23 **456**:7
**627**:10,11
**needle** 564:11
**needs** 339:19
**340**:24 **365**:4
**442**:17 **560**:20
**561**:19
**negotiate** 505:25
**508**:15 **509**:7
**negotiated** 506:9
**negotiating** 463:22
**neither** 481:11
**neutral** 414:3
**never** 331:7 358:7
**361**:15,15,17,18
**363**:23 **377**:2
**424**:22 **470**:15,16
**557**:18 **564**:3,4,5
**589**:21,22 **603**:22
**616**:14 **625**:6
**new** 304:3,9,18,18
**304**:20 **305**:7,7,12
**305**:16,16 **306**:4
**317**:18 **318**:8,8
**332**:16 **370**:4
**426**:6,25 **502**:14
**502**:17,21 **503**:6
**503**:22 **508**:16
**509**:10 **510**:19
**519**:10,25 **530**:24
**537**:17 **538**:5
**555**:25 **556**:6
**621**:12
**newly** 627:17

**newspaper** 375:21
**nineteen** 306:25
**nobel** 536:13
**537**:5,10 **540**:12
**542**:13
**noel** 505:6 513:15
**513**:20,23 **548**:4
**556**:22 **557**:7,12
**586**:21 **587**:25
**589**:25 **590**:10
**591**:2 **594**:3
**595**:21 **596**:23
**613**:18 **614**:7
**noel's** 589:14
**590**:7
**noneconomic**
**405**:12,19 **409**:3
**nontaxing** 549:13
**549**:15 **550**:3,5
**nonteaching**
**487**:20 **497**:5,9,13
**497**:25
**north** 365:8,12,19
**365**:20 **368**:25
**369**:3 **617**:18
**notary** 304:20
**306**:3 **634**:7
**638**:24
**note** 359:5 371:8
**426**:15 **628**:10,24
**629**:3,5,12
**noted** 313:8 318:5
**372**:13,20 **373**:20
**383**:18 **390**:3
**391**:22 **407**:24
**492**:18 **512**:11
**606**:11 **608**:11
**609**:18 **610**:11
**633**:14
**notes** 325:19,20
**348**:17,18 **358**:24

**359**:7,8,11,13,14
**359**:16,18 **450**:14
**539**:5 **625**:21
**634**:12
**notice** 304:16
**626**:11
**noticed** 622:23
**notified** 356:20
**notwithstanding**
**503**:3
**november** 462:19
**465**:5 **496**:21
**number** 306:10
**309**:5 **333**:9,9
**343**:4 **356**:4
**368**:14,17 **380**:21
**380**:24,25 **381**:6
**384**:7,8,11,19,22
**384**:25 **385**:4,11
**386**:2,10,17,23
**387**:21,23 **388**:2,8
**388**:25 **389**:5,12
**392**:17,21 **398**:24
**404**:2,5,23 **405**:8
**405**:10 **408**:22
**414**:5 **428**:7
**430**:18,23 **432**:9
**432**:25 **434**:16,22
**435**:9 **436**:7,13,25
**450**:10 **466**:25
**467**:7,11,15
**469**:12,17,18,22
**470**:10,22 **471**:3
**471**:13,24 **472**:5,7
**472**:10,14,17,25
**473**:18,20 **474**:9
**474**:16 **484**:5
**488**:23 **493**:13
**519**:8 **524**:21
**527**:16 **534**:10
**535**:23 **540**:7

**543**:23 **544**:6
**552**:2 **553**:22
**565**:11 **568**:23
**603**:3
**numbering** 575:19
**numbers** 534:8
**565**:17 **592**:3
**613**:6 **614**:18
**616**:24
**numerous** 323:17
**323**:19 **324**:2
**348**:9 **351**:10
**438**:16 **439**:6
**466**:21 **553**:4
**603**:13

**o**

**o** 306:2,2 419:2,2,2
**419**:4,4 **440**:10
**512**:23 **513**:6
**521**:3 **634**:2
**oak** 318:16,24
**319**:7 **321**:20
**322**:10,19 **323**:8
**326**:12,18 **344**:22
**344**:23 **346**:12,24
**353**:25
**object** 315:8
**317**:20 **341**:16
**380**:11 **383**:15
**389**:25 **391**:21
**407**:9,14,20 **449**:2
**488**:10,20 **489**:11
**490**:17 **492**:8
**503**:10 **530**:13
**546**:16 **557**:9
**606**:8 **609**:15
**610**:8
**objecting** 407:21
**489**:10 **608**:2,8
**objection** 312:17
**313**:4,7,16 **330**:18

330:19,23 331:3
331:11,17 333:7
333:25 334:4
337:10,20 338:21
339:23 341:12
383:3,17 390:2
391:22 406:15
407:18,19,23
420:18 422:7
440:24 492:11,17
503:15,16 586:3,5
606:11 608:10
609:17 610:10
630:7,19

**objectionable**
333:24

**objections** 306:11
330:12,13 333:6,8
333:13,14,21,21
333:22 335:3,14
335:18 337:6,8,13
337:16 339:23
353:9 377:22
380:3 381:10,11
407:9 419:24
464:23 635:11,17

**objects** 345:12

**obstreperousness**
435:5

**obstructing**
330:10

**obtain** 392:19
526:23

**obviously** 334:4
482:4 494:13

**occasion** 361:3
531:12

**occasions** 323:17
323:18 348:10
361:2 603:14

**occupied** 396:10
397:9

**occur** 475:21

**october** 496:25

**odd** 513:24

**office** 305:4,13
325:8,22 326:4
328:8 329:4,15
331:9,16 332:17
340:16 344:10
345:9 348:9,20
354:3 364:4 368:4
368:7,7,15,19,22
370:10,13,19
371:14 373:4
374:3 376:2,19
386:5,8,15 395:25
396:8,9,24,25
397:8,12,14
415:22,23 427:2
441:24 444:7,20
444:21 449:25
450:5,7,10,11
452:15 453:9,13
453:19 454:10
476:12 487:24
499:25 500:6
502:11,21 503:7
503:22,25 504:2
514:15 515:18,19
515:23 550:7
552:12 555:7,15
556:2,11 587:17
615:22 617:14,15

**officer** 535:9

**offices** 304:17
326:5,25 327:4,20
328:3,20 346:18
347:23 420:6
514:17

**official** 515:17

**officially** 517:19

**officials** 603:3,5,7
603:10,17

**ojeda** 618:20

**okay** 308:7,23
309:23 310:23
313:2 314:20
317:11 319:2
326:11 331:14
332:22 335:15,23
336:18 337:24
341:17 343:24
350:3 353:23
355:8 356:21
361:19 363:18
364:17 365:12
366:10 369:6
370:9,11,18 371:8
371:10,11 377:10
378:18 379:14
380:15,18 381:17
384:6 387:3
388:25 389:14
394:20 399:13
400:15 401:19,24
402:22 404:20
423:5,10 427:17
427:25 430:16
431:10 432:22
437:7 438:9
439:16 440:25
441:18 442:4
444:23 445:4,5
446:3,6 447:13,18
449:24 452:23
454:17 455:2,10
455:17 462:24
465:14 467:14
469:16 470:4
471:2 472:4,8,16

**official** 476:5 477:6 479:9
481:19 483:3
484:12 485:12,24
489:14 491:13
496:9,16 501:3,5
507:6 510:15
513:10 523:11
525:13 528:11
530:11 532:4,5
533:24 537:4,11
539:8,14 540:9,10
542:6 543:22
548:2,25 550:13
552:5 558:15
566:11 569:5
575:24 577:16
578:5,24 583:19
586:19 590:6
592:13 593:5,19
596:8,25 598:3
599:17 601:6
603:20 605:24
606:10,20,22
607:5 608:5
610:20 611:22
616:18 620:19
623:8 629:8,25
632:18

**old** 541:10,13
545:15

**ongoing** 560:25

**open** 374:15 397:5
606:18

**opened** 397:2

**openly** 531:7

**operation** 321:11

**opinion** 361:22
363:4,13,20 413:2
596:2,2 635:8

**opportunities**
362:25

**opportunity**
327:18,23 328:9
328:10,15,18
329:2,11 330:7
333:20 338:14
341:13 344:16
354:13 510:10
**opposed** 469:9
470:6 573:16
**opposite** 370:7
**oral** 438:17,24
439:6 458:13
**orally** 454:14
**orchestrated**
605:12
**ordeal** 536:13
537:6
**order** 457:3
552:15 560:25
561:11
**org** 614:20
**organization**
360:10 483:24
487:5 488:17
491:8 506:20
510:2 519:12
622:6
**organizations**
552:3 553:6,7
**orient** 368:25
**orientation** 364:15
605:8,11,15,25
607:24 608:21
609:7
**original** 403:8
440:13,20 441:8
530:22
**originally** 620:14
631:20
**ortiz** 512:19 513:5
513:10,14 516:21

516:22
**ought** 335:22
**outline** 368:21
**outrageous** 334:12
**outside** 397:13
494:3
**overlap** 558:19
559:5
**oversaw** 571:21
**overseeing** 591:14
**oversight** 530:4
**overview** 621:9
**overwhelming**
589:11

**p**

**p** 305:2,2 306:2
419:4 437:13,13
439:19,21,22,25
441:13 442:6,7,7
442:15,25 443:4
444:24,25 445:5
445:10 446:8,15
446:16,17,18,20
446:23,24 449:17
452:6,7,23,25
453:2,4 454:21,23
454:25 456:17
457:16,18 458:3,4
458:8 460:7,9
461:17 462:24,25
635:15,15
**p.c.** 304:17 305:4
**p.m.** 418:4 419:3
449:19 451:4
452:12 460:12
461:24 588:2
614:11 633:14
**pack** 451:9
**page** 306:20 308:7
308:8,23 309:3,17
311:21 357:7,8,9

357:10,12 378:13
378:15,23,24
379:8,9,11,12,15
379:16 380:16,17
384:7,23 389:2
392:16,22,24
397:18 398:12
399:5,9 404:5,8,9
404:10,16,17,18
404:21 405:16
406:17 408:23,24
414:6,7 419:19
423:7 427:18,19
428:2,2 430:20
432:9,16 438:10
438:13 439:17
440:2 441:13
442:5,6,15 443:4
445:7,7,8,11,13,13
445:17,18,24
446:5,6,7,9,13,15
446:16,17,22,23
449:16,18 452:5,8
453:23 454:18
456:4,20 457:16
458:3 460:4,5,8,9
461:18,22 462:25
465:4,10,13
466:23,24,24
467:2,5,6,8,9,12
469:18 471:3,13
471:15,24 472:6,7
472:15 473:19
477:4,4,7 478:21
479:10,20 481:22
482:6 483:11
484:4,8,13,14
485:13,13,22,25
486:23,23 492:13
493:6,7,10,11,13
493:14,18 495:21

496:9,16 497:15
497:17 498:3
501:20 512:3,17
513:18 532:13,14
536:7,10,17,20,22
536:23 537:12,15
539:25 540:2,4,6
540:11 543:6,7
569:11 570:6,6
572:8,25 574:5,12
575:5 576:18,20
580:6 581:12
585:16,20,24
599:23,24 602:14
603:21,22 606:20
607:9 608:20
614:7 617:11
618:4,11,21
622:17 623:12,14
624:9 635:5 636:5
637:7,7,14,14
638:4
**paged** 486:23
488:2
**pages** 307:25
310:4,6,7,19 311:7
311:18 313:17
325:7 354:15
366:24,25 439:3
446:10 447:10,10
471:8 476:23
478:12,13 482:5
488:3,4 492:15
531:25 600:9
604:19 608:6
610:6 623:17,20
629:5
**paid** 494:14
497:24 505:18
506:14 509:24
521:24 522:3,11

527:16 552:15,20
552:23 558:25
560:8 561:4,13,14
584:23 600:21
**paisley** 316:20
322:2,14 323:14
325:6,8,13,21
326:3 460:17
563:4 624:12,25
625:11 627:6,13
627:16,19
**paisley's** 321:23
321:25 322:6
325:10
**pam** 324:14
327:12 440:14,17
441:7,14,19
442:21 444:9
445:21 449:19
452:9 453:11,25
454:9,19 455:3,19
456:23 479:24
506:6
**pamela** 440:5
441:2 442:10
443:5 453:5
**panel** 582:15
584:12,19
**paper** 363:25
368:3 542:23
581:23 582:7,12
582:14
**papers** 353:2
375:12,20 394:25
396:13,21 415:22
441:20 455:20
457:12 460:16
461:9 540:25
**paragraph** 309:7
357:6,11,14
359:21 360:7

380:20,23 381:8
432:11 435:12
438:19 443:11
467:14,23 473:24
532:16 549:11
560:10 566:14
590:6 593:23
626:6
**paragraphs** 399:9
**parentheses**
485:25 560:17
**part** 358:3 472:17
473:24 491:10
492:4 494:5,12,18
498:18 510:21
511:17 523:14
528:15 543:25
554:14 567:18
585:24 610:2
623:17 624:7
**partial** 344:4
612:13
**partially** 527:12
527:13
**participants** 620:9
**participate** 547:7
609:6 617:16
**participated**
540:23 584:19
**participation**
351:18 584:12
605:9,13 608:14
608:22 609:8
**particular** 310:3
370:2 373:2
552:16 568:24
**particularly**
375:20
**parties** 390:10
402:8 430:7,10

**party** 632:16
634:14
**patterson** 595:21
**pause** 307:23
332:2 336:4 355:7
472:3,13 473:21
482:22 483:2
509:5 512:2
520:14 534:20
539:3,13 545:8
547:25 578:23
583:4 586:18
597:12,16 602:2
611:21 623:7
**pay** 484:22 521:23
549:5,12 599:14
630:17
**payable** 520:23
**payment** 483:23
485:3,20 487:2,11
487:19 488:9,16
492:6,25 493:3
524:11 527:24
530:23,23,24
533:15,16 535:13
535:15 539:17
543:25 552:8
598:4 600:15
601:2 602:5
619:15
**payments** 485:5
490:15 491:7
499:19 507:4,10
516:17 517:12
549:14,15,16
567:12,15 568:2
**peck** 441:20
**pecking** 440:7
**pen** 365:3
**penalty** 379:24

**pencil** 589:17
**pending** 481:10
585:12 595:14,16
596:20 631:5
**pensionable**
527:20
**people** 326:19
345:8 349:14
350:17 361:7,9
422:24 423:15
425:12 500:13
521:23,24 526:22
568:4 573:22
**people's** 395:3
406:23
**percent** 608:23
609:9
**perfect** 596:24
**period** 325:23
328:14 350:17
415:19 488:23
549:5 553:4 554:3
561:4
**perjury** 379:25
**person** 411:23
412:7 500:12
590:18
**person's** 412:10
**personal** 309:21
320:25 327:19
345:12 353:6,7
394:15,16,17
395:4 425:24
428:18 430:6
447:23,24 448:8
448:18 455:20
463:11 481:3,12
**personally** 317:14
317:16 320:6
346:23,25 347:10
347:18,23 348:5

348:15 382:18
393:21,22 395:14
395:16 397:9
474:23 506:17
516:18 537:8,10
589:21 625:14
**personnel** 372:23
524:22
**perspective**
617:18
**perspectives**
617:24
**pertain** 419:15
**pete** 442:10
447:21 448:3,6,10
448:16 449:20
459:3 463:5,21
**peter** 452:10
477:11,13 478:3
**phd** 304:6 306:2
633:20 634:9
638:4,20
**phone** 330:11,15
331:5,24 394:14
394:15,16,17
503:18 597:13
**photo** 351:13
387:4,13,13,15,17
**photograph**
385:13 386:24
**photographic**
351:13 385:14
**photographs**
351:18,20
**phrase** 414:18
**phrases** 391:6
**physical** 340:4
**physically** 334:20
338:25 339:8
345:3,3

**pick** 463:11
**picture** 364:3
387:17
**piece** 363:25 368:3
**placed** 396:2
**places** 535:5
537:18 538:5,7,11
**plagiarized** 564:7
**plaintiff** 304:7
305:5 357:20
381:11,13 382:9
382:22 383:9
384:11,13 385:5
386:18 388:3
389:6,16 390:15
390:20 391:12
399:2 401:2
404:13,24 405:12
409:3 414:19
422:13 428:15
430:23 431:8
432:17,18 435:15
436:14 466:21
467:16,22 468:2,4
468:13,18 472:17
472:19 473:25
474:2
**plaintiff's** 332:13
377:21 380:2
419:23 464:23
635:10,16
**plaintiffs** 399:14
433:3
**plant** 453:14
**plants** 322:19
323:10
**play** 526:4 587:22
**played** 355:24
526:3,11
**please** 307:17
312:17 342:16

344:4 349:21
350:2 351:7
352:24 355:4
357:8,14 358:18
368:4 377:25
385:22 396:5
414:6 442:16
451:10 460:14
476:21 484:22
509:3 511:24
520:11 531:18,24
534:17 538:25
540:6 545:5
547:21 565:22
566:8 578:18
582:25 586:15
597:10,14 601:23
611:17 631:13
**plenty** 626:11
**point** 317:3 341:10
344:8 353:10,16
378:13 388:11
464:6,9 490:23
493:19 528:11
545:14 554:2
561:8 562:7 564:2
605:7 608:19
609:22 610:5
630:8,22
**pointed** 619:6
622:17,20,25
**pointing** 334:19
339:5,6 447:18
**points** 510:11
**policies** 380:24
381:2,24 382:16
383:22 531:16
533:25 571:22
**policy** 471:6,20,21
514:19 531:16
533:14 562:12

570:22 603:12
617:18,21 622:13
**political** 323:22
368:9 556:23
573:17,18 600:5
627:20
**politics** 573:23
603:13
**pollack** 324:14
440:5,14,17 441:3
441:7,14,19
442:10,15,21
443:5 444:10
449:19 451:2
452:9 453:6,25
454:9,19 455:3
456:3 457:6
479:24 506:6
**popular** 621:24
**portion** 310:8,13
343:23 355:16
**portions** 309:24
314:3 343:18,21
378:3 447:5
548:19
**portray** 352:4
**position** 321:7
410:2,4,5,7 411:23
412:3 489:21
490:3,7,14 491:3,6
492:3,23 494:16
494:21 514:20
557:8,13 561:12
562:4,7,8,12
624:16
**positions** 336:22
517:23
**positive** 372:7
**possession** 322:15
382:3 383:12
384:18 385:10,25

386:11 388:15,18
389:11,22 390:14
390:25 391:2,15
392:3,8 409:9
421:16,21 422:16
428:18,25 429:3
430:4 432:23
433:5,8,19,25
434:15,20 435:19
436:5 439:10,13
439:14 448:6,8,11
448:16 468:21
469:8,11 470:6,8
470:20 472:24
473:7 474:7,15
**possessions** 463:11
**possibilities**
500:20,22
**possibility** 474:18
**poster** 581:23
582:8
**potentially** 428:16
428:19 429:2
628:12
**power** 573:22
**practice** 314:25
**practices** 572:4
**precedes** 466:5
**preceding** 467:2
**precise** 528:7
529:5 553:21
556:15 631:18
**precisely** 349:9
355:23 413:20
502:23 571:16
**preclude** 406:24
474:18
**predating** 505:20
**prefer** 453:12
**preliminary** 310:9
310:14,17 419:16

419:17
**premises** 321:3
325:22 347:16
348:8,11
**preparation**
622:12
**prepare** 309:23
310:13 311:13,24
312:6,6,9,12,13
313:6,10,23
343:22 355:16
**prepared** 310:16
311:4 314:2,14
343:18 618:14
619:14
**preparing** 429:20
**present** 344:23
346:9 414:11
429:6 582:7
**presentations**
617:24
**presented** 582:12
582:13 584:20
620:16
**presenting** 581:22
582:3 583:21
584:10,13,18
**presently** 416:20
**president** 320:3
325:5 326:24
345:18,19,20,21
346:2 347:20
484:17 506:7
515:13,14,16
**president's** 507:19
516:2,16 517:9,19
**pretrip** 605:8,11
605:15,25 607:24
608:21 609:7
**pretty** 413:14

**previous** 334:3
338:16 342:18
353:19 359:15
364:7,8 404:10
423:9 459:12
497:23 514:23
617:8
**previously** 343:25
396:9 419:5
457:25 561:16
573:8 577:17
**primarily** 518:24
577:24
**principal** 504:24
505:3,4
**printed** 445:21
**printout** 545:25
**prior** 331:21 478:9
485:13 533:20
**privacy** 430:9
**privilege** 435:23
**privileged** 420:18
420:21 447:6
**probably** 346:15
375:20 477:4
521:20 569:25
**problem** 340:7
568:3
**problems** 342:3
**procedure** 530:24
**procedures** 559:6
**process** 528:16
561:8
**processed** 549:16
**produce** 386:22
402:18 403:5
408:18,21 437:18
629:12
**produced** 324:16
359:11 387:5
402:25 403:22

409:21 447:12
451:20 466:9,10
466:12 470:19
473:13 629:2,24
633:13
**producing** 404:25
**production** 377:23
380:4 387:4
400:16,18 402:16
403:4,6 419:25
429:16 430:17
439:4 445:18
451:20,25 464:25
629:17 635:13,19
637:6
**professional** 320:2
325:3,17 326:22
341:2 345:16,24
347:19 352:25
400:17 449:14
455:23 526:15,23
612:15,20
**professions** 617:22
**professor** 321:19
324:21 325:2,15
357:20 358:12,13
361:12 442:16
480:20 481:12
556:23 565:5
580:11 610:16
617:14 621:11
625:17 626:2,6,21
628:10,22,23
629:3
**professors** 563:15
610:18
**profiles** 585:19
**program** 410:16
413:14 551:6,7
555:4 556:17
571:15 587:7

588:23 590:20,24
593:14 621:13
625:6,7 627:4,12
**programs** 502:3
522:9 556:15
559:18 567:6
578:3 580:18
589:13 594:12,14
595:24 615:19,24
621:7
**prohibited** 461:6
**project** 518:21
519:2,9 552:16
625:13
**projects** 367:3
519:6 525:11
560:3
**properties** 471:7
**property** 309:21
347:15 348:22
392:20 438:18,25
439:8 447:24
448:9,18 471:5,19
**proposals** 594:15
**propose** 591:7
**prospective**
362:24
**protest** 343:13
356:17
**protested** 343:8
356:3
**protesting** 356:22
**prove** 439:12
**provide** 359:12
362:8,12,14,17,20
362:23 408:15
409:11,12 415:10
429:13,23 444:2
445:17 447:20
448:5 473:12,15
474:12,12 476:13

500:15 502:3,15
504:21 525:5
529:19 564:20
**provided** 314:3
351:17 359:14
408:21 412:14,23
412:24 429:10,15
429:24 431:3,19
436:11,17,24
437:6,11,18 438:3
438:7,22 443:22
448:15 466:14,17
487:17 502:15
516:18 518:17
522:18,23 523:17
524:16,24 530:2
555:25 567:21
600:20 612:13
633:8
**provides** 503:25
551:7
**providing** 392:9
**provost** 346:15,16
491:21 494:13,14
494:15 513:3
515:16 625:10
**psc** 533:4 612:12
612:19,24
**psychiatrist** 406:5
**psychiatrists**
405:23
**psychologist** 406:5
**psychologists**
405:22
**public** 304:20
306:4 570:20
574:2 575:20
603:19 621:19
634:7 638:24
**publically** 603:9
603:11,14,16

621:25
**publication** 563:8
**publications**
562:15 564:8
**published** 586:11
**purchase** 537:12
537:17 545:24
589:17
**purchased** 535:7
535:24 536:13
537:8,10 538:10
538:10 540:16,19
541:2 546:12
588:13
**purchases** 535:2
**purchasing** 544:18
**purpose** 504:17,19
556:10 562:8
581:15 583:21
593:6
**purposes** 628:13
**pursuant** 304:16
**put** 335:25 337:11
365:15 371:9
373:7 376:24
411:3,5 500:2,7,17
500:23 504:14
583:19 588:4,18
607:12,17,22
616:3
**putney** 543:9,12
543:12 544:12
**putting** 371:22
403:17 493:2

**q**

**quarter** 397:23
**quarterly** 507:14
**queens** 518:12
**question** 306:15
318:18,22,25
319:3 324:11

328:21,23 329:11
329:12,19,20
330:6 331:19
334:7 337:9,19,21
340:11 342:16
344:4 349:23
352:8 362:5
366:17,18 377:3
378:4 381:19,23
382:20,21 383:5,6
383:7,19 385:17
385:20,21 386:4
389:19 396:19
398:8,11 403:19
405:5 407:4
408:10 412:17,19
422:8 430:5 431:6
431:10,23,24
432:22 433:13,18
434:18 435:3,17
435:25 436:2,3
437:25 446:21
447:15 448:14,23
449:7,9 455:11
459:6 464:11,16
464:18 469:6,7,20
470:2,5 474:7
481:10,17 490:10
490:24 491:2
492:19,21 495:5
505:24 507:8,9
508:7,9 517:2
524:16 525:4,14
526:19 528:8
546:18,20 551:14
552:19 561:25
564:8,12 566:6
585:12,13 592:24
595:14,16,17
596:20 600:23
601:12 605:4

608:2,9 610:9
612:2 622:22
628:16,19,21
630:7,18 631:16
**questioned** 564:3
564:4,5
**questions** 312:14
312:22 313:4
321:15 323:8
333:3,10,11 334:6
335:2,20 337:3,7
338:6 343:19
353:8 404:4
449:12 495:20
508:14 510:9,12
541:17 547:4
578:21 606:9
629:14,16 630:24
631:5,6 637:13
**quick** 471:25
599:21
**quickly** 569:4
**quite** 567:21 604:6
626:8
**quotations** 499:6
**quote** 620:24

**r**

**r** 305:2 419:2
512:23 513:6
521:3 550:21
559:13 587:4
634:2
**race** 375:17
**rachel** 477:10,16
477:17 479:12,24
479:25 624:10
**raid** 344:6
**raising** 323:7
**ran** 627:25
**range** 617:22

**rate** 487:16,17,19
497:6,9,13,23,24
527:23
**ratings** 563:5
**rb** 551:13
**rba** 550:15,18,19
551:12,12,16,18
551:23 552:4,6,9
552:15,20,23,25
553:2,8,14,16
554:5,11,24 555:3
560:12 567:13
**reaching** 632:2
**read** 307:24
313:24 342:17
344:5 357:14
373:13 396:4,6
399:7,8,10 472:8
472:14 473:19,22
499:10 532:2
536:16 537:4
546:19,21 563:19
563:20 617:12
623:11,11
**reading** 311:16
372:25 604:5
**really** 340:18
483:20 564:10
**rearrange** 614:14
**reason** 353:5
449:11 475:19
486:12 538:9
539:4 558:12
564:3 638:4
**reasonable** 381:12
381:21 384:12
432:18 435:14
**reassigned** 564:14
564:16,17,20,24
564:24 565:7
569:8,14 570:12

571:3,4 572:18
574:7,25 576:10
576:14 577:10,12
**recall** 306:9,15,17
306:18,19,22
311:15 316:19
349:2 350:9,16
351:23 352:16,18
368:17 372:7
394:8,9 413:24
414:4 442:24
451:17 452:2,4,21
453:20 454:16
460:3 468:8
477:25 478:20,20
483:5,20 485:19
486:20 499:24,24
500:5,9,11 507:25
508:6,8 512:5,14
514:22 519:5,13
519:19 521:14
522:2,10 531:14
532:7,8,11 538:7
542:24 544:15,19
548:9,15,18,20,22
551:10 553:21
559:19 567:25
568:16,18 574:23
575:12 581:10
585:3 587:9 589:5
595:6,9 596:6
612:4,8,12,17,19
612:22 613:23
614:23 616:17
624:15,19 626:4
631:15
**recalled** 350:18
**receipt** 414:9
444:11 462:17
491:7 540:12
542:13 546:5

**receipts** 544:17
545:23 546:11
600:19,20
**receive** 443:11
452:19 453:15
456:10,11,12
457:11 527:24
529:2 556:19
568:2 591:13
600:13,23 627:8
629:16
**received** 424:5
443:15,17 453:21
504:9,11 524:23
528:12,14,22
529:20 547:9
552:10,11 554:6
567:13 569:13
571:4,11 574:7,24
576:10 577:11
598:14,17 600:18
604:15
**receives** 532:24
**receiving** 416:20
416:24 417:4,10
452:21 490:15
548:9,18
**reception** 462:18
**receptionists**
524:21
**recess** 377:14
418:4 476:6 566:3
**recidivism** 519:13
**recklessness**
406:23
**recognition**
523:15 527:7
**recognize** 501:14
501:16 509:6
511:10

**recognized** 511:7
**recollection** 367:8
  375:9 439:2
  443:15 450:10
  486:7 504:3 505:5
  519:15 523:12,22
  528:19 550:19
  628:25
**recommend** 530:5
**recommended**
  599:13 632:20
**record** 307:7
  315:11,12,17
  316:2,8,12 317:22
  332:6 333:12
  335:10,12 337:9
  337:11 342:17
  344:5 377:18
  390:18 396:6
  403:17 422:7
  423:18 424:12
  425:10 449:22
  464:21 476:9
  482:11 491:15
  546:21 622:25
  630:5,16,21
**recorded** 392:18
  393:10
**records** 375:14
**recover** 460:15,20
  460:25
**recovering** 459:9
  460:2
**recovery** 458:19
**reduced** 315:3
  527:22
**redundancy** 432:3
**refer** 387:12
  392:17 463:19
  537:20 617:10
  621:16

**reference** 350:20
  351:2 357:18
  359:20 393:9
  462:11 497:14
  503:5,20,21
  505:10 555:23,24
  592:18 593:2,18
  608:7 619:20
  630:3,9,14
**referred** 326:23
  359:25 432:11
  471:7 516:20
  517:4 523:4
  551:12,15,18
  559:14 615:5
  619:10
**referring** 322:7
  325:11 327:8
  368:8 387:16
  396:8 436:18
  524:2 607:23
  608:20 616:10
  628:14,17
**refers** 388:8 432:2
  450:4 492:14
  538:11 568:13
  572:25 609:23
  615:8 620:24
  621:5
**reflect** 335:10,13
  394:18,19
**reflected** 491:10
  618:17
**reflecting** 517:5
**reflection** 338:19
  424:2
**reflects** 573:4
  574:6
**refresh** 443:14
  450:9

**refreshed** 361:11
**refused** 317:23
**refuses** 334:9
**regard** 321:15
  352:11 400:9
  406:4 407:25
  504:25 523:9
  630:8 631:10,12
**regarding** 426:20
  440:6 454:9
  458:19 459:9,25
  557:19
**regards** 408:6
**registration**
  604:11
**regular** 493:23
  494:12,18 527:19
  567:16
**regulations** 555:17
  555:18
**reimburse** 524:11
  524:19
**reimbursed** 530:9
  531:3 542:18
  543:25 545:24
  578:6 599:3,5,16
**reimbursement**
  521:4,25 522:7,12
  523:20 535:23
  537:22 539:19
  546:13 579:12,22
  580:2,22 581:7
  583:7,12,25
  584:24 598:11,21
  601:7 602:11
  604:15,15 612:14
  614:22 620:22
**reject** 508:3
  529:14 530:6
**rejected** 351:21
  495:15 529:16,17

  581:9 584:5,6,7
**relate** 488:7,15
**related** 386:4
  439:5 450:17
  501:25 522:8
  563:11 571:14
  612:16 616:5
  630:11 634:14
**relates** 485:20
**relating** 398:25
  400:25 405:11
  408:4,25 432:10
  435:10 437:2
  438:16,23 471:17
  553:16 554:11
**relations** 410:8
  412:5 603:12
**relevant** 605:25
**relied** 404:10
**remain** 315:6,14
  315:19 317:5
**remaining** 478:5
**remember** 315:12
  323:7 367:6
  369:25 370:12
  411:25 423:25
  468:15 489:18
  500:16 505:9
  519:11 521:20
  528:6,9 529:5
  531:12 539:6
  574:4 628:7
  631:24
**remind** 593:5
**remove** 441:21
  623:19
**removed** 480:7,22
  481:3
**repeat** 357:8 423:4
  436:3 464:18
  484:18 491:2

| | | | |
|---|---|---|---|
| 492:21 546:18 | 387:2 436:21 | 471:13,24 472:5,9 | 372:23,24 375:15 |
| **repeated** 360:8,13 | **representatives** | 472:15,17,20,25 | 402:3 406:20 |
| 427:15 435:11 | 459:8,24 621:6,23 | 473:8,18,19,22,23 | 455:24 457:4 |
| 438:17 439:6 | **represented** 363:8 | 474:4,9,16 485:3 | 518:11 519:9,23 |
| **repeatedly** 335:10 | 425:24 | 487:19 488:14,25 | 523:2 525:2,11,15 |
| 421:15 422:12 | **representing** | 535:13,15,22 | 525:22 526:6,10 |
| 426:10 | 333:5 337:4 | 539:17,18 543:25 | 526:14 527:11,17 |
| **repeating** 351:10 | 424:20 632:14,15 | 579:11,21 583:6 | 528:20 529:21,24 |
| **rephrases** 334:6 | **repurchase** 546:4 | 583:11 584:24 | 530:25 531:4 |
| **replaced** 356:9 | **request** 318:4 | 598:4 600:15 | 532:15,19,20 |
| **replacing** 414:15 | 380:21,25 381:6 | 601:3,7 602:5 | 533:5,9,11 535:3,3 |
| 416:18 | 381:14,22 382:5 | 606:23 607:2 | 538:2,4 540:24 |
| **report** 494:8,18,20 | 382:11,15,23 | 619:15 620:4,22 | 541:2,4 542:21,23 |
| 568:10,21 570:9 | 383:10,13 384:6,7 | 622:4 629:20 | 543:2 546:25 |
| 590:10 | 384:11,14,19,22 | 637:6 | 547:3,5 562:14,16 |
| **reported** 515:13 | 384:25 385:4,6,11 | **requested** 390:14 | 562:22,23 563:11 |
| **reporter** 304:19 | 386:2,10,17,19,23 | 392:4 430:18 | 563:14,14 564:6 |
| 307:9 332:8,11 | 387:20,23 388:2,5 | **requesting** 428:7 | 577:20 622:12 |
| 336:9 339:21 | 388:8,16,25 389:5 | 447:22 448:7,17 | **researcher** 518:24 |
| 354:23 361:21 | 389:7,12,17,23 | 583:25 609:23 | **reservation** |
| 364:24 476:10,14 | 390:8,11,12,17,22 | **requests** 377:23 | 633:11 |
| 481:8,21 508:20 | 391:4,13,16 | 380:4,25 384:2 | **reserve** 340:16 |
| 511:15 520:5 | 392:17 393:2,2,3,4 | 403:13,14 408:25 | 629:15 |
| 530:16 534:5 | 393:4 398:24 | 419:25 421:17 | **resign** 557:7,12 |
| 538:15 544:22 | 400:24 404:2,4,8,9 | 438:5 464:25 | **resigned** 576:11 |
| 547:14 565:14 | 404:23 405:2,8,10 | 465:23 466:21 | **resolution** 511:11 |
| 578:11 582:18 | 408:22,24 409:10 | 468:11 475:17 | **resources** 487:24 |
| 585:5 595:11 | 414:5,20 415:7 | 483:23 486:25 | 515:4,21,24,24 |
| 596:10 601:16 | 422:14,17 428:7 | 488:3,4,7,8,15,16 | 552:12 555:7,21 |
| 610:23 613:3 | 428:17 429:22 | 492:5,25 493:3 | **respect** 315:2 |
| 616:20 630:3,18 | 430:3,18,22,25 | 507:3 530:8 531:6 | 435:8 469:16 |
| 630:19 634:7 | 432:9,20,25 434:3 | 598:10 635:14,19 | 493:3 557:21 |
| **reports** 399:23 | 434:16,22 435:8 | **require** 622:11 | 574:8 |
| 400:11 489:21 | 435:16,20,21 | **required** 494:17 | **respective** 336:21 |
| 490:3,7,14 491:6 | 436:7,12,15,25 | 495:6 | **respond** 333:16 |
| 492:4,23 494:21 | 438:15 449:14 | **requirements** | 451:14,16 530:21 |
| 495:2 569:6 | 466:25 467:6,11 | 563:10 | 624:22,24 626:2 |
| **represent** 608:23 | 467:15 468:5,14 | **reread** 381:23 | **responded** 451:2 |
| 609:9 | 468:20,22 469:12 | **research** 325:19 | 451:21,24 452:4 |
| **representation** | 469:17,18,22 | 325:19,25 346:7 | 456:3 457:8 |
| 358:10 385:15 | 470:10,22 471:3 | 348:17,17 354:7 | |

responding   391:17
452:2
responds   545:20
response   338:8,15
338:24 380:21,24
381:5,10 384:10
385:3 386:17
387:25 388:7
389:4 392:17
393:2,4,5,7,9
399:4,10 404:22
407:4 411:18,21
414:18 428:14
430:22,24 435:14
436:12 438:8
447:11 451:19
464:10,14,15,16
466:20,25 467:10
467:11,15,24
468:9,12,23
470:13 472:16
473:23 596:5,6,23
596:23 600:14
601:2 631:15
responses   377:21
380:2 399:15
419:15,23 464:23
465:21 474:19
635:10,16
responsibilities
455:24 494:7
565:12 571:25
responsible   321:5
347:14 467:17
468:3 472:18
474:2,20 566:19
599:8,12
responsive   338:13
381:14,22 382:4
382:10,15,23
383:5,10,13

384:14,18 385:6
385:10,25 386:10
386:19,23 388:4
388:16 389:7,12
389:17,22 390:8
390:12,16,21
391:3,13,16
400:24 404:2,25
405:7 409:9
414:20 421:17,25
422:14,17 428:16
428:19 429:2
432:19,24 433:3
434:2,16,21
435:16,20 436:6
436:15,16 437:5,6
438:4 468:5,14,19
468:22,24 469:12
470:9,21 472:20
472:24 473:8,16
474:3,8,16 475:16
475:24
rest   430:4 486:22
560:12 587:12
restrict   335:2
restrictions   529:7
result   314:24
399:3 401:3
404:14 405:13,24
406:22 409:4
554:6 555:3
resulted   412:16,25
514:18
results   436:23
437:2 519:23,24
550:21,22,25
551:3,13
resume   410:23
411:10
retaliation   627:16

retaliatory   388:10
retired   427:9
retrieve   354:13
return   318:16
319:7,21 320:2,11
320:15,19,24,24
321:20 324:22
325:3,16 346:11
346:24 347:11,19
348:6,16 438:18
438:24 439:7
456:5 486:2 546:4
returned   324:7
373:20,22,24
455:21 456:7
457:3 470:15,17
returns   342:13
428:8 429:4,17,24
430:4,7,15,17
review   307:6,18
312:8 314:8,15
315:9,16,25 316:7
317:22 343:6,14
355:5,13 356:23
357:3,4 466:8,11
466:13 478:5
499:20 506:11
509:3 511:24
516:6 517:11
519:22 520:11
528:15 529:13,15
531:19 534:18
538:25 545:6
547:22 550:8,9
553:23 555:21
561:21 562:23
565:23 578:19
583:2 586:16
597:10 601:24
611:18

reviewed   343:2
401:10 476:23
478:9 528:4
529:12 531:7,24
532:4 535:8
539:15 549:17
552:25 555:19
578:24 586:19
597:17,20 611:24
reviewer   535:19
539:20
reviewing   517:21
526:21 527:3
535:8
reviews   529:25
562:19
rework   614:17
rich   351:9,10
righ.t   383:25
right   306:21,25
307:2,5 308:17,20
308:25 309:14
310:9 311:2,9
313:19 316:5,8
318:10 321:14
323:23 327:20
328:14 329:9
336:19 339:17
341:24 349:2
350:11 355:22
356:3,25 357:17
358:22 361:8,16
362:12,15,16,18
363:10,13,19
365:13 367:14,25
368:2,11 369:11
370:17 372:18
374:2 375:5 377:8
378:9 379:22,23
380:19 381:21
384:21 387:20

388:6 390:9
391:17 392:15
393:10 394:7
395:7 396:22
397:3,10,17 399:8
399:17 400:7,21
401:21 405:10
406:14 408:19,22
414:5 415:25
419:21 422:20
426:22 427:11,22
428:12 432:3
433:5,20,21 434:6
434:9 438:20,25
440:7,16 441:3
442:2,3 443:8
445:11,12 449:20
450:5,14,20,24
451:3 454:15
456:17 457:6
458:6,7,10 459:19
461:17,25 462:2,4
462:8,15,19,22
464:13 467:7,12
469:4 471:2,10,21
471:23 473:14,18
474:21 478:23
479:7 480:25
483:5 484:6
485:10 487:3
489:2,3,8 493:20
493:21 496:13,17
496:19 497:9
498:2,6,23 499:4
500:12 501:7,19
504:7,15 505:17
506:10 509:13
513:16,21 517:25
518:4,6 521:10
524:14 527:5
528:9,10,25,25

534:4 536:15
537:14 540:10
541:8 542:7,8,10
542:11,18 544:6
544:13 545:16
546:6 548:7,23
549:2 551:16,17
551:19 552:6
556:7,24 557:3
566:10 568:6,14
570:5,13,16 571:3
571:6,9,15,17
572:7,13 573:2,5
573:11 574:5,12
574:15,18 575:3,9
576:5,22,25
577:19,21 579:23
580:4,11 581:24
582:2,5,6 583:13
583:17,22 585:25
587:4 588:17
591:25 592:10
594:8,9 597:22
600:2,3,7 602:4,12
602:21 603:18
604:5,12,16,23
605:16,17,22
606:3,18,24
607:10,14,19,24
608:17,24,25
609:10,11,13,24
613:23 615:9,24
616:7,16 618:5
619:17 621:14
623:2 624:5,17
628:2,4 629:9,13
629:15 631:3,7
633:3,7,10
**rights**  633:12
**risk**  556:18

**road**  563:20
**role**  516:15,17
  518:16,20 519:20
  519:22 525:25
  526:12,16,21
  527:15,17 551:11
  551:22 553:14,16
  554:11 571:8
  574:8 575:2
  576:12,15 577:13
  587:23
**roles**  420:11 526:3
  526:4,7,10,17
**room**  332:6
  336:15 340:16
  342:14,22 376:10
**roosevelt**  320:3
  325:5 326:24
  345:21 346:2
  347:20
**roster**  599:19
**roughly**  370:14
**round**  542:15
**routed**  515:2
**rules**  340:6 353:14
  353:15 555:17
  563:20,22,23
**ruling**  340:10
  637:13
**running**  502:4
  556:17 610:2

**s**

**s**  304:17 305:2,4
  306:2,2 419:2,2,2
  419:4,4 440:10
  541:8 587:4 635:2
  636:2
**sabotage**  625:14
**salaries**  491:17,18
  491:23 492:2

**salary**  493:4
  527:16,19 533:6
  560:19,22 561:18
  589:20,25 590:4
  590:10
**sally**  499:3 558:18
**sat**  571:23
**save**  527:25 546:7
**saw**  358:7 404:22
  405:24 406:6
  437:24 488:25
  597:24
**saying**  312:10
  330:5 334:8 361:7
  386:9 390:25
  393:7,8 431:3
  433:13 444:12,16
  455:9 468:20
  503:19,24 529:23
  564:6 584:11,14
**says**  309:7 338:8
  360:7 379:15
  381:5,8 388:5
  392:23 398:24
  400:6 419:19
  428:9,14 441:19
  445:21 446:20
  459:17 463:9
  472:17 478:3,3
  480:4 484:21
  485:2,25 493:22
  501:21 513:24
  521:2,3 532:18
  536:14,16 537:5
  542:25 548:23
  549:12 550:14
  552:5 558:16
  560:11,17 566:11
  566:16 579:16,16
  581:15,22 582:2
  583:20 585:18

590:7 592:4,6,8,13
593:15,22 599:24
600:17 603:21
605:7 608:20,25
609:2 617:18
620:6,7 626:7
627:10
**scanla** 339:17
**scanlan** 336:5,6,8
336:12,18 337:24
341:7,15,21,24
342:8 402:8
407:15 421:12
**schedule** 549:13
**schedules** 388:10
**scholarly** 622:11
622:15
**scholars** 617:21
622:13
**school** 410:7 412:4
508:16 509:10,24
510:18 519:8
535:4 536:4 543:9
543:12,15,17
544:13
**schooling** 540:21
540:24 546:13
**science** 323:22
368:9 556:23
573:17,18 600:5
627:20
**scott** 587:4,13,14
587:22,24 589:19
589:22,24 593:21
**screaming** 353:3
**seam** 513:24
**search** 381:12,21
384:12 392:13
432:18 435:15
467:17 468:3
472:18 474:2,20

474:24 475:2
**searched** 434:5,7
**second** 306:20
309:12 310:5
333:25 334:11
336:25 359:22
360:6 379:8
443:10 464:24
465:4,22 467:20
471:15 478:2
487:9 539:12
550:13 570:6
584:24 590:6
592:5 615:20
617:11 623:17,19
635:18
**secondly** 515:16
**secretary** 321:24
321:25 322:6
323:21 486:7,10
513:9 516:20
**section** 310:25
311:13,19 313:18
583:20
**sections** 314:14
**security** 523:16
524:20
**see** 308:12 309:10
309:11,20 345:9
345:13 346:25
357:16,22,24
359:22 360:10,11
368:11 369:14,16
369:20,23 378:21
380:22 381:3,4,15
381:16,25 384:7
384:10,15,25
385:3,7,8 387:23
387:25 389:2,4,8
396:7,13,20 399:4
399:6,12 400:5,8

404:15 405:4,15
405:17 409:6,7
413:15 414:15,17
414:21,22 428:20
428:20,22 432:14
432:15,20,21
434:23 435:2
438:20 441:16
442:19,20 443:3,5
443:13 451:12,13
451:18 452:17,18
453:4,24 456:8,9
456:21 459:17
460:17 463:12
465:14 467:4,13
467:18,20 468:5,7
469:4,22 472:21
472:22 474:4,5,11
475:23 478:6,19
478:22,24 479:5
480:7,8,10,11
482:25 483:10,13
485:16 486:2,4
490:9 491:21
493:8,13 499:6,8
499:11,12 501:22
501:23 512:4,12
514:6,7 521:5
522:21 531:22
532:15 533:6,7,12
533:16 537:9,13
540:3 541:15
545:9 546:8
547:24 549:6
550:16,17 560:5
560:15 566:20,21
575:20 579:3,4
580:8 581:11,19
581:25 583:5
585:16 588:5,6,20
592:2,3,5,6,16,17

593:15,25 594:2
599:19 601:10
602:3 603:21,24
605:5,14 610:14
611:22 612:5,10
613:17,21,22,25
616:10,10 619:2,5
623:10 626:15,17
626:19 628:14,17
629:22
**seeing** 361:10
453:20 478:20
483:6 485:19
512:5,14 532:7
568:16,18 613:24
**seek** 435:21 591:9
591:10
**seeking** 579:25
**seen** 308:4 346:9
355:10,12 362:6,7
378:5,6,8 400:13
462:25 466:4
477:19,23 478:17
479:17 485:17
520:16 532:6
578:25 579:5
612:3 623:9
**seized** 318:15
319:6,20,25 320:5
320:6,8,10,12,14
320:16,18,21,24
321:4,19 322:3
324:21 325:2,16
328:8 346:11,23
347:10,18 348:5
348:15 367:4
400:18 420:8
422:25 433:3,6,10
433:16 434:10,17
434:24 444:4,5,8
444:12,15,18,22

[seized - signed]                                                                    Page 44

455:8 468:25
**seizing** 321:5
**seizure** 328:13
347:15 444:6
**semester** 561:3,15
569:8,15 570:13
570:16 575:9
576:25 626:13
**seminar** 569:20
570:19 572:17
573:8 577:5
**send** 480:5 628:10
628:23
**sending** 588:8
**senior** 587:15
**sent** 320:4 324:14
324:15 325:5
326:24 345:18
346:2 347:21
401:7,15 411:10
412:9 438:5 441:2
442:19 444:10,14
447:22 448:3,7,16
449:18 451:3
452:11,16 455:18
456:20 460:11
461:23 477:20
480:3 486:11,13
486:17,20 496:18
512:18 513:19
545:11 548:6
588:2 614:10
629:3
**sentence** 360:6
440:18 441:18
450:4,19 463:8
478:2 542:25
550:13,16 556:21
558:15,22 559:14
**sentences** 626:5

**separation** 557:15
**september** 484:14
484:19 494:7
624:13
**series** 337:3
351:15 352:6
360:24 361:6
442:9 507:2
534:25 553:24
613:20
**served** 527:15
533:18,21 563:9
**service** 502:22
527:10,21 528:20
528:21 529:21
532:15,18 533:9
535:18 546:15
553:12 562:15
563:2,2,7 564:4
**services** 484:23
485:9 486:9
487:25 497:2
500:2,7 501:22,24
502:3,7,12,16
503:6,8,21,23
504:2,23,23
515:19 521:18
524:16,24 539:20
550:16 554:25
555:5,15,24 556:2
556:12 560:14
567:13,20 614:16
615:6,11,23 616:4
616:5
**serving** 532:21,23
**session** 513:25
560:18
**sessions** 457:2
551:25 553:3,23
553:25

**set** 377:22 380:3
399:16 411:15
419:24 464:24
465:22 468:10
502:2 532:25
535:17 546:14
566:17,23 589:4
589:14 606:2
619:17 635:12,18
**sets** 604:19,22
**seven** 323:5 375:6
**seventh** 309:20
**shakespeare** 544:6
547:5
**share** 594:5
**sheet** 498:6,8,12
498:19 501:6,10
549:13 638:2
**sheets** 359:9
501:18 549:5
558:20 559:4,8
**shelves** 374:13
375:16 376:7,9,25
**shit** 566:19 567:24
**shop** 537:13
538:12
**shops** 593:16
**short** 626:10 627:6
**shorter** 495:3
**shorthand** 304:19
494:19 634:6
**shortly** 625:18
**show** 307:16
316:13 355:3
362:2 377:19
394:22 395:21
435:5 437:7
464:20 467:19
476:20 482:3
489:14 509:2
511:23 520:10

531:17 534:16
536:9 538:22
545:4 547:20
553:11 565:21
569:6 578:17
582:24 593:24
594:6 597:9
601:22 606:16
611:16 613:11
617:5 618:6
628:20
**showed** 441:6
586:14
**showing** 440:21
594:20
**shown** 483:18
**shows** 394:23
395:5,23,24
568:23 569:12
570:11,15 572:12
574:14,24 576:9
576:24 577:10
**side** 339:19,20
365:8 366:7
371:20 540:10
562:11 563:16
**sign** 308:14,15
380:9 521:9
558:18 560:20,22
561:19 579:9
583:7
**signature** 379:19
379:20 465:15,18
509:21 579:3,4,6,7
579:8 583:10
607:9,13 634:22
**signed** 308:12,17
308:18 312:3
313:12 378:20
379:21 465:21,25
466:6 491:20

[signed - stamp]

498:11,21,23
501:7 509:13,16
521:7 579:10
607:8
**significant**  325:23
554:16 599:10
**significantly**  315:3
**signing**  501:10
**similar**  468:11
**simple**  340:3
433:12,22 448:23
448:24 526:18
552:18,19
**simply**  430:25
433:15 507:15
**single**  328:9
354:13 515:22
610:13
**sir**  309:24 315:15
316:5 328:12
354:16 355:11
359:22 380:17
383:20 384:15
385:7 389:2 409:6
423:7 425:8
427:18 428:20
430:20 431:21
435:17 438:20
440:2 442:19
447:16 451:12
453:2 465:18
469:7 472:21
473:14 490:25
514:6 517:2 530:7
531:18 533:6
535:11 540:2
541:22 544:3
546:8,17 560:15
568:8 576:20
579:2 580:8 593:6
597:18 605:4

606:19 607:24
609:14,24 611:23
612:18,23 613:12
614:25 618:9
619:2,22 623:3
633:4
**sit**  340:17 371:6
**sitting**  315:10
328:24 399:7
407:5 408:8
409:13 474:14
**situation**  406:24
626:9
**six**  375:2 376:9
**size**  372:2,3
**skills**  364:2
**slamming**  353:2
**slash**  587:4
**slightly**  375:8
620:11
**slipped**  530:10
531:10
**slots**  376:25
**smashed**  406:22
**smashes**  367:5
**smily**  480:9
**social**  405:23
406:4 504:22
595:22 621:13
**society**  351:15
352:7 360:9
395:24 435:12
**solutions**  638:2
**somebody**  462:7
558:13 579:9
**son**  430:11,13
542:2,4
**soon**  611:14,15
**sorry**  345:21
349:22 367:7
388:5,7 400:16

436:3,4 447:19
449:5 455:4
467:19 489:16
554:21 600:14
618:21
**sort**  411:14 549:21
567:24
**sought**  537:21
543:24 602:10
604:14
**sounds**  542:8
**south**  365:21
366:7 369:2,4
588:13,14 617:18
**southern**  304:3
**spanish**  544:8
547:5
**speak**  323:14
361:18 424:13
425:4 448:2 632:7
632:9,24 633:3,6
**speaker**  585:21
**speakers**  585:18
**speaking**  330:13
333:6,8 335:17
337:6,12,15
339:22 407:9
412:12 423:25
503:16 603:9,16
610:3
**special**  320:11
325:17 348:6
**specific**  378:3
462:10 502:2
517:20 555:13
557:23 575:12
578:20
**specifically**  322:9
322:12,13,16
323:3,7,12,17
334:2 345:11

346:5 354:5
524:17 548:21
552:13 553:5
**specifics**  620:8
**speculate**  376:16
550:20
**speculation**
356:16 508:5
**speech**  407:12
622:4
**speeches**  407:10
**spelled**  449:23
**spend**  311:16
529:8 553:15,18
554:10 608:18
**spent**  520:2
554:16 555:3,4
**spoke**  322:2 339:3
358:25 412:10,13
420:23 421:5
424:3,25 535:8
558:10 584:21
603:11,13 610:13
621:25 631:20
**sponsors**  585:19
**spread**  553:9
554:3 593:24
**spring**  570:9,12
572:24 573:3
574:6 575:5
**staff**  326:17 327:3
327:5 500:10
521:4,10,12,19,23
522:3 524:20
526:15,24 552:2
554:17 567:6,25
612:20,20
**staffing**  627:3
**staging**  396:16
**stamp**  476:16
493:16 508:22

511:17 520:6
536:8,8 538:16
544:23 578:12
585:6 597:4 613:4
613:6
**stamped**   395:12
437:12,12,13
**stamps**   481:22
511:16 530:17
534:7 538:18
547:15 565:15
582:19 596:11
601:17 610:24
616:21
**stand**   334:22
340:12
**standard**   372:2,3
**standing**   334:13
334:19
**stands**   577:7
**started**   337:20
339:5
**starting**   467:5
478:14 600:10
**starts**   333:12
561:21 562:18
588:2
**state**   304:9,20
305:12 306:4
317:17 318:7
332:16 333:7
422:7 426:6 427:2
503:25 549:25
**stated**   379:25
442:15
**statement**   310:9
310:14,17 334:11
339:20 349:5,8
404:22 406:18
419:16,17 420:14
422:19,21 432:11

545:25
**statements**   338:4
350:7 360:8,14
361:8 435:10
**states**   304:2
381:11 384:12
430:23 432:17
452:10 466:22
467:15,16,22
468:2 472:18
473:25
**stating**   425:15
**status**   455:9,19
510:23
**stenographic**
634:12
**step**   358:11 566:20
**steve**   351:8 352:19
484:17 485:15
496:18
**stood**   335:7 339:4
587:10
**stop**   339:18
387:14 398:19
549:14 588:3,3
627:7
**stopped**   335:22
595:19
**store**   546:2,3
**stored**   348:22
**straight**   433:23
448:14,14 469:6
527:19 533:15
**straightforward**
449:8
**straightforwards**
490:9
**strait**   490:10
**stream**   445:17
**street**   305:15

**stretch**   398:4
472:2
**strike**   430:14
627:18
**strong**   338:21
**student**   370:3,5
375:12,14,19,20
591:20,22 593:12
616:6
**students**   504:21
556:18 559:16
568:24 577:18,21
577:22 578:2
587:20 589:8,12
589:18 593:8
595:2 599:17
600:4,7 602:25
603:10 609:4
615:16
**studies**   346:4
394:4 480:5,13,17
621:9
**stuff**   321:24
322:24 346:19
395:4 475:14,18
**style**   543:4
**subject**   381:9
430:8 440:7 453:8
549:4,9,10 587:3
614:24 616:15
624:15 628:9
633:11
**submit**   340:10
410:21 546:11
580:21 581:6
**submitted**   312:4
313:13 343:7,8,9
343:13,22 385:12
385:16 386:3,8,12
386:13,14 410:23
485:21 489:21

490:4,8 492:24
526:22 529:11,11
529:15 530:8
535:2 539:18
547:8 578:5
579:12 580:25
581:3,4 585:23
598:4,5 602:5
619:7,14 620:3,21
**subscribed**   633:22
638:21
**subsequent**   314:25
423:24
**substance**   420:24
421:6
**substantially**
431:13,15,16
**subversively**
564:9
**succeed**   587:21
**successful**   567:21
**successfully**   627:5
**suddenly**   625:11
627:6
**suggested**   589:25
626:22
**suggesting**   594:4
616:2
**summarize**   332:23
**summary**   311:2,4
336:20 543:8,23
568:9,20 569:6
570:8 572:9
576:21
**summer**   491:17,18
491:23 492:2
493:4 533:5
560:18
**sums**   555:8,11
**superseding**
517:23

**supervising** 504:7
**supplemental** 399:14
**supplementary** 493:24
**supplies** 535:3,4
**support** 484:23 485:9 496:25 504:20 515:6 553:12 587:19 637:2
**supporting** 521:15 521:17 522:22
**supposed** 567:7 632:2
**supposedly** 347:9 347:13 360:13
**sure** 317:2 319:23 324:18,24 326:17 355:23 366:19,22 378:11 380:12 386:20 396:18 405:20 423:19 430:2 434:4 440:12 464:4 482:25 498:21 500:3 501:2 502:9 502:18,20,23 503:5,12 513:8 516:10 518:15 519:25 541:19 548:13 557:14 558:18 559:5,8 562:13 566:2 567:4,11,20,23 568:3 569:23 570:25 576:4 577:6 579:5 588:24 595:25 603:5,13,19 616:9 627:22

**sustained** 399:2 401:3 404:13 405:13 409:4
**sworn** 306:3 419:5 633:22 634:9 638:21
**syllabus** 610:15
**system** 531:12

**t**

**t** 419:2 512:23 513:6 559:13 634:2,2 635:2 636:2
**table** 334:14,18 339:5 353:3
**tabs** 400:5
**tactics** 338:10
**taft** 518:7,9,10,13 518:17,23,25 519:3,17 522:4,8 522:18 524:13,17 525:2,7,9 538:9
**take** 307:17 318:14 327:18 328:2,9,18,18 329:2,8,14,21 331:14,15 336:13 342:8 344:9,16,22 344:25 345:7,16 345:23 350:4 355:5 358:11 377:12,25 398:14 430:14 461:8,11 476:21 499:11,16 499:22 531:18 534:24 545:5 547:21 563:18 565:25 583:2 586:16 599:21 609:4 611:17

**taken** 304:15 321:4 324:6 332:7 377:14 413:12 421:24 452:14 460:16 476:6 566:3
**talk** 349:24 370:10 424:11,23 425:2 558:7 632:21
**talked** 362:24 437:20 485:22 558:5 584:13 590:4 610:5 618:8
**talking** 327:23 350:21 354:15 387:9,18 401:12 419:18 467:5 488:22 523:23 524:5 536:25 566:7 606:17 619:4
**tall** 374:8 375:3,7
**taller** 374:18 375:8
**tap** 560:11,13,19
**tapes** 394:19
**taught** 569:7,12 570:16 572:12 573:4 574:14 575:8 576:24
**tax** 428:8 429:4,17 429:23 430:4,6,15 430:17 549:18,19 549:22,23 550:5 628:12
**taxes** 499:18
**teach** 411:2,16 442:17,23 450:23 457:4 565:5
**teachers** 559:19

**teaching** 388:10 410:4,5 412:3,3 455:25 456:8 562:14,24,24 563:5 564:4 565:2 565:4,6,9 568:23 570:11 626:14
**team** 553:3
**technical** 531:2 564:2
**technically** 464:4 559:11
**telephone** 323:20 324:2
**tell** 321:17 322:13 336:21 341:25 352:21 355:5 358:18 373:16 382:7 391:5 412:15,24 413:9 413:22,25 415:16 422:3 437:16 451:6 472:11 480:21,24 481:2 484:13 509:4 511:25 520:12 531:19,23 534:18 534:22 539:7,10 545:6 547:22 565:23 575:16 578:19 583:2 586:16 596:4 597:11 601:24 614:14 623:6 629:4 631:18
**telling** 328:6 384:4 421:20 422:2 433:15 436:16 452:3 489:6,12 503:2 559:23 561:18 606:13

607:21 609:3,25
**ten**   368:20 377:12
**tens**   354:15 367:2
488:8
**tenses**   544:9
**term**   411:11
532:24 626:10
627:6
**terminated**   413:19
413:23 463:21
**termination**   414:2
**terms**   413:17
553:10 557:15
561:10 572:4
**terrence**   316:20
317:10 352:3
358:5,8,9 359:2
360:3 361:13
436:8,21
**test**   563:18
**testified**   306:5
314:13 344:7
349:3 355:19
361:14 366:6
393:13 394:6
408:2 419:6
426:20 503:4,12
517:6,24 533:19
554:9 577:16
**testify**   503:11
586:6
**testimony**   314:18
314:19 315:20,21
325:9,11,14
326:16 327:25
328:7,16,24 329:7
331:6,13,22 334:3
335:12 338:17
340:9,10 343:24
356:21 358:17
388:9,19,21

391:10 396:17
419:10,14 420:20
470:18 489:11
503:11 515:6,7,15
517:3 523:8
529:18 530:7,14
558:9 616:13
633:9
**thank**   336:3
341:18,19,23
342:5,7 352:24
373:9 432:8
441:17 476:2
492:18 512:25
596:25 628:10,23
629:2,5,12,21
633:8,10
**thanks**   342:8
**thesis**   572:15
**thhat**   503:20
**thief**   351:12
352:13,14,16
**thing**   328:10
337:16 354:13
443:24 444:2
446:25 589:6
**things**   321:4 322:3
322:20 325:25
343:11,16 345:9
354:10 396:2
408:2 440:7
542:15 549:20
559:10 589:7
601:13 620:10,11
**think**   312:11,12
323:6 330:22
335:22,23 365:4
367:12 372:5
392:25 395:13
408:7,9,11 409:15
410:23 415:18,23

417:17,23 421:4
422:19 425:11,16
425:22 431:13
432:6 439:23
443:23 446:15,22
464:3,5,16 479:19
493:15 494:22
514:3,8 525:8
541:18 551:8
554:3 567:25
568:2 575:17,17
596:3 609:22
632:9,15
**thinking**   504:3
529:4
**thinks**   624:4
**third**   309:7 315:2
316:14 354:24
356:24 368:16
379:11,16 456:19
465:9,11,13 484:4
484:8 497:17
536:6,10,19 543:6
543:7 560:10
623:17,20 635:7
**thoroughly**   401:10
**thought**   316:23
524:10,15,18
525:5 547:9
563:17 593:13
594:17 596:24
624:6
**thousand**   592:12
593:20
**thousands**   325:7
354:15 366:24,25
367:2 420:7
434:24 488:8,15
**three**   315:12
346:17 372:4,8
417:14 420:12

455:7 528:17
532:24 533:2
536:11 569:12,14
569:18 570:23
571:4,5 572:19,21
574:7,25 576:10
576:13 577:11
581:25
**threw**   335:7 339:4
**throw**   339:13
**thursday**   614:10
**time**   308:20,22
311:16 318:15
325:23 328:12,12
328:13,14 334:25
341:23 349:15
350:17 352:20
358:12 361:4
382:21 383:8
389:15,20 390:10
390:19 391:8,11
395:12 398:16
403:13,15 408:14
415:19 417:21
420:2 427:9 444:8
447:8 454:7 455:6
461:10 463:10
480:16,25 486:7
493:23 494:6,11
494:24 498:5,8,12
498:13,13,19
501:6,10,18
516:13 517:15
522:10 525:3
540:17 549:5,13
552:15 553:15,17
553:18 554:10,13
554:17 555:3,4
556:16 558:20
559:2,4,8 560:6
561:4 564:14,16

| | | | |
|---|---|---|---|
| 564:17,17,20 | 500:17,22 563:12 | **transparently** | **try** 390:9 433:23 |
| 565:7 569:8,14 | 633:2 | 531:7 | **trying** 385:19 |
| 570:12 571:4,4,12 | **tomorrow** 451:10 | **transportation** | 390:17 391:25 |
| 572:18 574:7,25 | **top** 337:6 368:17 | 584:2,25 | 432:4 449:3 564:2 |
| 576:10,11,14 | 372:17 374:21 | **trashed** 326:6 | 589:4 |
| 577:11,12 584:8 | 404:21 452:8 | 395:2 396:2,17 | **tuesday** 618:25 |
| 584:16,16,18 | 456:4 483:10 | 406:21 | 619:3 |
| 589:16 590:15 | 512:11 513:18 | **trauma** 408:7,12 | **tumaniro** 426:21 |
| 594:23 608:18 | 514:16 519:18 | **traumatic** 406:24 | 426:23,24 |
| 611:6,9 626:9,12 | 531:14 540:4 | **travel** 531:4 | **turkey** 588:4,9,12 |
| 627:23 629:15 | 576:3 595:8 | 577:20 579:11,21 | 588:15 |
| 630:25 633:14 | 599:23 610:16 | 583:6,11 599:5,13 | **turn** 417:13 |
| **times** 324:2 382:9 | **topic** 549:7 | 602:6 604:11 | 439:16 585:18 |
| 389:14 | **total** 488:24 489:5 | 606:23 607:2 | **turned** 417:7 |
| **tipping** 599:9,12 | 489:13 498:16 | 612:13 614:15,19 | **turning** 597:14 |
| **tired** 398:3,18 | 530:13 592:15 | 615:5 616:3 | **twice** 464:19 |
| **title** 309:6 401:14 | 598:18 600:24 | 619:10 620:10,23 | **two** 313:9 314:14 |
| 412:6 551:21 | 604:10 | 622:5,6 | 333:9 352:14 |
| **titled** 307:11 310:8 | **totally** 334:12 | **trial** 428:12 | 358:3 370:20 |
| 311:14 354:24 | 335:18 338:5 | **tricked** 427:16 | 371:7,12,18 372:6 |
| 361:22 377:21 | 380:12 492:15 | **tricking** 427:8 | 372:6,7,13,16 |
| 400:17 549:5 | 577:25 586:4 | **tried** 564:5 | 376:18 393:18 |
| **titles** 517:18 | **touch** 478:4 620:7 | **trip** 579:13,18 | 394:21 395:6,9 |
| **today** 328:17,25 | **tour** 599:11 | 580:4,23 581:8 | 397:21 399:9 |
| 329:2 338:23 | **track** 611:6 | 582:9 583:16 | 423:8 433:21 |
| 339:9 344:8 | **train** 584:2,25 | 585:2 588:12 | 441:12 478:12,13 |
| 398:17 408:8 | **trainer** 554:5 | 594:25 598:7,15 | 536:11 541:23 |
| 409:13 444:3 | **training** 551:5,6 | 598:23 599:18 | 558:22 565:10 |
| 474:14 533:19 | 551:24,25 552:25 | 601:3,8 602:7,12 | 566:6 569:23 |
| 587:9 606:13 | 553:22 554:7 | 604:23 605:16,20 | 576:3,25 577:3 |
| 611:7,8 613:24 | **transactions** 543:8 | 609:5,8 610:2,12 | 592:2 604:3 |
| 629:7 | 543:23 | 618:14 | 613:15 626:5 |
| **told** 321:24 326:9 | **transcript** 339:22 | **trips** 577:17 578:7 | **type** 347:15 |
| 333:6 337:9 | 435:6 | 599:7,8,8 614:19 | 533:15 |
| 349:15 350:19 | **transcription** | 615:14,18 | **typing** 631:14 |
| 352:9,13,19 354:2 | 634:11 | **true** 338:18 380:4 | |
| 357:19 358:4,19 | **transferred** | 422:5 609:21 | **u** |
| 360:2 361:7,9 | 614:20 | 634:11 | **u.s.** 603:12 |
| 424:4,13,14,24 | **transparent** | **trustees** 511:7,9 | **ucra** 523:5 525:14 |
| 426:8 427:15 | 558:24 | 511:12,13 | 525:17 526:5,9 |
| 457:2 471:9,11 | | | 527:9 528:2 |
| | | | 529:19 532:19,23 |

533:10,18,21
535:20 539:21
546:14
uct 560:15,19
uh 311:10 368:6
384:24 385:23
387:22 430:21
438:14 442:8
457:17,21 461:19
462:12 479:13
539:11,22 581:16
unable 345:4
415:9
unaware 473:9
uncompensated
493:25
undergraduate
375:14 569:25
570:2,25 573:11
573:12,14 593:17
undermine 625:14
understand
312:13 324:10
336:8 343:25
358:18 381:19
390:18 391:25
393:3 412:18
431:2,25 433:19
434:18 446:21
448:22 463:18
480:12,18 554:18
554:22 558:12,21
561:23 588:18
592:9 594:10,11
594:18 632:10
understanding
316:24 317:7
321:8,12 352:3
417:9 431:19
469:14 483:4
494:9 497:20

502:25 509:8
510:17 529:9
546:25 549:23
550:2 554:15
555:2,9 556:3,9,13
559:22 561:17
588:7,10 590:25
591:18 615:4
616:8 622:12
632:5,11,12
635:24
understood
312:12 330:16
331:2 594:3
underwent 551:24
552:24
unemployment
414:12,23 415:6
415:24 416:2
unfortunately
534:8
unidentifiable
395:2
unit 526:9 612:15
united 304:2
university 318:8
409:19 410:3
413:12 452:15,22
468:25 469:10
470:7 522:25
525:15,22 526:9,9
553:12 561:2
563:9 571:25
603:2,4,5,7,17
619:21 620:25
621:6,22 625:9
university's
621:10
unknown 395:4
unprofessional
334:13

unrelated 482:15
615:19
unresponsive
323:16
unsuccessful
460:22
upheld 414:2
upper 499:4
501:19 536:15
537:14
upset 338:10
353:5
urban 559:18
617:17
urgency 627:14
urgent 627:13
urgently 627:10
627:11
use 331:23 351:11
351:13 383:8
385:4 388:2
389:18,20 390:15
390:23 391:8
414:18 431:11
505:15,19 506:2
506:15 509:24
589:20 612:21
628:12
users 556:15
usually 549:20

**v**

v 440:10 638:3
vague 329:23
338:6
various 375:17
421:17 438:4
483:23 526:3
529:12 535:4
571:23 577:17
603:16 629:17

venezuela 595:2
598:7 599:25
601:4 602:7 609:5
venezuelan 603:12
617:13 620:9
veras 621:12
verb 544:8
verbal 410:15,17
412:21
verbally 563:21
verification
378:19 379:21
380:9 465:20
466:5
verified 436:13
verify 380:14
veritext 638:2
vermont 543:12
version 312:8
vertical 374:5,6,8
vice 484:17 506:6
515:13
video 387:7,8
397:2 436:18,20
451:8 452:20
videos 387:10,12
387:16 392:18
393:10,12,17,18
393:21,24 394:5
394:10,13,18,21
395:6,10,15,18,21
396:15 431:19,21
437:19 450:17
451:11
view 337:25 353:3
viewed 625:11
viewpoint 395:22
visit 618:19
vms 304:4
voice 352:23

**volumes** 326:3
**voluminous**
  354:14 359:7
  482:24
**vote** 628:6,8

**w**

**w** 306:2 419:4
  428:8 429:4
  449:23
**wait** 331:18 428:3
  455:6 516:23
  523:6,6 539:11
  560:13,18 606:16
**waiting** 480:4
**waiving** 381:9
  517:21
**wall** 366:5 367:23
  373:5 374:5,5
  376:5
**walls** 365:22
**want** 308:12
  316:14 318:6
  321:16 322:25
  339:19 341:7
  351:6 353:20
  364:8,13 366:11
  382:2 383:25
  398:6,18 399:11
  403:2 423:10
  425:7 426:14,17
  430:25 482:24
  503:17 523:8,11
  539:6 566:5 569:3
  578:3 595:19
  596:17,18,21
  597:2 623:22
  630:17,21
**wanted** 324:7
  411:16 425:9
  546:10 559:7
  560:6 588:4,18

622:18 626:10
630:10,22 632:16
**wants** 631:6
**wasted** 398:16
**waswhether**
  421:15
**watch** 566:18,24
  567:8
**way** 318:6 338:17
  341:3 364:13
  407:16 409:25
  481:14 482:10
  487:8 527:13,18
  527:23 553:11
  556:22 559:9
  562:17 576:7
  611:5 614:21
**ways** 588:22
  591:15
**wednesday** 449:18
  621:5
**week** 456:6,13
  560:12 620:25
  625:19,20
**weekly** 566:17,23
  567:4,11,14
**weeks** 424:4 554:2
  631:18
**weight** 345:4
**went** 322:21
  345:10 346:4
  396:24 423:17
  506:18 507:11,17
  507:18,22 510:2,5
  515:11 516:4
  523:13,20 556:14
  577:17 584:18
  588:11 599:17
  615:14
**west** 367:22 369:2

**whatsoever**
  359:11
**wide** 374:8,25
  375:2 526:9,10
  571:25 573:16,19
  590:16,24
**wife** 430:10,15
**wife's** 318:16
  319:7 321:20
  322:10 326:12
  346:12,24
**wills** 357:20 358:4
  358:12,13 359:2
  360:2 361:12,13
**wilson** 304:6,15
  306:1,7 307:1,10
  307:13,16 308:1
  309:1,2 310:1
  311:1 312:1 313:1
  313:17 314:1
  315:1 316:1 317:1
  318:1,10,17 319:1
  320:1 321:1 322:1
  323:1 324:1 325:1
  326:1 327:1 328:1
  328:2 329:1 330:1
  331:1,6 332:1
  333:1,5 334:1
  335:1 336:1,25
  337:1,5 338:1
  339:1 340:1 341:1
  342:1,12,13 343:1
  344:1 345:1,18,19
  345:20 346:1
  347:1 348:1 349:1
  350:1 351:1 352:1
  352:8 353:1 354:1
  354:23,25 355:1,3
  355:4 356:1 357:1
  357:21,21 358:1
  359:1 360:1 361:1

361:21,23 362:1,2
363:1 364:1,25
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1,15,19,20
378:1 379:1 380:1
381:1 382:1 383:1
383:8 384:1 385:1
385:17 386:1
387:1 388:1 389:1
390:1,10 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
400:17,23 401:1
402:1,9 403:1,20
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1 412:1
413:1 414:1 415:1
416:1 417:1 418:1
419:1,9 420:1
421:1,14 422:1
423:1 424:1 425:1
426:1 427:1 428:1
429:1 430:1 431:1
432:1,13 433:1,14
434:1 435:1,7
436:1 437:1 438:1
439:1 440:1 441:1
441:14 442:1,17
443:1 444:1 445:1
446:1 447:1 448:1
448:13 449:1
450:1 451:1 452:1
453:1 454:1 455:1
455:11 456:1
457:1 458:1 459:1
460:1 461:1 462:1

| | | | |
|---|---|---|---|
| 463:1 464:1 465:1 | 554:1,8,19,20 | 637:1 638:1,3,4,20 | **witnesses'**  638:4 |
| 465:10 466:1 | 555:1 556:1 557:1 | **window**  364:16 | **woman**  351:22,24 |
| 467:1 468:1 469:1 | 558:1 559:1 560:1 | 365:6,7,10,18,21 | **won**  628:4,5 |
| 470:1 471:1 472:1 | 561:1 562:1 563:1 | 368:13,23 369:6 | **wondering**  482:17 |
| 473:1 474:1 475:1 | 564:1 565:1,14,18 | 369:13,20 | **wooden**  372:9 |
| 476:1,7,11,17,20 | 565:21,22 566:1,5 | **winter**  513:25 | 373:5 462:11 |
| 477:1 478:1 479:1 | 566:13 567:1 | 514:20,21,23,24 | **word**  312:12,13 |
| 480:1 481:1,24 | 568:1 569:1,2 | **witchhunt**  564:10 | 313:6,10 350:8,10 |
| 482:1,3 483:1 | 570:1 571:1 572:1 | **withdraw**  343:10 | 350:16,20 351:2 |
| 484:1 485:1 486:1 | 573:1 574:1 575:1 | **withdrawn**  322:5 | 351:12 352:10 |
| 487:1 488:1 489:1 | 576:1 577:1 578:1 | 346:21 410:11 | 356:2 432:2 |
| 490:1,8 491:1,5,11 | 578:11,14,17,18 | 491:25 523:25 | 523:15 604:4 |
| 492:1,5,7,20,22 | 579:1 580:1 581:1 | 528:13 615:13 | 607:18 |
| 493:1 494:1 495:1 | 582:1,18,21,24,25 | **withheld**  516:14 | **words**  306:12 |
| 496:1 497:1 498:1 | 583:1 584:1 585:1 | 517:10 | 349:17 350:5,14 |
| 499:1 500:1 501:1 | 585:8 586:1,14 | **withholding** | 352:14 382:22 |
| 502:1 503:1,19 | 587:1 588:1 589:1 | 499:17 | 383:8 384:3 388:2 |
| 504:1 505:1 506:1 | 590:1 591:1 592:1 | **withholds**  499:18 | 389:5,15,20 |
| 506:24 507:1 | 593:1 594:1 595:1 | **witness**  307:15 | 390:15,24 391:6,8 |
| 508:1,10,20,23 | 595:11 596:1,10 | 312:23 313:2 | 391:12 422:13 |
| 509:1,2 510:1,8 | 596:14 597:1,6,9 | 332:6 333:3 | 431:12 433:21 |
| 511:1,15,20,23 | 597:13 598:1 | 335:11,20 336:14 | 467:10 468:18 |
| 512:1 513:1 514:1 | 599:1 600:1 601:1 | 361:25 377:24 | 571:6 607:22 |
| 515:1 516:1 517:1 | 601:17,19,22,23 | 396:17 399:23 | **work**  312:5 406:20 |
| 518:1 519:1 520:1 | 602:1,4 603:1 | 428:4 437:9,23 | 429:20 487:20 |
| 520:5,7,10 521:1 | 604:1,14,18 605:1 | 476:19 482:2 | 494:2 497:25 |
| 522:1 523:1,9 | 606:1,2 607:1 | 508:25 511:22 | 504:22 507:15 |
| 524:1 525:1 526:1 | 608:1,25 609:1 | 516:22 520:9 | 514:5 519:24 |
| 527:1 528:1 529:1 | 610:1,16 611:1,2 | 531:21 534:15 | 546:2 547:7 |
| 530:1,16,19 531:1 | 611:17 612:1 | 538:21,24 545:3 | 558:19,25 559:3,6 |
| 532:1 533:1 534:1 | 613:1,8,11 614:1 | 547:19 565:20 | 560:24 561:3,9,12 |
| 534:5,13,16,17 | 615:1 616:1,20 | 578:16,22 582:23 | 561:14,16 564:19 |
| 535:1 536:1 537:1 | 617:1,2,5,6,15 | 585:10 596:16 | 564:23,25 567:18 |
| 538:1,15,19,22 | 618:1 619:1 620:1 | 597:8 601:21 | 569:15 571:13 |
| 539:1,5 540:1 | 621:1 622:1 623:1 | 611:4,5 613:10 | 592:15 593:17 |
| 541:1,6 542:1 | 624:1 625:1 626:1 | 617:4 624:2 | 594:21 599:25 |
| 543:1 544:1,22,25 | 627:1 628:1 629:1 | 632:23 634:8 | 600:4 612:17 |
| 545:1,4 546:1 | 629:14,21 630:1 | **witnesses**  326:9 | 615:15 621:13 |
| 547:1,14,17,20 | 631:1,2 632:1 | 327:15 362:9 | 626:8,15 627:9,11 |
| 548:1 549:1 550:1 | 633:1,20 634:1,9 | 425:13,23 | 627:12 |
| 551:1 552:1 553:1 | 635:1,4 636:1,4 | | |

**[worked - zwiebach]**                                                          Page 53

**worked**  358:15
540:25 563:7
587:16
**worker**  326:13
328:5 329:5
351:19 358:15
386:25 395:20
396:10 406:4
484:16,24 487:6
488:19 491:9
494:24 497:3
505:16,19 506:3
506:15,21 507:11
507:16 509:9,25
510:3,20,23
521:22 524:7
569:16 571:11,12
572:20 576:15
577:19,23 580:16
591:21 595:3,22
600:2,6,16,25
615:15 616:6
**workers**  405:23
414:12 416:8
**working**  351:25
367:4 518:22
519:7 563:15
568:4
**workload**  568:9
568:20 570:8
572:9 576:21
**write**  319:2 358:7
366:15 373:8
482:19 499:13,15
542:21,22,25
630:12
**writing**  318:17,24
410:22 411:3,4,5
451:24 626:3
**writings**  375:22

**written**  324:3,12
410:12 411:18
412:14,22 438:17
438:24 439:6
594:14
**wrong**  327:21
364:15 425:12,17
425:23 426:2,9
427:14,14 536:22
620:5
**wrote**  606:14

**x**

**x**  304:5,11 365:15
371:3 574:18
577:7 607:17,22
635:2 636:2

**y**

**year**  315:12
360:16 458:9
497:23,24 513:25
514:21,23,24
528:17,23 529:3
531:22 532:24,25
533:12,14 563:21
572:10 595:7,9
606:24
**years**  308:4 323:5
368:20 373:13
375:13 376:22
406:19 417:14
427:5 428:11
429:5 486:10
488:23 494:6
505:20 527:16
533:3 543:20
545:15 562:6
**yesterday**  306:9
306:11 326:23
338:23 339:9
344:7 349:3,10

364:11,23 365:8
366:6 367:12
393:13 399:13,19
400:19 423:14,24
426:22 471:4
489:15 505:10
562:5
**yong**  304:17 305:4
305:8
**york**  304:3,9,18,18
304:21 305:7,7,12
305:16,16 306:4
317:18 318:8,8
332:16 426:6,25
502:14,17,21
503:6,22 508:16
509:10 510:19
537:18 538:5
555:25 556:6

**z**

**z**  449:23 512:23
513:6
**zaromatidis**
304:19 634:6,23
**zero**  328:10
348:12
**zwiebach**  363:7,8
442:10 447:4,21
448:3,7,10,16
449:20,22 452:10
459:3 463:5,14
464:11 477:11,13
478:8 479:2
495:11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.